IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN, MILWAUKEE DIVISION

```
SAM HADAWAY,                            )
                                        )
          Plaintiff,                    )
                                        )
     vs.                                )     No.
                                        )
CITY OF MILWAUKEE,                      )
CARL BUSCHMANN, JAMES DEVALKENAERE,     )
ROBERT SIMON, and OTHER AS-OF-YET       )
UNKNOWN EMPLOYEES OF THE                )
CITY OF MILWAUKEE,                      )
                                        )
          Defendants.                   )     JURY TRIAL DEMANDED
```

## COMPLAINT

1.   Plaintiff Sam Hadaway was wrongly imprisoned for a murder that he did not commit.

2.   At the time of his arrest, Mr. Hadaway was a young man with severe cognitive and intellectual disabilities. He also had cerebral palsy, which made the left side of his body very weak, and a seizure disorder, for which he took medication.

3.   Rather than investigate the murder, the Defendants short-circuited the process: They exploited Plaintiff's vulnerabilities and threatened and coerced him into giving a fabricated statement falsely inculpating himself and his once-co-defendant, Chaunte Ott, into the murder of Jessica Payne.

4.    The Defendants also withheld from Plaintiff exculpatory evidence that would have conclusively proven who the real perpetrator was: serial killer, Walter Ellis.

5.    Plaintiff served out his almost five-year sentence, but never gave up on proving his innocence. Eventually, the Wisconsin Innocence Project took up his cause, and in 2018, his conviction was overturned.

6.    This lawsuit seeks redress for his injuries.

### Jurisdiction and Venue

7.    This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

8.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to this Complaint occurred in this judicial district.

### Parties

9.    Sam Hadaway is a 44-year-old father of three, who was born and raised in Milwaukee, Wisconsin.

10.    Defendants Carl Buschmann, James DeValkenaere, Robert Simon, Percy Moore, and Michael Dubis, are current or former police officers with the City of Milwaukee Police Department. Each of the Defendant Officers is sued in his individual capacity, and each acted under color of law and in the scope of

his employment in engaging in the actions alleged in this Complaint.

11.  Defendant City of Milwaukee is a municipal entity that employs or employed the Defendant Officers, including the as-of-yet unknown Defendants.

## Facts

### *The Murder*

12.  On August 26, 1995, 16 year-old Jessica Payne and 13 year-old Rebecca Morrison were arrested by the South Milwaukee Police Department for fighting with another girl. Fearing the consequences of their arrest, Ms. Payne and Ms. Morrison ran away from home.

13.  The two girls decided to go to North Milwaukee. At some point, they ended up at a house at which prostitution and drug-sale activities were present.

14.  Sometime that same night, Ms. Morrison and Ms. Payne got into a yellow Cadillac with four black men: Terrance Wallace, Johnnie Jones, Delon Russell, and Deshay Cox. When the six of them arrived at a friend's house, Ms. Morrison agreed to go inside.

15.  Ms. Payne, however, wanted to go home. According to Mr. Wallace, he dropped Ms. Payne off at the corner of 17th Street and Center Street. Her subsequent whereabouts, movements, and interactions until she was killed by Mr. Ellis are unknown.

3

16.  Four days later, on August 30, 1995, the body of Jessica Payne was discovered under a mattress behind an abandoned house. Her throat was slashed, her t-shirt was partially pushed up, and her pants were pulled down to knee-level.

17.  The Medical Examiner determined that Ms. Payne may have been sexually assaulted before she died. As a result, a rape kit was collected.

### *The Police Investigation*

18.  Approximately one month after Ms. Payne's body was found, an inmate at the Milwaukee County Jail reportedly told authorities that a 17-year-old named Richard Gwin was involved in the murder of a young white woman.

19.  Thereafter, the Defendant Officers arrested and interrogated Mr. Gwin. During that interrogation, the Defendant Officers coerced Mr. Gwin into falsely identifying someone they could arrest for the crime. As a result of improper and undue pressure by the Defendant Officers, Mr. Gwin gave a statement falsely implicating himself and two others—Plaintiff and Chaunte Ott—in Ms. Payne's murder.

20.  Prior to Mr. Gwin's death, he confessed to his sister that the coerced statement he gave to the police about the Payne murder was absolutely false. In truth, neither of Mr. Gwin, Mr. Hadaway nor Plaintiff had anything to do with the Payne murder.

