IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| SAM HADAWAY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:19-cv-01106-PP |
| | ) | |
| v. | ) | Judge Pamela Pepper |
| | ) | |
| CITY OF MILWAUKEE, et al., | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## DEFENDANTS' LOCAL RULE 56.1(b)(1) STATEMENT OF UNDISPUTED FACTS

Defendants the City of Milwaukee (the "City"), Carl Buschmann, James Devalkenaere and Robert Simons (with Buschmann and Devalkenaere, the "Individual Defendants"), hereby submit this Local Rule 56.1(b)(1) statement of undisputed material facts in support of their Motion for Summary Judgment and accompanying Memorandum of Law.[1]

### Jurisdiction and Venue

1. Jurisdiction and venue is proper because Plaintiff brings federal claims pursuant to 42 U.S.C. § 1983 and the events giving rise to the alleged claims occurred within this judicial district. (Pl.'s Compl., Dkt. # 1, ¶¶ 10-11).

### Parties and Claims

2. Plaintiff Sam Hadaway is an individual. (*Id.* at ¶ 9.)

3. Defendants Carl Buschmann, James Devalkenaere and Robert Simons are current or former Milwaukee police officers, and are sued in their individual capacities. (*Id.* at ¶ 10.)

4. Defendant the City of Milwaukee is a municipal entity that employs or employed the Individual Defendants. (*Id.* at ¶ 11.)

---

[1] The facts set forth herein are not admitted for any purpose other than to facilitate an analysis under Fed. R. Civ. Proc. 56.

# Undisputed Material Facts

## A. The Death of Jessica Payne

5. On August 26, 1995, 16 year-old Jessica Payne and 13 year-old Rebecca Morrison ran away from home. (*Id.* at ¶ 12.)

6. The two girls went to North Milwaukee, and arrived at a house involved with drug use and prostitution. (*Id.* at ¶ 13.)

7. At some point, Morrison and Payne got into a yellow Cadillac with four black men: Terrance Wallace, Johnnie Jones, Delon Russell, and Deshay Cox. When the six of them arrived at a friend's house, Morrison went inside. (*Id.* at ¶ 14.)

8. Payne, however, wanted to go home. Wallace dropped Payne off at the corner of 17th Street and Center Street. (*Id.* at ¶ 15.)

9. Four days later, on August 30, 1995, Payne's body was discovered under a mattress behind an abandoned house with her throat slashed. (*Id.* at ¶ 16.)

10. A rape kit was collected. (*Id.* at ¶ 17.)

## B. The Murder Investigation

11. From roughly August 30 to October 1995, several Milwaukee Police Department officers investigated Payne's murder. While numerous leads were pursued, a killer was not identified. (Ex. 1 – Jones Decl., p.3.)

12. Around October 20, 1995, Buschmann and Devlakenaere were assigned the Payne homicide as a cold case. (Ex. 2 – Buschmann 2010 Dep., 34:18-35:3; Ex. 3 – 10/27/95 Report, p.1.)

13. One of the remaining leads was to locate a potential suspect known by the name "Cortez." (Ex. 3 – 10/27/95 Report, p.1.)

14. Police obtained the name "Cortez" from a jailhouse informant, who said she heard him say that he had a "white bitch for sale." (Ex. 4 – 10/4/95 Report.)

15. Police eventually identified "Cortez" as Richard Gwin. (Ex. 3 – 10/27/95 Report, p.1.)

C. **Police Interrogation of Richard Gwin**

16. After Gwin was identified, he appeared and was interviewed at the Criminal Investigation Bureau on October 24, 1995. (Ex. 3 –10/27/95 Report)

17. Gwin initially denied any knowledge regarding Payne's murder. (*Id.*at p.3)

18. He was nevertheless taken into custody when he indicated that (i) he knew police wanted to speak to him about the death of a white girl because his mother had told him so, when police had not actually told Gwin's mother why they wanted to speak to him, and (ii) he displayed knowledge of Payne having her throat cut. (*Id.*)

19. Around 4:50 that day, Gwin was interviewed again. (Ex. 5 – 10/27/95 Report.)

20. He again denied having any involvement in Payne's death. (*Id.* at p.1.)

21. However, we added that he heard about the death of a white girl on 7th and Burleigh from his neighbor "Sammy Joe." (*Id.*)

22. He further explained that sometime possibly within the last few months, he had been on his front porch and saw Sammy Joe and who he thought to be Sammy Joe's cousin on Sammy Joe's porch with two white girls. (*Id.* at pp.1-2.)

