# EXHIBIT 1

Dawn Jones LLC
Dawnjonesllc@yahoo.com

July 3, 2023

Brian Wilson, Esq.
Nathan & Kamionski LLP
33 W. Monroe St., Suite 1830
Chicago, IL 60603
312-957-6649

RE:   Sam Hadaway v. City of Milwaukee, et al.

USDC, Eastern District, Wisconsin, Milwaukee Division

Mr. Wilson:

The following report is presented in accordance with your request for my opinions on issues related to this litigation.

### *Background and Qualifications:*

I am a retired law enforcement officer and retired at the rank of Lieutenant in 2019. I worked in various locations within the Milwaukee Police Department including but not limited to the Vice Control Division, Sensitive Crimes Division, Communications Division, and the Prisoner Processing Section.

I have developed courses for law enforcement which include Sexual Assault, Human Trafficking, and Domestic Violence. The target audiences of the presentations include, but are not limited to law enforcement, judges, victim service, community members, defense attorneys, prosecutors, professionals, and youth regarding various topics including sexual assault, domestic violence, human trafficking, bullying, elder abuse, and child abuse. These presentations have been conducted nationally and internationally. I currently create curriculum and provide training for law enforcement and the Enhanced Collaborative Model anti-human trafficking task forces throughout the United States as a Senior Project Manager with the International Association of Chiefs of Police.

I have served as a consultant and subject matter expert witness in cases regarding Domestic Violence, Human Trafficking, and trauma. I have also testified in cases involving police procedures and records. I have been requested as a subject matter expert by prosecutors, defense attorneys, guardian ad litem, and private practice (civil) attorneys.

1

I have a Bachelor of Science degree in Criminal Justice from Capella University. I am a Wisconsin Department of Justice Law Enforcement Standards Board (LESB) certified instructor. I currently am an instructor at the Waukesha County Technical College (WCTC) for the police recruits in WCTC's academy classes. I provide instruction in Cultural Competence.

### *Methodology*

The methodology I use to examine police-related issues involved in litigation is to develop an understanding of the facts, analyze the actions of the officers/department once an understanding of the facts is achieved, compare those actions with accepted standards of training and practices (including department policies and procedures, police training, relevant laws and court decisions, and widely accepted standards and best practices during the timeframe the actions and decisions were made), and ultimately provide an opinion of whether those actions complied with or deviated from acceptable professional standards and practices. This method is commonly used by experienced and respected subject matter expert witnesses in the field of police practice. This method has been used and accepted in the cases that I have participated in.

### *Materials Reviewed:*

Depositions:
- Buschmann Hadaway Deposition (2021)
- Buschmann Ott Deposition (2012)
- Buschmann Ott Deposition (2010)
- DeValkenaere Deposition (4.12.12)
- DeValkenaere Ott Deposition (2010)
- DeValkenaere Ott Deposition (2012)
- Hadaway's Deposition

Reports:
- Autopsy Report
- Section 01 Offense Face & Offense Clearance
- Section 04 Investigative Reports Pages 1-400
- Section 05 Arrest Reports & Juvenile Reports
- Section 08 Physical Evidence
- Section 09 Crime Lab Reports
- Section 11 Medical Examination Reports
- Section 14 Final Deposition Supp.
- Robert Simons' reports
- Report of Dennis Waller to Heather Lewis Donnell (dated 2-6-23)

### **Brief Synopsis Understanding of the Facts:**

On August 30, 1995, at approximately 7:45 a.m. the body of sixteen-year-old Jessica Payne was found behind an abandoned house at 3116 N. 7th Street. Ms. Payne was discovered partially disrobed with her T shirt pulled up near breast level, her bra was torn in the center portion exposing her breasts, and her pants pulled down to about knee level.

According to the medical examiner's report. The medical examiner conducted an autopsy and made the determination that Ms. Payne died from loss of blood due to a 10.0 x 2.5 cm incised wound to the neck which extended to the esophagus and a depth of greater than 3 cm. There were also poorly defined abrasions on the left aspect of the neck. Payne also appeared to have severed branches of both the carotid artery and internal jugular vein system. There was also a slight suggestion of a periorbital ecchymosis on the right upper eye. The sclerae and conjunctivae were free of identified petechiae.

