# EXHIBIT 2

```
 1                UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF WISCONSIN
    ---------------------------------------------------------------
 3
    CHAUNTE OTT,
 4
                    Plaintiff,
 5
                vs.                  Case No. 09-C-0870
 6
    CITY OF MILWAUKEE, ARTHUR L. JONES,
 7   NANETTE H. HEGERTY, CARL BUSCHMANN,
    JAMES DEVALKENAERE, ROBERT SIMON,
 8   ERIC MOORE, RICKY BUREMS, PERCY MOORE,
    MICHAEL DUBIS and OTHER AS-OF-YET
 9   UNKNOWN EMPLOYEES OF THE CITY OF
    MILWAUKEE,
10
                    Defendants.
11
    ---------------------------------------------------------------
12

13

14             Deposition of CARL BUSCHMANN

15             Wednesday, June 30th, 2010

16
                        10:07 a.m.
17
                           at
18
                  GRAMANN REPORTING, LTD.
19       710 North Plankinton Avenue, Suite 710
                    Milwaukee, Wisconsin
20

21

22

23

24         Reported by Sarah M. Sondag, RPR, RMR

25
```



```
 1                  Deposition of CARL BUSCHMANN, a witness in
 2         the above-entitled action, taken at the instance of
 3         the Plaintiff, pursuant to the Federal Rules of Civil
 4         Procedure, pursuant to notice, before Sarah M.
 5         Sondag, Registered Professional Reporter, Registered
 6         Merit Reporter and Notary Public, State of Wisconsin,
 7         at GRAMANN REPORTING, LTD., 710 North Plankinton
 8         Avenue, Suite 710, Milwaukee, Wisconsin, on the 30th
 9         day of June, 2010, commencing at 10:07 a.m. and
10         concluding at 1:33 p.m.
11    A P P E A R A N C E S:
12             LOEVY & LOEVY, by
                  Mr. Arthur Loevy
13                312 North May Street - Suite 100
                  Chicago, Illinois  60607
14                Appeared on behalf of the Plaintiff.

15             CITY ATTORNEY'S OFFICE, by
                  Mr. Jan A. Smokowicz
16                841 North Broadway, Suite 716
                  Milwaukee, Wisconsin 53202
17                Appeared on behalf of the Defendants.
18
19
20
21
22
23
24
25
```



```
 1          form of the question, it's confusing.  If you can
 2          clear it up just a little bit what you mean.
 3    BY MR. LOEVY:
 4    Q     Do you understand the question?
 5    A     Physical condition, how the body was found?
 6    Q     Yeah.
 7    A     I viewed photographs from the scene.
 8    Q     Okay.  How many photographs did you view?
 9    A     I don't know how many.
10    Q     And you reviewed the coroner's report; is that
11          correct?
12    A     Yes.
13    Q     When you were assigned the case, other than pictures
14          of the -- well, strike that, please.
15                    When you indicated you saw pictures of
16          the scene, did that include pictures of the victim?
17    A     Yes.
18    Q     Other than pictures of the scene and pictures of the
19          victim and the corners' report, what else, if
20          anythings, did you review prior to interviewing
21          anyone with respect to this case?
22    A     When I first received the case, we were just starting
23          up the Cold Case Unit, a Cold Case Unit and Jim
24          DeValkenaere and myself were members of this Cold
25          Case Unit.  So we took this case as a cold case and
```

```
 1         started looking at it, in which case I read every
 2         report I had available to me regarding that
 3         investigation.
 4    Q    Previous to the Payne homicide was there a Cold Case
 5         Unit in the Milwaukee Police Department Detective
 6         Bureau?
 7    A    No.
 8    Q    Was this the first case that the Cold Case Unit was
 9         assigned to?
10    A    This is the first one we adopted.  Yes.
11    Q    For the whole unit or just you and --
12    A    Jim and I.  Jim DeValkenaere.
13    Q    Who else was a member of the Cold Case Unit at that
14         period of time?
15    A    I believe it was Detective Gary Temp and Detective
16         Eric Moore.
17    Q    Can you spell Temp for me?
18    A    T-E-M-P.
19    Q    Did the Cold Case Unit have a supervisor?
20    A    Yes.
21    Q    Who was that?
22    A    The top person in charge of the unit would have been
23         Captain Donald Domagalski.
24    Q    Common spelling of Domagalski?
25    A    Yes.  Yes.
```



|     |   |                                                          |
|-----|---|----------------------------------------------------------|
|  1  |   | home regarding a Rebecca Morrison.  I'm not sure if I    |
|  2  |   | did that prior to this.                                  |
|  3  | Q | Okay.  Fair enough.  Take a minute and look at this.     |
|  4  | A | Okay.                                                    |
|  5  | Q | Take as much time as you would like.                     |
|  6  | A | Sure.                                                    |
|  7  |   | (Witness reviewing document.)                            |
|  8  |   | BY MR. LOEVY:                                            |
|  9  | Q | What was the process of the Detective Bureau at that     |
| 10  |   | time with respect to creating reports such as Exhibit    |
| 11  |   | 1?  And by that I mean did you take notes and then       |
| 12  |   | dictate it?  How did you go about creating a report?     |
| 13  | A | What I would do -- everybody doesn't do it the same.     |
| 14  |   | I make notes on like a notepad and when I'm done with    |
| 15  |   | my notes, I transfer them, I call them in on a           |
| 16  |   | dictation machine to have them typed.  After they're     |
| 17  |   | typed, they come back to me and I review the written     |
| 18  |   | report or the typed report with my notes to make sure    |
| 19  |   | they're accurate.  And if they are, then I destroy       |
| 20  |   | those notes and this becomes the document.               |
| 21  | Q | What would be your purpose in destroying the notes?      |
| 22  | A | Because I have an official report that represents        |
| 23  |   | those notes.                                             |
| 24  | Q | And when you took notes in the course of an              |
| 25  |   | investigation, would you prepare them on a legal pad,    |

```
 1        scratch paper or were there actual sheets of paper
 2        that you, you know, were assigned to use?
 3   A    No.  Sometimes it would be a legal pad, sometimes it
 4        would be a steno book.  Mainly I would use a steno
 5        pad.
 6   Q    There was no assigned papers that you were told to
 7        use?
 8   A    No.
 9   Q    And was it consistent with your understanding, the
10        policy and the practice of the Milwaukee Police
11        Department that when you took notes after
12        interviewing a witness, that you could destroy those
13        notes?
14   A    Correct.
15   Q    Taking a look at -- again at Exhibit 1, I had asked
16        you some questions about -- well, strike that,
17        please.
18             (Exhibit 2 marked for identification.)
19   BY MR. LOEVY:
20   Q    Do you recall the interview that took place between
21        Richard Gwin, yourself and he, Detective
22        DeValkenaere?
23   A    Yes.
24   Q    Approximately how long did that interview take?
25   A    I would have to see the report.
```