SAM HADAWAY,

        Plaintiff,

    v.                                           Case No. 2:19-cv-01106-PP

CITY OF MILWAUKEE, et al.,

        Defendants.

# Exhibit 4

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

--------------------------------------------------------

SAM HADAWAY,

       Plaintiff,

     -vs-               Case No. 19-cv-1106

CITY OF MILWAUKEE, et al.,

       Defendants.

--------------------------------------------------------


       Video examination of CARL BUSCHMANN, taken at the instance of the Plaintiff, under and pursuant to the Federal Rules of Civil Procedure, before SAMANTHA J. SHALLUE, a Registered Professional Reporter and Notary Public in and for the State of Wisconsin, at Brown & Jones Reporting, Inc., 735 North Water Street, Suite M185, Milwaukee, Wisconsin, on April 7, 2021, commencing at 10:11 a.m. and concluding at 4:19 p.m.

1                       A P P E A R A N C E S

2        LOEVY & LOEVY, by
         MS. HEATHER LEWIS DONNELL,
3        311 North Aberdeen, 3rd Floor,
         Chicago, Illinois 60607,
4        appeared on behalf of the Plaintiff.

5        CITY OF MILWAUKEE,
         OFFICE OF CITY ATTORNEY, by
6        MS. NAOMI E. GEHLING,
         200 East Wells Street, Room 800,
7        Milwaukee, Wisconsin 53202,
         appeared on behalf of the Defendants.

8

9                    A L S O   P R E S E N T

10       MS. KRISTEN WILLIAMS, City of Milwaukee.
         MR. JON HANSEN, Videographer.
11

12                         * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2

  Examination:                                      Page

3
  By Ms. Donnell..................................    5
4 By Ms. Gehling................................. 219

5

  Exhibits Identified:                              Page
6
  Exhibit 1 - Deposition Transcript...............   56
7 Exhibit 2 - Supplementary Report...............   63
  Exhibit 3 - Supplementary Report...............   65
8 Exhibit 4 - Memorandum.........................   67
  Exhibit 5 - Supplementary Report...............   78
9 Exhibit 6 - Supplementary Report...............   81
  Exhibit 7 - Supplementary Report...............   90
10 Exhibit 8 - Polygraph Examination Report........   98
  Exhibit 9 - Handwritten Statement.............. 105
11 Exhibit 10 -Handwritten Statement.............. 107
  Exhibit 11 -Supplementary Report.............. 112
12 Exhibit 12 -Handwritten Statement.............. 127
  Exhibit 13 -Supplementary Report.............. 127
13 Exhibit 14 -Medical Examiner's Report.......... 144
  Exhibit 15 -Supplementary Report.............. 147
14 Exhibit 16 -Supplementary Report.............. 148
  Exhibit 17 -Polygraph Examination Report........ 156
15 Exhibit 18 -Handwritten Statement.............. 156
  Exhibit 19 -Supplementary Report.............. 156
16 Exhibit 20 -Affidavit in Support of Search
                Warrant............................ 163
17 Exhibit 21 -Wisconsin Department of Justice
                Crime Laboratory Report............ 180
18 Exhibit 22 -Wisconsin Department of Justice
                Crime Laboratory Report............ 182
19 Exhibit 23 -Report............................. 199
  Exhibit 24 -Supplementary Report.............. 200
20 Exhibit 25 -Report............................. 203
  Exhibit 26 -Milwaukee Police Department
21              In-Service Training Curriculum...... 210

22

  Disposition of Original Exhibits:
23
  Attached to Original Transcript.
24

25                        *  *  *  *  *

|   |   |
|---|---|
|          | 1 |
| 10:11:37 | 2 |
| 10:11:38 | 3 |
| 10:11:43 | 4 |
| 10:11:47 | 5 |
| 10:11:49 | 6 |
| 10:11:51 | 7 |
| 10:11:57 | 8 |
| 10:11:58 | 9 |
| 10:12:04 | 10 |
| 10:12:08 | 11 |
| 10:12:11 | 12 |
| 10:12:15 | 13 |
| 10:12:18 | 14 |
| 10:12:20 | 15 |
| 10:12:21 | 16 |
| 10:12:21 | 17 |
| 10:12:23 | 18 |
| 10:12:26 | 19 |
| 10:12:27 | 20 |
| 10:12:29 | 21 |
| 10:12:34 | 22 |
| 10:12:36 | 23 |
| 10:12:40 | 24 |
| 10:12:40 | 25 |

                    TRANSCRIPT OF PROCEEDINGS

               THE VIDEOGRAPHER:  Good morning.  We
          are on the record.  The time is 10:11.  Today's
          date, April 7, 2021.  This is Media No. 1 of
          the deposition of Carl Buschmann.

               This deposition is being taken in the
          matter of Sam Hadaway versus City of Milwaukee,
          United States District Court for the Eastern
          District of Wisconsin, Case No. 19-cv-01106.

               This deposition is taking place at
          735 Water Street, Milwaukee, Wisconsin.

               My name is Jon Hansen, CLVS, and I'm
          the videographer with Brown & Jones.

               At this time if counsel could state
          their appearance, after which our reporter will
          swear in the witness and we can proceed.

               MS. DONNELL:  Good morning.  Heather
          Lewis Donnell, D-O-N-N-E-L-L, on behalf of the
          plaintiff, Sam Hadaway.

               MS. GEHLING:  Good morning.
          Assistant City Attorney Naomi Gehling, G, as in
          "girl," -E-H-L-I-N-G, on behalf of the
          defendants.  With me today is Kristen Williams,
          regular spelling, my paralegal.

               CARL BUSCHMANN, called as a witness

| | |
|---|---|
| 10:12:40 | 1 |

herein, having been first duly sworn on oath,

10:12:48  2  was examined and testified as follows:

10:12:48  3                    EXAMINATION

10:12:48  4  BY MS. DONNELL:

10:12:51  5  Q   Good morning, Mr. Buschmann.  How are you?

10:12:56  6  A   Fine.

10:12:57  7  Q   I know you've been deposed before, but just for

10:13:00  8      a reminder, if you don't understand one of my

10:13:02  9      questions, please let me know.  I'm happy to

10:13:04  10     say it again or rephrase it, okay?

10:13:06  11 A   Okay.

10:13:06  12 Q   If I -- if you answer one of my questions, I'm

10:13:08  13     going to assume that you understood it.  Fair?

10:13:10  14 A   Fair.

10:13:11  15 Q   If at any point you need to take a break, let

10:13:16  16     me know.  I'm happy to accommodate that.  I

10:13:19  17     just ask that you answer any question that's

10:13:22  18     pending before we take a break, okay?

10:13:24  19 A   Okay.

10:13:24  20 Q   All right.  Did you meet with your attorney to

10:13:29  21     prepare for your deposition today?

10:13:30  22 A   Yes.

10:13:30  23 Q   I don't want to know about the communications

10:13:33  24     you had with her, but I'm going to ask you some

10:13:35  25     questions about those meetings, okay?

Case 2:19-cv-01106-PP  Filed 03/20/24  Page 6 of 249  Document 119-4

| 10:13:37 | 1 | A | Sure. |
| 10:13:38 | 2 | Q | Was there more than one meeting? |
| 10:13:40 | 3 | A | No. |
| 10:13:40 | 4 | Q | Who was present for the meeting you had other |
| 10:13:45 | 5 | | | than you and Ms. Gehling? |
| 10:13:49 | 6 | A | The paralegal. |
| 10:13:50 | 7 | Q | Is that Ms. Williams who's also present here |
| 10:13:54 | 8 | | | today? |
| 10:13:54 | 9 | A | Yes.  James DeValkenaere and Robert Simons. |
| 10:14:02 | 10 | Q | When was the meeting that you had with |
| 10:14:05 | 11 | | | Ms. Gehling, Ms. Williams, Mr. DeValkenaere, |
| 10:14:10 | 12 | | | and Mr. Simons? |
| 10:14:11 | 13 | A | A couple weeks ago. |
| 10:14:12 | 14 | Q | How long was that meeting for? |
| 10:14:17 | 15 | A | About an hour. |
| 10:14:18 | 16 | Q | Where was it? |
| 10:14:22 | 17 | A | In Gehling's office. |
| 10:14:27 | 18 | Q | At the City Attorney's Office in Milwaukee? |
| 10:14:30 | 19 | A | Yes. |
| 10:14:30 | 20 | Q | During that approximately one-hour meeting that |
| 10:14:37 | 21 | | | you had a couple weeks ago with Ms. Gehling and |
| 10:14:41 | 22 | | | the other defendants and Ms. Williams, did you |
| 10:14:43 | 23 | | | look at any documents? |
| 10:14:44 | 24 | A | Yes. |
| 10:14:45 | 25 | Q | What documents did you look at? |

| | | |
|---|---|---|
| 10:14:50 | 1 | A | I looked at Hadaway's statement that he gave to |
| 10:14:56 | 2 | | me, I looked at the statements he gave to the |
| 10:15:01 | 3 | | previous detectives, and some reports that were |
| 10:15:06 | 4 | | filed by other detectives regarding |
| 10:15:10 | 5 | | Mr. Hadaway. |
| 10:15:10 | 6 | Q | The first document you mentioned, Mr. Hadaway's |
| 10:15:19 | 7 | | statement, was that a handwritten statement? |
| 10:15:22 | 8 | A | Yes. |
| 10:15:23 | 9 | Q | And was that in your handwriting? |
| 10:15:24 | 10 | A | Yes. |
| 10:15:25 | 11 | Q | Okay.  Did you also look at your supplementary |
| 10:15:33 | 12 | | report that went along with the statement that |
| 10:15:35 | 13 | | Mr. Hadaway gave? |
| 10:15:36 | 14 | A | No. |
| 10:15:36 | 15 | Q | You also said that you looked at statements |
| 10:15:38 | 16 | | that Mr. Hadaway had provided to other |
| 10:15:41 | 17 | | detectives; is that right? |
| 10:15:42 | 18 | A | Yes. |
| 10:15:42 | 19 | Q | Were those handwritten statements? |
| 10:15:45 | 20 | A | Yes. |
| 10:15:46 | 21 | Q | Did you read any supplementary reports |
| 10:15:50 | 22 | | pertaining or correlating with those |
| 10:15:52 | 23 | | handwritten statements Mr. Hadaway provided to |
| 10:15:54 | 24 | | detectives prior to your interaction with him? |
| 10:15:57 | 25 | A | No. |

| | | |
|---|---|---|
| 10:15:57 | 1 | Q   And then you mentioned some -- some police |
| 10:16:06 | 2 | reports by other detectives; is that right? |
| 10:16:08 | 3 | A   Yes. |
| 10:16:09 | 4 | Q   Were those police reports -- well, strike that. |
| 10:16:15 | 5 | Do you remember anything about who |
| 10:16:17 | 6 | those reports were by or what they were |
| 10:16:20 | 7 | documenting? |
| 10:16:20 | 8 | A   One was by Detective Cameo Barbian-Gayan, and |
| 10:16:29 | 9 | the other one was Detective Katherine Hein. |
| 10:16:34 | 10 | Q   And with respect to the -- those are |
| 10:16:38 | 11 | supplementary reports, both of them; is that |
| 10:16:41 | 12 | right? |
| 10:16:41 | 13 | A   Yes. |
| 10:16:41 | 14 | Q   Regarding the first supplementary report that |
| 10:16:45 | 15 | you reviewed at your meeting to prepare for |
| 10:16:47 | 16 | your deposition by Cameo Barbian-Gayan, what |
| 10:16:50 | 17 | subject matter did that report pertain to? |
| 10:16:52 | 18 | A   The statement that Hadaway had given to me. |
| 10:17:03 | 19 | Q   And how about the -- anything else that you |
| 10:17:10 | 20 | remember about the supplementary report that |
| 10:17:14 | 21 | Cameo Barbian had prepared? |
| 10:17:14 | 22 | A   She asked him about there possibly being a |
| 10:17:21 | 23 | fourth person with them. |
| 10:17:22 | 24 | Q   And anything else you recall about that report? |
| 10:17:24 | 25 | A   No. |

| | | | |
|---|---|---|---|
| 10:17:25 | 1 | Q | Okay. How about the one by Detective Katherine |
| 10:17:36 | 2 | | Hein? What do you recall about that |
| 10:17:37 | 3 | | supplementary report? |
| 10:17:39 | 4 | A | I know that was regarding Hadaway's meeting |
| 10:17:42 | 5 | | with Chaunte Ott's attorney and reviewing his |
| 10:17:47 | 6 | | statement to Milwaukee police detectives. |
| 10:17:53 | 7 | Q | Anything else? |
| 10:18:00 | 8 | A | No. |
| 10:18:01 | 9 | Q | Other than the handwritten statements you |
| 10:18:04 | 10 | | reviewed of Mr. Hadaway that you've identified |
| 10:18:07 | 11 | | and the supplementary report by Detective Cameo |
| 10:18:12 | 12 | | Barbian and Detective Hein, any other documents |
| 10:18:14 | 13 | | that you recall reviewing during your meeting |
| 10:18:17 | 14 | | with your attorney to prepare for your |
| 10:18:18 | 15 | | deposition today? |
| 10:18:19 | 16 | A | No. |
| 10:18:19 | 17 | Q | Did you review any of the statements provided |
| 10:18:26 | 18 | | by Mr. Richard Gwin? |
| 10:18:29 | 19 | A | No. |
| 10:18:29 | 20 | Q | Do you recall the individual by the name of |
| 10:18:34 | 21 | | Richard Gwin who was spoken to during the Payne |
| 10:18:37 | 22 | | investigation? |
| 10:18:38 | 23 | A | Yes. |
| 10:18:39 | 24 | Q | Did you review any of your deposition testimony |
| 10:18:52 | 25 | | that you gave in the Ott versus City of Chicago |

| | | |
|---|---|---|
| 10:18:56 | 1 | [sic] civil case? |
| 10:18:57 | 2 | A    I did not. |
| 10:18:58 | 3 | Q    Did you look at any photographs from the Payne |
| 10:19:03 | 4 |      homicide investigation? |
| 10:19:04 | 5 | A    No. |
| 10:19:05 | 6 | Q    Did you look at the medical examiner's report |
| 10:19:11 | 7 |      or toxicology report? |
| 10:19:13 | 8 | A    No. |
| 10:19:13 | 9 | Q    Okay.  Okay.  The last time that I spoke to you |
| 10:19:33 | 10 |      or met you was back in 2012, I believe, in the |
| 10:19:38 | 11 |      Ott matter, and at that point you were employed |
| 10:19:40 | 12 |      with the district attorney's office as an |
| 10:19:43 | 13 |      investigator and had been for approximately |
| 10:19:45 | 14 |      four years.  Does that sound right to you? |
| 10:19:47 | 15 | A    Yes. |
| 10:19:47 | 16 | Q    Are you still employed as an investigator with |
| 10:19:50 | 17 |      the district attorney's office? |
| 10:19:51 | 18 | A    I am not. |
| 10:19:52 | 19 | Q    When did you stop working for the district |
| 10:19:55 | 20 |      attorney's office? |
| 10:19:56 | 21 | A    I retired in March of 2018. |
| 10:20:00 | 22 | Q    Are you employed in any capacity now? |
| 10:20:06 | 23 | A    No. |
| 10:20:06 | 24 | Q    So you're fully retired? |
| 10:20:09 | 25 | A    Yes. |

Case 2:19-cv-01106-PP   Filed 03/20/24   Page 11 of 249   Document 119-4

10:20:09  1    Q    Did you work for the DA's office for about a

10:20:22  2         ten-year period of time?

10:20:24  3    A    Just short of 12 years.

10:20:26  4    Q    Oh, just short of 12 years.  Okay.  And was

10:20:33  5         that always in the capacity as an investigator?

10:20:36  6    A    Yes.

10:20:37  7    Q    I guess after 2012, what were your assignments

10:20:49  8         in terms of units or special assignments with

10:20:52  9         the district attorney's office as an

10:20:54  10        investigator?

10:20:55  11   A    I was assigned to the witness protection unit.

10:20:58  12   Q    And were you part of the witness protection

10:21:02  13        unit from 2012 till your retirement in 20- --

10:21:04  14        March of 2018?

10:21:06  15   A    Yes.

10:21:06  16   Q    Okay.  I'm going to briefly go over your

10:21:19  17        employment history with the Milwaukee Police

10:21:21  18        Department, okay?

10:21:22  19   A    Yes.

10:21:22  20   Q    You started as a police cadet or police intern?

10:21:28  21   A    Police aide.

10:21:29  22   Q    Police aide.  I'm sorry.  Different agencies

10:21:32  23        have different terms for it, but basically you

10:21:34  24        started at the age of, was it, 19?

10:21:37  25   A    19.

| | | |
|---|---|---|
| 10:21:37 | 1 | Q And you had had family members as part of the |
| 10:21:41 | 2 | department before you, right? |
| 10:21:42 | 3 | A Yes. |
| 10:21:42 | 4 | Q Was that your uncle and your cousin? |
| 10:21:44 | 5 | A Yes. |
| 10:21:44 | 6 | Q Any other family members that have been part of |
| 10:21:48 | 7 | the Milwaukee Police Department other than you, |
| 10:21:50 | 8 | your uncle, and your cousin? |
| 10:21:52 | 9 | A No. |
| 10:21:52 | 10 | Q Okay. And you served a total of 31 years with |
| 10:21:57 | 11 | the Milwaukee Police Department; is that right? |
| 10:21:59 | 12 | A Yes. |
| 10:22:00 | 13 | Q And what was your date of being sworn in? |
| 10:22:06 | 14 | A Well, when I first was hired it was August of |
| 10:22:15 | 15 | 1975. |
| 10:22:18 | 16 | Q And that was as a police aide? |
| 10:22:20 | 17 | A Yes. |
| 10:22:21 | 18 | Q And then when you turned 21, you became a sworn |
| 10:22:24 | 19 | officer? |
| 10:22:25 | 20 | A Yes. |
| 10:22:25 | 21 | Q So that would have been '77? |
| 10:22:26 | 22 | A May of 1977. |
| 10:22:28 | 23 | Q And I forget, is that before you went to the |
| 10:22:30 | 24 | academy or after you went to the academy that |
| 10:22:32 | 25 | you were sworn? |

| | | | |
|---|---|---|---|
| 10:22:33 | 1 | A | I was sworn in both times, but when I was sworn |
| 10:22:37 | 2 | | in as a police officer, it was before the |
| 10:22:39 | 3 | | academy. |
| 10:22:39 | 4 | Q | Okay.  So you were sworn in in May 1977 and |
| 10:22:43 | 5 | | then you went to the police academy? |
| 10:22:46 | 6 | A | Yes. |
| 10:22:46 | 7 | Q | Okay.  And that academy was here in Milwaukee; |
| 10:22:52 | 8 | | is that right? |
| 10:22:52 | 9 | A | Yes. |
| 10:22:53 | 10 | Q | Okay.  And then you were part of the patrol |
| 10:22:59 | 11 | | division until you were promoted to the rank of |
| 10:23:01 | 12 | | detective in April 1991; is that right? |
| 10:23:04 | 13 | A | Yes. |
| 10:23:04 | 14 | Q | And you'll have to remind me.  Did you have to |
| 10:23:10 | 15 | | take a test to become a detective at that time? |
| 10:23:13 | 16 | A | Yes. |
| 10:23:13 | 17 | Q | And you took the -- how many times did you take |
| 10:23:16 | 18 | | the test to become a detective? |
| 10:23:18 | 19 | A | One time. |
| 10:23:18 | 20 | Q | And then you retired at the rank of detective, |
| 10:23:25 | 21 | | correct? |
| 10:23:25 | 22 | A | Yes. |
| 10:23:26 | 23 | Q | And you never sought to -- did you ever seek to |
| 10:23:29 | 24 | | be promoted? |
| 10:23:30 | 25 | A | No. |

| | | |
|---|---|---|
| 10:23:30 | 1 | Q  Okay.  Now, your time at the Criminal |
| 10:23:43 | 2 | Investigative Bureau -- that's the name for the |
| 10:23:46 | 3 | detective division while you were there? |
| 10:23:48 | 4 | A  Yes. |
| 10:23:48 | 5 | Q  Okay.  And is it -- did it -- was it called |
| 10:23:51 | 6 | "CIB" for short? |
| 10:23:52 | 7 | A  Yes. |
| 10:23:52 | 8 | Q  Okay.  So if I use the term "CIB," you'll know |
| 10:23:56 | 9 | what I'm referring to? |
| 10:23:57 | 10 | A  Yes. |
| 10:23:58 | 11 | Q  Okay.  Oh, what was your date of retirement? |
| 10:24:05 | 12 | I'm sorry.  I forgot to ask that. |
| 10:24:07 | 13 | A  June of 2006. |
| 10:24:09 | 14 | Q  Okay.  Okay.  So from April 1991 to June 2006, |
| 10:24:17 | 15 | you were part of CIB, correct? |
| 10:24:20 | 16 | A  Yes. |
| 10:24:20 | 17 | Q  And you had -- it's fair to say you had various |
| 10:24:25 | 18 | assignments within the units of CIB over that |
| 10:24:29 | 19 | time period, right? |
| 10:24:30 | 20 | A  Yes. |
| 10:24:30 | 21 | Q  Okay.  I would like to -- can you describe your |
| 10:24:32 | 22 | assignments that you had from April 1991 till |
| 10:24:37 | 23 | your retirement in June 2006 at CIB? |
| 10:24:40 | 24 | A  I was assigned to the violent crimes unit, the |
| 10:24:47 | 25 | crimes against persons unit, and homicide. |

| | | |
|---|---|---|
| 10:24:50 | 1 | Q  And when were you assigned to -- was your first |
| 10:25:03 | 2 | assignment violent crimes? |
| 10:25:05 | 3 | A  My first assignment I would say was general |
| 10:25:08 | 4 | duty.  I was just learning the position. |
| 10:25:12 | 5 | Q  And how long were you assigned to general duty |
| 10:25:18 | 6 | at CIB? |
| 10:25:19 | 7 | A  I don't recall. |
| 10:25:23 | 8 | Q  Okay.  How long were you assigned to the |
| 10:25:29 | 9 | homicide unit? |
| 10:25:31 | 10 | A  Off and on, about 11 years. |
| 10:25:35 | 11 | Q  11 years total, but not consecutive? |
| 10:25:40 | 12 | A  Correct. |
| 10:25:40 | 13 | Q  Okay.  What was the first stint you did in the |
| 10:25:43 | 14 | homicide unit of CIB? |
| 10:25:45 | 15 | A  I don't recall the year.  It was -- |
| 10:25:57 | 16 | Q  Oh, sorry.  The Payne investigation was, you |
| 10:26:00 | 17 | know, October 1995, and at that point you were |
| 10:26:03 | 18 | a homicide detective, right? |
| 10:26:05 | 19 | A  Yes. |
| 10:26:06 | 20 | Q  Was that the first assignment -- time you were |
| 10:26:09 | 21 | first assigned to homicide? |
| 10:26:10 | 22 | A  I probably was there maybe a year before that. |
| 10:26:15 | 23 | Q  Okay.  So you may have been assigned around |
| 10:26:25 | 24 | 1994? |
| 10:26:25 | 25 | A  Yes. |

| | | |
|---|---|---|
| 10:26:26 | 1 | Q And do you remember how long you were at |
| 10:26:30 | 2 | homicide during that first period of |
| 10:26:32 | 3 | assignment? |
| 10:26:33 | 4 | A A couple years. |
| 10:26:35 | 5 | Q Like, two to three years? |
| 10:26:38 | 6 | A Yes. |
| 10:26:38 | 7 | Q Okay. And then where did you move after that? |
| 10:26:42 | 8 | A I went to violent crimes. |
| 10:26:47 | 9 | Q Can you identify for the record what kind of |
| 10:26:50 | 10 | crimes violent crime detectives investigated? |
| 10:26:53 | 11 | A We investigate non-fatal shootings, stabbings. |
| 10:27:01 | 12 | Q Is that non-fatal stabbings? |
| 10:27:03 | 13 | A Yes. We basically investigate the same things |
| 10:27:08 | 14 | homicide would investigate, only that our |
| 10:27:11 | 15 | victims survive. |
| 10:27:13 | 16 | Q Is it accurate to say at this time period in |
| 10:27:18 | 17 | the City of Milwaukee sexual assaults were |
| 10:27:20 | 18 | assigned to the sensitive crime unit within |
| 10:27:24 | 19 | CIB? |
| 10:27:24 | 20 | A Yes. |
| 10:27:24 | 21 | Q So violent crimes would not include crimes of |
| 10:27:27 | 22 | sexual assault? |
| 10:27:28 | 23 | A No. |
| 10:27:28 | 24 | Q Okay. If there was a non-fatal crime that |
| 10:27:36 | 25 | included a sexual assault, would it go to |

Case 2:19-cv-01106-PP   Filed 03/20/24   Page 17 of 249   Document 119-4

10:27:39  1    violent crimes or sensitive crimes during this

10:27:42  2    time period?

10:27:43  3  A  The initial investigation may start with

10:27:48  4    violent crimes, but I would say that it would

10:27:52  5    eventually go to sensitive crimes.

10:27:54  6  Q  Do you recall how long you were assigned to the

10:28:01  7    violent crimes unit of CIB?

10:28:04  8  A  A year.

10:28:06  9  Q  Where did you go next?

10:28:11 10  A  Crimes against persons.

10:28:13 11  Q  What kind of crimes does the crimes against

10:28:17 12    persons -- did the crimes against persons unit

10:28:19 13    at CIB investigate when you were assigned

10:28:22 14    there?

10:28:22 15  A  My assignment was to the -- they called it the

10:28:26 16    "holdup squad."  We investigated bank

10:28:29 17    robberies, armed robberies, street robberies,

10:28:35 18    and that.

10:28:37 19  Q  Thank you.  Do you recall how long you were

10:28:40 20    assigned to the crimes against persons unit?

10:28:42 21  A  Two years.

10:28:48 22  Q  Where did you go next?

10:28:50 23  A  Back to homicide.

10:28:51 24  Q  And was that for the last six years you were at

10:28:56 25    homicide?

| | |
|---|---|
| 10:28:57 | 1 |
| 10:29:06 | 2 |
| 10:29:10 | 3 |
| 10:29:14 | 4 |

A    There was a -- I went back to homicide for a
couple years.  Then I had a change of shift and
went back to robberies.  Then my last four
years I finished in homicide.

5    Q    And what shift did you finish in homicide?

6    A    Day shift, 8:00 a.m. to 12:00 -- or 8:00 a.m.
7         to 4:00 p.m.

8    Q    Thank you.  You had regular partners when you
9         were assigned to CIB for -- or various regular
10        partners during that time you worked as a
11        detective at the Milwaukee Police Department,
12        correct?

13   A    Yes.

14   Q    Can you identify some of your -- who your
15        regular partners were?

16   A    Kurt Sutter, Raymond Trudell, Gary Temp, and
17        Jim DeValkenaere, Michael Wesolowski, and I
18        believe my last partner was Thomas Fischer.

19   Q    Thank you.  When -- of the regular partners
20        you've just identified, which ones of them did
21        you work homicides with?

22   A    Sutter, DeValkenaere, Temp, Wesolowski, and
23        Fischer.

24   Q    Okay.  Are you still in communication with
25        Michael Wesolowski, your former partner?

| | | | |
|---|---|---|---|
| 10:31:13 | 1 | A | He's deceased. |
| 10:31:15 | 2 | Q | Oh, he is?  I'm sorry to hear that. |
| 10:31:18 | 3 | A | Thank you. |
| 10:31:19 | 4 | Q | I deposed him.  I met him in the Ott case.  So |
| 10:31:27 | 5 | | I'm sorry to hear that. |
| 10:31:27 | 6 | A | Hm-hm. |
| 10:31:29 | 7 | Q | How about Jim DeValkenaere?  Are you still in |
| 10:31:32 | 8 | | contact with him? |
| 10:31:33 | 9 | A | No. |
| 10:31:33 | 10 | Q | How about Gary Temp? |
| 10:31:36 | 11 | A | No. |
| 10:31:37 | 12 | Q | How about Kurt Sutter? |
| 10:31:40 | 13 | A | Once a year we golf together. |
| 10:31:43 | 14 | Q | I want to talk to you about the cold case |
| 10:31:58 | 15 | | squad.  Do you know what I'm talking about? |
| 10:32:00 | 16 | A | Yes. |
| 10:32:00 | 17 | Q | Okay.  Can you define -- or how would you |
| 10:32:04 | 18 | | describe the cold case squad? |
| 10:32:06 | 19 | A | We would go through open homicides that had |
| 10:32:14 | 20 | | come to a dead end and look at the cases and |
| 10:32:19 | 21 | | see if there was anything else that may or |
| 10:32:25 | 22 | | could have been done, and we would conduct |
| 10:32:27 | 23 | | follow-up on those cases. |
| 10:32:30 | 24 | Q | The -- the cold case squad, it came into |
| 10:32:38 | 25 | | existence for the first time as part of the |

10:32:41  1      detective -- well, strike that.

10:32:42  2             Was the cold case squad just

10:32:46  3      pertaining to homicides?

10:32:47  4  A   Yes.

10:32:47  5  Q   Okay.  And when the cold case squad first came

10:32:50  6      into existence, that was right at or shortly

10:32:53  7      before the time of the Payne homicide in

10:32:54  8      October '95, right?

10:32:56  9  A   Yes.

10:32:56  10  Q   And you were one of the first members of that

10:32:59  11      cold case squad?

10:33:01  12  A   Yes.

10:33:01  13  Q   Along with Jim DeValkenaere?

10:33:03  14  A   Yes.

10:33:03  15  Q   Gary Temp?

10:33:04  16  A   Yes.

10:33:04  17  Q   And is it Eric Moore?

10:33:07  18  A   Yes.

10:33:07  19  Q   Okay.  Was that the total of the first

10:33:11  20      iteration of the cold case squad?

10:33:12  21  A   As I recall, yes.

10:33:14  22  Q   How -- and is it fair to say that you were

10:33:16  23      assigned -- all of those four were assigned to

10:33:19  24      the -- detectives were assigned to the cold

10:33:21  25      case squad, but you would also have assignments

10:33:25  1    on active homicides that weren't cold

10:33:28  2    simultaneously with your cold case assignments?

10:33:31  3  A  As I recall, if we were needed, we could go to

10:33:34  4    other assignments, yes.

10:33:34  5  Q  Okay.  But your involvement -- is it accurate

10:33:36  6    to say that your involvement on the Payne

10:33:38  7    homicide was you got assigned to it as part of

10:33:42  8    your initial cold case investigations?

10:33:45  9  A  Yes, we -- we took on that case.

10:33:48  10  Q  Okay.  Was that the first case you and Jim

10:33:51  11    DeValkenaere took on as a cold case squad case?

10:33:54  12  A  I don't recall.

10:33:55  13  Q  Okay.  But it was at least one of the very

10:33:57  14    first?

10:33:58  15  A  Yes.

10:33:58  16  Q  Who -- sorry.  Who determined or made the

10:34:07  17    assignments to look into certain cold cases?

10:34:11  18    Was it you as the detectives or one of your

10:34:14  19    supervisors?

10:34:14  20  A  We -- we chose the cases we wanted to look at.

10:34:18  21  Q  So you, Jim DeValkenaere, Eric Moore, and Gary

10:34:24  22    Temp would decide the cases you wanted to work

10:34:27  23    on?

10:34:27  24  A  Yes.

10:34:27  25  Q  Okay.  Would you have to get a supervisor's

| | | |
|---|---|---|
| 10:34:30 | 1 | approval? |
| 10:34:31 | 2 | A   We would touch base with a supervisor to let |
| 10:34:35 | 3 |     him know what we were doing. |
| 10:34:37 | 4 | Q   I'm sorry.  For the selection of what case you |
| 10:34:40 | 5 |     were going to investigate as a cold case, did |
| 10:34:43 | 6 |     you have to get a supervisor's sign-off? |
| 10:34:47 | 7 | A   I wouldn't say we had to get a sign-off, no. |
| 10:34:53 | 8 | Q   So it's fair -- is your testimony that you and |
| 10:34:57 | 9 |     one of the other cold case squad detectives |
| 10:35:01 | 10 |     could decide what cases you wanted to |
| 10:35:02 | 11 |     investigate as a cold case and you would just |
| 10:35:04 | 12 |     let your supervisor know; you didn't have to |
| 10:35:06 | 13 |     get their approval? |
| 10:35:07 | 14 | A   Correct. |
| 10:35:07 | 15 | Q   Okay.  In your previous deposition in the Ott |
| 10:35:12 | 16 |     matter, you identified the captain of the |
| 10:35:15 | 17 |     cold -- for the cold case squad to be Captain |
| 10:35:21 | 18 |     Domagalski; is that right? |
| 10:35:23 | 19 | A   Yes. |
| 10:35:23 | 20 | Q   And you had identified the lieutenants as |
| 10:35:27 | 21 |     Lieutenant Susik, Lieutenant Kane, and |
| 10:35:30 | 22 |     Lieutenant Ardis.  Does that sound right to |
| 10:35:34 | 23 |     you? |
| 10:35:34 | 24 | A   Yes. |
| 10:35:35 | 25 | Q   Okay.  Other than the Payne case, do you |

| | | |
|---|---|---|
| 10:35:43 | 1 | remember any of the other cases you |
| 10:35:44 | 2 | investigated as part of the cold case squad? |
| 10:35:48 | 3 | A I really don't, no. |
| 10:35:49 | 4 | Q Okay. Do you remember as you sit here today -- |
| 10:35:52 | 5 | and, again, it's a long time ago. I understand |
| 10:35:54 | 6 | that. So if you don't remember, just let me |
| 10:35:57 | 7 | know. But do you remember how long you were |
| 10:35:59 | 8 | part of the cold case squad? |
| 10:36:01 | 9 | A Maybe about a year. |
| 10:36:06 | 10 | Q Did the squad keep existing after you left |
| 10:36:10 | 11 | after that year and have other people assigned |
| 10:36:13 | 12 | to it? |
| 10:36:14 | 13 | A I don't recall. |
| 10:36:14 | 14 | Q Okay. You previously testified that you and -- |
| 10:36:20 | 15 | well, I think you previously testified that you |
| 10:36:22 | 16 | and Jim DeValkenaere were partners during that |
| 10:36:24 | 17 | time period; is that right? |
| 10:36:25 | 18 | A Yes. |
| 10:36:25 | 19 | Q Okay. And was it that Gary Temp and Eric Moore |
| 10:36:30 | 20 | worked together? |
| 10:36:32 | 21 | A I don't recall if they worked together. |
| 10:36:37 | 22 | Q Okay. Thank you. I think you previously |
| 10:36:41 | 23 | testified that you and Jim DeValkenaere had |
| 10:36:45 | 24 | worked on approximately four to five cases as |
| 10:36:48 | 25 | cold cases. Does that sound right to you |

| | | |
|---|---|---|
| 10:36:51 | 1 | still? |
| 10:36:51 | 2 | A   I really don't recall. |
| 10:36:52 | 3 | Q   Okay.  You have no reason as you sit here today |
| 10:36:55 | 4 | to doubt your prior testimony, though? |
| 10:36:57 | 5 | A   No, I don't. |
| 10:36:57 | 6 | Q   Okay.  I want to talk to you about what you |
| 10:37:14 | 7 | remember or don't remember about your |
| 10:37:18 | 8 | investigative work on the Payne homicide |
| 10:37:20 | 9 | investigation, but before I do, I want to have |
| 10:37:22 | 10 | an understanding of whether you have an |
| 10:37:24 | 11 | independent recollection of any of your |
| 10:37:27 | 12 | investigatory work on the Payne homicide.  Do |
| 10:37:30 | 13 | you know what I mean when I say "independent |
| 10:37:32 | 14 | recollection"? |
| 10:37:32 | 15 | A   Yes. |
| 10:37:32 | 16 | Q   Okay.  And what do you think I mean by it, or |
| 10:37:36 | 17 | what do you mean by it? |
| 10:37:37 | 18 | A   As I sit here today, do I remember certain |
| 10:37:41 | 19 | events of that investigation. |
| 10:37:42 | 20 | Q   Yes.  Okay.  And so do you have an independent |
| 10:37:45 | 21 | recollection of certain events in that |
| 10:37:48 | 22 | investigation? |
| 10:37:48 | 23 | A   Yes. |
| 10:37:48 | 24 | Q   Can you identify for me what events of the |
| 10:37:52 | 25 | Payne homicide you have an independent |

10:37:54   1       recollection of?

10:37:56   2   A   The investigation involving Richard Gwin, Sam

10:38:04   3       Hadaway, and Chaunte Ott.

10:38:11   4   Q   Okay.  Before you reviewed the records a couple

10:38:16   5       weeks ago pertaining to Mr. Hadaway's statement

10:38:18   6       to you, did you have an independent

10:38:21   7       recollection before you reviewed those

10:38:22   8       documents?

10:38:24   9   A   Limited.

10:38:25  10   Q   Did reviewing the documents refresh your

10:38:27  11       recollection?

10:38:28  12   A   Yes.

10:38:29  13   Q   The -- you didn't review any documents

10:38:33  14       pertaining to Richard Gwin a couple weeks ago

10:38:37  15       getting ready for your deposition.  So do

10:38:39  16       you -- as you sit here today, you have a

10:38:41  17       recollection of some of your involvement with

10:38:43  18       Richard Gwin?

10:38:45  19   A   Yes.

10:38:45  20   Q   Okay.  And then did you -- I don't think you

10:38:48  21       identified any documents pertaining to Mr. Ott

10:38:50  22       that you looked at a couple weeks ago; is that

10:38:53  23       right?

10:38:53  24   A   I did not look at anything pertaining to

10:38:55  25       Mr. Ott.

| | | |
|---|---|---|
| 10:38:55 | 1 | Q   Okay.  But as you sit here today, you have an |
| 10:38:58 | 2 | independent recollection of some of your |
| 10:39:00 | 3 | interactions with Mr. Ott? |
| 10:39:01 | 4 | A   Yes. |
| 10:39:02 | 5 | Q   Okay.  Let's start with Mr. Gwin.  What do you |
| 10:39:10 | 6 | have an independent recollection of regarding |
| 10:39:12 | 7 | your involvement with Mr. Gwin during the Payne |
| 10:39:16 | 8 | homicide investigation? |
| 10:39:17 | 9 | A   That there was a person who came forward |
| 10:39:26 | 10 | indicating that a subject by the name of Cortez |
| 10:39:33 | 11 | had a girl with him and he was going to sell |
| 10:39:38 | 12 | her.  I guess it was a white girl, and he was |
| 10:39:43 | 13 | going to sell her.  And it was around the time |
| 10:39:47 | 14 | when Jessica Payne -- the Jessica Payne |
| 10:39:54 | 15 | investigation was going on. |
| 10:39:57 | 16 | So we attempted to identify the |
| 10:40:01 | 17 | person Cortez who subsequently ended up being |
| 10:40:07 | 18 | Richard Gwin, and we brought him down for |
| 10:40:15 | 19 | questioning.  And at one point during the |
| 10:40:19 | 20 | questioning, he gave a statement that he was |
| 10:40:22 | 21 | with Sam Hadaway, Chaunte Ott, and a white girl |
| 10:40:28 | 22 | in his car, that they bought and smoked some |
| 10:40:33 | 23 | weed, that they ended up on 7th and Burleigh, |
| 10:40:38 | 24 | in that area, that Chaunte Ott and Sam Hadaway |
| 10:40:43 | 25 | left with the girl and walked behind a house, |

Case 2:19-cv-01106-PP   Filed 03/20/24   Page 27 of 249   Document 119-4

10:40:47  1    and that he remained in the car smoking his

10:40:51  2    weed.  And then at one point Hadaway and Ott

10:40:57  3    returned to the car without the girl and that

10:41:00  4    he drove off with them, and he eventually drove

10:41:06  5    them to Hadaway's house and dropped them off.

10:41:08  6  Q    Okay.  And what you've just testified to, you

10:41:14  7    have an independent recollection of that

10:41:16  8    statement Mr. Gwin gave to you and your

10:41:20  9    partner, James DeValkenaere, independent of any

10:41:23  10   document?

10:41:25  11  A   Yes.

10:41:25  12  Q   How is it that you have that memory?

10:41:31  13  A   When I read Hadaway's statement, it refreshed

10:41:37  14   my recollection.

10:41:38  15  Q   Okay.  So prior to reading Mr. Hadaway's

10:41:42  16   written statement that you and your partner,

10:41:45  17   James DeValkenaere, obtained from him, you

10:41:47  18   didn't have a detailed memory of the statement

10:41:51  19   Mr. Gwin had provided to you, correct?

10:41:54  20  A   Right.

10:41:54  21  Q   Okay.  Do you recall that Mr. Gwin -- you had

10:41:59  22   two interviews with Mr. Gwin?

10:42:02  23  A   I don't recall that.  I don't know how many

10:42:05  24   times we talked to him.

10:42:06  25  Q   Okay.  As you sit here today, do you have an

10:42:11   1      independent recollection of any of the

10:42:13   2      circumstances on how Mr. Gwin came to CIB to be

10:42:18   3      interviewed by you and your partner?

10:42:21   4   A  We brought him to -- or no.  No, I don't

10:42:25   5      remember.

10:42:25   6   Q  Okay.  I want to go back before I -- well,

10:42:48   7      strike that.

10:42:48   8              Before I move forward, have you told

10:42:52   9      me everything that is your independent memory

10:42:55  10      as you sit here today of your interactions with

10:42:56  11      Richard Gwin?

10:42:57  12   A  Yes.

10:42:57  13   Q  Okay.  Do you remember how old Mr. Gwin was at

10:43:03  14      the time that you were interrogating him in the

10:43:07  15      Payne homicide investigation?

10:43:08  16   A  I do not recall.

10:43:10  17   Q  As you sit here today, do you have a memory of

10:43:18  18      whether Mr. Gwin was in your -- was in what was

10:43:22  19      a custodial interrogation at the time he gave

10:43:25  20      the statement that you recall him giving?

10:43:32  21   A  I don't recall.

10:43:33  22   Q  I want to backtrack for just a minute back to

10:43:39  23      when you and James DeValkenaere decided to take

10:43:43  24      on the Payne homicide investigation as one of

10:43:45  25      the first cold cases you were going to

10:43:49  1      investigate, okay?

10:43:50  2    A  Okay.

10:43:50  3    Q  Was that your decision or James's decision or

10:43:54  4      both of your decisions to investigate it as a

10:43:57  5      cold case?

10:43:58  6    A  Jim had worked on that case previously in

10:44:02  7      regular homicide and wanted to revisit the

10:44:07  8      case.

10:44:08  9    Q  Did you support him in that or agree with his

10:44:16  10     decision to take it on as a cold case?

10:44:19  11   A  Yes.

10:44:19  12   Q  I guess by the very nature of it being worked

10:44:29  13     up as a cold case, the case had gone cold,

10:44:32  14     right?

10:44:34  15   A  It wasn't your typical cold case.  It was only

10:44:38  16     a couple months old, but Jim knew there was

10:44:43  17     some follow-up that needed to be done that

10:44:46  18     hadn't been done, and he wanted to look into

10:44:48  19     that.

10:44:49  20   Q  But at the -- is it fair to say that at the

10:44:57  21     time that you and Jim took it on as a cold case

10:45:00  22     there were not any active leads being

10:45:02  23     investigated by the homicide unit?

10:45:04  24   A  To my knowledge, yes.

10:45:05  25   Q  Okay.  And so in that regard, there weren't any

10:45:10  1      suspects being actively investigated, correct?

10:45:13  2   A  No.

10:45:13  3   Q  And at that point there weren't -- wasn't any

10:45:17  4      physical evidence that was being followed up

10:45:21  5      on, either, right?

10:45:23  6   A  What do you mean by "physical evidence"?

10:45:24  7   Q  Like, there was no physical evidence that still

10:45:27  8      needed to be tested or analyzed that was --

10:45:29  9      everything had sort of been done up until that

10:45:32  10     point?

10:45:32  11  A  I don't recall.

10:45:33  12  Q  Okay.  Do you recall, as you sit here today,

10:45:45  13     what the follow-up information -- or, sorry,

10:45:50  14     strike that.  That was a bad question.

10:45:52  15             Do you recall, as you sit here today,

10:45:54  16     what Jim DeValkenaere wanted to follow up on

10:45:57  17     with respect to the Payne homicide

10:46:00  18     investigation?

10:46:00  19  A  The -- trying to identify and locate the person

10:46:03  20     named Cortez.

10:46:04  21  Q  Do you recall, as you sit here today, why Jim

10:46:08  22     DeValkenaere wanted to try and identify and

10:46:12  23     locate the person named Cortez?

10:46:14  24  A  No.

10:46:17  25  Q  When you testified earlier in the Ott case in

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 10:46:29 | 1  | your deposition in that case, you indicated              |
| 10:46:31 | 2  | that you read all of the reports in the Payne            |
| 10:46:35 | 3  | homicide investigation when you first got                |
| 10:46:37 | 4  | involved as a cold case.  Do you remember that           |
| 10:46:39 | 5  | testimony?                                               |
| 10:46:39 | 6  | A  Yes.                                                  |
| 10:46:40 | 7  | Q  Okay.  And is that true?                              |
| 10:46:41 | 8  | A  Yes.                                                  |
| 10:46:42 | 9  | Q  Okay.  So before -- is that true that before          |
| 10:46:45 | 10 | you took any steps and went out and tried to             |
| 10:46:48 | 11 | find Cortez you reviewed the M file as it                |
| 10:46:52 | 12 | existed at that time?                                    |
| 10:46:53 | 13 | A  Yes.                                                  |
| 10:46:53 | 14 | Q  Okay.  And why did you do that?                       |
| 10:46:56 | 15 | A  So I was up to speed on the case and that I was       |
| 10:47:00 | 16 | familiar with the case.                                  |
| 10:47:01 | 17 | Q  Okay.  Do you have an independent recollection        |
| 10:47:11 | 18 | as you sit here today of the facts of Jessica            |
| 10:47:15 | 19 | Payne's homicide?                                        |
| 10:47:19 | 20 | A  Very limited.                                         |
| 10:47:20 | 21 | Q  Okay.  What -- what is your limited memory of         |
| 10:47:23 | 22 | that homicide?                                           |
| 10:47:24 | 23 | A  That Jessica Payne was a runaway from South           |
| 10:47:29 | 24 | Milwaukee, that she ended up on the north side           |
| 10:47:33 | 25 | of Milwaukee where she was staying in a drug             |

|         |    |                                                      |
|---------|----|------------------------------------------------------|
| 10:47:38 | 1  |    house, that her body was found behind a vacant    |
| 10:47:46 | 2  |    house either on a mattress or under a mattress,   |
| 10:47:53 | 3  |    and that her throat had been slashed.             |
| 10:47:56 | 4  | Q  Anything else?                                    |
| 10:47:59 | 5  | A  No.                                               |
| 10:47:59 | 6  | Q  Do you recall the -- there had also been          |
| 10:48:22 | 7  |    evidence of prostitution in the house where       |
| 10:48:26 | 8  |    Ms. Payne was staying?                            |
| 10:48:27 | 9  | A  Yes.                                              |
| 10:48:33 | 10 | Q  Okay.  And do you have an independent             |
| 10:48:38 | 11 |    recollection as you sit here today whether you    |
| 10:48:41 | 12 |    and your partner, Jim DeValkenaere, also were     |
| 10:48:45 | 13 |    investigating Ms. Payne's homicide as a           |
| 10:48:48 | 14 |    possible sexual assault as well as a homicide?    |
| 10:48:56 | 15 | A  No.                                               |
| 10:48:58 | 16 | Q  Okay.  Meaning "No," you do not recall, or        |
| 10:49:03 | 17 |    "No," you did not investigate it as a sexual      |
| 10:49:06 | 18 |    assault?                                          |
| 10:49:06 | 19 | A  We wouldn't have investigated the sexual          |
| 10:49:11 | 20 |    assault.                                          |
| 10:49:11 | 21 | Q  Why not?                                          |
| 10:49:12 | 22 | A  That would have already been done during the      |
| 10:49:15 | 23 |    initial investigation.                            |
| 10:49:16 | 24 | Q  But in your review of your -- the records, you    |
| 10:49:23 | 25 |    would have reviewed that a sexual assault kit     |

| | | |
|---|---|---|
| 10:49:25 | 1 | was collected from Ms. Payne, right? |
| 10:49:28 | 2 | A   Yes. |
| 10:49:28 | 3 | Q   And do you remember -- you don't remember |
| 10:49:33 | 4 | the -- well, do you remember now whether her |
| 10:49:37 | 5 | body was found clothed or partially clothed? |
| 10:49:40 | 6 | A   Partially clothed. |
| 10:49:42 | 7 | Q   Do you remember how she was partially clothed? |
| 10:49:46 | 8 | A   Her shirt was pulled up, and her pants were |
| 10:49:51 | 9 | pulled down. |
| 10:49:52 | 10 | Q   Okay.  Did your review of the way in which |
| 10:50:04 | 11 | Ms. Payne's body was found indicate to you that |
| 10:50:07 | 12 | there was a possibility she had been the victim |
| 10:50:09 | 13 | of a sexual assault or an attempted sexual |
| 10:50:12 | 14 | assault? |
| 10:50:12 | 15 | A   Definitely could have been. |
| 10:50:15 | 16 | Q   Do you also have a memory of the medical |
| 10:50:28 | 17 | examiner identifying an unidentified white |
| 10:50:32 | 18 | substance in her vagina? |
| 10:50:41 | 19 | A   Yes. |
| 10:50:41 | 20 | Q   Okay.  I believe you also testified in your |
| 10:51:00 | 21 | prior deposition in the Ott case that in |
| 10:51:03 | 22 | addition to reading the police reports, you |
| 10:51:05 | 23 | also would have read the medical -- you did |
| 10:51:08 | 24 | read the medical examiner's report before your |
| 10:51:11 | 25 | involvement in investigating the Payne |

Case 2:19-cv-01106-PP   Filed 03/20/24   Page 34 of 249   Document 119-4

| | | |
|---|---|---|
| 10:51:12 | 1 | homicide.  Is that -- do you remember that? |
| 10:51:17 | 2 | A   Yes. |
| 10:51:17 | 3 | Q   Okay.  And why would you read the medical |
| 10:51:20 | 4 | examiner's report? |
| 10:51:21 | 5 | A   It's all part of the file, and I read the whole |
| 10:51:25 | 6 | file. |
| 10:51:25 | 7 | Q   Okay.  When you became a detective in the |
| 10:51:39 | 8 | Milwaukee Police Department in April 1991, did |
| 10:51:42 | 9 | you go to a detective training academy for some |
| 10:51:45 | 10 | portion of time before being -- working as a |
| 10:51:48 | 11 | detective? |
| 10:51:49 | 12 | A   Yes. |
| 10:51:49 | 13 | Q   How long was the detective academy back in |
| 10:51:53 | 14 | 1991? |
| 10:51:53 | 15 | A   It was 80 hours. |
| 10:51:56 | 16 | Q   Was it 80 hours classroom? |
| 10:51:59 | 17 | A   Yes. |
| 10:51:59 | 18 | Q   Was that conducted here in Milwaukee? |
| 10:52:02 | 19 | A   Yes. |
| 10:52:03 | 20 | Q   Were you given training on how to conduct |
| 10:52:07 | 21 | interrogations of suspects? |
| 10:52:13 | 22 | A   No. |
| 10:52:13 | 23 | Q   Were you given any training on how to interview |
| 10:52:18 | 24 | suspects? |
| 10:52:20 | 25 | A   No. |

| | | |
|---|---|---|
| 10:52:20 | 1 | Q | Were you given any training on how to take a |
| 10:52:25 | 2 | | statement from a witness or suspect? |
| 10:52:29 | 3 | A | No. |
| 10:52:29 | 4 | Q | Do you remember the subject matter of any of |
| 10:52:38 | 5 | | the 80 hours of training you were provided when |
| 10:52:40 | 6 | | you were promoted to a detective by the |
| 10:52:42 | 7 | | Milwaukee Police Department? |
| 10:52:43 | 8 | A | Yes. |
| 10:52:46 | 9 | Q | What subject matters do you recall being |
| 10:52:49 | 10 | | trained on? |
| 10:52:50 | 11 | A | It was crime scene investigations on various |
| 10:52:57 | 12 | | crimes.  They set up scenarios for homicides |
| 10:53:02 | 13 | | and robberies and arson.  So it was how to |
| 10:53:09 | 14 | | conduct a crime scene investigation. |
| 10:53:11 | 15 | Q | Anything else that you recall? |
| 10:53:16 | 16 | A | No. |
| 10:53:17 | 17 | Q | Did they provide any training on how to prepare |
| 10:53:21 | 18 | | reports as a detective? |
| 10:53:25 | 19 | A | As a police officer, I already knew how to |
| 10:53:28 | 20 | | prepare reports and how to conduct interviews, |
| 10:53:30 | 21 | | and they didn't provide that specially, no. |
| 10:53:37 | 22 | Q | Okay.  Is it fair to say during this time |
| 10:53:40 | 23 | | period as a detective, the reports would be |
| 10:53:43 | 24 | | dictated and called in on a phone line and then |
| 10:53:46 | 25 | | there'd be a stenographer to type it up and |

| | | |
|---|---|---|
| 10:53:48 | 1 | send it back typed up for the detective to |
| 10:53:50 | 2 | review? |
| 10:53:50 | 3 | A | Yes. |
| 10:53:50 | 4 | Q | But that wasn't true on patrol; is that right? |
| 10:53:53 | 5 | A | No. |
| 10:53:53 | 6 | Q | Patrol you just wrote your own reports? |
| 10:53:56 | 7 | A | Correct. |
| 10:53:56 | 8 | Q | Okay.  So at the detective academy they didn't |
| 10:53:59 | 9 | give you any training on how to dictate |
| 10:54:01 | 10 | reports? |
| 10:54:02 | 11 | A | No, not that I recall. |
| 10:54:04 | 12 | Q | That was something you learned on the job once |
| 10:54:07 | 13 | you got your assignment? |
| 10:54:08 | 14 | A | Yes. |
| 10:54:08 | 15 | Q | Okay.  Once you're on the job and you got |
| 10:54:11 | 16 | assigned -- well, strike that. |
| 10:54:14 | 17 | Do you remember who told you how to |
| 10:54:16 | 18 | dictate your reports as a detective? |
| 10:54:17 | 19 | A | No. |
| 10:54:17 | 20 | Q | Were you given any training on the job about |
| 10:54:21 | 21 | what you were supposed to do with the notes you |
| 10:54:24 | 22 | took that were turned into a supplementary |
| 10:54:27 | 23 | report dictated through the phone line that |
| 10:54:30 | 24 | then came back to you? |
| 10:54:31 | 25 | A | Was I told what to do with my -- |

Case 2:19-cv-01106-PP   Filed 03/20/24   Page 37 of 249   Document 119-4

| | | | |
|---|---|---|---|
| 10:54:34 | 1 | Q | Yes. |
| 10:54:35 | 2 | A | No. |
| 10:54:35 | 3 | Q | What did you do with your -- well, is it fair |
| 10:54:40 | 4 | | to say you used to take notes on, like, a steno |
| 10:54:40 | 5 | | pad or some other pad when you were out in the |
| 10:54:42 | 6 | | field as a detective? |
| 10:54:43 | 7 | A | Yes. |
| 10:54:43 | 8 | Q | And that was true when you were a homicide |
| 10:54:45 | 9 | | detective? |
| 10:54:46 | 10 | A | Yes. |
| 10:54:46 | 11 | Q | Did you ever take notes as a homicide detective |
| 10:54:48 | 12 | | in one of your department-issued memo books? |
| 10:54:51 | 13 | A | No. |
| 10:54:51 | 14 | Q | Did you use your memo book as a patrol officer? |
| 10:54:55 | 15 | A | Yes. |
| 10:54:55 | 16 | Q | Okay.  So once you became a detective, you no |
| 10:54:58 | 17 | | longer used memo books? |
| 10:55:00 | 18 | A | No. |
| 10:55:01 | 19 | Q | Did other detectives use memo books? |
| 10:55:03 | 20 | A | I don't recall. |
| 10:55:04 | 21 | Q | Okay.  But your practice was to take notes on a |
| 10:55:07 | 22 | | steno pad; is that right? |
| 10:55:08 | 23 | A | Yes. |
| 10:55:08 | 24 | Q | Okay.  What was your practice with respect to |
| 10:55:12 | 25 | | keeping those notes? |

10:55:14    1    A    If I conducted an interview, I would call a

10:55:21    2         report in based off my notes.  After the report

10:55:27    3         was typed, I reviewed it for its accuracy, and

10:55:31    4         if it was accurate and consistent with my

10:55:33    5         notes, then I destroyed the notes.

10:55:35    6    Q    And were you ever given any instruction one way

10:55:42    7         or the other about maintaining notes as a

10:55:44    8         detective?

10:55:45    9    A    No.

10:55:45   10    Q    What if you had to -- a report came back once

10:55:52   11         it had been written up by the stenographer and

10:55:54   12         you needed to make changes?  What -- how did

10:55:56   13         you do that?

10:55:57   14    A    I would go down and talk to the stenographer in

10:56:01   15         person, point out where changes needed to be

10:56:05   16         made.  They would make the changes, I'd review

10:56:08   17         them for the accuracy, and then I would keep

10:56:10   18         that report as the report of record.

10:56:12   19    Q    Okay.  When you said you would keep the report

10:56:15   20         as the report of record, would you keep a

10:56:17   21         personal copy, or it would go in the file?

10:56:20   22    A    It would go in the file.

10:56:21   23    Q    Were -- were the detectives responsible for

10:56:22   24         turning it into the admin to get it in the

10:56:25   25         file?

| | | |
|---|---|---|
| 10:56:28 | 1 | A We would review the reports and place them in |
| 10:56:33 | 2 | a -- a tray where a clerk would file them. |
| 10:56:35 | 3 | Q Okay. Would the -- would you have to place |
| 10:56:38 | 4 | them in a tray for a supervisor to sign off on |
| 10:56:41 | 5 | them first? |
| 10:56:41 | 6 | A Yes. |
| 10:56:41 | 7 | Q And then you'd have to put them in another tray |
| 10:56:44 | 8 | for the clerk to file once they were signed off |
| 10:56:47 | 9 | on? |
| 10:56:47 | 10 | A The supervisor would put them in so that they |
| 10:56:50 | 11 | could be filed. |
| 10:56:50 | 12 | Q Okay. So the detectives didn't put them in the |
| 10:56:54 | 13 | basket for the clerk to file; they put them in |
| 10:56:57 | 14 | the basket for the supervisor to sign off? |
| 10:56:59 | 15 | A I don't recall. |
| 10:56:59 | 16 | Q Okay. When you went to review -- do you have a |
| 10:57:04 | 17 | memory as you sit here today of reviewing the |
| 10:57:07 | 18 | Payne file when you first took it on as a cold |
| 10:57:10 | 19 | case? |
| 10:57:10 | 20 | A Independent memory of looking at the file? No. |
| 10:57:12 | 21 | Q Okay. But based on your memory of -- general |
| 10:57:17 | 22 | memory of what happened back then, if you |
| 10:57:19 | 23 | wanted to review an M file when you were a |
| 10:57:22 | 24 | homicide detective, what would you do to obtain |
| 10:57:24 | 25 | the file to look at it? |

| | | | |
|---|---|---|---|
| 10:57:25 | 1 | A | Pull the file off the shelf and look at it. |
| 10:57:30 | 2 | Q | Could a detective just go into the room with a |
| 10:57:34 | 3 | | murder file -- do you call them "M files," or |
| 10:57:37 | 4 | | do you call -- |
| 10:57:37 | 5 | A | "M file." |
| 10:57:38 | 6 | Q | "M file." And "M file" meant "murder file"? |
| 10:57:40 | 7 | A | Yes. |
| 10:57:40 | 8 | Q | If you wanted to get an M file and look at it, |
| 10:57:44 | 9 | | could you just go as a homicide detective and |
| 10:57:47 | 10 | | pull it off a shelf, or did you have to check |
| 10:57:49 | 11 | | it out from the clerk? |
| 10:57:50 | 12 | A | If you were going to remove it from the CIB, |
| 10:57:53 | 13 | | you needed to sign it out. |
| 10:57:55 | 14 | Q | Okay. Did you ever take M files into the |
| 10:57:58 | 15 | | field, like sign them out to take them into the |
| 10:58:01 | 16 | | field? |
| 10:58:01 | 17 | A | No. |
| 10:58:01 | 18 | Q | Would you sign them out to take an M file over |
| 10:58:05 | 19 | | to the DA's office for a charging conference? |
| 10:58:09 | 20 | A | Yes. |
| 10:58:09 | 21 | Q | Or for court? |
| 10:58:10 | 22 | A | Yes. |
| 10:58:10 | 23 | Q | Okay. Otherwise, if you were going to look at |
| 10:58:12 | 24 | | an M file, you did it in the CIB bureau? |
| 10:58:15 | 25 | A | Yes. |

10:58:15   1    Q    I think I said "CIB."  CID bureau.

10:58:22   2              Okay.  Did you -- I think you just

10:58:41   3         said you never used your memo book as a

10:58:44   4         detective; is that right?

10:58:46   5    A    Correct.

10:58:46   6    Q    But you maintained your memo books from when

10:58:49   7         you were on patrol for your entire career as a

10:58:51   8         Milwaukee Police Department officer?

10:58:54   9    A    After I got promoted, I -- when I retired,

10:59:04  10         that's when all my memo books and everything

10:59:09  11         were destroyed.

10:59:10  12    Q    Your memo books and everything?  What else

10:59:13  13         was -- did you destroy other than the memo

10:59:15  14         books?

10:59:15  15    A    My memo books.

10:59:16  16    Q    Okay.  And you burnt them, right?

10:59:18  17    A    Yes.

10:59:18  18    Q    Where did you burn them?

10:59:20  19    A    In a fire.

10:59:23  20    Q    Where was the fire?

10:59:26  21    A    In my backyard.

10:59:27  22    Q    Okay.  How long after your retirement did you

10:59:30  23         burn your memo books?

10:59:32  24    A    I don't recall.  It was recently after I

10:59:40  25         retired.

Case 2:19-cv-01106-PP  Filed 03/20/24  Page 42 of 249  Document 119-4

| | | | |
|---|---|---|---|
| 10:59:41 | 1 | Q | Okay.  Do you need a break, or are you okay? |
| 10:59:53 | 2 | A | I'm okay. |
| 10:59:54 | 3 | Q | Okay.  I believe you just testified that you |
| 11:00:05 | 4 | | | did not receive any training with respect to |
| 11:00:08 | 5 | | | interviewing witnesses or suspects or |
| 11:00:11 | 6 | | | interrogations at the detective academy when |
| 11:00:14 | 7 | | | you were promoted, true? |
| 11:00:16 | 8 | A | Not that I can recall. |
| 11:00:17 | 9 | Q | Okay.  But you did receive some of that |
| 11:00:20 | 10 | | | training back at the original police academy |
| 11:00:23 | 11 | | | when you attended? |
| 11:00:25 | 12 | A | Yes. |
| 11:00:25 | 13 | Q | Okay.  Do you recall any of the substance that |
| 11:00:30 | 14 | | | you were provided as a cadet at the academy |
| 11:00:35 | 15 | | | with respect to how to interview suspects? |
| 11:00:38 | 16 | A | No. |
| 11:00:38 | 17 | Q | How about with respect to interrogation skills |
| 11:00:41 | 18 | | | or techniques? |
| 11:00:42 | 19 | A | Not that I can recall. |
| 11:00:43 | 20 | Q | Do you recall any in-service trainings you |
| 11:00:46 | 21 | | | received with respect to interrogation |
| 11:00:48 | 22 | | | techniques? |
| 11:00:49 | 23 | A | No. |
| 11:00:49 | 24 | Q | Were you ever sent to an outside training? |
| 11:00:56 | 25 | A | No. |

| | | |
|---|---|---|
| 11:00:56 | 1 | Q |
| 11:01:04 | 2 | |

**Q** Do you know the term "Reid technique" from John Reid & Associates?

**A** I've heard that, yes.

**Q** Did you get any training in the Reid technique of interrogations while you were an officer with the Milwaukee Police Department?

**A** No.

**Q** Were you provided any on-the-job training when you were promoted to detective on how to conduct interrogations?

**A** Yes.

**Q** Do you remember any of the officers or detectives that trained you?

**A** No.

**Q** Do you remember anything that you were told on the job about how to conduct interrogations?

**A** Not that I recall.

**Q** Do you recall any of the -- do they call them "general orders" up here?  I forget.  I use the Chicago term.  What are the orders called that direct Milwaukee Police Department's -- the directives or the orders that direct your officers' conduct?  Do you have a name for that?  Like, the policies and procedures?

**A** Rules and regulations.

| | | |
|---|---|---|
| 11:02:07 | 1 | Q  Rules and regulations.  Okay.  I'm sorry.  I |
| 11:02:10 | 2 | was using the Chicago term. |
| 11:02:12 | 3 | Do you remember, as you sit here |
| 11:02:14 | 4 | today, any of the Milwaukee Police Department's |
| 11:02:16 | 5 | rules and regulations pertaining to |
| 11:02:19 | 6 | interrogations? |
| 11:02:20 | 7 | A  No. |
| 11:02:20 | 8 | Q  How about any of the rules and regulations |
| 11:02:23 | 9 | pertaining to custodial interrogations? |
| 11:02:26 | 10 | A  No. |
| 11:02:26 | 11 | Q  Okay.  So back to your training, you don't |
| 11:02:37 | 12 | remember any of the detectives who trained you |
| 11:02:39 | 13 | on interrogation skills or techniques, and did |
| 11:02:42 | 14 | I ask you, do you remember anything of the |
| 11:02:45 | 15 | substance you were taught? |
| 11:02:46 | 16 | A  And I don't -- I do not recall. |
| 11:02:48 | 17 | Q  Okay.  As a homicide detective, did you have a |
| 11:03:21 | 18 | personal practice in how you conducted |
| 11:03:24 | 19 | interrogations of possible suspects with |
| 11:03:26 | 20 | respect to how you -- well, strike that.  Let |
| 11:03:31 | 21 | me try again. |
| 11:03:31 | 22 | When you were a homicide detective |
| 11:03:36 | 23 | with the Milwaukee Police Department, did you |
| 11:03:40 | 24 | have a personal practice with respect to how |
| 11:03:42 | 25 | you treated non-public facts about the homicide |

| 11:03:47 | 1 | | when you were interrogating suspects? |
| 11:03:52 | 2 | A | I don't understand the question. |
| 11:03:53 | 3 | Q | Thanks for letting me know.  It maybe wasn't |
| 11:03:57 | 4 | | clear.  Do you understand the phrase |
| 11:03:58 | 5 | | "non-public facts"? |
| 11:04:02 | 6 | A | No. |
| 11:04:02 | 7 | Q | No.  Okay.  So you know when you're |
| 11:04:05 | 8 | | investigating a homicide, there's details about |
| 11:04:07 | 9 | | how the crime occurred -- maybe the weapon |
| 11:04:09 | 10 | | used, where the injuries are on the body, where |
| 11:04:11 | 11 | | the body was found -- that isn't reported in |
| 11:04:15 | 12 | | the news or generally known.  I'm referring to |
| 11:04:17 | 13 | | that as, like, a non-public fact, something |
| 11:04:19 | 14 | | that only the investigators and the perpetrator |
| 11:04:26 | 15 | | would know. |
| 11:04:27 | 16 | A | Okay. |
| 11:04:27 | 17 | Q | Do you understand what I'm saying now? |
| 11:04:29 | 18 | A | Yes. |
| 11:04:29 | 19 | Q | So, for example, if you're an investigating a |
| 11:04:33 | 20 | | homicide of a missing person and you're |
| 11:04:38 | 21 | | interrogating a suspect and the suspect can |
| 11:04:40 | 22 | | take you to the body, that's good evidence that |
| 11:04:43 | 23 | | that's the perpetrator, right? |
| 11:04:45 | 24 | A | Yes. |
| 11:04:45 | 25 | Q | Okay.  Similarly, if you're interrogating |

| | | |
|---|---|---|
| 11:04:50 | 1 | somebody and they know a specific detail about |
| 11:04:53 | 2 | injuries to the victim or something about the |
| 11:04:55 | 3 | crime scene, that helps the investigator |
| 11:04:59 | 4 | understand that this is the -- the suspect |
| 11:05:01 | 5 | they're interrogating is the perpetrator, |
| 11:05:03 | 6 | right? |
| 11:05:03 | 7 | A  Yes. |
| 11:05:04 | 8 | Q  So did you have a practice with respect to how |
| 11:05:06 | 9 | you treated non-public facts in the context of |
| 11:05:10 | 10 | your interrogation of a suspect in a homicide? |
| 11:05:13 | 11 | A  I would keep them private. |
| 11:05:18 | 12 | Q  And why would you keep them private? |
| 11:05:23 | 13 | A  If I was conducting an interrogation, I would |
| 11:05:26 | 14 | want to hear it from the person I'm |
| 11:05:28 | 15 | interrogating. |
| 11:05:31 | 16 | Q  Did you make efforts to try and determine what |
| 11:05:36 | 17 | facts were known in the public either through |
| 11:05:38 | 18 | the news or through people who had found a |
| 11:05:42 | 19 | victim and it was generally known in the |
| 11:05:44 | 20 | neighborhood, would you try and figure out what |
| 11:05:46 | 21 | was sort of known and not known? |
| 11:05:48 | 22 | A  I'm sorry, again I don't understand. |
| 11:05:50 | 23 | Q  Oh, I'm sorry.  That's a bad question.  Thank |
| 11:05:52 | 24 | you.  I'm sorry.  Did you ever make any effort |
| 11:05:55 | 25 | to try and determine what facts were known |

11:05:57  1     publicly either because reported in the news or

11:05:59  2     known in the neighborhood where the crime

11:06:01  3     occurred and those that were truly non-public

11:06:06  4     facts, known only to the investigators and the

11:06:09  5     perpetrator?

11:06:09  6   A  Now, we're talking the Payne homicide?

11:06:11  7   Q  I was talking in general, but -- I was talking

11:06:16  8      in general.

11:06:17  9   A  In general?

11:06:17  10  Q  Yep.

11:06:19  11  A  Could you repeat the question again?

11:06:22  12  Q  Yeah, no problem.  I'm -- I'm sorry that

11:06:25  13     they're not clear.  I think that's my fault.

11:06:28  14     Did you have a general practice with respect to

11:06:30  15     when you were interrogating a suspect in a

11:06:33  16     homicide investigation to try and determine

11:06:36  17     before you interrogated the suspect what facts

11:06:38  18     were known publicly about the crime and what

11:06:41  19     weren't known publicly about the crime?

11:06:44  20  A  Yes.

11:06:44  21  Q  And why would you do that?

11:06:46  22  A  So that you would have knowledge of the crime

11:06:55  23     and you -- I would not share that knowledge

11:06:57  24     with the person I was interrogating because I

11:07:01  25     would want to hear it from that person.  If

11:07:02  1    they did have knowledge, I wanted to hear it

11:07:05  2    from them.

11:07:06  3  Q  Would you ever use a non-public fact to test

11:07:11  4    whether the suspect had knowledge or not?

11:07:13  5    Would you ever do that in the context of an

11:07:15  6    interrogation?

11:07:16  7  A  Yes.

11:07:18  8  Q  So sometimes you would use a non-public fact to

11:07:20  9    try and tease out whether the person had

11:07:24 10    knowledge or not?

11:07:25 11  A  I'm allowed to, yes.

11:07:26 12  Q  Okay.  So is it fair you sometimes did that

11:07:33 13    from time to time?

11:07:33 14  A  I don't recall how many times.

11:07:35 15  Q  I'm just saying sometimes -- you did do that on

11:07:38 16    occasion, correct?

11:07:41 17  A  I don't recall.

11:07:44 18  Q  I'm not asking how many times you did it; I'm

11:07:47 19    just saying your testimony is that you

11:07:49 20    occasionally would use a non-public fact in the

11:07:52 21    context of an interrogation to try and

11:07:54 22    determine whether the person was a perpetrator

11:07:56 23    or not?

11:07:57 24  A  I recall that I could.  I do not recall if I

11:08:03 25    did or when I did.

| | | |
|---|---|---|
| 11:08:04 | 1 | Q How do you recall that you could do that? |
| 11:08:07 | 2 | A I'm allowed to use trickery when talking to a |
| 11:08:14 | 3 | person that I'm interrogating. |
| 11:08:15 | 4 | Q Okay.  And what -- when you use the term |
| 11:08:23 | 5 | "trickery," was that ever defined for you, what |
| 11:08:29 | 6 | you could do and what you couldn't do? |
| 11:08:31 | 7 | A When would -- when would it have been defined |
| 11:08:40 | 8 | to me? |
| 11:08:40 | 9 | Q Yeah, or was it ever defined to you, like, what |
| 11:08:44 | 10 | are some tools you can use as trickery that |
| 11:08:46 | 11 | were permissible.  You're saying that you |
| 11:08:51 | 12 | were -- you recall that you could do that, that |
| 11:08:51 | 13 | you were allowed to use trickery when you were |
| 11:08:51 | 14 | interrogating a person, and I was just asking |
| 11:08:52 | 15 | you to define what you mean by "trickery." |
| 11:08:54 | 16 | A Giving them facts that were not necessarily |
| 11:09:01 | 17 | true. |
| 11:09:06 | 18 | Q So you could give false facts? |
| 11:09:08 | 19 | A Yes. |
| 11:09:13 | 20 | Q Could you also use non-public facts that were |
| 11:09:20 | 21 | known about the crime that were true to |
| 11:09:24 | 22 | determine whether or not you were talking to |
| 11:09:25 | 23 | the perpetrator of the crime? |
| 11:09:30 | 24 | A Again, if it were facts that would lead to a |
| 11:09:36 | 25 | person being suspected of the crime, I wouldn't |

| | | |
|---|---|---|
| 11:09:42 | 1 | give them those facts until that person gave |
| 11:09:46 | 2 | them to me. |
| 11:09:48 | 3 | Q   Before you interviewed Mr. Richard Gwin in the |
| 11:10:17 | 4 | Payne homicide, you had reviewed all the |
| 11:10:22 | 5 | investigatory reports, right? |
| 11:10:24 | 6 | A   Yes. |
| 11:10:25 | 7 | Q   And the medical examiner's reports, right? |
| 11:10:32 | 8 | A   Anything that was in that file. |
| 11:10:32 | 9 | Q   Would the crime scene photographs have also |
| 11:10:35 | 10 | been in that file, in the M file? |
| 11:10:36 | 11 | A   Yes. |
| 11:10:36 | 12 | Q   So you also reviewed all the crime scene |
| 11:10:38 | 13 | photographs of the Payne homicide |
| 11:10:40 | 14 | investigation, right? |
| 11:10:41 | 15 | A   Yes. |
| 11:10:41 | 16 | Q   And that was something -- you would have seen |
| 11:10:43 | 17 | those photographs prior to your interactions |
| 11:10:46 | 18 | with Mr. Gwin in October 1995, right? |
| 11:10:48 | 19 | A   Yes. |
| 11:10:48 | 20 | Q   Okay.  And so prior to your efforts to locate |
| 11:10:57 | 21 | and identify Cortez, you knew who the victim |
| 11:11:03 | 22 | was, Jessica Payne, right? |
| 11:11:05 | 23 | A   Yes. |
| 11:11:05 | 24 | Q   You knew the date her body was found? |
| 11:11:07 | 25 | A   Yes. |

11:11:07  1   Q   You knew the location that she was found,

11:11:10  2       behind the house?

11:11:12  3   A   Yes.

11:11:13  4   Q   You knew that she was found underneath a stack

11:11:16  5       of mattresses?

11:11:17  6   A   Yes.

11:11:18  7   Q   You knew that she was found with her shirt up,

11:11:22  8       right?

11:11:23  9   A   Yes.

11:11:23  10  Q   You knew that she was wearing a green bra and

11:11:25  11      it was torn?

11:11:26  12  A   That I don't recall.

11:11:27  13  Q   Okay.  But you would have known that based on

11:11:30  14      your review of the photographs and the records,

11:11:33  15      right?

11:11:33  16  A   Yes.

11:11:33  17  Q   And you knew that she was found with her pants

11:11:36  18      pulled down, right?

11:11:37  19  A   Yes.

11:11:37  20  Q   You knew that she was identified as having some

11:11:42  21      tattoos on her body, right?

11:11:45  22  A   I would have known then.  I don't recall that

11:11:47  23      now.

11:11:47  24  Q   Sure.  You knew all of the evidence of injury

11:11:55  25      to her body that the medical examiner had

11:11:58  1        identified, right?

11:11:59  2    A   Yes.

11:12:00  3    Q   Okay.  And so you knew that she had -- her neck

11:12:07  4        had been cut, right?

11:12:09  5    A   Yes.

11:12:09  6    Q   You knew there was some bruising on her hands,

11:12:12  7        right?

11:12:15  8    A   If it was in the reports, then I would have

11:12:18  9        known about it.

11:12:18  10   Q   Okay.  You knew there was some bruising on her

11:12:21  11       legs, both the anterior and the post

11:12:24  12       internal -- inside of her leg and outside of

11:12:25  13       her leg, right?

11:12:26  14   A   I don't recall now, but if it was in the

11:12:33  15       reports, then I'm sure I reviewed it.

11:12:36  16   Q   Okay.  And you had knowledge in terms of what

11:12:46  17       was reported about Ms. Payne's whereabouts

11:12:49  18       until she was found; you had knowledge about

11:12:52  19       where she had been staying and some of the

11:12:54  20       people she had been with as well, right?

11:12:56  21   A   Yes.

11:12:56  22   Q   Okay.  Okay.  You said earlier that you had a

11:13:24  23       limited but independent recollection of your

11:13:27  24       interactions with Mr. Chaunte Ott, right?

11:13:30  25   A   Yes.

11:13:31  1   Q   Can you please describe for me your independent

11:13:34  2       recollections of your interactions with Chaunte

11:13:37  3       Ott during the Payne homicide investigation?

11:13:39  4   A   We met with him in an interview room.

11:13:44  5   Q   At the CIB?

11:13:45  6   A   In the CIB.  And I remember him being very

11:13:53  7       smug, and he denied any knowledge or

11:13:58  8       involvement.

11:14:00  9   Q   Can you describe for me what Mr. -- you recall

11:14:11  10      Mr. Ott saying or doing that made you interpret

11:14:18  11      him as being very smug?

11:14:19  12  A   He was chuckling and laughing.

11:14:21  13  Q   Anything else?

11:14:26  14  A   No.

11:14:31  15  Q   Do you have an independent recollection of how

11:14:33  16      long you spoke to Mr. Ott?

11:14:34  17  A   No.

11:14:37  18  Q   Do you have an independent memory of the

11:14:40  19      charging conference for Mr. Ott and Mr. Hadaway

11:14:44  20      that was conducted at the district attorney's

11:14:46  21      office with Mark Williams?

11:14:48  22  A   Somewhat.

11:14:49  23  Q   What's your independent recollection of the

11:14:51  24      charging conference with Mark Williams for

11:14:55  25      Mr. Hadaway and Mr. Ott?

11:14:56  1    A    I know that Mr. Hadaway was brought in to talk

11:15:03  2         to Mr. Williams and that he was provided

11:15:06  3         counsel for the interview and that Hadaway

11:15:16  4         confirmed that what he told us was the truth,

11:15:21  5         and he went to relay that statement back to

11:15:26  6         Mr. Williams.

11:15:27  7    Q    Do you have an independent recollection of you

11:15:33  8         and -- you taking Mr. Hadaway to be polygraphed

11:15:38  9         after the charging conference?

11:15:41  10   A    I know that he was polygraphed.  I don't know

11:15:44  11        if I took him there.  I don't recall that.

11:15:47  12   Q    Okay.  Okay.  Do you remember Mr. Gwin being

11:15:54  13        part of this charging conference?

11:15:58  14   A    I don't know at what point Mr. Gwin was brought

11:16:04  15        in to talk to Mr. Williams.

11:16:06  16   Q    Okay.  Have you told me everything that

11:16:15  17        consists of your independent recollection of

11:16:17  18        your interactions with Mr. Ott?

11:16:18  19   A    Yes.

11:16:19  20   Q    Okay.  Now, you also said you had an

11:16:23  21        independent recollection that had been recently

11:16:27  22        refreshed by your review of the statements

11:16:29  23        Mr. Hadaway gave to you and James DeValkenaere,

11:16:31  24        as well as other detectives: Eric Moore,

11:16:36  25        Detective Dubis, and Detective Percy Moore,

| | | |
|---|---|---|
| 11:16:39 | 1 | right? |
| 11:16:39 | 2 | A    Yes. |
| 11:16:39 | 3 | Q    Okay.  Do you have an independent recollection |
| 11:16:49 | 4 | that before you spoke to Mr. Hadaway that you |
| 11:16:53 | 5 | reviewed the reports or the handwritten |
| 11:16:56 | 6 | statements that Detective Eric Moore, Detective |
| 11:17:01 | 7 | Percy Moore or Dubis had prepared? |
| 11:17:05 | 8 | A    I don't recall looking at their statements. |
| 11:17:08 | 9 | Q    Is it fair to say that you would have known -- |
| 11:17:15 | 10 | you would have read those statements or talked |
| 11:17:16 | 11 | to those detectives to find out what |
| 11:17:20 | 12 | Mr. Hadaway said to them before you spoke to |
| 11:17:22 | 13 | Mr. Hadaway? |
| 11:17:23 | 14 | A    Yes. |
| 11:17:23 | 15 | Q    And why would you do that, or why did you do |
| 11:17:25 | 16 | that? |
| 11:17:26 | 17 | A    So I know what he had told the previous |
| 11:17:30 | 18 | detectives regarding his knowledge or |
| 11:17:33 | 19 | involvement in the investigation. |
| 11:17:36 | 20 | Q    Do you remember that after you and James |
| 11:17:41 | 21 | DeValkenaere talked to Richard Gwin that you |
| 11:17:45 | 22 | briefed the next shift and told them to go find |
| 11:17:48 | 23 | Mr. Hadaway and bring him in? |
| 11:17:49 | 24 | A    I don't recall that. |
| 11:17:56 | 25 | Q    Okay.  I'm going to mark your deposition, your |

11:18:13  1        first deposition in the Ott case as Exhibit 1

11:18:16  2        and see if it refreshes your recollection,

11:18:18  3        okay?

11:18:18  4                 (Discussion off the record.)

11:18:36  5                 (Exhibit No. 1 was marked.)

11:18:53  6                 MS. DONNELL:  Do you want to take a

11:18:55  7        short break, or are you just e-mailing it now?

11:18:59  8                 MS. WILLIAMS:  I'm just looking for

11:19:02  9        it.  It'll just take me a second.

11:19:05 10                 MS. GEHLING:  You can start.  It's

11:19:06 11        fine.  You don't have to wait for me.

11:19:08 12                 MS. DONNELL:  Okay.

11:19:09 13    BY MS. DONNELL:

11:19:09 14    Q    Mr. Buschmann, I'm going to hand you what I've

11:19:12 15        designated as Exhibit 1 to your deposition, and

11:19:15 16        Exhibit 1 is the deposition that was taken of

11:19:17 17        you in the Ott versus City of Chicago matter on

11:19:21 18        June 30th, 2010, okay?

11:19:24 19    A    Okay.

11:19:24 20    Q    And I'm going to call your attention to Page 91

11:19:32 21        of your deposition, and this has four pages, so

11:19:38 22        it's going to be on Page 93.

11:19:44 23    A    Page 93?

11:19:46 24    Q    93 of the document, but it's going to be

11:19:48 25        Page 91 of the deposition.  It's kind of

Case 2:19-cv-01106-PP  Filed 03/20/24  Page 57 of 249  Document 119-4

|         |    |   |                                              |
|---------|----|---|----------------------------------------------|
| 11:19:51 | 1  |   | strange.  I'm not sure why.  Oh, here.  It's |
| 11:19:55 | 2  |   | about midway through.                        |
| 11:20:13 | 3  |   | Okay.  So, Mr. Buschmann, I'm just           |
| 11:20:15 | 4  |   | going to have you review your testimony on   |
| 11:20:17 | 5  |   | Page 91 starting at Line 3 going down to Line, |
| 11:20:26 | 6  |   | let's see, 21, and you can just let me know  |
| 11:20:34 | 7  |   | when you've had a chance to review that      |
| 11:20:36 | 8  |   | testimony.                                   |
| 11:20:50 | 9  | A | Okay.                                        |
| 11:20:50 | 10 | Q | Does that refresh your recollection that after |
| 11:20:53 | 11 |   | you and James DeValkenaere drove Mr. Gwin home |
| 11:20:57 | 12 |   | that you briefed the next shift of detectives |
| 11:20:59 | 13 |   | to try and locate Mr. Hadaway?               |
| 11:21:03 | 14 | A | Maybe I'm in the wrong part here.            |
| 11:21:06 | 15 | Q | Okay.                                        |
| 11:21:08 | 16 | A | You said Page --                            |
| 11:21:09 | 17 | Q | Page 91, lines --                           |
| 11:21:15 | 18 | A | Oh.                                          |
| 11:21:15 | 19 | Q | Sorry.                                       |
| 11:21:15 | 20 | A | I'm on 81.                                   |
| 11:21:15 | 21 | Q | Oh, 81?                                      |
| 11:21:16 | 22 | A | I'm sorry.                                   |
| 11:21:17 | 23 | Q | No problem.  That's not a problem.  Thanks for |
| 11:21:21 | 24 |   | letting me know.  If you want to just review |
| 11:21:23 | 25 |   | your testimony on Page 91 of the deposition  |

Case 2:19-cv-01106-PP  Filed 03/20/24  Page 58 of 249  Document 119-4

|  |  |  |
|---|---|---|
| 11:21:26 | 1 | starting at Line 3 -- |
| 11:21:29 | 2 | A    Okay. |
| 11:21:30 | 3 | Q    -- to, like, Line 23.  21, sorry.  3 to 21. |
| 11:21:35 | 4 | A    Okay. |
| 11:21:35 | 5 | Q    Okay.  Did you have a chance to review your |
| 11:21:38 | 6 | testimony back in 2010? |
| 11:21:39 | 7 | A    Yes. |
| 11:21:39 | 8 | Q    Does that refresh your recollection that it was |
| 11:21:42 | 9 | you and your partner, DeValkenaere, James |
| 11:21:46 | 10 | DeValkenaere, had briefed the next shift of |
| 11:21:48 | 11 | detectives after you drove Mr. Gwin home? |
| 11:21:51 | 12 | A    Yes. |
| 11:21:52 | 13 | Q    Okay.  Do you, as you sit here -- and I can -- |
| 11:21:55 | 14 | you can set that down.  We'll just leave it |
| 11:21:56 | 15 | here if we need it.  Do you remember anything |
| 11:21:58 | 16 | about that briefing? |
| 11:22:03 | 17 | A    No. |
| 11:22:03 | 18 | Q    Okay.  Generally speaking, can you describe |
| 11:22:07 | 19 | what those briefing -- were there -- sorry, |
| 11:22:10 | 20 | strike that. |
| 11:22:10 | 21 | Were there briefings at the beginning |
| 11:22:14 | 22 | and end of each shift in the detective -- in |
| 11:22:19 | 23 | the homicide unit? |
| 11:22:19 | 24 | A    Yes. |
| 11:22:19 | 25 | Q    Okay.  And what did those briefings consist of? |

11:22:22  1    A    Any follow-up that had been conducted by the

11:22:25  2         previous shift would be conveyed to the next

11:22:29  3         shift that's going to still be working on the

11:22:31  4         case, and any new information that was obtained

11:22:35  5         by the previous shift would be passed on to the

11:22:38  6         shift that was going to be working on the case.

11:22:40  7    Q    So was it common practice that when you were

11:22:43  8         coming on shift you would start your shift by

11:22:46  9         hearing the briefing from the shift going off?

11:22:48 10    A    Yes.

11:22:48 11    Q    And then it was also common practice that

11:22:51 12         unless you were actively investigating a crime,

11:22:54 13         you'd come back to CIB and participate in the

11:22:57 14         briefing at the end of the shift?

11:22:59 15    A    Yes.

11:22:59 16    Q    And was the purpose or one of the main reasons

11:23:02 17         of that is to have continuity in investigations

11:23:05 18         and to pass on new information?

11:23:06 19    A    Yes.

11:23:06 20    Q    And that was because while reports might be

11:23:09 21         getting dictated -- they weren't quite in the

11:23:11 22         file -- you could share information in real

11:23:13 23         time about what had happened through the course

11:23:15 24         of the shift?

11:23:16 25    A    Correct.

| | | |
|---|---|---|
| 11:23:16 | 1 | Q    Okay.  Okay.  I was asking you some questions |
| 11:23:38 | 2 | about the training you received or didn't |
| 11:23:43 | 3 | receive about interrogations of suspects.  Did |
| 11:23:47 | 4 | you have a -- a general approach to how you |
| 11:23:49 | 5 | conducted interrogations when you were working |
| 11:23:51 | 6 | homicide as a Milwaukee police detective? |
| 11:23:54 | 7 | A    Yes. |
| 11:23:55 | 8 | Q    Can you describe your approach to |
| 11:23:57 | 9 | interrogations of suspects? |
| 11:23:59 | 10 | A    Every person is different, but I had a -- a set |
| 11:24:06 | 11 | practice that I tried to follow where I would |
| 11:24:12 | 12 | first advise the person of their Miranda |
| 11:24:17 | 13 | warnings, then I would get background |
| 11:24:20 | 14 | information, and then I would start talking to |
| 11:24:24 | 15 | them about whatever incident it was that I was |
| 11:24:27 | 16 | investigating.  I would write the statement out |
| 11:24:34 | 17 | in the presence of that person.  I would read |
| 11:24:38 | 18 | it out loud to them.  I would make note of any |
| 11:24:45 | 19 | cross-outs or deletions or additions I had on |
| 11:24:49 | 20 | the statement, and I would have them place |
| 11:24:51 | 21 | their initials where that correction was made, |
| 11:24:54 | 22 | and I would also place my initials there. |
| 11:24:58 | 23 | At the end of the statement, I would |
| 11:25:01 | 24 | have them write that they had either read or |
| 11:25:04 | 25 | had read to them the statement and that it was |

11:25:07   1    true and had them sign it.  Then after the

11:25:11   2    statement was done, then I asked them if there

11:25:13   3    would be anything they would want to write in

11:25:16   4    their own handwriting and in their own words at

11:25:19   5    the end of the statement.

11:25:20   6  Q  Why would you do that last part, ask them to --

11:25:24   7    if they wanted to write anything out in their

11:25:26   8    own words?

11:25:27   9  A  It personalizes the -- the statement and if

11:25:32  10    they -- many times they show remorse, and they

11:25:38  11    want to put in words that they are apologizing

11:25:41  12    or why they did something and they want to

11:25:45  13    apologize to families and of the such.

11:25:49  14  Q  Was the approach to interrogations that you've

11:25:58  15    just described for us that you used, was that

11:26:00  16    in any way informed by your training at the

11:26:06  17    detective academy?

11:26:09  18  A  No.

11:26:09  19  Q  Okay.  Were you given any training as a

11:26:23  20    detective or a police officer on how to handle

11:26:28  21    an individual with -- individuals with limited

11:26:31  22    cognitive functioning?

11:26:33  23  A  No.

11:26:33  24  Q  How about how to -- and is that true with

11:26:38  25    interrogations, you didn't get any special

| | | |
|---|---|---|
| 11:26:40 | 1 | training on how to conduct interrogations of |
| 11:26:42 | 2 | someone with limitations in their cognitive |
| 11:26:45 | 3 | functioning? |
| 11:26:45 | 4 | A    No. |
| 11:26:47 | 5 | Q    Okay.  How about as a detective or police |
| 11:26:54 | 6 | officer?  Did the Milwaukee Police Department |
| 11:26:57 | 7 | provide to you any training on -- on custodial |
| 11:27:04 | 8 | interrogations of individuals who had medical |
| 11:27:09 | 9 | needs? |
| 11:27:10 | 10 | A    Not that I recall. |
| 11:27:11 | 11 | Q    So no training with respect how to handle |
| 11:27:15 | 12 | diabetics or anybody like that? |
| 11:27:17 | 13 | A    Not that I recall. |
| 11:27:17 | 14 | Q    Okay.  You were not provided any training as a |
| 11:27:57 | 15 | polygraph examiner on how to read polygraph |
| 11:28:01 | 16 | charts, correct? |
| 11:28:01 | 17 | A    No. |
| 11:28:01 | 18 | Q    I mean, it's true you don't have any training |
| 11:28:03 | 19 | with respect to polygraphs, right? |
| 11:28:07 | 20 | A    Correct. |
| 11:28:07 | 21 | Q    Okay.  Sorry.  I had that double negative in |
| 11:28:10 | 22 | there. |
| 11:28:17 | 23 |      Okay.  Do you know the person by the |
| 11:28:56 | 24 | name Walter Ellis? |
| 11:29:00 | 25 | A    Yes, I've heard his name. |

| | | |
|---|---|---|
| 11:29:02 | 1 | Q |
| 11:29:06 | 2 | A |
| 11:29:13 | 3 | |
| 11:29:14 | 4 | Q |
| 11:29:24 | 5 | |
| 11:29:27 | 6 | |
| 11:29:30 | 7 | |
| 11:29:31 | 8 | A |
| 11:29:32 | 9 | Q |
| 11:29:39 | 10 | |
| 11:29:41 | 11 | |
| 11:29:44 | 12 | A |
| 11:29:44 | 13 | Q |
| 11:29:46 | 14 | A |
| 11:29:46 | 15 | Q |
| 11:30:13 | 16 | |
| 11:30:14 | 17 | |
| 11:30:31 | 18 | |
| 11:30:31 | 19 | Q |
| 11:30:35 | 20 | |
| 11:30:38 | 21 | |
| 11:30:44 | 22 | |
| 11:30:49 | 23 | |
| 11:30:52 | 24 | |
| 11:30:59 | 25 | |

Q    Okay.  And who do you know Walter Ellis to be?

A    He was referred to as the "North Side
     Strangler."

Q    And did you have any -- well, as you sit here
     today, did you ever have any interactions with
     Mr. Ellis when you were a Milwaukee police
     officer or detective that you're aware of?

A    None.

Q    How about with his -- any of his family
     members?  Do you, as you sit here today,
     remember any interactions with Martha Ellis?

A    No.

Q    Mattie Ellis?

A    No.

Q    All right.  I'm going to mark this as Exhibit
     2.

               (Exhibit No. 2 was marked.)

BY MS. DONNELL:

Q    Okay.  Detective Buschmann, I'm handing you
     what I've designated as Exhibit 2 to your
     deposition.  Do you recognize Exhibit 2 as a
     Milwaukee Police Department Supplementary
     Report, a two-page report?  It has the Bates
     stamp MPD SJH284 and 285.  Do you recognize the
     form that this exhibit is prepared on?

| | | |
|---|---|---|
| 11:31:03 | 1 | A | Yes. |
| 11:31:03 | 2 | Q | Okay. And I'll represent to you that this is |
| 11:31:11 | 3 | | from the M file for the Payne homicide, okay? |
| 11:31:14 | 4 | A | Okay. |
| 11:31:15 | 5 | Q | And do you see here -- I'm going to call your |
| 11:31:20 | 6 | | attention to the bottom of Page 1 of Exhibit 2 |
| 11:31:23 | 7 | | where the officer reports "I then interviewed a |
| 11:31:26 | 8 | | Martha S. Ellis, black female, 2/11/63, of 602 |
| 11:31:33 | 9 | | West Burleigh and she stated that possibly last |
| 11:31:36 | 10 | | Saturday or Sunday she was standing on her |
| 11:31:37 | 11 | | porch when she observed a white female walking |
| 11:31:39 | 12 | | past her house and that she appeared to be 16 |
| 11:31:42 | 13 | | or 17 and she was carrying her shoes and her |
| 11:31:45 | 14 | | purse in her hand and that as she walked past |
| 11:31:48 | 15 | | her house, a car pulled over and she walked |
| 11:31:52 | 16 | | towards the car and after a few seconds, the |
| 11:31:55 | 17 | | car pulled away and she continued to walk on |
| 11:31:57 | 18 | | Burleigh. Ellis was then also interviewed by |
| 11:32:00 | 19 | | the detective bureau." Do you see that? |
| 11:32:02 | 20 | A | Hm-hm, yes. |
| 11:32:03 | 21 | Q | Okay. And so this report of an interview with |
| 11:32:08 | 22 | | Ms. Martha Ellis was one of the reports you |
| 11:32:12 | 23 | | would have reviewed in the -- your review of |
| 11:32:16 | 24 | | the Payne homicide file prior to you working it |
| 11:32:19 | 25 | | up as a cold case, correct? |

| | | |
|---|---|---|
| 11:32:21 | 1 | A   It would have been in the file, yes. |
| 11:32:22 | 2 | Q   Okay.  And you would have reviewed it? |
| 11:32:25 | 3 | A   Yes. |
| 11:32:25 | 4 | Q   Okay.  Okay.  As you sit here today, do you |
| 11:33:13 | 5 |     have a memory of doing any work on the Payne |
| 11:33:15 | 6 |     homicide yourself prior to being involved as a |
| 11:33:17 | 7 |     cold case? |
| 11:33:19 | 8 | A   No. |
| 11:33:19 | 9 | Q   Okay.  Let's mark this as Exhibit 3. |
| 11:33:28 | 10 |     (Exhibit No. 3 was marked.) |
| 11:33:40 | 11 | BY MS. DONNELL: |
| 11:33:40 | 12 | Q   Mr. Buschmann, I'm handing you what I've |
| 11:33:42 | 13 |     designated as Exhibit 3 to your deposition. |
| 11:33:45 | 14 |     Exhibit 3 has Bates stamp MPD SJH354 and 3- -- |
| 11:33:51 | 15 |     534 and 535.  It also has the M file from |
| 11:33:57 | 16 |     M3084, Section 4, Pages 258 and 259.  Do you |
| 11:34:05 | 17 |     recognize Exhibit 3 as your supplementary |
| 11:34:09 | 18 |     report from your work on the Jessica Payne |
| 11:34:11 | 19 |     homicide from back on October 9th, 1995? |
| 11:34:14 | 20 | A   Yes. |
| 11:34:14 | 21 | Q   Okay.  And that's your signature on the back of |
| 11:34:17 | 22 |     Page 2? |
| 11:34:19 | 23 | A   Yes, it is. |
| 11:34:20 | 24 | Q   Okay.  And was this when you were working it as |
| 11:34:22 | 25 |     a cold case, or was this working it before it |

| | | |
|---|---|---|
| 11:34:25 | 1 | became a cold case? |
| 11:34:27 | 2 | A While I was on cold case. |
| 11:34:34 | 3 | Q This would have been on cold case? |
| 11:34:36 | 4 | A Yes. |
| 11:34:36 | 5 | Q How do you know that? |
| 11:34:37 | 6 | A Because that's the first time I was partners |
| 11:34:40 | 7 | with James DeValkenaere. |
| 11:34:41 | 8 | Q Is when you were assigned to the cold case |
| 11:34:45 | 9 | squad? |
| 11:34:45 | 10 | A Yes. |
| 11:34:45 | 11 | Q Okay.  Okay.  And Exhibit 3 is documenting an |
| 11:34:58 | 12 | interview you and James DeValkenaere conducted |
| 11:35:02 | 13 | with Cassandra McMurray who reportedly had |
| 11:35:08 | 14 | information about Rebecca Morrison about the |
| 11:35:10 | 15 | Payne homicide, right? |
| 11:35:11 | 16 | A Yes. |
| 11:35:11 | 17 | Q Okay.  Do you know who Rebecca Morrison was? |
| 11:35:17 | 18 | A Yes. |
| 11:35:17 | 19 | Q Who was she? |
| 11:35:18 | 20 | A She was a friend of Jessica Payne. |
| 11:35:21 | 21 | Q And do you recall that she was with Jessica |
| 11:35:27 | 22 | staying at that home on the north side of |
| 11:35:29 | 23 | Milwaukee with Sandra Giles prior to Jessica's |
| 11:35:32 | 24 | murder? |
| 11:35:33 | 25 | A Yes. |

| | | |
|---|---|---|
| 11:35:33 | 1 | Q   Sandra Giles -- here, I can take that.  Do you |
| 11:35:37 | 2 |      know Sandra Giles? |
| 11:35:39 | 3 | A   I do not. |
| 11:35:40 | 4 | Q   Okay.  Okay.  This will be Exhibit 4. |
| 11:36:57 | 5 |           (Exhibit No. 4 was marked.) |
| 11:36:58 | 6 | BY MS. DONNELL: |
| 11:37:02 | 7 | Q   Okay.  Mr. Buschmann, I'm handing you what I've |
| 11:37:05 | 8 |      designated as Exhibit 4.  Exhibit 4 is Bates |
| 11:37:08 | 9 |      stamped HADAWAY38647 consecutive through 38656. |
| 11:37:17 | 10 |      It also has a prior exhibit designation to the |
| 11:37:20 | 11 |      deposition that I took of you back in the Ott |
| 11:37:22 | 12 |      case on April 12th, 2012, okay? |
| 11:37:27 | 13 | A   Okay. |
| 11:37:27 | 14 | Q   And we have referred to it as the "Moore |
| 11:37:33 | 15 |      report," but it's a memorandum by Detective |
| 11:37:37 | 16 |      Eric Moore dated Tuesday, January 9th, 1996, |
| 11:37:44 | 17 |      documenting -- identifying cases that -- for |
| 11:37:48 | 18 |      possible submission of evidence to the FBI lab |
| 11:37:51 | 19 |      for DNA analysis, right? |
| 11:37:53 | 20 | A   Yes. |
| 11:37:53 | 21 | Q   And I showed this document to you back in April |
| 11:37:57 | 22 |      of 2012.  Do you remember that? |
| 11:37:59 | 23 | A   No. |
| 11:37:59 | 24 | Q   Okay.  Well, I'd like to give you a chance to |
| 11:38:09 | 25 |      look over it, but maybe what we'll do is I'm |

| | | |
|---|---|---|
| 11:38:12 | 1 | going to ask you some preliminary questions, |
| 11:38:14 | 2 | and then I'll give you a chance to read it. |
| 11:38:16 | 3 | It's not very long, but I'm going to ask you |
| 11:38:18 | 4 | some questions first, and then maybe we can |
| 11:38:21 | 5 | take a break and you can look at it, okay? |
| 11:38:21 | 6 | A | Okay. |
| 11:38:22 | 7 | Q | As you sit here today, before you have a chance |
| 11:38:24 | 8 | to look at Exhibit 4 -- and, again, I am going |
| 11:38:27 | 9 | to give you a chance to look at it, so I'm not |
| 11:38:29 | 10 | trying to trick you at all -- but do you |
| 11:38:32 | 11 | remember at that time that the cold case squad |
| 11:38:33 | 12 | was created in the Milwaukee Police Department |
| 11:38:37 | 13 | that there was an effort to identify unsolved |
| 11:38:43 | 14 | homicides that may have been perpetrated by a |
| 11:38:46 | 15 | common perpetrator? |
| 11:38:49 | 16 | A | Yes. |
| 11:38:49 | 17 | Q | Can you tell me what you recall just |
| 11:38:52 | 18 | independent about that? |
| 11:38:56 | 19 | A | I think independently they were prostitutes, |
| 11:39:04 | 20 | known prostitutes, that were found to be |
| 11:39:08 | 21 | victims of homicides. |
| 11:39:10 | 22 | Q | Okay.  And so there was -- was there a thought |
| 11:39:23 | 23 | among homicide detectives that there might be a |
| 11:39:25 | 24 | single perpetrator who was committing those |
| 11:39:28 | 25 | crimes, those murders? |

11:39:29   1    A    They were trying to link them together.

11:39:33   2    Q    And that was -- the thought was that there was

11:39:38   3         enough homicides that had sort of similar

11:39:41   4         features that it looked like it could have been

11:39:43   5         a single perpetrator?

11:39:45   6    A    Yes.

11:39:45   7    Q    Okay.  Do you remember any briefings that

11:39:50   8         happened in the homicide unit that pertained to

11:39:53   9         that?

11:39:54  10    A    I don't recall.

11:39:55  11    Q    Okay.  Do you remember any memos going out that

11:39:59  12         were identifying murders or homicide victims

11:40:01  13         that were possibly linked?

11:40:03  14    A    Not that I recall.

11:40:04  15    Q    Okay.  Do you remember, as you sit here today,

11:40:42  16         any other features of the homicides other than

11:40:45  17         the victims were prostitutes?

11:40:56  18    A    They were all black.

11:41:00  19    Q    The victims were black?

11:41:01  20    A    The victims were black, and I believe they were

11:41:08  21         strangled.

11:41:09  22    Q    And were they -- all the victims you were

11:41:12  23         thinking of, were they women?

11:41:14  24    A    Yes.

11:41:14  25    Q    Okay.  How about the locations where the bodies

| | | |
|---|---|---|
| 11:41:17 | 1 | were found?  Do you remember, as you sit here |
| 11:41:19 | 2 | today, anything that was common about that? |
| 11:41:21 | 3 | A   No. |
| 11:41:21 | 4 | Q   Okay.  Sorry, just one second.  Okay.  Okay. |
| 11:43:01 | 5 | Well, why don't you take a chance to look at |
| 11:43:06 | 6 | Exhibit 4, and maybe we could take just a -- go |
| 11:43:09 | 7 | off the record and take a short break? |
| 11:43:12 | 8 | THE VIDEOGRAPHER:  Going off the |
| 11:43:12 | 9 | record at 11:43. |
| 11:43:16 | 10 | (Brief recess taken.) |
| 11:52:47 | 11 | THE VIDEOGRAPHER:  We're back on the |
| 11:52:53 | 12 | record at 11:52. |
| 11:52:54 | 13 | BY MS. DONNELL: |
| 11:52:55 | 14 | Q   Okay.  On the break, Mr. DeValkenaere -- I |
| 11:52:56 | 15 | mean, Mr. -- sorry, Mr. Buschmann, on the |
| 11:52:59 | 16 | break, were you able to review Exhibit 4 which |
| 11:53:01 | 17 | is the Moore report? |
| 11:53:02 | 18 | A   Yes. |
| 11:53:02 | 19 | Q   Did reviewing the Moore report refresh your |
| 11:53:06 | 20 | recollection in any way of some of the efforts |
| 11:53:09 | 21 | Eric Moore was making as part of the cold case |
| 11:53:12 | 22 | unit to identify cases for further |
| 11:53:14 | 23 | investigation or DNA testing? |
| 11:53:16 | 24 | A   Yes. |
| 11:53:16 | 25 | Q   Okay.  How did -- what did -- how did it |

| | | |
|---|---|---|
| 11:53:18 | 1 | refresh your recollection? |
| 11:53:22 | 2 | A | Just from reading it, that he resubmitted the |
| 11:53:25 | 3 | evidence to be retested at the crime lab, along |
| 11:53:30 | 4 | with possible suspects in the other cases or |
| 11:53:36 | 5 | people of interest. I -- I wasn't in the |
| 11:53:41 | 6 | homicide unit any longer when this report was |
| 11:53:43 | 7 | authored. |
| 11:53:45 | 8 | Q | In January 1996? |
| 11:53:47 | 9 | A | Yes. |
| 11:53:48 | 10 | Q | How do you know that? |
| 11:53:49 | 11 | A | I was only there for about a year, and I |
| 11:53:55 | 12 | went -- went to another unit after. I don't |
| 11:53:59 | 13 | believe I was there at this time. |
| 11:54:01 | 14 | Q | So right after you were doing your |
| 11:54:04 | 15 | investigation of the Payne homicide you were |
| 11:54:06 | 16 | only in the cold case for a couple months or -- |
| 11:54:12 | 17 | because, you know, the -- |
| 11:54:13 | 18 | A | I -- |
| 11:54:14 | 19 | Q | Sorry. |
| 11:54:15 | 20 | A | I would have been there until the end of the -- |
| 11:54:18 | 21 | the Ott trial. So, yeah, I would have been |
| 11:54:21 | 22 | there. |
| 11:54:22 | 23 | Q | Because the Ott trial was in 1996? |
| 11:54:25 | 24 | A | Yes. |
| 11:54:25 | 25 | Q | Okay. So this Moore report would have been at |

| | | |
|---|---|---|
| 11:54:28 | 1 | the same time that you and James DeValkenaere |
| 11:54:31 | 2 | and Eric Moore were all part of the cold case |
| 11:54:34 | 3 | squad? |
| 11:54:35 | 4 | A   Yes. |
| 11:54:35 | 5 | Q   Okay.  So I'm just curious if refreshing -- if |
| 11:54:38 | 6 | reviewing Eric Moore's report on the cases he |
| 11:54:41 | 7 | was reviewing to identify for additional DNA |
| 11:54:45 | 8 | testing refreshed your recollection of any |
| 11:54:48 | 9 | conversations you guys had as the cold case |
| 11:54:51 | 10 | squad about this review he was doing? |
| 11:54:55 | 11 | A   Detective Moore was working by himself on |
| 11:55:01 | 12 | these.  He was assigned to reevaluate the |
| 11:55:04 | 13 | evidence and to resubmit it for testing.  He |
| 11:55:09 | 14 | didn't work with us at all.  This was his |
| 11:55:12 | 15 | assignment. |
| 11:55:12 | 16 | Q   So the cold case squad, those four of you, Eric |
| 11:55:19 | 17 | Moore and -- I'm forgetting the other guy's |
| 11:55:24 | 18 | name.  He was one of your regular partners at |
| 11:55:27 | 19 | one point, too. |
| 11:55:27 | 20 | A   Gary Temp? |
| 11:55:29 | 21 | Q   Gary Temp.  Gary Temp was part of the cold case |
| 11:55:31 | 22 | squad, too, when you were first there, right? |
| 11:55:33 | 23 | A   I believe so, yes. |
| 11:55:33 | 24 | Q   And so he was doing his own thing, or was he |
| 11:55:36 | 25 | partnered with anybody? |

| | | | |
|---|---|---|---|
| 11:55:37 | 1 | A | I can't answer -- I -- I know that Eric Moore |
| 11:55:40 | 2 | | had been assigned to this. |
| 11:55:43 | 3 | Q | Meaning this project of identifying -- |
| 11:55:47 | 4 | A | This project, yes. |
| 11:55:48 | 5 | Q | Meaning Exhibit 4, identifying cases for DNA |
| 11:55:51 | 6 | | testing? |
| 11:55:52 | 7 | A | Correct. |
| 11:55:52 | 8 | Q | Or identifying cold cases that would benefit |
| 11:55:54 | 9 | | from DNA testing? |
| 11:55:56 | 10 | A | Yes. |
| 11:55:56 | 11 | Q | And one of the cases that Eric Moore identified |
| 11:55:58 | 12 | | is Murder 3084 for Jessica Payne, right, if you |
| 11:56:08 | 13 | | look at Page 2 of the Eric Moore report? |
| 11:56:14 | 14 | A | Yes. |
| 11:56:14 | 15 | Q | So Eric Moore was identifying the Payne |
| 11:56:20 | 16 | | homicide as a case that could benefit from |
| 11:56:24 | 17 | | further DNA testing, right? |
| 11:56:26 | 18 | A | Yes. |
| 11:56:26 | 19 | Q | And this was just a few months after you had |
| 11:56:29 | 20 | | obtained statements from Mr. Gwin and |
| 11:56:31 | 21 | | Mr. Hadaway? |
| 11:56:32 | 22 | A | Correct. |
| 11:56:33 | 23 | Q | Okay.  Did you have conversations with Eric |
| 11:56:36 | 24 | | Moore about identifying Jessica Payne's case |
| 11:56:40 | 25 | | for additional DNA testing since it was right |

11:56:43  1        at the time when you and your partner were
11:56:45  2        investigating it?
11:56:45  3   A    Not that I recall.
11:56:47  4   Q    Okay.  Do you see on Page -- and nothing in
11:56:51  5        Exhibit 4 refreshes your recollection about any
11:56:53  6        of those conversations?
11:56:54  7   A    No.
11:56:54  8   Q    As you sit here today, can you think of a
11:56:57  9        reason why Jessica Payne was on this list, you
11:57:05  10       know, two months after you and your partner had
11:57:08  11       obtained statements from Mr. Gwin and
11:57:11  12       Mr. Hadaway?
11:57:11  13            MS. GEHLING:  Objection; foundation.
11:57:15  14       You can answer if you know.
11:57:19  15            THE WITNESS:  No.
11:57:19  16  BY MS. DONNELL:
11:57:19  17  Q    Okay.  On the third page of Eric Moore's
11:57:24  18       report, there were 33 persons that were
11:57:25  19       subsequently identified as possible suspects,
11:57:28  20       right?
11:57:30  21  A    Yes.
11:57:31  22  Q    And some of those individuals are redacted out,
11:57:41  23       correct?
11:57:42  24  A    Yes.
11:57:43  25  Q    And some of those individuals include

| | | |
|---|---|---|
| 11:58:02 | 1 | individuals that were suspects that are |
| 11:58:05 | 2 | identified in the Payne homicide, correct, if |
| 11:58:08 | 3 | you look at Page 4?  So you'll see -- |
| 11:58:18 | 4 | A   Yes. |
| 11:58:18 | 5 | Q   -- suspect -- Eric Moore had identified Suspect |
| 11:58:23 | 6 | No. 27 as Terrance Wallace, right? |
| 11:58:25 | 7 | A   Correct. |
| 11:58:25 | 8 | Q   And that was from the -- a suspect from the |
| 11:58:27 | 9 | Payne homicide? |
| 11:58:27 | 10 | A   Yes. |
| 11:58:28 | 11 | Q   He had identified Johnnie Lee Jones from the |
| 11:58:31 | 12 | Payne homicide? |
| 11:58:32 | 13 | A   Yes. |
| 11:58:32 | 14 | Q   And he identified Walter J.D. Moffett from the |
| 11:58:37 | 15 | Payne homicide, right? |
| 11:58:39 | 16 | A   Yes. |
| 11:58:39 | 17 | Q   Does that refresh your recollection in any way |
| 11:58:41 | 18 | as to conversations you had with Eric Moore |
| 11:58:44 | 19 | about further investigation of three suspects |
| 11:58:47 | 20 | from the Payne homicide you were investigating? |
| 11:58:49 | 21 | A   No. |
| 11:58:49 | 22 | Q   Do you remember the suspect that Eric Moore |
| 11:59:07 | 23 | identified as No. 14, Mr. Thomas Wynn, who had |
| 11:59:12 | 24 | been identified as a suspect in the Preston, |
| 11:59:17 | 25 | McCormick, Farrior, and Maniece cases? |

| | | | |
|---|---|---|---|
| 11:59:18 | 1 | A | Yes. |
| 11:59:18 | 2 | Q | He was a city forestry worker.  Do you remember |
| 11:59:20 | 3 | | that guy? |
| 11:59:22 | 4 | A | Yes, I do. |
| 11:59:23 | 5 | Q | What do you remember about Mr. Wynn? |
| 11:59:25 | 6 | A | That he was a city forestry worker. |
| 11:59:28 | 7 | Q | Anything else? |
| 11:59:29 | 8 | A | No. |
| 11:59:29 | 9 | Q | Do you remember, back then, information about |
| 11:59:34 | 10 | | some of the victims were -- had been part of |
| 11:59:40 | 11 | | community drug rehab groups and had all been |
| 11:59:43 | 12 | | participants in that or some of them had been |
| 11:59:46 | 13 | | participants in community drug rehab groups, a |
| 11:59:49 | 14 | | friendship group, a friendship circle? |
| 11:59:52 | 15 | A | I don't recall. |
| 11:59:56 | 16 | Q | It's fair to say that even though you reviewed |
| 11:59:59 | 17 | | all of Exhibit 4 today, Eric Moore's report, |
| 12:00:03 | 18 | | and see that both Jessica Payne is identified |
| 12:00:07 | 19 | | here for DNA testing and three of the suspects |
| 12:00:13 | 20 | | from Jessica Payne's homicide are identified |
| 12:00:15 | 21 | | for further testing, that nothing in this has |
| 12:00:19 | 22 | | refreshed your recollection as to conversations |
| 12:00:20 | 23 | | you had with Eric Moore back in late '95, early |
| 12:00:25 | 24 | | '96 about the Payne homicide? |
| 12:00:27 | 25 | A | Correct. |

Case 2:19-cv-01106-PP   Filed 03/20/24   Page 77 of 249   Document 119-4

| | | |
|---|---|---|
| 12:00:27 | 1 | Q    Okay.  This memo was submitted to Victor Venus, |
| 12:00:43 | 2 |      the captain of the police, right? |
| 12:00:44 | 3 | A    Yes. |
| 12:00:44 | 4 |           MS. GEHLING:  Objection; foundation. |
| 12:00:46 | 5 | BY MS. DONNELL: |
| 12:00:46 | 6 | Q    Or it's identified to -- on Page 1, to Victor |
| 12:00:50 | 7 |      Venus, right? |
| 12:00:51 | 8 | A    To Victor Venus, yes. |
| 12:00:53 | 9 | Q    And was that the chief of the Milwaukee Police |
| 12:00:56 | 10 |     Department at that time? |
| 12:00:56 | 11 | A    No. |
| 12:00:56 | 12 | Q    He was a captain? |
| 12:00:58 | 13 | A    Yes. |
| 12:00:58 | 14 | Q    Was he captain of the CIB? |
| 12:01:01 | 15 | A    I don't recall. |
| 12:01:02 | 16 | Q    Okay.  When you said Eric Moore had been |
| 12:01:05 | 17 |     assigned to this project of identifying cases |
| 12:01:07 | 18 |     for additional testing, who -- do you know who |
| 12:01:12 | 19 |     assigned him to that task? |
| 12:01:13 | 20 | A    No. |
| 12:01:13 | 21 | Q    Okay.  Who did you report to when you were part |
| 12:01:20 | 22 |     of the cold case squad? |
| 12:01:23 | 23 | A    I don't recall. |
| 12:01:24 | 24 | Q    Okay.  If you previously testified that you |
| 12:01:29 | 25 |     mostly interacted with Lieutenant Ardis, does |

Case 2:19-cv-01106-PP   Filed 03/20/24   Page 78 of 249   Document 119-4

| | | |
|---|---|---|
| 12:01:32 | 1 | that refresh your recollection? |
| 12:01:34 | 2 | A   I know he was a homicide lieutenant. |
| 12:01:38 | 3 | Q   Okay.  Do you ever see or talk to Eric Moore |
| 12:02:30 | 4 | since your retirement? |
| 12:02:31 | 5 | A   No. |
| 12:02:31 | 6 | Q   How about Percy Moore? |
| 12:02:43 | 7 | A   No. |
| 12:02:57 | 8 | Q   Okay.  Do you remember Walter J.D. -- I mean, I |
| 12:03:39 | 9 | don't -- J.D.  Moffett as an individual in the |
| 12:03:43 | 10 | Payne homicide? |
| 12:03:47 | 11 | A   I recall the name. |
| 12:03:50 | 12 | Q   Do you remember his interactions with Jessica |
| 12:03:54 | 13 | Payne prior to her murder? |
| 12:03:55 | 14 | A   No. |
| 12:03:56 | 15 | Q   Okay.  Do you remember that Sandra Giles had |
| 12:03:59 | 16 | reported that he had had sex with her, that she |
| 12:04:04 | 17 | had sex with him? |
| 12:04:04 | 18 | A   I don't recall that. |
| 12:04:05 | 19 | Q   Okay.  I'm going to show you what I've |
| 12:04:08 | 20 | designated as Exhibit 5 to your -- Exhibit 5 to |
| 12:04:12 | 21 | your deposition. |
| 12:04:25 | 22 | (Exhibit No. 5 was marked.) |
| 12:04:25 | 23 | BY MS. DONNELL: |
| 12:04:25 | 24 | Q   Mr. Buschmann, I'm holding -- handing you what |
| 12:04:27 | 25 | I've designated as Exhibit 5 to your |

Case 2:19-cv-01106-PP  Filed 03/20/24  Page 79 of 249  Document 119-4

| | |
|---|---|
| 12:04:31 1 | deposition.  It has Bates stamp MPD SJH497 and |
| 12:04:36 2 | 498.  This is a supplementary report by |
| 12:04:40 3 | reporting officer Detective Mark Levenhagen, |
| 12:04:46 4 | and I'm -- and this is from the Jessica Payne |
| 12:04:53 5 | M file, Section 4, Pages 220 and 221, okay? |
| 12:04:57 6 | A   Hm-hm, yes. |
| 12:04:58 7 | Q   Okay.  And this is documenting his |
| 12:05:00 8 | investigation from September 12, 1995, where he |
| 12:05:05 9 | spoke to Sandra Giles at the -- the jail, |
| 12:05:09 10 | right? |
| 12:05:12 11 | A   Yes. |
| 12:05:13 12 | Q   And this would have been one of the reports |
| 12:05:15 13 | that was in the M file for the Payne homicide |
| 12:05:17 14 | that you reviewed prior to getting involved as |
| 12:05:20 15 | a cold case investigation, correct? |
| 12:05:22 16 | A   Yes. |
| 12:05:22 17 | Q   And if you see on the back, the last paragraph, |
| 12:05:29 18 | Mark Levenhagen asked Sandra Giles if J.D., |
| 12:05:33 19 | meaning J.D. Moffett who was identified on |
| 12:05:35 20 | the -- Walter J.D. Moffett who's identified on |
| 12:05:40 21 | the front page, whether he had had sex with |
| 12:05:42 22 | Rebecca to which she said that J.D. had had sex |
| 12:05:46 23 | with both Rebecca Morrison and Jessica Payne, |
| 12:05:48 24 | and then he inquired how Giles knew that, and |
| 12:05:50 25 | she explained that J.D. had been in the back |

Case 2:19-cv-01106-PP   Filed 03/20/24   Page 80 of 249   Document 119-4

12:05:53  1    room with Jessica for several hours when

12:05:57  2    Rebecca was gone and that she stated at one

12:05:58  3    point Jessica came out dressed in blue jeans

12:05:59  4    and a T-shirt and J.D. said to get Jessica a

12:06:02  5    towel.  "She stated that while Jessica was

12:06:05  6    getting a towel in the bathroom, he told Giles

12:06:07  7    how -- how good Jessica's stuff was, and I

12:06:09  8    asked Giles what J.D. meant by this, at which

12:06:13  9    Giles stated she believed J.D. had sex with

12:06:15  10   Jessica because that's what he meant by 'her

12:06:17  11   good stuff,'" right?

12:06:18  12  A   That's what it says.

12:06:19  13  Q   Okay.  And this would have been one of those

12:06:23  14   reports you read, right?

12:06:24  15  A   Yes.

12:06:24  16  Q   Okay.  And J.D. -- J.D. Moffett is one of those

12:06:27  17   individuals identified for further

12:06:28  18   investigation as a suspect in Eric Moore's

12:06:33  19   report, right?

12:06:33  20  A   Yes.

12:06:34  21  Q   And there was evidence that Jessica Payne was

12:06:36  22   having sex in the house where she was staying

12:06:39  23   with Sandra Giles, right?

12:06:42  24  A   Based on this, yes.

12:06:49  25  Q   Okay.  Do you remember there being evidence

12:06:52  1      that Becky Morrison had been prostituting

12:06:54  2      herself during that same time frame?

12:06:56  3   A  I don't recall.

12:06:56  4   Q  Okay.  But if there was that evidence in the

12:07:01  5      supplementary report, you would have been aware

12:07:04  6      of it back when you were investigating in 1995,

12:07:06  7      right?

12:07:07  8   A  Yes.

12:07:07  9   Q  Okay.  But you do recall independently there

12:07:17  10     was evidence of drug use in the home where

12:07:20  11     Becky Morrison and Jessica Payne were staying

12:07:22  12     before her murder, right?

12:07:25  13  A  Yes.

12:07:26  14  Q  Okay.  Okay.  I'm going to mark this as

12:08:10  15     Exhibit 6.

12:08:11  16          (Exhibit No. 6 was marked.)

12:08:12  17  BY MS. DONNELL:

12:08:12  18  Q  Mr. Buschmann, I'm handing you what I've

12:08:15  19     designated as Exhibit 6 to your deposition.  Do

12:08:18  20     you recognize Exhibit 6 as a supplementary

12:08:21  21     report prepared by your partner, James

12:08:25  22     DeValkenaere, in the Payne homicide

12:08:26  23     investigation?

12:08:26  24  A  Yes.

12:08:27  25  Q  Okay.  And you didn't see this supplementary

12:08:31  1      report to prepare for your deposition; is that

12:08:33  2      right?

12:08:33  3   A  That's correct.

12:08:33  4   Q  Okay.  This documents that on Friday, October

12:08:43  5      20th you and James DeValkenaere were assigned

12:08:52  6      to assist in the investigation of the

12:08:55  7      above-captioned incident.  Do you see that?

12:08:56  8   A  Yes.

12:08:56  9   Q  But you had already -- were you assigned to

12:09:00  10     assist with it, or this is what you were

12:09:02  11     working as a cold case at this point?

12:09:04  12  A  I don't recall.

12:09:05  13  Q  Okay.  But this indicates that you were going

12:09:07  14     to find a suspect named Cortez who was

12:09:11  15     described as a 17-year-old black male, right?

12:09:14  16  A  Yes.

12:09:14  17  Q  And you recall that being one of the first

12:09:16  18     things that you and James DeValkenaere were

12:09:19  19     doing as part of the cold case investigation

12:09:22  20     was to figure out who this Cortez was, right?

12:09:25  21  A  Yes.

12:09:25  22  Q  Okay.  So that refreshes your recollection that

12:09:27  23     this was part of your cold case investigation,

12:09:29  24     right?

12:09:29  25  A  Yes.

| | | |
|---|---|---|
| 12:09:29 | 1 | Q   And, in fact, you didn't get partnered with |
| 12:09:32 | 2 | James DeValkenaere until you were part of the |
| 12:09:34 | 3 | cold case squad, right? |
| 12:09:36 | 4 | A   Yes. |
| 12:09:37 | 5 | Q   And what I showed you in Exhibit 3 -- or |
| 12:09:43 | 6 | Exhibit 3 was a report that you authored from |
| 12:09:48 | 7 | October 9th which predated this and you said |
| 12:09:52 | 8 | that was when you were working it up as a cold |
| 12:09:55 | 9 | case, right? |
| 12:09:56 | 10 | A   Yes. |
| 12:10:06 | 11 | Q   And this was about 11 days later, right? |
| 12:10:15 | 12 | A   I guess what -- yes. |
| 12:10:23 | 13 | Q   So in Exhibit 3, it documented your |
| 12:10:29 | 14 | investigation with James DeValkenaere on |
| 12:10:31 | 15 | October 9th when you went to talk to Cassandra |
| 12:10:36 | 16 | McMurray who had information about Rebecca |
| 12:10:39 | 17 | Morrison, Jessica Payne's friend, right? |
| 12:10:41 | 18 | A   Yes. |
| 12:10:41 | 19 | Q   And then your Exhibit 6 has -- documents your |
| 12:10:45 | 20 | investigation with James DeValkenaere to try |
| 12:10:48 | 21 | and figure out who Cortez is, right? |
| 12:10:51 | 22 | A   Correct. |
| 12:10:51 | 23 | Q   Okay.  Does that refresh your recollection in |
| 12:10:53 | 24 | any way that the first thing you were doing in |
| 12:10:55 | 25 | the cold case was to find out information about |

12:10:57  1        Becky Morrison?

12:11:01  2    A   In chronological order, yes.

12:11:03  3    Q   Okay.  Okay.  So back to Exhibit 6, this would

12:11:08  4        have been when you were working it up with Jim

12:11:11  5        DeValkenaere as a cold case, right?

12:11:13  6    A   Yes.

12:11:13  7    Q   And you were trying to find out who this

12:11:16  8        17-year-old Cortez is, and so you wanted to

12:11:19  9        talk to family members who were residing at

12:11:22 10        1611 North 19th Street, right?

12:11:24 11    A   Yes.

12:11:26 12    Q   And at that residence you talked to Teresa

12:11:29 13        Gwin; is that right?

12:11:30 14    A   Yes.

12:11:31 15    Q   And she stated that Cortez Brown is her

12:11:33 16        brother, Richard Gwin?

12:11:37 17    A   Yes.

12:11:38 18    Q   Okay.  Then you go on to -- this report

12:11:49 19        indicates that three days later on October 23rd

12:11:52 20        you and Jim DeValkenaere went to go find

12:11:57 21        Richard Gwin's mother, Melva Gwin, right?

12:12:01 22    A   Yes.

12:12:01 23    Q   And you guys told Mrs. Gwin, his mom, that you

12:12:08 24        needed to speak to her son about a serious

12:12:10 25        situation, but you didn't advise her on the

12:12:14  1    specifics, right?

12:12:15  2    A    Right.

12:12:24  3    Q    And then at the bottom, the second-to-last

12:12:28  4         paragraph, it says "At approximately 1:30 p.m.

12:12:31  5         on 10/24/95, Melva Gwin appeared at the

12:12:35  6         Criminal Investigation Bureau along with her

12:12:37  7         son, Richard C. Gwin.  Subsequently Richard

12:12:41  8         Gwin was interviewed in an interview room at

12:12:44  9         the Criminal Investigation Bureau"?

12:12:47  10   A    Yes.

12:12:47  11   Q    Does that refresh your recollection that

12:12:49  12        Mr. Gwin was brought in by his mom?

12:12:51  13   A    Yes.

12:12:51  14   Q    Okay.  And so does this refresh your

12:12:58  15        recollection that the first time you and Jim

12:13:00  16        DeValkenaere talked to Mr. Gwin was on the

12:13:03  17        afternoon of October 24th?

12:13:05  18   A    Yes.

12:13:05  19   Q    Okay.  And then if you look, in that interview

12:13:15  20        with Mr. Gwin, he denied any knowledge of the

12:13:18  21        incident which had occurred at North 7th Street

12:13:21  22        and West Burleigh and he denied having ever

12:13:24  23        made statements to anyone regarding any girl

12:13:26  24        being held for sale or anyone having killed a

12:13:29  25        girl and stating that she deserved it, right?

12:13:31  1      He denied any knowledge or involvement,

12:13:35  2      correct?

12:13:35  3   A  Yes.

12:13:35  4   Q  Okay.  Do you see on this -- the last page of

12:13:55  5      Exhibit 6 that -- that you went -- it says --

12:14:04  6      the report says "When questioned further, Gwin

12:14:06  7      went on to describe how the girl who was found

12:14:09  8      behind the house on North 7th Street and West

12:14:11  9      Burleigh Street had died as a result of having

12:14:15 10      her throat slashed.  Gwin was confronted with

12:14:16 11      the fact that he was showing personal knowledge

12:14:17 12      of this offense and he was unable to give any

12:14:19 13      explanation as to how he would have received

12:14:21 14      this knowledge," right?

12:14:22 15   A  Yes.

12:14:22 16   Q  Was the fact that her throat was slashed, was

12:14:30 17      that publicly known?

12:14:32 18   A  No, not to my knowledge.

12:14:34 19   Q  You know that there were public citizens who

12:14:37 20      had found the body and reported it, right?

12:14:41 21   A  Yes.

12:14:42 22   Q  And so her -- the observation of her neck being

12:14:49 23      slashed had been observed by members of the

12:14:51 24      public, right?

12:14:52 25   A  I don't -- I don't recall.

Case 2:19-cv-01106-PP   Filed 03/20/24   Page 87 of 249   Document 119-4

12:14:53   1    Q    Well, you have no knowledge that that wasn't

12:14:58   2         known by individuals who had found the body,

12:15:01   3         right?

12:15:01   4              MS. GEHLING:  Objection; foundation.

12:15:03   5         You can answer.

12:15:04   6              THE WITNESS:  I don't recall.

12:15:05   7    BY MS. DONNELL:

12:15:05   8    Q    Had you done -- it states that "He initially

12:15:08   9         stated he had seen news accounts relative to

12:15:12  10         the death, but then he was told that this had

12:15:14  11         not been public knowledge."  Do you see that?

12:15:16  12    A    Yes.

12:15:16  13    Q    How did you and James DeValkenaere know that

12:15:20  14         the fact that Jessica Payne's throat had been

12:15:23  15         slashed was not public?

12:15:26  16    A    The manner of death had not been released to

12:15:29  17         the public by our department.

12:15:31  18    Q    Other than that, the fact that the manner of

12:15:35  19         death had not been released by the department,

12:15:38  20         did you have any awareness of what was known in

12:15:41  21         the neighborhood at the time?

12:15:41  22    A    No.

12:15:41  23    Q    Okay.  So it's entirely possible that the fact

12:15:46  24         that the white girl had been found with her

12:15:48  25         neck slashed was known in the neighborhood

| 12:15:50 | 1 | based on what people had observed, right? |
| 12:15:53 | 2 | MS. GEHLING: Objection; foundation. |
| 12:15:55 | 3 | THE WITNESS: I don't know. |
| 12:15:56 | 4 | BY MS. DONNELL: |
| 12:15:56 | 5 | Q Okay. You have no way of knowing that it |
| 12:15:58 | 6 | wasn't known in the neighborhood even if the |
| 12:16:00 | 7 | department hadn't released that information, |
| 12:16:02 | 8 | correct? |
| 12:16:03 | 9 | A I -- I don't know. |
| 12:16:06 | 10 | Q But this report goes on -- I was going to ask |
| 12:16:22 | 11 | you more questions about the report. |
| 12:16:22 | 12 | A Okay. |
| 12:16:24 | 13 | Q The report goes on to say "Due to the |
| 12:16:25 | 14 | information that had been received prior to |
| 12:16:27 | 15 | Richard Gwin appearing at the Criminal |
| 12:16:29 | 16 | Investigation Bureau and the fact that he was |
| 12:16:32 | 17 | displaying some knowledge of this incident" -- |
| 12:16:36 | 18 | meaning that he knew her throat had been |
| 12:16:38 | 19 | slashed, right? |
| 12:16:39 | 20 | A Yes. |
| 12:16:40 | 21 | Q -- "he was taken into custody at 4:50 p.m. on |
| 12:16:45 | 22 | 10/24/95," right? |
| 12:16:47 | 23 | A Yes. |
| 12:16:47 | 24 | Q And so you and your partner arrested Mr. Gwin |
| 12:16:52 | 25 | for the Payne homicide based on this, right? |

| | | |
|---|---|---|
| 12:16:55 | 1 | A    Yes. |
| 12:16:56 | 2 | Q    Okay.  Then the report goes on to say |
| 12:17:01 | 3 | "Subsequent to being taken into custody, Gwin |
| 12:17:04 | 4 | would give additional statements.  These |
| 12:17:06 | 5 | statements are detailed in separate |
| 12:17:08 | 6 | supplementary reports," right? |
| 12:17:09 | 7 | A    Yes. |
| 12:17:09 | 8 | Q    And then this report is dated 10/27/95, right? |
| 12:17:13 | 9 | A    Yes. |
| 12:17:13 | 10 | Q    A week after the actual -- or, sorry, strike |
| 12:17:17 | 11 | that. |
| 12:17:18 | 12 | Three days after the actual interview |
| 12:17:19 | 13 | with Mr. Gwin on October 24th, right? |
| 12:17:22 | 14 | A    Yes. |
| 12:17:22 | 15 | Q    Okay.  Does having reviewed Exhibit 6 refresh |
| 12:17:29 | 16 | your recollection in any way of your |
| 12:17:32 | 17 | interrogation of Mr. Richard Gwin? |
| 12:17:43 | 18 | A    Minimal. |
| 12:17:44 | 19 | Q    Okay.  Does it refresh your recollection that |
| 12:18:26 | 20 | you and your partner decided to take him into |
| 12:18:29 | 21 | custody for the Payne homicide? |
| 12:18:31 | 22 | A    Yes. |
| 12:18:32 | 23 | Q    Okay.  Okay.  Do you remember taking Mr. Gwin |
| 12:18:51 | 24 | to be polygraphed? |
| 12:18:54 | 25 | A    No. |

12:18:54  1  Q    Okay.  I'm going to mark this as Exhibit 7.

12:19:48  2                (Exhibit No. 7 was marked.)

12:19:48  3  BY MS. DONNELL:

12:19:49  4  Q    Okay.  I'm handing you what I've designated as

12:19:52  5       Exhibit 7 to your deposition.  Exhibit 7 has

12:19:54  6       Bates stamp MPD SJH552, 553.  It comes from the

12:19:59  7       M homicide file 3084, Section 4, Pages 276 and

12:20:03  8       277.  Do you recognize this as the

12:20:06  9       supplementary report prepared by your partner,

12:20:10  10      James DeValkenaere, picking up on Tuesday,

12:20:14  11      October 24th at 4:50 p.m. for the custodial

12:20:20  12      interrogation of Mr. Gwin right after you guys

12:20:22  13      decided to arrest him?

12:20:24  14 A    Yes.

12:20:24  15 Q    Okay.  And you have not had a chance to review

12:20:30  16      this in preparing for your deposition; is that

12:20:33  17      right?

12:20:33  18 A    No.

12:20:33  19 Q    Okay.  All right.  So Exhibit 7 indicates that

12:20:51  20      you and your partner provided Mr. Gwin his

12:20:56  21      Miranda rights; is that right?

12:20:58  22 A    Yes.

12:20:58  23 Q    And he gives some background information that

12:21:01  24      he was born in Memphis but moved to Milwaukee a

12:21:05  25      year and a half ago and he lives with his mom

12:21:07    1         on 20th and Locust?

12:21:09    2    A    Yes.

12:21:09    3    Q    Okay.  He said he's currently in the 11th grade

12:21:14    4         at the North Division High School, right?

12:21:15    5    A    Yes.

12:21:15    6    Q    And here he gives his date of birth as

12:21:19    7         12/22/77, right?

12:21:20    8    A    Yes.

12:21:21    9    Q    And so when you were interviewing Mr. Gwin, he

12:21:26   10         was 17 years old, just shy of his 18th

12:21:30   11         birthday; is that right?

12:21:31   12    A    Yes.

12:21:31   13    Q    Okay.  He again denied having any involvement

12:21:38   14         in Jessica Payne's homicide, right?

12:21:41   15    A    Yes.

12:21:43   16    Q    And he again denied that he had any -- ever

12:21:47   17         said that he had a girl for sale or that he'd

12:21:49   18         killed a girl and she deserved it, right?

12:21:51   19    A    Correct.

12:21:52   20    Q    And then he goes on to say that he thought the

12:21:58   21         police wanted to talk to him about the death of

12:22:00   22         a white girl on 7th and Burleigh because

12:22:02   23         someone told him about it, and he said he'd

12:22:05   24         heard about it from a guy named Sammy Joe who's

12:22:08   25         a black male who lives next door to his sister,

12:22:12  1        Teresa, on 19th and Galena, right?

12:22:17  2    A   Yes.

12:22:17  3    Q   Okay.  Before I ask you more questions about

12:22:23  4        Exhibit 7, do you remember anything of the

12:22:27  5        questioning back and forth that you and your

12:22:29  6        partner had with Mr. Gwin prior to your

12:22:32  7        decision to arrest him, so, you know, when you

12:22:34  8        were first talking to him on the afternoon of

12:22:38  9        the 24th before 4:50 when you guys decided to

12:22:45 10        arrest him?

12:22:45 11    A   No.

12:22:46 12    Q   Do you remember whether it was an accusatorial

12:22:51 13        questioning or if it was just open-ended

12:22:53 14        questioning?  Do you remember anything about

12:22:54 15        the nature of the questioning you and your

12:22:56 16        partner were engaged in?

12:22:58 17    A   No.

12:22:58 18    Q   Do you remember, prior to his mom bringing him

12:23:12 19        in, that you and your partner thought Richard

12:23:15 20        Gwin was a suspect and possibly had involvement

12:23:19 21        in Payne's homicide based on the statements he

12:23:23 22        had allegedly made?

12:23:28 23    A   Statements he made to whom?

12:23:32 24    Q   Well, the statements that you were inquiring of

12:23:38 25        him about, that he had said he had a white girl

| | | |
|---|---|---|
| 12:23:40 | 1 | for sale and that -- and that he'd killed a |
| 12:23:46 | 2 | girl and she deserved it? |
| 12:23:47 | 3 | A   He was a person of interest. |
| 12:23:49 | 4 | Q   What's a person of interest? |
| 12:23:50 | 5 | A   Someone that displayed possible knowledge. |
| 12:23:57 | 6 | Q   So in your interactions with him before you |
| 12:24:03 | 7 | arrested him -- well, in your first interaction |
| 12:24:08 | 8 | with him, it doesn't indicate that he was given |
| 12:24:11 | 9 | his Miranda rights, does it? |
| 12:24:13 | 10 | A   He was not in custody. |
| 12:24:14 | 11 | Q   Okay.  So at that time he wasn't being |
| 12:24:17 | 12 | interrogated as a suspect; is that right? |
| 12:24:19 | 13 | A   Correct. |
| 12:24:19 | 14 | Q   Why not? |
| 12:24:23 | 15 | A   We didn't have probable cause to arrest him. |
| 12:24:27 | 16 | Q   So from 11:00 a.m. -- sorry, from -- so from |
| 12:24:34 | 17 | 1:30 p.m. on October 24th to 4:50 p.m., he was |
| 12:24:40 | 18 | not being interrogated as a suspect in the |
| 12:24:43 | 19 | Payne homicide? |
| 12:24:44 | 20 | A   No. |
| 12:24:45 | 21 | Q   And then at 4:50 p.m., you decided to arrest |
| 12:24:49 | 22 | him and that's when he got his Miranda rights? |
| 12:24:52 | 23 | A   Yes. |
| 12:24:52 | 24 | Q   Was his mom present for that first interview |
| 12:24:56 | 25 | from 1:30 p.m. to 4:50 p.m.? |

| | | |
|---|---|---|
| 12:25:00 | 1 | MS. GEHLING:  Objection; relevance. |
| 12:25:02 | 2 | THE WITNESS:  No. |
| 12:25:02 | 3 | BY MS. DONNELL: |
| 12:25:02 | 4 | Q    Was there any requirement for individuals under |
| 12:25:04 | 5 | 18 to have a present -- a parent or legal |
| 12:25:07 | 6 | guardian with them during a murder |
| 12:25:09 | 7 | interrogation? |
| 12:25:09 | 8 | A    No. |
| 12:25:10 | 9 | Q    Why not? |
| 12:25:12 | 10 | MS. GEHLING:  Objection; foundation; |
| 12:25:13 | 11 | also relevance. |
| 12:25:18 | 12 | THE WITNESS:  I don't know. |
| 12:25:19 | 13 | BY MS. DONNELL: |
| 12:25:19 | 14 | Q    Okay.  Okay.  Once he was arrested and you |
| 12:25:27 | 15 | started a custodial interrogation of him, did |
| 12:25:32 | 16 | it turn to be accusatorial in nature at that |
| 12:25:40 | 17 | point? |
| 12:25:40 | 18 | A    I don't recall. |
| 12:25:41 | 19 | Q    You don't recall one way or the other? |
| 12:25:44 | 20 | A    I don't have independent recollection of how |
| 12:25:48 | 21 | the interview went. |
| 12:25:50 | 22 | Q    So as you sit here today, you have no memory of |
| 12:25:53 | 23 | how the interrogation went -- the custodial |
| 12:25:56 | 24 | interrogation went with Mr. Gwin, right? |
| 12:25:58 | 25 | A    That's correct. |

Case 2:19-cv-01106-PP   Filed 03/20/24   Page 95 of 249   Document 119-4

| | | |
|---|---|---|
| 12:25:59 | 1 | Q Okay. On your -- in your custodial |
| 12:26:25 | 2 | interrogation of Mr. Gwin, he states that -- |
| 12:26:35 | 3 | that he reported that when he was at his |
| 12:26:38 | 4 | sister's house a couple months ago late at |
| 12:26:40 | 5 | night, he happened to look over to Sammy Joe's |
| 12:26:43 | 6 | house and he saw Sammy Joe on the porch with |
| 12:26:45 | 7 | two white girls, right? |
| 12:26:47 | 8 | A Yes. |
| 12:26:47 | 9 | Q And then your partner's -- your report -- James |
| 12:26:52 | 10 | DeValkenaere's report says "Subject identifies |
| 12:26:54 | 11 | one of the girls as Jessica Payne after being |
| 12:26:59 | 12 | shown her photo," right? |
| 12:27:00 | 13 | A Yes. |
| 12:27:00 | 14 | Q What photo did you and your partner show |
| 12:27:03 | 15 | Richard Gwin in this interrogation on October |
| 12:27:07 | 16 | 24th? |
| 12:27:07 | 17 | A I don't recall. |
| 12:27:08 | 18 | Q Would it have been the crime scene photograph? |
| 12:27:13 | 19 | A No. |
| 12:27:13 | 20 | Q It would have been a photograph of her alive? |
| 12:27:15 | 21 | A Yes. |
| 12:27:19 | 22 | Q Okay. Okay. And then according to this |
| 12:27:28 | 23 | report, Mr. Gwin had let you know that Sammy |
| 12:27:32 | 24 | Joe had stated a month later that the girl he |
| 12:27:34 | 25 | was kicking it with had been found at 7th and |

Case 2:19-cv-01106-PP   Filed 03/20/24   Page 96 of 249   Document 119-4

| | | |
|---|---|---|
| 12:27:38 | 1 | | Burleigh and that -- behind an abandoned house |
| 12:27:42 | 2 | | with her neck cut, right? |
| 12:27:43 | 3 | A | Yes. |
| 12:27:43 | 4 | Q | And then it indicates that Mr. Gwin had an |
| 12:27:49 | 5 | | opportunity to review the handwritten |
| 12:27:50 | 6 | | statement, right? |
| 12:27:51 | 7 | A | Yes. |
| 12:27:53 | 8 | Q | And that this interview concluded at 7:45 p.m.? |
| 12:28:00 | 9 | A | Correct. |
| 12:28:01 | 10 | Q | Okay.  So you and your partner were |
| 12:28:03 | 11 | | interrogating -- well, you and your partner |
| 12:28:05 | 12 | | were interviewing Mr. Gwin from 1:30 to 4:50 |
| 12:28:13 | 13 | | p.m. first, right? |
| 12:28:14 | 14 | A | Yes. |
| 12:28:14 | 15 | Q | And then at 4:50 you guys arrested him and |
| 12:28:18 | 16 | | continued to interrogate him in a custodial |
| 12:28:21 | 17 | | interrogation until 7:45 p.m., right? |
| 12:28:24 | 18 | A | Yes. |
| 12:28:24 | 19 | Q | And then he was taken over to the jail? |
| 12:28:27 | 20 | A | I believe so. |
| 12:28:28 | 21 | Q | Okay.  Now, nothing in the reports you've read |
| 12:28:35 | 22 | | so far, Exhibits 6 and 7, gives an inculpatory |
| 12:28:42 | 23 | | statement or a statement inculpating |
| 12:28:45 | 24 | | Mr. Hadaway or Mr. Ott in the murder of Jessica |
| 12:28:48 | 25 | | Payne, correct? |

| | | |
|---|---|---|
| 12:28:49 | 1 | A Right. |
| 12:28:49 | 2 | Q Okay. So at this point on the 24th, Mr. Gwin |
| 12:28:54 | 3 | still hasn't given you a statement that he had |
| 12:28:56 | 4 | actual knowledge or participation in Jessica |
| 12:28:59 | 5 | Payne's murder, right? |
| 12:29:00 | 6 | A Correct. |
| 12:29:00 | 7 | Q You're not -- you have no information saying |
| 12:29:02 | 8 | that Mr. Hadaway had knowledge or participation |
| 12:29:05 | 9 | in Jessica Payne's murder, right? |
| 12:29:08 | 10 | A Correct. |
| 12:29:08 | 11 | Q And Mr. Ott isn't even mentioned? |
| 12:29:18 | 12 | A Correct. |
| 12:29:18 | 13 | Q Okay. |
| 12:29:20 | 14 | MS. DONNELL: I think I said that we |
| 12:29:22 | 15 | would get a break at 12:30, so let's take a |
| 12:29:25 | 16 | lunch break. |
| 12:29:26 | 17 | THE VIDEOGRAPHER: Going off the |
| 12:29:27 | 18 | record at 12:29. |
| 12:29:30 | 19 | (Recess taken.) |
| 01:19:11 | 20 | THE VIDEOGRAPHER: We're back on the |
| 01:19:14 | 21 | record at 1:19. |
| 01:19:18 | 22 | BY MS. DONNELL: |
| 01:19:19 | 23 | Q Okay. Where we left off, I was asking you |
| 01:19:25 | 24 | questions about your -- in your time with |
| 01:19:29 | 25 | Mr. Richard Gwin. Do you remember that? |

Case 2:19-cv-01106-PP   Filed 03/20/24   Page 98 of 249   Document 119-4

| | | |
|---|---|---|
| 01:19:31 | 1 | A    Yes. |
| 01:19:31 | 2 | Q    Okay.  I think I asked you earlier before we |
| 01:19:34 | 3 | took a break whether you have any independent |
| 01:19:36 | 4 | recollection of taking Mr. Gwin to be |
| 01:19:39 | 5 | polygraphed on October 25th, 1995, and I |
| 01:19:44 | 6 | believe you said no; is that right? |
| 01:19:46 | 7 | A    Correct. |
| 01:19:47 | 8 | Q    Okay.  I'm going to show you what I'm |
| 01:19:51 | 9 | designating as Exhibit 8 to your deposition and |
| 01:20:06 | 10 | see if it refreshes your recollection. |
| 01:20:06 | 11 | (Exhibit No. 8 was marked.) |
| 01:20:06 | 12 | BY MS. DONNELL: |
| 01:20:08 | 13 | Q    Mr. Buschmann, I'm handing you what I've |
| 01:20:08 | 14 | designated as Exhibit 8 to your deposition. |
| 01:20:11 | 15 | Exhibit 8 has Bates stamps MPD SJH1347 and -48. |
| 01:20:15 | 16 | It's from the Payne homicide file, M3084.  This |
| 01:20:20 | 17 | is from Section 15, Pages 93 and 94.  You can |
| 01:20:24 | 18 | get a chance to look at that and I'll see if it |
| 01:20:27 | 19 | refreshes your recollection, okay? |
| 01:20:54 | 20 | A    Okay. |
| 01:20:54 | 21 | Q    Does reviewing -- do you recognize Exhibit 8 as |
| 01:20:58 | 22 | a Milwaukee Police Department Criminal |
| 01:21:01 | 23 | Investigation Bureau report of a polygraph |
| 01:21:04 | 24 | examination? |
| 01:21:04 | 25 | A    Yes. |

01:21:05  1    Q    Okay.  And this report was documenting the

01:21:09  2         polygraph examination of Richard Gwin on

01:21:12  3         October 25th, 1995, at 10:02 a.m. until 11:41

01:21:20  4         a.m.; is that right?

01:21:21  5    A    Yes.

01:21:21  6    Q    And you are the submitting investigator, right?

01:21:24  7    A    That's what it says.

01:21:25  8    Q    Okay.  And this would have been after we looked

01:21:32  9         at Exhibit 7, your custodial interrogation of

01:21:35  10        Mr. Gwin on the 24th, right?

01:21:38  11   A    Correct.

01:21:38  12   Q    It's the next morning, right?

01:21:39  13   A    Yes.

01:21:39  14   Q    Okay.  And the polygraph examiner is Richard --

01:21:45  15        I'm sorry, Robert Simons, right?

01:21:47  16   A    Yes.

01:21:48  17   Q    Okay.  And you -- you know Robert Simons?

01:21:50  18   A    I do.

01:21:51  19   Q    Had you worked with him before your work with

01:21:57  20        him in the polygraphs he did in the Payne

01:22:00  21        homicide investigation?

01:22:01  22   A    We were in the same unit.

01:22:04  23   Q    Okay.  Where was the polygraph examination room

01:22:09  24        with respect to where the homicide unit was?

01:22:11  25   A    It's on the same floor as the CIB, fourth

| | | |
|---|---|---|
| 01:22:16 | 1 | floor, and it was off in a corner in a back |
| 01:22:23 | 2 | office. |
| 01:22:23 | 3 | Q Do you remember how many polygraph examiners |
| 01:22:27 | 4 | there were in '95 other than Robert Simons? |
| 01:22:31 | 5 | A I believe there was one other one, Peter |
| 01:22:35 | 6 | Gauthier. |
| 01:22:36 | 7 | Q Okay. And if you wanted to polygraph someone, |
| 01:22:43 | 8 | did you have to set up an appointment, or could |
| 01:22:44 | 9 | you just bring someone over during business |
| 01:22:47 | 10 | hours, or how did it work? |
| 01:22:48 | 11 | A You'd have to set up an appointment to make |
| 01:22:51 | 12 | sure they were available. |
| 01:22:52 | 13 | Q Did they work more than one shift? |
| 01:22:56 | 14 | A No. |
| 01:22:56 | 15 | Q Did the polygraph examiners just work day shift |
| 01:23:01 | 16 | in the mid '90s? |
| 01:23:02 | 17 | A Yes. |
| 01:23:04 | 18 | Q And that was 8:00 a.m. to 4:00 p.m.? |
| 01:23:06 | 19 | A Yes. |
| 01:23:06 | 20 | Q So if you wanted to polygraph someone, it had |
| 01:23:10 | 21 | to be during those hours? |
| 01:23:11 | 22 | A Unless they made arrangements to be available. |
| 01:23:13 | 23 | Q Does anything you've reviewed so far refresh |
| 01:23:16 | 24 | your recollection as to when you had requested |
| 01:23:20 | 25 | Mr. Gwin to be polygraphed? |

01:23:30    1    A    I don't recall requesting Mr. Gwin to be

01:23:34    2         polygraphed.

01:23:35    3    Q    Okay.  Fair to say nothing you've seen so far

01:23:39    4         refreshes your recollection on that score?

01:23:40    5    A    No.

01:23:40    6    Q    But you don't have reason to dispute that you

01:23:43    7         had submitted to have Gwin polygraphed and he

01:23:47    8         was polygraphed on October 25th?

01:23:48    9    A    Correct.

01:23:49   10    Q    Okay.  And he was -- according to Robert

01:23:54   11         Simons' report, Gwin was being polygraphed for

01:23:58   12         the purpose of determining the truthfulness of

01:24:00   13         his denials that he had knowledge or

01:24:02   14         involvement in the homicide of Jessica Payne,

01:24:05   15         right?

01:24:06   16    A    Yes.

01:24:06   17    Q    And according to this report, he was asked four

01:24:13   18         relevant questions in the course of the

01:24:16   19         polygraph examination, right?

01:24:20   20    A    Yes.

01:24:20   21    Q    "Do you know for sure who murdered Jessica,"

01:24:24   22         right?

01:24:24   23    A    Yes.

01:24:24   24    Q    "Did you murder Jessica," right?

01:24:26   25    A    Yes.

| | | |
|---|---|---|
| 01:24:27 | 1 | Q "Were you present when Jessica was murdered?" |
| 01:24:30 | 2 | A Right. |
| 01:24:30 | 3 | Q And "Right now, can you give me the name of the |
| 01:24:33 | 4 | person who murdered Jessica," right? |
| 01:24:35 | 5 | A Correct. |
| 01:24:35 | 6 | Q And Mr. Gwin is reported to have answered no to |
| 01:24:39 | 7 | each of those four relevant questions, right? |
| 01:24:42 | 8 | A Correct. |
| 01:24:42 | 9 | Q Do you -- when an individual is being taken to |
| 01:24:48 | 10 | be polygraphed, would you -- and you were |
| 01:24:50 | 11 | requesting it, would you first meet with |
| 01:24:52 | 12 | Mr. Simons or Gauthier and give them |
| 01:24:56 | 13 | information about the case and the suspect |
| 01:24:58 | 14 | before they administered the polygraph? |
| 01:25:01 | 15 | A Yes. |
| 01:25:01 | 16 | Q And that was, like -- was that considered, |
| 01:25:04 | 17 | like, a pre-polygraph interview? |
| 01:25:06 | 18 | A Giving background on what they were going to be |
| 01:25:09 | 19 | talking to the person about. |
| 01:25:10 | 20 | Q Because they may not necessarily -- meaning the |
| 01:25:15 | 21 | polygraph examiner, may not have any knowledge |
| 01:25:17 | 22 | of what that homicide was, the details about |
| 01:25:20 | 23 | it, right? |
| 01:25:20 | 24 | A Correct. |
| 01:25:21 | 25 | Q So it's fair to say sometime before Mr. Gwin |

01:25:24   1          was administered a polygraph examination by

01:25:30   2          Examiner Simons, you would have talked to

01:25:32   3          Simons about the Payne homicide?

01:25:35   4     A    Possibly me or DeValkenaere.  I'm not sure who.

01:25:41   5     Q    Or both of you?

01:25:42   6     A    Or both.

01:25:42   7     Q    Yep.  And you would not have the individual

01:25:45   8          present for that meeting, meaning Richard Gwin

01:25:48   9          would not be present for it?

01:25:50  10     A    No.

01:25:50  11     Q    Do you know whether -- do you have any

01:25:51  12          knowledge about reports that were prepared by

01:25:55  13          the polygraph examiner for that pre-polygraph

01:25:58  14          interview, the interview they had with

01:26:01  15          detectives to get information about the case

01:26:04  16          and about the individual they would be

01:26:06  17          examining?

01:26:06  18     A    No.

01:26:06  19     Q    Okay.  According to this Simons report, that

01:26:18  20          "Upon conducting the examination and making

01:26:20  21          careful evaluation of the polygraph charts,

01:26:23  22          it's the opinion of this polygraphist that

01:26:26  23          Richard Gwin is not being completely truthful

01:26:29  24          in his denials," right?

01:26:30  25     A    Right.

01:26:30  1    Q    And he goes on to indicate that he "reacted

01:26:33  2         strongly to Questions 3 and 4 as listed below

01:26:35  3         and may have some knowledge of who may have

01:26:39  4         committed the offense or who may have been at

01:26:41  5         the scene."  Do you see that?

01:26:42  6    A    Yes.

01:26:42  7    Q    The opinion is being classified as "restricted

01:26:47  8         lying due to the subject's young age and him

01:26:54  9         having trouble with certain control questions

01:26:57  10        used in the polygraph technique."  Do you see

01:26:58  11        that?

01:26:58  12   A    Yes.

01:26:59  13   Q    Do you, as you sit here today, know what the

01:27:03  14        classification "restricted lying" means as a

01:27:05  15        classification of a polygraph examination?

01:27:07  16   A    I have no idea.

01:27:08  17   Q    Okay.  According to the report, one of the

01:27:11  18        reasons for that was Mr. Gwin's young age

01:27:13  19        because he was 17 at the time, right?

01:27:15  20   A    He was, yes.

01:27:16  21   Q    Did you -- is there any -- strike that.

01:27:19  22             Did you have to get a parent or legal

01:27:23  23        guardian's approval to polygraph a minor?

01:27:26  24             MS. GEHLING:  Objection; relevance.

01:27:29  25             THE WITNESS:  I don't recall.

01:27:30   1     BY MS. DONNELL:

01:27:32   2     Q    There's nothing in this report that indicates

01:27:34   3          that consent was given by Mr. Gwin's mom,

01:27:40   4          correct?

01:27:41   5                    MS. GEHLING:  Objection; relevance

01:27:43   6          and foundation.

01:27:44   7                    MS. DONNELL:  You can answer.

01:27:45   8                    THE WITNESS:  Correct.

01:27:45   9     BY MS. DONNELL:

01:27:45  10     Q    Okay.  And you don't have any memory of doing

01:27:48  11          that, right?

01:27:49  12     A    No.

01:27:50  13     Q    Okay.  I'm going to hand you what I've

01:28:07  14          designated as Exhibit 9.

01:28:24  15                    (Exhibit No. 9 was marked.)

01:28:24  16     BY MS. DONNELL:

01:28:25  17     Q    Okay.  Mr. Buschmann, I've handed you what I've

01:28:28  18          designated as Exhibit 9 to your deposition.

01:28:30  19          This is Bates stamped MPD SJH716 consecutive to

01:28:38  20          718, and it's a copy of the handwritten

01:28:41  21          statement prepared by your partner as well as

01:28:46  22          the Miranda rights.

01:28:49  23     A    Hm-hm.

01:28:49  24     Q    Is that right?

01:28:50  25     A    Yes.

01:28:50  1    Q    You didn't look at this document -- and this

01:28:53  2         one's dated, I'm sorry, October 24th, 1995, at

01:28:58  3         4:50 p.m., right?

01:29:00  4    A    Yes.

01:29:00  5    Q    You didn't look at this to prepare for your

01:29:03  6         deposition; is that right?

01:29:03  7    A    That's correct.

01:29:04  8    Q    Do you recognize your signature on the second

01:29:08  9         page of Exhibit 9?

01:29:11  10   A    Yes.

01:29:11  11   Q    And you also recognize your signature on the

01:29:14  12        third page of Exhibit 9 for the Miranda

01:29:18  13        warnings?

01:29:19  14   A    Yes.

01:29:19  15   Q    Okay.  And it indicates that this interview

01:29:23  16        started at 4:54 p.m. and ended at 7:45 p.m.; is

01:29:28  17        that right?

01:29:28  18   A    Yes.

01:29:28  19   Q    And do you recognize this handwriting as your

01:29:31  20        partner, Jim DeValkenaere's?

01:29:34  21   A    Yes.

01:29:34  22   Q    And this statement is the statement that

01:29:49  23        corresponds to the supplementary report that

01:29:52  24        your partner prepared of the custodial

01:29:57  25        interrogation, Exhibit 7, right?

| | | |
|---|---|---|
| 01:29:59 | 1 | A    Correct. |
| 01:29:59 | 2 | Q    This will be 10 and 11. |
| 01:30:34 | 3 |      (Exhibit Nos. 10 and 11 were marked.) |
| 01:30:36 | 4 | BY MS. DONNELL: |
| 01:30:37 | 5 | Q    Okay.  I'm going to hand you first what is |
| 01:30:37 | 6 |      Exhibits 10 and 11.  Exhibit 10 is Bates |
| 01:30:38 | 7 |      stamped MPD SJH720 consecutive through 722.  Do |
| 01:30:44 | 8 |      you recognize this as the handwritten statement |
| 01:30:46 | 9 |      that James DeValkenaere prepared for your |
| 01:30:49 | 10 |      interrogation of Richard Gwin on the following |
| 01:30:52 | 11 |      day, October 25th, 1995, beginning at 5:15 |
| 01:30:57 | 12 |      p.m.? |
| 01:30:57 | 13 | A    Yes. |
| 01:30:57 | 14 | Q    And this statement is reported to have |
| 01:31:03 | 15 |      concluded at 6:45 p.m., right? |
| 01:31:07 | 16 | A    Yes. |
| 01:31:07 | 17 | Q    Okay.  And so this would have been sometime |
| 01:31:11 | 18 |      after the polygraph examination.  There was |
| 01:31:14 | 19 |      another time that you and your partner spoke to |
| 01:31:17 | 20 |      Mr. Gwin, right? |
| 01:31:18 | 21 | A    Yes. |
| 01:31:18 | 22 | Q    And this statement comes after Mr. Gwin had |
| 01:31:27 | 23 |      denied any knowledge or involvement in the |
| 01:31:29 | 24 |      Payne homicide to you and your partner on |
| 01:31:31 | 25 |      October 24th, right? |

Case 2:19-cv-01106-PP  Filed 03/20/24  Page 108 of 249  Document 119-4

01:31:33    1    A    Correct.

01:31:33    2    Q    First as a witness, right?

01:31:37    3    A    Yes.

01:31:37    4    Q    Then in a custodial interrogation, right?

01:31:40    5    A    Yes.

01:31:40    6    Q    And then again on the morning of the 25th after

01:31:44    7         the -- or during the polygraph examination?

01:31:47    8    A    Yes.

01:31:47    9    Q    Okay.  Do you know whether you spoke -- how

01:31:52   10         long you spoke to Mr. Gwin after the polygraph

01:31:57   11         examination?

01:31:58   12    A    No.

01:31:58   13    Q    Was it typical if the polygraph examination

01:32:03   14         resulted in a -- a finding of possible lying

01:32:07   15         being detected that you would then conduct a

01:32:11   16         post-polygraph interrogation of the individual?

01:32:14   17    A    Yes.

01:32:14   18    Q    So is it fair to say that you would have likely

01:32:19   19         again interrogated Mr. Gwin after you got the

01:32:23   20         results of his polygraph examination?

01:32:27   21    A    Yes.

01:32:27   22    Q    Was it typical that you'd wait, like, for six

01:32:31   23         hours to do that?

01:32:34   24    A    It doesn't -- there's no time limit on when we

01:32:38   25         would have got to it.

01:32:39   1   Q   Was it typical to interrogate someone right
01:32:42   2       after they learned that the examiner found
01:32:44   3       deception indicated?
01:32:52   4   A   I -- I don't know.  In this case, I don't know.
01:32:53   5   Q   Sure.  Putting this case aside since you don't
01:32:56   6       remember this case, but was it typical -- like,
01:32:59   7       you would go and set up a polygraph
01:33:01   8       examination, give Simons or the other examiner
01:33:04   9       information about the case and the individual,
01:33:04  10       he would take them alone to be polygraphed,
01:33:07  11       read the charts, come back with the results,
01:33:09  12       and then depending on the results of the
01:33:11  13       examination, there'd be a post-polygraph
01:33:14  14       interrogation, right?
01:33:15  15   A   There was times when the polygraphist would
01:33:21  16       interview the person after the exam themselves.
01:33:26  17   Q   Okay.
01:33:26  18   A   Right after?  There's no written rule when the
01:33:29  19       person's going to be talked to after a
01:33:31  20       polygraph is administered.
01:33:32  21   Q   Is it possible that you talked to Richard Gwin
01:33:35  22       right after the polygraph examination?
01:33:37  23   A   I don't recall.
01:33:37  24   Q   Okay.  Were you as a detective able to observe
01:33:43  25       the individual being polygraphed?

| | | | |
|---|---|---|---|
| 01:33:45 | 1 | A | No. |
| 01:33:46 | 2 | Q | Like, there wasn't, like, a two-way glass or -- |
| 01:33:52 | 3 | A | No. |
| 01:33:52 | 4 | Q | Okay.  So the examiner would take the person |
| 01:33:55 | 5 | | | alone.  Would you guys wait in the polygraph |
| 01:33:58 | 6 | | | office or go to the CIB? |
| 01:34:00 | 7 | A | No, we wouldn't -- once he's with the |
| 01:34:04 | 8 | | | polygraphist, we'd go about our own business. |
| 01:34:07 | 9 | Q | Would the polygraph examiner call you when they |
| 01:34:10 | 10 | | | had the results? |
| 01:34:11 | 11 | A | Yes. |
| 01:34:12 | 12 | Q | Okay.  Do -- do you have a recollection of how |
| 01:34:18 | 13 | | | long a typical examination took? |
| 01:34:21 | 14 | A | No. |
| 01:34:21 | 15 | Q | Okay.  Thanks.  All right.  So the statement |
| 01:34:25 | 16 | | | here, do you recognize your signature on Page 3 |
| 01:34:30 | 17 | | | of Exhibit 10, the 10/25/95 statement by |
| 01:34:36 | 18 | | | Mr. Gwin? |
| 01:34:36 | 19 | A | Yes. |
| 01:34:36 | 20 | Q | Okay.  Now, this statement -- strike that. |
| 01:34:53 | 21 | | | Do you see at the top of the |
| 01:35:02 | 22 | | | handwritten statement where it says -- after |
| 01:35:06 | 23 | | | giving the time and date and location of the |
| 01:35:11 | 24 | | | interview, it says "This interview was |
| 01:35:13 | 25 | | | conducted after Gwin's release from custody." |

01:35:20  1        Do you see that?

01:35:21  2    A   Yes.

01:35:21  3    Q   And then it says "He was -- he was re-advised

01:35:27  4        of his rights where he states he understands";

01:35:31  5        is that right?

01:35:31  6    A   Yes.

01:35:32  7    Q   Can you explain to me what that -- what that

01:35:36  8        means, that he was released from custody but

01:35:39  9        then he was re-advised of his rights?

01:35:41  10            MS. GEHLING:  Objection; foundation.

01:35:46  11            THE WITNESS:  He was released from

01:35:47  12       custody.  There wasn't enough probable cause to

01:35:50  13       hold him at the time.  And when he was

01:35:55  14       re-talked to, he was re-advised of his rights

01:36:02  15       in case he was going to provide any

01:36:07  16       incriminating information.

01:36:11  17   BY MS. DONNELL:

01:36:12  18   Q   Do you -- well, you said Mr. Gwin was released

01:36:15  19       because there wasn't probable cause to hold

01:36:17  20       him; is that right?

01:36:18  21   A   Yes.

01:36:18  22   Q   Why was there not probable cause to hold him?

01:36:20  23   A   We didn't have enough probable cause to hold

01:36:23  24       him and get him charged.

01:36:25  25   Q   Is this the interview, the October 25th early

| | | |
|---|---|---|
| 01:36:48 | 1 | evening interview of Mr. Gwin, that you have an |
| 01:36:50 | 2 | independent recollection of? |
| 01:36:53 | 3 | A I haven't read the statement. |
| 01:36:57 | 4 | Q I've also designated in front of you Exhibit 11 |
| 01:37:01 | 5 | which is the supplementary report for the |
| 01:37:05 | 6 | re-interview of Mr. Gwin from 10/25/1995 as |
| 01:37:09 | 7 | well. Do you see that? |
| 01:37:11 | 8 | A Yes. |
| 01:37:11 | 9 | Q And you recognize that as your partner's |
| 01:37:13 | 10 | supplementary report -- |
| 01:37:15 | 11 | A Yes. |
| 01:37:15 | 12 | Q -- documenting your and his interview of |
| 01:37:19 | 13 | Mr. Gwin after he was released, his |
| 01:37:21 | 14 | administrative release from custody? |
| 01:37:23 | 15 | A Yes. |
| 01:37:23 | 16 | Q Okay. |
| 01:37:30 | 17 | A Yes, this is what I would say I -- this is what |
| 01:37:33 | 18 | I recall. |
| 01:37:34 | 19 | Q Okay. Can you tell me everything you recall |
| 01:37:36 | 20 | about this re-interview of Mr. Cortez [sic]? |
| 01:37:42 | 21 | A We already talked about that. |
| 01:37:43 | 22 | Q Well, did you release him from custody and tell |
| 01:37:47 | 23 | him he was free to go home? |
| 01:37:49 | 24 | A We told him he was released from custody and |
| 01:37:54 | 25 | that we wanted to talk to him before he went |

01:37:57    1          home.

01:37:58    2    Q    And you guys were his way home, right?

01:38:03    3               MS. GEHLING:  Objection; relevance.

01:38:05    4    BY MS. DONNELL:

01:38:05    5    Q    Well, you guys eventually drove Mr. Gwin home,

01:38:08    6          right?

01:38:08    7    A    I don't recall.

01:38:08    8    Q    Do you remember seeing that in the -- your

01:38:11    9          testimony in Ott?

01:38:13   10    A    I never read the Ott deposition.

01:38:16   11    Q    On Page 91, when I referred you to your

01:38:20   12          testimony earlier today.  If you look at Page

01:38:32   13          91 -- oh, I'm sorry, it's not there.  Hold on

01:39:02   14          just a second.  My apologies.

01:39:02   15               MS. GEHLING:  90.  It's the page

01:39:02   16          right before.

01:39:14   17               MS. DONNELL:  Sorry.  Thank you.

01:39:14   18    BY MS. DONNELL:

01:39:15   19    Q    If you look at Page 90 --

01:39:15   20               MS. GEHLING:  Yeah.

01:39:17   21    BY MS. DONNELL:

01:39:17   22    Q    -- does that refresh your recollection that you

01:39:19   23          and your partner drove Mr. Gwin home?

01:39:29   24    A    Yes.

01:39:30   25    Q    Okay.  So you did drive Mr. Gwin home on the

01:39:34   1        25th, right?

01:39:35   2   A    Yes.

01:39:35   3   Q    All right.  So before Mr. Gwin gave the

01:39:42   4        statement on the 25th, you had indicated to him

01:39:45   5        that he was free to go home?

01:39:47   6   A    Yes.

01:39:48   7   Q    And he chose not to go home?

01:39:53   8   A    He chose to talk with us.

01:39:55   9   Q    Did he indicate why he chose to talk to you?

01:39:59  10   A    No.

01:39:59  11   Q    Was that unusual that an individual who had

01:40:04  12        just been held in custody and interrogated

01:40:07  13        for -- and polygraphed for knowledge and

01:40:09  14        involvement in a murder was then released from

01:40:12  15        custody and chose to stay and talk?

01:40:15  16   A    No.

01:40:15  17   Q    That happened before other than this occasion?

01:40:18  18   A    I don't recall if it's ever happened before.

01:40:21  19        It's not unusual.

01:40:21  20   Q    But you can't think of another instance today,

01:40:24  21        can you?

01:40:25  22   A    Not today, no.

01:40:26  23   Q    Okay.  Did Mr. Gwin indicate to you why he was

01:40:42  24        choosing to talk to you and your partner after

01:40:47  25        he was released from custody?

01:40:52   1    A    I don't know.

01:40:53   2    Q    Did -- is it fair to assume that after Mr. Gwin

01:41:02   3         was found to have had failed or possible

01:41:06   4         deception on his polygraph that there would

01:41:08   5         have been a post-polygraph interrogation of

01:41:11   6         Mr. Gwin?

01:41:14   7    A    This is -- are you saying this is the

01:41:18   8         post-polygraph?

01:41:19   9    Q    I'm not saying that.  I'm saying it's just fair

01:41:24   10        to assume there would have been at one point a

01:41:25   11        post-polygraph interrogation where deception is

01:41:28   12        indicated?

01:41:29   13   A    Yes.

01:41:29   14   Q    That would have been an investigative step that

01:41:32   15        would have been conducted in a homicide

01:41:34   16        investigation where there's somebody who's

01:41:36   17        taken to be polygraphed for knowledge or

01:41:37   18        participation in a murder and deception is

01:41:39   19        indicated.  That wouldn't just be left gone,

01:41:44   20        left alone; there would be an interrogation by

01:41:46   21        somebody, right?

01:41:48   22   A    Yes.

01:41:48   23   Q    So either you or your partner would have done

01:41:52   24        it or you would expect the examiner to do it?

01:41:55   25   A    Yes.

01:41:56  1    Q    Okay.  And that post-polygraph examination of

01:42:00  2         Mr. Gwin should be documented by somebody,

01:42:03  3         whoever did it, right?

01:42:04  4    A    Correct.

01:42:05  5    Q    Okay.  Did you make Mr. Gwin any promises that

01:42:20  6         if he implicated Mr. Hadaway in the Payne

01:42:28  7         homicide that he would receive?

01:42:31  8    A    No.

01:42:31  9    Q    Did you -- did your partner in your presence

01:42:35  10        make any promises to Mr. Gwin that if he

01:42:38  11        cooperated and implicated Mr. Hadaway in the

01:42:41  12        Payne homicide that he might receive?

01:42:44  13   A    No.

01:42:44  14   Q    Did you make any threats to Mr. Gwin that he

01:42:48  15        could be charged with the Payne homicide if he

01:42:52  16        did not implicate Mr. Hadaway in the Payne

01:42:56  17        homicide?

01:42:57  18   A    No.

01:42:57  19   Q    Did you hear your partner, Jim DeValkenaere,

01:42:59  20        make any threats to Mr. Richard Gwin that if he

01:43:04  21        did not implicate Chaunte Ott in the Payne

01:43:07  22        homicide that he could be charged with it?

01:43:09  23   A    No.

01:43:10  24   Q    And even when Mr. Gwin was under arrest -- or

01:43:27  25        was under arrest and in custody for possibly

01:43:30   1    committing the Payne homicide, you did not --

01:43:36   2    did you -- well, strike that.

01:43:37   3         Did you at any point during your

01:43:39   4    custodial interrogation of Mr. Gwin threaten

01:43:42   5    that he could be charged with a crime?

01:43:46   6  A    No.

01:43:47   7  Q    Did you provide Mr. Gwin any non-public facts

01:43:58   8    about the Payne homicide in your questioning of

01:44:00   9    him?

01:44:00   10  A    No.

01:44:00   11  Q    Did your partner provide any non-public facts

01:44:03   12    to Mr. Gwin in his questioning of Mr. Gwin?

01:44:05   13  A    No.

01:44:05   14  Q    Okay.  In this -- in the supplementary report

01:44:32   15    or in the statement, whichever is -- which

01:44:35   16    would you like to refer to?

01:44:36   17  A    This one.

01:44:38   18  Q    Exhibit 11?

01:44:39   19  A    Yes.

01:44:39   20  Q    Okay.  So looking at Exhibit 11, on Page 2 it's

01:44:42   21    documented that Mr. Gwin stated that he was in

01:44:49   22    the car with Sammy, meaning Sam Hadaway, in the

01:44:53   23    front passenger seat, the girl in the back

01:44:55   24    middle seat, and Chaunte was in the back right

01:44:58   25    seat; is that right?

01:44:59  1    A    Yes.

01:44:59  2    Q    And that Gwin stated he drove to 7th Street,

01:45:03  3         North 7th Street, and West Burleigh Street

01:45:07  4         without stopping?

01:45:07  5    A    Yes.

01:45:07  6    Q    And then he indicates he stopped on North 7th

01:45:11  7         Street, and after stopping, all of them smoked

01:45:17  8         some bud that he had, right?

01:45:21  9    A    Yes.

01:45:21 10    Q    And "bud" was referring to marijuana?

01:45:25 11    A    Yes.

01:45:25 12    Q    And that after that they were in the car

01:45:28 13         listening to music and that Sammy then said he

01:45:33 14         thought the girl had some money and that's why

01:45:36 15         they were talking -- taking her to the spot,

01:45:38 16         right?

01:45:39 17    A    Yes.

01:45:41 18    Q    And then he stated Sammy said that they should

01:45:44 19         go to the -- into the spot -- well, strike

01:45:46 20         that.

01:45:47 21              Gwin said that Sammy told them they

01:45:50 22         would be back in a minute, and then he waited

01:45:52 23         in the car, right?

01:45:53 24    A    Yes.

01:45:53 25    Q    And then the report goes on to say that Sammy

01:46:18  1      said about 15 -- that Gwin said about 15

01:46:21  2      minutes later Sammy and Chaunte came back to

01:46:23  3      the car without the girl, right?

01:46:25  4   A  Yes.

01:46:25  5   Q  And then apparently Mr. Gwin said that "Sammy

01:46:30  6      said she didn't have no money, so Chaunte cut

01:46:33  7      her throat," right?

01:46:34  8   A  Yes.

01:46:34  9   Q  And then Gwin said he drove -- after that

01:46:46  10     conversation, alleged conversation, they drove

01:46:48  11     to his cousin's house, Charlotte Brown's house,

01:46:53  12     right?

01:46:53  13  A  Yes.

01:46:54  14  Q  Where Mr. Gwin wanted to check on his drug-sale

01:46:58  15     business?

01:46:59  16  A  Yes.

01:46:59  17  Q  And then according to Mr. Gwin, a month later

01:47:13  18     Sammy was told -- he talked to Sammy and Sammy

01:47:18  19     said -- told him that the girl who was found

01:47:21  20     dead behind the house was the girl who was with

01:47:24  21     them and that he made a cutting throat [sic]

01:47:26  22     saying her throat got cut, right?

01:47:29  23  A  Yes.

01:47:29  24  Q  Okay.  Now, Mr. Gwin, after denying any

01:47:33  25     knowledge or involvement for over a day of

| | | |
|---|---|---|
| 01:47:37 | 1 | being -- in talking to you and your partner |
| 01:47:41 | 2 | both in and out of custody and being |
| 01:47:42 | 3 | polygraphed suddenly volunteers all this |
| 01:47:45 | 4 | information after he was released from custody, |
| 01:47:47 | 5 | right? |
| 01:47:48 | 6 | A   Yes. |
| 01:47:48 | 7 | Q   Can you explain why that -- that happened? |
| 01:47:50 | 8 | A   No. |
| 01:47:51 | 9 | Q   And you don't think that's unusual? |
| 01:47:56 | 10 | A   I don't recall how the interview happened. |
| 01:48:03 | 11 | Q   As you sit here today, you have no memory of |
| 01:48:06 | 12 | how it happened? |
| 01:48:07 | 13 | A   That's correct. |
| 01:48:07 | 14 | Q   So you have no memory of the specific questions |
| 01:48:09 | 15 | that you or your partner asked Mr. Gwin? |
| 01:48:12 | 16 | A   No. |
| 01:48:12 | 17 | Q   And you have no memory of his responses? |
| 01:48:15 | 18 | A   No. |
| 01:48:15 | 19 | Q   Other than how it's documented in these |
| 01:48:18 | 20 | reports? |
| 01:48:18 | 21 | A   Correct. |
| 01:48:19 | 22 | Q   Okay.  Is it accurate to say that the |
| 01:48:25 | 23 | information that Mr. Gwin provided to you on |
| 01:48:29 | 24 | the 25th about the Payne homicide and the |
| 01:48:33 | 25 | manner of death was information you already |

01:48:35    1        had?

01:48:38    2    A   No.

01:48:39    3    Q   Well, you already knew her neck had been cut,

01:48:43    4        correct?

01:48:43    5    A   Yes.

01:48:44    6    Q   Okay.  So was there any information about

01:48:49    7        the -- the cause of her death that was new to

01:48:52    8        you that Mr. Gwin provided?

01:48:54    9    A   He wasn't there when the incident happened.

01:49:04   10        When the murder happened, he was in the car, so

01:49:07   11        he would have no knowledge of what happened

01:49:11   12        back there, other than what was told to him.

01:49:12   13    Q   And what was allegedly told to him was

01:49:15   14        information you already had, right?

01:49:18   15    A   No, because we didn't know about Sammy Joe

01:49:21   16        Hadaway or Chaunte Ott prior to his statement.

01:49:25   17    Q   Okay.  Putting aside the Sammy Joe and Chaunte

01:49:30   18        Ott piece in terms of the cause of -- what

01:49:32   19        caused Ms. Payne's death, there was no new

01:49:34   20        information that Mr. Gwin was able to provide

01:49:35   21        to you?

01:49:38   22    A   Correct.

01:49:38   23    Q   And in terms of the location of where her body

01:49:42   24        was found, you also had that information --

01:49:45   25    A   Yes.

| | | | |
|---|---|---|---|
| 01:49:45 | 1 | Q | -- prior to Mr. Gwin? |
| 01:49:47 | 2 | A | Yes. |
| 01:49:47 | 3 | Q | Okay.  Okay.  Is it fair to say that the next |
| 01:50:08 | 4 | | thing you did on the Payne homicide |
| 01:50:13 | 5 | | investigation was -- well, strike that. |
| 01:50:16 | 6 | | After your interview with Mr. Gwin, |
| 01:50:20 | 7 | | you and your partner drove him home, right? |
| 01:50:24 | 8 | A | Yes. |
| 01:50:24 | 9 | Q | And then you came back and briefed the next |
| 01:50:27 | 10 | | shift on the follow-up investigation you were |
| 01:50:29 | 11 | | requesting? |
| 01:50:29 | 12 | A | Correct. |
| 01:50:29 | 13 | Q | And that was to find Sam Hadaway? |
| 01:50:32 | 14 | A | Yes. |
| 01:50:32 | 15 | Q | Was it also to find Chaunte Ott? |
| 01:50:36 | 16 | A | I don't recall. |
| 01:50:36 | 17 | Q | Okay.  And then you did -- I don't know if I |
| 01:50:51 | 18 | | asked you this, so forgive me if I already did. |
| 01:50:55 | 19 | | Prior to your involvement in the Payne |
| 01:50:57 | 20 | | homicide, had you had any interactions with my |
| 01:51:00 | 21 | | client, Sam Hadaway, that you're aware of? |
| 01:51:02 | 22 | A | No. |
| 01:51:02 | 23 | Q | How about with respect to Chaunte Ott?  Prior |
| 01:51:05 | 24 | | to your involvement in the Payne homicide |
| 01:51:07 | 25 | | investigation, had you had any interactions |

01:51:09   1          with Mr. Ott that you're aware of?

01:51:11   2     A    No.

01:51:14   3     Q    And how about Mr. Gwin?

01:51:15   4     A    No.

01:51:16   5     Q    How about Walter J.D. Moffett?  Had you had

01:51:24   6          interactions with him --

01:51:25   7     A    No.

01:51:25   8     Q    -- that you're aware of?  No?

01:51:30   9               Okay.  Do you remember back in

01:51:41  10          October '95 what days you were working?

01:51:44  11     A    No.

01:51:44  12     Q    Do you remember, was there, like, a rotation?

01:51:48  13          Like, you'd work five days on, two days off,

01:51:50  14          and it would rotate back then?

01:51:52  15     A    I don't recall.  They changed the shifts for

01:51:58  16          seven days on, three days off.  Then it was

01:52:03  17          five days on, two days off, four days on, two

01:52:07  18          days off.  They switched it up, so back then I

01:52:09  19          don't know.

01:52:09  20     Q    It's hard to remember?

01:52:10  21     A    I don't remember.

01:52:11  22     Q    Is it fair to say while you were working the

01:52:14  23          cold case squad with DeValkenaere during this

01:52:18  24          time frame you were working days, though?

01:52:20  25     A    Yes.

Case 2:19-cv-01106-PP   Filed 03/20/24   Page 124 of 249   Document 119-4

| | | |
|---|---|---|
| 01:52:20 | 1 | Q   Okay.  Okay.  The next thing that you remember |
| 01:52:36 | 2 | being involved in was your interrogation of |
| 01:52:38 | 3 | Mr. Hadaway, right? |
| 01:52:40 | 4 | A   Correct. |
| 01:52:40 | 5 | Q   Okay.  And like you said earlier, you were |
| 01:52:50 | 6 | aware when you were going to interrogate |
| 01:52:53 | 7 | Mr. Hadaway that he had already been |
| 01:52:55 | 8 | interrogated by several of your colleagues, |
| 01:52:58 | 9 | right? |
| 01:52:58 | 10 | A   Yes. |
| 01:52:59 | 11 | Q   And so he was interrogated by Eric Moore on |
| 01:53:04 | 12 | October 25th, right? |
| 01:53:06 | 13 | A   Yes. |
| 01:53:06 | 14 | Q   And he was then interrogated by Detective Dubis |
| 01:53:14 | 15 | and Percy Moore, right? |
| 01:53:16 | 16 | A   Yes. |
| 01:53:16 | 17 | Q   And then eventually you guys spoke to him on |
| 01:53:20 | 18 | the 27th, right? |
| 01:53:22 | 19 | A   Correct. |
| 01:53:23 | 20 | Q   And so you were aware at the time that you were |
| 01:53:37 | 21 | talking to Mr. Hadaway that -- that he had |
| 01:53:46 | 22 | denied any knowledge or involvement to Eric |
| 01:53:50 | 23 | Moore, right? |
| 01:53:51 | 24 | A   Yes. |
| 01:53:51 | 25 | Q   And he had denied any knowledge or involvement |

| | | |
|---|---|---|
| 01:53:54 | 1 | to Detective Dubis and Percy Moore, right? |
| 01:53:57 | 2 | A  Correct. |
| 01:53:58 | 3 | Q  Okay. |
| 01:54:56 | 4 | MS. DONNELL:  Okay.  I apologize. |
| 01:54:58 | 5 | Can we go off the record for just a second? |
| 01:55:03 | 6 | Can we go off the record, please? |
| 01:55:05 | 7 | THE VIDEOGRAPHER:  Going off the |
| 01:55:06 | 8 | record at 1:55. |
| 01:55:08 | 9 | (Brief recess taken.) |
| 02:00:26 | 10 | THE VIDEOGRAPHER:  We're back on the |
| 02:00:27 | 11 | record at 2:00. |
| 02:00:29 | 12 | MS. DONNELL:  Thanks. |
| 02:00:29 | 13 | BY MS. DONNELL: |
| 02:00:33 | 14 | Q  Okay.  Detective Buschmann, you had said |
| 02:00:38 | 15 | earlier that you had an independent |
| 02:00:41 | 16 | recollection of your interrogation of my |
| 02:00:45 | 17 | client, Sammy Hadaway, right? |
| 02:00:47 | 18 | A  I reviewed his statement. |
| 02:00:48 | 19 | Q  You reviewed his handwritten statement that is |
| 02:00:52 | 20 | in your handwriting? |
| 02:00:53 | 21 | A  Yes. |
| 02:00:53 | 22 | Q  And you did that a couple weeks ago to prepare |
| 02:00:56 | 23 | for your deposition? |
| 02:00:57 | 24 | A  Correct. |
| 02:00:57 | 25 | Q  Okay.  And in doing that, it refreshed your |

| | | |
|---|---|---|
| 02:01:01 | 1 | recollection as to some of -- to have an |
| 02:01:05 | 2 | independent recollection of your interactions |
| 02:01:08 | 3 | with Mr. Hadaway; is that true? |
| 02:01:09 | 4 | A   Yes. |
| 02:01:09 | 5 | Q   Okay.  Can you tell me your independent |
| 02:01:12 | 6 | recollection of this independent, you know, |
| 02:01:16 | 7 | refreshed recollection of your interactions |
| 02:01:18 | 8 | with Mr. Hadaway on October 27th, 1995? |
| 02:01:26 | 9 | A   I guess, can you repeat the question? |
| 02:01:30 | 10 | Q   Sure.  Please describe for me your independent |
| 02:01:33 | 11 | recollection, what you remember as you sit here |
| 02:01:37 | 12 | today, of your interactions with Mr. Hadaway on |
| 02:01:40 | 13 | October 27th, 1995. |
| 02:01:44 | 14 | A   My first recollection was getting him from the |
| 02:01:50 | 15 | city jail as he had summoned a jailer that he |
| 02:01:58 | 16 | wished to talk to the detectives, and so I was |
| 02:02:02 | 17 | assigned to go and bring him down, and Jim and |
| 02:02:07 | 18 | I put him in an interview room.  I advised him |
| 02:02:15 | 19 | of his constitutional rights which I had him |
| 02:02:22 | 20 | read from a card.  He indicated he understood |
| 02:02:25 | 21 | his rights and that he was willing to answer |
| 02:02:27 | 22 | questions, and then we just went into talking |
| 02:02:30 | 23 | to him.  I said, "You wanted to talk to us; |
| 02:02:34 | 24 | what did you want to tell us," words to that |
| 02:02:36 | 25 | effect, and he went on to talk about the |

02:02:39  1       incident in which he was under arrest for.

02:02:44  2   Q   Okay.  As you sit here today, do you know how

02:03:15  3       long Mr. Hadaway had been under arrest for the

02:03:18  4       Payne homicide at the time you were talking to

02:03:21  5       him?

02:03:22  6   A   No.

02:03:22  7   Q   Eric Moore, your colleague, had an

02:03:39  8       interrogation of him that was at 3:25 p.m. on

02:03:43  9       October 25th, right?

02:03:48 10   A   Okay.

02:03:48 11   Q   And your conversation with him was starting at

02:03:51 12       12:30 on October 27th?

02:03:57 13   A   I think it was 2:00.

02:04:00 14   Q   2:00 was when you started?  Yes, sorry.

02:04:06 15       Thank -- let's see -- thank you for clarifying

02:04:09 16       at 2:00.

02:04:09 17   A   Yes.

02:04:10 18   Q   Let's mark this as the next exhibit, Exhibit

02:04:14 19       12.

02:04:15 20          (Exhibit Nos. 12 and 13 were marked.)

02:04:39 21   BY MS. DONNELL:

02:04:40 22   Q   Okay.  I've handed you what I've designated as

02:04:43 23       Exhibits 12 and 13 to your deposition.  Do you

02:04:45 24       recognize Exhibit 12 as the handwritten

02:04:47 25       statement in your handwriting of Mr. Hadaway

| | | |
|---|---|---|
| 02:04:50 | 1 | from your interrogation of him on October 27th, |
| 02:04:56 | 2 | 1995? |
| 02:04:57 | 3 | A   Yes. |
| 02:04:57 | 4 | Q   And it also includes a signed Miranda waiver; |
| 02:05:02 | 5 | is that right? |
| 02:05:02 | 6 | A   Yes. |
| 02:05:02 | 7 | Q   With your signature on it? |
| 02:05:04 | 8 | A   Yes. |
| 02:05:05 | 9 | Q   And it also includes a -- the last page is a |
| 02:05:10 | 10 | diagram, right? |
| 02:05:11 | 11 | A   Yes. |
| 02:05:18 | 12 | Q   And that diagram is part -- in part is in your |
| 02:05:22 | 13 | handwriting as well? |
| 02:05:23 | 14 | A   It's both my handwriting and Hadaway's. |
| 02:05:27 | 15 | Q   Okay.  If I give you this pink pen, can you |
| 02:05:31 | 16 | identify on the last page of Exhibit 12 what |
| 02:05:34 | 17 | part's in your handwriting, other than your |
| 02:05:37 | 18 | signature, and what part's in Mr. Hadaway's? |
| 02:05:41 | 19 | So can you indicate in pink -- in red what's |
| 02:05:45 | 20 | your -- circle what's your -- |
| 02:05:46 | 21 | A   What's mine? |
| 02:05:47 | 22 | Q   Yeah, what's yours. |
| 02:06:05 | 23 | A   Well, my -- I drew the -- the layout of the map |
| 02:06:10 | 24 | for 7th and Burleigh. |
| 02:06:12 | 25 | Q   Okay.  So is that your writing on the last page |

02:06:15  1      of Exhibit 12 that says "N. 7th"?  That's your

02:06:19  2      handwriting?

02:06:20  3   A  Yes.

02:06:20  4   Q  Okay.  Can you circle it?

02:06:20  5   A  (Witness complies.)

02:06:24  6   Q  And "West Burleigh" down at the bottom, that's

02:06:26  7      yours?

02:06:27  8   A  Yes.

02:06:27  9   Q  And the north indication at the top orientating

02:06:30 10      the map, that's yours?

02:06:32 11   A  Yes.

02:06:33 12   Q  Okay.  And then this "X-way" over on the left,

02:06:38 13      is that you -- your handwriting as well, it

02:06:39 14      looks like?

02:06:40 15   A  Yeah.

02:06:40 16   Q  Okay.  And then the street designation that

02:06:44 17      says 7th and Burleigh, is that also yours on

02:06:50 18      the blocks?  I'm sorry.  So, like, these

02:06:53 19      squares, did you draw these squares indicating

02:06:56 20      the streets?

02:06:56 21   A  Yes.

02:06:57 22   Q  Okay.  How about the "abandoned house" with an

02:07:03 23      arrow?  Is that your handwriting?

02:07:04 24   A  No.

02:07:05 25   Q  Okay.  How about "mattress"?  Is that your

02:07:07  1          handwriting?

02:07:08  2     A    No.

02:07:08  3     Q    And how about the squiggly lines and then it

02:07:15  4          says, I don't know, "CB" and "HS"?  Is the "CB"

02:07:19  5          your initials?

02:07:20  6     A    Yes.

02:07:20  7     Q    And that's the alley being crossed out?

02:07:23  8     A    Yes.

02:07:23  9     Q    And you're initialing that the same way Hadaway

02:07:28  10         is?

02:07:28  11    A    Yes.

02:07:28  12    Q    Although his initials are backwards, right?

02:07:33  13    A    Yeah.

02:07:34  14    Q    Okay.

02:07:34  15              MS. GEHLING:  Or just upside down.

02:07:36  16              THE WITNESS:  Or upside down, yeah.

02:07:37  17    BY MS. DONNELL:

02:07:38  18    Q    Okay.  How about the indication of a car?

02:07:41  19    A    The "car" is my handwriting.

02:07:43  20    Q    Okay.

02:07:44  21    A    The car itself isn't; it was his.

02:07:48  22    Q    Hadaway's?

02:07:49  23    A    Yes.

02:07:49  24    Q    Okay.  The "abandoned house" you said is not

02:07:53  25         your writing?

| | | | |
|--|--|--|--|
| 02:07:54 | 1 | A | No. |
| 02:07:54 | 2 | Q | That's Hadaway's writing? |
| 02:07:56 | 3 | A | Yes. |
| 02:07:56 | 4 | Q | Okay.  And how about the three blocks?  One is |
| 02:08:02 | 5 | | indicating an abandoned house, and there's two |
| 02:08:04 | 6 | | other squares.  Who drew those? |
| 02:08:06 | 7 | A | I don't recall. |
| 02:08:12 | 8 | Q | It could have been you? |
| 02:08:13 | 9 | A | It could have been me.  I'm thinking it was |
| 02:08:16 | 10 | | him. |
| 02:08:16 | 11 | Q | But you don't really know one way -- you're not |
| 02:08:21 | 12 | | sure? |
| 02:08:21 | 13 | A | I'm not sure. |
| 02:08:21 | 14 | Q | I don't want you to speculate.  So are you |
| 02:08:24 | 15 | | uncertain who put the squares or the |
| 02:08:26 | 16 | | rectangles, excuse me, for the house |
| 02:08:27 | 17 | | indications? |
| 02:08:27 | 18 | A | I thought that's what we were talking about. |
| 02:08:29 | 19 | Q | Yeah, I'm saying to be clear, you don't recall |
| 02:08:32 | 20 | | one way or the other whether it was you or Sam |
| 02:08:34 | 21 | | who did that? |
| 02:08:35 | 22 | A | Correct. |
| 02:08:35 | 23 | Q | Okay.  How about the square for the mattress? |
| 02:08:38 | 24 | A | That was him. |
| 02:08:38 | 25 | Q | And the writing that says "mattress" or -- |

| | | |
|---|---|---|
| 02:08:41 | 1 | A    His. |
| 02:08:41 | 2 | Q    -- "matters"? |
| 02:08:43 | 3 | A    That was his. |
| 02:08:45 | 4 | Q    Okay. |
| 02:08:45 | 5 |          MS. GEHLING:  And, I'm sorry, I |
| 02:08:46 | 6 |      just -- did he say the writing for the car was |
| 02:08:50 | 7 |      his but the square was -- |
| 02:08:50 | 8 |          MS. DONNELL:  You know, I can -- |
| 02:08:54 | 9 |          MS. GEHLING:  I'm sorry. |
| 02:08:54 | 10 |          MS. DONNELL:  Well, if you want to |
| 02:08:58 | 11 |      clean it up later you can, but... |
| 02:08:59 | 12 |          MS. GEHLING:  Yeah. |
| 02:08:59 | 13 | BY MS. DONNELL: |
| 02:09:00 | 14 | Q    The "car," the "C-A-R," that's your |
| 02:09:01 | 15 |      handwriting? |
| 02:09:02 | 16 | A    Yes. |
| 02:09:02 | 17 | Q    And you're not sure who did the rectangle to |
| 02:09:06 | 18 |      indicate the car, or do you know who did that? |
| 02:09:08 | 19 | A    That would have been Sam. |
| 02:09:10 | 20 | Q    Okay.  Okay.  How about these squiggly lines in |
| 02:09:16 | 21 |      the back and then, I don't know, it looks like |
| 02:09:18 | 22 |      a circle and a triangle and some other things? |
| 02:09:21 | 23 |      Do you know what that indicates? |
| 02:09:22 | 24 | A    I don't know what that is.  I don't remember. |
| 02:09:23 | 25 | Q    Do you know who did it? |

02:09:25   1    A    No.

02:09:25   2    Q    Okay.  And Page -- or Exhibit 12, this is all

02:09:38   3         in your handwriting except where Mr. Hadaway

02:09:41   4         has signed it; is that right?

02:09:43   5    A    Where he signed it and where my partner signed

02:09:46   6         it.

02:09:46   7    Q    Okay.  And then at the very -- let's see -- the

02:09:51   8         third-to-last page, Page MPD SJH747 --

02:10:01   9    A    Okay.

02:10:02  10    Q    -- is that -- or the last lines "I have had the

02:10:08  11         above statement read to me and it is true, Sam

02:10:11  12         Hadaway" with the date 10/27/95, that's

02:10:17  13         Mr. Hadaway's?

02:10:17  14    A    Yes.

02:10:17  15    Q    And then "I am sorry it had to turn out this

02:10:21  16         way and am sorry I had to lie the first two

02:10:24  17         days, but it came to me to tell the truth and

02:10:27  18         now I am here, Sam Hadaway, end 4:25," was that

02:10:27  19         all Mr. Hadaway?

02:10:27  20    A    Yes.

02:10:30  21    Q    The "2 cans of orange soda," is that your

02:10:34  22         writing again?

02:10:35  23    A    Yes.

02:10:35  24    Q    Okay.  And that last part -- those two last

02:10:37  25         parts I've just read from Exhibit 12, that was

02:10:39   1      sort of part of your protocol to have the

02:10:42   2      individual write in their own words that the

02:10:44   3      statement had been either read to them or they

02:10:47   4      read it to themselves, right?

02:10:47   5  A   Yes, my own way I did it, yes.

02:10:50   6  Q   And then it was also your own way that you did

02:10:53   7      it to give the individual an opportunity to add

02:10:56   8      anything else that they wanted to?

02:10:57   9  A   Yes.

02:10:58  10  Q   Okay.  Thank you.  Now, you had indicated that

02:11:07  11      you had Mr. Hadaway read the Miranda rights,

02:11:10  12      right?

02:11:11  13  A   Yes.

02:11:11  14  Q   On a photocopy card, right?

02:11:15  15  A   Yes.

02:11:16  16  Q   And is that what you had him read which is the

02:11:19  17      second-to-last page of Exhibit 12, Bates 748?

02:11:24  18  A   Yes.

02:11:24  19  Q   And he's initialed it here and signed it along

02:11:27  20      with you?

02:11:28  21  A   Yes.

02:11:28  22  Q   Now, was that typical that you did in your

02:11:31  23      interrogations for everybody?

02:11:33  24  A   Yes.

02:11:34  25  Q   And you would include the signed Miranda

| | | |
|---|---|---|
| 02:11:36 | 1 | statements for everybody? |
| 02:11:40 | 2 | A   As I recall, yes. |
| 02:11:43 | 3 | Q   Did you have some concern that Mr. Hadaway |
| 02:11:46 | 4 |     wasn't able to read? |
| 02:11:50 | 5 | A   I wanted to make sure that he could read. |
| 02:11:52 | 6 | Q   Why did you want to make sure he could read? |
| 02:11:55 | 7 | A   Because I was -- part of building my rapport |
| 02:11:59 | 8 |     with him was to know that he could read and |
| 02:12:01 | 9 |     understand my questions and that he was |
| 02:12:03 | 10 |    coherent enough to go on with the interview. |
| 02:12:05 | 11 | Q  Did you have an understand -- well, did you |
| 02:12:09 | 12 |    have an impression of Mr. Hadaway that he may |
| 02:12:13 | 13 |    have limited education? |
| 02:12:15 | 14 | A  Not that I recall. |
| 02:12:16 | 15 | Q  How about limited cognitive functioning? |
| 02:12:19 | 16 | A  No, not that I recall. |
| 02:12:20 | 17 | Q  Do you remember observing him having weakness |
| 02:12:24 | 18 |    on the left side of his body? |
| 02:12:25 | 19 | A  I learned that, that he had cerebral palsy. |
| 02:12:30 | 20 | Q  When did you learn that Sam Hadaway had |
| 02:12:36 | 21 |    cerebral palsy? |
| 02:12:36 | 22 | A  I believe when he was interviewed by Detective |
| 02:12:39 | 23 |    Simons. |
| 02:12:40 | 24 | Q  Okay.  Did you -- did Mr. Hadaway tell you in |
| 02:12:49 | 25 |    part of the time building your rapport with him |

02:12:51  1          that he had cerebral palsy?

02:12:53  2     A    Not that I recall.

02:12:55  3     Q    And you went and got him from the jail and

02:12:56  4          transported him up to the CIB, correct?

02:13:00  5     A    Yes.

02:13:00  6     Q    So you observed Sam Hadaway walking?

02:13:04  7     A    Yeah.  He would have walked with me.

02:13:06  8     Q    Do you remember observing any limitations in

02:13:09  9          his ability to walk?

02:13:10  10    A    No.

02:13:10  11    Q    Did you -- did Mr. Hadaway tell you that he had

02:13:18  12         a seizure disorder?

02:13:20  13    A    Not that I recall.

02:13:21  14    Q    Did Mr. Hadaway convey to you that he took

02:13:25  15         medicine to prevent him from suffering

02:13:28  16         seizures?

02:13:29  17    A    Not that I recall.

02:13:30  18    Q    And you don't recall providing any medication

02:13:32  19         for Mr. Hadaway, correct?

02:13:34  20    A    No.

02:13:35  21    Q    Do you deny that Mr. Hadaway told you he had a

02:13:41  22         seizure disorder, or you just don't know one

02:13:44  23         way or the other?

02:13:45  24    A    I don't remember him saying anything about his

02:13:48  25         seizure disorder.

02:13:49   1   Q   So he could have; you just don't remember?

02:13:51   2   A   I don't recall.

02:13:52   3   Q   Okay.  But, I mean, by saying you don't recall

02:13:55   4       means he could have told you; you just don't

02:13:57   5       recall, correct?

02:13:59   6   A   I would have documented it somewhere.  If he

02:14:02   7       needed seizure medication, we would have got it

02:14:04   8       for him.

02:14:05   9   Q   Is it your testimony that if Mr. Hadaway had

02:14:09  10       told you he had a seizure disorder you would

02:14:11  11       have put it in his statement?

02:14:13  12   A   If he requested his medication, we would have

02:14:16  13       gotten it for him.

02:14:18  14   Q   Would you have documented it if you did it?

02:14:27  15   A   If he would have requested it, it would have

02:14:29  16       been documented.

02:14:30  17   Q   Okay.  And it's your testimony that you don't

02:15:04  18       believe you knew Sam Hadaway had cerebral palsy

02:15:10  19       until he was taken to be polygraphed?

02:15:13  20   A   As I recall today, the way I found out about

02:15:19  21       cerebral palsy was through Detective Simons'

02:15:21  22       interview with him.

02:15:23  23   Q   Okay.  And you realize that that interview with

02:15:25  24       Detective Simons occurred after this October

02:15:27  25       27th interview, correct?

02:15:29   1    A    That's correct.

02:15:29   2    Q    Okay.  Did you at any point in time in your

02:15:47   3         interrogation of Mr. Hadaway on October 27th,

02:15:50   4         1995, threaten him that he would spend 80 years

02:15:55   5         in prison for the murder of Jessica Payne?

02:15:57   6    A    No.

02:15:58   7    Q    It's your testimony that that didn't occur?

02:16:02   8    A    That's correct.

02:16:03   9    Q    Did you witness your partner, James

02:16:06   10        DeValkenaere, threaten Mr. Hadaway that he

02:16:09   11        would go to prison for 80 years for Jessica

02:16:12   12        Payne's murder?

02:16:12   13   A    No.

02:16:13   14   Q    Is it your testimony that that did not occur?

02:16:16   15   A    Yes.

02:16:16   16   Q    Did you make any promise to Mr. Hadaway that if

02:16:22   17        he implicated Chaunte Ott in the murder of

02:16:24   18        Jessica Payne that he'd only have to do five

02:16:26   19        years?

02:16:27   20   A    No.

02:16:27   21   Q    Did you witness your partner promise

02:16:31   22        Mr. Hadaway that if he implicated Chaunte Ott

02:16:34   23        in the murder of Jessica Payne he'd only have

02:16:37   24        to serve five years in prison?

02:16:39   25   A    No.

| | | |
|---|---|---|
| 02:16:39 | 1 | Q | Is it your testimony that didn't occur? |
| 02:16:42 | 2 | A | Yes. |
| 02:16:42 | 3 | Q | Did you threaten Sam Hadaway that if he went to |
| 02:16:49 | 4 | | prison he'd be raped? |
| 02:16:50 | 5 | A | No. |
| 02:16:50 | 6 | Q | Did your partner, James DeValkenaere, threaten |
| 02:16:53 | 7 | | Mr. Hadaway that if he went to prison he'd be |
| 02:16:57 | 8 | | raped? |
| 02:16:58 | 9 | A | No. |
| 02:16:58 | 10 | Q | Is it your testimony that didn't occur? |
| 02:17:00 | 11 | A | Yes. |
| 02:17:00 | 12 | Q | Did you use any physical threat of violence |
| 02:17:03 | 13 | | with Mr. Hadaway when you interrogated him? |
| 02:17:05 | 14 | A | No. |
| 02:17:05 | 15 | Q | Did you push over any furniture in the |
| 02:17:08 | 16 | | interrogation room during your interrogation of |
| 02:17:09 | 17 | | him? |
| 02:17:10 | 18 | A | No. |
| 02:17:10 | 19 | Q | Did you witness James DeValkenaere use any |
| 02:17:13 | 20 | | threat of physical violence with Mr. Hadaway? |
| 02:17:17 | 21 | A | No. |
| 02:17:18 | 22 | Q | Did you witness your partner turn over any |
| 02:17:20 | 23 | | furniture or chairs in the interrogation room |
| 02:17:22 | 24 | | during the interrogation of Sam Hadaway? |
| 02:17:25 | 25 | A | No. |

Case 2:19-cv-01106-PP   Filed 03/20/24   Page 140 of 249   Document 119-4

02:17:27    1    Q    Was any physical force used with Mr. Hadaway?

02:17:30    2    A    No.

02:17:30    3    Q    Did Mr. Hadaway deny any knowledge or

02:17:38    4         involvement in the Payne homicide in your

02:17:41    5         interrogation of him?

02:17:44    6    A    No.

02:17:45    7    Q    Do you have any knowledge of whether

02:17:51    8         Mr. Hadaway was provided his seizure medicine

02:17:53    9         in the time that he was in custody prior to

02:17:56   10         your interrogation of him?

02:17:58   11              MS. GEHLING:  Objection; foundation.

02:18:02   12              MS. DONNELL:  You can answer.

02:18:03   13              THE WITNESS:  I wasn't aware he was

02:18:05   14         on medicine at the time.

02:18:05   15    BY MS. DONNELL:

02:18:06   16    Q    So it's true you have no knowledge about

02:18:08   17         whether he was provided any medicine during his

02:18:11   18         custody, correct?

02:18:11   19    A    I don't have -- no, I don't.

02:18:13   20    Q    Okay.  Do you have any knowledge, personal

02:18:18   21         knowledge, of Mr. Hadaway's meals he was

02:18:25   22         provided?

02:18:26   23    A    No.

02:18:27   24    Q    Do you know how long you were allowed to hold

02:18:39   25         somebody in custody before charges were

02:18:42  1        approved at that time?

02:18:45  2   A    We had 48 hours to establish probable cause,

02:18:50  3        and after that's established, then you have 72

02:18:52  4        hours for charging.

02:18:54  5   Q    Was there probable cause to hold -- to arrest

02:19:00  6        Mr. Hadaway -- well, strike that.

02:19:02  7                  Was there probable cause to hold

02:19:04  8        Mr. Hadaway prior to your interrogation of him?

02:19:06  9                  MS. GEHLING:  Objection; foundation.

02:19:12 10        You can answer if you know.

02:19:15 11                  THE WITNESS:  I don't recall.

02:19:17 12   BY MS. DONNELL:

02:19:17 13   Q    Based on the information that Mr. Gwin had

02:19:20 14        allegedly provided to you and your partner,

02:19:24 15        James DeValkenaere, was there probable cause,

02:19:26 16        in your view, to arrest Mr. Hadaway for the

02:19:29 17        Payne homicide?

02:19:30 18   A    Yes.

02:19:30 19   Q    Okay.  Was there probable cause to seek charges

02:19:36 20        for Mr. Hadaway prior to your interrogation of

02:19:40 21        him on October 27th, 1995, at 2:00 p.m.?

02:19:45 22   A    No.

02:19:45 23   Q    Why not?

02:19:46 24   A    It didn't -- there was no admission on his part

02:19:52 25        of being involved and Mr. Gwin wasn't a witness

02:19:56   1          to the homicide.

02:19:58   2      Q   Is it fair to say that if in your interrogation

02:20:08   3          of Mr. Hadaway he had denied involvement or

02:20:13   4          knowledge, you would have had to let him go?

02:20:17   5      A   Yes.

02:20:17   6      Q   Okay.  Are you aware as you sit here today of

02:20:22   7          what was the basis of probable cause to charge

02:20:25   8          Mr. Hadaway with Jessica Payne's murder?

02:20:28   9      A   Based on his own statement.

02:20:30  10      Q   Anything else?

02:20:32  11      A   And Gwin's statement.

02:20:34  12      Q   Anything else?

02:20:36  13      A   No.

02:20:37  14      Q   Is it fair to say none of the -- there was no

02:20:42  15          eyewitnesses to -- that ever linked Mr. Hadaway

02:20:46  16          to the Payne homicide?

02:20:47  17      A   Correct.

02:20:47  18      Q   And there was no physical evidence linking Sam

02:20:50  19          Hadaway to the Jessica Payne homicide?

02:20:51  20      A   Correct.

02:20:52  21      Q   And Mr. Ott never implicated Mr. Hadaway,

02:21:01  22          correct?

02:21:02  23      A   No.

02:21:02  24      Q   Okay.  Whatever's easiest to look at, if you

02:21:42  25          want to look at Exhibit 12 or Exhibit 13 --

02:21:44  1    well, actually, before we do that, do you have

02:21:47  2    any memory of any of the specific questions you

02:21:51  3    asked Mr. Hadaway in this or -- well, strike

02:21:55  4    that.

02:21:55  5         Do you have any memory of the

02:21:58  6    specific questions that you asked Mr. Hadaway

02:22:01  7    other than the one you just testified to "What

02:22:03  8    did you want to tell us?"

02:22:05  9  A  No.

02:22:06  10  Q  Was this statement the product of a

02:22:11  11    back-and-forth of question or answering?

02:22:14  12  A  Yes.

02:22:14  13  Q  This isn't, like, a verbatim account of

02:22:17  14    Mr. Hadaway just telling you a bunch of things,

02:22:20  15    right?

02:22:21  16  A  Correct.

02:22:21  17  Q  And I believe you testified earlier your

02:22:23  18    practice was, you know, to have some background

02:22:25  19    questions, get a -- ask questions about the

02:22:26  20    incident, and then go back and write it out,

02:22:29  21    right?

02:22:29  22  A  Yes.

02:22:29  23  Q  And that's the protocol you followed for

02:22:32  24    Exhibit 12?

02:22:33  25  A  Yes.

02:22:34  1    Q    Okay.  In Exhibit 12 or 13, there's a portion

02:22:41  2         in which Mr. Hadaway allegedly said that

02:22:44  3         Mr. Ott struck Mr. Payne -- Ms. Payne in the

02:22:47  4         face a number of times.  Do you remember that?

02:22:49  5    A    Yes.

02:22:49  6    Q    Was there any evidence of bruising on

02:22:52  7         Ms. Payne's face?

02:22:53  8    A    I don't recall.

02:22:55  9    Q    I'm going to mark this as Exhibit 14.  This is

02:23:05  10        the medical examiner's report.

02:23:18  11                  (Exhibit No. 14 was marked.)

02:23:18  12   BY MS. DONNELL:

02:23:18  13   Q    Okay.  Mr. Buschmann, I'm handing you

02:23:21  14        Exhibit 14 which is the medical examiner and

02:23:24  15        toxicology report for Jessica Payne dated

02:23:25  16        August 30th, 1995, okay?

02:23:27  17   A    Hm-hm, yes.

02:23:28  18   Q    And this is something you read prior to your

02:23:30  19        involvement on the Payne homicide, right?

02:23:33  20   A    Yes.

02:23:33  21   Q    Okay.  And if you -- you can review it, but I

02:23:38  22        can call your -- your attention to the page

02:23:41  23        that has Bates stamps MPD952 and 953 where it

02:23:46  24        says "Other Evidence of Trauma."  It's -- it's

02:23:50  25        Section 11, Page 17 of the M file, and it has

02:23:53  1          Bates stamp 952, and there's a subsection that

02:24:03  2          says "Other Evidence of Trauma."

02:24:07  3    A     Okay.

02:24:07  4    Q     And it says "Other evidence of trauma is

02:24:10  5          limited to areas of contusion inclusive of a

02:24:11  6          small -- two small contusions along the medial

02:24:15  7          right costal margin," right?

02:24:17  8    A     Yes.

02:24:17  9    Q     "A contusion on the left medial costal margin

02:24:21  10         of the anterior chest wall," right?

02:24:23  11   A     Yes.

02:24:23  12   Q     "A contusion over the dorsum of the right

02:24:25  13         hand"?

02:24:26  14   A     Yes.

02:24:26  15   Q     "A superficial abrasion along the left groin,"

02:24:30  16         right?

02:24:30  17   A     Yes.

02:24:30  18   Q     And that's indicated as a "probable postmortem

02:24:35  19         artifact," right?

02:24:37  20   A     Yes.

02:24:37  21   Q     Then there's "A series of contusions along the

02:24:40  22         right leg anteriorly," and then there's various

02:24:43  23         measurements of those contusions along the

02:24:45  24         outside of the right leg, right?

02:24:46  25   A     Yes.

| | | |
|---|---|---|
| 02:24:47 | 1 | Q   And then there's "Two contusions on the left |
| 02:24:49 | 2 | anterior thigh" as well, right? |
| 02:24:52 | 3 | A   Yes. |
| 02:24:52 | 4 | Q   There is no evidence that the autopsy indicated |
| 02:24:58 | 5 | of any bruising or contusions on Ms. Payne's |
| 02:25:01 | 6 | face, right? |
| 02:25:03 | 7 | A   Correct. |
| 02:25:03 | 8 | Q   In terms of injuries to Ms. Payne, there's |
| 02:25:28 | 9 | nothing that Mr. Hadaway provided to you that |
| 02:25:31 | 10 | you didn't already know prior to your |
| 02:25:33 | 11 | interrogation of him on the 27th of October, |
| 02:25:36 | 12 | 1995, correct? |
| 02:25:40 | 13 | A   To Ms. Payne's -- |
| 02:25:41 | 14 | Q   Body. |
| 02:25:42 | 15 | A   -- body?  Correct. |
| 02:25:44 | 16 | Q   And, in fact, the -- the statement that Chaunte |
| 02:25:49 | 17 | Ott struck her in the face, there was no |
| 02:25:51 | 18 | corroborating physical evidence in the |
| 02:25:53 | 19 | photographs or the medical examiner's report, |
| 02:25:56 | 20 | correct? |
| 02:25:56 | 21 | A   No. |
| 02:25:59 | 22 | Q   Okay.  And -- and the same is true with the |
| 02:26:15 | 23 | statement of Mr. Richard Gwin, you also knew |
| 02:26:19 | 24 | the location that Ms. Gwin's [sic] body was |
| 02:26:22 | 25 | found before you ever talked to Mr. Hadaway or |

| | | |
|---|---|---|
| 02:26:25 | 1 | Gwin, correct? |
| 02:26:27 | 2 | A   Yes. |
| 02:26:27 | 3 | Q   Okay.  Now, it's fair to say that after your |
| 02:26:30 | 4 | conversation with Mr. Hadaway -- well, strike |
| 02:26:37 | 5 | that. |
| 02:26:37 | 6 | The next thing you did was take |
| 02:26:40 | 7 | Mr. Hadaway to meet with Mark Williams; is that |
| 02:26:43 | 8 | right? |
| 02:26:43 | 9 | A   That happened eventually, yes.  I don't know |
| 02:26:45 | 10 | exactly when it happened. |
| 02:26:47 | 11 | Q   Okay.  Sorry, that might not be the next thing. |
| 02:27:00 | 12 | Do you recall that your conversation with |
| 02:27:02 | 13 | Chaunte Ott that you spoke about occurred |
| 02:27:04 | 14 | before you talked to Mr. Hadaway? |
| 02:27:08 | 15 | A   I don't recall. |
| 02:27:11 | 16 | Q   Okay.  I'm going to show you Exhibit 15 to see |
| 02:27:14 | 17 | if it refreshes your recollection. |
| 02:27:27 | 18 | (Exhibit No. 15 was marked.) |
| 02:27:28 | 19 | BY MS. DONNELL: |
| 02:27:28 | 20 | Q   I'm showing you what I've designated as |
| 02:27:31 | 21 | Exhibit 15 to your deposition.  It's Bates |
| 02:27:32 | 22 | stamped MPD570.  It's from M file 3084, |
| 02:27:35 | 23 | Section 4, Page 294.  Do you see -- do you |
| 02:27:38 | 24 | recognize this supp report from your partner, |
| 02:27:42 | 25 | James DeValkenaere, memorializing a |

02:27:44   1          conversation with Chaunte Ott on October 26th,

02:27:47   2          1995?

02:27:47   3    A     Yes.

02:27:48   4    Q     And so that was the day before you talked to

02:27:51   5          Sam Hadaway, right?

02:27:52   6    A     That's correct.

02:27:52   7    Q     And this is where Mr. Ott denied any

02:27:56   8          involvement or knowledge of the Payne homicide,

02:28:02   9          right?

02:28:02  10    A     Correct.

02:28:03  11    Q     Okay.  This is 16.

02:28:21  12                  (Exhibit No. 16 was marked.)

02:28:21  13    BY MS. DONNELL:

02:28:21  14    Q     Mr. Buschmann, I'm handing you what I've

02:28:24  15          designated as Exhibit 16 to your deposition.

02:28:26  16          This has Bates stamp MPD1162.  Do you recognize

02:28:32  17          Exhibit -- and it's from M file 3084, Section

02:28:35  18          14, Page 1.  Do you recognize Exhibit 16 as the

02:28:39  19          supp report for the charging conference that

02:28:41  20          occurred on Monday, October 30th?

02:28:44  21    A     Yes.

02:28:44  22    Q     And that was with District Attorney Mark

02:28:46  23          Williams?

02:28:47  24    A     Correct.

02:28:47  25    Q     And Mark Williams was the homicide DA, right?

| | | | |
|---|---|---|---|
| 02:28:52 | 1 | A | Correct. |
| 02:28:52 | 2 | Q | And so you worked with him frequently even |
| 02:28:55 | 3 | | before this homicide investigation? |
| 02:28:59 | 4 | A | Yes. |
| 02:28:59 | 5 | Q | Okay.  Okay.  Okay.  The supp report you |
| 02:29:26 | 6 | | prepared is dated November 6th, 1995; is that |
| 02:29:31 | 7 | | right? |
| 02:29:31 | 8 | A | Yes. |
| 02:29:31 | 9 | Q | And so you met first for a charging conference |
| 02:29:34 | 10 | | on October 30th; is that right? |
| 02:29:38 | 11 | A | Yes. |
| 02:29:39 | 12 | Q | But charges were not approved until the |
| 02:29:43 | 13 | | following Monday on November 6th? |
| 02:29:45 | 14 | A | Yes. |
| 02:29:46 | 15 | Q | Okay.  And did Mr. Williams indicate he had |
| 02:29:54 | 16 | | concerns about the investigation and things he |
| 02:29:58 | 17 | | wanted followed up on before he was willing to |
| 02:30:00 | 18 | | charge Mr. Hadaway with the Payne homicide? |
| 02:30:05 | 19 | A | Yes. |
| 02:30:05 | 20 | Q | What was Mr. Williams concerned about? |
| 02:30:08 | 21 | A | He wanted to make sure that both Gwin and |
| 02:30:12 | 22 | | Hadaway were telling the truth. |
| 02:30:14 | 23 | Q | Did Mark Williams indicate to you why he had |
| 02:30:20 | 24 | | concerns of whether Gwin and Hadaway were |
| 02:30:24 | 25 | | telling the truth about implicating them- -- |

02:30:29   1          Mr. Hadaway and Mr. Ott in the Payne homicide?

02:30:32   2   A    It was the only evidence we had implicating

02:30:35   3          Chaunte Ott in the homicide.

02:30:41   4   Q    Was Mark Williams concerned that there were no

02:30:52   5          eyewitnesses -- well, strike that.

02:30:53   6                Was Mark Williams concerned that

02:30:56   7          there was no physical evidence to corroborate

02:30:58   8          the statements?

02:31:00   9                MS. GEHLING:  Objection; foundation.

02:31:01  10                THE WITNESS:  Not that I recall.

02:31:03  11   BY MS. DONNELL:

02:31:06  12   Q    Was Mark Williams concerned about Mr. Gwin as a

02:31:13  13          reliable witness?

02:31:14  14                MS. GEHLING:  Objection; foundation.

02:31:15  15                THE WITNESS:  I don't recall.

02:31:16  16   BY MS. DONNELL:

02:31:17  17   Q    How about with respect to Mr. Hadaway?  Was he

02:31:20  18          concerned about Mr. Hadaway?

02:31:22  19                MS. GEHLING:  Objection; foundation.

02:31:23  20                THE WITNESS:  I don't recall.

02:31:24  21   BY MS. DONNELL:

02:31:25  22   Q    Do you recall him expressing any concerns to

02:31:27  23          you other than what you've just testified to

02:31:29  24          that the only evidence implicating Mr. Ott was

02:31:31  25          the two witness statements by Gwin and Hadaway?

| | | | |
|---|---|---|---|
| 02:31:34 | 1 | A | No. |
| 02:31:35 | 2 | Q | Did -- well, Mr. Hadaway was taken to be |
| 02:31:46 | 3 | | polygraphed the following day -- well, two days |
| 02:31:50 | 4 | | later on November 1st, right? |
| 02:31:51 | 5 | A | Yes. |
| 02:31:51 | 6 | Q | Was that your decision? |
| 02:31:57 | 7 | A | No. |
| 02:31:57 | 8 | Q | Whose decision was it to polygraph Sam Hadaway? |
| 02:32:01 | 9 | A | I believe it was the -- Mr. Williams'. |
| 02:32:04 | 10 | Q | Why do you believe it was Mr. Williams'? |
| 02:32:06 | 11 | A | Because he's the one that had the concerns |
| 02:32:08 | 12 | | about both Hadaway and Gwin telling the truth. |
| 02:32:15 | 13 | | I don't know -- I'm going to say I don't know |
| 02:32:18 | 14 | | for sure who requested the polygraph. |
| 02:32:21 | 15 | Q | Okay.  Thank you for clarifying.  When you say |
| 02:32:26 | 16 | | Williams was the one -- Mark Williams was the |
| 02:32:29 | 17 | | one that had concerns about Gwin and Hadaway |
| 02:32:32 | 18 | | telling the truth about the Payne homicide and |
| 02:32:35 | 19 | | any knowledge of it, did you share that concern |
| 02:32:40 | 20 | | back in October/November 1995? |
| 02:32:45 | 21 | A | Who did I -- who would I have shared that |
| 02:32:48 | 22 | | concern with? |
| 02:32:48 | 23 | Q | Did you share Mark Williams' concern about Gwin |
| 02:32:51 | 24 | | and Hadaway telling the truth? |
| 02:32:54 | 25 | A | Not that I recall. |

| | | |
|--|--|--|
| 02:32:55 | 1 | Q   You recall that being the prosecutor's concern, |
| 02:32:58 | 2 | but not yours? |
| 02:33:00 | 3 | A   You're -- oh, I don't understand -- I didn't |
| 02:33:03 | 4 | understand the question. |
| 02:33:04 | 5 | Q   Oh, thank you.  Thanks for letting me know. |
| 02:33:06 | 6 | I'm happy to rephrase. |
| 02:33:07 | 7 | So you said Mark Williams had |
| 02:33:10 | 8 | concerns about Gwin and Hadaway telling the |
| 02:33:11 | 9 | truth about what they said implicating |
| 02:33:13 | 10 | Mr. Hadaway and Mr. Ott in the Payne homicide, |
| 02:33:16 | 11 | right? |
| 02:33:16 | 12 | A   Correct. |
| 02:33:16 | 13 | Q   And I'm asking did you share his concern?  Did |
| 02:33:19 | 14 | you have the same concern? |
| 02:33:20 | 15 | A   Yes, I did. |
| 02:33:21 | 16 | Q   Okay.  Why were you concerned about Gwin and |
| 02:33:24 | 17 | Hadaway telling the truth? |
| 02:33:26 | 18 | A   Because that's the only evidence we had. |
| 02:33:28 | 19 | Q   And why did that concern you as the homicide |
| 02:33:30 | 20 | detective? |
| 02:33:31 | 21 | A   Because I'm not going to try to have an |
| 02:33:34 | 22 | innocent person charged with homicide without |
| 02:33:37 | 23 | going the extra steps of finding out if the |
| 02:33:41 | 24 | people that gave us statements were telling us |
| 02:33:43 | 25 | the truth. |

02:33:43  1    Q    But you took Hadaway and Ott to a charging

02:33:52  2         conference to seek charges or to seek approval

02:33:55  3         of charges, right?

02:33:59  4    A    Not for Gwin.

02:34:00  5    Q    Sorry.  You weren't seeking charges for Gwin.

02:34:03  6         Thanks for clarifying.  You were seeking

02:34:05  7         charges for Hadaway and Ott?

02:34:07  8    A    We were having the case reviewed at that time.

02:34:09  9    Q    And you were -- you were only proposing to have

02:34:13  10        charges for Hadaway and Ott?

02:34:16  11   A    Yes.

02:34:17  12   Q    But you are aware that there were criminal

02:34:22  13        charges that were possible charges that could

02:34:25  14        be brought against Mr. Gwin based on his

02:34:28  15        involvement?

02:34:29  16             MS. GEHLING:  Objection; relevance.

02:34:32  17        You can answer.

02:34:32  18             THE WITNESS:  No.

02:34:33  19   BY MS. DONNELL:

02:34:33  20   Q    Well, do you understand what accessory to a

02:34:36  21        murder is?

02:34:37  22   A    Yes.  He didn't give a statement implicating

02:34:42  23        himself in the murder at all.

02:34:43  24   Q    Okay.  So it's your -- your belief back in

02:34:47  25        October 1995 that there was no criminal charges

| | | |
|---|---|---|
| 02:34:51 | 1 | for Mr. Gwin's conduct? |
| 02:34:53 | 2 | A   Correct. |
| 02:34:53 | 3 | Q   Okay.  Had you made that promise to Mr. Gwin |
| 02:35:04 | 4 | that he couldn't be charged? |
| 02:35:06 | 5 | A   No. |
| 02:35:06 | 6 | Q   Why not? |
| 02:35:08 | 7 | A   Because it's not my decision. |
| 02:35:10 | 8 | Q   Okay.  And Mr. Gwin was being brought to the |
| 02:35:13 | 9 | charging conference, right? |
| 02:35:14 | 10 | A   Correct. |
| 02:35:14 | 11 | Q   Okay.  But it sounds to me like your testimony |
| 02:35:18 | 12 | is neither you or DeValkenaere thought Gwin |
| 02:35:21 | 13 | should be charged? |
| 02:35:24 | 14 | A   No. |
| 02:35:25 | 15 | Q   Okay.  And -- but at that point on October 30th |
| 02:35:32 | 16 | when you were setting up the charging |
| 02:35:35 | 17 | conference with Mark Williams, you did think |
| 02:35:37 | 18 | that charges -- you were seeking review for |
| 02:35:39 | 19 | charging Mr. Ott and Mr. Hadaway, correct? |
| 02:35:43 | 20 | A   Yes. |
| 02:35:44 | 21 | Q   And it was at that point that Mr. Williams |
| 02:35:46 | 22 | indicated he had some concerns, right? |
| 02:35:49 | 23 | A   I don't recall how it went in the charging |
| 02:35:56 | 24 | conference.  I don't have independent |
| 02:35:59 | 25 | recollection of my conversation or the charging |

02:36:03    1        conference itself.

02:36:04    2    Q   But at the time that you brought Mr. Hadaway

02:36:11    3        and Mr. Ott to the charging conference, at that

02:36:15    4        point there wasn't any follow-up you and your

02:36:17    5        partner had planned to do before seeking

02:36:20    6        charges, right?

02:36:23    7    A   I'm not sure if -- I don't recall if we had

02:36:28    8        another plan or if anything else was planned.

02:36:31    9        I do not recall that.

02:36:32   10    Q   Okay.  Other than the polygraph of Mr. Hadaway,

02:36:48   11        do you have a recollection as you sit here

02:36:50   12        today of any other steps you took to address

02:36:54   13        the concern about the only evidence being

02:36:58   14        Mr. Gwin and Mr. Hadaway?

02:37:04   15    A   No, I don't recall.

02:37:06   16    Q   Okay.  Okay.  Do you remember anything as you

02:37:39   17        sit here today about taking Sam Hadaway to

02:37:45   18        be -- for a polygraph examination?

02:37:47   19    A   No.

02:37:47   20    Q   Did you review any of the documentation related

02:37:52   21        to Sam Hadaway's polygraph examination to

02:37:55   22        prepare for your deposition?

02:37:57   23    A   Yes, I read the statement prepared by Detective

02:38:01   24        Simons.

02:38:02   25    Q   Okay.  Did that refresh your recollection in

02:38:04   1        any way as to your involvement in that

02:38:07   2        polygraph examination and statement?

02:38:09   3   A    Yes.

02:38:09   4   Q    Do you have any independent recollection now as

02:38:14   5        you sit here today of the polygraph

02:38:16   6        examination?

02:38:17   7   A    I remember just being called in by Detective

02:38:22   8        Simons to witness the statement.

02:38:24   9   Q    Okay.  This is going to be 17.  This is going

02:38:24   10       to be 18 and 19.

02:38:48   11           (Exhibit Nos. 17 through 19 were marked.)

02:39:28   12   BY MS. DONNELL:

02:39:28   13   Q    Okay.  Mr. Buschmann, I'm handing you what I've

02:39:32   14        designated as Exhibits 17, 18, and 19, okay?

02:39:35   15   A    Okay.

02:39:35   16   Q    Do you recognize -- hopefully I didn't just

02:39:45   17        give you my copy.  Oh, got it.  Okay.  Do you

02:39:50   18        recognize Exhibit 17 as the Milwaukee Police

02:39:54   19        Department polygraph examination report for the

02:39:56   20        examination that Examiner Simons conducted on

02:40:01   21        November 1st of 1995 of Mr. Hadaway?

02:40:05   22   A    Yes.

02:40:05   23   Q    And this is -- you again were the investigator

02:40:10   24        as the -- identified as the submitting officer,

02:40:12   25        right?

| | | | |
|---|---|---|---|
| 02:40:12 | 1 | A | Yes. |
| 02:40:12 | 2 | Q | And this indicates that Mr. Hadaway was |
| 02:40:16 | 3 | | examined between 9:31 a.m. and 10:06 a.m. on |
| 02:40:19 | 4 | | November 1st? |
| 02:40:30 | 5 | A | I can't read this.  Yes. |
| 02:40:35 | 6 | Q | Okay.  And then do you recognize Exhibit 18 as |
| 02:40:43 | 7 | | the handwritten statement of the post-polygraph |
| 02:40:45 | 8 | | interrogation of Mr. Hadaway on November 1st? |
| 02:40:48 | 9 | A | Yes. |
| 02:40:49 | 10 | Q | And that indicates that on November 1st at |
| 02:40:52 | 11 | | 11:26 a.m. the subject was questioned at CIB, |
| 02:40:56 | 12 | | right? |
| 02:40:56 | 13 | A | Correct. |
| 02:40:56 | 14 | Q | And you were present for this as well? |
| 02:40:58 | 15 | A | Yes. |
| 02:40:59 | 16 | Q | Okay.  And you've also signed it on the back of |
| 02:41:02 | 17 | | Exhibit 18? |
| 02:41:03 | 18 | A | Yes. |
| 02:41:03 | 19 | Q | Okay.  And then Exhibit 19, do you recognize |
| 02:41:07 | 20 | | that to be the supplementary report prepared by |
| 02:41:11 | 21 | | Detective Simons about the post-polygraph |
| 02:41:14 | 22 | | examination? |
| 02:41:14 | 23 | A | Yes. |
| 02:41:15 | 24 | Q | Okay.  Okay.  And you again would have spoken |
| 02:41:32 | 25 | | to Detective Simons before he conducted this |

Case 2:19-cv-01106-PP   Filed 03/20/24   Page 158 of 249   Document 119-4

02:41:39  1      examination of Mr. Hadaway, right?

02:41:41  2   A  Yes.

02:41:41  3   Q  And at this point in time was Mr. Hadaway still

02:41:43  4      under arrest?

02:41:45  5   A  Yes.

02:41:45  6   Q  For the Payne homicide?

02:41:48  7   A  Yes.

02:41:48  8   Q  Okay.  And here Mr. Hadaway was asked if

02:42:03  9      Chaunte Ott cut that white girl's throat,

02:42:11 10      right?  Or these are the relevant questions,

02:42:13 11      okay?

02:42:13 12   A  Oh, okay.

02:42:14 13            MS. GEHLING:  Oh, okay.

02:42:15 14   BY MS. DONNELL:

02:42:16 15   Q  The relevant questions at the polygraph

02:42:20 16      examination were "Did Chaunte Ott cut the white

02:42:24 17      girl's throat," right?

02:42:25 18   A  Yes.

02:42:25 19   Q  "Did you," meaning Sam Hadaway, "cut the white

02:42:25 20      girl's throat," right?

02:42:27 21   A  Right.

02:42:27 22   Q  "While the white girl was fighting, did you

02:42:30 23      help hold her down," right?

02:42:32 24   A  Right.

02:42:32 25   Q  And then "Did you have any sexual contact with

02:42:34    1         the white girl," right?

02:42:36    2    A    Yes.

02:42:36    3    Q    And those questions about -- or strike that.

02:42:40    4              The information that you wanted in

02:42:43    5         the context of the Payne homicide investigation

02:42:46    6         after meeting with Mark Williams would have --

02:42:50    7         well, strike that.  Let me strike that.

02:42:52    8              These questions would have come from

02:42:56    9         you and Detective -- well, strike that again.

02:42:59   10              The questions that Detective Simons

02:43:02   11         decided to ask were after his meeting with you

02:43:06   12         and your partner, right, or you?  I'm sorry,

02:43:10   13         just you.

02:43:13   14              MS. GEHLING:  Object to foundation.

02:43:14   15         You can answer if you know.

02:43:15   16              THE WITNESS:  Yes.

02:43:15   17    BY MS. DONNELL:

02:43:15   18    Q    And this November 1st polygraph and

02:43:19   19         post-polygraph interview, your partner wasn't

02:43:22   20         present for, right?

02:43:23   21    A    I don't believe so.

02:43:24   22    Q    Okay.  Do you, as you sit here today, know why

02:43:30   23         Detective Simons was asking Mr. Hadaway if he

02:43:33   24         had sexual contact with Jessica Payne?

02:43:36   25              MS. GEHLING:  Objection; foundation.

02:43:39  1                    THE WITNESS:  I don't.

02:43:40  2    BY MS. DONNELL:

02:43:42  3    Q    But it's fair to say Detective Simons, he was

02:43:47  4         only -- was his -- he was not a homicide

02:43:48  5         detective; he was a polygraph examiner?

02:43:50  6    A    Correct, and he worked in the robbery unit.

02:43:54  7    Q    But he didn't work in homicide?

02:43:57  8    A    He did not.

02:43:58  9    Q    Okay.  Okay.  Looking at -- calling your

02:44:15  10        attention to Exhibit 18, on the back half, do

02:44:41  11        you see the paragraph that says "During the

02:44:43  12        interview, Sam and Detective Simons role-played

02:44:46  13        on what he did and what the white girl did"?

02:44:49  14        Do you see that?

02:44:49  15   A    Yes.

02:44:50  16   Q    And that "Sam held my hands about [sic] my head

02:44:55  17        just as he did to the white girl" to Detective

02:44:58  18        Simons.  Do you see that?

02:44:59  19   A    Yes.

02:44:59  20   Q    Does this refresh your recollection of you

02:45:01  21        observing Sam Hadaway and Detective Simons

02:45:05  22        role-playing?

02:45:12  23   A    I don't remember the role-playing.

02:45:14  24   Q    Okay.

02:45:14  25   A    I don't recall that, but I know that this is

| | | |
|---|---|---|
| 02:45:22 | 1 | when I found out about the -- that I remembered |
| 02:45:26 | 2 | about the weak left arm. |
| 02:45:31 | 3 | Q  Okay.  Did you make any promises to Sam Hadaway |
| 02:45:47 | 4 | on November 1st that if he implicated Chaunte |
| 02:45:52 | 5 | Ott he'd only have to go to prison for five |
| 02:45:56 | 6 | years? |
| 02:45:56 | 7 | A  No. |
| 02:45:56 | 8 | Q  Did you threaten Mr. Hadaway at any point on |
| 02:45:59 | 9 | November 1st that if he didn't implicate |
| 02:46:00 | 10 | Chaunte Ott that he would go to prison? |
| 02:46:01 | 11 | A  No. |
| 02:46:05 | 12 | Q  Did you witness or observe Detective Simons |
| 02:46:09 | 13 | make any promises to Sam Hadaway on November |
| 02:46:12 | 14 | 1st? |
| 02:46:12 | 15 | A  No. |
| 02:46:12 | 16 | Q  Did you witness Detective Simons make any |
| 02:46:18 | 17 | threats to Sam Hadaway on November 1st? |
| 02:46:21 | 18 | A  No. |
| 02:46:22 | 19 | Q  And there's nothing -- no information that |
| 02:46:26 | 20 | Mr. Hadaway provided on November 1st, 1995, |
| 02:46:29 | 21 | that indicated any additional facts related to |
| 02:46:32 | 22 | any injuries to Ms. Payne, right? |
| 02:46:35 | 23 | A  Correct. |
| 02:46:35 | 24 | Q  The only new information he provided was about |
| 02:46:40 | 25 | holding her hand at some point? |

| | | | |
|---|---|---|---|
| 02:46:42 | 1 | A | Correct. |
| 02:46:43 | 2 | Q | Okay.  Do you remember seeking a search warrant |
| 02:46:58 | 3 | | to search Chaunte Ott's house? |
| 02:47:02 | 4 | A | I know a search warrant was executed at his |
| 02:47:06 | 5 | | house. |
| 02:47:06 | 6 | Q | Were you part of the actual search? |
| 02:47:37 | 7 | A | I would say yes.  Yes. |
| 02:47:39 | 8 | Q | Okay.  Do you remember obtaining evidence |
| 02:47:45 | 9 | | there? |
| 02:47:45 | 10 | A | Yes. |
| 02:47:45 | 11 | Q | What do you remember obtaining? |
| 02:47:48 | 12 | A | Some knives. |
| 02:47:50 | 13 | Q | Was there ever -- was there any evidence that |
| 02:47:56 | 14 | | you obtained during the search of Chaunte Ott |
| 02:48:00 | 15 | | that was ever linked by biological or |
| 02:48:06 | 16 | | fingerprints or any other kind of evidence to |
| 02:48:08 | 17 | | Ms. Payne's murder? |
| 02:48:11 | 18 | A | Not conclusively. |
| 02:48:13 | 19 | Q | What does that mean? |
| 02:48:14 | 20 | A | The medical examiner looked at the instruments |
| 02:48:19 | 21 | | we recovered -- |
| 02:48:23 | 22 | Q | Meaning the knives? |
| 02:48:26 | 23 | A | Yeah.  I'm sorry, yes. |
| 02:48:28 | 24 | | -- and indicated that one of them |
| 02:48:33 | 25 | | could have possibly been used. |

02:48:34  1    Q    That was just based on the shape or the size of

02:48:39  2         the knife?

02:48:39  3    A    I -- I don't recall.

02:48:40  4    Q    But there was no blood swab taken from any

02:48:43  5         knives or instruments obtained from Mr. Ott's

02:48:47  6         home that was linked to the blood of Jessica

02:48:49  7         Payne, correct?

02:48:50  8    A    No.

02:48:50  9    Q    Okay.  This is Exhibit 20.

02:49:03  10                   (Exhibit No. 20 was marked.)

02:49:03  11   BY MS. DONNELL:

02:49:16  12   Q    I'm handing you what I've just designated as

02:49:20  13        Exhibit 20 to your deposition.  This is an

02:49:22  14        affidavit in support of a search warrant

02:49:24  15        bearing Bates stamps MPD SJH756 consecutive to

02:49:30  16        760, and this is an affidavit in support of a

02:49:33  17        search warrant by you as the affiant, right?

02:49:36  18   A    Yes.

02:49:36  19   Q    Okay.  On the second page of the search

02:50:02  20        warrant, you were providing some of the

02:50:05  21        information about how Jessica Payne was found,

02:50:10  22        right?

02:50:11  23   A    Yes.

02:50:12  24   Q    And that included that her bra was torn in the

02:50:17  25        mid front portion -- is that right -- at the

02:50:30  1      top, Jessica Payne's bra?

02:50:33  2   A  Yes.

02:50:33  3   Q  And that "he observed her pants were pulled

02:50:37  4      down to her ankles and the buttons unbuttoned,"

02:50:43  5      right?

02:50:43  6   A  Yes.

02:50:43  7   Q  And that she had bruising on her right hand,

02:50:43  8      right?

02:50:43  9   A  Yes.

02:50:44  10  Q  And a four-inch gash on her throat, right?

02:50:48  11  A  Yes.

02:50:49  12  Q  Okay.  And you were seeking to seize any bloody

02:51:18  13     clothing in the home of Chaunte Ott and any

02:51:21  14     cutting -- and there may be a cutting device?

02:51:24  15  A  Correct.

02:51:24  16  Q  Okay.  Was there another charging conference

02:51:33  17     after the polygraph and after the search of

02:51:39  18     Mr. Ott's home that you recall?

02:51:42  19  A  Not that I recall, but they hadn't been

02:51:51  20     officially charged yet, so I would say there

02:51:55  21     probably was one.

02:51:56  22  Q  Was that typically what was done, if charges

02:52:05  23     weren't approved, there'd be a second

02:52:07  24     conference?

02:52:07  25  A  If there was follow-up to be conducted before a

02:52:10  1      final decision was made, yes.

02:52:12  2  Q   Okay.  And as you sit here today, do you have

02:52:18  3      an independent recollection of that?

02:52:19  4  A   Of a second conference?

02:52:21  5  Q   Yes.

02:52:21  6  A   I do not.

02:52:22  7  Q   Okay.  I'm looking back at Exhibit 16.

02:52:45  8  A   Yep.  Yes.

02:52:46  9  Q   There's no indication -- on Exhibit 16, it

02:52:52  10      indicates that "On Monday, November 6th, 1995,

02:52:56  11      after completing his review of the above

02:52:59  12      incident, ADA Williams proceeded to issue one

02:53:03  13      charge of first-degree intentional homicide,

02:53:06  14      party to a crime, and one count of attempted

02:53:06  15      robbery, party to a crime, against defendant,

02:53:08  16      Chaunte Ott," right?

02:53:09  17  A   Yes.

02:53:10  18  Q   And "one count of attempted robbery, party to a

02:53:13  19      crime, against defendant, Sam Hadaway," right?

02:53:15  20  A   Correct.

02:53:16  21  Q   And then it says "No charges were brought

02:53:18  22      against the subject, Richard Gwin"?

02:53:22  23  A   Correct.

02:53:22  24  Q   And there's no indication in this supplementary

02:53:24  25      report that you prepared of an additional

| 02:53:27 | 1 | | conference sometime after October 30th, right? |
|---|---|---|---|
| 02:53:30 | 2 | A | Correct. |
| 02:53:30 | 3 | Q | Okay.  You were present for Mr. Ott's criminal |
| 02:53:47 | 4 | | trial? |
| 02:53:47 | 5 | A | Yes. |
| 02:53:47 | 6 | Q | Okay.  But you didn't testify? |
| 02:53:50 | 7 | A | I did not. |
| 02:53:51 | 8 | Q | Were you prepared to possibly testify? |
| 02:53:55 | 9 | A | Yes. |
| 02:53:56 | 10 | Q | Okay.  And why -- what were you -- did Mark |
| 02:54:00 | 11 | | Williams prepare you? |
| 02:54:02 | 12 | A | Yes. |
| 02:54:02 | 13 | Q | And in what -- what -- what was your testimony |
| 02:54:08 | 14 | | going to be prepared to provide? |
| 02:54:11 | 15 | A | If Hadaway or -- if Hadaway would have given |
| 02:54:17 | 16 | | testimony contrary to his statement that he had |
| 02:54:21 | 17 | | provided to me. |
| 02:54:21 | 18 | Q | And was -- Gwin was not present to testify, |
| 02:54:26 | 19 | | right? |
| 02:54:28 | 20 | A | I believe Gwin did testify. |
| 02:54:29 | 21 | Q | Oh, Gwin did testify, right.  I'm sorry.  So |
| 02:54:32 | 22 | | was the same true for Gwin? |
| 02:54:34 | 23 | A | Yes. |
| 02:54:34 | 24 | Q | And at trial, Mr. Ott's trial, the entire |
| 02:54:49 | 25 | | evidence against him was still just Gwin's |

Case 2:19-cv-01106-PP   Filed 03/20/24   Page 167 of 249   Document 119-4

| | | |
|--|--|--|
| 02:54:51 | 1 | statement and Hadaway's statement, correct? |
| 02:54:53 | 2 | A   Yes. |
| 02:54:54 | 3 | Q   There was no physical evidence corroborating |
| 02:54:58 | 4 | anything that implicated Mr. Ott in that |
| 02:55:00 | 5 | homicide? |
| 02:55:01 | 6 | A   Correct. |
| 02:55:01 | 7 | Q   And there was no other evidence from other |
| 02:55:03 | 8 | witnesses that was developed before trial, |
| 02:55:06 | 9 | correct? |
| 02:55:06 | 10 | A   Correct. |
| 02:55:07 | 11 | Q   Okay.  The same is true for Sam Hadaway, there |
| 02:55:17 | 12 | was nothing other than the statements that he |
| 02:55:20 | 13 | made and Mr. Gwin made, right? |
| 02:55:24 | 14 | A   Correct. |
| 02:55:25 | 15 | Q   There was no physical evidence corroborating |
| 02:55:27 | 16 | those statements? |
| 02:55:28 | 17 | A   Correct. |
| 02:55:28 | 18 | Q   And there was no eyewitnesses that ever |
| 02:55:31 | 19 | implicated Mr. Hadaway? |
| 02:55:32 | 20 | A   Correct. |
| 02:55:33 | 21 | Q   You -- I'm going to go back and ask you some |
| 02:55:57 | 22 | questions about the interrogation of |
| 02:56:01 | 23 | Mr. Hadaway back on October 27th, okay? |
| 02:56:04 | 24 | A   Okay. |
| 02:56:04 | 25 | Q   You previously testified that you spent |

| | | |
|---|---|---|
| 02:56:10 | 1 | somewhere between 45 minutes to an hour |
| 02:56:13 | 2 | building a rapport when talking to Mr. Hadaway, |
| 02:56:19 | 3 | okay? |
| 02:56:19 | 4 | A    Okay. |
| 02:56:19 | 5 | Q    Do you want to see your testimony in that |
| 02:56:22 | 6 | regard? |
| 02:56:23 | 7 | A    Is that from -- |
| 02:56:23 | 8 | Q    It's from the Ott dep on Page 102 and 103 if |
| 02:56:28 | 9 | you'd like to refer to that. |
| 02:56:52 | 10 | A    Okay. |
| 02:56:54 | 11 | Q    Does that refresh your recollection that the |
| 02:56:56 | 12 | first 45 minutes to an hour was spent talking |
| 02:56:59 | 13 | to Mr. Hadaway and you weren't documenting it |
| 02:57:01 | 14 | in any way? |
| 02:57:02 | 15 | A    Correct. |
| 02:57:04 | 16 | Q    Okay.  You can put that down.  Sorry.  You also |
| 02:57:22 | 17 | previously testified that Mr. Hadaway was |
| 02:57:26 | 18 | emotional when you were interrogating him.  Do |
| 02:57:30 | 19 | you remember that testimony? |
| 02:57:30 | 20 | A    Yes. |
| 02:57:31 | 21 | Q    Do you have an independent recollection of |
| 02:57:34 | 22 | Mr. Hadaway being emotional? |
| 02:57:36 | 23 | A    Yes. |
| 02:57:36 | 24 | Q    Can you describe what you mean by that?  What |
| 02:57:40 | 25 | did you observe? |

| | | | |
|---|---|---|---|
| 02:57:41 | 1 | A | He was crying at one point. |
| 02:57:45 | 2 | Q | Like, actual tears? |
| 02:57:48 | 3 | A | I don't know if they were actual tears, but he |
| 02:57:52 | 4 | | was emotional and crying. |
| 02:57:55 | 5 | Q | Anything else you observed? |
| 02:57:57 | 6 | A | Not that I recall. |
| 02:57:58 | 7 | Q | If you would turn your attention to Page 105 of |
| 02:58:05 | 8 | | your deposition from June 30th, 2010, in |
| 02:58:08 | 9 | | Exhibit 1, and do you see on Page 105 at Line |
| 02:58:25 | 10 | | 10 you testified he did show tears? |
| 02:58:29 | 11 | A | Okay. |
| 02:58:30 | 12 | Q | Does that refresh your recollection that you |
| 02:58:32 | 13 | | observed Mr. Hadaway with actual tears? |
| 02:58:36 | 14 | A | Yes. |
| 02:58:37 | 15 | Q | Okay.  And then at Line 12 you testified "That |
| 02:58:46 | 16 | | was it.  He was pretty much -- that was pretty |
| 02:58:48 | 17 | | much it.  He was pretty talkative.  It wasn't |
| 02:58:52 | 18 | | like, you know, I had to pull these answers |
| 02:58:53 | 19 | | from him.  As we talked, it flowed from him. |
| 02:58:57 | 20 | | It was not a hard interview."  Do you see that |
| 02:58:58 | 21 | | testimony at Lines -- Page 105, Lines -- 105, |
| 02:59:00 | 22 | | Lines 12 to 15? |
| 02:59:01 | 23 | A | Yes. |
| 02:59:01 | 24 | Q | Does that -- do you remember that? |
| 02:59:03 | 25 | A | Yes. |

02:59:03  1    Q    Okay.  Can you tell me about that?  What does

02:59:07  2         it -- Mr. Hadaway wasn't a hard witness?  What

02:59:10  3         do you mean?

02:59:11  4    A    Because it was his doing that we were talking

02:59:14  5         to him in the first place.  He initiated the

02:59:17  6         contact with us.  He wanted to talk about the

02:59:22  7         event and decided that he wanted to tell the

02:59:27  8         truth, and it was a nonconfrontational type of

02:59:34  9         interview.  He told us about what happened.  We

02:59:40  10        asked questions in between, and it was very --

02:59:47  11        I don't want to say an easy interview, but it

02:59:52  12        was not a difficult interview.

02:59:54  13   Q    Did you make -- well, strike that.

03:00:14  14             Do you remember any of that

03:00:15  15        back-and-forth with Mr. Hadaway, things you

03:00:18  16        were asking him or details you were asking him

03:00:21  17        to provide?

03:00:21  18   A    Specific details, no.

03:00:23  19   Q    But you -- it was a back-and-forth, right?

03:00:27  20   A    Yes.

03:00:28  21   Q    Was there any information you were hoping you

03:00:32  22        could elicit from Mr. Hadaway?

03:00:33  23   A    Just the truth.

03:00:34  24   Q    Did you try to seek to obtain -- was there

03:00:39  25        certain -- well, strike that.

03:00:44   1              Did you have any concerns that

03:00:48   2         Mr. Hadaway was of limited intelligence?

03:01:01   3    A    No.

03:01:02   4    Q    Did Mr. Hadaway convey to you that he was in

03:01:08   5         learning -- special education classes during --

03:01:11   6    A    No, not to my knowledge.

03:01:13   7    Q    You had also testified that you thought

03:01:23   8         Mr. Hadaway was remorseful, right?

03:01:26   9    A    I don't recall.

03:01:30  10    Q    Okay.  Do you have any memory as you sit here

03:01:35  11         today of Mr. Hadaway being remorseful?

03:01:38  12    A    Based on his writings at the end of the

03:01:43  13         statement, I would say he was remorseful.

03:01:45  14    Q    Do you have any information other than what's

03:01:49  15         documented at the end of Mr. Hadaway's

03:01:52  16         handwritten statement other than that?

03:01:57  17    A    No.

03:01:58  18    Q    So you have no independent recollection of any

03:02:02  19         observations you made of Mr. Hadaway that you

03:02:07  20         would describe as being remorseful?

03:02:09  21    A    That would go hand in hand with him being

03:02:13  22         emotional.

03:02:15  23    Q    Okay.  Other than your observation -- and when

03:02:24  24         you're saying "emotional," you're referring to

03:02:27  25         Mr. Hadaway as being tearful?

|       |    |   |                                                    |
|-------|----|---|----------------------------------------------------|
| 03:02:30 | 1  | A | Yes. |
| 03:02:30 | 2  | Q | Anything else that you observed other than |
| 03:02:32 | 3  |   | Mr. Hadaway being tearful that you would |
| 03:02:34 | 4  |   | describe as being emotional? |
| 03:02:35 | 5  | A | Not that I recall. |
| 03:02:36 | 6  | Q | Okay.  Is it true that one of the things you |
| 03:02:48 | 7  |   | did during your interrogation of Mr. Hadaway is |
| 03:02:51 | 8  |   | to provide him a copy of Mr. Gwin's statement |
| 03:02:57 | 9  |   | that he had given to you and Detective |
| 03:03:00 | 10 |   | DeValkenaere on the 25th? |
| 03:03:01 | 11 | A | No, I don't recall that. |
| 03:03:03 | 12 | Q | You don't recall that, but -- as you sit here |
| 03:03:07 | 13 |   | today, but is it -- are you denying that you |
| 03:03:10 | 14 |   | did it, or you just don't remember -- |
| 03:03:10 | 15 | A | I don't remember -- |
| 03:03:12 | 16 | Q | -- one way or the other? |
| 03:03:13 | 17 | A | I don't remember doing that. |
| 03:03:15 | 18 | Q | Okay.  Is that something that you would do from |
| 03:03:17 | 19 |   | time to time if you were interrogating a |
| 03:03:20 | 20 |   | suspect, provide them a copy of a witness |
| 03:03:21 | 21 |   | statement against them? |
| 03:03:23 | 22 | A | No. |
| 03:03:23 | 23 | Q | You never did that? |
| 03:03:27 | 24 | A | I would never give a -- a person a copy of |
| 03:03:30 | 25 |   | another defendant's or suspect's report. |

03:03:33   1   Q   Well, how about just a witness?  At this point

03:03:35   2       you didn't think Gwin was -- had implicated

03:03:40   3       himself in any criminal conduct.  Would you

03:03:43   4       have told Mr. Hadaway "We have this evidence

03:03:47   5       against you from Richard Gwin"?

03:03:49   6   A   I could have told him that.

03:03:50   7   Q   But you don't think you would have provided the

03:03:53   8       actual statement?

03:03:53   9   A   I would never have provided him with the

03:03:58   10      statement.

03:03:58   11  Q   Okay.  So you deny doing that?

03:03:59   12  A   Where he would have physical possession of the

03:04:01   13      statement?  No.

03:04:02   14  Q   Would you have it in your physical possession

03:04:04   15      and be reading from it to Mr. Hadaway?  Could

03:04:08   16      that happen?

03:04:08   17  A   That could happen.

03:04:09   18  Q   Okay.  That's something you've done before?

03:04:11   19  A   Yes.

03:04:11   20  Q   Okay.  And you'd do that to sort of demonstrate

03:04:15   21      to the suspect that you have actual evidence

03:04:17   22      against them from another witness?

03:04:19   23  A   It's a good -- in good faith.

03:04:21   24  Q   What do you mean "in good faith"?

03:04:23   25  A   That what I was telling them was the truth and

03:04:28  1      so that he can tell that I'm not lying to him

03:04:32  2      about it, these things.  In good faith, I would

03:04:36  3      show him where his name was mentioned in the

03:04:39  4      other statement, but I would not read that

03:04:42  5      statement verbatim to him.

03:04:44  6   Q  So you might show him the physical copy and

03:04:47  7      point to his name?

03:04:48  8   A  Correct.

03:04:48  9   Q  And that would be a technique you could use in

03:04:51  10     interrogation to demonstrate, "Hey, we have

03:04:55  11     evidence against you"?

03:04:56  12  A  Correct.

03:04:56  13  Q  Okay.  Do you remember doing that in the

03:05:00  14     context of Mr. Hadaway's interrogation?

03:05:04  15  A  Not specifically, no.

03:05:06  16  Q  But it's a technique that you have used from

03:05:10  17     time to time in interrogations of homicide

03:05:11  18     suspects?

03:05:12  19  A  I have used it in the past.

03:05:14  20  Q  Okay.  Did you -- in your interrogation of

03:05:26  21     Mr. Hadaway, did you tell Mr. Hadaway that

03:05:29  22     Jessica Payne's body was found under a

03:05:32  23     mattress?

03:05:32  24  A  No.

03:05:32  25  Q  Did Jim DeValkenaere tell Sam Hadaway that

03:05:36  1          Jessica Payne's body was found under a

03:05:38  2          mattress?

03:05:38  3     A    No.

03:05:38  4     Q    Did you tell Mr. Hadaway that her --

03:05:42  5          Ms. Payne's neck had been cut?

03:05:43  6     A    No.

03:05:44  7     Q    Did Jim DeValkenaere do that?

03:05:46  8     A    No.

03:05:46  9     Q    Did you tell Sam Hadaway that Ms. Hadaway --

03:05:49  10         Ms. Payne -- I'm sorry, strike that.

03:05:51  11                   Did you tell Sam Hadaway that

03:05:55  12         Ms. Payne was found with her shirt pulled up?

03:05:57  13    A    No.

03:05:57  14    Q    Did you tell Sam Hadaway that Ms. Payne was

03:06:01  15         found with her pants pulled down?

03:06:03  16    A    No.

03:06:03  17    Q    Did Jim DeValkenaere tell Sam Hadaway that

03:06:07  18         Ms. Payne was found with her shirt pulled up?

03:06:09  19    A    Not that I recall, no.

03:06:10  20    Q    And did Jim DeValkenaere tell Sam Hadaway that

03:06:15  21         Ms. Payne was found with her pants down?

03:06:16  22    A    No.

03:07:46  23    Q    Okay.  I'm going to switch gears and move

03:07:51  24         forward in time, okay?  Do you remember being

03:07:56  25         partners with Michael Wesolowski between 2000

03:08:02   1        and 2004?

03:08:04   2    A   Yes.

03:08:04   3    Q   And, again, I'm sorry about his passing.  Were

03:08:17   4        you guys in the homicide unit when you were

03:08:19   5        partners?

03:08:20   6    A   Yes.

03:08:21   7    Q   Okay.  So sometime after Mr. Ott's criminal

03:08:30   8        trial in 1996 you moved to -- I'm sorry, was it

03:08:35   9        crimes against persons or robberies?

03:08:38  10    A   Robberies.

03:08:38  11    Q   So you went to bank robberies?

03:08:41  12    A   Yes.

03:08:41  13    Q   And then by 2000 you came back to homicide?

03:08:45  14    A   Yes.

03:08:45  15    Q   Okay.  And at that point you and Detective

03:08:51  16        Wesolowski were partners?

03:08:52  17    A   Yes.

03:08:53  18    Q   Had you requested to be partners together?

03:08:55  19    A   It was his request.

03:09:00  20    Q   Okay.  Were you guys -- had you been -- worked

03:09:03  21        together prior to that time?

03:09:04  22    A   Yes.

03:09:05  23    Q   When had you guys worked together, in bank

03:09:09  24        robberies?

03:09:09  25    A   No, we were police officers together.

| | | |
|---|---|---|
| 03:09:11 | 1 | Q | Okay.  Did you guys go to the academy together? |
| 03:09:14 | 2 | A | No. |
| 03:09:14 | 3 | Q | And you're saying it was his request, not your |
| 03:09:20 | 4 | | request to be together? |
| 03:09:22 | 5 | A | He was already in the unit and he requested |
| 03:09:24 | 6 | | that I come back. |
| 03:09:26 | 7 | Q | Did he ask you about it before he made that |
| 03:09:29 | 8 | | request? |
| 03:09:30 | 9 | A | Yes. |
| 03:09:30 | 10 | Q | But you didn't put in a similar request? |
| 03:09:34 | 11 | A | No. |
| 03:09:34 | 12 | Q | Okay.  Why not? |
| 03:09:35 | 13 | A | I don't know. |
| 03:09:40 | 14 | Q | Okay.  But you weren't, like, objecting to |
| 03:09:53 | 15 | | being transferred back to homicide, right? |
| 03:09:55 | 16 | A | No. |
| 03:09:55 | 17 | Q | Why did you leave homicide -- or did you leave |
| 03:10:11 | 18 | | homicide after you guys stopped being partners, |
| 03:10:13 | 19 | | or you continued in homicide and just had |
| 03:10:16 | 20 | | another partner? |
| 03:10:17 | 21 | A | After -- |
| 03:10:18 | 22 | Q | Wesolowski. |
| 03:10:20 | 23 | A | After he retired, then I got a new partner. |
| 03:10:22 | 24 | Q | I see.  Okay.  Okay.  So during the time that |
| 03:10:32 | 25 | | you were partners with Detective Wesolowski and |

| | | |
|---|---|---|
| 03:10:37 | 1 | back in the homicide unit, do you remember |
| 03:10:40 | 2 | there was DNA testing that linked DNA from |
| 03:10:46 | 3 | Ms. Payne to the Joyce Mims homicide?  Do you |
| 03:10:51 | 4 | remember that? |
| 03:10:51 | 5 | A  I recall something like that. |
| 03:10:53 | 6 | Q  Okay.  What do you recall about that? |
| 03:10:54 | 7 | A  Just what you said, that there was DNA found on |
| 03:10:59 | 8 | Mims that linked to Jessica Payne. |
| 03:11:02 | 9 | Q  When do you recall first learning that |
| 03:11:05 | 10 | information? |
| 03:11:06 | 11 | A  I don't recall. |
| 03:11:07 | 12 | Q  What do you recall doing, if anything, after |
| 03:11:15 | 13 | you learned that DNA from Jessica Payne was |
| 03:11:24 | 14 | linked to DNA obtained from Joyce Mims? |
| 03:11:31 | 15 | A  I don't know what I did. |
| 03:11:32 | 16 | Q  Is it possible you did nothing? |
| 03:11:35 | 17 | A  Yes. |
| 03:11:36 | 18 | Q  Do you remember who gave that information to |
| 03:11:44 | 19 | you? |
| 03:11:44 | 20 | A  I don't think that information was given |
| 03:11:46 | 21 | directly to me. |
| 03:11:48 | 22 | Q  Who did you get that information from, if you |
| 03:11:52 | 23 | recall? |
| 03:11:52 | 24 | A  I don't know.  I don't recall. |
| 03:11:56 | 25 | Q  Did you work on the Joyce Mims homicide also? |

| | | | |
|---|---|---|---|
| 03:12:05 | 1 | A | No, I don't -- I don't think I did. |
| 03:12:07 | 2 | Q | Okay.  Do you remember how many homicides you |
| 03:12:30 | 3 | | worked of women who had been killed in the |
| 03:12:37 | 4 | | North Milwaukee area that had been strangled or |
| 03:12:39 | 5 | | cut in their throat? |
| 03:12:44 | 6 | A | No. |
| 03:12:44 | 7 | Q | But it's fair to say there was more than just |
| 03:12:47 | 8 | | Ms. Payne, correct? |
| 03:12:50 | 9 | A | That I was involved in? |
| 03:12:51 | 10 | Q | Yep. |
| 03:12:52 | 11 | A | I -- I don't recall. |
| 03:12:53 | 12 | Q | Okay.  Do you remember working on the Sheila |
| 03:13:02 | 13 | | Farrior homicide? |
| 03:13:03 | 14 | A | No. |
| 03:13:03 | 15 | Q | How about Ophelia Preston? |
| 03:13:11 | 16 | A | Yes. |
| 03:13:12 | 17 | Q | McCormick?  I'm trying to think of McCormick's |
| 03:13:21 | 18 | | first name.  Do you remember working on the |
| 03:13:28 | 19 | | McCormick homicide? |
| 03:13:29 | 20 | A | No. |
| 03:13:30 | 21 | Q | How about Carron Kilpatrick? |
| 03:13:34 | 22 | A | No. |
| 03:13:35 | 23 | Q | Okay.  Can you -- |
| 03:13:45 | 24 | | MS. GEHLING:  Florence McCormick. |
| 03:13:45 | 25 | | MS. DONNELL:  Florence McCormick? |

03:13:48    1            Thanks so much.

03:13:48    2       BY MS. DONNELL:

03:13:55    3       Q    Florence McCormick?

03:13:58    4       A    No.

03:13:58    5       Q    This will be 21.  This is 22.

03:14:24    6                 (Exhibit Nos. 21 and 22 were marked.)

03:14:29    7       BY MS. DONNELL:

03:14:30    8       Q    Okay.  I'm first handing you what it's

03:14:32    9            designated -- I've designated as Exhibit 21 to

03:14:34   10            your deposition.  Do you recognize Exhibit 21

03:14:36   11            as a Wisconsin Department of Justice crime

03:14:40   12            laboratory report?

03:14:41   13       A    Yes.

03:14:42   14       Q    And you've seen this report before, right?

03:14:44   15       A    Yes.

03:14:45   16       Q    And this is a report that's dated May 22nd,

03:14:49   17            2003?

03:14:49   18       A    Yes.

03:14:50   19       Q    And do you see at the bottom that it's received

03:14:54   20            June 18th, 2003?

03:14:57   21       A    Yes.

03:14:57   22       Q    I'm going to represent to you in the Ott

03:15:00   23            litigation, the City of Milwaukee provided

03:15:02   24            discovery responses that admitted it received

03:15:05   25            this report on June 18th, 2003, okay?

| | | | |
|---|---|---|---|
| 03:15:09 | 1 | A | Okay. |
| 03:15:09 | 2 | Q | Is any of this handwriting yours on Exhibit 21? |
| 03:15:15 | 3 | A | No. |
| 03:15:15 | 4 | Q | You see here, though, that your name is at the |
| 03:15:20 | 5 | | bottom right-hand corner? |
| 03:15:22 | 6 | A | Yes. |
| 03:15:22 | 7 | Q | Do you know whose handwriting that's in? |
| 03:15:26 | 8 | A | I have no idea. |
| 03:15:26 | 9 | Q | Would you recognize Michael Wesolowski's |
| 03:15:30 | 10 | | handwriting? |
| 03:15:30 | 11 | A | I don't know. |
| 03:15:31 | 12 | Q | What was the process -- do you know, did that |
| 03:15:40 | 13 | | name indicate that that means this report was |
| 03:15:43 | 14 | | to go to you? |
| 03:15:44 | 15 | A | I have no idea. |
| 03:15:47 | 16 | Q | Okay.  Is it accurate to say that when crime |
| 03:15:52 | 17 | | lab reports from the state crime lab would come |
| 03:15:55 | 18 | | in on a homicide they would be sent to the |
| 03:15:57 | 19 | | attention of one of the lead detectives? |
| 03:16:00 | 20 | | MS. GEHLING:  Objection; foundation. |
| 03:16:03 | 21 | | THE WITNESS:  Not from the crime lab. |
| 03:16:05 | 22 | BY MS. DONNELL: | |
| 03:16:05 | 23 | Q | Somebody in the police department would route |
| 03:16:07 | 24 | | it to the detective, one of the detectives on |
| 03:16:11 | 25 | | the case? |

03:16:13  1    A    Yes.

03:16:14  2    Q    Okay.  If you look at Exhibit -- here, I'm

03:16:17  3         going to hand you what's Exhibit 22 to your

03:16:19  4         deposition which is Bates MPD SJH863, okay, and

03:16:26  5         864.  Do you see this is a Wisconsin crime lab

03:16:30  6         report dated June 5th, 2003.  Do you see that?

03:16:35  7    A    Yes.

03:16:35  8    Q    And this report is also for the Jessica Payne

03:16:37  9         homicide?

03:16:38  10   A    Yes.

03:16:38  11   Q    And I think I forgot to ask you -- tell you,

03:16:41  12        like, the -- there's an M file number, murder

03:16:43  13        file number, at the top of both Exhibit 21 and

03:16:46  14        22 of 3084, right?

03:16:48  15   A    Yes.

03:16:48  16   Q    And that's the Payne homicide number for the

03:16:51  17        Milwaukee Police Department?

03:16:51  18   A    Correct.

03:16:52  19   Q    Okay.  And do you see on Exhibit 22 there's a

03:17:01  20        stamp that says "October 6th, 2003"?  Do you

03:17:05  21        see that?

03:17:05  22   A    Yes.

03:17:05  23   Q    And do you see here it's also written on here

03:17:08  24        at the top "Buschmann" at the -- at the -- just

03:17:12  25        over the stamp on Exhibit 22?  So on --

03:17:17   1    A    Yes.

03:17:17   2    Q    -- Page 2 of Exhibit -- the June 5th, 2003,

03:17:21   3         report, on the second page --

03:17:21   4    A    Yes.

03:17:21   5    Q    -- do you see that your name is written,

03:17:23   6         "Buschmann"?

03:17:23   7    A    I do.

03:17:24   8    Q    And then in the stamp under -- after the

03:17:26   9         office, it says "Det. Carl Buschmann"?

03:17:30  10    A    Yep.

03:17:30  11    Q    Is that your signature?

03:17:31  12    A    Yes, it is.

03:17:32  13    Q    Okay.  So was it your practice to sign crime

03:17:38  14         lab reports when you received them?

03:17:40  15    A    Yes.

03:17:40  16    Q    And so Exhibit 22 indicates to you that you did

03:17:44  17         receive Exhibit 22, the June 5th, 2003, report,

03:17:49  18         right?

03:17:49  19    A    Yes.

03:17:50  20    Q    Okay.  And -- okay.  So looking back at

03:18:12  21         Exhibit 21 from the crime lab, this is the May

03:18:15  22         22nd, 2003, report.

03:18:18  23    A    Hm-hm.

03:18:19  24    Q    This report indicates that a short tandem

03:18:30  25         repeat (STR) DNA profile consistent of having

03:18:33  1      originated from a mixture of DNA from Jessica

03:18:36  2      Payne and an unknown male individual was

03:18:36  3      developed from the vaginal swab remainder that

03:18:39  4      was Item B1a, right?

03:18:42  5   A  Yes.

03:18:42  6   Q  And that profile -- on September 24th, an

03:18:51  7      initial search of the unknown male STR profile

03:18:54  8      against the Wisconsin DNA Databank didn't

03:18:56  9      reveal any matches, right?

03:18:58 10   A  Right.

03:18:59 11   Q  And then on May 19th, 2003, a second search of

03:19:03 12      the evidentiary profile was run against the

03:19:05 13      Wisconsin DNA Databank and resulted in a match

03:19:08 14      between the STR profile developed from

03:19:11 15      Ms. Payne's vaginal swab remainder and an

03:19:13 16      evidentiary profile from the June 20th, 1997,

03:19:17 17      homicide, also from the City of Milwaukee, and

03:19:18 18      the victim was Joyce Mims, right?

03:19:21 19   A  Yes.

03:19:21 20   Q  And so the STR profile of the unknown male

03:19:26 21      evidentiary sample from the vaginal swab of

03:19:28 22      Ms. Mims was linked by -- with -- by the DNA

03:19:34 23      Databank to the unknown male evidentiary

03:19:36 24      profile obtained from the vaginal swab of

03:19:39 25      Ms. Payne, right?

| | | | |
|---|---|---|---|
| 03:19:40 | 1 | A | Yes. |
| 03:19:40 | 2 | Q | That these evidentiary -- then it indicates |
| 03:19:58 | 3 | | that these evidentiary profiles from Ms. Payne |
| 03:20:00 | 4 | | and Ms. Mims are going to continue to be |
| 03:20:03 | 5 | | routinely searched against the national and |
| 03:20:05 | 6 | | state -- at the national and state levels, |
| 03:20:08 | 7 | | right? |
| 03:20:09 | 8 | A | Yes. |
| 03:20:09 | 9 | Q | And then the lab's indicating to the -- to you |
| 03:20:13 | 10 | | or to the Milwaukee Police Department that if |
| 03:20:14 | 11 | | there's any additional matches, the department |
| 03:20:17 | 12 | | will be notified, right? |
| 03:20:18 | 13 | A | Yes. |
| 03:20:18 | 14 | Q | And do you consider the information that's |
| 03:20:29 | 15 | | documented in Exhibit 21 as important |
| 03:20:34 | 16 | | investigatory information to be followed up on? |
| 03:20:36 | 17 | A | Yes. |
| 03:20:41 | 18 | Q | Why? |
| 03:20:42 | 19 | A | Well, they want -- it would be important to |
| 03:20:44 | 20 | | identify the supplier of the DNA that was found |
| 03:20:48 | 21 | | on both Jessica Payne and the other, Mims. |
| 03:20:55 | 22 | Q | And why, as a homicide detective, would you |
| 03:21:01 | 23 | | want to follow up on that information? |
| 03:21:08 | 24 | A | Because it could be important to the |
| 03:21:10 | 25 | | investigation. |

03:21:14  1    Q    Is that because it may indicate a common

03:21:18  2         perpetrator?

03:21:20  3    A    That's what it says.

03:21:21  4    Q    Because the unknown male evidentiary profile of

03:21:26  5         two of these homicide victims were the --

03:21:29  6         appearing to be the same person, right?

03:21:32  7    A    Yes.

03:21:36  8    Q    Okay.  And in the Exhibit 22, the June 5th,

03:21:42  9         2003, report, that evidentiary profile that was

03:21:47  10        obtained from the vaginal swab of Ms. Payne

03:21:51  11        that was B1 designated sub-designation B1a was

03:21:56  12        run against the standard for the DNA profile of

03:22:01  13        Walter Moffett, Chaunte Ott, Richard Gwin, and

03:22:05  14        Sam Hadaway, right?

03:22:06  15   A    Yes.

03:22:06  16   Q    And all of those individuals were excluded as

03:22:10  17        being the contributor to the unknown male

03:22:14  18        profile of B1a, correct?

03:22:16  19   A    Correct.

03:22:17  20   Q    Okay.  Do you consider that important -- well,

03:22:27  21        strike that.

03:22:27  22             Do you consider that -- these two

03:22:30  23        pieces of information, Exhibit 1 and Exhibit --

03:22:31  24        I mean Exhibit 21 and Exhibit 22 as also

03:22:36  25        important investigatory information to be

03:22:38  1      followed up on?

03:22:39  2   A  I don't see where it would be followed up on.

03:22:44  3      It was just an elimination of known people that

03:22:47  4      had contact with Jessica Payne.  I don't know

03:22:52  5      where the follow-up would go from there because

03:22:54  6      the -- the DNA sample had not been identified.

03:22:59  7   Q  Sure.  But as a homicide detective, if you are

03:23:03  8      receiving information that there's a possible

03:23:06  9      link through DNA evidence of two homicide

03:23:10  10     victims, Ms. Payne and Ms. Mims, who were

03:23:13  11     killed approximately, you know, two years apart

03:23:19  12     and that individuals that had been suspects in

03:23:24  13     one of those, in the Payne homicide, were

03:23:28  14     excluded as the contributors, does that suggest

03:23:31  15     to you that somebody else did that crime?

03:23:35  16  A  No.

03:23:35  17  Q  Why not?

03:23:36  18  A  Because the fact that Chaunte Ott allegedly

03:23:43  19     killed her doesn't mean that he had sex with

03:23:46  20     her, and she was having sex with other people.

03:23:52  21     We know that she was having sex with other

03:23:57  22     people which could attribute itself to the DNA

03:24:02  23     that was left.  Her lifestyle, staying at where

03:24:09  24     she was staying, she was prostituting herself,

03:24:14  25     and she could have had sex with numerous men

| | | |
|---|---|---|
| 03:24:18 | 1 | that could have been the contributors to that |
| 03:24:20 | 2 | DNA. |
| 03:24:21 | 3 | Q   So you would want to follow up on that |
| 03:24:23 | 4 | information, but it wouldn't necessarily be |
| 03:24:25 | 5 | preclusive, in your mind? |
| 03:24:26 | 6 | A   Well, we did follow up, and that's why all |
| 03:24:28 | 7 | these people were tested. |
| 03:24:29 | 8 | Q   Okay.  Did you request that all of these people |
| 03:24:37 | 9 | be tested that were tested and reported in the |
| 03:24:40 | 10 | June 5th, 2003, report? |
| 03:24:47 | 11 | A   Yes, I believe it was me. |
| 03:24:49 | 12 | Q   Okay.  And that's because you -- you signed |
| 03:24:52 | 13 | your name here? |
| 03:24:52 | 14 | A   Yes. |
| 03:24:53 | 15 | Q   Okay.  Do you remember having any conversations |
| 03:24:56 | 16 | with the lab about that? |
| 03:24:59 | 17 | A   No, I don't. |
| 03:25:01 | 18 | Q   How about with your supervisors? |
| 03:25:04 | 19 | A   I don't recall. |
| 03:25:05 | 20 | Q   How about with your partner, Michael |
| 03:25:10 | 21 | Wesolowski? |
| 03:25:10 | 22 | A   I -- again, I don't recall. |
| 03:25:12 | 23 | Q   Okay.  But as you sit here today, you think you |
| 03:25:18 | 24 | probably requested the follow-up investigation |
| 03:25:22 | 25 | to see if the unknown male profile could be run |

03:25:28   1        against the standards that were collected from

03:25:31   2        various individuals, including Ott, Gwin, and

03:25:35   3        Hadaway?

03:25:36   4   A    I would say yes, the fact that my signature is

03:25:39   5        on this report.

03:25:40   6   Q    Okay.  Do you remember what, if anything, you

03:25:57   7        did with the information you obtained from the

03:26:00   8        June 5th, 2003, report once you obtained it?

03:26:07   9   A    I -- I don't think I ever saw that report.

03:26:12  10   Q    I'm sorry, Exhibit 22, the one that has your

03:26:15  11        name on it.

03:26:16  12   A    Oh, okay.

03:26:17  13   Q    Do you remember what you -- what, if anything,

03:26:19  14        you did with the information once you got this

03:26:21  15        report from the lab?

03:26:23  16   A    The lab report should have been forwarded to

03:26:26  17        the district attorney's office.

03:26:28  18   Q    Do you have any independent recollection of

03:26:33  19        providing the June 5th, 2003, report to the

03:26:37  20        district attorney's office?

03:26:37  21   A    I do not.

03:26:39  22   Q    Okay.  Looking at both Exhibit 21 and Exhibit

03:26:44  23        22, is it fair to assume that you actually had

03:26:48  24        the information in the May 22nd, 2003, report

03:26:53  25        and that's what resulted in the follow-up

03:26:55  1    investigation reported in the June 5th report?

03:27:06  2  A  I don't -- like, I don't recall seeing this

03:27:10  3     report.

03:27:11  4  Q  Exhibit 21, just for the record?  You don't

03:27:14  5     recall ever seeing Exhibit 21?

03:27:15  6  A  Okay.  Right, I don't recall seeing this

03:27:18  7     report.  Whether it triggered this, it's a good

03:27:21  8     possibility, but, again, I don't recall the

03:27:27  9     circumstances around it.

03:27:28  10  Q  It's -- right.  That makes sense.  So is it

03:27:35  11     accurate -- I think your testimony is seeing

03:27:38  12     Exhibit 21 and Exhibit 22 doesn't refresh your

03:27:40  13     recollection as you sit here today about

03:27:44  14     receiving the information contained in the May

03:27:46  15     22nd, 2003, report from the crime lab that

03:27:50  16     linked the evidentiary profile obtained from

03:27:53  17     the vaginal swab of Ms. Payne to the

03:27:55  18     evidentiary male profile obtained from the

03:27:58  19     vaginal swab of Ms. Mims, right?

03:28:00  20  A  Correct.

03:28:00  21  Q  However, as you sit here today, reviewing

03:28:03  22     Exhibit 22 and the additional testing of

03:28:08  23     running various standards obtained from

03:28:11  24     suspects in the Payne homicide against the

03:28:14  25     vaginal swab obtained from Ms. Payne to see if

03:28:18  1        there was any connection, they seem like they

03:28:22  2        could be connected?  In other words, Exhibit 22

03:28:25  3        could have been a follow-up investigation

03:28:28  4        requested after the information about Payne

03:28:31  5        being linked to the Mims homicide?

03:28:35  6    A   Could have been.

03:28:36  7    Q   That's a reasonable assumption?

03:28:40  8    A   Yes.

03:28:41  9    Q   Okay.  And you don't recall specifically

03:28:48  10       providing the June 5th, 2003, report or

03:28:52  11       information contained in it to Mark Williams;

03:28:55  12       is that right?

03:28:55  13   A   Correct.

03:28:56  14   Q   Okay.  Was there a policy and procedure that

03:29:06  15       provided these reports to the district

03:29:09  16       attorney's office directly, or did the

03:29:12  17       requesting agency have to provide that

03:29:15  18       information to the DA's office?

03:29:17  19              MS. GEHLING:  Objection; foundation.

03:29:18  20              MS. DONNELL:  If you know.

03:29:19  21              THE WITNESS:  I'm not sure.

03:29:19  22   BY MS. DONNELL:

03:29:20  23   Q   Okay.  Do you recall, as you sit here today,

03:29:59  24       receiving any additional DNA reports that

03:30:03  25       linked evidentiary DNA profiles of unknown

03:30:08    1        males to the Mims, Payne, and additional

03:30:14    2        homicides?

03:30:15    3   A    No.

03:30:43    4   Q    Do you recall, as you sit here today, any

03:30:49    5        follow-up investigation you requested after

03:30:51    6        receiving the June 5th, 2003, DNA report from

03:30:57    7        the Wisconsin crime lab?

03:31:00    8   A    No.

03:31:29    9   Q    Did you ever -- do you know Gilbert Hernandez?

03:31:35   10   A    Yes.

03:31:35   11   Q    Did you and Gilbert Hernandez work together in

03:31:39   12        the homicide unit at any point in your career?

03:31:41   13   A    No.

03:31:42   14   Q    How do you know Gilbert Hernandez?

03:31:46   15   A    He's a fellow detective.

03:31:47   16   Q    But in a different unit?

03:31:49   17   A    He worked homicide on a different shift.

03:31:52   18   Q    Okay.  So you were both in homicide, just

03:31:55   19        different shifts?

03:31:55   20   A    Correct.

03:31:56   21   Q    And how about Katherine Hein?

03:32:02   22   A    Yes, I know her.

03:32:03   23   Q    Are you social friends with either one of them?

03:32:06   24   A    No.

03:32:06   25   Q    Did you have any conversations with Gilbert

03:32:13  1       Hein [sic] or Katherine Hein about their

03:32:16  2       investigation of Walter Ellis?

03:32:18  3   A   No.

03:32:18  4   Q   Did you have any conversations with any

03:32:20  5       Milwaukee Police Department detectives

03:32:23  6       investigating Walter Ellis ever?

03:32:28  7   A   Ever?

03:32:29  8   Q   Yeah.

03:32:29  9   A   Not that I recall.

03:32:30  10  Q   Did you only read about Walter Ellis in the

03:32:35  11      newspaper?  Well, strike that.

03:32:39  12              Other than conversations with your

03:32:40  13      attorneys, did you obtain information related

03:32:43  14      to Walter Ellis from any other sources other

03:32:49  15      than the newspaper?

03:32:50  16  A   I don't recall hearing the name Walter Ellis

03:32:53  17      until he was arrested.

03:32:56  18  Q   And after his arrest, did you have any

03:32:58  19      conversations with any of your colleagues or

03:33:00  20      former colleagues at the Milwaukee Police

03:33:02  21      Department about Ellis?

03:33:03  22  A   Not that I recall.

03:33:05  23  Q   Did you take any interest in his arrest based

03:33:22  24      on the fact that he was arrested and ultimately

03:33:24  25      convicted of a number of -- nine homicides from

03:33:26   1     the period of time with which you were working

03:33:28   2     homicide?

03:33:29   3   A   I was retired for four years already from

03:33:33   4     there.

03:33:33   5   Q   Understood. When he was charged and convicted

03:33:37   6     you were retired, but the cases for which he

03:33:39   7     was charged and convicted, a number of them

03:33:41   8     occurred when you were a detective with the

03:33:43   9     Milwaukee Police Department.

03:33:45   10   A   Okay. Yes.

03:33:46   11   Q   So I'm just asking, did you take any interest

03:33:48   12     in it given that they were homicides you'd been

03:33:52   13     working up?

03:33:53   14   A   The only one I was interested in was the

03:33:56   15     Jessica Payne.

03:34:00   16   Q   Why were you interested in that one?

03:34:02   17   A   Because they had identified his DNA with her.

03:34:09   18     I was -- took interest in that.

03:34:13   19   Q   Did it concern you that Walter Ellis -- well,

03:34:21   20     what -- what interested you about the fact that

03:34:23   21     Walter Ellis's DNA was found in Jessica Payne?

03:34:27   22   A   I just was interested in the circumstances and

03:34:31   23     how his DNA was recovered from her.

03:34:36   24   Q   Did you talk to anybody in the department about

03:34:39   25     that?

| | | | |
|---|---|---|---|
| 03:34:40 | 1 | A | Not that I recall. |
| 03:34:42 | 2 | Q | Okay.  So you just read about that in the |
| 03:34:45 | 3 | | newspaper? |
| 03:34:46 | 4 | A | No.  I remember talking to Mark Williams. |
| 03:35:03 | 5 | Q | What did you and Mark Williams talk about? |
| 03:35:06 | 6 | A | He just told me that they were charging this |
| 03:35:11 | 7 | | guy with numerous homicides and that it was his |
| 03:35:18 | 8 | | DNA that was identified with Jessica Payne. |
| 03:35:22 | 9 | Q | Anything else you recall about that |
| 03:35:25 | 10 | | conversation with Mark Williams? |
| 03:35:27 | 11 | A | No. |
| 03:35:28 | 12 | Q | Was that when you were working as an |
| 03:35:31 | 13 | | investigator with the DA's office? |
| 03:35:32 | 14 | A | Yes. |
| 03:35:33 | 15 | Q | Was that in Mark's office? |
| 03:35:35 | 16 | A | Yes. |
| 03:35:36 | 17 | Q | Anybody else other than you and Mark present |
| 03:35:39 | 18 | | for that conversation? |
| 03:35:40 | 19 | A | Not that I recall. |
| 03:35:41 | 20 | Q | Was that conversation prior to the actual |
| 03:35:45 | 21 | | criminal complaint being issued for Walter |
| 03:35:47 | 22 | | Ellis? |
| 03:35:48 | 23 | A | I don't know. |
| 03:35:48 | 24 | Q | Did you and Mark have any conversation about |
| 03:35:53 | 25 | | whether he was going to charge Walter Ellis |

03:35:55    1      with Jessica Payne's murder?

03:35:58    2    A   In particular, no, I don't have recollection of

03:36:05    3        our conversation about that.

03:36:07    4    Q   Did you have any conversation with Mark

03:36:14    5        Williams about whether he was considering to

03:36:17    6        charge Walter Ellis with the murder of Jessica

03:36:20    7        Payne based on the DNA evidence?

03:36:30    8    A   I believe -- I can't say for certain what the

03:36:36    9        conversation was.

03:36:37   10    Q   It sounds like you recall a vague conversation,

03:36:41   11        but you don't recall the specifics --

03:36:42   12    A   But I don't want to say something where I'm

03:36:45   13        guessing.  So I don't remember what the

03:36:49   14        conversation was.

03:36:49   15    Q   Okay.  And just so I have it clear, I don't

03:36:54   16        want you to speculate.  I don't need you to

03:36:56   17        guess.  So -- and I don't want you to do that

03:36:58   18        and neither does your attorney, so I'm not

03:37:00   19        asking you to do that, okay?  Okay?

03:37:03   20    A   Yes.

03:37:03   21    Q   Why don't you just tell me everything that you

03:37:09   22        do have a memory of.

03:37:10   23    A   I did already.

03:37:11   24    Q   Okay.  And so your memory is that you remember

03:37:24   25        having a conversation with Mark Williams about

03:37:28  1      Walter Ellis's DNA being found on a number of

03:37:32  2      victims for which he was either going to be

03:37:36  3      charged or was already charged, right?

03:37:37  4   A  Yeah, I don't know if he had been charged yet

03:37:39  5      or was being looked at.  I don't know.  I don't

03:37:43  6      remember.

03:37:43  7   Q  But it was -- this conversation was sometime

03:37:45  8      after the point at which Walter Ellis's DNA had

03:37:49  9      been obtained and then was linked to these

03:37:52  10     various evidentiary profiles?

03:37:54  11  A  Yes.

03:37:54  12  Q  Okay.  And so Walter Ellis was -- had either

03:37:58  13     been charged or was going to be charged, one of

03:38:02  14     those two, right?

03:38:02  15  A  One of the two.

03:38:03  16  Q  Yep.  And Jessica Payne, her homicide was

03:38:09  17     brought up in that conversation in the context

03:38:11  18     of she was one of the people who Walter Ellis's

03:38:16  19     DNA was found in or on?

03:38:19  20  A  Correct.

03:38:19  21  Q  Okay.  And you don't recall one way or the

03:38:23  22     other whether you and Mark Williams had any

03:38:27  23     discussion about whether he was going to charge

03:38:30  24     Walter Ellis with Payne's homicide; you just

03:38:33  25     don't recall one way or the other?

| | | | |
|---|---|---|---|
| 03:38:35 | 1 | A | Correct. |
| 03:38:35 | 2 | Q | Okay.  And is that the extent of your memory as |
| 03:38:42 | 3 | | you sit here today of that conversation with |
| 03:38:44 | 4 | | Mark Williams -- |
| 03:38:45 | 5 | A | Yes. |
| 03:38:45 | 6 | Q | -- in his office? |
| 03:38:47 | 7 | A | Yes. |
| 03:38:47 | 8 | Q | Okay.  Prior to the conversation you've just |
| 03:39:00 | 9 | | testified about with Mark Williams, do you, as |
| 03:39:03 | 10 | | you sit here today, remember any other |
| 03:39:06 | 11 | | conversations you had with Mark Williams after |
| 03:39:10 | 12 | | Mr. Ott's criminal trial concluded and this |
| 03:39:15 | 13 | | conversation, whenever it occurred, regarding |
| 03:39:18 | 14 | | Walter Ellis and the Payne homicide?  Do you |
| 03:39:22 | 15 | | have any other memory of conversations you had |
| 03:39:24 | 16 | | with Mark Williams about the Payne homicide |
| 03:39:27 | 17 | | between those two time periods? |
| 03:39:29 | 18 | A | No, I don't. |
| 03:39:31 | 19 | Q | Okay.  Thank you.  Did you have any work -- do |
| 03:40:08 | 20 | | you remember the Maryetta Griffin homicide? |
| 03:40:11 | 21 | | Did you do any work on that homicide that you |
| 03:40:13 | 22 | | remember? |
| 03:40:13 | 23 | A | No, not that I remember. |
| 03:40:14 | 24 | Q | Okay.  Okay.  Let's see.  Do you need a break, |
| 03:40:47 | 25 | | or do you want to keep going? |

| | | |
|---|---|---|
| 03:40:49 | 1 | A    I'm okay. |
| 03:40:51 | 2 | Q    Okay. |
| 03:40:51 | 3 | MS. DONNELL:  Are you okay? |
| 03:40:52 | 4 | MS. GEHLING:  (Nods head.) |
| 03:41:09 | 5 | MS. DONNELL:  Okay. |
| 03:41:21 | 6 | (Exhibit No. 23 was marked.) |
| 03:41:22 | 7 | BY MS. DONNELL: |
| 03:41:25 | 8 | Q    Mr. Buschmann, I'm handing you what I've |
| 03:41:27 | 9 | designated as Exhibit 23 to your deposition, |
| 03:41:31 | 10 | and this is from the Florence McCormick |
| 03:41:37 | 11 | homicide, M No. 3044, and it's Bates stamped |
| 03:41:43 | 12 | HADAWAY38631 consecutive to 635, and it's part |
| 03:41:50 | 13 | of Section 13 of that M file, Pages 44 to 48, |
| 03:41:56 | 14 | okay? |
| 03:41:56 | 15 | A    Okay. |
| 03:41:57 | 16 | Q    This report was submitted by Detective Orley. |
| 03:42:08 | 17 | Do you know who Detective Orley was? |
| 03:42:10 | 18 | A    Yes. |
| 03:42:10 | 19 | Q    Okay.  And did you work with Detective Orley? |
| 03:42:13 | 20 | A    No. |
| 03:42:14 | 21 | Q    You never worked with him? |
| 03:42:17 | 22 | A    I did not. |
| 03:42:18 | 23 | Q    Okay.  Okay.  Do you see at the bottom of this |
| 03:42:33 | 24 | report "This was passed to Detective Buschmann |
| 03:42:37 | 25 | and Detective Valuch on the early shift," and |

| | | |
|---|---|---|
| 03:42:42 | 1 | detectives will take possible hair and blood |
| 03:42:45 | 2 | samples from an individual, a Mr. Scott, a |
| 03:42:53 | 3 | Mr. Sylvester Scott?  Do you see that? |
| 03:42:54 | 4 | A    Yes. |
| 03:42:56 | 5 | Q    Do you remember -- does that refresh your |
| 03:42:59 | 6 | recollection of any of your involvement on the |
| 03:43:02 | 7 | Florence McCormick homicide? |
| 03:43:04 | 8 | A    No. |
| 03:43:04 | 9 | Q    Okay.  Okay.  I'm going to mark this as |
| 03:43:42 | 10 | Exhibit 24. |
| 03:43:53 | 11 | (Exhibit No. 24 was marked.) |
| 03:43:54 | 12 | BY MS. DONNELL: |
| 03:43:54 | 13 | Q    I'm handing you what I've designated as |
| 03:43:58 | 14 | Exhibit 24, Mr. Buschmann.  Do you see Exhibit |
| 03:44:00 | 15 | 24 and recognize this as a supplementary report |
| 03:44:04 | 16 | prepared by Detective Michael Valuch -- is it |
| 03:44:11 | 17 | Valuch or Valuch? |
| 03:44:11 | 18 | A    Valuch. |
| 03:44:12 | 19 | Q    Valuch. |
| 03:44:12 | 20 | -- documenting work you did with him |
| 03:44:15 | 21 | in June of 1995 on the Sheila Farrior homicide |
| 03:44:19 | 22 | investigation? |
| 03:44:43 | 23 | A    I don't remember this. |
| 03:44:44 | 24 | Q    You don't remember the work you did with |
| 03:44:49 | 25 | Detective Valuch on June 28th, 1995, in the |

Case 2:19-cv-01106-PP   Filed 03/20/24   Page 201 of 249   Document 119-4

03:44:55  1          Sheila Farrior homicide; is that right?

03:44:57  2     A    That's correct.

03:44:58  3     Q    But you don't disagree that you were doing work

03:45:01  4          on that homicide?

03:45:02  5     A    Correct.

03:45:02  6     Q    Okay.  Did you ever work with confidential

03:45:08  7          informants when you were a homicide detective?

03:45:12  8     A    No.

03:45:12  9     Q    You never did?

03:45:13  10    A    No.

03:45:13  11    Q    Why not?

03:45:14  12    A    It was not something I did.

03:45:17  13    Q    Okay.  Was there a reason why you didn't work

03:45:20  14          with confidential informants?

03:45:22  15    A    I never had a reason to.

03:45:24  16    Q    You certainly were permitted to, right?

03:45:27  17    A    Yes.  I've never worked with a confidential

03:45:38  18          informant.

03:45:39  19    Q    Did any of your partners ever work with

03:45:48  20          confidential informants --

03:45:51  21               MS. GEHLING:  Objection; foundation.

03:45:51  22    BY MS. DONNELL:

03:45:51  23    Q    -- that you're aware of?

03:45:53  24    A    I don't know.

03:45:53  25    Q    But there's no particular reason why you

03:45:55  1    didn't?

03:45:56  2  A  No.

03:46:19  3  Q  Do you remember any of the circumstances of the

03:46:21  4    Sheila Farrior homicide?

03:46:23  5  A  No.

03:46:24  6  Q  How about the Debra Maniece homicide?

03:46:27  7  A  No, not really.  I know Maniece was one of the

03:46:38  8    homicide victims, and I think Detective

03:46:44  9    Wesolowski and I did some work on that, that

03:46:45  10    case.

03:46:46  11  Q  Okay.  What do you remember about your work on

03:46:51  12    the Maniece homicide, the Debra Maniece

03:46:54  13    homicide?

03:46:55  14  A  I -- I don't know the person's name, but there

03:47:00  15    was DNA found that was identified, and this

03:47:04  16    person was in prison out of state, and we had

03:47:07  17    gone to that prison and talked to him.

03:47:09  18  Q  Was that George Jones?

03:47:11  19  A  I'm not sure.

03:47:12  20  Q  And that was down in Mississippi?

03:47:17  21  A  It could have been.  I know it was down south.

03:47:22  22  Q  Do you remember who you went with?

03:47:24  23  A  It would have been with Detective Wesolowski.

03:47:27  24  Q  Okay.  How about the Mims homicide?  Do you

03:47:40  25    remember working on the Joyce Mims homicide?

03:47:42   1    A    I do not.

03:47:43   2    Q    Okay.  This will be Exhibit 25.

03:48:05   3                   (Exhibit No. 25 was marked.)

03:48:05   4    BY MS. DONNELL:

03:48:05   5    Q    I'm handing you what I've designated as

03:48:09   6         Exhibit 25.  Do you recognize Exhibit 25 as a

03:48:18   7         report submitted by Detective Michael

03:48:22   8         Wesolowski?

03:48:22   9    A    Yes.

03:48:23   10   Q    And this report actually is documenting some

03:48:29   11        work that you did with him in April of 2003.

03:48:33   12        Do you see that down at the bottom?

03:48:35   13   A    Yes.

03:48:35   14   Q    But Joyce Mims was somebody who was murdered

03:48:38   15        back in June 1997.  Do you see that?

03:48:41   16   A    Yes.

03:48:42   17   Q    Okay.  And do you see here that -- so this

03:49:18   18        investigation that you were doing in April of

03:49:21   19        2003, basically there was items that were

03:49:32   20        resubmitted for testing in February of 2003,

03:49:35   21        right --

03:49:35   22   A    Yes.

03:49:35   23   Q    -- for Ms. Mims in the first paragraph?

03:49:40   24   A    Yes.

03:49:41   25   Q    Okay.  And there was DNA -- on April 10th of

03:49:57  1      2003, there was a hit, a positive hit, in the

03:50:00  2      DNA Databank regarding the semen that was found

03:50:03  3      in the underpants located next to the body of

03:50:06  4      Ms. Mims with a Mr. Fabian Reyes, right?

03:50:10  5   A  Yes.

03:50:10  6   Q  And so you and your partner, Mr. Wesolowski,

03:50:15  7      went and talked to him, right?

03:50:17  8   A  Yes.

03:50:21  9   Q  Okay.  And Mr. Reyes gave you guys a buccal

03:50:37  10      swab; is that right?

03:50:50  11   A  Yes.

03:50:50  12   Q  And then there's some other follow-up interview

03:50:53  13      and this was presented to Mark Williams and he

03:50:55  14      decided not to charge Fabian Reyes, right?

03:51:03  15   A  Yes.

03:51:04  16   Q  Okay.  And then not too long after this work

03:51:10  17      that you did on the Joyce Mims investigation

03:51:14  18      was when there was that DNA hit less than a

03:51:18  19      month later, right, or around a month later on

03:51:22  20      May 22nd where there was the hit between --

03:51:27  21      that the lab identified between Payne --

03:51:27  22   A  Oh, okay.

03:51:29  23   Q  -- and Mims, right?

03:51:30  24   A  Okay.  Yes.

03:51:31  25   Q  So you and Wesolowski were working on the Mims

Case 2:19-cv-01106-PP   Filed 03/20/24   Page 205 of 249   Document 119-4

03:51:35  1        case in April of 2003, a little more than a

03:51:41  2        month before that hit came through, right?

03:51:44  3    A   Yes.

03:51:44  4    Q   Okay.  Does that refresh your recollection in

03:51:46  5        any way of the work you were doing back then?

03:51:49  6    A   No.

03:51:49  7    Q   Okay.  As you sit here today, are you now aware

03:51:57  8        that the -- Walter Ellis was charged with the

03:52:01  9        Mims homicide?

03:52:02 10    A   I wasn't aware of that, no.

03:52:05 11    Q   Are you -- as you sit here today, are you also

03:52:09 12        aware that he was charged with the Sheila

03:52:12 13        Farrior homicide?

03:52:13 14    A   No.

03:52:14 15    Q   How about Debra Harris?  Did I ask you about

03:52:19 16        Debra Harris?  Did you work on that homicide?

03:52:21 17    A   No.  I don't know which homicides he was

03:52:23 18        charged with.

03:52:24 19    Q   Okay.  As you sit here today, you don't know

03:52:26 20        any of them?

03:52:26 21    A   No.

03:52:27 22    Q   Okay.

03:52:56 23            MS. DONNELL:  Let's go off the

03:52:57 24        record.

03:52:58 25            THE VIDEOGRAPHER:  Going off the

| | | |
|---|---|---|
| 03:52:59 | 1 | record at 3:52. |
| 03:53:01 | 2 | (Brief recess taken.) |
| 04:00:33 | 3 | THE VIDEOGRAPHER:  We're back on the |
| 04:00:34 | 4 | record at 4:00. |
| 04:00:37 | 5 | BY MS. DONNELL: |
| 04:00:39 | 6 | Q    Okay.  Detective Buschmann, thank you for your |
| 04:00:41 | 7 | time.  I do have some follow-up questions. |
| 04:00:45 | 8 | A    Okay. |
| 04:00:45 | 9 | Q    Earlier you testified that you gave Mr. Hadaway |
| 04:00:49 | 10 | the Miranda card to read to himself because you |
| 04:00:53 | 11 | wanted to make sure he could read.  Do you |
| 04:00:56 | 12 | remember that testimony? |
| 04:00:56 | 13 | A    I had him read it out loud to me. |
| 04:00:58 | 14 | Q    And that was because you wanted to make sure he |
| 04:01:01 | 15 | could read; is that right? |
| 04:01:01 | 16 | A    Yes. |
| 04:01:01 | 17 | Q    Was that something you did for everybody you |
| 04:01:04 | 18 | interviewed after you read their Miranda -- |
| 04:01:08 | 19 | read their Miranda warnings, or was that unique |
| 04:01:10 | 20 | to individuals that you wanted to make sure |
| 04:01:12 | 21 | they could read? |
| 04:01:15 | 22 | A    I wouldn't say I did it all the time. |
| 04:01:20 | 23 | Q    Did you have a reason why you would do it |
| 04:01:25 | 24 | sometimes and not other times or a practice? |
| 04:01:30 | 25 | A    It was a practice that I picked up from some |

| | |
|---|---|
| 04:01:33 1 | other detectives when I was watching them and I |
| 04:01:36 2 | liked it, so then I started using it. |
| 04:01:39 3 | Q   Was there a reason -- was there certain |
| 04:01:43 4 | situations that you chose to use it versus not |
| 04:01:46 5 | use it? |
| 04:01:47 6 | A   I didn't really consider it when I first |
| 04:01:51 7 | started.  It's something I just picked up |
| 04:01:54 8 | around -- at some point. |
| 04:01:58 9 | Q   Once you picked up that practice, did you do it |
| 04:02:00 10 | with everybody you interviewed that was -- that |
| 04:02:03 11 | you apprised them of their rights? |
| 04:02:05 12 | A   I don't recall. |
| 04:02:07 13 | Q   I guess what I'm trying to get at is was there |
| 04:02:12 14 | anything that you had observed in your |
| 04:02:14 15 | interactions with Mr. Hadaway or had been |
| 04:02:17 16 | informed by other detectives in their |
| 04:02:19 17 | interactions with Mr. Hadaway that made you |
| 04:02:21 18 | want to make sure he could read? |
| 04:02:25 19 | A   When reviewing the statement that I wrote, I |
| 04:02:30 20 | had him follow along, and I wanted to make sure |
| 04:02:33 21 | that, as he was following along, he could |
| 04:02:35 22 | actually read what I was reading to him. |
| 04:02:40 23 | Q   Why did you read it to him instead of having |
| 04:02:44 24 | Mr. Hadaway read it to himself? |
| 04:02:46 25 | A   That's what I do. |

Case 2:19-cv-01106-PP   Filed 03/20/24   Page 208 of 249   Document 119-4

| | | |
|---|---|---|
| 04:02:48 | 1 | Q You do that for everybody? |
| 04:02:49 | 2 | A Yes. |
| 04:02:49 | 3 | Q Why do you do that? |
| 04:02:53 | 4 | A That's the way I -- that was the way I |
| 04:02:57 | 5 | operated. |
| 04:02:58 | 6 | Q Any particular reason -- |
| 04:02:59 | 7 | A No. |
| 04:02:59 | 8 | Q -- for that being the reason why you operated |
| 04:03:02 | 9 | that way? |
| 04:03:02 | 10 | A That's what I liked to do.  That's what I |
| 04:03:05 | 11 | thought worked good for me. |
| 04:03:07 | 12 | Q But you didn't have a particular reason, it |
| 04:03:09 | 13 | sounds like? |
| 04:03:10 | 14 | A No. |
| 04:03:10 | 15 | Q Because I thought earlier you would give people |
| 04:03:13 | 16 | the option to read it to themselves or have it |
| 04:03:16 | 17 | read to them and then they could -- they'd |
| 04:03:19 | 18 | write down which one happened? |
| 04:03:21 | 19 | A Well, I wanted to make sure that he was |
| 04:03:23 | 20 | actually reading what I had written down. |
| 04:03:25 | 21 | Q But did you sometimes give people the option to |
| 04:03:29 | 22 | read the statements you'd written to |
| 04:03:32 | 23 | themselves? |
| 04:03:32 | 24 | A No. |
| 04:03:33 | 25 | Q Okay.  Have you, in your career with the |

| | | |
|---|---|---|
| 04:03:42 | 1 | Milwaukee Police Department, ever investigated |
| 04:03:47 | 2 | homicides that had a modus operandi or certain |
| 04:03:57 | 3 | idiosyncratic circumstances that were being |
| 04:03:58 | 4 | investigated as possibly victims of a serial |
| 04:04:03 | 5 | killer? |
| 04:04:03 | 6 | A   That I was involved in? |
| 04:04:05 | 7 | Q   Yes. |
| 04:04:11 | 8 | A   It would have been the prostitution homicides. |
| 04:04:18 | 9 | Q   Other than the prostitution homicides, any |
| 04:04:20 | 10 | other homicides that were investigated for a |
| 04:04:23 | 11 | possible serial killer? |
| 04:04:24 | 12 | A   Not that I can recall. |
| 04:04:26 | 13 | Q   Okay.  And I -- forgive me, but was the Jeffrey |
| 04:04:47 | 14 | Dahmer, was that in your career as a detective? |
| 04:04:50 | 15 | A   Yes. |
| 04:04:50 | 16 | Q   Did you have any involvement in that case? |
| 04:04:52 | 17 | A   I did not. |
| 04:04:55 | 18 | Q   Okay.  I forgot to ask you, did you know who |
| 04:05:03 | 19 | Latonya Cooper is? |
| 04:05:05 | 20 | A   No. |
| 04:05:05 | 21 | Q   How about Denise Ball? |
| 04:05:10 | 22 | A   No. |
| 04:05:10 | 23 | Q   How about Stanley Hueble? |
| 04:05:22 | 24 | A   No. |
| 04:05:22 | 25 | Q   I forgot to ask you this.  Were you trained as |

04:05:32    1          an officer at the Milwaukee Police Department

04:05:34    2          on any duties to disclose exculpatory

04:05:40    3          information?

04:05:42    4     A    No.

04:05:44    5     Q    Okay.  Do you have an understanding of the word

04:06:00    6          "exculpatory" as you sit here today?

04:06:01    7     A    Yes.

04:06:01    8     Q    What's your understanding of it?

04:06:04    9     A    Evidence that could change the way a person is

04:06:09   10          charged or if it can exonerate that person.

04:06:16   11     Q    Do you have an understanding of the word

04:06:21   12          "inculpatory"?

04:06:22   13     A    Not that much.

04:06:23   14     Q    You don't know what it means, inculpatory?

04:06:26   15     A    Inculpatory?

04:06:27   16     Q    Yeah.

04:06:29   17     A    No.

04:06:29   18     Q    Okay.  This is Exhibit 26.

04:06:54   19               (Exhibit No. 26 was marked.)

04:06:54   20     BY MS. DONNELL:

04:06:58   21     Q    I'm handing you what I've designated as

04:07:01   22          Exhibit 26 to your deposition.  Do you

04:07:03   23          recognize Exhibit 26?  Have you seen it before?

04:07:06   24     A    I've never seen this before.

04:07:07   25     Q    Okay.  This was produced in this litigation by

04:07:10   1     the City of Milwaukee as MPD SJH1434 through

04:07:17   2     1445, and it includes what appears to be your

04:07:27   3     in-service training curriculum, and then at the

04:07:31   4     last page -- as well as specialized training,

04:07:33   5     okay, for the first pages of it.  Then the back

04:07:35   6     page -- two pages is a Statement [sic] of

04:07:36   7     Wisconsin Law Enforcement Standards Board

04:07:40   8     Transcript of Recruit Course Completion for the

04:07:43   9     Milwaukee Police Academy May 23rd, '77, to

04:07:47   10    September 16th, 1977.

04:07:49   11  A   Yes.

04:07:49   12  Q   Have you seen these last two pages?

04:07:51   13  A   No.

04:07:52   14  Q   And you haven't seen any of the pages in

04:07:54   15    Exhibit 26; is that right?

04:07:56   16  A   No.

04:07:57   17  Q   Okay.  Do you see on -- it has the Bates stamp

04:08:20   18    1443 -- there's a specialized training report

04:08:24   19    for you?  Do you see that?

04:08:36   20  A   Yes.

04:08:36   21  Q   And you see here it listed as a "New Detective

04:08:39   22    Orientation" for 80 hours?

04:08:41   23  A   Correct.

04:08:41   24  Q   And this looks like you completed that between

04:08:44   25    August 31st, 1990, and September 14th, 1990?

| | | |
|---|---|---|
| 04:08:50 | 1 | A    Yes. |
| 04:08:50 | 2 | Q    So did you attend the detective academy before |
| 04:08:53 | 3 | you became a detective in April '91? |
| 04:08:56 | 4 | A    Yes. |
| 04:08:56 | 5 | Q    And that was because you'd already taken the |
| 04:08:58 | 6 | test and it was -- you were going to be |
| 04:09:00 | 7 | promoted or probably going to be promoted? |
| 04:09:02 | 8 | A    I was going to be promoted, correct. |
| 04:09:05 | 9 | Q    Okay.  And these last two pages -- or the very |
| 04:09:09 | 10 | last page of Exhibit 26 has your -- the hours |
| 04:09:14 | 11 | and subject matter from your police academy |
| 04:09:17 | 12 | training.  Do you see that? |
| 04:09:18 | 13 | A    Oh, I didn't see that. |
| 04:09:19 | 14 | Q    Have you ever seen this before? |
| 04:09:21 | 15 | A    No. |
| 04:09:21 | 16 | Q    Okay.  It looks like you were given various |
| 04:09:37 | 17 | categories of instruction, and then it says the |
| 04:09:39 | 18 | hours completed.  So there was introduction, |
| 04:09:43 | 19 | fundamentals of human behavior, juvenile |
| 04:09:47 | 20 | procedures, police proficiencies, legal |
| 04:09:48 | 21 | principles, investigate -- crime investigation |
| 04:09:51 | 22 | and apprehension, traffic supervision, patrol |
| 04:09:55 | 23 | procedures, and administrative procedures, and |
| 04:09:58 | 24 | conclusion.  Do you see that? |
| 04:09:58 | 25 | A    Yep.  Yes. |

Case 2:19-cv-01106-PP   Filed 03/20/24   Page 213 of 249   Document 119-4

04:10:01  1    Q    And it looks here that you were given in the

04:10:08  2         crime investigation and apprehension, that

04:10:12  3         there was interviewing techniques for two

04:10:16  4         hours.  Do you see that?  It's under Category

04:10:25  5         VI.  I'm sorry, V.  VI, yeah, crime

04:10:28  6         investigation and apprehension.

04:10:34  7    A    Okay.

04:10:35  8    Q    Do you see that little section that says

04:10:37  9         "Interviewing Techniques, Mandatory Hours: 2"?

04:10:41  10   A    Yes.

04:10:41  11   Q    Okay.  But it looks like you -- it says that --

04:10:52  12        we don't know, but it says the total hours

04:10:55  13        completed, and it looks like 84 there, right?

04:10:58  14   A    Yep.  Yes.

04:10:58  15   Q    But we don't know how many of that was for

04:11:01  16        interviewing, right?

04:11:03  17   A    No.

04:11:03  18   Q    Does that refresh your recollection in any way

04:11:05  19        of techniques you were trained on in

04:11:08  20        interviewing at the academy?

04:11:10  21   A    I don't have any current recollection, but this

04:11:14  22        shows that I did attend some training.

04:11:19  23   Q    Yep.  I'm just asking if it refreshes your

04:11:25  24        recollection in any way.

04:11:26  25   A    No.

| | | |
|---|---|---|
| 04:11:27 | 1 | Q No. Okay. Going back to that May 22nd, 2003, |
| 04:11:50 | 2 | DNA report and the June 5th, 2003, DNA report, |
| 04:11:56 | 3 | Exhibits 21 and 22, do you remember those? |
| 04:11:58 | 4 | A Yes. |
| 04:11:58 | 5 | Q Do you, as you sit here today, have a belief |
| 04:12:02 | 6 | about whether that information contained in |
| 04:12:04 | 7 | those reports was exculpatory? |
| 04:12:09 | 8 | A No. |
| 04:12:11 | 9 | Q Meaning "No," you don't have a belief, or "No," |
| 04:12:14 | 10 | it wasn't exculpatory? |
| 04:12:16 | 11 | A No, I don't have a belief. |
| 04:12:17 | 12 | Q Okay. Do you have an understanding of whether |
| 04:12:21 | 13 | that information should have been turned over |
| 04:12:24 | 14 | to the prosecutor, Mark Williams? |
| 04:12:27 | 15 | A I can't say that it wasn't. |
| 04:12:30 | 16 | Q Fair. You can't say one way or the other, |
| 04:12:32 | 17 | right? |
| 04:12:33 | 18 | A Correct. |
| 04:12:33 | 19 | Q Because you just don't remember, right? |
| 04:12:36 | 20 | A Correct. |
| 04:12:36 | 21 | Q My question's a little bit different. Do you, |
| 04:12:39 | 22 | as you sit here today, think that information |
| 04:12:42 | 23 | should have been provided to the prosecutor? |
| 04:12:47 | 24 | A Yes. |
| 04:12:47 | 25 | Q Why? |

04:12:48  1   A   Because it concerned a case that he had

04:12:54  2       prosecuted.

04:12:55  3   Q   Do you, as you sit here today, have an

04:13:00  4       understanding that the information contained in

04:13:02  5       those two DNA reports was exculpatory

04:13:08  6       information for Mr. Hadaway?

04:13:12  7   A   No.

04:13:13  8   Q   You don't think it was exculpatory as to

04:13:17  9       Mr. Hadaway?

04:13:18 10   A   No.

04:13:18 11   Q   How about with respect to Mr. Ott?

04:13:20 12   A   No.

04:13:20 13   Q   And can you explain for me why your answer is

04:13:25 14       "No," that information is not exculpatory as to

04:13:27 15       Mr. Hadaway and his conviction for the robbery

04:13:32 16       of Ms. Payne?

04:13:34 17   A   There was no indication that either one of them

04:13:38 18       had sexually -- had any sexual contact with the

04:13:42 19       victim.

04:13:45 20   Q   Okay.  And do you think -- well, so based on

04:14:00 21       that, you think that that -- based on your

04:14:03 22       belief that there was no evidence that

04:14:05 23       Mr. Hadaway or Mr. Ott had sexual contact with

04:14:08 24       Ms. Payne, then you don't think those DNA

04:14:10 25       reports were exculpatory as to them; is that

| | | |
|---|---|---|
| 04:14:15 | 1 | right? |
| 04:14:15 | 2 | A   Correct. |
| 04:14:15 | 3 | Q   Any other reason? |
| 04:14:17 | 4 | A   No. |
| 04:14:18 | 5 | Q   Do you remember the Chaunte Ott case? |
| 04:14:23 | 6 | A   Yes. |
| 04:14:24 | 7 | Q   And other than communications with your |
| 04:14:26 | 8 |     attorneys, do you have an understanding of how |
| 04:14:29 | 9 |     that case was resolved? |
| 04:14:32 | 10 | A   Yes. |
| 04:14:32 | 11 | Q   And what's your understanding of how the Ott |
| 04:14:35 | 12 |     case was resolved? |
| 04:14:36 | 13 | A   The City paid him. |
| 04:14:38 | 14 | Q   Okay.  Do you have any opinions or feelings |
| 04:14:43 | 15 |     about that? |
| 04:14:45 | 16 | A   Yes. |
| 04:14:45 | 17 | Q   What's that? |
| 04:14:46 | 18 | A   I feel Chaunte Ott is guilty, and I feel Sam |
| 04:14:49 | 19 |     Hadaway is guilty. |
| 04:14:51 | 20 | Q   Okay.  And can you tell me, as you sit here |
| 04:14:57 | 21 |     today, what you base your belief on that Sam |
| 04:15:01 | 22 |     Hadaway is guilty of the murder of Ms. Payne? |
| 04:15:05 | 23 | A   I didn't say he's guilty of the murder. |
| 04:15:08 | 24 | Q   I'm sorry. |
| 04:15:09 | 25 | A   He's guilty of the attempted robbery of her. |

| | | |
|---|---|---|
| 04:15:12 | 1 | Q   Okay.  And what's that based upon? |
| 04:15:14 | 2 | A   Based upon his own statement, his own words. |
| 04:15:20 | 3 | Q   And you understand the allegations in this case |
| 04:15:25 | 4 |     is that Mr. Hadaway is alleging that he was |
| 04:15:28 | 5 |     coerced into providing that statement and that |
| 04:15:31 | 6 |     it was a false and fabricated statement, right? |
| 04:15:34 | 7 | A   Yes. |
| 04:15:35 | 8 | Q   Okay.  And you -- well, how about Mr. Ott?  Do |
| 04:15:44 | 9 |     you think Mr. Ott, as you sit here today, is |
| 04:15:45 | 10 |     guilty of the murder of Jessica Payne? |
| 04:15:47 | 11 |          MS. GEHLING:  Objection; relevance. |
| 04:15:48 | 12 |     That -- that case is over.  That has nothing to |
| 04:15:51 | 13 |     do with this case.  This case is about Sam |
| 04:15:54 | 14 |     Hadaway, not about Chaunte Ott.  He literally |
| 04:15:56 | 15 |     just said it was settled, so what does it |
| 04:15:58 | 16 |     matter what he thinks about it? |
| 04:15:58 | 17 |          MS. DONNELL:  But, yes, you |
| 04:15:59 | 18 |     understand relevance isn't an objection, so he |
| 04:16:00 | 19 |     said he -- |
| 04:16:00 | 20 |          MS. GEHLING:  I do, but it doesn't |
| 04:16:01 | 21 |     have anything to do with this case. |
| 04:16:03 | 22 |          MS. DONNELL:  Well, it does -- |
| 04:16:04 | 23 |          MS. GEHLING:  It does not relate to |
| 04:16:06 | 24 |     any admissible evidence because that case is |
| 04:16:08 | 25 |     over and his feelings on what Chaunte Ott's |

04:16:12  1        guilt is have nothing to do with this civil

04:16:13  2        case -- either civil case at all.

04:16:14  3                    MS. DONNELL:  Okay.  Well, I'm going

04:16:15  4        to ask the question, and if you want to make

04:16:18  5        your record, you can.

04:16:18  6                    MS. GEHLING:  That's fine.

04:16:19  7                    MS. DONNELL:  Okay.

04:16:19  8        BY MS. DONNELL:

04:16:19  9        Q    So, again, you testified earlier that you think

04:16:21  10       Mr. Ott is guilty of the murder of Ms. Payne,

04:16:24  11       right?

04:16:24  12       A    Yes.

04:16:25  13       Q    And what is that based upon?

04:16:27  14       A    Based on the statement of Sam Hadaway.

04:16:33  15       Q    The statement that Sam Hadaway provided to you

04:16:35  16       on October 27th, 1995?

04:16:38  17       A    Correct.

04:16:38  18       Q    Anything else?

04:16:43  19       A    Some of Richard Gwin's statement also stating

04:16:49  20       that Ott was with them in that location.

04:16:53  21       Q    Anything else?

04:16:56  22       A    Nope.

04:16:56  23       Q    Okay.

04:17:15  24                    MS. DONNELL:  Okay.  Thank you for

04:17:16  25       your time today.  I don't have any questions at

04:17:18   1         this time, but I don't know if your attorney

04:17:20   2         has questions that I might want to follow up

04:17:22   3         on.

04:17:22   4                        EXAMINATION

04:17:22   5    BY MS. GEHLING:

04:17:23   6    Q    I just have one question about Exhibit 12, if

04:17:26   7         you can take it out, and it could be that I'm

04:17:27   8         remembering your questions -- Attorney

04:17:32   9         Donnell's questions incorrectly, but I -- when

04:17:33  10         you were talking about it, I recall her asking

04:17:38  11         if just the signatures were -- well, the

04:17:42  12         handwritten statement was written by you,

04:17:44  13         correct?

04:17:44  14    A    Yes.

04:17:44  15    Q    And then she asked if the only other

04:17:47  16         handwriting on the -- on the paper was the

04:17:50  17         signatures of Mr. Hadaway.  Do you remember

04:17:53  18         that --

04:17:53  19    A    Yes.

04:17:53  20    Q    -- conversation?

04:17:54  21    A    Yes.

04:17:54  22    Q    And you answered "Yes," right?

04:17:56  23    A    Yes.

04:17:56  24    Q    I just want to make sure, but there are also

04:17:59  25         initials at the bottom of the page, "SH."  Did

04:18:02  1          you write those?

04:18:03  2      A   No, Mr. Hadaway did.

04:18:04  3      Q   Okay.  And there are a couple corrections on

04:18:11  4          Page -- like, at 3 of the -- Page 3 of 6.  So

04:18:20  5          it's marked -- Bates marked 744 is the ending.

04:18:24  6      A   Yes.

04:18:24  7      Q   There's a correction on the fourth line.

04:18:27  8      A   Correct.

04:18:28  9      Q   I see there are two initials, two sets of

04:18:33  10         initials.

04:18:34  11     A   The "CB" are mine, and the "SH" are Hadaway's.

04:18:41  12     Q   Okay.  And then is that similar for the

04:18:45  13         corrections that we see on Page 4?  There are

04:18:49  14         one, two, three of them.

04:18:53  15     A   Yes.

04:18:53  16     Q   I believe.

04:18:55  17     A   That would be correct.

04:18:56  18     Q   And the same for Page 5?  There's one -- one

04:19:04  19         that kind of goes from one line to the next.

04:19:06  20     A   Yes.

04:19:06  21     Q   Okay.  And then -- and then the signatures that

04:19:13  22         appear on Page 1 and 6 are Mr. Hadaway's?

04:19:18  23     A   Correct.

04:19:18  24     Q   Okay.

04:19:19  25                 MS. GEHLING:  That's all.  I just

04:19:20    1          wanted to make clear to everybody what was

04:19:23    2          written on there.

04:19:24    3                    MS. DONNELL:  I don't have any

04:19:24    4          further questions.  Do you want to reserve

04:19:28    5          signature?

04:19:29    6                    MS. GEHLING:  Yes, please.

04:19:31    7                    MS. DONNELL:  Okay.

04:19:31    8                    THE VIDEOGRAPHER:  Going off the

04:19:32    9          record at 4:19.

          10                    (Proceedings concluded at 4:19 p.m.)

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1   STATE OF WISCONSIN  )
                        ) SS:
2   COUNTY OF MILWAUKEE )

3

4

5              I, SAMANTHA J. SHALLUE, a Registered

6   Professional Reporter and Notary Public in and for

7   the State of Wisconsin, do hereby certify that the

8   above deposition of CARL BUSCHMANN was recorded by

9   me on April 7, 2021, and reduced to writing under my

10  personal direction.

11             I further certify that I am not a

12  relative or employee or attorney or counsel of any

13  of the parties, or a relative or employee of such

14  attorney or counsel, or financially interested

15  directly or indirectly in this action.

16             In witness whereof I have hereunder set

17  my hand and affixed my seal of office at Milwaukee,

18  Wisconsin, this 15th day of April, 2021.

19

20

21             _____

                             Notary Public
22                 In and for the State of Wisconsin

23

24
    My Commission Expires:  June 3, 2023.
25

```
 1   STATE OF              )
                           ) SS:
 2   COUNTY OF             )

 3

 4              I, CARL BUSCHMANN, do hereby certify

 5   that I have read the foregoing transcript of

 6   proceedings, taken on April 7, 2021, at Brown &

 7   Jones Reporting, Inc., 735 North Water Street, Suite

 8   M185, Milwaukee, Wisconsin, and the same is true and

 9   correct, except for the list of corrections noted on

10   the annexed page.

11

12              Dated at _____

13   this _____day of _____, 2021.

14

15

16                         _____

17                              CARL BUSCHMANN

18

19   Subscribed and sworn to before me
     this_____day of _____ 2021.
20

21

22   _____
     Notary Public
23

24
     My Commission Expires:
25
```

1                    C O R R E C T I O N S

2

      PAGE NO.    LINE NO.    DESCRIPTION
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**'**

**'77** [2] - 12:21, 211:9
**'90s** [1] - 100:16
**'91** [1] - 212:3
**'95** [4] - 20:8, 76:23, 100:4, 123:10
**'96** [1] - 76:24
**'her** [1] - 80:10

---

**1**

**1** [12] - 3:6, 4:4, 56:1, 56:5, 56:15, 56:16, 64:6, 77:6, 148:18, 169:9, 186:23, 220:22
**10** [7] - 3:11, 107:2, 107:3, 107:6, 110:17, 169:10
**10/24/95** [2] - 85:5, 88:22
**10/25/1995** [1] - 112:6
**10/25/95** [1] - 110:17
**10/27/95** [2] - 89:8, 133:12
**102** [1] - 168:8
**103** [1] - 168:8
**105** [3] - 3:10, 169:7, 169:9, 169:21
**107** [1] - 3:11
**10:02** [1] - 99:3
**10:06** [1] - 157:3
**10:11** [2] - 1:20, 4:3
**10th** [1] - 203:25
**11** [11] - 3:11, 15:10, 15:11, 83:11, 107:2, 107:3, 107:6, 112:4, 117:18, 117:20, 144:25
**112** [1] - 3:11
**11:00** [1] - 93:16
**11:26** [1] - 157:11
**11:41** [1] - 99:3
**11:43** [1] - 70:9
**11:52** [1] - 70:12
**11th** [1] - 91:3
**12** [19] - 3:12, 11:3, 11:4, 79:8, 127:19, 127:20, 127:23, 127:24, 128:16, 129:1, 133:2, 133:25, 134:17, 142:25, 143:24, 144:1, 169:15, 169:22,

219:6
**12/22/77** [1] - 91:7
**127** [2] - 3:12, 3:12
**12:00** [1] - 18:6
**12:29** [1] - 97:18
**12:30** [2] - 97:15, 127:12
**12th** [1] - 67:12
**13** [6] - 3:12, 127:20, 127:23, 142:25, 144:1, 199:13
**14** [6] - 3:13, 75:23, 144:9, 144:11, 144:14, 148:18
**144** [1] - 3:13
**1443** [1] - 211:18
**1445** [1] - 211:2
**147** [1] - 3:13
**148** [1] - 3:14
**14th** [1] - 211:25
**15** [8] - 3:13, 98:17, 119:1, 147:16, 147:18, 147:21, 169:22
**156** [3] - 3:14, 3:15, 3:15
**15th** [1] - 222:18
**16** [8] - 3:14, 64:12, 148:11, 148:12, 148:15, 148:18, 165:7, 165:9
**1611** [1] - 84:10
**163** [1] - 3:16
**16th** [1] - 211:10
**17** [9] - 3:14, 64:13, 91:10, 104:19, 144:25, 156:9, 156:11, 156:14, 156:18
**17-year-old** [2] - 82:15, 84:8
**18** [7] - 3:15, 94:5, 156:10, 156:14, 157:6, 157:17, 160:10
**180** [1] - 3:17
**182** [1] - 3:18
**18th** [3] - 91:10, 180:20, 180:25
**19** [7] - 3:15, 11:24, 11:25, 156:10, 156:11, 156:14, 157:19
**19-cv-01106** [1] - 4:9
**19-cv-1106** [1] - 1:7
**1975** [1] - 12:15
**1977** [3] - 12:22,

13:4, 211:10
**199** [1] - 3:19
**1990** [2] - 211:25
**1991** [5] - 13:12, 14:14, 14:22, 34:8, 34:14
**1994** [1] - 15:24
**1995** [26] - 15:17, 50:18, 65:19, 79:8, 81:6, 98:5, 99:3, 106:2, 107:11, 126:8, 126:13, 128:2, 138:4, 141:21, 144:16, 146:12, 148:2, 149:6, 151:20, 153:25, 156:21, 161:20, 165:10, 200:21, 200:25, 218:16
**1996** [4] - 67:16, 71:8, 71:23, 176:8
**1997** [2] - 184:16, 203:15
**19th** [3] - 84:10, 92:1, 184:11
**1:19** [1] - 97:21
**1:30** [4] - 85:4, 93:17, 93:25, 96:12
**1:55** [1] - 125:8
**1st** [11] - 151:4, 156:21, 157:4, 157:8, 157:10, 159:18, 161:4, 161:9, 161:14, 161:17, 161:20

---

**2**

**2** [12] - 3:7, 63:16, 63:17, 63:20, 63:21, 64:6, 65:22, 73:13, 117:20, 133:21, 183:2, 213:9
**2/11/63** [1] - 64:8
**20** [5] - 3:16, 11:13, 163:9, 163:10, 163:13
**200** [2] - 2:6, 3:19
**2000** [2] - 175:25, 176:13
**2003** [24] - 180:17, 180:20, 180:25, 182:6, 182:20, 183:2, 183:17, 183:22, 184:11, 186:9, 188:10, 189:8, 189:19, 189:24, 190:15, 191:10, 192:6, 203:11, 203:19, 203:20,

204:1, 205:1, 214:1, 214:2
**2004** [1] - 176:1
**2006** [3] - 14:13, 14:14, 14:23
**2010** [3] - 56:18, 58:6, 169:8
**2012** [5] - 10:10, 11:7, 11:13, 67:12, 67:22
**2018** [2] - 10:21, 11:14
**2021** [7] - 1:20, 4:4, 222:9, 222:18, 223:6, 223:13, 223:19
**2023** [1] - 222:24
**203** [1] - 3:20
**20th** [3] - 82:5, 91:1, 184:16
**21** [19] - 3:17, 12:18, 57:6, 58:3, 180:5, 180:6, 180:9, 180:10, 181:2, 182:13, 183:21, 185:15, 186:24, 189:22, 190:4, 190:5, 190:12, 214:3
**210** [1] - 3:21
**219** [1] - 3:4
**22** [17] - 3:18, 180:5, 180:6, 182:3, 182:14, 182:19, 182:25, 183:16, 183:17, 186:8, 186:24, 189:10, 189:23, 190:12, 190:22, 191:2, 214:3
**220** [1] - 79:5
**221** [1] - 79:5
**22nd** [6] - 180:16, 183:22, 189:24, 190:15, 204:20, 214:1
**23** [4] - 3:19, 58:3, 199:6, 199:9
**23rd** [2] - 84:19, 211:9
**24** [5] - 3:19, 200:10, 200:11, 200:14, 200:15
**24th** [11] - 85:17, 89:13, 90:11, 92:9, 93:17, 95:16, 97:2, 99:10, 106:2, 107:25, 184:6
**25** [5] - 3:20, 203:2, 203:3, 203:6
**258** [1] - 65:16
**259** [1] - 65:16

**25th** [12] - 98:5, 99:3, 101:8, 107:11, 108:6, 111:25, 114:1, 114:4, 120:24, 124:12, 127:9, 172:10
**26** [7] - 3:20, 210:18, 210:19, 210:22, 210:23, 211:15, 212:10
**26th** [1] - 148:1
**27** [1] - 75:6
**276** [1] - 90:7
**277** [1] - 90:8
**27th** [11] - 124:18, 126:8, 126:13, 127:12, 128:1, 137:25, 138:3, 141:21, 146:11, 167:23, 218:16
**285** [1] - 63:24
**28th** [1] - 200:25
**294** [1] - 147:23
**2:00** [5] - 125:11, 127:13, 127:14, 127:16, 141:21

---

**3**

**3** [19] - 3:7, 57:5, 58:1, 58:3, 65:9, 65:10, 65:13, 65:14, 65:17, 66:11, 83:5, 83:6, 83:13, 104:2, 110:16, 220:4, 222:24
**3044** [1] - 199:11
**3084** [5] - 73:12, 90:7, 147:22, 148:17, 182:14
**30th** [7] - 56:18, 144:16, 148:20, 149:10, 154:15, 166:1, 169:8
**31** [1] - 12:10
**311** [1] - 2:3
**31st** [1] - 211:25
**33** [1] - 74:18
**38656** [1] - 67:9
**3:25** [1] - 127:8
**3:52** [1] - 206:1
**3rd** [1] - 2:3

---

**4**

**4** [18] - 3:8, 65:16, 67:4, 67:5, 67:8, 68:8, 70:6, 70:16, 73:5, 74:5, 75:3, 76:17, 79:5, 90:7, 104:2, 147:23, 220:13

**44** [1] - 199:13
**45** [2] - 168:1, 168:12
**48** [3] - 98:15, 141:2, 199:13
**498** [1] - 79:2
**4:00** [3] - 18:7, 100:18, 206:4
**4:19** [3] - 1:21, 221:9, 221:10
**4:25** [1] - 133:18
**4:50** [9] - 88:21, 90:11, 92:9, 93:17, 93:21, 93:25, 96:12, 96:15, 106:3
**4:54** [1] - 106:16

**5**

**5** [7] - 3:3, 3:8, 78:20, 78:22, 78:25, 220:18
**53202** [1] - 2:7
**534** [1] - 65:15
**535** [1] - 65:15
**553** [1] - 90:6
**56** [1] - 3:6
**5:15** [1] - 107:11
**5th** [11] - 182:6, 183:2, 183:17, 186:8, 188:10, 189:8, 189:19, 190:1, 191:10, 192:6, 214:2

**6**

**6** [12] - 3:9, 81:15, 81:16, 81:19, 81:20, 83:19, 84:3, 86:5, 89:15, 96:22, 220:4, 220:22
**602** [1] - 64:8
**60607** [1] - 2:3
**63** [1] - 3:7
**635** [1] - 199:12
**65** [1] - 3:7
**67** [1] - 3:8
**6:45** [1] - 107:15
**6th** [4] - 149:6, 149:13, 165:10, 182:20

**7**

**7** [14] - 1:20, 3:9, 4:4, 90:1, 90:2, 90:5, 90:19, 92:4, 96:22, 99:9, 106:25, 222:9, 223:6
**718** [1] - 105:20
**72** [1] - 141:3
**722** [1] - 107:7

**735** [3] - 1:18, 4:11, 223:7
**744** [1] - 220:5
**748** [1] - 134:17
**760** [1] - 163:16
**78** [1] - 3:8
**7:45** [3] - 96:8, 96:17, 106:16
**7th** [11] - 26:23, 85:21, 86:8, 91:22, 95:25, 118:2, 118:3, 118:6, 128:24, 129:1, 129:17

**8**

**8** [6] - 3:10, 98:9, 98:11, 98:14, 98:15, 98:21
**80** [6] - 34:15, 34:16, 35:5, 138:4, 138:11, 211:22
**800** [1] - 2:6
**81** [3] - 3:9, 57:20, 57:21
**84** [1] - 213:13
**864** [1] - 182:5
**8:00** [3] - 18:6, 100:18

**9**

**9** [6] - 3:10, 105:14, 105:15, 105:18, 106:9, 106:12
**90** [3] - 3:9, 113:15, 113:19
**91** [7] - 56:20, 56:25, 57:5, 57:17, 57:25, 113:11, 113:13
**93** [4] - 56:22, 56:23, 56:24, 98:17
**94** [1] - 98:17
**952** [1] - 145:1
**953** [1] - 144:23
**98** [1] - 3:10
**9:31** [1] - 157:3
**9th** [4] - 65:19, 67:16, 83:7, 83:15

**A**

**a.m** [10] - 1:20, 18:6, 93:16, 99:3, 99:4, 100:18, 157:3, 157:11
**abandoned** [4] - 96:1, 129:22, 130:24, 131:5
**Aberdeen** [1] - 2:3

**ability** [1] - 136:9
**able** [4] - 70:16, 109:24, 121:20, 135:4
**above-captioned** [1] - 82:7
**abrasion** [1] - 145:15
**academy** [16] - 12:24, 13:3, 13:5, 13:7, 34:9, 34:13, 36:8, 42:6, 42:10, 42:14, 61:17, 177:1, 212:2, 212:11, 213:20
**Academy** [1] - 211:9
**accessory** [1] - 153:20
**accommodate** [1] - 5:16
**according** [6] - 95:22, 101:10, 101:17, 103:19, 104:17, 119:17
**account** [1] - 143:13
**accounts** [1] - 87:9
**accuracy** [2] - 38:3, 38:17
**accurate** [6] - 16:16, 21:5, 38:4, 120:22, 181:16, 190:11
**accusatorial** [2] - 92:12, 94:16
**action** [1] - 222:15
**active** [2] - 21:1, 29:22
**actively** [2] - 30:1, 59:12
**actual** [10] - 89:10, 89:12, 97:4, 162:6, 169:2, 169:3, 169:13, 173:8, 173:21, 195:20
**ADA** [1] - 165:12
**add** [1] - 134:7
**addition** [1] - 33:22
**additional** [10] - 72:7, 73:25, 77:18, 89:4, 161:21, 165:25, 185:11, 190:22, 191:24, 192:1
**additions** [1] - 60:19
**address** [1] -

155:12
**admin** [1] - 38:24
**administered** [3] - 102:14, 103:1, 109:20
**administrative** [2] - 112:14, 212:23
**admissible** [1] - 217:24
**admission** [1] - 141:24
**admitted** [1] - 180:24
**advise** [2] - 60:12, 84:25
**advised** [4] - 111:3, 111:9, 111:14, 126:18
**affiant** [1] - 163:17
**Affidavit** [1] - 3:16
**affidavit** [2] - 163:14, 163:16
**affixed** [1] - 222:17
**afternoon** [2] - 85:17, 92:8
**against** [21] - 14:25, 17:10, 17:11, 17:12, 17:20, 153:14, 165:15, 165:19, 165:22, 166:25, 172:21, 173:5, 173:22, 174:11, 176:9, 184:8, 184:12, 185:5, 186:12, 189:1, 190:24
**age** [3] - 11:24, 104:8, 104:18
**agencies** [1] - 11:22
**agency** [1] - 191:17
**ago** [9] - 6:13, 6:21, 23:5, 25:5, 25:14, 25:22, 90:25, 95:4, 125:22
**agree** [1] - 29:9
**aide** [3] - 11:21, 11:22, 12:16
**al** [1] - 1:8
**alive** [1] - 95:20
**allegations** [1] - 217:3
**alleged** [1] - 119:10
**allegedly** [5] - 92:22, 121:13, 141:14, 144:2,

187:18
**alleging** [1] - 217:4
**alley** [1] - 130:7
**allowed** [4] - 48:11, 49:2, 49:13, 140:24
**alone** [3] - 109:10, 110:5, 115:20
**analysis** [1] - 67:19
**analyzed** [1] - 30:8
**ankles** [1] - 164:4
**annexed** [1] - 223:10
**answer** [12] - 5:12, 5:17, 73:1, 74:14, 87:5, 105:7, 126:21, 140:12, 141:10, 153:17, 159:15, 215:13
**answered** [2] - 102:6, 219:22
**answering** [1] - 143:11
**answers** [1] - 169:18
**anterior** [3] - 52:11, 145:10, 146:2
**anteriorly** [1] - 145:22
**apart** [1] - 187:11
**apologies** [1] - 113:14
**apologize** [2] - 61:13, 125:4
**apologizing** [1] - 61:11
**appear** [1] - 220:22
**appearance** [1] - 4:15
**appeared** [4] - 2:4, 2:7, 64:12, 85:5
**appearing** [2] - 88:15, 186:6
**appointment** [2] - 100:8, 100:11
**apprehension** [3] - 212:22, 213:2, 213:6
**apprised** [1] - 207:11
**approach** [3] - 60:4, 60:8, 61:14
**approval** [4] - 22:1, 22:13, 104:23, 153:2
**approved** [3] -

141:1, 149:12, 164:23

**April** [16] - 1:20, 4:4, 13:12, 14:14, 14:22, 34:8, 67:12, 67:21, 203:11, 203:18, 203:25, 205:1, 212:3, 222:9, 222:18, 223:6

**Ardis** [2] - 22:22, 77:25

**area** [2] - 26:24, 179:4

**areas** [1] - 145:5

**arm** [1] - 161:2

**armed** [1] - 17:17

**arrangements** [1] - 100:22

**arrest** [14] - 90:13, 92:7, 92:10, 93:15, 93:21, 116:24, 116:25, 127:1, 127:3, 141:5, 141:16, 158:4, 193:18, 193:23

**arrested** [6] - 88:24, 93:7, 94:14, 96:15, 193:17, 193:24

**arrow** [1] - 129:23

**arson** [1] - 35:13

**artifact** [1] - 145:19

**aside** [2] - 109:5, 121:17

**assault** [8] - 16:22, 16:25, 32:14, 32:18, 32:20, 32:25, 33:13, 33:14

**assaults** [1] - 16:17

**assigned** [26] - 11:11, 14:24, 15:1, 15:5, 15:8, 15:21, 15:23, 16:18, 17:6, 17:13, 17:20, 18:9, 20:23, 20:24, 21:7, 23:11, 36:16, 66:8, 72:12, 73:2, 77:17, 77:19, 82:5, 82:9, 126:17

**assignment** [7] - 15:2, 15:3, 15:20, 16:3, 17:15, 36:13, 72:15

**assignments** [8] - 11:7, 11:8, 14:18, 14:22, 20:25, 21:2, 21:4, 21:17

**assist** [2] - 82:6,

82:10

**assistant** [1] - 4:21

**Associates** [1] - 43:2

**assume** [4] - 5:13, 115:2, 115:10, 189:23

**assumption** [1] - 191:7

**Attached** [1] - 3:23

**attempted** [5] - 26:16, 33:13, 165:14, 165:18, 216:25

**attend** [2] - 212:2, 213:22

**attended** [1] - 42:11

**attention** [6] - 56:20, 64:6, 144:22, 160:10, 169:7, 181:19

**attorney** [7] - 5:20, 9:5, 9:14, 196:18, 219:1, 222:12, 222:14

**Attorney** [3] - 4:21, 148:22, 219:8

**ATTORNEY** [1] - 2:5

**attorney's** [8] - 10:12, 10:17, 10:20, 11:9, 53:20, 189:17, 189:20, 191:16

**Attorney's** [1] - 6:18

**attorneys** [2] - 193:13, 216:8

**attribute** [1] - 187:22

**August** [3] - 12:14, 144:16, 211:25

**authored** [2] - 71:7, 83:6

**autopsy** [1] - 146:4

**available** [2] - 100:12, 100:22

**aware** [14] - 63:7, 81:5, 122:21, 123:1, 123:8, 124:6, 124:20, 140:13, 142:6, 153:12, 201:23, 205:7, 205:10, 205:12

**awareness** [1] - 87:20

# B

**B1** [1] - 186:11

**B1a** [3] - 184:4, 186:11, 186:18

**back-and-forth** [3] - 143:11, 170:15, 170:19

**background** [4] - 60:13, 90:23, 102:18, 143:18

**backtrack** [1] - 28:22

**backwards** [1] - 130:12

**backyard** [1] - 41:21

**bad** [2] - 30:14, 46:23

**Ball** [1] - 209:21

**bank** [3] - 17:16, 176:11, 176:23

**Barbian** [4] - 8:8, 8:16, 8:21, 9:12

**Barbian-Gayan** [2] - 8:8, 8:16

**base** [2] - 22:2, 216:21

**based** [20] - 38:2, 39:21, 51:13, 80:24, 88:1, 88:25, 92:21, 141:13, 142:9, 153:14, 163:1, 171:12, 193:23, 196:7, 215:20, 215:21, 217:1, 217:2, 218:13, 218:14

**basis** [1] - 142:7

**basket** [2] - 39:13, 39:14

**Bates** [18] - 63:23, 65:14, 67:8, 79:1, 90:6, 98:15, 105:19, 107:6, 134:17, 144:23, 145:1, 147:21, 148:16, 163:15, 182:4, 199:11, 211:17, 220:5

**bathroom** [1] - 80:6

**bearing** [1] - 163:15

**became** [5] - 12:18, 34:7, 37:16, 66:1, 212:3

**Becky** [3] - 81:1, 81:11, 84:1

**become** [2] - 13:15, 13:18

**before** [56] - 1:16, 5:7, 5:18, 12:2, 12:23, 13:2, 15:22,

20:7, 24:9, 25:4, 25:7, 28:6, 28:8, 31:9, 33:24, 34:10, 47:17, 50:3, 55:4, 55:12, 65:25, 68:7, 81:12, 92:3, 92:9, 93:6, 98:2, 99:19, 102:14, 102:25, 112:25, 113:16, 114:3, 114:17, 114:18, 140:25, 143:1, 146:25, 147:14, 148:4, 149:3, 149:17, 155:5, 157:25, 164:25, 167:8, 173:18, 177:7, 180:14, 205:2, 210:23, 210:24, 212:2, 212:14, 223:19

**beginning** [2] - 58:21, 107:11

**behalf** [4] - 2:4, 2:7, 4:18, 4:22

**behavior** [1] - 212:19

**behind** [6] - 26:25, 32:1, 51:2, 86:8, 96:1, 119:20

**belief** [6] - 153:24, 214:5, 214:9, 214:11, 215:22, 216:21

**below** [1] - 104:2

**benefit** [2] - 73:8, 73:16

**between** [9] - 157:3, 168:1, 170:10, 175:25, 184:14, 198:17, 204:20, 204:21, 211:24

**biological** [1] - 162:15

**birth** [1] - 91:6

**birthday** [1] - 91:11

**bit** [1] - 214:21

**black** [6] - 64:8, 69:18, 69:19, 69:20, 82:15, 91:25

**blocks** [2] - 129:18, 131:4

**blood** [3] - 163:4, 163:6, 200:1

**bloody** [1] - 164:12

**blue** [1] - 80:3

**Board** [1] - 211:7

**bodies** [1] - 69:25

**body** [19] - 32:1,

33:5, 33:11, 45:10, 45:11, 45:22, 50:24, 51:21, 51:25, 86:20, 87:2, 121:23, 135:18, 146:14, 146:15, 146:24, 174:22, 175:1, 204:3

**book** [2] - 37:14, 41:3

**books** [9] - 37:12, 37:17, 37:19, 41:6, 41:10, 41:12, 41:14, 41:15, 41:23

**born** [1] - 90:24

**bottom** [8] - 64:6, 85:3, 129:6, 180:19, 181:5, 199:23, 203:12, 219:25

**bought** [1] - 26:22

**bra** [3] - 51:10, 163:24, 164:1

**break** [12] - 5:15, 5:18, 42:1, 56:7, 68:5, 70:7, 70:14, 70:16, 97:15, 97:16, 98:3, 198:24

**Brief** [3] - 70:10, 125:9, 206:2

**briefed** [4] - 55:22, 57:12, 58:10, 122:9

**briefing** [4] - 58:16, 58:19, 59:9, 59:14

**briefings** [3] - 58:21, 58:25, 69:7

**briefly** [1] - 11:16

**bring** [3] - 55:23, 100:9, 126:17

**bringing** [1] - 92:18

**brother** [1] - 84:16

**brought** [10] - 26:18, 28:4, 54:1, 54:14, 85:12, 153:14, 154:8, 155:2, 165:21, 197:17

**Brown** [4] - 1:18, 4:13, 84:15, 223:6

**Brown's** [1] - 119:11

**bruising** [5] - 52:6, 52:10, 144:6, 146:5, 164:7

**buccal** [1] - 204:9

**bud** [2] - 118:8,

Case 2:19-cv-01106-PP Filed 03/20/24 Page 228 of 249 Document 119-4

118:10
**building** [3] -
135:7, 135:25,
168:2
**bunch** [1] -
143:14
**Bureau** [5] - 14:2,
85:6, 85:9, 88:16,
98:23
**bureau** [3] -
40:24, 41:1, 64:19
**Burleigh** [11] -
26:23, 64:9, 64:18,
85:22, 86:9, 91:22,
96:1, 118:3,
128:24, 129:6,
129:17
**burn** [2] - 41:18,
41:23
**burnt** [1] - 41:16
**Buschmann** [23]
- 4:5, 5:5, 56:14,
57:3, 63:19, 65:12,
67:7, 70:15, 78:24,
81:18, 98:13,
105:17, 125:14,
144:13, 148:14,
156:13, 182:24,
183:6, 183:9,
199:8, 199:24,
200:14, 206:6
**BUSCHMANN** [5]
- 1:13, 4:25, 222:8,
223:4, 223:17
**business** [3] -
100:9, 110:8,
119:15
**but..** [1] - 132:11
**buttons** [1] -
164:4
**BY** [54] - 5:4,
56:13, 63:18,
65:11, 67:6, 70:13,
74:16, 77:5, 78:23,
81:17, 87:7, 88:4,
90:3, 94:3, 94:13,
97:22, 98:12,
105:1, 105:9,
105:16, 107:4,
111:17, 113:4,
113:18, 113:21,
125:13, 127:21,
130:17, 132:13,
140:15, 141:12,
144:12, 147:19,
148:13, 150:11,
150:16, 150:21,
153:19, 156:12,
158:14, 159:17,
160:2, 163:11,
180:2, 180:7,
181:22, 191:22,
199:7, 200:12,
201:22, 203:4,

206:5, 210:20,
218:8

# C

**cadet** [2] - 11:20,
42:14
**Cameo** [4] - 8:8,
8:16, 8:21, 9:11
**cans** [1] - 133:21
**capacity** [2] -
10:22, 11:5
**captain** [4] -
22:16, 77:2, 77:12,
77:14
**Captain** [1] -
22:17
**captioned** [1] -
82:7
**CAR** [1] - 132:14
**car** [17] - 26:22,
27:1, 27:3, 64:15,
64:16, 64:17,
117:22, 118:12,
118:23, 119:3,
121:10, 130:18,
130:19, 130:21,
132:6, 132:14,
132:18
**card** [3] - 126:20,
134:14, 206:10
**career** [4] - 41:7,
192:12, 208:25,
209:14
**careful** [1] -
103:21
**Carl** [2] - 4:5,
183:9
**CARL** [5] - 1:13,
4:25, 222:8, 223:4,
223:17
**Carron** [1] -
179:21
**carrying** [1] -
64:13
**Case** [2] - 1:7, 4:9
**case** [93] - 10:1,
19:4, 19:14, 19:18,
19:24, 20:2, 20:5,
20:11, 20:20,
20:25, 21:2, 21:8,
21:9, 21:10, 21:11,
22:4, 22:5, 22:9,
22:11, 22:17,
22:25, 23:2, 23:8,
29:5, 29:6, 29:8,
29:10, 29:13,
29:15, 29:21,
30:25, 31:1, 31:4,
31:15, 31:16,
33:21, 39:19, 56:1,
59:4, 59:6, 64:25,
65:7, 65:25, 66:1,
66:2, 66:3, 66:8,

67:12, 68:11,
70:21, 71:16, 72:2,
72:9, 72:16, 72:21,
73:16, 73:24,
77:22, 79:15,
82:11, 82:19,
82:23, 83:3, 83:9,
83:25, 84:5,
102:13, 103:15,
109:4, 109:5,
109:6, 109:9,
111:15, 123:23,
153:8, 181:25,
202:10, 205:1,
209:16, 215:1,
216:5, 216:9,
216:12, 217:3,
217:12, 217:13,
217:21, 217:24,
218:2
**cases** [20] -
19:20, 19:23,
21:17, 21:20,
21:22, 22:10, 23:1,
23:24, 23:25,
28:25, 67:17,
70:22, 71:4, 72:6,
73:5, 73:8, 73:11,
75:25, 77:17,
194:6
**Cassandra** [2] -
66:13, 83:15
**categories** [1] -
212:17
**Category** [1] -
213:4
**caused** [1] -
121:19
**CB** [3] - 130:4,
220:11
**cerebral** [5] -
135:19, 135:21,
136:1, 137:18,
137:21
**certain** [8] -
21:17, 24:18,
24:21, 104:9,
170:25, 196:8,
207:3, 209:2
**certainly** [1] -
201:16
**certify** [3] - 222:7,
222:11, 223:4
**chairs** [1] -
139:23
**chance** [9] - 57:7,
58:5, 67:24, 68:2,
68:7, 68:9, 70:5,
90:15, 98:18
**change** [2] - 18:2,
210:9
**changed** [1] -
123:15
**changes** [3] -

38:12, 38:15,
38:16
**charge** [7] -
142:7, 149:18,
165:13, 195:25,
196:6, 197:23,
204:14
**charged** [19] -
111:24, 116:15,
116:22, 117:5,
152:22, 154:4,
154:13, 164:20,
194:5, 194:7,
197:3, 197:4,
197:13, 205:8,
205:12, 205:18,
210:10
**charges** [15] -
140:25, 141:19,
149:12, 153:2,
153:3, 153:5,
153:7, 153:10,
153:13, 153:25,
154:18, 155:6,
164:22, 165:21
**charging** [17] -
40:19, 53:19,
53:24, 54:9, 54:13,
141:4, 148:19,
149:9, 153:1,
154:9, 154:16,
154:19, 154:23,
154:25, 155:3,
164:16, 195:6
**Charlotte** [1] -
119:11
**charts** [3] - 62:16,
103:21, 109:11
**Chaunte** [34] -
9:5, 25:3, 26:24,
26:24, 52:24, 53:2,
116:21, 117:24,
119:2, 119:6,
121:16, 121:17,
122:15, 122:23,
138:17, 138:22,
146:16, 147:13,
148:1, 150:3,
158:9, 158:16,
161:4, 161:10,
162:3, 162:14,
164:13, 165:16,
186:13, 187:18,
216:5, 216:18,
217:14, 217:25
**check** [2] - 40:10,
119:14
**chest** [1] - 145:10
**Chicago** [5] - 2:3,
9:25, 43:20, 44:2,
56:17
**chief** [1] - 77:9
**choosing** [1] -
114:24

**chose** [6] - 21:20,
114:7, 114:8,
114:9, 114:15,
207:4
**chronological** [1]
- 84:2
**chuckling** [1] -
53:12
**CIB** [23] - 14:6,
14:8, 14:15, 14:18,
14:23, 15:6, 15:14,
16:19, 17:7, 17:13,
18:9, 28:2, 40:12,
40:24, 41:1, 53:5,
53:6, 59:13, 77:14,
99:25, 110:6,
136:4, 157:11
**CID** [1] - 41:1
**circle** [4] - 76:14,
128:20, 129:4,
132:22
**circumstances**
[5] - 28:2, 190:9,
194:22, 202:3,
209:3
**citizens** [1] -
86:19
**City** [11] - 2:10,
4:7, 4:21, 6:18,
9:25, 16:17, 56:17,
180:23, 184:17,
211:1, 216:13
**CITY** [1] - 1:8,
2:5, 2:5
**city** [1] - 76:2,
76:6, 126:15
**civil** [3] - 10:1,
218:1, 218:2
**Civil** [1] - 1:15
**clarifying** [3] -
127:15, 151:15,
153:6
**classes** [1] -
171:5
**classification** [2]
- 104:14, 104:15
**classified** [1] -
104:7
**classroom** [1] -
34:16
**clean** [1] - 132:11
**clear** [5] - 45:4,
47:13, 131:19,
196:15, 221:1
**clerk** [4] - 39:2,
39:8, 39:13, 40:11
**client** [2] -
122:21, 125:17
**clothed** [4] - 33:5,
33:6, 33:7
**clothing** [1] -
164:13
**CLVS** [1] - 4:12

**coerced** [1] - 217:5

**cognitive** [3] - 61:22, 62:2, 135:15

**coherent** [1] - 135:10

**cold** [55] - 19:14, 19:18, 19:24, 20:2, 20:5, 20:11, 20:20, 20:24, 21:1, 21:2, 21:8, 21:11, 21:17, 22:5, 22:9, 22:11, 22:17, 23:2, 23:8, 23:25, 28:25, 29:5, 29:10, 29:13, 29:15, 29:21, 31:4, 39:18, 64:25, 65:7, 65:25, 66:1, 66:2, 66:3, 66:8, 68:11, 70:21, 71:16, 72:2, 72:9, 72:16, 72:21, 73:8, 77:22, 79:15, 82:11, 82:19, 82:23, 83:3, 83:8, 83:25, 84:5, 123:23

**colleague** [1] - 127:7

**colleagues** [3] - 124:8, 193:19, 193:20

**collected** [2] - 33:1, 189:1

**coming** [1] - 59:8

**commencing** [1] - 1:20

**Commission** [2] - 222:24, 223:24

**committed** [1] - 104:4

**committing** [2] - 68:24, 117:1

**common** [5] - 59:7, 59:11, 68:15, 70:2, 186:1

**communication** [1] - 18:24

**communications** [2] - 5:23, 216:7

**community** [2] - 76:11, 76:13

**complaint** [1] - 195:21

**completed** [3] - 211:24, 212:18, 213:13

**completely** [1] - 103:23

**completing** [1] - 165:11

**Completion** [1] - 211:8

**complies** [1] - 129:5

**concern** [10] - 135:3, 151:19, 151:22, 151:23, 152:1, 152:13, 152:14, 152:19, 155:13, 194:19

**concerned** [7] - 149:20, 150:4, 150:6, 150:12, 150:18, 152:16, 215:1

**concerns** [8] - 149:16, 149:24, 150:22, 151:11, 151:17, 152:8, 154:22, 171:1

**concluded** [4] - 96:8, 107:15, 198:12, 221:10

**concluding** [1] - 1:21

**conclusion** [1] - 212:24

**conclusively** [1] - 162:18

**conduct** [11] - 19:22, 34:20, 35:14, 35:20, 43:10, 43:16, 43:23, 62:1, 108:15, 154:1, 173:3

**conducted** [12] - 34:18, 38:1, 44:18, 53:20, 59:1, 60:5, 66:12, 110:25, 115:15, 156:20, 157:25, 164:25

**conducting** [2] - 46:13, 103:20

**conference** [17] - 40:19, 53:19, 53:24, 54:9, 54:13, 148:19, 149:9, 153:2, 154:9, 154:17, 154:24, 155:1, 155:3, 164:16, 164:24, 165:4, 166:1

**confidential** [4] - 201:6, 201:14, 201:17, 201:20

**confirmed** [1] - 54:4

**confronted** [1] - 86:10

**connected** [1] - 191:2

**connection** [1] - 191:1

**consecutive** [6] - 15:11, 67:9,

105:19, 107:7, 163:15, 199:12

**consent** [1] - 105:3

**consider** [4] - 185:14, 186:20, 186:22, 207:6

**considered** [1] - 102:16

**considering** [1] - 196:5

**consist** [1] - 58:25

**consistent** [2] - 38:4, 183:25

**consists** [1] - 54:17

**constitutional** [1] - 126:19

**contact** [7] - 19:8, 158:25, 159:24, 170:6, 187:4, 215:18, 215:23

**contained** [4] - 190:14, 191:11, 214:6, 215:4

**context** [6] - 46:9, 48:5, 48:21, 159:5, 174:14, 197:17

**continue** [1] - 185:4

**continued** [3] - 64:17, 96:16, 177:19

**continuity** [1] - 59:17

**contrary** [1] - 166:16

**contributor** [1] - 186:17

**contributors** [2] - 187:14, 188:1

**control** [1] - 104:9

**contusion** [3] - 145:5, 145:9, 145:12

**contusions** [5] - 145:6, 145:21, 145:23, 146:1, 146:5

**conversation** [23] - 119:10, 127:11, 147:4, 147:12, 148:1, 154:25, 195:10, 195:18, 195:20, 195:24, 196:3, 196:4, 196:9, 196:10, 196:14, 196:25, 197:7, 197:17, 198:3, 198:8, 198:13, 219:20

**conversations** [12] - 72:9, 73:23, 74:6, 75:18, 76:22, 188:15, 192:25, 193:4, 193:12, 193:19, 198:11, 198:15

**convey** [2] - 136:14, 171:4

**conveyed** [1] - 59:2

**convicted** [3] - 193:25, 194:5, 194:7

**conviction** [1] - 215:15

**Cooper** [1] - 209:19

**cooperated** [1] - 116:11

**copy** [7] - 38:21, 105:20, 156:17, 172:8, 172:20, 172:24, 174:6

**corner** [2] - 100:1, 181:5

**correct** [47] - 13:21, 14:15, 18:12, 27:19, 30:1, 48:16, 62:16, 64:25, 74:23, 75:2, 79:15, 82:3, 86:2, 88:8, 94:25, 96:25, 105:4, 106:7, 120:13, 121:4, 136:4, 136:19, 137:5, 137:25, 138:1, 138:8, 140:18, 142:17, 142:22, 146:12, 146:15, 146:20, 147:1, 148:6, 154:19, 160:6, 163:7, 167:1, 167:9, 167:20, 179:8, 186:18, 201:2, 212:8, 219:13, 220:17, 223:9

**Correct** [73] - 15:12, 22:14, 36:7, 41:5, 59:25, 62:20, 73:7, 73:22, 75:7, 76:25, 83:22, 91:19, 93:13, 96:9, 97:6, 97:10, 97:12, 98:7, 99:11, 101:9, 102:5, 102:8, 102:24, 105:8, 107:1, 108:1, 116:4, 120:21, 121:22, 122:12, 124:4, 124:19, 125:2, 125:24,

131:22, 142:20, 143:16, 146:7, 148:10, 148:24, 149:1, 152:12, 154:2, 154:10, 157:13, 161:23, 162:1, 164:15, 165:20, 165:23, 166:2, 167:6, 167:10, 167:14, 167:17, 168:15, 174:8, 174:12, 182:18, 186:19, 190:20, 191:13, 192:20, 197:20, 198:1, 201:5, 211:23, 214:18, 214:20, 216:2, 218:17, 220:8, 220:23

**correction** [2] - 60:21, 220:7

**corrections** [2] - 220:3, 220:13, 223:9

**correlating** [1] - 7:22

**corresponds** [1] - 106:23

**corroborate** [1] - 150:7

**corroborating** [3] - 146:18, 167:3, 167:15

**Cortez** [12] - 26:10, 26:17, 30:20, 30:23, 31:11, 50:21, 82:14, 82:20, 83:21, 84:8, 84:15, 112:20

**costal** [2] - 145:7, 145:9

**counsel** [4] - 4:14, 54:3, 222:12, 222:14

**count** [2] - 165:14, 165:18

**COUNTY** [2] - 222:2, 223:2

**couple** [12] - 6:13, 6:21, 16:4, 18:2, 25:4, 25:14, 25:22, 29:16, 71:16, 95:4, 125:22, 220:3

**course** [2] - 59:23, 101:18

**Course** [1] - 211:8

**COURT** [1] - 1:1

**Court** [1] - 4:8

**court** [1] - 40:21

**cousin** [2] - 12:4,

12:8
  **cousin's** [1] - 119:11
  **created** [1] - 68:12
  **crime** [36] - 16:10, 16:18, 16:24, 35:11, 35:14, 45:9, 46:3, 47:2, 47:18, 47:19, 47:22, 49:21, 49:23, 49:25, 50:9, 50:12, 59:12, 71:3, 95:18, 117:5, 165:14, 165:15, 165:19, 180:11, 181:16, 181:17, 181:21, 182:5, 183:13, 183:21, 187:15, 190:15, 192:7, 212:21, 213:2, 213:5
  **Crime** [2] - 3:17, 3:18
  **crimes** [20] - 14:24, 14:25, 15:2, 16:8, 16:10, 16:21, 17:1, 17:4, 17:5, 17:7, 17:10, 17:11, 17:12, 17:20, 35:12, 68:25, 176:9
  **criminal** [7] - 153:12, 153:25, 166:3, 173:3, 176:7, 195:21, 198:12
  **Criminal** [5] - 14:1, 85:6, 85:9, 88:15, 98:22
  **cross** [1] - 60:19
  **cross-outs** [1] - 60:19
  **crossed** [1] - 130:7
  **crying** [2] - 169:1, 169:4
  **curious** [1] - 72:5
  **current** [1] - 213:21
  **curriculum** [1] - 211:3
  **Curriculum.....** [1] - 3:21
  **custodial** [12] - 28:19, 44:9, 62:7, 90:11, 94:15, 94:23, 95:1, 96:16, 99:9, 106:24, 108:4, 117:4
  **custody** [19] - 88:21, 89:3, 89:21, 93:10, 110:25, 111:8, 111:12,

112:14, 112:22, 112:24, 114:12, 114:15, 114:25, 116:25, 120:2, 120:4, 140:9, 140:18, 140:25
  **cut** [10] - 52:4, 96:2, 119:6, 119:22, 121:3, 158:9, 158:16, 158:19, 175:5, 179:5
  **cutting** [2] - 119:21, 164:14

# D

**DA** [1] - 148:25
  **DA's** [4] - 11:1, 40:19, 191:18, 195:13
  **Dahmer** [1] - 209:14
  **Databank** [4] - 184:8, 184:13, 184:23, 204:2
  **date** [7] - 4:4, 12:13, 14:11, 50:24, 91:6, 110:23, 133:12
  **dated** [7] - 67:16, 89:8, 106:2, 144:15, 149:6, 180:16, 182:6
  **Dated** [1] - 223:12
  **days** [15] - 83:11, 84:19, 89:12, 123:10, 123:13, 123:16, 123:17, 123:18, 123:24, 133:17, 151:3
  **dead** [2] - 19:20, 119:20
  **death** [7] - 87:10, 87:16, 87:19, 91:21, 120:25, 121:7, 121:19
  **Debra** [4] - 202:6, 202:12, 205:15, 205:16
  **deceased** [1] - 19:1
  **deception** [4] - 109:3, 115:4, 115:11, 115:18
  **decide** [2] - 21:22, 22:10
  **decided** [8] - 28:23, 89:20, 90:13, 92:9, 93:21, 159:11, 170:7, 204:14
  **decision** [8] - 29:3, 29:10, 92:7,

151:6, 151:8, 154:7, 165:1
  **decisions** [1] - 29:4
  **defendant** [2] - 165:15, 165:19
  **defendant's** [1] - 172:25
  **Defendants** [2] - 1:10, 2:7
  **defendants** [2] - 4:23, 6:22
  **define** [2] - 19:17, 49:15
  **defined** [3] - 49:5, 49:7, 49:9
  **definitely** [1] - 33:15
  **degree** [1] - 165:13
  **deletions** [1] - 60:19
  **demonstrate** [2] - 173:20, 174:10
  **denials** [2] - 101:13, 103:24
  **denied** [11] - 53:7, 85:20, 85:22, 86:1, 91:13, 91:16, 107:23, 124:22, 124:25, 142:3, 148:7
  **Denise** [1] - 209:21
  **deny** [3] - 136:21, 140:3, 173:11
  **denying** [2] - 119:24, 172:13
  **dep** [1] - 168:8
  **Department** [26] - 3:17, 3:18, 3:20, 11:18, 12:7, 12:11, 18:11, 34:8, 35:7, 41:8, 43:6, 44:23, 62:6, 63:22, 68:12, 77:10, 98:22, 156:19, 180:11, 182:17, 185:10, 193:5, 193:21, 194:9, 209:1, 210:1
  **department** [8] - 12:2, 37:12, 87:17, 87:19, 88:7, 181:23, 185:11, 194:24
  **Department's** [2] - 43:21, 44:4
  **department-issued** [1] - 37:12
  **deposed** [2] - 5:7, 19:4
  **deposition** [44] -

4:5, 4:6, 4:10, 5:21, 8:16, 9:15, 9:24, 22:15, 25:15, 31:1, 33:21, 55:25, 56:1, 56:15, 56:16, 56:21, 56:25, 57:25, 63:21, 65:13, 67:11, 78:21, 79:1, 81:19, 82:1, 90:5, 90:16, 98:9, 98:14, 105:18, 106:6, 113:10, 125:23, 127:23, 147:21, 148:15, 155:22, 163:13, 169:8, 180:10, 182:4, 199:9, 210:22, 222:8
  **Deposition** [1] - 3:6
  **describe** [11] - 14:21, 19:18, 53:1, 53:9, 58:18, 60:8, 86:7, 126:10, 168:24, 171:20, 172:4
  **described** [2] - 61:15, 82:15
  **DESCRIPTION** [1] - 224:2
  **deserved** [3] - 85:25, 91:18, 93:2
  **designated** [24] - 56:15, 63:20, 65:13, 67:8, 78:20, 78:25, 81:19, 90:4, 98:14, 105:14, 105:18, 112:4, 127:22, 147:20, 148:15, 156:14, 163:12, 180:9, 186:11, 199:9, 200:13, 203:5, 210:21
  **designating** [1] - 98:9
  **designation** [3] - 67:10, 129:16, 186:11
  **destroy** [1] - 41:13
  **destroyed** [2] - 38:5, 41:11
  **Det** [1] - 183:9
  **detail** [1] - 46:1
  **detailed** [2] - 27:18, 89:5
  **details** [4] - 45:8, 102:22, 170:16, 170:18
  **detected** [1] - 108:15
  **Detective** [43] -

8:8, 8:9, 9:1, 9:11, 9:12, 54:25, 55:6, 67:15, 79:3, 124:14, 125:1, 135:22, 137:21, 137:24, 155:23, 156:7, 157:21, 157:25, 159:9, 159:10, 159:23, 160:3, 160:12, 160:17, 160:21, 161:12, 161:16, 172:9, 176:15, 177:25, 199:16, 199:17, 199:19, 199:24, 199:25, 200:16, 200:25, 202:8, 202:23, 203:7, 211:21
  **detective** [54] - 13:12, 13:15, 13:18, 13:20, 14:3, 15:18, 18:11, 20:1, 34:7, 34:9, 34:11, 34:13, 35:6, 35:18, 35:23, 36:1, 36:8, 36:18, 37:6, 37:9, 37:11, 37:16, 38:8, 39:24, 40:2, 40:9, 41:4, 42:6, 43:9, 44:17, 44:22, 58:22, 60:6, 61:17, 61:20, 62:5, 63:7, 63:19, 64:19, 72:11, 109:24, 125:14, 152:20, 160:5, 181:24, 185:22, 187:7, 192:15, 194:8, 201:7, 206:6, 209:14, 212:2, 212:3
  **detectives** [29] - 7:3, 7:4, 7:17, 7:24, 8:2, 9:6, 16:10, 20:24, 21:18, 22:9, 37:19, 38:23, 39:12, 43:13, 44:12, 54:24, 55:11, 55:18, 57:12, 58:11, 68:23, 103:15, 126:16, 181:19, 181:24, 193:5, 200:1, 207:1, 207:16
  **determine** [5] - 46:16, 46:25, 47:16, 48:22, 49:22
  **determined** [1] - 21:16
  **determining** [1] - 101:12

**DeValkenaere**
[51] - 6:9, 6:11,
18:17, 18:22, 19:7,
20:13, 21:11,
21:21, 23:16,
23:23, 27:9, 27:17,
28:23, 30:16,
30:22, 32:12,
54:23, 55:21,
57:11, 58:9, 58:10,
66:7, 66:12, 70:14,
72:1, 81:22, 82:5,
82:18, 83:2, 83:14,
83:20, 84:5, 84:20,
85:16, 87:13,
90:10, 103:4,
107:9, 116:19,
123:23, 138:10,
139:6, 139:19,
141:15, 147:25,
154:12, 172:10,
174:25, 175:7,
175:17, 175:20
**DeValkenaere's**
[2] - 95:10, 106:20
**developed** [3] -
167:8, 184:3,
184:14
**device** [1] -
164:14
**diabetics** [1] -
62:12
**diagram** [2] -
128:10, 128:12
**dictate** [2] - 36:9,
36:18
**dictated** [3] -
35:24, 36:23,
59:21
**died** [1] - 86:9
**different** [7] -
11:22, 11:23,
60:10, 192:16,
192:17, 192:19,
214:21
**difficult** [1] -
170:12
**direct** [2] - 43:21,
43:22
**direction** [1] -
222:10
**directives** [1] -
43:22
**directly** [3] -
178:21, 191:16,
222:15
**disagree** [1] -
201:3
**disclose** [1] -
210:2
**discovery** [1] -
180:24
**discussion** [1] -

197:23
**Discussion** [1] -
56:4
**disorder** [4] -
136:12, 136:22,
136:25, 137:10
**displayed** [1] -
93:5
**displaying** [1] -
88:17
**Disposition** [1] -
3:22
**dispute** [1] -
101:6
**district** [8] -
10:12, 10:17,
10:19, 11:9, 53:20,
189:17, 189:20,
191:15
**DISTRICT** [2] -
1:1, 1:2
**District** [3] - 4:8,
4:9, 148:22
**Division** [1] - 91:4
**division** [2] -
13:11, 14:3
**DNA** [43] - 67:19,
70:23, 72:7, 73:5,
73:9, 73:17, 73:25,
76:19, 178:2,
178:7, 178:13,
178:14, 183:25,
184:1, 184:8,
184:13, 184:22,
185:20, 186:12,
187:6, 187:9,
187:22, 188:2,
191:24, 191:25,
192:6, 194:17,
194:21, 194:23,
195:8, 196:7,
197:1, 197:8,
197:19, 202:15,
203:25, 204:2,
204:18, 214:2,
215:5, 215:24
**document** [5] -
7:6, 27:10, 56:24,
67:21, 106:1
**documentation**
[1] - 155:20
**documented** [9] -
83:13, 116:2,
117:21, 120:19,
137:6, 137:14,
137:16, 171:15,
185:15
**documenting** [9]
- 8:7, 66:11, 67:17,
79:7, 99:1, 112:12,
168:13, 200:20,
203:10
**documents** [9] -
6:23, 6:25, 9:12,

25:8, 25:10, 25:13,
25:21, 82:4, 83:19
**Domhgalski** [1] -
22:18
**done** [10] - 19:22,
29:17, 29:18, 30:9,
32:22, 61:2, 87:8,
115:23, 164:22,
173:18
**DONNELL** [79] -
2:2, 4:17, 4:18,
5:4, 56:6, 56:12,
56:13, 63:18,
65:11, 67:6, 70:13,
74:16, 77:5, 78:23,
81:17, 87:7, 88:4,
90:3, 94:3, 94:13,
97:14, 97:22,
98:12, 105:1,
105:7, 105:9,
105:16, 107:4,
111:17, 113:4,
113:17, 113:18,
113:21, 125:4,
125:12, 125:13,
127:21, 130:17,
132:8, 132:10,
132:13, 140:12,
140:15, 141:12,
144:12, 147:19,
148:13, 150:11,
150:16, 150:21,
153:19, 156:12,
158:14, 159:17,
160:2, 163:11,
179:25, 180:2,
180:7, 181:22,
191:20, 191:22,
199:3, 199:5,
199:7, 200:12,
201:22, 203:4,
205:23, 206:5,
210:20, 217:17,
217:22, 218:3,
218:7, 218:8,
218:24, 221:3,
221:7
**Donnell** [1] - 4:18
**Donnell's** [1] -
219:9
**Donnell.............
.................** [1] -
3:3
**door** [1] - 91:25
**dorsum** [1] -
145:12
**double** [1] - 62:21
**doubt** [1] - 24:4
**down** [20] - 26:18,
33:9, 38:14, 51:18,
57:5, 58:14,
126:17, 129:6,
130:15, 130:16,
158:23, 164:4,

168:16, 175:15,
175:21, 202:20,
202:21, 203:12,
208:18, 208:20
**draw** [1] - 129:19
**dressed** [1] - 80:3
**drew** [2] - 128:23,
131:6
**drive** [1] - 113:25
**dropped** [1] -
27:5
**drove** [10] - 27:4,
57:11, 58:11,
113:5, 113:23,
118:2, 119:9,
119:10, 122:7
**drug** [5] - 31:25,
76:11, 76:13,
81:10, 119:14
**drug-sale** [1] -
119:14
**Dubis** [4] - 54:25,
55:7, 124:14,
125:1
**due** [1] - 104:8
**Due** [1] - 88:13
**duly** [1] - 5:1
**During** [1] -
160:11
**during** [26] - 6:20,
9:13, 9:21, 16:2,
17:1, 18:10, 23:16,
26:7, 26:19, 32:22,
35:22, 53:3, 81:2,
94:6, 100:9,
100:21, 108:7,
117:3, 123:23,
139:16, 139:24,
140:17, 162:14,
171:5, 172:7,
177:24
**duties** [1] - 210:2
**duty** [2] - 15:4,
15:5

**E**

**e-mailing** [1] -
56:7
**early** [3] - 76:23,
111:25, 199:25
**easiest** [1] -
142:24
**East** [1] - 2:6
**Eastern** [1] - 4:8
**EASTERN** [1] -
1:2
**easy** [1] - 170:11
**education** [2] -
135:13, 171:5
**effect** [1] - 126:25
**effort** [2] - 46:24,
68:13
**efforts** [3] -

46:16, 50:20,
70:20
**EHLING** [1] - 4:22
**either** [12] - 30:5,
32:2, 46:17, 47:1,
60:24, 115:23,
134:3, 192:23,
197:2, 197:12,
215:17, 218:2
**elicit** [1] - 170:22
**elimination** [1] -
187:3
**Ellis** [22] - 62:24,
63:1, 63:6, 63:11,
63:13, 64:8, 64:18,
64:22, 193:2,
193:6, 193:10,
193:14, 193:16,
193:21, 194:19,
195:22, 195:25,
196:6, 197:12,
197:24, 198:14,
205:8
**Ellis's** [4] -
194:21, 197:1,
197:8, 197:18
**emotional** [6] -
168:18, 168:22,
169:4, 171:22,
171:24, 172:4
**employed** [3] -
10:11, 10:16,
10:22
**employee** [2] -
222:12, 222:13
**employment** [1] -
11:17
**end** [9] - 19:20,
58:22, 59:14,
60:23, 61:5, 71:20,
133:18, 171:12,
171:15
**ended** [5] - 26:17,
26:23, 31:24,
92:13, 106:16
**ending** [1] - 220:5
**Enforcement** [1] -
211:7
**engaged** [1] -
92:16
**entire** [2] - 41:7,
166:24
**entirely** [1] -
87:23
**Eric** [27] - 20:17,
21:21, 23:19,
54:24, 55:6, 67:16,
70:21, 72:2, 72:6,
72:16, 73:1, 73:11,
73:13, 73:15,
73:23, 74:17, 75:5,
75:18, 75:22,
76:17, 76:23,
77:16, 78:3, 80:18,

124:11, 124:22,
127:7
**establish** [1] -
141:2
**established** [1] -
141:3
**et** [1] - 1:8
**evaluation** [1] -
103:21
**evening** [1] -
112:1
**event** [1] - 170:7
**events** [3] -
24:19, 24:21,
24:24
**eventually** [5] -
17:5, 27:4, 113:5,
124:17, 147:9
**evidence** [38] -
30:4, 30:6, 30:7,
32:7, 45:22, 51:24,
67:18, 71:3, 72:13,
80:21, 80:25, 81:4,
81:10, 142:18,
144:6, 145:4,
146:4, 146:18,
150:2, 150:7,
150:24, 152:18,
155:13, 162:8,
162:13, 162:16,
166:25, 167:3,
167:7, 167:15,
173:4, 173:21,
174:11, 187:9,
196:7, 210:9,
215:22, 217:24
**Evidence** [2] -
144:24, 145:2
**evidentiary** [12] -
184:12, 184:16,
184:21, 184:23,
185:2, 185:3,
186:4, 186:9,
190:16, 190:18,
191:25, 197:10
**exactly** [1] -
147:10
**exam** [1] - 109:16
**Examination** [3] -
3:2, 3:10, 3:14
**EXAMINATION**
[2] - 5:3, 219:4
**examination** [27]
- 1:13, 98:24, 99:2,
99:23, 101:19,
103:1, 103:20,
104:15, 107:18,
108:7, 108:11,
108:13, 108:20,
109:8, 109:13,
109:22, 110:13,
116:1, 155:18,
155:21, 156:2,
156:6, 156:19,

156:20, 157:22,
158:1, 158:16
**examined** [2] -
5:2, 157:3
**Examiner** [2] -
103:2, 156:20
**examiner** [14] -
33:17, 51:25,
62:15, 99:14,
102:21, 103:13,
109:2, 109:8,
110:4, 110:9,
115:24, 144:14,
160:5, 162:20
**examiner's** [6] -
10:6, 33:24, 34:4,
50:7, 144:10,
146:19
**Examiner's** [1] -
3:13
**examiners** [2] -
100:3, 100:15
**examining** [1] -
103:17
**example** [1] -
45:19
**except** [2] -
133:3, 223:9
**excluded** [2] -
186:16, 187:14
**exculpatory** [8] -
210:2, 210:6,
214:7, 214:10,
215:5, 215:8,
215:14, 215:25
**excuse** [1] -
131:16
**executed** [1] -
162:4
**Exhibit** [169] - 3:6,
3:7, 3:7, 3:8, 3:8,
3:9, 3:9, 3:10,
3:10, 3:11, 3:11,
3:12, 3:12, 3:13,
3:13, 3:14, 3:14,
3:15, 3:15, 3:16,
3:17, 3:18, 3:19,
3:19, 3:20, 3:20,
56:1, 56:5, 56:15,
56:16, 63:15,
63:17, 63:20,
63:21, 64:6, 65:9,
65:10, 65:13,
65:14, 65:17,
66:11, 67:4, 67:5,
67:8, 68:8, 70:6,
70:16, 73:5, 74:5,
76:17, 78:20,
78:22, 78:25,
81:15, 81:16,
81:19, 81:20, 83:5,
83:6, 83:13, 83:19,
84:3, 86:5, 89:15,
90:1, 90:2, 90:5,

90:19, 92:4, 98:9,
98:11, 98:14,
98:15, 98:21, 99:9,
105:14, 105:15,
105:18, 106:9,
106:12, 106:25,
107:3, 107:6,
110:17, 112:4,
117:18, 117:20,
127:18, 127:20,
127:24, 128:16,
129:1, 133:2,
133:25, 134:17,
142:25, 143:24,
144:1, 144:9,
144:11, 144:14,
147:16, 147:18,
147:21, 148:12,
148:15, 148:17,
148:18, 156:11,
156:18, 157:6,
157:17, 157:19,
160:10, 163:9,
163:10, 163:13,
165:7, 165:9,
169:9, 180:6,
180:9, 180:10,
181:2, 182:2,
182:3, 182:13,
182:19, 182:25,
183:2, 183:16,
183:17, 183:21,
185:15, 186:8,
186:23, 186:24,
189:10, 189:22,
190:4, 190:5,
190:12, 190:22,
191:2, 199:6,
199:9, 200:10,
200:11, 200:14,
203:2, 203:3,
203:6, 210:18,
210:19, 210:22,
210:23, 211:15,
212:10, 219:6
**exhibit** [3] -
63:25, 67:10,
127:18
**Exhibits** [7] - 3:5,
3:22, 96:22, 107:6,
127:23, 156:14,
214:3
**existed** [1] -
31:12
**existence** [2] -
19:25, 20:6
**existing** [1] -
23:10
**exonerate** [1] -
210:10
**expect** [1] -
115:24
**Expires** [2] -
222:24, 223:24

**explain** [3] -
111:7, 120:7,
215:13
**explained** [1] -
79:25
**explanation** [1] -
86:13
**expressing** [1] -
150:22
**extent** [1] - 198:2
**extra** [1] - 152:23
**eyewitnesses** [3]
- 142:15, 150:5,
167:18

# F

**Fabian** [2] -
204:4, 204:14
**fabricated** [1] -
217:6
**face** [4] - 144:4,
144:7, 146:6,
146:17
**fact** [16] - 45:13,
48:3, 48:8, 48:20,
83:1, 86:11, 86:16,
87:14, 87:18,
87:23, 88:16,
146:16, 187:18,
189:4, 193:24,
194:20
**facts** [16] - 31:18,
44:25, 45:5, 46:9,
46:17, 46:25, 47:4,
47:17, 49:16,
49:18, 49:20,
49:24, 50:1, 117:7,
117:11, 161:21
**failed** [1] - 115:3
**fair** [25] - 5:13,
5:14, 14:17, 20:22,
22:8, 29:20, 35:22,
37:3, 48:12, 55:9,
76:16, 101:3,
102:25, 108:18,
115:2, 115:9,
122:3, 123:22,
142:2, 142:14,
147:3, 160:3,
179:7, 189:23,
214:16
**faith** [3] - 173:23,
173:24, 174:2
**false** [2] - 49:18,
217:6
**familiar** [1] -
31:16
**families** [1] -
61:13
**family** [4] - 12:1,
12:6, 63:9, 84:9
**far** [3] - 96:22,
100:23, 101:3

**Farrior** [6] -
75:25, 179:13,
200:21, 201:1,
202:4, 205:13
**fatal** [3] - 16:11,
16:12, 16:24
**fault** [1] - 47:13
**FBI** [1] - 67:18
**features** [2] -
69:4, 69:16
**February** [1] -
203:20
**Federal** [1] - 1:15
**feelings** [2] -
216:14, 217:25
**fellow** [1] -
192:15
**female** [2] - 64:8,
64:11
**few** [2] - 64:16,
73:19
**field** [3] - 37:6,
40:15, 40:16
**fighting** [1] -
158:22
**figure** [3] - 46:20,
82:20, 83:21
**file** [40] - 31:11,
34:5, 34:6, 38:21,
38:22, 38:25, 39:2,
39:8, 39:13, 39:18,
39:20, 39:23,
39:25, 40:1, 40:3,
40:5, 40:6, 40:8,
40:18, 40:24, 50:8,
50:10, 59:22, 64:3,
64:24, 65:1, 65:15,
79:5, 79:13, 90:7,
98:16, 144:25,
147:22, 148:17,
182:12, 182:13,
199:13
**filed** [2] - 7:4,
39:11
**files** [2] - 40:3,
40:14
**final** [1] - 165:1
**financially** [1] -
222:14
**fine** [3] - 5:6,
56:11, 218:6
**fingerprints** [1] -
162:16
**finish** [1] - 18:5
**finished** [1] - 18:4
**fire** [2] - 41:19,
41:20
**first** [47] - 5:1,
7:6, 8:14, 12:14,
15:1, 15:3, 15:13,
15:20, 15:21, 16:2,
19:25, 20:5, 20:10,
20:19, 21:10,

21:14, 28:25, 31:3, 39:5, 39:18, 56:1, 60:12, 66:6, 68:4, 72:22, 82:17, 83:24, 85:15, 92:8, 93:7, 93:24, 96:13, 102:11, 107:5, 108:2, 126:14, 133:16, 149:9, 165:13, 168:12, 170:5, 178:9, 179:18, 180:8, 203:23, 207:6, 211:5

**first-degree** [1] - 165:13

**Fischer** [2] - 18:18, 18:23

**five** [6] - 23:24, 123:13, 123:17, 138:18, 138:24, 161:5

**Floor** [1] - 2:3

**floor** [2] - 99:25, 100:1

**Florence** [5] - 179:24, 179:25, 180:3, 199:10, 200:7

**flowed** [1] - 169:19

**follow** [21] - 19:23, 29:17, 30:13, 30:16, 59:1, 60:11, 122:10, 155:4, 164:25, 185:23, 187:5, 188:3, 188:6, 188:24, 189:25, 191:3, 192:5, 204:12, 206:7, 207:20, 219:2

**follow-up** [14] - 19:23, 29:17, 30:13, 59:1, 122:10, 155:4, 164:25, 187:5, 188:24, 189:25, 191:3, 192:5, 204:12, 206:7

**followed** [6] - 30:4, 143:23, 149:17, 185:16, 187:1, 187:2

**following** [4] - 107:10, 149:13, 151:3, 207:21

**follows** [1] - 5:2

**FOR** [1] - 1:2

**force** [1] - 140:1

**foregoing** [1] - 223:5

**forestry** [2] - 76:2, 76:6

---

**forget** [2] - 12:23, 43:19

**forgetting** [1] - 72:17

**forgive** [2] - 122:18, 209:13

**forgot** [4] - 14:12, 182:11, 209:18, 209:25

**form** [1] - 63:25

**former** [2] - 18:25, 193:20

**forth** [4] - 92:5, 143:11, 170:15, 170:19

**forward** [3] - 26:9, 28:8, 175:24

**forwarded** [1] - 189:16

**foundation** [17] - 74:13, 77:4, 87:4, 88:2, 94:10, 105:6, 111:10, 140:11, 141:9, 150:9, 150:14, 150:19, 159:14, 159:25, 181:20, 191:19, 201:21

**four** [11] - 10:14, 18:3, 20:23, 23:24, 56:21, 72:16, 101:17, 102:7, 123:17, 164:10, 194:3

**four-inch** [1] - 164:10

**fourth** [3] - 8:23, 99:25, 220:7

**frame** [2] - 81:2, 123:24

**free** [2] - 112:23, 114:5

**frequently** [1] - 149:2

**Friday** [1] - 82:4

**friend** [2] - 66:20, 83:17

**friends** [1] - 192:23

**friendship** [2] - 76:14

**front** [4] - 79:21, 112:4, 117:23, 163:25

**fully** [1] - 10:24

**functioning** [1] - 61:22, 62:3, 135:15

**fundamentals** [1] - 212:19

**furniture** [2] - 139:15, 139:23

---

## G

**Galena** [1] - 92:1

**Gary** [8] - 18:16, 19:10, 20:15, 21:21, 23:19, 72:20, 72:21

**gash** [1] - 164:10

**Gauthier** [2] - 100:6, 102:12

**Gayan** [2] - 8:8, 8:16

**gears** [1] - 175:23

**Gehling** [2] - 4:21, 6:5

**gehling** [2] - 6:11, 6:21

**GEHLING** [40] - 2:6, 4:20, 56:10, 74:13, 77:4, 87:4, 88:2, 94:1, 94:10, 104:24, 105:5, 111:10, 113:3, 113:15, 113:20, 130:15, 132:5, 132:9, 132:12, 140:11, 141:9, 150:9, 150:14, 150:19, 153:16, 158:13, 159:14, 159:25, 179:24, 181:20, 191:19, 199:4, 201:21, 217:11, 217:20, 217:23, 218:6, 219:5, 220:25, 221:6

**Gehling's** [1] - 6:17

**Gehling..............**
**..................** [1] - 3:4

**general** [9] - 15:3, 15:5, 39:21, 43:19, 47:7, 47:8, 47:9, 47:14, 60:4

**generally** [3] - 45:12, 46:19, 58:18

**George** [1] - 202:18

**Gilbert** [4] - 192:9, 192:11, 192:14, 192:25

**Giles** [11] - 66:23, 67:1, 67:2, 78:15, 79:9, 79:18, 79:24, 80:6, 80:8, 80:9, 80:23

**girl** [25] - 4:22, 26:11, 26:12, 26:21, 26:25, 27:3, 85:23, 85:25, 86:7, 87:24, 91:17,

---

91:18, 91:22, 92:25, 93:2, 95:24, 117:23, 118:14, 119:3, 119:19, 119:20, 158:22, 159:1, 160:13, 160:17

**girl's** [3] - 158:9, 158:17, 158:20

**girls** [2] - 95:7, 95:11

**given** [16] - 8:18, 34:20, 34:23, 35:1, 36:20, 38:6, 61:19, 93:8, 97:3, 105:3, 166:15, 172:9, 178:20, 194:12, 212:16, 213:1

**glass** [1] - 110:2

**golf** [1] - 19:13

**grade** [1] - 91:3

**green** [1] - 51:10

**Griffin** [1] - 198:20

**groin** [1] - 145:15

**group** [1] - 76:14

**groups** [2] - 76:11, 76:13

**guardian** [1] - 94:6

**guardian's** [1] - 104:23

**guess** [7] - 11:7, 26:12, 29:12, 83:12, 126:9, 196:17, 207:13

**guessing** [1] - 196:13

**guilt** [1] - 218:1

**guilty** [7] - 216:18, 216:19, 216:22, 216:23, 216:25, 217:10, 218:10

**guy** [3] - 76:3, 91:24, 195:7

**guys** [15] - 72:9, 84:23, 90:12, 92:9, 96:15, 110:5, 113:2, 113:5, 124:17, 176:4, 176:20, 176:23, 177:1, 177:18, 204:9

**Gwin** [141] - 9:18, 9:21, 25:2, 25:14, 25:18, 26:5, 26:7, 26:18, 27:8, 27:19, 27:21, 27:22, 28:2, 28:11, 28:13, 28:18, 50:3, 50:18, 54:12, 54:14, 55:21, 57:11,

---

58:11, 73:20, 74:11, 84:13, 84:16, 84:21, 84:23, 85:5, 85:7, 85:8, 85:12, 85:16, 85:20, 86:6, 86:10, 88:15, 88:24, 89:3, 89:13, 89:17, 89:23, 90:12, 90:20, 91:9, 92:6, 92:20, 94:24, 95:2, 95:15, 95:23, 96:4, 96:12, 97:2, 97:25, 98:4, 99:2, 99:10, 100:25, 101:1, 101:7, 101:11, 102:6, 102:25, 103:8, 103:23, 107:10, 107:20, 107:22, 108:10, 108:19, 109:21, 110:18, 111:18, 112:1, 112:6, 112:13, 113:5, 113:23, 113:25, 114:3, 114:23, 115:2, 115:6, 116:2, 116:5, 116:10, 116:14, 116:20, 116:24, 117:4, 117:7, 117:12, 117:21, 118:2, 118:21, 119:1, 119:5, 119:9, 119:14, 119:17, 119:24, 120:15, 120:23, 121:8, 121:20, 122:1, 122:6, 123:3, 141:13, 141:25, 146:23, 147:1, 149:21, 149:24, 150:12, 150:25, 151:12, 151:17, 151:23, 152:8, 152:16, 153:4, 153:5, 153:14, 154:3, 154:8, 154:12, 155:14, 165:22, 166:18, 166:20, 166:21, 166:22, 167:13, 173:2, 173:5, 186:13, 189:2

**Gwin's** [10] - 84:21, 104:18, 105:3, 110:25, 142:11, 146:24, 154:1, 166:25, 172:8, 218:19

---

## H

**Hadaway** [180] -

4:7, 4:19, 7:5,
7:13, 7:16, 7:23,
8:18, 9:10, 25:3,
26:21, 26:24, 27:2,
53:19, 53:25, 54:1,
54:3, 54:8, 54:23,
55:4, 55:12, 55:13,
55:23, 57:13,
73:21, 74:12,
96:24, 97:8, 116:6,
116:11, 116:16,
117:22, 121:16,
122:13, 122:21,
124:3, 124:7,
124:21, 125:17,
126:3, 126:8,
126:12, 127:3,
127:25, 130:9,
133:3, 133:12,
133:18, 133:19,
134:11, 135:3,
135:12, 135:20,
135:24, 136:6,
136:11, 136:14,
136:19, 136:21,
137:9, 137:18,
138:3, 138:10,
138:16, 138:22,
139:3, 139:7,
139:13, 139:20,
139:24, 140:1,
140:3, 140:8,
141:6, 141:8,
141:16, 141:20,
142:3, 142:8,
142:15, 142:19,
142:21, 143:3,
143:6, 143:14,
144:2, 146:9,
146:25, 147:4,
147:7, 147:14,
148:5, 149:18,
149:22, 149:24,
150:1, 150:17,
150:18, 150:25,
151:2, 151:8,
151:12, 151:17,
151:24, 152:8,
152:10, 152:17,
153:1, 153:7,
153:10, 154:19,
155:2, 155:10,
155:14, 155:17,
156:21, 157:2,
157:8, 158:1,
158:3, 158:8,
158:19, 159:23,
160:21, 161:3,
161:8, 161:13,
161:17, 161:20,
165:19, 166:15,
167:11, 167:19,
167:23, 168:2,
168:13, 168:17,

168:22, 169:13,
170:2, 170:15,
170:22, 171:2,
171:4, 171:8,
171:11, 171:19,
171:25, 172:3,
172:7, 173:4,
173:15, 174:21,
174:25, 175:4,
175:9, 175:11,
175:14, 175:17,
175:20, 186:14,
189:3, 206:9,
207:15, 207:17,
207:24, 215:6,
215:9, 215:15,
215:23, 216:19,
216:22, 217:4,
217:14, 218:14,
218:15, 219:17,
220:2
   **HADAWAY** [1] -
1:4
   **Hadaway's** [19] -
7:1, 7:6, 9:4, 25:5,
27:5, 27:13, 27:15,
128:14, 128:18,
130:22, 131:2,
133:13, 140:21,
155:21, 167:1,
171:15, 174:14,
220:11, 220:22
   **HADAWAY
38631** [1] - 199:12
   **HADAWAY
38647** [1] - 67:9
   **hair** [1] - 200:1
   **half** [2] - 90:25,
160:10
   **hand** [12] - 56:14,
64:14, 105:13,
107:5, 145:13,
161:25, 164:7,
171:21, 181:5,
182:3, 222:17
   **handed** [2] -
105:17, 127:22
   **handing** [16] -
63:19, 65:12, 67:7,
78:24, 81:18, 90:4,
98:13, 144:13,
148:14, 156:13,
163:12, 180:8,
199:8, 200:13,
203:5, 210:21
   **handle** [2] -
61:20, 62:11
   **hands** [2] - 52:6,
160:16
   **handwriting** [19] -
7:9, 61:4, 106:19,
125:20, 127:25,
128:13, 128:14,
128:17, 129:2,

129:13, 129:23,
130:1, 130:19,
132:15, 133:3,
181:2, 181:7,
181:10, 219:16
   **Handwritten** [4] -
3:10, 3:11, 3:12,
3:15
   **handwritten** [14] -
7:7, 7:19, 7:23,
9:9, 55:5, 96:5,
105:20, 107:8,
110:22, 125:19,
127:24, 157:7,
171:16, 219:12
   **HANSEN** [1] -
2:10
   **Hansen** [1] - 4:12
   **happy** [3] - 5:9,
5:16, 152:6
   **hard** [3] - 123:20,
169:20, 170:2
   **Harris** [2] -
205:15, 205:16
   **head** [2] - 160:16,
199:4
   **hear** [6] - 19:2,
19:5, 46:14, 47:25,
48:1, 116:19
   **heard** [3] - 43:3,
62:25, 91:24
   **hearing** [2] - 59:9,
193:16
   **HEATHER** [1] -
2:2
   **Heather** [1] - 4:17
   **Hein** [6] - 8:9, 9:2,
9:12, 192:21,
193:1
   **held** [3] - 85:24,
114:12, 160:16
   **help** [1] - 158:23
   **helps** [1] - 46:3
   **hereby** [2] -
222:7, 223:4
   **herein** [1] - 5:1
   **hereunder** [1] -
222:16
   **Hernandez** [3] -
192:9, 192:11,
192:14
   **herself** [2] - 81:2,
187:24
   **High** [1] - 91:4
   **himself** [5] -
72:11, 153:23,
173:3, 206:10,
207:24
   **hired** [1] - 12:14
   **history** [1] - 11:17
   **hit** [5] - 204:1,
204:18, 204:20,
205:2

   **hm** [12] - 19:6,
64:20, 79:6,
105:23, 144:17,
183:23
   **hm-hm** [6] - 19:6,
64:20, 79:6,
105:23, 144:17,
183:23
   **hold** [9] - 111:13,
111:19, 111:22,
111:23, 113:13,
140:24, 141:5,
141:7, 158:23
   **holding** [2] -
78:24, 161:25
   **holdup** [1] - 17:16
   **home** [16] -
57:11, 58:11,
66:22, 81:10,
112:23, 113:1,
113:2, 113:5,
113:23, 113:25,
114:5, 114:7,
122:7, 163:6,
164:13, 164:18
   **homicide** [166] -
10:4, 14:25, 15:9,
15:14, 15:18,
15:21, 16:2, 16:14,
17:23, 17:25, 18:1,
18:4, 18:5, 20:7,
21:7, 24:8, 24:12,
24:25, 26:8, 28:15,
28:24, 29:7, 29:23,
30:17, 31:3, 31:19,
31:22, 32:13,
32:14, 34:1, 37:8,
37:11, 39:24, 40:9,
44:17, 44:22,
44:25, 45:8, 45:20,
46:10, 47:6, 47:16,
50:4, 50:13, 53:3,
58:23, 60:6, 64:3,
64:24, 65:6, 65:19,
66:15, 68:23, 69:8,
69:12, 71:6, 71:15,
73:16, 75:2, 75:9,
75:12, 75:15,
75:20, 76:20,
76:24, 78:2, 78:10,
79:13, 81:22,
88:25, 89:21, 90:7,
91:14, 92:21,
93:19, 98:16,
99:21, 99:24,
101:14, 102:22,
103:3, 107:24,
115:15, 116:7,
116:12, 116:15,
116:17, 116:22,
117:1, 117:8,
120:24, 122:4,
122:20, 122:24,
127:4, 140:4,

141:17, 142:1,
142:16, 142:19,
144:19, 148:8,
148:25, 149:3,
149:18, 150:1,
150:3, 151:18,
152:10, 152:19,
152:22, 158:6,
159:5, 160:4,
160:7, 165:13,
167:5, 174:17,
176:4, 176:13,
177:15, 177:17,
177:18, 177:19,
178:1, 178:3,
178:25, 179:13,
179:19, 181:18,
182:9, 182:16,
184:17, 185:22,
186:5, 187:7,
187:9, 187:13,
190:24, 191:5,
192:12, 192:17,
192:18, 194:2,
197:16, 197:24,
198:14, 198:16,
198:20, 198:21,
199:11, 200:7,
200:21, 201:1,
201:4, 201:7,
202:4, 202:6,
202:8, 202:12,
202:13, 202:24,
202:25, 205:9,
205:13, 205:16
   **homicides** [19] -
18:21, 19:19, 20:3,
21:1, 35:12, 68:14,
68:21, 69:3, 69:16,
179:2, 192:2,
193:25, 194:12,
195:7, 205:17,
209:2, 209:8,
209:9, 209:10
   **hopefully** [1] -
156:16
   **hoping** [1] -
170:21
   **hour** [4] - 6:15,
6:20, 168:1,
168:12
   **hours** [14] -
34:15, 34:16, 35:5,
80:1, 100:10,
100:21, 108:23,
141:2, 141:4,
211:22, 212:10,
212:18, 213:4,
213:12
   **Hours** [1] - 213:9
   **house** [22] -
26:25, 27:5, 32:1,
32:2, 32:7, 51:2,
64:12, 64:15,

80:22, 86:8, 95:4,
95:6, 96:1, 119:11,
119:20, 129:22,
130:24, 131:5,
131:16, 162:3,
162:5
**HS** [1] - 130:4
**Hueble** [1] -
209:23
**human** [1] -
212:19

**I**

**idea** [3] - 104:16,
181:8, 181:15
**Identified** [1] - 3:5
**identified** [27] -
9:10, 18:20, 22:16,
22:20, 25:21,
51:20, 52:1, 73:11,
74:19, 75:2, 75:5,
75:11, 75:14,
75:23, 75:24,
76:18, 76:20, 77:6,
79:19, 79:20,
80:17, 156:24,
187:6, 194:17,
195:8, 202:15,
204:21
**identifies** [1] -
95:10
**identify** [12] -
16:9, 18:14, 24:24,
26:16, 30:19,
30:22, 50:21,
68:13, 70:22, 72:7,
128:16, 185:20
**identifying** [9] -
33:17, 67:17,
69:12, 73:3, 73:5,
73:8, 73:15, 73:24,
77:17
**idiosyncratic** [1]
- 209:3
**Illinois** [1] - 2:3
**implicate** [3] -
116:16, 116:21,
161:9
**implicated** [9] -
116:6, 116:11,
138:17, 138:22,
142:21, 161:4,
167:4, 167:19,
173:2
**implicating** [5] -
149:25, 150:2,
150:24, 152:9,
153:22
**important** [5] -
185:15, 185:19,
185:24, 186:20,
186:25
**impression** [1] -

135:12
**IN** [1] - 1:1
**in-service** [2] -
42:20, 211:3
**In-Service** [1] -
3:21
**Inc** [2] - 1:18,
223:7
**inch** [1] - 164:10
**incident** [8] -
60:15, 82:7, 85:21,
88:17, 121:9,
127:1, 143:20,
165:12
**include** [3] -
16:21, 74:25,
134:25
**included** [2] -
16:25, 163:24
**includes** [3] -
128:4, 128:9,
211:2
**including** [1] -
189:2
**inclusive** [1] -
145:5
**incorrectly** [1] -
219:9
**incriminating** [1]
- 111:16
**inculpating** [1] -
96:23
**inculpatory** [4] -
96:22, 210:12,
210:14, 210:15
**independent** [38]
- 24:11, 24:13,
24:20, 24:25, 25:6,
26:2, 26:6, 27:7,
27:9, 28:1, 28:9,
31:17, 32:10,
39:20, 52:23, 53:1,
53:15, 53:18,
53:23, 54:7, 54:17,
54:21, 55:3, 68:18,
94:20, 98:3, 112:2,
125:15, 126:2,
126:5, 126:6,
126:10, 154:24,
156:4, 165:3,
168:21, 171:18,
189:18
**independently**
[2] - 68:19, 81:9
**indicate** [11] -
33:11, 93:8, 104:1,
114:9, 114:23,
128:19, 132:18,
149:15, 149:23,
181:13, 186:1
**indicated** [12] -
31:1, 109:3, 114:4,
115:12, 115:19,

126:20, 134:10,
145:18, 146:4,
154:22, 161:21,
162:24
**indicates** [14] -
82:13, 84:19,
90:19, 96:4, 105:2,
106:15, 118:6,
132:23, 157:2,
157:10, 165:10,
183:16, 183:24,
185:2
**indicating** [4] -
26:10, 129:19,
131:5, 185:9
**indication** [5] -
129:9, 130:18,
165:9, 165:24,
215:17
**indications** [1] -
131:17
**indirectly** [1] -
222:15
**individual** [14] -
9:20, 61:21, 78:9,
102:9, 103:7,
103:16, 108:16,
109:9, 109:25,
114:11, 134:2,
134:7, 184:2,
200:2
**individuals** [12] -
61:21, 62:8, 74:22,
74:25, 75:1, 80:17,
87:2, 94:4, 186:16,
187:12, 189:2,
206:20
**informant** [1] -
201:18
**informants** [3] -
201:7, 201:14,
201:20
**information** [57] -
30:13, 59:4, 59:18,
59:22, 60:14,
66:14, 76:9, 83:16,
83:25, 88:7, 88:14,
90:23, 97:7,
102:13, 103:15,
109:9, 111:16,
120:4, 120:23,
120:25, 121:6,
121:14, 121:20,
121:24, 141:13,
159:4, 161:19,
161:24, 163:21,
170:21, 171:14,
178:10, 178:18,
178:20, 178:22,
185:14, 185:16,
185:23, 186:23,
186:25, 187:8,
188:4, 189:7,
189:14, 189:24,

190:14, 191:4,
191:11, 191:18,
193:13, 210:3,
214:6, 214:13,
214:22, 215:4,
215:6, 215:14
**informed** [2] -
61:16, 207:16
**initial** [4] - 17:3,
21:8, 32:23, 184:7
**initialed** [1] -
134:19
**initialing** [1] -
130:9
**initials** [7] -
60:21, 60:22,
130:5, 130:12,
219:25, 220:9,
220:10
**initiated** [1] -
170:5
**injuries** [4] -
45:10, 46:2, 146:8,
161:22
**injury** [1] - 51:24
**innocent** [1] -
152:22
**inquired** [1] -
79:24
**inquiring** [1] -
92:24
**inside** [1] - 52:12
**instance** [2] -
1:14, 114:20
**instead** [1] -
207:23
**instruction** [2] -
38:6, 212:17
**instruments** [2] -
162:20, 163:5
**intelligence** [1] -
171:2
**intentional** [1] -
165:13
**interacted** [1] -
77:25
**interaction** [2] -
7:24, 93:7
**interactions** [18] -
26:3, 28:10, 50:17,
52:24, 53:2, 54:18,
63:5, 63:11, 78:12,
93:6, 122:20,
122:25, 123:6,
126:2, 126:7,
126:12, 207:15,
207:17
**interest** [6] - 71:5,
93:3, 93:4, 193:23,
194:11, 194:18
**interested** [5] -
194:14, 194:16,
194:20, 194:22,

222:14
**intern** [1] - 11:20
**internal** [1] -
52:12
**interpret** [1] -
53:10
**interrogate** [3] -
96:16, 109:1,
124:6
**interrogated** [9] -
47:17, 93:12,
93:18, 108:19,
114:12, 124:8,
124:11, 124:14,
139:13
**interrogating** [13]
- 28:14, 45:1,
45:21, 45:25, 46:5,
46:15, 47:15,
47:24, 49:3, 49:14,
96:11, 168:18,
172:19
**interrogation** [48]
- 28:19, 42:17,
42:21, 44:13,
46:10, 46:13, 48:6,
48:21, 89:17,
90:12, 94:7, 94:15,
94:23, 94:24, 95:2,
95:15, 96:17, 99:9,
106:25, 107:10,
108:4, 108:16,
109:14, 115:5,
115:11, 115:20,
117:4, 124:2,
125:16, 127:8,
128:1, 138:3,
139:16, 139:23,
139:24, 140:5,
140:10, 141:8,
141:20, 142:2,
146:11, 157:8,
167:22, 172:7,
174:10, 174:14,
174:20
**interrogations**
[17] - 34:21, 42:6,
43:5, 43:10, 43:16,
44:6, 44:9, 44:19,
60:3, 60:5, 60:9,
61:14, 61:25, 62:1,
62:8, 134:23,
174:17
**interview** [39] -
34:23, 38:1, 42:15,
53:4, 54:3, 64:21,
66:12, 85:8, 85:19,
89:12, 93:24,
94:21, 96:8,
102:17, 103:14,
106:15, 109:16,
110:24, 111:25,
112:1, 112:6,
112:12, 112:20,

Case 2:19-cv-01106-PP Filed 03/20/24 Page 236 of 249 Document 119-4

120:10, 122:6,
126:18, 135:10,
137:22, 137:23,
137:25, 159:19,
160:12, 169:20,
170:9, 170:11,
170:12, 204:12
**interviewed** [8] -
28:3, 50:3, 64:7,
64:18, 85:8,
135:22, 206:18,
207:10
**interviewing** [6] -
42:5, 91:9, 96:12,
213:3, 213:16,
213:20
**Interviewing** [1] -
213:9
**interviews** [2] -
27:22, 35:20
**introduction** [1] -
212:18
**investigate** [10] -
16:11, 16:13,
16:14, 17:13, 22:5,
22:11, 29:1, 29:4,
32:17, 212:21
**investigated** [9] -
16:10, 17:16, 23:2,
29:23, 30:1, 32:19,
209:1, 209:4,
209:10
**investigating** [10]
- 32:13, 33:25,
45:8, 45:19, 59:12,
60:16, 74:2, 75:20,
81:6, 193:6
**investigation** [52]
- 9:22, 10:4, 15:16,
17:3, 24:9, 24:19,
24:22, 25:2, 26:8,
26:15, 28:15,
28:24, 30:18, 31:3,
32:23, 35:14,
47:16, 50:14, 53:3,
55:19, 70:23,
71:15, 75:19, 79:8,
79:15, 80:18,
81:23, 82:6, 82:19,
82:23, 83:14,
83:20, 99:21,
115:16, 122:5,
122:10, 122:25,
149:3, 149:16,
159:5, 185:25,
188:24, 190:1,
191:3, 192:5,
193:2, 200:22,
203:18, 204:17,
212:21, 213:2,
213:6
**Investigation** [4]
- 85:6, 85:9, 88:16,
98:23

**investigations** [3]
- 21:8, 35:11,
59:17
**Investigative** [1] -
14:2
**investigative** [2] -
24:8, 115:14
**investigator** [8] -
10:13, 10:16, 11:5,
11:10, 46:3, 99:6,
156:23, 195:13
**investigators** [2]
- 45:14, 47:4
**investigatory** [4]
- 24:12, 50:5,
185:16, 186:25
**involved** [7] -
31:4, 65:6, 79:14,
124:2, 141:25,
179:9, 209:6
**involvement** [26]
- 21:5, 21:6, 25:17,
26:7, 33:25, 53:8,
55:19, 86:1, 91:13,
92:20, 101:14,
107:23, 114:14,
119:25, 122:19,
122:24, 124:22,
124:25, 140:4,
142:3, 144:19,
148:8, 153:15,
156:1, 200:6,
209:16
**involving** [1] -
25:2
**issue** [1] - 165:12
**issued** [2] -
37:12, 195:21
**It'll** [1] - 56:9
**Item** [1] - 184:4
**items** [1] - 203:19
**iteration** [1] -
20:20
**itself** [3] - 130:21,
155:1, 187:22

**J**

**J.D** [14] - 75:14,
78:8, 78:9, 79:18,
79:19, 79:20,
79:22, 79:25, 80:4,
80:8, 80:9, 80:16,
123:5
**jail** [4] - 79:9,
96:19, 126:15,
136:3
**jailer** [1] - 126:15
**James** [26] - 6:9,
27:9, 27:17, 28:23,
54:23, 55:20,
57:11, 58:9, 66:7,
66:12, 72:1, 81:21,
82:5, 82:18, 83:2,

83:14, 83:20,
87:13, 90:10, 95:9,
107:9, 138:9,
139:6, 139:19,
141:15, 147:25
**James's** [1] - 29:3
**January** [2] -
67:16, 71:8
**jeans** [1] - 80:3
**Jeffrey** [1] -
209:13
**Jessica** [61] -
26:14, 31:18,
31:23, 50:22,
65:18, 66:20,
66:21, 73:12,
73:24, 74:9, 76:18,
76:20, 78:12, 79:4,
79:23, 80:1, 80:3,
80:4, 80:5, 80:10,
80:21, 81:11,
83:17, 87:14,
91:14, 95:11,
96:24, 97:4, 97:9,
101:14, 101:21,
101:24, 102:1,
102:4, 138:5,
138:11, 138:18,
138:23, 142:8,
142:19, 144:15,
159:24, 163:6,
163:21, 164:1,
174:22, 175:1,
178:8, 178:13,
182:8, 184:1,
185:21, 187:4,
194:15, 194:21,
195:8, 196:1,
196:6, 197:16,
217:10
**Jessica's** [2] -
66:23, 80:7
**Jim** [23] - 18:17,
19:7, 20:13, 21:10,
21:21, 23:16,
23:23, 29:6, 29:16,
29:21, 30:16,
30:21, 32:12, 84:4,
84:20, 85:15,
106:20, 116:19,
126:17, 174:25,
175:7, 175:17,
175:20
**job** [5] - 36:12,
36:15, 36:20, 43:8,
43:16
**Joe** [5] - 91:24,
95:6, 95:24,
121:15, 121:17
**Joe's** [1] - 95:5
**John** [1] - 43:1
**Johnnie** [1] -
75:11
**JON** [1] - 2:10

**Jon** [1] - 4:12
**Jones** [5] - 1:18,
4:13, 75:11,
202:18, 223:7
**Joyce** [7] - 178:3,
178:14, 178:25,
184:18, 202:25,
203:14, 204:17
**June** [23] - 14:13,
14:14, 14:23,
56:18, 169:8,
180:20, 180:25,
182:6, 183:2,
183:17, 184:16,
186:8, 188:10,
189:8, 189:19,
190:1, 191:10,
192:6, 200:21,
200:25, 203:15,
214:2, 222:24
**Justice** [3] - 3:17,
3:18, 180:11
**juvenile** [1] -
212:19

**K**

**Kane** [1] - 22:21
**Katherine** [4] -
8:9, 9:1, 192:21,
193:1
**keep** [7] - 23:10,
38:17, 38:19,
38:20, 46:11,
46:12, 198:25
**keeping** [1] -
37:25
**kicking** [1] -
95:25
**killed** [6] - 85:24,
91:18, 93:1, 179:3,
187:11, 187:19
**killer** [2] - 209:5,
209:11
**Kilpatrick** [1] -
179:21
**kind** [5] - 16:9,
17:11, 56:25,
162:16, 220:19
**kit** [1] - 32:25
**knife** [1] - 163:2
**knives** [3] -
162:12, 162:22,
163:5
**knowing** [1] -
88:5
**knowledge** [41] -
29:24, 47:22,
47:23, 48:1, 48:4,
48:10, 52:16,
52:18, 53:7, 55:18,
85:20, 86:1, 86:11,
86:14, 86:18, 87:1,
87:11, 88:17, 93:5,

97:4, 97:8, 101:13,
102:21, 103:12,
104:3, 107:23,
114:13, 115:17,
119:25, 121:11,
124:22, 124:25,
140:3, 140:7,
140:16, 140:20,
140:21, 142:4,
148:8, 151:19,
171:6
**known** [22] -
45:12, 46:17,
46:19, 46:21,
46:25, 47:2, 47:4,
47:18, 47:19,
49:21, 51:13,
51:22, 52:9, 55:9,
68:20, 86:17, 87:2,
87:20, 87:25, 88:6,
187:3
**KRISTEN** [1] -
2:10
**Kristen** [1] - 4:23
**Kurt** [2] - 18:16,
19:12

**L**

**lab** [14] - 67:18,
71:3, 181:17,
181:21, 182:5,
183:14, 183:21,
188:16, 189:15,
189:16, 190:15,
192:7, 204:21
**lab's** [1] - 185:9
**Laboratory** [2] -
3:17, 3:18
**laboratory** [1] -
180:12
**last** [21] - 10:9,
17:24, 18:3, 18:18,
61:6, 64:9, 79:17,
85:3, 86:4, 128:9,
128:16, 128:25,
133:8, 133:10,
133:24, 134:17,
211:4, 211:12,
212:9, 212:10
**late** [2] - 76:23,
95:4
**Latonya** [1] -
209:19
**laughing** [1] -
53:12
**Law** [1] - 211:7
**layout** [1] -
128:23
**lead** [2] - 49:24,
181:19
**leads** [1] - 29:22
**learn** [1] - 135:20
**learned** [4] -

36:12, 109:2,
135:19, 178:13
**learning** [3] -
15:4, 171:5, 178:9
**least** [1] - 21:13
**leave** [3] - 58:14,
177:17
**Lee** [1] - 75:11
**left** [12] - 23:10,
26:25, 97:23,
115:19, 115:20,
129:12, 135:18,
145:9, 145:15,
146:1, 161:2,
187:23
**leg** [4] - 52:12,
52:13, 145:22,
145:24
**legal** [3] - 94:5,
104:22, 212:20
**legs** [1] - 52:11
**less** [1] - 204:18
**letting** [3] - 45:3,
57:24, 152:5
**levels** [1] - 185:6
**Levenhagen** [2] -
79:3, 79:18
**Lewis** [1] - 4:18
**LEWIS** [1] - 2:2
**lie** [1] - 133:16
**Lieutenant** [4] -
22:21, 22:22,
77:25
**lieutenant** [1] -
78:2
**lieutenants** [1] -
22:20
**lifestyle** [1] -
187:23
**likely** [1] - 108:18
**limit** [1] - 108:24
**limitations** [2] -
62:2, 136:8
**limited** [9] - 25:9,
31:20, 31:21,
52:23, 61:21,
135:13, 135:15,
145:5, 171:2
**line** [4] - 35:24,
36:23, 220:7,
220:19
**LINE** [1] - 224:2
**Line** [6] - 57:5,
58:1, 58:3, 169:9,
169:15
**Lines** [3] -
169:21, 169:22
**lines** [4] - 57:17,
130:3, 132:20,
133:10
**link** [2] - 69:1,
187:9
**linked** [12] -

69:13, 142:15,
162:15, 163:6,
178:2, 178:8,
178:14, 184:22,
190:16, 191:5,
191:25, 197:9
**linking** [1] -
142:18
**list** [2] - 74:9,
223:9
**listed** [2] - 104:2,
211:21
**listening** [1] -
118:13
**literally** [1] -
217:14
**litigation** [2] -
180:23, 210:25
**lives** [2] - 90:25,
91:25
**locate** [4] - 30:19,
30:23, 50:20,
57:13
**located** [1] -
204:3
**location** [5] -
51:1, 110:23,
121:23, 146:24,
218:20
**locations** [1] -
69:25
**Locust** [1] - 91:1
**LOEVY** [2] - 2:2
**look** [31] - 6:23,
6:25, 7:11, 10:3,
10:6, 19:20, 21:17,
21:20, 25:24,
29:18, 39:25, 40:1,
40:8, 40:23, 67:25,
68:5, 68:8, 68:9,
70:5, 73:13, 75:3,
85:19, 95:5, 98:18,
106:1, 106:5,
113:12, 113:19,
142:24, 142:25,
182:2
**looked** [8] - 7:1,
7:2, 7:15, 25:22,
69:4, 99:8, 162:20,
197:5
**looking** [8] -
39:20, 55:8, 56:8,
117:20, 160:9,
165:7, 183:20,
189:22
**looks** [7] -
129:14, 132:21,
211:24, 212:16,
213:1, 213:11,
213:13
**loud** [2] - 60:18,
206:13
**lunch** [1] - 97:16

**lying** [4] - 104:8,
104:14, 108:14,
174:1

# M

**M185** [2] - 1:19,
223:8
**M3084** [2] - 65:16,
98:16
**mailing** [1] - 56:7
**main** [1] - 59:16
**maintained** [1] -
41:6
**maintaining** [1] -
38:7
**male** [10] - 82:15,
91:25, 184:2,
184:7, 184:20,
184:23, 186:4,
186:17, 188:25,
190:18
**males** [1] - 192:1
**Mandatory** [1] -
213:9
**Maniece** [5] -
75:25, 202:6,
202:7, 202:12
**manner** [3] -
87:16, 87:18,
120:25
**map** [2] - 128:23,
129:10
**March** [2] - 10:21,
11:14
**margin** [2] -
145:7, 145:9
**marijuana** [1] -
118:10
**Mark** [32] - 53:21,
53:24, 79:3, 79:18,
147:7, 148:22,
148:25, 149:23,
150:4, 150:6,
150:12, 151:16,
151:23, 152:7,
154:17, 159:6,
166:10, 191:11,
195:4, 195:5,
195:10, 195:17,
195:24, 196:4,
196:25, 197:22,
198:4, 198:9,
198:11, 198:16,
204:13, 214:14
**mark** [8] - 55:25,
63:15, 65:9, 81:14,
90:1, 127:18,
144:9, 200:9
**Mark's** [1] -
195:15
**marked** [23] -
56:5, 63:17, 65:10,
67:5, 78:22, 81:16,

90:2, 98:11,
105:15, 107:3,
127:20, 144:11,
147:18, 148:12,
156:11, 163:10,
180:6, 199:6,
200:11, 203:3,
210:19, 220:5
**Martha** [3] -
63:11, 64:8, 64:22
**Maryetta** [1] -
198:20
**match** [1] -
184:13
**matches** [2] -
184:9, 185:11
**matter** [8] - 4:7,
8:17, 10:11, 22:16,
35:4, 56:17,
212:11, 217:16
**matters** [2] - 35:9,
132:2
**Mattie** [1] - 63:13
**mattress** [7] -
32:2, 129:25,
131:23, 131:25,
174:23, 175:2
**mattresses** [1] -
51:5
**McCormick** [8] -
75:25, 179:17,
179:19, 179:24,
179:25, 180:3,
199:10, 200:7
**McCormick's** [1]
- 179:17
**McMurray** [2] -
66:13, 83:16
**meals** [1] -
140:21
**mean** [15] - 24:13,
24:16, 24:17, 30:6,
49:15, 62:18,
70:15, 78:8, 137:3,
162:19, 168:24,
170:3, 173:24,
186:24, 187:19
**meaning** [11] -
32:16, 73:3, 73:5,
79:19, 88:18,
102:20, 103:8,
117:22, 158:19,
162:22, 214:9
**means** [5] -
104:14, 111:8,
137:4, 181:13,
210:14
**meant** [3] - 40:6,
80:8, 80:10
**measurements**
[1] - 145:23
**Media** [1] - 4:4
**medial** [2] -

145:6, 145:9
**medical** [12] -
10:6, 33:16, 33:23,
33:24, 34:3, 50:7,
51:25, 62:8,
144:10, 144:14,
146:19, 162:20
**Medical** [1] - 3:13
**medication** [3] -
136:18, 137:7,
137:12
**medicine** [4] -
136:15, 140:8,
140:14, 140:17
**meet** [3] - 5:20,
102:11, 147:7
**meeting** [11] -
6:2, 6:4, 6:10,
6:14, 6:20, 8:15,
9:4, 9:13, 103:8,
159:6, 159:11
**meetings** [1] -
5:25
**Melva** [2] - 84:21,
85:5
**members** [6] -
12:1, 12:6, 20:10,
63:10, 84:9, 86:23
**memo** [12] -
37:12, 37:14,
37:17, 37:19, 41:3,
41:6, 41:10, 41:12,
41:13, 41:15,
41:23, 77:1
**memorandum** [1]
- 67:15
**Memorandum....
..................** [1] -
3:8
**memorializing** [1]
- 147:25
**memory** [24] -
27:12, 27:18, 28:9,
28:17, 31:21,
33:16, 39:17,
39:20, 39:21,
39:22, 53:18, 65:5,
94:22, 105:10,
120:11, 120:14,
120:17, 143:2,
143:5, 171:10,
196:22, 196:24,
198:2, 198:15
**memos** [1] -
69:11
**Memphis** [1] -
90:24
**men** [1] - 187:25
**mentioned** [4] -
7:6, 8:1, 97:11,
174:3
**met** [4] - 10:10,
19:4, 53:4, 149:9

**Michael** [7] - 18:17, 18:25, 175:25, 181:9, 188:20, 200:16, 203:7
**mid** [2] - 100:16, 163:25
**middle** [1] - 117:24
**midway** [1] - 57:2
**might** [6] - 59:20, 68:23, 116:12, 147:11, 174:6, 219:2
**MILWAUKEE** [3] - 1:8, 2:5, 222:2
**Milwaukee** [48] - 1:19, 2:7, 2:10, 3:20, 4:7, 4:11, 6:18, 9:6, 11:17, 12:7, 12:11, 13:7, 16:17, 18:11, 31:24, 31:25, 34:8, 34:18, 35:7, 41:8, 43:6, 43:21, 44:4, 44:23, 60:6, 62:6, 63:6, 63:22, 66:23, 68:12, 77:9, 90:24, 98:22, 156:18, 179:4, 180:23, 182:17, 184:17, 185:10, 193:5, 193:20, 194:9, 209:1, 210:1, 211:1, 211:9, 222:17, 223:8
**Mims** [21] - 178:3, 178:8, 178:14, 178:25, 184:18, 184:22, 185:4, 185:21, 187:10, 190:19, 191:5, 192:1, 202:24, 202:25, 203:14, 203:23, 204:4, 204:17, 204:23, 204:25, 205:9
**mind** [1] - 188:5
**mine** [2] - 128:21, 220:11
**minimal** [1] - 89:18
**minor** [1] - 104:23
**minute** [2] - 28:22, 118:22
**minutes** [3] - 119:2, 168:1, 168:12
**Miranda** [12] - 60:12, 90:21, 93:9, 93:22, 105:22, 106:12, 128:4, 134:11, 134:25, 206:10, 206:18,

206:19
**missing** [1] - 45:20
**Mississippi** [1] - 202:20
**mixture** [1] - 184:1
**modus** [1] - 209:2
**Moffett** [7] - 75:14, 78:9, 79:19, 79:20, 80:16, 123:5, 186:13
**mom** [6] - 84:23, 85:12, 90:25, 92:18, 93:24, 105:3
**Monday** [3] - 148:20, 149:13, 165:10
**money** [2] - 118:14, 119:6
**month** [5] - 95:24, 119:17, 204:19, 205:2
**months** [5] - 29:16, 71:16, 73:19, 74:10, 95:4
**Moore** [33] - 20:17, 21:21, 23:19, 54:24, 54:25, 55:6, 55:7, 67:14, 67:16, 70:17, 70:19, 70:21, 71:25, 72:2, 72:11, 72:17, 73:1, 73:11, 73:13, 73:15, 73:24, 75:5, 75:18, 75:22, 76:23, 77:16, 78:3, 78:6, 124:11, 124:15, 124:23, 125:1, 127:7
**Moore's** [4] - 72:6, 74:17, 76:17, 80:18
**morning** [6] - 4:2, 4:17, 4:20, 5:5, 99:12, 108:6
**Morrison** [7] - 66:14, 66:17, 79:23, 81:1, 81:11, 83:17, 84:1
**mostly** [1] - 77:25
**mother** [1] - 84:21
**move** [3] - 16:7, 28:8, 175:23
**moved** [2] - 90:24, 176:8
**MPD** [11] - 63:24, 65:14, 79:1, 90:6, 98:15, 105:19, 107:7, 133:8,

163:15, 182:4, 211:1
**MPD1162** [1] - 148:16
**MPD570** [1] - 147:22
**MPD952** [1] - 144:23
**MR** [1] - 2:10
**MS** [120] - 2:2, 2:6, 2:10, 4:17, 4:20, 5:4, 56:6, 56:8, 56:10, 56:12, 56:13, 63:18, 65:11, 67:6, 70:13, 74:13, 74:16, 77:4, 77:5, 78:23, 81:17, 87:4, 87:7, 88:2, 88:4, 90:3, 94:1, 94:3, 94:10, 94:13, 97:14, 97:22, 98:12, 104:24, 105:1, 105:5, 105:7, 105:9, 105:16, 107:4, 111:10, 111:17, 113:3, 113:4, 113:15, 113:17, 113:18, 113:20, 113:21, 125:4, 125:12, 125:13, 127:21, 130:15, 130:17, 132:5, 132:8, 132:9, 132:10, 132:12, 132:13, 140:11, 140:12, 140:15, 141:9, 141:12, 144:12, 147:19, 148:13, 150:9, 150:11, 150:14, 150:16, 150:19, 150:21, 153:16, 153:19, 156:12, 158:13, 158:14, 159:14, 159:17, 159:25, 160:2, 163:11, 179:24, 179:25, 180:2, 180:7, 181:20, 181:22, 191:19, 191:20, 191:22, 199:3, 199:4, 199:5, 199:7, 200:12, 201:21, 201:22, 203:4, 205:23, 206:5, 210:20, 217:11, 217:17, 217:20, 217:22, 217:23, 218:3, 218:6, 218:7, 218:8, 218:24, 219:5, 220:25, 221:3,

221:6, 221:7
**murder** [28] - 40:3, 40:6, 66:24, 78:13, 81:12, 94:6, 96:24, 97:5, 97:9, 101:24, 114:14, 115:18, 121:10, 138:5, 138:12, 138:17, 138:23, 142:8, 153:21, 153:23, 162:17, 182:12, 196:1, 196:6, 216:22, 216:23, 217:10, 218:10
**Murder** [1] - 73:12
**murdered** [4] - 101:21, 102:1, 102:4, 203:14
**murders** [2] - 68:25, 69:12
**music** [1] - 118:13

## N

**name** [20] - 4:12, 9:20, 14:2, 26:10, 43:23, 62:24, 62:25, 72:18, 78:11, 102:3, 174:3, 174:7, 179:18, 181:4, 181:13, 183:5, 188:13, 189:11, 193:16, 202:14
**named** [4] - 30:20, 30:23, 82:14, 91:24
**Naomi** [1] - 4:21
**NAOMI** [1] - 2:6
**national** [2] - 185:5, 185:6
**nature** [3] - 29:12, 92:15, 94:16
**necessarily** [3] - 49:16, 102:20, 188:4
**neck** [6] - 52:3, 86:22, 87:25, 96:2, 121:3, 175:5
**need** [5] - 5:15, 42:1, 58:15, 196:16, 198:24
**needed** [8] - 21:3, 29:17, 30:8, 38:12, 38:15, 40:13, 84:24, 137:7
**needs** [1] - 62:9
**negative** [1] - 62:21
**neighborhood** [5] - 46:20, 47:2,

87:21, 87:25, 88:6
**never** [12] - 13:23, 41:3, 113:10, 142:21, 172:23, 172:24, 173:9, 199:21, 201:9, 201:15, 201:17, 210:24
**new** [6] - 59:4, 59:18, 121:7, 121:19, 161:24, 177:23
**New** [1] - 211:21
**news** [4] - 45:12, 46:18, 47:1, 87:9
**newspaper** [3] - 193:11, 193:15, 195:3
**next** [16] - 17:9, 17:22, 55:22, 57:12, 58:10, 59:2, 91:25, 99:12, 122:3, 122:9, 124:1, 127:18, 147:6, 147:11, 204:3, 220:19
**night** [1] - 95:5
**nine** [1] - 193:25
**NO** [2] - 224:2
**non** [14] - 16:11, 16:12, 16:24, 44:25, 45:5, 45:13, 46:9, 47:3, 48:3, 48:8, 48:20, 49:20, 117:7, 117:11
**non-fatal** [3] - 16:11, 16:12, 16:24
**non-public** [11] - 44:25, 45:5, 45:13, 46:9, 47:3, 48:3, 48:8, 48:20, 49:20, 117:7, 117:11
**nonconfrontatio nal** [1] - 170:8
**none** [2] - 63:8, 142:14
**north** [3] - 31:24, 66:22, 129:9
**North** [11] - 1:19, 2:3, 63:2, 84:10, 85:21, 86:8, 91:4, 118:3, 118:6, 179:4, 223:7
**Nos** [4] - 107:3, 127:20, 156:11, 180:6
**Notary** [4] - 1:17, 222:6, 222:21, 223:22
**note** [1] - 60:18
**noted** [1] - 223:9
**notes** [9] - 36:21,

37:4, 37:11, 37:21, 37:25, 38:2, 38:5, 38:7

**nothing** [11] - 74:4, 76:21, 96:21, 101:3, 105:2, 146:9, 161:19, 167:12, 178:16, 217:12, 218:1

**notified** [1] - 185:12

**November** [14] - 149:6, 149:13, 151:4, 156:21, 157:4, 157:8, 157:10, 159:18, 161:4, 161:9, 161:13, 161:17, 161:20, 165:10

**number** [7] - 144:4, 182:12, 182:13, 182:16, 193:25, 194:7, 197:1

**numerous** [2] - 187:25, 195:7

## O

**oath** [1] - 5:1
**object** [1] - 159:14
**objecting** [1] - 177:14
**objection** [22] - 74:13, 77:4, 87:4, 88:2, 94:1, 94:10, 104:24, 105:5, 111:10, 113:3, 140:11, 141:9, 150:9, 150:14, 150:19, 153:16, 159:25, 181:20, 191:19, 201:21, 217:11, 217:18

**observation** [2] - 86:22, 171:23

**observations** [1] - 171:19

**observe** [3] - 109:24, 161:12, 168:25

**observed** [9] - 64:11, 86:23, 88:1, 136:6, 164:3, 169:5, 169:13, 172:2, 207:14

**observing** [3] - 135:17, 136:8, 160:21

**obtain** [3] - 39:24, 170:24, 193:13

**obtained** [16] - 27:17, 59:4, 73:20,

74:11, 162:14, 163:5, 178:14, 184:24, 186:10, 189:7, 189:8, 190:16, 190:18, 190:23, 190:25, 197:9

**obtaining** [2] - 162:8, 162:11

**occasion** [2] - 48:16, 114:17

**occasionally** [1] - 48:20

**occur** [4] - 138:7, 138:14, 139:1, 139:10

**occurred** [8] - 45:9, 47:3, 85:21, 137:24, 147:13, 148:20, 194:8, 198:13

**October** [40] - 15:17, 20:8, 50:18, 65:19, 82:4, 83:7, 83:15, 84:19, 85:17, 89:13, 90:11, 93:17, 95:15, 98:5, 99:3, 101:8, 106:2, 107:11, 107:25, 111:25, 123:10, 124:12, 126:8, 126:13, 127:9, 127:12, 128:1, 137:24, 138:3, 141:21, 146:11, 148:1, 148:20, 149:10, 153:25, 154:15, 166:1, 167:23, 182:20, 218:16

**October/ November** [1] - 151:20

**OF** [9] - 1:2, 1:8, 2:5, 2:5, 4:1, 222:1, 222:2, 223:1, 223:2

**offense** [2] - 86:12, 104:4

**OFFICE** [1] - 2:5
**office** [19] - 6:17, 10:12, 10:17, 10:20, 11:1, 11:9, 40:19, 53:21, 100:2, 110:6, 183:9, 189:17, 189:20, 191:16, 191:18, 195:13, 195:15, 198:6, 222:17

**Office** [1] - 6:18
**officer** [13] - 12:19, 13:2, 35:19,

37:14, 41:8, 43:5, 61:20, 62:6, 63:7, 64:7, 79:3, 156:24, 210:1

**officers** [2] - 43:12, 176:25

**officers'** [1] - 43:23

**officially** [1] - 164:20

**old** [3] - 28:13, 29:16, 91:10

**on-the-job** [1] - 43:8

**once** [11] - 19:13, 36:12, 36:15, 37:16, 38:10, 39:8, 94:14, 110:7, 189:8, 189:14, 207:9

**one** [73] - 5:8, 5:12, 6:2, 6:20, 8:8, 8:9, 9:1, 13:19, 20:10, 21:13, 21:18, 22:9, 26:19, 27:2, 28:24, 37:12, 38:6, 59:16, 64:22, 70:4, 72:18, 72:19, 73:11, 79:12, 80:2, 80:13, 80:16, 82:17, 94:19, 95:11, 100:5, 100:13, 104:17, 115:10, 117:17, 131:4, 131:11, 131:20, 136:22, 143:7, 151:11, 151:16, 151:17, 162:24, 164:21, 165:12, 165:14, 165:18, 169:1, 172:6, 172:16, 181:19, 181:24, 187:13, 189:10, 192:23, 194:14, 194:16, 197:13, 197:15, 197:18, 197:21, 197:25, 202:7, 208:18, 214:16, 215:17, 219:6, 220:14, 220:18, 220:19

**one's** [1] - 106:2
**one-hour** [1] - 6:20

**ones** [1] - 18:20
**open** [2] - 19:19, 92:13

**open-ended** [1] - 92:13

**operandi** [1] - 209:2

**operated** [2] -

208:5, 208:8
**Ophelia** [1] - 179:15

**opinion** [2] - 103:22, 104:7

**opinions** [1] - 216:14

**opportunity** [2] - 96:5, 134:7

**option** [2] - 208:16, 208:21

**orange** [1] - 133:21

**order** [1] - 84:2
**orders** [3] - 43:19, 43:20, 43:22

**orientating** [1] - 129:9

**Orientation** [1] - 211:22

**Original** [2] - 3:22, 3:23

**original** [1] - 42:10

**originated** [1] - 184:1

**Orley** [3] - 199:16, 199:17, 199:19

**otherwise** [1] - 40:23

**ott** [8] - 25:25, 26:3, 53:10, 53:16, 53:19, 54:18, 96:24, 97:11

**Ott** [67] - 9:25, 10:11, 19:4, 22:15, 25:3, 25:21, 26:21, 26:24, 27:2, 30:25, 33:21, 52:24, 53:3, 53:25, 56:1, 56:17, 67:11, 71:21, 71:23, 113:9, 113:10, 116:21, 121:16, 121:18, 122:15, 122:23, 123:1, 138:17, 138:22, 142:21, 144:3, 146:17, 147:13, 148:1, 148:7, 150:1, 150:3, 150:24, 152:10, 153:1, 153:7, 153:10, 154:19, 155:3, 158:9, 158:16, 161:5, 161:10, 162:14, 164:13, 165:16, 167:4, 168:8, 180:22, 186:13, 187:18, 189:2, 215:11, 215:23, 216:5,

216:11, 216:18, 217:8, 217:9, 217:14, 218:10, 218:20

**Ott's** [9] - 9:5, 162:3, 163:5, 164:18, 166:3, 166:24, 176:7, 198:12, 217:25

**outs** [1] - 60:19
**outside** [3] - 42:24, 52:12, 145:24

**own** [12] - 36:6, 61:4, 61:8, 72:24, 110:8, 134:2, 134:5, 134:6, 142:9, 217:2

## P

**p.m** [22] - 1:21, 18:7, 85:4, 88:21, 90:11, 93:17, 93:21, 93:25, 96:8, 96:13, 96:17, 100:18, 106:3, 106:16, 107:12, 107:15, 127:8, 141:21, 221:10

**pad** [3] - 37:5, 37:22

**Page** [36] - 3:2, 3:5, 56:20, 56:22, 56:23, 56:25, 57:5, 57:16, 57:17, 57:25, 64:6, 65:22, 73:13, 74:4, 75:3, 77:6, 110:16, 113:11, 113:12, 113:19, 117:20, 133:2, 133:8, 144:25, 147:23, 148:18, 168:8, 169:7, 169:9, 169:21, 183:2, 220:4, 220:13, 220:18, 220:22

**PAGE** [1] - 224:2
**page** [20] - 63:23, 74:17, 79:21, 86:4, 106:9, 106:12, 113:15, 128:9, 128:16, 128:25, 133:8, 134:17, 144:22, 163:19, 183:3, 211:4, 211:6, 212:10, 219:25, 223:10

**Pages** [5] - 65:16, 79:5, 90:7, 98:17, 199:13

**pages** [6] - 56:21, 211:5, 211:6,

211:12, 211:14, 212:9

**paid** [1] - 216:13

**palsy** [5] - 135:19, 135:21, 136:1, 137:18, 137:21

**pants** [5] - 33:8, 51:17, 164:3, 175:15, 175:21

**paper** [1] - 219:16

**paragraph** [4] - 79:17, 85:4, 160:11, 203:23

**paralegal** [2] - 4:24, 6:6

**parent** [2] - 94:5, 104:22

**part** [30] - 11:12, 12:1, 12:6, 13:10, 14:15, 19:25, 21:7, 23:2, 23:8, 34:5, 54:13, 57:14, 61:6, 70:21, 72:2, 72:21, 76:10, 77:21, 82:19, 82:23, 83:2, 128:12, 133:24, 134:1, 135:7, 135:25, 141:24, 162:6, 199:12

**part's** [2] - 128:17, 128:18

**partially** [3] - 33:5, 33:6, 33:7

**participants** [2] - 76:12, 76:13

**participate** [1] - 59:13

**participation** [3] - 97:4, 97:8, 115:18

**particular** [4] - 196:2, 201:25, 208:6, 208:12

**parties** [1] - 222:13

**partner** [48] - 18:18, 18:25, 27:9, 27:16, 28:3, 32:12, 58:9, 74:1, 74:10, 81:21, 88:24, 89:20, 90:9, 90:20, 92:6, 92:16, 92:19, 95:14, 96:10, 96:11, 105:21, 106:20, 106:24, 107:19, 107:24, 113:23, 114:24, 115:23, 116:9, 116:19, 117:11, 120:1, 120:15, 122:7, 133:5, 138:9, 138:21, 139:6, 139:22, 141:14, 147:24,

155:5, 159:12, 159:19, 177:20, 177:23, 188:20, 204:6

**partner's** [2] - 95:9, 112:9

**partnered** [2] - 72:25, 83:1

**partners** [14] - 18:8, 18:10, 18:15, 18:19, 23:16, 66:6, 72:18, 175:25, 176:5, 176:16, 176:18, 177:18, 177:25, 201:19

**parts** [1] - 133:25

**party** [3] - 165:14, 165:15, 165:18

**pass** [1] - 59:18

**passed** [2] - 59:5, 199:24

**passenger** [1] - 117:23

**passing** [1] - 176:3

**past** [3] - 64:12, 64:14, 174:19

**patrol** [6] - 13:10, 36:4, 36:6, 37:14, 41:7, 212:22

**Payne** [133] - 9:21, 10:3, 15:16, 20:7, 21:6, 22:25, 24:8, 24:12, 24:25, 26:7, 26:14, 28:15, 28:24, 30:17, 31:2, 31:23, 32:8, 33:1, 33:25, 39:18, 47:6, 50:4, 50:13, 50:22, 53:3, 64:3, 64:24, 65:5, 65:18, 65:15, 66:20, 71:15, 73:12, 73:15, 74:9, 75:2, 75:9, 75:12, 75:15, 75:20, 76:18, 76:24, 78:10, 78:13, 79:4, 79:13, 79:23, 80:21, 81:11, 81:22, 88:25, 89:21, 93:19, 95:11, 96:25, 98:16, 99:20, 101:14, 103:3, 107:24, 116:6, 116:12, 116:15, 116:16, 116:21, 117:1, 117:8, 120:24, 122:4, 122:19, 122:24, 127:4, 138:5, 138:18, 138:23, 140:4, 141:17, 142:16, 142:19,

144:3, 144:15, 144:19, 146:8, 148:8, 149:18, 150:1, 151:18, 152:10, 158:6, 159:5, 159:24, 161:22, 163:7, 163:21, 175:10, 175:12, 175:14, 175:18, 175:21, 178:3, 178:8, 178:13, 179:8, 182:8, 182:16, 184:2, 184:25, 185:3, 185:21, 186:10, 187:4, 187:10, 187:13, 190:17, 190:24, 190:25, 191:4, 192:1, 194:15, 194:21, 195:8, 196:7, 197:16, 198:14, 198:16, 204:21, 215:16, 215:24, 216:22, 217:10, 218:10

**Payne's** [26] - 31:19, 32:13, 33:11, 52:17, 73:24, 76:20, 83:17, 87:14, 91:14, 92:21, 97:5, 97:9, 121:19, 138:12, 142:8, 144:7, 146:5, 146:13, 162:17, 164:1, 174:22, 175:1, 175:5, 184:15, 196:1, 197:24

**pen** [1] - 128:15

**pending** [1] - 5:18

**people** [14] - 23:11, 46:18, 52:20, 71:5, 88:1, 152:24, 187:3, 187:20, 187:22, 188:7, 188:8, 197:18, 208:15, 208:21

**Percy** [5] - 54:25, 55:7, 78:6, 124:15, 125:1

**period** [8] - 11:2, 14:19, 16:2, 16:16, 17:2, 23:17, 35:23, 194:1

**periods** [1] - 198:17

**permissible** [1] - 49:11

**permitted** [1] - 201:16

**perpetrated** [1] -

68:14

**perpetrator** [10] - 45:14, 45:23, 46:5, 47:5, 48:22, 49:23, 68:15, 68:24, 69:5, 186:2

**person** [32] - 8:23, 26:9, 26:17, 30:19, 30:23, 38:15, 45:20, 46:14, 47:24, 47:25, 48:9, 48:22, 49:3, 49:14, 49:25, 50:1, 60:10, 60:12, 60:17, 62:23, 93:3, 93:4, 102:4, 102:19, 109:16, 110:4, 152:22, 172:24, 186:6, 202:16, 210:9, 210:10

**person's** [2] - 109:19, 202:14

**personal** [6] - 38:21, 44:18, 44:24, 86:11, 140:20, 222:10

**personalizes** [1] - 61:9

**persons** [7] - 14:25, 17:10, 17:12, 17:20, 74:18, 176:9

**pertain** [1] - 8:17

**pertained** [1] - 69:8

**pertaining** [8] - 7:22, 20:3, 25:5, 25:14, 25:21, 25:24, 44:5, 44:9

**Peter** [1] - 100:5

**phone** [2] - 35:24, 36:23

**photo** [2] - 95:12, 95:14

**photocopy** [1] - 134:14

**photograph** [2] - 95:18, 95:20

**photographs** [6] - 10:3, 50:9, 50:13, 50:17, 51:14, 146:19

**phrase** [1] - 45:4

**physical** [14] - 30:4, 30:6, 30:7, 139:12, 139:20, 140:1, 142:18, 146:18, 150:7, 167:3, 167:15, 173:12, 173:14, 174:6

**picked** [3] - 206:25, 207:7,

207:9

**picking** [1] - 90:10

**piece** [1] - 121:18

**pieces** [1] - 186:23

**pink** [2] - 128:15, 128:19

**place** [6] - 4:10, 39:1, 39:3, 60:20, 60:22, 170:5

**Plaintiff** [3] - 1:5, 1:14, 2:4

**plaintiff** [1] - 4:19

**plan** [1] - 155:8

**planned** [2] - 155:5, 155:8

**played** [1] - 160:12

**playing** [2] - 160:22, 160:23

**point** [30] - 5:15, 10:11, 15:17, 26:19, 27:2, 30:3, 30:10, 38:15, 54:14, 72:19, 80:3, 82:11, 94:17, 97:2, 115:10, 117:3, 138:2, 154:15, 154:21, 155:4, 158:3, 161:8, 161:25, 169:1, 176:7, 176:15, 176:15, 192:12, 197:8, 207:8

**Police** [26] - 3:20, 11:17, 12:7, 12:11, 18:11, 34:8, 35:7, 41:8, 43:6, 43:21, 44:4, 44:23, 62:6, 63:22, 68:12, 77:9, 98:22, 156:18, 182:17, 185:10, 193:5, 193:20, 194:9, 209:1, 210:1, 211:9

**police** [23] - 8:1, 8:4, 9:6, 11:20, 11:21, 11:22, 12:16, 13:2, 13:5, 33:22, 35:19, 42:10, 60:6, 61:20, 62:5, 63:6, 77:2, 91:21, 176:25, 181:23, 212:11, 212:20

**policies** [1] - 43:24

**policy** [1] - 191:14

**polygraph** [53] - 62:15, 98:23, 99:2, 99:14, 99:23, 100:3, 100:7,

100:15, 100:20, 101:19, 102:14, 102:17, 102:21, 103:1, 103:13, 103:21, 104:10, 104:15, 104:23, 107:18, 108:7, 108:10, 108:13, 108:16, 108:20, 109:7, 109:13, 109:20, 109:22, 110:5, 110:9, 115:4, 115:5, 115:8, 115:11, 116:1, 151:8, 151:14, 155:10, 155:18, 155:21, 156:2, 156:5, 156:19, 157:7, 157:21, 158:15, 159:18, 159:19, 160:5, 164:17

**Polygraph** [2] - 3:10, 3:14

**polygraphed** [17] - 54:8, 54:10, 89:24, 98:5, 100:25, 101:2, 101:7, 101:8, 101:11, 102:10, 109:10, 109:25, 114:13, 115:17, 120:3, 137:19, 151:3

**polygraphist** [3] - 103:22, 109:15, 110:8

**polygraphs** [2] - 62:19, 99:20

**porch** [2] - 64:11, 95:6

**portion** [3] - 34:10, 144:1, 163:25

**position** [1] - 15:4

**positive** [1] - 204:1

**possession** [2] - 173:12, 173:14

**possibility** [2] - 33:12, 190:8

**possible** [15] - 32:14, 44:19, 67:18, 71:4, 74:19, 87:23, 93:5, 108:14, 109:21, 115:3, 153:13, 178:16, 187:8, 200:1, 209:11

**possibly** [9] - 8:22, 64:9, 69:13, 92:20, 103:4, 116:25, 162:25, 166:8, 209:4

**post** [10] - 52:11, 108:16, 109:13, 115:5, 115:8, 115:11, 116:1, 157:7, 157:21, 159:19

**post-polygraph** [9] - 108:16, 109:13, 115:5, 115:8, 115:11, 116:1, 157:7, 157:21, 159:19

**postmortem** [1] - 145:18

**practice** [14] - 37:21, 37:24, 44:18, 44:24, 46:8, 47:14, 59:7, 59:11, 60:11, 143:18, 183:13, 206:24, 206:25, 207:9

**pre** [2] - 102:17, 103:13

**pre-polygraph** [2] - 102:17, 103:13

**preclusive** [1] - 188:5

**predated** [1] - 83:7

**preliminary** [1] - 68:1

**prepare** [10] - 5:21, 8:15, 9:14, 35:17, 35:20, 82:1, 106:5, 125:22, 155:22, 166:11

**prepared** [16] - 8:21, 55:7, 63:25, 81:21, 90:9, 103:12, 105:21, 106:24, 107:9, 149:6, 155:23, 157:20, 165:25, 166:8, 166:14, 200:16

**preparing** [1] - 90:16

**presence** [2] - 60:17, 116:9

**present** [12] - 6:4, 6:7, 93:24, 94:5, 102:1, 103:8, 103:9, 157:14, 159:20, 166:3, 166:18, 195:17

**presented** [1] - 204:13

**Preston** [2] - 75:24, 179:15

**pretty** [3] - 169:16, 169:17

**prevent** [1] - 136:15

**previous** [5] - 7:3, 22:15, 55:17, 59:2, 59:5

**previously** [7] - 23:14, 23:15, 23:22, 29:6, 77:24, 167:25, 168:17

**principles** [1] - 212:21

**prior** [27] - 7:24, 24:4, 27:15, 33:21, 50:17, 50:20, 64:24, 65:6, 66:23, 67:10, 78:13, 79:14, 88:14, 92:6, 92:18, 121:16, 122:1, 122:19, 122:23, 140:9, 141:8, 141:20, 144:18, 146:10, 176:21, 195:20, 198:8

**prison** [9] - 138:5, 138:11, 138:24, 139:4, 139:7, 161:5, 161:10, 202:16, 202:17

**private** [2] - 46:11, 46:12

**probable** [12] - 93:15, 111:12, 111:19, 111:22, 111:23, 141:2, 141:5, 141:7, 141:15, 141:19, 142:7, 145:18

**problem** [3] - 47:12, 57:23

**procedure** [1] - 191:14

**Procedure** [1] - 1:15

**procedures** [4] - 43:24, 212:20, 212:23

**proceed** [1] - 4:16

**proceeded** [1] - 165:12

**proceedings** [1] - 223:6

**PROCEEDINGS** [1] - 4:1

**Proceedings** [1] - 221:10

**process** [1] - 181:12

**produced** [1] - 210:25

**product** [1] - 143:10

**Professional** [2] - 1:16, 222:6

**proficiencies** [1]

- 212:20

**profile** [15] - 183:25, 184:6, 184:7, 184:12, 184:14, 184:16, 184:20, 184:24, 186:4, 186:9, 186:12, 186:18, 188:25, 190:16, 190:18

**profiles** [3] - 185:3, 191:25, 197:10

**project** [3] - 73:3, 73:4, 77:17

**promise** [3] - 138:16, 138:21, 154:3

**promises** [4] - 116:5, 116:10, 161:3, 161:13

**promoted** [9] - 13:11, 13:24, 35:6, 41:9, 42:7, 43:9, 212:7, 212:8

**proposing** [1] - 153:9

**prosecuted** [1] - 215:2

**prosecutor** [2] - 214:14, 214:23

**prosecutor's** [1] - 152:1

**prostitutes** [3] - 68:19, 68:20, 69:17

**prostituting** [2] - 81:1, 187:24

**prostitution** [3] - 32:7, 209:8, 209:9

**protection** [2] - 11:11, 11:12

**protocol** [2] - 134:1, 143:23

**provide** [12] - 35:17, 35:21, 62:7, 111:15, 117:7, 117:11, 121:20, 166:14, 170:17, 172:8, 172:20, 191:17

**provided** [26] - 7:16, 7:23, 9:17, 27:19, 35:5, 42:14, 43:8, 54:2, 62:14, 90:20, 120:23, 121:8, 140:8, 140:17, 140:22, 141:14, 146:9, 161:20, 161:24, 166:17, 173:7, 173:9, 180:23, 191:15, 214:23, 218:15

**providing** [5] - 136:18, 163:20, 189:19, 191:10, 217:5

**Public** [4] - 1:17, 222:6, 222:21, 223:22

**public** [17] - 44:25, 45:5, 45:13, 46:9, 46:17, 47:3, 48:3, 48:8, 48:20, 49:20, 86:19, 86:24, 87:11, 87:15, 87:17, 117:7, 117:11

**publicly** [4] - 47:1, 47:18, 47:19, 86:17

**pull** [3] - 40:1, 40:10, 169:18

**pulled** [9] - 33:8, 33:9, 51:18, 64:15, 64:17, 164:3, 175:12, 175:15, 175:18

**purpose** [2] - 59:16, 101:12

**purse** [1] - 64:14

**pursuant** [1] - 1:15

**push** [1] - 139:15

**put** [10] - 39:7, 39:10, 39:12, 39:13, 61:11, 126:18, 131:15, 137:11, 168:16, 177:10

**putting** [2] - 109:5, 121:17

### Q

**question's** [1] - 214:21

**questioned** [2] - 86:6, 157:11

**questioning** [8] - 26:19, 26:20, 92:5, 92:13, 92:14, 92:15, 117:8, 117:12

**questions** [32] - 5:9, 5:12, 5:25, 60:1, 68:1, 68:4, 88:11, 92:3, 97:24, 101:18, 102:7, 104:9, 120:14, 126:22, 135:9, 143:2, 143:6, 143:19, 158:10, 158:15, 159:3, 159:8, 159:10, 167:22, 170:10, 206:7, 218:25,

# R

219:2, 219:8, 219:9, 221:4

**Questions** [1] - 104:2

**quite** [1] - 59:21

**rank** [2] - 13:11, 13:20

**raped** [2] - 139:4, 139:8

**rapport** [3] - 135:7, 135:25, 168:2

**Raymond** [1] - 18:16

**re** [6] - 111:3, 111:9, 111:14, 112:6, 112:20

**re-advised** [3] - 111:3, 111:9, 111:14

**re-interview** [2] - 112:6, 112:20

**re-talked** [1] - 111:14

**reacted** [1] - 104:1

**read** [50] - 7:21, 27:13, 31:2, 33:23, 33:24, 34:3, 34:5, 55:10, 60:17, 60:24, 60:25, 62:15, 68:2, 80:14, 96:21, 109:11, 112:3, 113:10, 126:20, 133:11, 133:25, 134:3, 134:4, 134:11, 134:16, 135:4, 135:5, 135:6, 135:8, 144:18, 155:23, 157:5, 174:4, 193:10, 195:2, 206:10, 206:11, 206:13, 206:15, 206:18, 206:19, 206:21, 207:18, 207:22, 207:23, 207:24, 208:16, 208:17, 208:22, 223:5

**reading** [6] - 27:15, 33:22, 71:2, 173:15, 207:22, 208:20

**ready** [1] - 25:15

**real** [1] - 59:22

**realize** [1] - 137:23

**really** [5] - 23:3, 24:2, 131:11, 202:7, 207:6

**reason** [12] - 24:3, 74:9, 101:6, 201:13, 201:15, 201:25, 206:23, 207:3, 208:6, 208:8, 208:12, 216:3

**reasonable** [1] - 191:7

**reasons** [2] - 59:16, 104:18

**Rebecca** [6] - 66:14, 66:17, 79:22, 79:23, 80:2, 83:16

**receive** [6] - 42:4, 42:9, 60:3, 116:7, 116:12, 183:17

**received** [7] - 42:21, 60:2, 86:13, 88:14, 180:19, 180:24, 183:14

**receiving** [4] - 187:8, 190:14, 191:24, 192:6

**recently** [2] - 41:24, 54:21

**recess** [3] - 70:10, 125:9, 206:2

**Recess** [1] - 97:19

**recognize** [25] - 63:21, 63:24, 65:17, 81:20, 90:8, 98:21, 106:8, 106:11, 106:19, 107:8, 110:16, 112:9, 127:24, 147:24, 148:16, 148:18, 156:16, 156:18, 157:6, 157:19, 180:10, 181:9, 200:15, 203:6, 210:23

**recollection** [72] - 24:11, 24:14, 24:21, 25:1, 25:7, 25:11, 25:17, 26:2, 26:6, 27:7, 27:14, 28:1, 31:17, 32:11, 52:23, 53:15, 53:23, 54:7, 54:17, 54:21, 55:3, 56:2, 57:10, 58:8, 70:20, 71:1, 72:8, 74:5, 75:17, 76:22, 78:1, 82:22, 83:23, 85:11, 85:15, 89:16, 89:19, 94:20, 98:4, 98:10, 98:19, 100:24, 101:4, 110:12, 112:2, 113:22,

125:16, 126:1, 126:2, 126:6, 126:7, 126:11, 126:14, 147:17, 154:25, 155:11, 155:25, 156:4, 160:20, 165:3, 168:11, 168:21, 169:12, 171:18, 189:18, 190:13, 196:2, 200:6, 205:4, 213:18, 213:21, 213:24

**recollections** [1] - 53:2

**record** [20] - 4:3, 16:9, 38:18, 38:20, 56:4, 70:7, 70:9, 70:12, 97:18, 97:21, 125:5, 125:6, 125:8, 125:11, 190:4, 205:24, 206:1, 206:4, 218:5, 221:9

**recorded** [1] - 222:8

**records** [3] - 25:4, 32:24, 51:14

**recovered** [2] - 162:21, 194:23

**Recruit** [1] - 211:8

**rectangle** [1] - 132:17

**rectangles** [1] - 131:16

**red** [1] - 128:19

**redacted** [1] - 74:22

**reduced** [1] - 222:9

**reevaluate** [1] - 72:12

**refer** [2] - 117:16, 168:9

**referred** [3] - 63:2, 67:14, 113:11

**referring** [4] - 14:9, 45:12, 118:10, 171:24

**refresh** [22] - 25:10, 57:10, 58:8, 70:19, 71:1, 75:17, 78:1, 83:23, 85:11, 85:14, 89:15, 89:19, 100:23, 113:22, 155:25, 160:20, 168:11, 169:12, 190:12, 200:5, 205:4, 213:18

**refreshed** [6] -

27:13, 54:22, 72:8, 76:22, 125:25, 126:7

**refreshes** [8] - 56:2, 74:5, 82:22, 98:10, 98:19, 101:4, 147:17, 213:23

**refreshing** [1] - 72:5

**regard** [2] - 29:25, 168:6

**regarding** [8] - 7:4, 8:14, 9:4, 26:6, 55:18, 85:23, 198:13, 204:2

**Registered** [2] - 1:16, 222:5

**regular** [7] - 4:24, 18:8, 18:9, 18:15, 18:19, 29:7, 72:18

**regulations** [4] - 43:25, 44:1, 44:5, 44:8

**rehab** [2] - 76:11, 76:13

**Reid** [3] - 43:1, 43:2, 43:4

**relate** [1] - 217:23

**related** [3] - 155:20, 161:21, 193:13

**relative** [3] - 87:9, 222:12, 222:13

**relay** [1] - 54:5

**release** [3] - 110:25, 112:14, 112:22

**released** [11] - 87:16, 87:19, 88:7, 111:8, 111:11, 111:18, 112:13, 112:24, 114:14, 114:25, 120:4

**relevance** [8] - 94:1, 94:11, 104:24, 105:5, 113:3, 153:16, 217:11, 217:18

**relevant** [4] - 101:18, 102:7, 158:10, 158:15

**reliable** [1] - 150:13

**remainder** [2] - 184:3, 184:15

**remained** [1] - 27:1

**remember** [108] - 8:5, 8:20, 16:1, 23:1, 23:4, 23:6, 23:7, 24:7, 24:18, 28:5, 28:13, 31:4,

33:3, 33:4, 33:7, 34:1, 35:4, 36:17, 43:12, 43:15, 44:3, 44:12, 44:14, 53:6, 54:12, 55:20, 58:15, 63:11, 67:22, 68:11, 69:7, 69:11, 69:15, 70:1, 75:22, 76:2, 76:5, 76:9, 78:8, 78:12, 78:15, 80:25, 89:23, 92:4, 92:12, 92:14, 92:18, 97:25, 100:3, 109:6, 113:8, 123:9, 123:12, 123:20, 123:21, 124:11, 132:24, 135:17, 136:8, 136:24, 137:1, 144:4, 155:16, 156:7, 160:23, 162:2, 162:8, 162:11, 168:19, 169:24, 170:14, 172:14, 172:15, 172:17, 174:13, 175:24, 178:1, 178:4, 178:18, 179:2, 179:12, 179:18, 188:15, 189:6, 189:13, 195:4, 196:13, 196:24, 197:6, 198:10, 198:20, 198:22, 198:23, 200:5, 200:23, 200:24, 202:3, 202:11, 202:22, 202:25, 206:12, 214:3, 214:19, 216:5, 219:17

**remembered** [1] - 161:1

**remembering** [1] - 219:8

**remind** [1] - 13:14

**reminder** [1] - 5:8

**remorse** [1] - 61:10

**remorseful** [4] - 171:8, 171:11, 171:13, 171:20

**remove** [1] - 40:12

**repeat** [3] - 47:11, 126:9, 183:25

**rephrase** [2] - 5:10, 152:6

**report** [105] - 7:12, 8:14, 8:17, 8:20, 8:24, 9:3, 9:11, 10:6, 10:7,

33:24, 34:4, 36:23,
38:2, 38:10, 38:18,
38:19, 38:20,
63:23, 64:21,
65:18, 67:15,
70:17, 70:19, 71:6,
71:25, 72:6, 73:13,
74:18, 76:17,
77:21, 79:2, 80:19,
81:5, 81:21, 82:1,
83:6, 84:18, 86:6,
88:10, 88:11,
88:13, 89:2, 89:8,
90:9, 95:9, 95:10,
95:23, 98:23, 99:1,
101:11, 101:17,
103:19, 104:17,
105:2, 106:23,
112:5, 112:10,
117:14, 118:25,
144:10, 144:15,
146:19, 147:24,
148:19, 149:5,
156:19, 157:20,
165:25, 172:25,
180:12, 180:14,
180:16, 180:25,
181:13, 182:6,
182:8, 183:3,
183:17, 183:22,
183:24, 186:9,
188:10, 189:5,
189:8, 189:9,
189:15, 189:16,
189:19, 189:24,
190:1, 190:3,
190:7, 190:15,
191:10, 192:6,
199:16, 199:24,
200:15, 203:7,
203:10, 211:18,
214:2
   **Report** [1] - 63:23
   **Report.......** [2] -
3:10, 3:14
   **Report..........** [1] -
3:13
   **Report.............** [2]
- 3:17, 3:18
   **Report...............**
[11] - 3:7, 3:7, 3:8,
3:9, 3:9, 3:11,
3:12, 3:13, 3:14,
3:15, 3:19
   **Report................**
**.............** [2] - 3:19,
3:20
   **reported** [10] -
45:11, 47:1, 52:17,
78:16, 86:20, 95:3,
102:6, 107:14,
188:9, 190:1
   **reportedly** [1] -
66:13

   **Reporter** [2] -
1:17, 222:6
   **reporter** [1] - 4:15
   **reporting** [1] -
79:3
   **Reporting** [2] -
1:18, 223:7
   **reports** [36] - 7:3,
7:21, 8:2, 8:4, 8:6,
8:11, 31:2, 33:22,
35:18, 35:20,
35:23, 36:6, 36:10,
36:18, 39:1, 50:5,
50:7, 52:8, 52:15,
55:5, 59:20, 64:7,
64:22, 79:12,
80:14, 89:6, 96:21,
103:12, 120:20,
181:17, 183:14,
191:15, 191:24,
214:7, 215:5,
215:25
   **represent** [2] -
64:2, 180:22
   **request** [6] -
176:19, 177:3,
177:4, 177:8,
177:10, 188:8
   **requested** [9] -
100:24, 137:12,
137:15, 151:14,
176:18, 177:5,
188:24, 191:4,
192:5
   **requesting** [4] -
101:1, 102:11,
122:11, 191:17
   **requirement** [1] -
94:4
   **reserve** [1] -
221:4
   **residence** [1] -
84:12
   **residing** [1] - 84:9
   **resolved** [2] -
216:9, 216:12
   **respect** [17] -
8:10, 30:17, 37:24,
42:4, 42:15, 42:17,
42:21, 44:20,
44:24, 46:8, 47:14,
62:11, 62:19,
99:24, 122:23,
150:17, 215:11
   **responses** [2] -
120:17, 180:24
   **responsible** [1] -
38:23
   **restricted** [2] -
104:7, 104:14
   **resubmit** [1] -
72:13
   **resubmitted** [2] -

71:2, 203:20
   **result** [1] - 86:9
   **resulted** [3] -
108:14, 184:13,
189:25
   **results** [4] -
108:20, 109:11,
109:12, 110:10
   **retested** [1] - 71:3
   **retired** [8] -
10:21, 10:24,
13:20, 41:9, 41:25,
177:23, 194:3,
194:6
   **retirement** [5] -
11:13, 14:11,
14:23, 41:22, 78:4
   **returned** [1] -
27:3
   **reveal** [1] - 184:9
   **review** [25] - 9:17,
9:24, 25:13, 32:24,
33:10, 36:2, 38:16,
39:1, 39:16, 39:23,
51:14, 54:22, 57:4,
57:7, 57:24, 58:5,
64:23, 70:16,
72:10, 90:15, 96:5,
144:21, 154:18,
155:20, 165:11
   **reviewed** [20] -
8:15, 9:10, 25:4,
25:7, 31:11, 32:25,
38:3, 50:4, 50:12,
52:15, 55:5, 64:23,
65:2, 76:16, 79:14,
89:15, 100:23,
125:18, 125:19,
153:8
   **reviewing** [10] -
9:5, 9:13, 25:10,
39:17, 70:19, 72:6,
72:7, 98:21,
190:21, 207:19
   **revisit** [1] - 29:7
   **Reyes** [3] - 204:4,
204:9, 204:14
   **Richard** [30] -
9:18, 9:21, 25:2,
25:14, 25:18,
26:18, 28:11, 50:3,
55:21, 84:16,
84:21, 85:7, 88:15,
89:17, 92:19,
95:15, 97:25, 99:2,
99:14, 103:8,
103:23, 107:10,
109:21, 116:20,
146:23, 165:22,
173:5, 186:13,
218:19
   **right-hand** [1] -
181:5
   **rights** [11] -

90:21, 93:9, 93:22,
105:22, 111:4,
111:9, 111:14,
126:19, 126:21,
134:11, 207:11
   **robberies** [9] -
17:17, 18:3, 35:13,
176:9, 176:10,
176:11, 176:24
   **robbery** [5] -
160:6, 165:15,
165:18, 215:15,
216:25
   **Robert** [5] - 6:9,
99:15, 99:17,
100:4, 101:10
   **role** [3] - 160:12,
160:22, 160:23
   **role-played** [1] -
160:12
   **role-playing** [2] -
160:22, 160:23
   **room** [8] - 40:2,
53:4, 80:1, 85:8,
99:23, 126:18,
139:16, 139:23
   **Room** [1] - 2:6
   **rotate** [1] - 123:14
   **rotation** [1] -
123:12
   **route** [1] - 181:23
   **routinely** [1] -
185:5
   **rule** [1] - 109:18
   **Rules** [1] - 1:15
   **rules** [4] - 43:25,
44:1, 44:5, 44:8
   **run** [3] - 184:12,
186:12, 188:25
   **runaway** [1] -
31:23
   **running** [1] -
190:23

**S**

   **sale** [4] - 85:24,
91:17, 93:1,
119:14
   **Sam** [43] - 4:7,
4:19, 25:2, 26:21,
26:24, 117:22,
122:13, 122:21,
131:20, 132:19,
133:11, 133:18,
135:20, 136:6,
137:18, 139:3,
139:24, 142:18,
148:5, 151:8,
155:17, 155:21,
158:19, 160:12,
160:16, 160:21,
161:3, 161:13,
161:17, 165:19,

167:11, 174:25,
175:9, 175:11,
175:14, 175:17,
175:20, 186:14,
216:18, 216:21,
217:13, 218:14,
218:15
   **SAM** [1] - 1:4
   **SAMANTHA** [2] -
1:16, 222:5
   **Sammy** [17] -
91:24, 95:5, 95:6,
95:23, 117:22,
118:13, 118:18,
118:21, 118:25,
119:2, 119:5,
119:18, 121:15,
121:17, 125:17
   **sample** [2] -
184:21, 187:6
   **samples** [1] -
200:2
   **Sandra** [7] -
66:23, 67:1, 67:2,
78:15, 79:9, 79:18,
80:23
   **Saturday** [1] -
64:10
   **saw** [2] - 95:6,
189:9
   **scenarios** [1] -
35:12
   **scene** [7] - 35:11,
35:14, 46:3, 50:9,
50:12, 95:18,
104:5
   **School** [1] - 91:4
   **score** [1] - 101:4
   **Scott** [2] - 200:2,
200:3
   **seal** [1] - 222:17
   **Search** [1] - 3:16
   **search** [11] -
162:2, 162:3,
162:4, 162:6,
162:14, 163:14,
163:17, 163:19,
164:17, 184:7,
184:11
   **searched** [1] -
185:5
   **seat** [3] - 117:23,
117:24, 117:25
   **second** [12] -
56:9, 70:4, 85:3,
106:8, 113:14,
125:5, 134:17,
163:19, 164:23,
165:4, 183:3,
184:11
   **second-to-last**
[2] - 85:3, 134:17
   **seconds** [1] -

64:16
**section** [1] -
213:8
**Section** [8] -
65:16, 79:5, 90:7,
98:17, 144:25,
147:23, 148:17,
199:13
**see** [60] - 19:21,
56:2, 57:6, 64:5,
64:19, 74:4, 75:3,
76:18, 78:3, 79:17,
81:25, 82:7, 86:4,
87:11, 98:10,
98:18, 104:5,
104:10, 110:21,
111:1, 112:7,
127:15, 133:7,
147:16, 147:23,
160:11, 160:14,
160:18, 168:5,
169:9, 169:20,
177:24, 180:19,
181:4, 182:5,
182:6, 182:19,
182:21, 182:23,
183:5, 187:2,
188:25, 190:25,
198:24, 199:23,
200:3, 200:14,
203:12, 203:15,
203:17, 211:17,
211:19, 211:21,
212:12, 212:13,
212:24, 213:4,
213:8, 220:9,
220:13
**seeing** [5] -
113:8, 190:2,
190:5, 190:6,
190:11
**seek** [5] - 13:23,
141:19, 153:2,
170:24
**seeking** [6] -
153:5, 153:6,
154:18, 155:5,
162:2, 164:12
**seem** [1] - 191:1
**seize** [1] - 164:12
**seizure** [6] -
136:12, 136:22,
136:25, 137:7,
137:10, 140:8
**seizures** [1] -
136:16
**selection** [1] -
22:4
**sell** [2] - 26:11,
26:13
**semen** [1] - 204:2
**send** [1] - 36:1
**sense** [1] -
190:10

**sensitive** [3] -
16:18, 17:1, 17:5
**sent** [2] - 42:24,
181:18
**separate** [1] -
89:5
**September** [4] -
79:8, 184:6,
211:10, 211:25
**serial** [2] - 209:4,
209:11
**series** [1] -
145:21
**serious** [1] -
84:24
**serve** [1] - 138:24
**served** [1] - 12:10
**Service** [1] - 3:21
**service** [2] -
42:20, 211:3
**set** [7] - 35:12,
58:14, 60:10,
100:8, 100:11,
109:7, 222:16
**sets** [1] - 220:9
**setting** [1] -
154:16
**settled** [1] -
217:15
**seven** [1] -
123:16
**several** [2] - 80:1,
124:8
**sex** [10] - 78:16,
78:17, 79:21,
79:22, 80:9, 80:22,
187:19, 187:20,
187:21, 187:25
**sexual** [13] -
16:17, 16:22,
16:25, 32:14,
32:17, 32:19,
32:25, 33:13,
158:25, 159:24,
215:18, 215:23
**sexually** [1] -
215:18
**SH** [2] - 219:25,
220:11
**SHALLUE** [2] -
1:16, 222:5
**shape** [1] - 163:1
**share** [5] - 47:23,
59:22, 151:19,
151:23, 152:13
**shared** [1] -
151:21
**Sheila** [5] -
179:12, 200:21,
201:1, 202:4,
205:12
**shelf** [2] - 40:1,
40:10

**shift** [21] - 18:2,
18:5, 18:6, 55:22,
57:12, 58:10,
58:22, 59:2, 59:3,
59:5, 59:6, 59:8,
59:9, 59:14, 59:24,
100:13, 100:15,
122:10, 192:17,
199:25
**shifts** [2] -
123:15, 192:19
**shirt** [5] - 33:8,
51:7, 80:4, 175:12,
175:18
**shoes** [1] - 64:13
**shootings** [1] -
16:11
**short** [6] - 11:3,
11:4, 14:6, 56:7,
70:7, 183:24
**shortly** [1] - 20:6
**show** [8] - 61:10,
78:19, 95:14, 98:8,
147:16, 169:10,
174:3, 174:6
**showed** [2] -
67:21, 83:5
**showing** [2] -
86:11, 147:20
**shown** [1] - 95:12
**shows** [1] -
213:22
**shy** [1] - 91:10
**sic** [7] - 10:1,
112:20, 119:21,
146:24, 160:16,
193:1, 211:6
**Side** [1] - 63:2
**side** [3] - 31:24,
66:22, 135:18
**sign** [9] - 22:6,
22:7, 39:4, 39:14,
40:13, 40:15,
40:18, 61:1,
183:13
**sign-off** [2] -
22:6, 22:7
**signature** [9] -
65:21, 106:8,
106:11, 110:16,
128:7, 128:18,
183:11, 189:4,
221:5
**signatures** [3] -
219:11, 219:17,
220:21
**signed** [9] - 39:8,
128:4, 133:4,
133:5, 134:19,
134:25, 157:16,
188:12
**similar** [3] - 69:3,
177:10, 220:12

**similarly** [1] -
45:25
**Simons** [25] - 6:9,
6:12, 99:15, 99:17,
100:4, 102:12,
103:2, 103:3,
103:19, 109:8,
135:23, 137:24,
155:24, 156:8,
156:20, 157:21,
157:25, 159:10,
159:23, 160:3,
160:12, 160:18,
160:21, 161:12,
161:16
**Simons'** [2] -
101:11, 137:21
**simultaneously**
[1] - 21:2
**single** [2] - 68:24,
69:5
**sister** [1] - 91:25
**sister's** [1] - 95:4
**sit** [52] - 23:4,
24:3, 24:18, 25:16,
26:1, 27:25, 28:10,
28:17, 30:12,
30:15, 30:21,
31:18, 32:11,
39:17, 44:3, 58:13,
63:4, 63:10, 65:4,
68:7, 69:15, 70:1,
74:8, 94:22,
104:13, 120:11,
126:11, 127:2,
142:6, 155:11,
155:17, 156:5,
159:22, 165:2,
171:10, 172:12,
188:23, 190:13,
190:21, 191:23,
192:4, 198:3,
198:10, 205:7,
205:11, 205:19,
210:6, 214:5,
214:22, 215:3,
216:20, 217:9
**situation** [1] -
84:25
**situations** [1] -
207:4
**six** [2] - 17:24,
108:22
**size** [1] - 163:1
**SJH1347** [1] -
98:15
**SJH1434** [1] -
211:1
**SJH284** [1] -
63:24
**SJH354** [1] -
65:14
**SJH497** [1] - 79:1
**SJH552** [1] - 90:6

**SJH716** [1] -
105:19
**SJH720** [1] -
107:7
**SJH747** [1] -
133:8
**SJH756** [1] -
163:15
**SJH863** [1] -
182:4
**skills** [2] - 42:17,
44:13
**slashed** [7] -
32:3, 86:10, 86:16,
86:23, 87:15,
87:25, 88:19
**small** [2] - 145:6
**smoked** [2] -
26:22, 118:7
**smoking** [1] -
27:1
**smug** [2] - 53:7,
53:11
**social** [1] -
192:23
**soda** [1] - 133:21
**someone** [7] -
62:2, 91:23, 93:5,
100:7, 100:9,
100:20, 109:1
**sometime** [5] -
102:25, 107:17,
166:1, 176:7,
197:7
**sometimes** [5] -
48:8, 48:12, 48:15,
206:24, 208:21
**somewhat** [1] -
53:22
**somewhere** [2] -
137:6, 168:1
**son** [2] - 84:24,
85:7
**sorry** [45] - 11:22,
14:12, 15:16, 19:2,
19:5, 21:16, 22:4,
30:13, 44:1, 46:22,
46:23, 46:24,
47:12, 57:19,
57:22, 58:3, 58:19,
62:21, 70:4, 70:15,
71:19, 89:10,
93:16, 99:15,
106:2, 113:13,
113:17, 127:14,
129:18, 132:5,
132:9, 133:15,
133:16, 147:11,
153:5, 159:12,
162:23, 166:21,
168:16, 175:10,
176:3, 176:8,
189:10, 213:5,

216:24
**sort** [5] - 30:9, 46:21, 69:3, 134:1, 173:20
**sought** [1] - 13:23
**sound** [3] - 10:14, 22:22, 23:25
**sounds** [3] - 154:11, 196:10, 208:13
**sources** [1] - 193:14
**South** [1] - 31:23
**south** [1] - 202:21
**speaking** [1] - 58:18
**special** [3] - 11:8, 61:25, 171:5
**specialized** [2] - 211:4, 211:18
**specially** [1] - 35:21
**specific** [5] - 46:1, 120:14, 143:2, 143:6, 170:18
**specifically** [2] - 174:15, 191:9
**specifics** [2] - 85:1, 196:11
**speculate** [2] - 131:14, 196:16
**speed** [1] - 31:15
**spelling** [1] - 4:24
**spend** [1] - 138:4
**spent** [2] - 167:25, 168:12
**spoken** [2] - 9:21, 157:24
**spot** [2] - 118:15, 118:19
**squad** [24] - 17:16, 19:15, 19:18, 19:24, 20:2, 20:5, 20:11, 20:20, 20:25, 21:11, 22:9, 22:17, 23:2, 23:8, 23:10, 66:9, 68:11, 72:3, 72:10, 72:16, 72:22, 77:22, 83:3, 123:23
**square** [2] - 131:23, 132:7
**squares** [4] - 129:19, 131:6, 131:15
**squiggly** [2] - 130:3, 132:20
**sS** [2] - 222:1, 223:1
**stabbings** [2] - 16:11, 16:12
**stack** [1] - 51:4

**stamp** [10] - 63:24, 65:14, 79:1, 90:6, 145:1, 148:16, 182:20, 182:25, 183:8, 211:17
**stamped** [5] - 67:9, 105:19, 107:7, 147:22, 199:11
**stamps** [3] - 98:15, 144:23, 163:15
**standard** [1] - 186:12
**Standards** [1] - 211:7
**standards** [2] - 189:1, 190:23
**standing** [1] - 64:10
**Stanley** [1] - 209:23
**start** [5] - 17:3, 26:5, 56:10, 59:8, 60:14
**started** [7] - 11:20, 11:24, 94:15, 106:16, 127:14, 207:2, 207:7
**starting** [3] - 57:5, 58:1, 127:11
**state** [5] - 4:14, 181:17, 185:6, 202:16
**State** [3] - 1:17, 222:7, 222:22
**STATE** [2] - 222:1, 223:1
**Statement** [1] - 211:6
**statement** [76] - 7:1, 7:7, 7:12, 8:18, 9:6, 25:5, 26:20, 27:8, 27:13, 27:16, 27:18, 28:20, 35:2, 54:5, 60:16, 60:20, 60:23, 60:25, 61:2, 61:5, 61:9, 96:6, 96:23, 97:3, 105:21, 106:22, 107:8, 107:14, 107:22, 110:15, 110:17, 110:20, 110:22, 112:3, 114:4, 117:15, 121:16, 125:18, 125:19, 127:25, 133:11, 134:3, 137:11, 142:9, 142:11, 143:10, 146:16, 146:23,

153:22, 155:23, 156:2, 156:8, 157:7, 166:16, 167:1, 171:13, 171:16, 172:8, 172:21, 173:8, 173:10, 173:13, 174:4, 174:5, 207:19, 217:2, 217:5, 217:6, 218:14, 218:15, 218:19, 219:12
**Statement..........** .... [4] - 3:10, 3:11, 3:12, 3:15
**statements** [25] - 7:2, 7:15, 7:19, 7:23, 9:9, 9:17, 54:22, 55:6, 55:8, 55:10, 73:20, 74:11, 85:23, 89:4, 89:5, 92:21, 92:23, 92:24, 135:1, 150:8, 150:25, 152:24, 167:12, 167:16, 208:22
**states** [3] - 87:8, 95:2, 111:4
**States** [1] - 4:8
**STATES** [1] - 1:1
**stating** [2] - 85:25, 218:19
**stay** [1] - 114:15
**staying** [8] - 31:25, 32:8, 52:19, 66:22, 80:22, 81:11, 187:23, 187:24
**steno** [2] - 37:4, 37:22
**stenographer** [3] - 35:25, 38:11, 38:14
**step** [1] - 115:14
**steps** [3] - 31:10, 152:23, 155:12
**still** [9] - 10:16, 18:24, 19:7, 24:1, 30:7, 59:3, 97:3, 158:3, 166:25
**stint** [1] - 15:13
**stop** [1] - 10:19
**stopped** [2] - 118:6, 177:18
**stopping** [2] - 118:4, 118:7
**STR** [4] - 183:25, 184:7, 184:14, 184:20
**strange** [1] - 57:1
**strangled** [2] - 69:21, 179:4
**Strangler** [1] -

63:3
**street** [2] - 17:17, 129:16
**Street** [12] - 1:19, 2:6, 4:11, 84:10, 85:21, 86:8, 86:9, 118:2, 118:3, 118:7, 223:7
**streets** [1] - 129:20
**strike** [26] - 8:4, 20:1, 28:7, 30:14, 36:16, 44:20, 58:20, 89:10, 104:21, 110:20, 117:2, 118:19, 122:5, 141:6, 143:3, 147:4, 150:5, 159:3, 159:7, 159:9, 170:13, 170:25, 175:10, 186:21, 193:11
**strongly** [1] - 104:2
**struck** [2] - 144:3, 146:17
**stuff** [2] - 80:7, 80:11
**sub** [1] - 186:11
**sub-designation** [1] - 186:11
**Subject** [1] - 95:10
**subject** [7] - 8:17, 26:10, 35:4, 35:9, 157:11, 165:22, 212:11
**subject's** [1] - 104:8
**submission** [1] - 67:18
**submitted** [4] - 77:1, 101:7, 199:16, 203:7
**submitting** [2] - 99:6, 156:24
**Subscribed** [1] - 223:19
**subsection** [1] - 145:1
**Subsequent** [1] - 89:3
**subsequently** [3] - 26:17, 74:19, 85:7
**substance** [3] - 33:18, 42:13, 44:15
**suddenly** [1] - 120:3
**suffering** [1] - 136:15

**suggest** [1] - 187:14
**Suite** [2] - 1:19, 223:7
**summoned** [1] - 126:15
**Sunday** [1] - 64:10
**superficial** [1] - 145:15
**supervision** [1] - 212:22
**supervisor** [5] - 22:2, 22:12, 39:4, 39:10, 39:14
**supervisor's** [2] - 21:25, 22:6
**supervisors** [2] - 21:19, 188:18
**supp** [3] - 147:24, 148:19, 149:5
**Supplementary** [12] - 3:7, 3:7, 3:8, 3:9, 3:9, 3:11, 3:12, 3:13, 3:14, 3:15, 3:19, 63:22
**supplementary** [22] - 7:11, 7:21, 8:11, 8:14, 8:20, 9:3, 9:11, 36:22, 65:17, 79:2, 81:5, 81:20, 81:25, 89:6, 90:9, 106:23, 112:5, 112:10, 117:14, 157:20, 165:24, 200:15
**supplier** [1] - 185:20
**Support** [1] - 3:16
**support** [3] - 29:9, 163:14, 163:16
**supposed** [1] - 36:21
**survive** [1] - 16:15
**Susik** [1] - 22:21
**Suspect** [1] - 75:5
**suspect** [20] - 35:2, 45:21, 46:4, 46:10, 47:15, 47:17, 48:4, 75:5, 75:8, 75:22, 75:24, 80:18, 82:14, 92:20, 93:12, 93:18, 102:13, 172:20, 173:21
**suspect's** [1] - 172:25
**suspected** [1] - 49:25
**suspects** [17] - 30:1, 34:21, 34:24,

42:5, 42:15, 44:19,
45:1, 60:3, 60:9,
71:4, 74:19, 75:1,
75:19, 76:19,
174:18, 187:12,
190:24
**Sutter** [3] - 18:16,
18:22, 19:12
**swab** [10] - 163:4,
184:3, 184:15,
184:21, 184:24,
186:10, 190:17,
190:19, 190:25,
204:10
**swear** [1] - 4:16
**switch** [1] -
175:23
**switched** [1] -
123:18
**sworn** [8] - 5:1,
12:13, 12:18,
12:25, 13:1, 13:4,
223:19
**Sylvester** [1] -
200:3

**T**

**T-shirt** [1] - 80:4
**talkative** [1] -
169:17
**tandem** [1] -
183:24
**task** [1] - 77:19
**tattoos** [1] - 51:21
**taught** [1] - 44:15
**tearful** [2] -
171:25, 172:3
**tears** [4] - 169:2,
169:3, 169:10,
169:13
**tease** [1] - 48:9
**technique** [5] -
43:1, 43:4, 104:10,
174:9, 174:16
**Techniques** [1] -
213:9
**techniques** [5] -
42:18, 42:22,
44:13, 213:3,
213:19
**Temp** [9] - 18:16,
18:22, 19:10,
20:15, 21:22,
23:19, 72:20,
72:21
**ten** [1] - 11:2
**ten-year** [1] - 11:2
**Teresa** [2] -
84:12, 92:1
**term** [5] - 14:8,
43:1, 43:20, 44:2,
49:4
**terms** [6] - 11:8,

11:23, 52:16,
121:18, 121:23,
146:8
**Terrance** [1] -
75:6
**test** [4] - 13:15,
13:18, 48:3, 212:6
**tested** [4] - 30:8,
188:7, 188:9
**testified** [20] -
5:2, 23:14, 23:15,
23:23, 27:6, 30:25,
33:20, 42:3, 77:24,
143:7, 143:17,
150:23, 167:25,
168:17, 169:10,
169:15, 171:7,
198:9, 206:9,
218:9
**testify** [5] - 166:6,
166:8, 166:18,
166:20, 166:21
**testimony** [25] -
9:24, 22:8, 24:4,
31:5, 48:19, 57:4,
57:8, 57:25, 58:6,
113:9, 113:12,
137:9, 137:17,
138:7, 138:14,
139:1, 139:10,
154:11, 166:13,
166:16, 168:5,
169:19, 169:21,
190:11, 206:12
**testing** [13] -
70:23, 72:8, 72:13,
73:6, 73:9, 73:17,
73:25, 76:19,
76:21, 77:18,
178:2, 190:22,
203:20
**THE** [31] - 1:1,
1:2, 4:2, 70:8,
70:11, 74:15, 87:6,
88:3, 94:2, 94:12,
97:17, 97:20,
104:25, 105:8,
111:11, 125:7,
125:10, 130:16,
140:13, 141:11,
150:10, 150:15,
150:20, 153:18,
159:16, 160:1,
181:21, 191:21,
205:25, 206:3,
221:8
**themselves** [4] -
109:16, 134:4,
208:16, 208:23
**there'd** [3] -
35:25, 109:13,
164:23
**thigh** [1] - 146:2
**thinking** [2] -

69:23, 131:9
**thinks** [1] -
217:16
**third** [3] - 74:17,
106:12, 133:8
**third-to-last** [1] -
133:8
**this_____
day** [1] - 223:19
**Thomas** [2] -
18:18, 75:23
**threat** [2] -
139:12, 139:20
**threaten** [6] -
117:4, 138:4,
138:10, 139:3,
139:6, 161:8
**threats** [3] -
116:14, 116:20,
161:17
**three** [8] - 16:5,
75:19, 76:19,
84:19, 89:12,
123:16, 131:4,
220:14
**throat** [13] - 32:3,
86:10, 86:16,
87:14, 88:18,
119:7, 119:21,
119:22, 158:9,
158:17, 158:20,
164:10, 179:5
**today** [61] - 4:23,
5:21, 6:8, 9:15,
23:4, 24:3, 24:18,
25:16, 26:1, 27:25,
28:10, 28:17,
30:12, 30:15,
30:21, 31:18,
32:11, 39:17, 44:4,
63:5, 63:10, 65:4,
68:7, 69:15, 70:2,
74:8, 76:17, 94:22,
104:13, 113:12,
114:20, 114:22,
120:11, 126:12,
127:2, 137:20,
142:6, 155:12,
155:17, 156:5,
159:22, 165:2,
171:11, 172:13,
188:23, 190:13,
190:21, 191:23,
192:4, 198:3,
198:10, 205:7,
205:11, 205:19,
210:6, 214:5,
214:22, 215:3,
216:21, 217:9,
218:25
**today's** [1] - 4:3
**together** [11] -
19:13, 23:20,
23:21, 69:1,

176:18, 176:21,
176:23, 176:25,
177:1, 177:4,
192:11
**took** [15] - 13:17,
21:9, 21:11, 29:21,
31:10, 36:22,
39:18, 54:11,
67:11, 98:3,
110:13, 136:14,
153:1, 155:12,
194:18
**tools** [1] - 49:10
**top** [5] - 110:21,
129:9, 164:1,
182:13, 182:24
**torn** [2] - 51:11,
163:24
**total** [4] - 12:10,
15:11, 20:19,
213:12
**touch** [1] - 22:2
**towards** [1] -
64:16
**towel** [2] - 80:5,
80:6
**toxicology** [2] -
10:7, 144:15
**traffic** [1] - 212:22
**trained** [5] -
35:10, 43:13,
44:12, 209:25,
213:19
**Training** [1] -
3:21
**training** [27] -
34:9, 34:20, 34:23,
35:1, 35:5, 35:17,
36:9, 36:20, 42:4,
42:10, 42:24, 43:4,
43:8, 44:11, 60:2,
61:16, 61:19, 62:1,
62:7, 62:11, 62:14,
62:18, 211:3,
211:4, 211:18,
212:12, 213:22
**trainings** [1] -
42:20
**transcript** [1] -
223:5
**Transcript** [2] -
3:23, 211:8
**TRANSCRIPT** [1]
- 4:1
**Transcript..........
....** [1] - 3:6
**transferred** [1] -
177:15
**transported** [1] -
136:4
**Trauma** [2] -
144:24, 145:2
**trauma** [1] - 145:4

**tray** [3] - 39:2,
39:4, 39:7
**treated** [2] -
44:25, 46:9
**trial** [8] - 71:21,
71:23, 166:4,
166:24, 167:8,
176:8, 198:12
**triangle** [1] -
132:22
**trick** [1] - 68:10
**trickery** [5] - 49:2,
49:5, 49:10, 49:13,
49:15
**tried** [2] - 31:10,
60:11
**triggered** [1] -
190:7
**trouble** [1] -
104:9
**Trudell** [1] - 18:16
**true** [18] - 31:7,
31:9, 36:4, 37:8,
42:7, 49:17, 49:21,
61:1, 61:24, 62:18,
126:3, 133:11,
140:16, 146:22,
166:22, 167:11,
172:6, 223:8
**truly** [1] - 47:3
**truth** [13] - 54:4,
133:17, 149:22,
149:25, 151:12,
151:18, 151:24,
152:9, 152:17,
152:25, 170:8,
170:23, 173:25
**truthful** [1] -
103:23
**truthfulness** [1] -
101:12
**try** [12] - 30:22,
44:21, 46:16,
46:20, 46:25,
47:16, 48:9, 48:21,
57:13, 83:20,
152:21, 170:24
**trying** [6] - 30:19,
68:10, 69:1, 84:7,
179:17, 207:13
**Tuesday** [2] -
67:16, 90:10
**turn** [4] - 94:16,
133:15, 139:22,
169:7
**turned** [3] -
12:18, 36:22,
214:13
**turning** [1] -
38:24
**Two** [1] - 146:1
**two** [31] - 16:5,
17:21, 27:22,

Case 2:19-cv-01106-PP Filed 03/20/24 Page 247 of 249 Document 119-4

63:23, 74:10, 95:7, 110:2, 123:13, 123:17, 131:5, 133:16, 133:24, 145:6, 150:25, 151:3, 186:5, 186:22, 187:9, 187:11, 197:14, 197:15, 198:17, 211:6, 211:12, 212:9, 213:3, 215:5, 220:9, 220:14

**two-page** [1] - 63:23

**two-way** [1] - 110:2

**type** [2] - 35:25, 170:8

**typed** [2] - 36:1, 38:3

**typical** [7] - 29:15, 108:13, 108:22, 109:1, 109:6, 110:13, 134:22

**typically** [1] - 164:22

## U

**ultimately** [1] - 193:24

**unable** [1] - 86:12

**unbuttoned** [1] - 164:4

**uncertain** [1] - 131:15

**uncle** [2] - 12:4, 12:8

**under** [13] - 1:14, 32:2, 94:4, 116:24, 116:25, 127:1, 127:3, 158:4, 174:22, 175:1, 183:8, 213:4, 222:9

**underneath** [1] - 51:4

**underpants** [1] - 204:3

**understood** [3] - 5:13, 126:20, 194:5

**unidentified** [1] - 33:17

**unique** [1] - 206:19

**unit** [24] - 11:11, 11:13, 14:24, 14:25, 15:9, 15:14, 16:18, 17:7, 17:12, 17:20, 29:23, 58:23, 69:8, 70:22,

71:6, 71:12, 99:22, 99:24, 160:6, 176:4, 177:5, 178:1, 192:12, 192:16

**UNITED** [1] - 1:1

**United** [1] - 4:8

**units** [2] - 11:8, 14:18

**unknown** [8] - 184:2, 184:7, 184:20, 184:23, 186:4, 186:17, 188:25, 191:25

**unless** [2] - 59:12, 100:22

**unsolved** [1] - 68:13

**unusual** [3] - 114:11, 114:19, 120:9

**up** [55] - 19:23, 26:17, 26:23, 29:13, 29:17, 30:4, 30:9, 30:13, 30:16, 31:15, 31:24, 33:8, 35:12, 35:25, 36:1, 38:11, 43:19, 51:7, 59:1, 64:25, 83:8, 84:4, 90:10, 100:8, 100:11, 109:7, 122:10, 123:18, 132:11, 136:4, 149:17, 154:16, 155:4, 164:25, 175:12, 175:18, 185:16, 185:23, 187:1, 187:2, 187:5, 188:3, 188:6, 188:24, 189:25, 191:3, 192:5, 194:13, 197:17, 204:12, 206:7, 206:25, 207:7, 207:9, 219:2

**upside** [2] - 130:15, 130:16

## V

**vacant** [1] - 32:1

**vagina** [1] - 33:18

**vaginal** [8] - 184:3, 184:15, 184:21, 184:24, 186:10, 190:17, 190:19, 190:25

**vague** [1] - 196:10

**Valuch** [7] - 199:25, 200:16, 200:17, 200:18, 200:19, 200:25

**various** [8] - 14:17, 18:9, 35:11, 145:22, 189:2, 190:23, 197:10, 212:16

**Venus** [3] - 77:1, 77:7, 77:8

**verbatim** [2] - 143:13, 174:5

**versus** [4] - 4:7, 9:25, 56:17, 207:4

**VI** [2] - 213:5

**victim** [6] - 33:12, 46:2, 46:19, 50:21, 184:18, 215:19

**victims** [13] - 16:15, 68:21, 69:12, 69:17, 69:19, 69:20, 69:22, 76:10, 186:5, 187:10, 197:2, 202:8, 209:4

**Victor** [3] - 77:1, 77:6, 77:8

**Video** [1] - 1:13

**Videographer** [1] - 2:10

**VIDEOGRAPHE R** [10] - 4:2, 70:8, 70:11, 97:17, 97:20, 125:7, 125:10, 205:25, 206:3, 221:8

**videographer** [1] - 4:13

**view** [1] - 141:16

**violence** [2] - 139:12, 139:20

**violent** [8] - 14:24, 15:2, 16:8, 16:10, 16:21, 17:1, 17:4, 17:7

**volunteers** [1] - 120:3

**vs** [1] - 1:7

## W

**wait** [3] - 56:11, 108:22, 110:5

**waited** [1] - 118:22

**waiver** [1] - 128:4

**walk** [2] - 64:17, 136:9

**walked** [4] - 26:25, 64:14, 64:15, 136:7

**walking** [2] - 64:11, 136:6

**wall** [1] - 145:10

**Wallace** [1] - 75:6

**Walter** [24] -

62:24, 63:1, 75:14, 78:8, 79:20, 123:5, 186:13, 193:2, 193:6, 193:10, 193:14, 193:16, 194:19, 194:21, 195:21, 195:25, 196:6, 197:1, 197:8, 197:12, 197:18, 197:24, 198:14, 205:8

**warnings** [3] - 60:13, 106:13, 206:19

**warrant** [5] - 162:2, 162:4, 163:14, 163:17, 163:20

**Warrant.............. ............** [1] - 3:16

**watching** [1] - 207:1

**Water** [3] - 1:19, 4:11, 223:7

**weak** [1] - 161:2

**weakness** [1] - 135:17

**weapon** [1] - 45:9

**wearing** [1] - 51:10

**weed** [2] - 26:23, 27:2

**week** [1] - 89:10

**weeks** [6] - 6:13, 6:21, 25:5, 25:14, 25:22, 125:22

**Wells** [1] - 2:6

**Wesolowski** [13] - 18:17, 18:22, 18:25, 175:25, 176:16, 177:22, 177:25, 188:21, 202:9, 202:23, 203:8, 204:6, 204:25

**Wesolowski's** [1] - 181:9

**West** [5] - 64:9, 85:22, 86:8, 118:3, 129:6

**whatever's** [1] - 142:24

**whereabouts** [1] - 52:17

**whereof** [1] - 222:16

**whichever** [1] - 117:15

**white** [15] - 26:12, 26:21, 33:17, 64:11, 87:24, 91:22, 92:25, 95:7, 158:9, 158:16,

158:19, 158:22, 159:1, 160:13, 160:17

**whole** [1] - 34:5

**WILLIAMS** [2] - 2:10, 56:8

**Williams** [39] - 4:23, 6:7, 6:11, 6:22, 53:21, 53:24, 54:2, 54:6, 54:15, 147:7, 148:23, 148:25, 149:15, 149:20, 149:23, 150:4, 150:6, 150:12, 151:16, 152:7, 154:17, 154:21, 159:6, 165:12, 166:11, 191:11, 195:4, 195:5, 195:10, 196:5, 196:25, 197:22, 198:4, 198:9, 198:11, 198:16, 204:13, 214:14

**Williams'** [3] - 151:9, 151:10, 151:23

**willing** [2] - 126:21, 149:17

**WISCONSIN** [2] - 1:2, 222:1

**Wisconsin** [17] - 1:18, 1:19, 2:7, 3:17, 3:18, 4:9, 4:11, 180:11, 182:5, 184:8, 184:13, 192:7, 211:7, 222:7, 222:18, 222:22, 223:8

**wished** [1] - 126:16

**WITNESS** [19] - 74:15, 87:6, 88:3, 94:2, 94:12, 104:25, 105:8, 111:11, 130:16, 140:13, 141:11, 150:10, 150:15, 150:20, 153:18, 159:16, 160:1, 181:21, 191:21

**witness** [22] - 4:16, 4:25, 11:11, 11:12, 35:2, 108:2, 129:5, 138:9, 138:21, 139:19, 139:22, 141:25, 150:13, 150:25, 156:8, 161:12, 161:16, 170:2, 172:20, 173:1, 173:22, 222:16

**witnesses** [2] - 42:5, 167:8

**women** [2] - 69:23, 179:3

**word** [2] - 210:5, 210:11

**words** [7] - 61:4, 61:8, 61:11, 126:24, 134:2, 191:2, 217:2

**worker** [2] - 76:2, 76:6

**write** [8] - 60:16, 60:24, 61:3, 61:7, 134:2, 143:20, 208:18, 220:1

**writing** [7] - 128:25, 130:25, 131:2, 131:25, 132:6, 133:22, 222:9

**writings** [1] - 171:12

**written** [9] - 27:16, 38:11, 109:18, 182:23, 183:5, 208:20, 208:22, 219:12, 221:2

**wrote** [2] - 36:6, 207:19

**Wynn** [2] - 75:23, 76:5

## X

**X-way** [1] - 129:12

## Y

**year** [9] - 11:2, 15:15, 15:22, 17:8, 19:13, 23:9, 23:11, 71:11, 90:25

**years** [20] - 10:14, 11:3, 11:4, 12:10, 15:10, 15:11, 16:4, 16:5, 17:21, 17:24, 18:2, 18:4, 91:10, 138:4, 138:11, 138:19, 138:24, 161:6, 187:11, 194:3

**young** [2] - 104:8, 104:18

**yourself** [1] - 65:6