4

*Plaintiff's Coerced Confession*

21.  After speaking to Mr. Gwin, the Defendant Officers then interrogated and arrested Plaintiff. That interrogation occurred over the course of multiple days and included coercive techniques that shock the conscience.

22.  As noted above, Plaintiff was a particularly vulnerable individual. He had significant cognitive and intellectual disabilities that made it hard for him to read and write. In addition, he was born with Cerebral Palsy, which left the left-side of his body very weak. He also had a seizure disorder for which he took medication. He communicated all his limitations and his need for medicine to the Defendant Officers, but this information fell on deaf ears.

23.  Rather than accommodate him, and provide him with his needed medication, the Defendant Officers exploited his vulnerabilities and coerced and threatened him into making a false statement.

24.  Among other methods used, the Defendant Officers yelled at him, threw chairs and other items at him, and hit the table.

25.  The Defendant Officers refused to provide Plaintiff with his seizure medication notwithstanding the fact that Plaintiff alerted them to the fact that he needed it.

26.   During his interrogation, the Defendant Officers also threatened Plaintiff. In particular, the Defendant Officers threatened that if Plaintiff did not falsely implicate Mr. Ott in the Payne murder, then they would put the murder on Plaintiff and make sure he got 80 years, or words to that effect. By contrast, the Defendant Officers also told Plaintiff that if he falsely inculpated Mr. Ott, they would make sure he got a plea deal and only served five years in prison.

27.   The Defendant Officers also repeatedly threatened that Plaintiff would be raped in prison unless he went along with their plan.

28.   In addition, the Defendants also isolated Plaintiff from his family during his multiple-day interrogation, which began on October 24, 1995 and continued through October 27, 1995, and then Defendants again interrogated Plaintiff again on November 1, 1995.

29.   Scared for his life, Plaintiff ultimately succumbed to the coercion and made a false statement implicating himself and Mr. Ott in the murder of Ms. Payne.

30.   To make the false and fabricated statement appear more credible, the Defendant Officers fed Plaintiff facts about the murder. For example, the Defendant Officers told Mr. Hadaway that the victim was found on a mattress and that she had her neck slashed.

***The Defendant Officers Withheld Exculpatory Evidence***
***That Demonstrated that Walter Ellis was the Murderer***

31.   In addition to coercing Plaintiff into falsely confessing to a crime that he did not commit, the Defendant Officers also withheld exculpatory evidence that demonstrated that serial killer Walter Ellis was responsible for Ms. Payne's murder.

32.   For example, around the time of Ms. Payne's murder, the Milwaukee Police Department was investigating a possible link among several unsolved female homicides due to the similarities among the homicides, including the demographic of the victims, the locations of the bodies and the manner in which they were killed.

33.   In particular, shortly after Payne's homicide but before Plaintiff's conviction, MPD Detective Eric Moore was assigned to review 32 unsolved female homicides between 1980 and 1995 for a possible connection among them and to determine if there was physical evidence to submit for DNA testing. Moore identified 5 cases in particular that should be prioritized for DNA testing, including Payne's murder, and two other women who were killed in the months just preceding Payne's murder—Shelia Farrior and Florence McCormick, all of whom were ultimately linked to Ellis. Moore documented this in a report ("Moore

7

Report"), which he submitted to his supervisors on or about January 9, 1996.

34. The Moore Report was never provided to Plaintiff before his plea.

35. Nor was Plaintiff made aware of other exculpatory evidence that the Defendants had in their possession prior to his plea, all of which pointed to Walter Ellis.

36. For example, during the criminal investigation into the Payne homicide, the Defendant Officers spoke with a witness, Latonia Cooper. Ms. Cooper had been with Ms. Payne earlier in the evening on the night Ms. Payne was murdered.

37. The Defendant Officers showed Ms. Cooper a picture of Walter Ellis. Although Ms. Cooper did not know Mr. Ellis by name, she identified him as someone who might be involved in Payne's murder because Ms. Cooper saw Mr. Ellis with Ms. Payne on the night of Ms. Payne's murder.

38. The Defendant Officers either never memorialized the exculpatory information that Ms. Cooper provided to them in a report, or wrote it down but never disclosed it to the prosecutor. Indeed, to the extent that the Defendant Officers wrote the information down, they did so in a separate "file"—a steno pad containing exculpatory evidence that they destroyed rather than ever provide to the prosecution or defense.

8

### Plaintiff's Plea

39.  Unaware that the Defendant Officers had evidence linking Payne's homicide to serial killer Walter Ellis, and scared into giving a false confession and fabricated statement, on March 4, 1996, Plaintiff pled guilty to attempted robbery.