23. Gwin identified one of the white girls as Payne from Payne's photo. (*Id.*)

24. Gwin saw the women leave Sammy Joe's porch and walk away. (*Id.* at p.2.)

25. Gwin said that about a month later, Sammy Joe told him that one of the girls Sammy Joe had been with had been found behind an abandoned house on 7th and Burleigh with her throat cut. (*Id.*)

3

26. On October 25, 1995, at 12:30 a.m., detectives Valuch and Trudell took Gwin to a hospital for blood, saliva, head hair and pubic hair samples. (Ex. 6 – 10/25/95 Report.)

27. Around 10:00 a.m. that day, detective Simons administered a polygraph test to Gwin in light of his statements that he had nothing to do with Payne's death. (Ex. 7 – Polygraph Report.)

28. Simon determined that Gwin was not being completely truthful and may have knowledge of who killed Payne. (*Id.*)

29. On October 25, 1995, around 5:15 p.m., Gwin was reinterviewed after being administratively released. (Ex. 8 – 10/25/95 Report.)

30. During this interview, Gwin indicated that he had previously seen Payne with two men he referred to as Sammie Joe and Chaunte. (*Id.* at p.1.)

31. He stated that he gave the three of them a ride in his car to a dope house. (*Id.* at p.2.)

32. Gwin said that when they arrived, Sammie Joe, Chaunte, and Payne got out and walked behind an abandoned house while Gwin waited in the car. (*Id.*)

33. According to Gwin, about fifteen minutes later, Sammie Joe and Chaunte returned without Payne. (*Id.*)

34. Gwin stated that when he asked where Payne was, Sammie Joe said she had no money so Chaunte cut her throat. (*Id.*)

35. Gwin recounted that Chaunte also stated that he "did that bitch." (*Id.*)

36. Gwin signed and initialed his statement. (*Id.* at p.3.)

D. **Police Interrogation of Sam Hadaway**

37. Police identified Gwin's neighbor, Sammy Joe, as Plaintiff. (Ex. 9 – 10/26/95 Report.)

38. On October 25, 1995, Plaintiff was arrested in relation to Payne's murder. (*Id.*)

4

Case 2:19-cv-01106-PP   Filed 02/02/24   Page 4 of 11   Document 104

39. Afterwards, Plaintiff was interviewed by several different detectives. (*E.g.*, Ex. 10 – 10/25/95 Report; Ex. 11 – 10/26/95 Report.)

40. Plaintiff eventually stated he and Ott were involved in the murder, and that he saw Ott kill Payne. (Ex 12 – 10/27/95 Report.)

41. Plaintiff claims that he was coerced into falsely giving this statement. (Pl.'s Compl., Dkt. 1, ¶ 3.)

42. After making his statement, Plaintiff was administered a polygraph test by Simons to determine if he was withholding information. (Ex. 13 – Polygraph Report.)

43. After Simons determined deception was indicated, Simons and Buschmann interviewed Plaintiff, at which point he added details to his prior statement, such as holding Payne's hands while Ott searched Payne for money. (Ex. 14 – 11/1/95 Report.)

E.  The Conviction of Chaunte Ott and Sam Hadaway

44. Ott was eventually prosecuted for Payne's murder. (Pl.'s Compl., Dkt. 1, ¶ 42.)

45. Gwin and Plaintiff testified at trial as to Ott's guilt. (Ex. 15 – Gwin trial testimony; Ex. 16 – Hadaway trial testimony.)

46. Neither witness stated that Ott raped Payne. (Ex. 15 – *passim*; Ex. 16 – *passim*.)

47. Ott was found guilty and sentenced to life in prison on March 20, 1996. (Ex. 30 sentencing transcript.)

48. Plaintiff pled guilty to attempted robbery in and was sentenced to five years in prison on October 29, 1996. (Ex. 17 – sentencing transcript, pp. 13, 16.)

49. He was released from IDOC around August 1999. (Ex. 18.)

50. Gwin died afterwards around 1997. (Ex. 19 – Jones Dep., 11:17-19.)

51. Mark Williams was the prosecutor in Hadaway's case. (Ex. 17, p.1.)

### F. Post-Conviction DNA Results

52. In 2003 DNA collected from Payne matched DNA collected from the homicide of Joyce Mims. (Pl.'s Compl., Dkt. 1, ¶ 44.)