The medical examiner also identified other trauma to the body which includes two small contusions along the medial right costal margin, each measuring 2.0 X 1.0 cm in size; a contusion to the left medial costal margin of the anterior chest wall measuring 1.5 X 1.0 cm; a large contusion over the dorsum of the right hand measuring 6.0 X 4.0 cm; a superficial abrasion on the left groin measuring 10 X .4 cm in size (Probable postmortem artifact); a series of contusions along the right leg anteriorly measuring 5.0 X 3.0 cm, 2.0 X 1.0 cm, 6.0 X 1.0 and 1.5 cm in maximum dimensions respectively superior to inferiorly; two contusions on the left anterior thigh measuring 6.0 X 1.5 cm superiorly and 4.0 X 1.0 cm inferiorly. The medical examiner ordered a complete sexual assault examination which revealed semen was in her vaginal vault; the semen was collected as evidence.

The Milwaukee Police Department conducted a homicide investigation. Numerous detectives followed up on leads and conducted interviews related to potential suspects involved in Ms. Payne's homicide as well as attempting to identify Ms. Payne's activities during the days prior to her death.

Investigators learned that Ms. Payne lived in South Milwaukee and left her home during the late evening hours of August 26, 1995. It was reported that she went to the north side of Milwaukee with her friend, Rebecca Morrison. Information was developed that Ms. Payne and Ms. Morrison stayed in a house on the north side of Milwaukee believed to be used for prostitution and drug sales. Investigative reports revealed information indicating that Ms. Payne was likely involved in the sale of drugs and was given drugs to sell.

During the Payne homicide investigation numerous suspects were interviewed, and/or interrogated, and/or arrested, and their information verified. According to reports many

leads involving various people with potential involvement in Payne's homicide were investigated. Many of the leads did not result in charges for the homicide of Payne by the District Attorney's Office. According to reports the Milwaukee Police Department and investigators continued to follow up on leads. Subsequently Richard Gwin, Sammy Hadaway, and Chaunte Ott were arrested regarding Payne's homicide. Hadaway plead guilty to lesser charges and agreed to cooperate with the prosecution of Chaunte Ott regarding homicide charges for Payne's homicide. Ott was found guilty of homicide at trial.

In 2003 the DNA recovered from Payne's body was linked to the DNA recovered from another victim of homicide. In 2007 the DNA from Payne's vaginal vault was linked to semen recovered from two other homicides victims (Joyce Mims M3340 occurring 06/20/1997, 2 years after Payne's homicide, and Ouithereaun Stokes M4548 occurring 04/27/2007, ten years after Payne's homicide)

## Analysis and Comparison:

For purposes of my analysis, I was provided with the following questions:

1. **Was it consistent with investigative standards and training for the cold-case detectives to have investigated Cortez/Gwin as a possible lead?**

A synopsis of information analyzed is as follows:

***Detective DeValkenare's report dated 09/27/1995:*** Reported that he was assigned to assist with the Homicide investigation of Jessica Payne. He received information that an inmate at the Criminal Justice Facility (CJF) of Milwaukee County wanted to speak to a detective. At approximately 1:40 p.m. he met Inetha Waller (AKA **Antoinette M. Rozzell**, it should be noted that Rozzell is her legal name).

Rozzell told detectives that she was staying with a friend of hers named Charlotte Brown at the end of August of 1995. Earlier that month she met Charlotte's cousin named **Cortez.** She was not sure which night it was, but it was after her birthday on August 23, 1995. She stated that at approximately 7:00 pm Cortez came to Brown's house with two black males (One named T-Bone). Cortez told her that they had a white bitch for sale. He said the girl was with his buddy. She stated that Cortez said after he was done, he was going to get her. Rozzell explained that when Cortez said "after he was done" meant that he came to the house to bag up some dope that he had. Cortez would come to the house, get a plate, and go upstairs. That night he had an 8-ball of crack which he bagged up into thirty dime bags. He left without saying anything.

compared for many people, leads and information was followed up on, and investigative alerts were entered into the system to interview other individuals that may have information regarding this investigation. This investigation did not appear to be rushed due to the thorough investigation of all leads.

9. Did the Milwaukee Police Department train its detectives in 1995 and beyond that investigative information should be documented and provided to the prosecutors?

Opinion:

Yes. I was trained at the Milwaukee Police Department from my time in the academy (09/27/1993) to my retirement date (04/20/2019) that investigation information should be documented and provided to prosecutors. Milwaukee Police Department police officers and detectives were trained that they need to document their investigative efforts so that the information could be shared with the prosecutor. This meant that police officers and detectives were trained and would practice documenting their investigative steps whether the information would be positive or negative for the prosecution's efforts. Ultimately, it was the prosecutor's decision about what discovery materials would be tendered to criminal defense attorneys but the detective training and practice in 1995 and beyond was to provide all investigative materials to the prosecutors so that they could make the legal decision about what needed to be tendered or not tendered.

These opinions are based on my review of the information provided and may change if further information is provided.

Respectfully submitted,

Dawn Jones