40.  Just as the Defendant Officers had promised, Plaintiff was sentenced to five years in prison.

41.  The factual foundation for the plea was Plaintiff's false confession.

42.  As a condition of his plea agreement, Plaintiff had to repeat his false confession at Mr. Ott's criminal trial. Mr. Ott was convicted of the murder of Jessica Payne, and sentenced to life in prison.

### DNA Testing Confirms Ellis is Ms. Payne's Killer

43.  In 2002, the State conducted DNA testing on the forensic material in the Payne homicide. The State was able to generate a DNA profile from the semen on the vaginal swabs taken from Ms. Payne; that profile did not match Mr. Ott, Mr. Gwin or Plaintiff, or any of the four men with whom Ms. Payne interacted in the yellow Cadillac.

44.  On information and belief, about one year later, or on or about May 19, 2003 at the latest, the Wisconsin State Police Crime Laboratory ran the male DNA profile generated from the evidence in Ms. Payne's murder through the Casework and

9

Convicted Offender Indices of the Wisconsin Databank. In doing so, the State Police established that the DNA profile from Ms. Payne's murder matched a DNA profile from the murder of Joyce Mims. Ms. Mims had been found dead on or about June 20, 1997, and her body, like Ms. Payne's, was left in an abandoned building just a few blocks away from where Ms. Payne's body was found.

45. Although the Defendant Officers were informed of the match between the DNA profile in Ms. Payne's and Ms. Mims' murders not later than 2003, this exculpatory evidence was not disclosed to Plaintiff, who remained convicted for the Payne murder—or even to Plaintiff's co-defendant, Mr. Ott, who remained both convicted and imprisoned.

46. No later than June 13, 2007, the State police discovered that the DNA profile generated from the forensic evidence in the murder of Ouithrean Stokes also matched the profile developed in the Payne and Mims case. Ms. Stokes had been found dead in an abandoned building in April 2007, just a few houses away from where Ms. Payne's body was found.

47. Ultimately, in 2009, the State was able to match Mr. Ellis' DNA profile to the unknown male DNA profile developed from the evidence in the Stokes, Mims and Payne cases. Indeed, all told, through DNA, the State linked each of the following ten cases to Mr. Ellis:

a. In October 1986, Deborah Harris was strangled to death. Her body was found in a river.

b. Also in October 1986, Tanya Miller was strangled to death. Her body was found between an abandoned house and a garage.

c. In November 1992, Irene Smith was stabbed and strangled to death. Her body was found in an alley.

d. In October 1994, Carron D. Kilpatrick was stabbed and strangled to death. Her body was found in a garbage truck.

e. In April 1995, Florence McCormick was strangled to death. Her body was found in the basement of a vacant home.

f. In June 1995, Sheila Farrior was strangled to death. Her body was found in a bedroom inside a vacant home.

g. In August 1995, Jessica Payne was found stabbed to death. Her body was found under a mattress behind an abandoned house.

h. In June 1997, Joyce Mims was strangled to death. Her body was found in an abandoned building.

i. In February 1998, Marietta Griffin was strangled to death. Her body was found in an abandoned garage at 3033 North 7th Street in Milwaukee.

11

j. In April 2007, Ouithrean Stokes was strangled to death. Her body was found in a vacant building.

48. In each of the above-mentioned cases, the victims were found in a small geographic area on the North side of Milwaukee. Indeed, Walter Ellis became known as the "North Side strangler."

## Chaunte Ott Exonerated

49. Based on some of the early DNA testing, in 2007, Mr. Hadaway's co-defendant, Chaunte Ott, petitioned the court to vacate his conviction.

50. Mr. Ott's conviction was ultimately vacated and the State of Wisconsin declared that he was wrongfully convicted of Ms. Payne's homicide.

51. Following his exoneration, Mr. Ott brought a lawsuit against the City of Milwaukee and the same Defendant Officers sued here. That lawsuit, *Ott v. City of Milwaukee*, No. 09-c-870, the City of Milwaukee and the Defendants settled Mr. Ott's case for 6.5 million dollars.

## William Avery Wrongful Conviction and Exoneration

52. William Avery was also wrongfully convicted of the 1998 murder of Marietta Griffin, another one of Walter Ellis's victims.

53. In Mr. Avery's case, two Milwaukee homicide detectives, fabricated a false confession that was used to prosecute and convict Mr. Avery of Ms. Griffin's murder.