53. In 2007 DNA collected from Payne matched DNA collected from the homicide of Outherean Stokes. (*Id.* at ¶ 45.)

54. Eventually that DNA was matched to a man named Walter Ellis, who was later revealed to be a serial killer. (*Id.* at ¶ 47-48.)

### G. The Eric Moore Report

55. In January 1996, detective Eric Moore wrote a report in which he recommended DNA testing in 19 homicides (the "Moore Report".) (Ex. 20.)

56. Payne's case was among them. (*Id.* at p.2.)

57. As to Payne's murder, the Moore Report recommended testing, *inter alia*, Plaintiff's and Ott's DNA against vaginal swabs taken from Payne, even though Ott and Hadaway denied sexual contact with Payne. (*Id.* at pp.7-8.)

58. This testing was recommended by Assistant District Attorneys Gahn and Mark Williams "due to time constraints created by the legislative goal of bringing homicide cases to trial within 90 days." (*Id.*)

59. The evaluation of that DNA testing was "presently being monitored by Assistant District Attorneys GAHN and WILLIAMS." (*Id.* at p.8.)

60. Elsewhere, the Moore Report recommended priority DNA testing "to determine if four relatively recent asphyxiation and/or suffocation Homicides were connected." (*Id.* at p.5.)

61. Payne's murder was not included among those four homicides. (*Id.*)

62. At the time of the Moore Report, police could not link any of the homicides listed therein. (Ex. 21 – Moore 2012 Dep., 17:19-24.)

63. The overall investigative strategy outlined in the Moore Report was developed by conferring with "Assistant District Attorney Norm GAHN, who ha[d] considerable expertise in the application of DNA evidence in criminal prosecutions." (Ex. 20, p.5.)

64. The Moore Report was only addressed to Captain Victor Vernon. (*Id.* at p.1.)

65. Devalkenaere and Buschmann did not see the Moore Report prior to their depositions in Chaunte Ott's civil lawsuit. (Ex. 22 – Devalkenaere 2012 Dep., 44:7-19; Ex. 23 – Buschmann 2012 Dep., 19:10-22.)

## H. Interviews of Latonia Cooper

66. On at least two occasions, police interviewed Latonia Cooper as part of the Payne investigation. (Ex. 24 – 8/31/95 Report.; Ex. 25 – 10/10/95 Report.)

67. Cooper had stayed in the drug and prostitution house that Payne and Morrison were at prior to Payne's death. (Ex. 24. at p.2.)

68. The first memorialized interview was on August 31, 1995, at the Police Administration Building, and was initially with detective Gregory Schuler, and was later joined by detective Michael Young. (*Id.* at p.1.)

69. The second memorialized interview was on October 8, 1995, at the Criminal Justice Facility (CJF, or jail) and was with detectives Devalkenaere and Ken Morrow. (Ex. 25, p.1.)

70. The report of the first interview indicates that Cooper was shown a photo of Payne. (Ex. 24, p.6.)

71. The report of the second interview does not indicate any photos were shown to Cooper. (Ex. 25, *passim*.)

72. When deposed in Chaunte Ott's civil suit against the City, Cooper recalled an interview when she was brought to the police stations and shown several photos, one of which was of Walter Ellis. (Ex. 26 – Cooper Dep., 6:15-16.)

73. She was shown this by one officer, and did not identify who the officer was. (*Id.* at 10:8-11, 32:17-22.)

74. Cooper did not know Ellis's name or address at the time, but recognized him as someone who she believed attempted to "get with" women who were on drugs. (*Id.* at 8:13-14, 9:3-5.)

75. Cooper testified that she told the interviewing officer she believed Ellis and a woman named Sandra Giles – who Cooper knew as a "madam" – had something to do with Payne's death. (*Id.* at 11:1-10, 24:11-17.)

76. Cooper was not asked if she saw Payne and Ellis together, and did not say that she ever saw Ellis hurt Payne. (*Id.* at 14:24-15:2, *passim*.)

77. Instead, Cooper recalled seeing Ellis outside of the house Payne and Morrison were staying at, and was one of several people around the house when she left Payne there. (*Id.* at 14:18-23, 15:5-12.)