12

54. Despite the fact that the MPD knew that there was a likely link between Ms. Griffin's murder and Walter Ellis as of 2009, Mr. Avery had to file a *pro se* petition for DNA testing. That testing implicated Walter Ellis and exonerated Mr. Avery. In May 2010, Mr. Avery was released from prison and four months later, all charges were dismissed against him. Mr. Avery's civil rights case, *Avery v. City of Milwaukee, et al.*, No. 11-c-408, went to trial in 2015. A jury found that the detective defendants fabricated Mr. Avery's confession in violation of his civil rights and also found the City of Milwaukee liable for the defendants' misconduct based on its policy and practice of inadequately investigating homicides, which led to the fabrication of evidence. In *Avery*, the City was the moving force behind the fabrication of a confession and fabricated witness statements. The jury awarded him $1 million dollars in damages.

### *Plaintiff is Exonerated*

55. The Wisconsin Innocence Project agreed to represent Mr. Hadaway.

56. The Wisconsin Innocence Project filed a Writ of Coram Nobis, alleging that the DNA evidence implicating Mr. Ellis in the Payne homicide warranted vacating Mr. Hadaway's plea. In that filing, Plaintiff also explained that his confession was coerced and fabricated by the Defendant Officers.

13

57.   Indeed, Plaintiff's plea was not knowing and voluntary.

58.   On August 14, 2018, the Court of Appeals issued an opinion ordering the Circuit Court to grant Plaintiff's *coram nobis*, vacate his conviction and withdraw his guilty plea.

59.   The charges were ultimately dismissed in October 2019.

### City of Milwaukee's Policies and Practices

60.   The wrongful conviction of Plaintiff was not an isolated incident. Rather, the City of Milwaukee's and the Milwaukee Police Department's policies and practices and inadequate training were the moving force behind the misconduct at issue here.

61.   For example, during the operative time period, detectives were issued "Memo Books," where they were told to keep all pertinent notes about any given criminal investigation. Notwithstanding that policy, however, detectives were using "steno pads" to take notes during witness interviews—notes that would be kept separate from and not a part of the Official Memo Book.

62.   These notes often contained exculpatory information, including about alternative offenders—just as was the case in the Payne homicide investigation. For example, as described more fully above, when the Defendant Officers interviewed Latonia Cooper about the Payne murder, she provided information

14

connecting Mr. Ellis to it; that information was not memorialized anywhere in a Memo Book, but instead on a steno pad and destroyed.

63. These notes and any other accompanying exculpatory evidence were not part of the Official Milwaukee Police Department file for any given homicide. Instead, they were kept separate and destroyed.

64. Policymakers in the City of Milwaukee had notice of this practice. Indeed, during the *Ott* and *Avery* litigation, a Rule 30(b)(6) witness for the City stated that the MPD was aware that detectives were not taking notes in their Memo Books, and that there was no policy or requirement that these notes be disclosed to the prosecutor.

65. Such a policy had obvious problems. As the district court in *Ott* explained, not only could the City be liable under *Monell* for such a policy, but also "it would have been clear to DeValkenaere and Buschmann long before 1995 that creating and then destroying separate notes in an attempt to skirt *Brady* would be impermissible."

66. Nonetheless, the City did nothing to correct the problem; instead, it turned a blind eye to it, acting deliberately indifferent to the rights of other individuals. This led to multiple wrongful convictions, including that of Plaintiff, Mr. Ott and others.

15

67.   In addition, the City had inadequate training. In particular, the City had little to no training on disclosure obligations and *Brady v. Maryland*, notwithstanding the obvious need for such training.

68.   As a result of the inadequate training, disclosures were left to the discretion of individual officers.

69.   This often led to information and documents not being turned over to the prosecutor, which in turn led to the violation of defendant's due process rights—just as occurred here.

70.   Had Defendants disclosed the exculpatory information related to Walter Ellis and his other murders, Plaintiff would not have pleaded guilty to the Payne homicide.

### *Plaintiff's Damages*

71.   Without the Defendants' misconduct, Plaintiff would never have been convicted.

72.   Plaintiff's life was forever damaged. Plaintiff was deprived his liberty even though he committed no crime and was completely innocent.

73.   During his nearly 5 years of incarceration, Plaintiff was detained in harsh and dangerous conditions, which was particularly difficult given Plaintiff's physical and mental disabilities.