78. Cooper recalled that she last saw Payne get into a yellow Cadillac with a group of men. (*Id.* at 40:15-41:13.)

79. It is now known that Ellis was not among those men. (Pl.'s Compl., Dkt. 1, ¶ 14.)

80. Cooper did not know if the officer who showed her Ellis's photo took notes of their discussion. (Ex. 26 – Cooper Dep., 10:22-25.)

81. Devlakenaere did not recall showing her a photo of Ellis. (Ex. 11 – Devalkenaere 2012 Dep., 90:12-15.)

8

I. **Testimony of Teresa Jones**

82. Teresa Jones is the deceased Richard Gwin's sister. (Ex. 19 – Jones Dep., 40:13-19.)

83. Jones testified that shortly after Gwin was released from police custody, he said to her that he "told them what they wanted to hear so I could go home." (*Id.* at 18:8-19:9, 53:12-16.)

84. She never went into detail with Gwin about what he told the police. (*Id.* at 28:8-21:3, 22:9-22, 54:6-14, 69:4-70:3.)

85. She also never discussed with him if he lied to the police, but instead made that assumption. (*Id.* at 53:12-16, 84:15-21.)

86. Jones testified that Gwin was told by officers that he could be a suspect if he did not cooperate. (*Id.* at 23:1-7.)

87. Gwin did not identify which officer or officers told him that, or when they did so. (*Id.* at 23:8-10.)

88. Beyond these statements, Gwin did not tell Jones how he was treated at the police station, and never indicated that the police hurt him. (*Id.* at 22:23-25, 96:8-15.)

J. **The Milwaukee Police Department's Policy on Memo Pads**

89. During the Payne investigation, the Milwaukee Police Department had a policy of requiring officers to record in Memo Books "the names of persons taken into custody by them and such particulars in each case as may be important in the trial thereof…and matters of importance relative to the discharge of their official duties…." (Ex. 27 – Milwaukee Police Department, Rule 4, General Order 4/0800.00(16).)

90. Sometimes Devalkaneare and Buschmann recorded investigatory notes, such as interview notes, in steno pads instead of their Memo Books (which were also notepads). (Ex. 2 – Buschmann 2010 Dep., 50:24-51:5; Ex. 22 – Devalkenaere 2012 Dep., 79:5-80:12.)

9

91. Those steno pads would later be destroyed. (Ex. 2 – Buschmann 2010 Dep., 50:9-20; Ex. 22 – Devalkenaere 2012 Dep., 82:3-23.)

92. However, notes within them would be copied to police reports before the steno pads were destroyed. (Ex. 2 – Buschmann 2010 Dep., 50:9-20; Ex. 22 – Devalkenaere 2012 Dep., 80:24-22.)

93. Buschmann did not recall receive training from the police department regarding his obligations to disclose exculpatory information to prosecutors in criminal cases. (Ex. 28 – Buschmann 2021 Dep., 209:25-210:4.)

94. However, Diane Rowe, who was a Milwaukee Police Department officer at the time of the Payne investigation, testified that she knew that such disclosure was part of the Department's policy. (Ex. 29 – Rowe Dep., 13:11-14:9, 57:1-58:4.)

95. The Milwaukee Chief of Police during the Payne investigation was Philip Arreola. (Ex. 30 – Arreols Non-Disclosure Request.)

96. Arthur Jones was Chief from 1996 to 2003. (Ex. 31 – A. Jones Dep., 28:10-12, 45:7-9.)

97. Nenette Hegerty was Chief from 2003 to 2007. (Ex. 32 – Hegerty Dep., 4:18-22).

**K. Vacated Convictions and Plaintiff's Claims**

98. Ott and Hadaway later had their convictions vacated (Ott in 2007 and Hadaway in 2019). (Compl., ¶¶ 49-50 & 58-59.)

99. Plaintiff brings the following claims: **Count I** – Coerced and False Confessions; **Count II** – Due Process; **Count III** – Federal Malicious Prosecution; **Count IV** – Unlawful Pretrial Detention; **Count V** – Conspiracy; **Count VI** – Failure to Intervene; **Count VII** – *Monell* (against the City) and **Count VIII** – State law indemnification. (*Id.* at ¶¶ 77-119.)

Respectfully Submitted,

By: *s/ Brian Wilson*

    Nathan & Kamionski, LLP
    33 W. Monroe, Suite 1830
    Chicago, Illinois 60603
    312-957-6649
    bwilson@nklawllp.com