16

74. Plaintiff was taken away from his family and friends. He has missed countless experiences and was deprived of the basic, everyday freedoms he deserved to enjoy.

75. For the following two decades, even after his release from incarceration, Plaintiff continued to suffer emotional and physical harm as a result of Defendants' misconduct, which falsely branded him as a convicted murderer.

76. In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, and other physical and psychological effects.

**Count I**
**42 U.S.C. § 1983 – Coerced and False Confession**
**(Fifth and Fourteenth Amendments)**

77. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

78. In the manner described more fully above, the Defendants Officers, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his rights secured by the United States Constitution. The misconduct described in this Count was done using psychological coercion

17

and torture and was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

79.  As described more fully above, the Defendant Officers participated in, encouraged, advised, and ordered an unconstitutional, multiple-day-long interrogation of Plaintiff, who was known to suffer intellectual and physical impairments. Defendants' interrogations eventually overcame Plaintiff's will, causing Plaintiff to make involuntary statements implicating Mr. Ott and himself in the murder and attempted rape of Jessica Payne.

80.  The false statements coerced by the Defendants and attributed to Plaintiff were used against Plaintiff to his detriment in a criminal case. On the basis of these false statements, Plaintiff was convicted.

81.  The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

82.  As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count II
### 42 U.S.C. § 1983 – Due Process

83.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

84.   As described in detail above, the Defendant Officers, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

85.   In the manner described more fully above, the Defendant Officers deliberately withheld exculpatory evidence from Plaintiff as well as fabricated false evidence, including a false confession/statement by Plaintiff, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

86.   The Defendant Officers' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fifth and Fourteenth Amendments. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

87.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with

reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

88.  As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**Count III**
**42 U.S.C. § 1983 – Federal Malicious Prosecution**

89.  Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

90.  In the manner described above, the Defendant Officers, acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that there was no reasonable basis to suspect Plaintiff of the crime, in violation of his rights secured by the Fourth and Fourteenth Amendments.

91.  In so doing, the Defendant Officers caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

92. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

93. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

94. Plaintiff does not have an adequate post-deprivation state tort remedy for his malicious prosecution because Wisconsin Gen. Stat. §893.80(3) caps any damage award Plaintiff has against Defendants at $50,000 and strictly prohibits punitive damages. The damages Plaintiff suffered as result of Defendants' malicious prosecution, including more than two decades of false imprisonment, cannot be adequately compensated under state tort law given the $50,000 cap on any damage award.

## Count IV
### 42 U.S.C. § 1983 – Unlawful Pre-trial Detention

95. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

96. In the manner described more fully above, the Defendants caused Plaintiff to be detained and imprisoned without probable cause. Plaintiff was incarcerated prior to

21

trial, and his incarceration continued until he served his full sentence.

97.   The misconduct described in this Count was undertaken by the Defendants under color of law and within the scope of their employment.

98.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, or with reckless indifference to the rights of others.

99.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**Count V**
**42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights**

100. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

101. After the murder of Jessica Payne, the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

102. In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In

22

addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

103. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

104. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

105. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count VI
### 42 U.S.C. § 1983 – Failure to Intervene

106. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

107. In the manner described above, during the constitutional violations described herein, one or more of the individual Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

23

108. As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. These Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

109. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

110. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT VII**
**42 U.S.C. 1983 – Monell Claims Against the City of Milwaukee**

111. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

112. The actions of all the Defendant Officers were undertaken pursuant to policies and practices of the Department, described above, which were ratified by policymakers for the City of Milwaukee with final policymaking authority. These policies and practices included the failure to adequately train,

24

supervise, and discipline officers who engaged in the alleged constitutional violations, as set forth in greater detail above.

113. The policies and practices described in this Count were maintained and implemented by the City of Milwaukee with deliberate indifference to Plaintiff's constitutional rights.

114. As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

115. The City of Milwaukee is therefore liable for the misconduct committed by the Defendant Officers.

**Count VIII**
**State Law Claim – Indemnification**

116. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

117. Wisconsin law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

118. The Defendants were employees, members, and agents of the City of Milwaukee, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

119. The City of Milwaukee is obligated by Wisconsin statute to pay any judgment entered against the Defendant

Officers in his official capacity, including any punitive damages awarded.

## JURY DEMAND

Plaintiff Sam Hadaway hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

/s/  Heather Lewis Donnell
Attorneys for Plaintiff

Jon Loevy
Arthur Loevy
Gayle Horn
Heather Lewis Donnell
Elliot Slosar
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900