# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN, MILWAUKEE DIVISION

| | | |
|---|---|---|
| SAM HADAWAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 2:19-cv-01106 |
| | ) | |
| CITY OF MILWAUKEE, ET AL., | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS IN SUPPORT OF HIS RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Sam Hadaway, by and through his attorneys, responds to the Defendants' LR 56.1 statement of facts as follows

### The Murder of Jessica Payne

1.     On the morning of August 30, 1995, the body of Jessica Payne was found on a mattress behind a vacant home located at 3116 North 7th Street, Milwaukee, Wisconsin. Ex. 1 (Morrow *Ott* Preliminary Hearing Test.) at 4:25-5:25. Ms. Payne had a "deep type, gashing type injury in the throat area." Ex. 1 (Morrow *Ott* Preliminary Hearing Test.) at 6:4-5.

2.     The manner in which Payne's body was found indicates a possible sexual assault; specifically, her body was found partially nude; there was bruising below her breast and on her inner thighs; her bra was torn in the center exposing her breasts; her t-shirt was pulled up near breast level, and her pants were pulled down to the knee area. Ex. 2 (Waller Decl.) at 48; Ex. 1 (Morrow *Ott* Preliminary Hearing Test.) at 5:1-25; Ex. 3 (Teggatz *Ott* Test.) at 212:5-13; Ex. 4 (Buschmann Dep. 4/7/21) at 32:24-33; Ex. 5 (Buschmann Dep. 6/30/10) at 29:23-30:3, 31:23-32:5.

3.     The medical examiner ordered a sexual assault kit, and a high concentration of seminal material was found. Ex. 2 (Waller Decl.) at 47; Ex. 3 (Teggatz *Ott* Test.) at 201:16-20.

**Plaintiff Sam Hadaway is Absolutely Innocent of this Crime**

4.     Plaintiff Sam Hadaway is absolutely innocent of this crime. Ex. 6 (Hadaway Claims Board Decision) at 3 ("[T]he Board concludes and finds that the evidence is clear and convincing that Hadaway was innocent of the charge discussed herein . . . ."); Ex. 7 (Hadaway Dep. 8/31/22) at 241:13-14, 327:25-328:11. In 2021, Plaintiff was declared innocent by "clear and convincing" evidence by the Wisconsin State Claims Board. Ex. 6 (Hadaway Claims Board Decision) at 3.

5.     Instead, the crime was committed by serial killer Walter Ellis. Ex. 8 (Spano Dep. 11/11/21) at 37:3-11; Ex. 9 (Lankford Aff. 2/10/13) at ¶ 8 (noting DNA match between Ellis and vaginal swab/smear of Payne). DNA evidence from the vaginal swab/smear of Jessica Payne matched Ellis's DNA. Ex. 9 (Lankford Aff. 2/10/23) at ¶ 8.

6.     Ellis's DNA was also found on the following homicide victims, all of whom were women murdered on the north side of Milwaukee between 1986 and 2007:

    a.  Debra Harris
    b.  Tanya Miller
    c.  Irene Smith
    d.  Carron Kilpatrick
    e.  Florence McCormick
    f.  Sheila Farrior.
    g.  Carron Kilpatrick
    h.  Maryetta Griffin
    i.  Joyce Mims
    j.  Ouitherean Stokes

Ex. 10 (Lankford Aff. 3/28/13) at ¶¶ 18-37; Ex. 2 (Waller Decl.) at 8, 48-49; Ex. 11 (Barbian-Gayan Dep. 12/1/2021) at 52:15-25. Ex. 12 (Williams Dep. 9/9/2022) at 70:20-72:12 ("the proximity was one of the arguments we made that Mr. Ellis did this. They were all within a

reasonable distance of each other," just a few houses away). In 2009, Ellis was arrested and charged with the homicides of Harris, Miller, Smith, McCormick, Farrior, Mims and Stokes. Ex. 8 (Spano Dep. 11/11/21) at 154:4-155:6. Two years later, in 2011, Ellis was convicted of murdering Harris, Miller, Smith, McCormick, Farrior, Mims and Stokes. Ex. 13 (Case Details – State v. Ellis); Ex. 2 (Waller Decl.) at 8, 19.

### The Moore Report

7. That the Payne homicide was committed by a serial killer was not news to the Milwaukee Police Department ("MPD"). Before Payne was killed, the homicide detectives in the MPD were "cognizan[t]" of the possibility that a serial killer was involved in the homicides of women on the north side of Milwaukee. Ex. 11 (Barbian-Gayan Dep.) at 36:4-23; Ex. 14 (E. Moore Dep. 8/29/22) at 69:16-21, 70:7-14, 71:12-25, 74:1-13. The victims of these homicides were women "living on the fringe of society;" many were either drug-addicted or prostituting themselves for drugs; a lot of the victims were sexually assaulted; many victims had injuries to their neck; and many victims were left in vacant lots or buildings, or even trash cans. Ex. 14 (E. Moore Dep. 8/29/22) at 71:5, 71:12-72:17.

8. The detectives would track these unsolved homicides on a chart that included information such as the M number of the homicide, the name of the victim, the location of the murder, and the cause of death. Ex. 11 (Barbian-Gayan Dep.) at 36:19-37:13; Ex. 14 (E. Moore Dep. 8/29/22) at 67:15-25. As new information and/or murders came in, they would be added to the chart. Ex. 11 (Barbian-Gayan Dep.) at 87:14-20.

9. A number of Ellis victims were on the detectives' chart: Ouitherean Stokes, Joyce Mims, Deborah Harris and Florence McCormick. Ex. 11 (Barbian-Gayan Dep.) at 36:21-37:10. Payne may also have been on the chart. Ex. 11 (Barbian-Gayan Dep.) at 36:21-37:10.

3

10.     In addition to the chart, Detectives Barbian-Gayan and Eric Moore were specifically assigned to review 32 unsolved homicides to look for a possible connection among them and to determine whether there was physical evidence that could be DNA tested. Ex. 14 (E. Moore Dep. 8/29/22) at 74:15-78:14, 82:19-83:25, 95:14-96:20; Ex. 11 (Barbian-Gayan Dep.) at 36:4-13, 51:16-23; Ex. 15 (Moore Report 1/9/96). This investigation was going on at least by the time of the Payne autopsy. Ex. 11 (Barbian-Gayan Dep.) at 75:7-23; Ex. 14 (E. Moore Dep. 8/29/22) at 83:11-17.

11.     Detective Moore identified five cases that should be prioritized for DNA testing, including Payne's and two other women—Sheila Farrior and Florence McCormick—whose murders were eventually linked to Ellis. Ex. 14 (E. Moore Dep. 8/29/22) at 87:23-93:2, 95:14-21; Ex. 15 (Moore Report 1/9/96) at 5-8; *see* PSOAF ¶¶ 5-10 above. Although not memorialized in the Moore Report, Detective Moore thought there was a possibility that the assailant in all five cases could be connected. Ex. 14 (E. Moore Dep. 8/29/22) at 95:14-21; *see also id*. at 95:24-98:13.

12.     Indeed, MPD—and the Defendants—should have known that there was a link among Payne's, Farrior's and McCormick's homicides. Ex. 2 (Waller Decl.) at 48-49; Ex. 11 (Barbian-Gayan Dep.) at 36:4-25 (the unsolved female homicides were something the detectives 'took cognizance of,' keeping track of the murders with a chart in the office), 39:10-17, 40:19-21, 51:6-23 (her department was trying to establish a link between the female homicide victims), 72:3-20, 75:7-76:4; Ex. 14 (Eric Moore Dep. 8/29/22) at 68:23-71:11, 72:1-17 (stating many of the unsolved homicide victims were sexually assaulted, bodies found in vacant lots with neck injuries), 95:14-21, 97:4-98:13 (seminal fluid found on Payne, she had been strangled, found

partially naked underneath a mattress in an abandoned lot near the murders of Farrior and McCormick).

13.     Detective Moore issued a report memorializing his investigation into the 32 homicides (which has been referred to as the "Moore Report"). Ex. 14 (E. Moore Dep. 8/29/22) at 79:3-15; 99:15-24. The Moore Report was widely distributed among the homicide division" because Detective Moore "made tons of copies and made sure that everybody had – had one." Ex. 14 (E. Moore Dep. 8/29/22) at 106:2-8; *see also id*. at 106:9-19. In particular, Detective Moore wanted to make sure that the detectives who were working on the cases identified in the Moore Report got a copy of the Report and the information therein. Ex. 14 (E. Moore Dep. 8/29/22) at 106:12-19.

**Latonia Cooper Implicates Walter Ellis but the
Defendants Bury that Information**

14.     Defendants were also aware of Walter Ellis at the time of their investigation into the Payne homicide. That was as a result of Latonia Cooper. Ex. 16 (Cooper Dep.) at 7:18-8:22, 10:3-14, 23:11-17, 23:20-23, 26:9-27:1, 28:11-15, 31:6-33:20, 44:9-45:6, 48:19-23.

15.     Latonia Cooper was friends with Payne. Ex. 16 (Cooper Dep.) at 5:16-19, 13:17-14:3, 24:18-25:15. At the time of Payne's homicide, Cooper was living in Willie Brooks's house where Sandra Giles also lived. Ex. 16 (Cooper Dep.) at 17:18-18:21; Ex. 17 (Giles Dep.) at 12:1-22. Payne came to Brooks's house when she ran away from home, just before her murder. Ex. 17 (Giles Dep.) at 24:10-24, 26:25-27:6, 28:3-6 (met Payne two days before she was killed when she came to Brooks's house); Ex. 4 (Buschmann Dep. 4/7/2021) at 31:21-25, Ex. 11 (Barbian-Gayan Dep.) at 106:16-23.

16.     Cooper was interviewed during the investigation into the homicide of Payne, including by Defendant Devalkenaere. Cooper specifically recalled being interviewed close in

time to the homicide, and was also interviewed again on October 10, 1995. Ex. 16 (Cooper Dep.) at 5:20-7:17 (interviewed at police station), 23:3-7 (interviewed by detectives, not sure if one or more); Ex. 18 (Devalkenaere Dep. 4/12/12) at 88:4-90:15; Ex. 19 (Morrow Supp. 10/10/95) at MPD SJH 528-30; Ex. 20 (Schuler Supp. 8/31/95) at MPD SJH 358-64.

17.     Cooper testified that during an interview by MPD detectives, she was shown photographs of women and men, including of Sandra Giles and Walter Ellis. Ex. 16 (Cooper Dep.) at 7:18-8:22, 10:12-14, 11:1-8, 28:11-15. Cooper identified both Giles and Ellis. Ex. 16 (Cooper Dep.) at 7:18-9:5, 11:1-17.

18.     Cooper told the detectives that were interviewing her that Giles was a madam who would try to get girls to prostitute themselves. Ex. 16 (Cooper Dep.) at 11:1-17. Cooper also said Giles would introduce women to Ellis either in exchange for drugs or simply to be mean because she knew that Ellis would hurt them. Ex. 16 (Cooper Dep.) at 44:9-45:6.

19.     Indeed, Cooper testified that Ellis was "real mean." Ex. 16 (Cooper Dep.) at 48:19-23. Cooper told detectives that Ellis "was just always just trying to get with women that he knew that probably was like a little too high to defend theirselves [*sic*] or whatever." Ex. 16 (Cooper Dep.) at 10:3-7.

20.     With respect to the Payne homicide, Cooper told the detectives that Giles did not want Payne at their house. Ex. 16 (Cooper Dep.) at 24:2-10. Cooper said that Giles introduced Payne to Ellis; and that she thought that Giles and Ellis had something to do with Payne disappearing. Ex. 16 (Cooper Dep.) at 8:5-22 (Exhibit 1 is Walter Ellis), 23:8-23 (told police that Giles introduced Payne to person in Exhibit 1), 24:11-17 (told police that she thought Giles and "him"—pointing at Exhibit 1—had something to do with murder).

6

21.     In fact, Cooper saw Ellis with Payne on the night of Payne's disappearance. Ex. 16 (Cooper Dep.) at 14:11-23.

22.     The information that Cooper provided detectives would have been shared with other detectives working on the Payne investigation, including Defendants. Ex. 21 (Devalkenaere Dep. 3/25/21) at 37:9-21 (information would be shared during a homicide unit briefing at the beginning and end of each shift); Ex. 4 (Buschmann Dep. 4/7/21) at 58:21-59:25 (information would be shared during briefings); Ex. 14 (Moore Dep. 8/29/22) at 59:20-62:10 (information would be shared during briefings and in follow-up book).

23.     Detectives shared information with each other about their interviews largely through briefings at shift changes, but also through a follow-up book and supplementary reports. Ex. 21 (Devalkenaere Dep. 3/25/21) at 37:9-21, 38:12-19; Ex. 4 (Buschmann Dep. 4/7/21) at 58:21-59:25; Ex. 14 (Moore Dep. 8/29/22) at 59:20-62:10. During the briefings, "[a]ny follow-up that had been conducted by the previous shift would be conveyed to the next shift that's going to still be working on the case, and any new information that was obtained by the previous shift would be passed on to the shift that was going to be working on the case." Ex. 4 (Buschmann Dep. 4/7/21) at 59:1-6. Captain Donald Domagalski, who was supervising officer at the time of the Payne homicide, instituted shift briefings so that homicide investigations continued on a 24-hour basis and information was shared among detectives on a "rolling basis" so that detectives did not have to wait for reports to be dictated and transcribed. Ex. 22 (Domagalski Dep.) at 9:22-10:2; 16:21-24; 18:4-20:24 & 25:7-11.

24.     The information that Cooper provided detectives about Giles and Ellis should have been memorialized in notes, a Memo Book and/or a supplementary report; it was not. Ex. 2 (Waller Decl.) at 28-29, 49-50; Ex. 18 (Devalkenaere Dep. 4/12/12) at 79:5-80:12 (took notes as

a detective, including during Payne investigation), 89:5-90:2 (would have taken notes during Cooper's interview and then destroyed them); Ex. 23 (Rowe Dep.) at 39:1-40:1 (supposed to write down "all matters of importance" in a Memo Book).

25.     Nor was the information that Cooper shared with detectives about Ellis and Giles disclosed to the prosecutor during the pendency of Plaintiff's criminal proceedings. Ex. 2 (Williams Decl.) at ¶ 4; Ex. 12 (Willliams Dep.) at 58:2-59:5 (detectives did not disclose any information that Cooper shared about Ellis or Giles was shared with him).

**Additional Evidence Corroborating Latonia Cooper**

26.     Defendant Devalkenaere went to speak with Antoinette Rozell aka Inetha Waller on two occasions: September 27, 1995 and September 28, 1995. Ex. 24 (Devalkenaere Supp. 10/4/95 – Rozell) at MPD SJH 507, 509; Ex. 21 (Devalkenaere Dep. 3/25/21) at 23:13-24:6 (authenticating report). At the time, Rozell was incarcerated in the County Jail, including with Giles. Ex. 24 (Devalkenaere Supp. 10/4/95 – Rozell) at MPD SJH 507, 509.

27.     At first, Rozell only told Defendant Devalkenaere about a boy named "Cortez" who she alleged said he had a white bitch for sale. Ex. 24 (Devalkenaere Supp. 10/4/95 – Rozell) at MPD SJH 507-08, SAO 1129; Ex. 21 (Devalkenaere Dep. 3/25/21) at 23:13-24:6 (authenticating report). When Defendant Devalkenaere went back to speak to Rozell on September 28, however, Rozell told Defendant Devalkenaere that Giles had been making statements about the death of the white girl, but Giles told Rozell not to say anything about what Giles had said and instead to tell detectives about Cortez. Ex. 24 (Devalkenaere Supp. 10/4/95 – Rozell) at MPD SJH 509; Ex. 21 (Devalkenaere Dep. 3/25/21) at 23:13-24:6 (authenticating report).

28.     Giles told Rozell that the white girl who was found dead had been at her home; that Giles held the girl for four days; and that when the girl tried to leave, Giles killed her. Ex. 24 (Devalkenaere Supp. 10/4/95 – Rozell) at MPD SJH 509-10; Ex. 21 (Devalkenaere Dep. 3/25/21) at 23:13-24:6 (authenticating report). Giles then made a throat-slashing motion. Ex. 24 (Devalkenaere Supp. 10/4/95 – Rozell) at MPD SJH 510; Ex. 21 (Devalkenaere Dep. 3/25/21) at 23:13-24:6 (authenticating report). Rozell told Defendant Devalkenaere that Gwen Mayone was present when Giles said this. Ex. 24 (Devalkenaere Supp. 10/4/95 – Rozell) at MPD SJH 510; Ex. 21 (Devalkenaere Dep. 3/25/21) at 23:13-24:6 (authenticating report).

29.     On September 28, 1995, Defendant Devalkenaere then went to speak with Mayone. Ex. 24 (Devalkenaere Supp. 10/4/95 – Mayone) at MPD SJH 513; Ex. 21 (Devalkenaere Dep. 3/25/21) at 96:21-97:9 (authenticating report). Mayone was also housed in the County Jail, and told Devalkenaere that Giles bragged about killing a 15 year-old white girl; that Giles said she held the girl as a slave for four days before she was killed; and that after the girl was killed, she was taken behind a greenhouse and covered with a mattress. Ex. 24 (Devalkenaere Supp. 10/4/95 – Mayone) at MPD SJH 513; Ex. 21 (Devalkenaere Dep. 3/25/21) at 96:21-97:9, 99:5-101:4.

30.     On September 29, 1995, Defendant Devalkenaere also spoke with Rhonda Smith. Ex. 25 (Devalkenaere Supp. 10/4/95 – Smith) at SAO 383; Ex. 25 (Devalkenaere Dep. 3/25/21) at 55:21-56:22 (authenticate report). Smith was in the County Jail and likewise confirmed that Giles was talking a lot about a white girl being killed, including describing how she was killed. Ex. 25 (Devalkenaere Supp. 10/4/95 – Smith) at SAO 383-84; Ex. 21 (Devalkenaere Dep. 3/25/21) at 55:21-56:22, 65:25-64:9, 67:16-22, 69:14-70:1.

9

31.     After these interviews, on October 2, ,1995, Devalkenaere interviewed Giles. Ex. 26 (Devalkenaere Supp. 10/4/95 – Giles) at SAO 385; Ex. 21 (Devalkenaere Dep. 3/25/21) at 70:20-71:10 (authenticate report). Giles denied any knowledge of the death of the white girl and denied that she had made the statements attributed to her. Ex. 26 (Devalkenaere Supp. 10/4/95 – Giles) at SAO 385-86; Ex. 21 (Devalkenaere Dep. 3/25/21) at 70:20-71:10, 78:20-81:2.

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████

33.     The investigation then went cold. Ex. 4 (Buschmann 4/7/21) at 28:22-30:2 (case was re-investigated a couple of months after murder as a cold case).

### The Interrogation of Richard "Cortez" Gwin

34.     Sometime after the Payne homicide, Defendants Devalkenaere and Buschmann were assigned to a newly-constituted Cold Case Squad. Ex. 4 (Buschmann Dep. 4/7/21) at 19:17-21:15; Ex. 5 (Buschman Dep. 6/30/10) at 34:18-35:10. They decided to reinvestigate the Payne homicide and were considered the primary detectives with the primary responsibility for investigating the case.  Ex. 4 (Buschmann Dep. 4/7/21) at 20:5-24; *see also id*. at 21:25-22:14; Ex. X (Buschmann Dep. 6/3/10)*.* at 40:6-9 (Devalkenaere and Buschmann "primary" detectives on Payne homicide); *id.* at 42:1-5 (once assigned Payne as a cold case, they had primary responsibility for investigating the Payne homicide).

35.     Around October 20, 1995, Devalkenaere and Buschmann picked the Payne homicide investigation back up and turned their attention to Gwin. Ex. 4 (Buschmann Dep. 4/7/21) at 28:22-30:20; Ex. 27 (Devalkenaere Supp. 10/27/95 – Gwin pt.1) at MPD SJH 550; Ex.

27 (Devalkenaere Supp. 10/27/95 – Gwin pt.1) at MPD SJH 549. But Gwin had nothing to do with the murder of Payne and Rozzell had no knowledge otherwise. Ex. 29 (Jones Dep.) at 97:15-18; Ex. 30 (Rozzell Dep.) at 25.19:8-13, 29:7-10 (neither "Cortez" nor Richard Gwin sounds familiar), 45:20-25 (no knowledge about a murder of a white girl).

36.     Gwin went to the police station with his mother on October 24, 1995 at around 1:30 p.m. Ex. 27 (Devalkenaere Supp. 10/27/95 – Gwin pt.1) at MPD SJH 550; Ex. 4 (Buschmann Dep. 4/7/21) at 85:3-13. Gwin was only 17 years old at the time that he was interrogated by Defendants Buschmann and Devalkenaere about the Payne homicide. Ex. 31 (Russano Report) at 28; Ex. 28 (Devalkenaere Supp. 10/27/95 – Gwin pt.2) at MPD SJH 552 (stating Gwin's DOB is 12/22/77); Ex. 4 (Buschmann Dep. 4/7/21) at 85:3-86:3 (interrogated Gwin with Devalkenaere on 10/24/95), 91:6-12 (Gwin was 17 when he and Devalkenaere interrogated him)

37.     On October 24, 1995, Gwin was interrogated twice by Defendants Devalkenaere and Buschmann. Ex. 4 (Buschmann Dep. 4/7/21) at 23:14-18 (Devalkenaere was partner), 96:21-97:13 (two interviews with Gwin with partner); Ex. 27 (Devalkenaere Supp. 10/27/95 – Gwin pt.1) at MPD SJH 549-50; Ex. 28 (Devalkenaere Supp. 10/27/95 – Gwin pt.2) at MPD SJH 552. Gwin told Defendants Devalkenaere and Buschmann that he knew nothing about Payne's murder. Ex. 4 (Buschmann Dep. 4/7/21) at 96:21-97:13.

38.     Gwin was held in custody for approximately 29 hours before he gave a signed statement implicating himself, Plaintiff and Chaunte Ott in Payne's murder. Ex. 31 (Russano Corrected Report) at 27; Ex. 4 (Buschmann Dep. 4/7/21) at 85:3-13 (came to MPD at 1:30 on 10/24/95 and interrogated), 107:5-21 (spoke to Gwin on 10/25/95 at 5:15 p.m.), 117:20-120:6

11

(final Gwin statement was inculpatory); Ex. 32 (Devalkenaere Supp. 10/27/95 – Gwin pt.3) at MPD SJH 557 (Gwin interview on 10/25/95 ended at 6:45 p.m. after which he was taken home).

39.     During his interrogation, Gwin was threatened and fed information by the police about what to say. Ex. 29 (Jones Dep.) at 21:18-22, 22:2-6, 22:14-20, 23:1-14, 50:3-9, 52:10-19, 83:16-84:21, 95:22-96:7. Although Gwin's sister Theresa Jones testified that Gwin did not tell her who was threatening him and telling him what to say, the only detectives whose names appear on any police reports as having interacted with Gwin are Defendants Devalkenaere, Buschmann and Simons. Ex. 29 (Jones Dep.) at 23:8-10; Ex. 27 (Devalkenaere Supp. 10/27/95 – Gwin pt.1) at MPD SJH 549-51; Ex. 28 (Devalkenaere Supp. 10/27/95 – Gwin pt.2) at MPD SJH 552-53; Ex. 32 (Devalkenaere Supp. 10/27/95 – Gwin pt.3) at MPD SJH 554-57; Ex. 33 (Gwin Handwritten Statement 10/24/95) at MPD SJH 716-717; Ex. 34 (Gwin Handwritten Statement 10/25/95) at MPD SJH 720-22; Ex. 35 (Gwin Polygraph Report) at MPD SJH 1762-63.

40.     Gwin was threatened that he had to tell Defendants something or he was going to be charged with the murder. Ex. 29 (Jones Dep.) at 23:1-7, 83:25-84:4, 95:22-96:7. Gwin felt pressure to talk to the police. Ex. 29 (Jones Dep.) at 48:14-23, 50:3-9, 52:12-19, 83:16-84:21, 96:4-7.

41.     Gwin was also given information about the crime by the Defendants. In particular, Defendants told Gwin that Hadaway and "his cousins was [*sic*] with the white girl that was missing that ended up dead . . . ." Ex. 29 (Jones Dep.) at 21:18-22; *see also id*. at 17:8-11, 86:1-5 (describing Chaunte Ott as Hadaway's cousin). Defendants "wanted [Gwin] to say that he seen them together or that he dropped them off somewhere." Ex. 29 (Jones Dep.) at 22:2-6; *see also id*. at 22:14-20. Police told him that "if he didn't, he could be involved as a suspect as well." Ex. 29 (Jones Dep.) at 23:4-7; *see also id*. at 95:22-96:7.

12

42. Gwin gave a statement on October 25, 1995 from 5:15 to 6:45 p.m. to Defendants Devalkenaere and Buschmann. Ex. 4 (Buschmann Dep. 4/7/21) at 107:5-21 (spoke to Gwin on 10/25/95 at 5:15 p.m.), 117:20-120:6 (final Gwin statement was inculpatory); Ex. 32 (Devalkenaere Supp. 10/27/95 – Gwin pt.3) at MPD SJH 557 (Gwin inculpatory statement on 10/25/95 ended at 6:45 p.m.); Ex. 34 (Gwin Handwritten Statement 10/25/95) at MPD SJH 720-22. In that statement, Gwin alleged (among other things) that he gave Plaintiff, Ott and Payne a ride to a drug house; that once there, they smoked marijuana. Plaintiff, Ott and Payne then got out of the car and only Plaintiff and Ott returned. When they returned, Plaintiff allegedly said that Payne "didn't have no money so Chaunte cut her throat." Ex. 4 (Buschmann Dep. 4/7/21) at 117:20-119:8; Ex. 34 (Gwin Handwritten Statement 10/25/95) at MPD SJH 720-71. According to Gwin's statement, about a month later, Gwin saw Plaintiff who told Gwin that the girl who was found dead behind the house was the same girl who was with them; and Plaintiff made a cutting motion across his throat. Ex. 4 (Buschmann Dep. 4/7/21) at 119:17-23; Ex. 34 (Gwin Handwritten Statement 10/25/95) at MPD SJH 722.

43. Gwin's October 25, 1995 handwritten statement was not true. Ex. 29 (Jones Dep.) at 24:7-24, 72:3-6, 84:15-85:3; *see also* PSOAF ¶¶ 4, 83 (Plaintiff is innocent); Ex. 37 (Ott Claims Board Decision) at 2-3. Gwin only gave it because he was threatened, put under "severe pressure" and wanted to go home. Ex. 29 (Jones Dep.) at 23:19-24:4, 45:9-13, 50:3-9, 83:16-84:4, 84:15-85:3, 95:4-11; *see also id*. at 95:12-96:7.

### Coercion and Fabrication of Plaintiff's Confession

44. On October 24, 1995, detectives Michael Valuch and Ricky Burems located Plaintiff at his home and took him to the police station for questioning. Ex. 38 (Burems Dep.) at

13

13:1-66, 38:1-42:4; Ex. 39 (Burems Supp. 10/25/95) at MPD SJH 536; Ex. 7 (Hadaway Dep. 8/31/22) at 129:11-130:11 (arrested at house on 10/24/95).

***Defendants Knew that Plaintiff was very Vulnerable***

45.    Plaintiff was born with cerebral palsy, which has impacted the left-side of his body. Ex. 7 (Hadaway Dep. 8/31/22) at 154:19-22; Ex. 40 (T. Hadaway Dep.) at 114:19-116:10. In particular, his left leg is shorter than his right leg and the left-side of his body is weaker than the right side of his body. Ex. 7 (Hadaway Dep. 8/31/22) at 45:11-13, 67:19-24; Ex. 40 (T. Hadaway Dep.) at 114:19-116:10. As a result, Plaintiff has always walked with a limp and has difficulty manipulating and holding things with his left hand. Ex. 40 (T. Hadaway Dep.) at 114:19-115:4, 115:21-116:10, 116:16-118:13.

46.    In addition, Plaintiff has a seizure disorder that he has had since he was a child. Ex. 40 (T. Hadaway Dep.) at 118:18-120:1; Ex. 7 (Hadaway Dep. 8/31/22) at 86:12-22. Plaintiff takes—and took—regular medication to control his seizures. Ex. 7 (Hadaway Dep. 8/31/22) at 86:23-89:2, 90:17-22.

47.    Plaintiff also has significant cognitive challenges. Plaintiff was in special education all of his life due to his difficulty with reading, writing and math. Ex. 7 (Hadaway Dep. 8/31/22) at 49:11-51:9 (special education all his life), 49:25-50:2 (slow at math), 61:2-5 (trouble with writing), 62:19-64:17 (reading was difficult). ██████████████████████ ████████████████████████████████████████████████████████████████ Ex. 7 (Hadaway Dep. 8/31/22) at 55:3-11 (low IQ).

48.    Defendants would have been aware of each of these vulnerabilities during their interrogations of Plaintiff. To start, Plaintiff told detectives Dubis and Percy Moore, as well Defendant Simons that he had cerebral palsy and that his left side was weak. Ex. 42 (Dubis

14

Notes) at MPD SJH 740; Ex. 43 (Dubis Dep.) at 154:19-22; Ex. 44 (Simons Dep. 7/6/22) at 187:19-25, 201:17-21, 215:6-14; 330:10-331:5; Ex. 45 (Hadaway Arther Procedures) at MPD SJH 1680; Ex. 46 (Hadaway Polygraph Background) at MPD SJH 1669.

49.     As noted above, detectives shared information with each other about interviews, and both Defendants Buschmann and Devalkenaere indicated that they would have reviewed information about prior interviews before speaking to a suspect. PSOAF ¶¶ 22-23; Ex. 21 (Devalkenaere Dep. 3/25/21) at 41:1-42:15 (practice was to review prior interviews either by speaking with detective or reading supplementary reports), 146:10-23 (information that Dubis and P. Moore obtained from Hadaway would have been shared at the briefing for next shift of detectives); Ex. 4 (Buschmann Dep. 4/7/21) at 55:3-14 (would have spoken to Percy Moore, Dubis and Eric Moore or read the documents they prepared before speaking to Hadaway), 58:21-59:25 (detectives shared information).

50.     Plaintiff's limp, left-side weakness and difficulty manipulating his left-hand also would have been obvious to anyone who saw Plaintiff, and in particular, to anyone who saw Plaintiff move. Ex. 40 (T. Hadaway Dep.) at 114:19-115:4, 115:21-116:10, 116:16-118:13. For example, according to Defendant Simons, he and Defendant Buschmann had Plaintiff act out how he allegedly held Payne down, and they would have known from that that Plaintiff had significant left-side weakness and a limp. Ex. 44 (Simons Dep. 7/6/22) at 312:22-313:12, 330:10-331:5.

51.     As for Plaintiff's seizure disorder and attendant need for medication, Plaintiff alerted the detectives and Defendants to it. Ex. 7 (Hadaway Dep. 8/31/22) at 142:4-9, 142:24-143:4, 144:10-145:3; Ex. 44 (Simons Dep. 7/6/22) at 204:18-205:13. As such, the Defendants would have known about it either directly from Plaintiff or from shift briefings and/or their

15

conversations with the other detectives who had interrogated Plaintiff. Ex. 7 (Hadaway Dep. 8/31/22) at 142:4-9, 142:24-143:4, 144:10-145:3; Ex. 44 (Simons Dep. 7/6/22) at 204:18-205:13; Ex. 21 (Devalkenaere Dep. 3/25/21) at 41:1-42:15 (practice was to review prior interviews either by speaking with detective or reading supplementary reports), 146:10-23 (information that Dubis and P. Moore obtained from Hadaway would have been shared at the briefing for next shift of detectives); Ex. 4 (Buschmann Dep. 4/7/21) at 55:3-14 (would have spoken to Percy Moore, Dubis and Eric Moore or read the documents they prepared before speaking to Hadaway), 58:21-59:25 (detectives shared information).

52.     Finally, Plaintiff's cognitive limitations were so obvious that Defendant Simons had concerns about giving Plaintiff a polygraph. Ex. 44 (Simons Dep. 7/6/22) at 205:22-206:22. Defendant Simons testified that he was worried about Plaintiff being able to complete the polygraph but gave him one nonetheless. Ex. 44 (Simons Dep. 7/6/22) at 206:12-22; *see also id*. at 215:11-19 (Simons stated that Plaintiff had "major problems" that might affect his ability to take a polygraph).

### *Defendants Coerced Plaintiff*

53.     Plaintiff was first interviewed on October 24, 1995 by detectives Ricky Burems and Michael Valuch. Ex. 38 (Burems Dep.) at 13:1-6, 38:1-42:4; Ex. 39 (Burems Supp. 10/25/95) at MPD SJH 536. During that interrogation, Plaintiff denied any knowledge of the Payne homicide. Ex. 39 (Burems Supp. 10/25/95) at MPD SJH 536-537; Ex. 7 (Hadaway Dep. 8/31/22) at 115:1-12; Ex. 38 (Burems Dep.) at 38:1-42:4.

54.     Plaintiff was then interrogated off and on for the next three days—on October 25, 1995 or October 26, 1995 by detective Eric Moore; on October 26, 1995 by detectives Michael Dubis and Percy Moore; and October 27, 1995 by Defendants Devalkenaere and Buschmann.

16

Ex. 43 (Dubis Dep.) at 19:7-21:4; Ex. 43 (Dubis Dep.) at 19:7-21:4; Ex. 42 (Dubis Notes) at MPD SJH 740-41; Ex. 47 (E. Moore Dep. 8/23/10) at 64:4-66:6 (interrogated Hadaway on either 10/25/95 or 10/26/95); Ex. 48 (Hadaway Statement to E. Moore) at MPD SJH 734-39; Ex. 4 (Buschmann Dep. 4/7/21) at 124:1-125:2; Ex. 21 (Devalkenaere Dep. 3/25/21) at 147:9-20; Ex. 49 (Hadaway Statement 10/27/95) at MPD SJH 742-47; Ex. 50 (Buschmann Supp. 10/27/95) at MPD SJH 562-67.

55.     During his deposition, Plaintiff referred to the two detectives that he gave his October 27, 1995 statement to—Defendants Buschmann and Devalkenaere—as the two "white ones." Ex. 7 (Hadaway Dep. 8/31/22) at 201:19-202:24 (explaining it was the "two white ones" that he spoke to when he gave his statement), 261:11-21 (two white detectives took his statement); *see also id.* at 202:25-204:13, 220:12-24, 258:4-13; Ex. 51 (Buschmann Personnel File) at MPD SJH 1; Ex. 52 (Devalkenaere Personnel File) at MPD SJH 4. Plaintiff described one as "skinny" and the other as "stocky" Ex. 7 (Hadaway Dep. 8/31/22) at 201:19-202:17; Ex. 51 (Buschmann Personnel File) at MPD SJH 1; Ex. 52 (Devalkenaere Personnel File) at MPD SJH 4.

56.     It was only on the third day of interrogation—October 27, 1995—that Plaintiff gave a false statement implicating himself and Ott in the Payne murder. Ex. 4 (Buschmann Dep. 4/7/21) at 124:5-125:2 (Hadaway denied knowledge in interrogations with Dubis, Percy Moore, Eric Moore); Ex. 48 (Hadaway Statement to E. Moore) at MPD SJH 734-39; Ex. 42 (Dubis Notes) at MPD SJH 740-41.

57.     That statement was the result of Defendants' coercion. Ex. 53 (Pltfs. Resp. Interrog.) at No. 1. First, as noted above, Plaintiff was detained and interrogated for a minimum of three days, during which Plaintiff was largely isolated. Ex. 31 (Russano Corrected Report) at

35-36; Ex. 38 (Burems Dep.) at 13:1-6, 38:1-42:4; Ex. 39 (Burems Supp. 10/25/95) at MPD SJH

536; Ex 43 (Dubis Dep.) at 19:7-21:4; Ex. 42 (Dubis Notes) at MPD SJH 740-41; Ex. 47 (Dep.

E. Moore Dep. 8/23/10) at 64:4-66:6 (interrogated Hadaway on either 10/25/95 or 10/26/95); Ex.

48 (Hadaway Statement to E. Moore) at MPD SJH 734-39; Ex. 4 (Buschmann Dep. 4/7/21) at

124:1-125:2; Ex. 21 (Devalkenaere Dep. 3/25/21) at 147:9-20; Ex. 49 (Hadaway Statement

10/27/95) at MPD SJH 742-47; Ex. 50 (Buschmann Supp. 10/27/95) at MPD SJH 562-67; Ex. 7

(Hadaway Dep. 8/31/22) at 129:11-130:10 (arrested at house on 10/24/95), 278:2-10 (in custody

from time arrested to time testified at Ott's trial).

58.     Second, Plaintiff was denied his seizure medication during this time. Ex. 7

(Hadaway Dep. 8/31/22) at 142:4-145:5, 198:10-23. As a result, Plaintiff had a seizure while in

custody. Ex. 7 (Hadaway Dep. 8/31/22) at 145:4-25.

59.     Third, Plaintiff was denied food during his interrogations, including by

Devalkenaere and Buschmann, the two white detectives. Ex. 7 (Hadaway Dep. 8/31/22) at

164:15-167:6; Ex. 31 (Russano Corrected Report) at 36.

60.     Fourth, Plaintiff was repeatedly threatened, including by Defendants

Devalkenaere and Buschmann. Ex. 7 (Hadaway Dep. 8/31/22) at 148:17-25, 163:10-25, 201:2-

17, 202:25-203:19, 204:23-205:13, 234:24-235:1, 251:8-14, 252:14-21, 260:9-18, 325:22-

326:13, 330:3-20.

61.     In particular, Plaintiff was threatened that he would not see his family again. Ex. 7

(Hadaway Dep. 8/31/22) at 330:9-15. Additionally, Plaintiff was repeatedly threatened that if he

did not implicate Ott, he was "doing a life bit." Ex. 7 (Hadaway Dep. 8/31/22) at 148:17-25,

201:2-17, 202:25-203:19, 204:23-205:13, 234:24-235:1, 251:8-14, 252:14-21, 325:22-326:13,

330:3-20. During these threats, police would slam on the table, call him a n***** and shake his

18

handcuffs, and Defendants Devalkenaere and Buschmann once threw a chair at him. Ex. 7 (Hadaway Dep. 8/31/22) at 146:24-147:12, 164:4-14, 166:24-167:6, 167:11-168:1, 302:2-13

62.     Fifth, Plaintiff was promised that if he gave a statement implicating Ott in the crime, he would not be charged and could go free. Ex. 7 (Hadaway Dep. 8/31/22) at 327:11-19, 332:7-333:6. These promises were made by a number of the detectives, including Defendants Devalkenaere and Buschmann. Ex. 7 (Hadaway Dep. 8/31/22) at 327:11-19, 332:7-333:6.

### *Defendants Feed Plaintiff Information about the Crime*

63.     Plaintiff did not know anything about the Payne homicide, which he repeatedly told the police and the Defendants. Ex. 7 (Hadaway Dep. 8/31/22) at 115:11-116:1, 118:17-21, 124:1-23, 156:12-15, 194:19-24, 201:19-202:4. Instead, Defendants provided Plaintiff with information about the crime that was incorporated into Plaintiff's "statement." Ex. 53 (Pltfs Resp. to Interrog.) at No. 1.

64.     As Plaintiff explained, "[t]hey was telling me what to say at certain times, certain points . . . ." Ex. 7 (Hadaway Dep. 8/31/22) at 210:20-211:3. Indeed, sometimes the Defendants would just tell him what they were writing down as his statement and threatened him that he had to "sign or you're doing life." Ex. 7 (Hadaway Dep. 8/31/22) at 234:19-235:1; *see also id.* at 220:12-21, 238:6-11, 258:4-13.

65.     The Defendants told Plaintiff what was in Gwin's confession. Ex. 7 (Hadaway Dep. 8/31/22) at 115:13-116:1, 117:9-14, 120:5-25, 123:18-23; Ex. 4 (Buschmann Dep. 4/7/21) at 173:1-6 (admits he may have told Hadaway what Gwin said); Ex. 39 (Burems Supp. 10/25/95) at MPD SJH 536 (telling Hadaway that police "had spoken to citizens who informed us he had mentioned to them that a white female had been to his house during a crap game and that she had been subsequently found dead").

19

66.     In addition, among other things, Defendants told Plaintiff to say that Ott motioned for him and Payne to get out of the car; that Ott was feeling Payne's pockets; that Ott was hitting Payne in the face; that Ott said you're going to give up something; that Plaintiff told Ott to go; that Plaintiff was about to leave but heard silence; that Plaintiff saw blood and told Ott that he was sick; that when Plaintiff and Ott walked back to the car, Plaintiff made a slashing motion and said "I think he killed her;" and that they then drove to Gwin's aunt's house. Ex. 7 (Hadaway Dep. 8/31/22) at 231:15-233:21, 239:5-241:2, 242:25-244:4, 244:16-245:23, 252:3-25.

67.     Defendants also drew the map that was attached to Plaintiff's handwritten statement. Ex. 7 (Hadaway Dep. 8/31/22) at 324:11-24; Ex. 4 (Buschmann Dep. 4/7/21) at 127:22-133:1 (explaining that he drew out the streets and the writing on the diagram that is circled is his); Ex. 54 (Buschmann Dep. Exhibit 12) at MPD SJH 749.

68.     Plaintiff testified that he agreed to the statement because he was scared and threatened, and he wanted to go home. Ex. 7 (Hadaway Dep. 8/31/22) at 329:6-330:23. Plaintiff was crying when he was being interrogated by Defendants Devalkenaere and Buschmann. Ex. 7 (Hadaway Dep. 8/31/22) at 238:20-25.

69.     Plaintiff was afraid to go to prison for the rest of his life for something that he did not do. Ex. 7 (Hadaway Dep. 8/31/22) at 197:13-23, 198:17-201:17, 329:6-330:23. Plaintiff signed the false statement on October 27, 1995. Ex. 49 (Hadaway Statement 10/27/95) at MPD SJH 742-49 (indicating statement signed at 4:25 p.m. on 10/27/95).

70.     That statement was false: Plaintiff never met Payne nor did he have anything to do with her murder. Ex. 7 (Hadaway Dep. 8/31/22) at 328:1-11; Ex. 6 (Hadaway Claims Board Decision) at 3.

**Defendants Fabricate a Polygraph**

71.     After Plaintiff signed his statement, he was brought to a charging conference where he met with prosecutor Mark Williams. Assistant District Attorney ("ADA") Williams had concerns about the investigation and in particular, about whether Plaintiff and Gwin were telling the truth. Ex. 4 (Buschmann Dep. 4/7/21) at 149:15-22.

72.     As a result, on November 1, 1995, Hadaway was taken for a polygraph. Ex. 4 (Buschmann Dep. 4/7/21) at 151:8-14; Ex. 44 (Simons Dep. 7/6/22) at 165:2-166:4; Ex. 55 (Hadaway Polygraph Report) at MPD SJH 1687-88.

73.     Defendant Simons conducted Plaintiff's polygraph. Ex. 4 (Buschmann Dep. 4/7/21) at 151:8-14; Ex. 44 (Simons Dep. 7/6/22) at 165:2-166:4, 305:21-306:4; Ex. 55 (Hadaway Polygraph Report) at MPD SJH 1687-88. Defendant Simons used the Arther Method to conduct Plaintiff's polygraph. Ex. 44 (Simons Dep. 7/6/22) at 339:11-15: Ex. 56 (Sosnowski Corrected Report) at 3.

74.     The Arther Method for polygraphing was not valid at the time that it was used to polygraph Plaintiff. Ex. 56 (Sosnowski Corrected Report) at 3; Ex. 57 (Sosnowski Rebuttal Report) at 1-3. The Arther method was "built on criteria that had no scientific basis," but were instead based on "preconceived signals" (*e.g.*, answers given to a checklist prior to the actual administration of the polygraph exam), myths (*e.g.*, at least 85% of non-reactors are lying) and prejudice (*e.g.*, male homosexuals are hard to test) about polygraph subjects. Ex. 57 (Sosnowski Rebuttal Report) at 2-3. In fact, the Arther Method instructs polygraphers to make a determination about whether the person is truthful or not prior to even administering the test. Ex. 57 (Sosnowski Rebuttal Report) at 3.

75.     Plaintiff was asked four relevant questions during the polygraph examination:

Question 3B: Did Chaunte Ott cut that white girl's throat?
Question 5: Did you cut that white girl's throat?
Question 8: While that white girl was fighting, did you help hold her down?
Question 9: Did you have any sexual contact with that white girl?

Ex. 44 (Simons Dep. 7/6/22) at 242:3-244:9; Ex. 55 (Hadaway Polygraph Report) at MPD SJH 1688.

76.     Defendant Simons falsely reported that Plaintiff was "lying." Ex. 55 (Hadaway Polygraph Report) at MPD SJH 1687; Ex. 44 (Simons Dep. 7/6/22) at 272:16-25. In particular, Simons reported that Plaintiff was "not telling the entire truth in regards to the [above] listed questions." Ex. 55 (Hadaway Polygraph Report) at MPD SJH 167.

77.     Defendant Simons's finding was false. The only question on which Plaintiff had a reaction was Question 3B; both Simons and Plaintiff's polygraph expert Dan Sosnowski found a reaction at 3B. Ex. 44 (Simons Dep. 7/6/22) at 263:17-265:14, 273:19-274:13; Ex. 56 (Sosnowski Corrected Report) at 6-7. Plaintiff answered "yes," to Question 3B, meaning that Plaintiff was lying when he said that "Chaunte cut that white girl's throat." Ex. 56 (Sosnowski Corrected Report) at 6-7.

78.     There were "no significant reactions" to the remainder of the relevant questions that Defendant Simons's asked Plaintiff. Ex. 56 (Sosnowski Corrected Report) at 6-7. Defendant Simons's finding otherwise was false. Ex. 56 (Sosnowski Corrected Report) at 6-7.

79.     In other words, the polygraph confirmed that Plaintiff was not involved in the Payne homicide and had no knowledge that Ott was either. Ex. 56 (Sosnowski Corrected Report) at 6-7. Defendant Simons, however, falsely reported that Plaintiff failed the polygraph, and that Plaintiff had additional knowledge about the crime. Ex. 55 (Hadaway Polygraph Report) at MPD

SJH 1687; Ex. 44 (Simons Dep. 7/6/22) at 315:1-15 (informed Buschmann that Plaintiff failed the polygraph).

80.     Plaintiff was then interrogated again on November 1, 1995 by Defendants Simons and Buschmann, Ex. 44 (Simons Dep. 7/6/22) at 239:4-241:15, 314:13-316:9; Ex. 4 (Buschmann Dep. 4/7/21) at 157:2-15; Ex. 58 (Buschmann Supp. 11/1/95) at MPD SJH 568-69; Ex. 59 (Hadaway Statement 11/1/95) at MPD SJH 1683-84. During that interrogation, Defendant Simons threatened Plaintiff and told Plaintiff that "[y]ou gotta say something. You killed her," or words to that effect. Ex. 7 (Hadaway Dep. 8/31/22) at 260:19-261:1; *see also id.* at 260:9-18.

81.     As a result, after the polygraph, Plaintiff agreed that he did not tell the police the whole truth previously. Ex. 7 (Hadaway Dep. 8/31/22) at 264:8-21. That was not true, but Plaintiff said as much because he was trying to tell Defendants Simons and Buschmann what they wanted to hear. Ex. 7 (Hadaway Dep. 8/31/22) at 264:8-21, 265:13-16.

82.     Plaintiff gave another statement to Defendants Buschmann and Simons on November 1, 1995. Ex. 59 (Hadaway Statement 11/1/95) at MPD SJH 1683-84. The Defendants told Plaintiff to make up some involvement in the crime, which Plaintiff did. Ex. 7 (Hadaway Dep. 8/31/22) at 270:7-24. In particular, Defendants Buschmann and Simons told Plaintiff to say that he held Payne's hands down; that Plaintiff told Ott that she didn't have anything so they should leave; and that Ott said she was fitting to give up something. Ex. 7 (Hadaway Dep. 8/31/22) at 268:18-272:4.

83.     Plaintiff's October 27, 1995 statement to Defendants Buschmann and Devalkenaere and his November 1, 1995 statement to Defendants Simons and Buschmann are both false. Ex. 7 (Hadaway Dep. 8/31/22) at 200:15-202:4, 219:19-223:24, 270:3-12; Ex. 53 (Plaintiff Resp. to Interrog.) at No. 1; Ex. 7 (Hadaway Dep. 8/31/22) at 311:18-24 (lied about

what happened with Payne), 327:25-328:11 (neither he nor Ott had anything to do with Payne's murder). Both Plaintiff and Ott are innocent of the murder of Jessica Payne. Ex. 7 (Hadaway Dep. 8/31/22) at 241:13-14, 327:25-328:11; Ex. 6 (Hadaway Claims Board Decision); Ex. 37 (Ott Claims Board Decision).

**Plaintiff Testifies Against Ott and Pleads Guilty to Armed Robbery**

84.     On February 27, 1996, and February 28, 1996, Plaintiff testified against Ott. Ex. 60 (Hadaway Test. 2/27/96) and Ex. 61 (Hadaway Test. 2/28/96). The Defendants rehearsed Plaintiff's testimony with him so that he could remember everything that was in his statement. Ex. 7 (Hadaway Dep. 8/31/22) at 279:8-18, 287:18-23; *see also id*. at 278:19-279:2 (two white detectives picked him up and took him to court), 279:19-282:3 (discussed with two white officers what he was going to testify about).

85.     After Plaintiff testified at Ott's trial, Plaintiff pled guilty to attempted armed robbery and was sentenced to five years in prison. Ex. 7 (Hadaway Dep. 8/31/22) at 287:25-288:2; Ex. 72 (Hadaway Sentencing Transcript) at 1, 13.

86.     Plaintiff's time in prison was particularly difficult: He was isolated from his family, spent two periods of time in solitary confinement, was afraid for his life and was aware that inmates were killed. Ex. 7 (Hadaway Dep. 8/31/22) at 305:21-306:5, 307:7-17, 307:23-308:6, 309:20-22, 310:3-15, 313:1-4. Even out of prison, Plaintiff has continued to be impacted by his wrongful conviction. For example, Plaintiff has had to endure the stigma of being falsely branded a convicted murderer and having to register as a sex offender. Ex. 7 (Hadaway Dep. 8/31/22) at 313:5-19, 314:18-23, 315:13-17, 317:9-24.

24

**The City of Milwaukee Failed to Train its Officers on Their Disclosure Obligations**

87.     The City of Milwaukee ("City") had an official written policy, Rule 4, general order 4/080.00(16) that requires all of its officers to record "the names of persons taken into custody by them and such particulars in each case as may be important in the trial thereof . . . and matters of importance relative to the discharge of their official duties" in their Memo Books, which are officially issued to detectives and officers by the Department. Ex.78 (Milwaukee Police Department, Rule 4, General Order 4/080.00(16)); Exhibit 23 (Rowe Dep.) at 39:1-40:21; Ex. 2 (Waller Declaration) at 26-28. The policy never defined the term "important" and left it up to the discretion of officers what to include. Ex. 23 (Rowe Dep.) at 71:1-10.

88.     Diane Rowe, the City's corporate witness who was designated to provide binding testimony on the City's policies, practices and training with respect to Memo Books from 1991 to 1996, testified that the City had no policy from 1991 through 1996 requiring officers to maintain their Memo Books. Ex. 23 (Rowe Dep.) at 28:1-16; 30:1-7; 49:20-50:1. It was not until 2000 that the City instituted a policy forbidding officers to destroy their Memo Books. Ex. 23 (Rowe Dep.) at 51:14-20.

89.     Importantly, between 1991 and 1996, the City also lacked a policy requiring officers to turn over their Memo Books to prosecutors. Ex. 23 (Rowe Dep.) at 56:6-18; Ex. 29 (Jones Dep.) at 24:4-6 ("There was no policy … from my time on the Police Department that the memo book would be turned over to the District Attorney's Office."). Moreover, the City also lacked any policy that required an officer or supervisor to compare the information that was documented in Memo Book to make sure it was consistent with the information that was turned over to the prosecutor. Ex. 23 (Rowe Dep.) at 61:11-63:15; *id.* at 63:13-15 (City has never required a comparison to determine that the information contained in a Memo Book is also

25

contained in official police report); *see also id.* at 65:24-66:2 (Q. "Does the supervisory have any responsibilities as a matter of either policy or practice to look at the memo book and compare it to the report?" A. "No.").

90.     According to Denny Waller, Plaintiff's police practices expert, the failure of the City to adopt policies on the use, retention and disclosure of Memo Books, as described in PSOAF ¶¶ 87-89 above, departed from the well-established standards at the time because "[t]he option of complying with the obligation to disclose exculpatory information … was left as a matter of policy and practice within the discretion of the individual officer. This stands in marked contrast to the well-established police practice that criminal defendants have a right to police notes because those notes could constitute *Brady* material." Ex. 2 (Waller Declaration) at 27-28 (citing Jones Dep. at 19-20; 21-22, 24)); *see also id.* at 40 ("A trained, experienced police officer would know and understand his/her duty to disclose exculpatory evidence and information related to credibility.").

### The City Provided *No* Training on Officer's Requirements to Disclose Exculpatory and Impeachment Information to the Prosecutors Prior to 1996

91.     The City provided no training whatsoever to its officers on their disclosure obligations at any time between 1990 and 2000. Ex. 69 (City's Resp. to Pltf's First Rog.) at No. 9. In fact, the City could not identify a single document that would reflect any training that it provided to its officers' on this topic. Ex. 69 (City's Resp. to Pltf's First Rog.) at No. 9.

92.     That is consistent with the Defendants' testimony. For example, Defendant Buschmann testified that he was not trained on his duty to disclose exculpatory information. Ex. 4 (Buschmann Dep. 4/7/21) at 209:25-210:4 ("Q. . . . Were you trained as an officer at the Milwaukee Police Department on any duties to disclose exculpatory information? A. No."). Similarly, Defendant Devalkenaere testified he did not have an understanding of his obligations

26

under *Brady*. Ex. 21 (Devalkenaere Dep. 3/25/21) 203:11-13. ("[D]o you have an understanding of Brady obligations and what that means?" A "No.").

93.　　In addition, the Defendants' training records produced in this case do not reflect any trainings on *Brady* or disclosure requirements. *See generally* Ex. 62 (Buschmann Training Records); Ex. 63 (Devalkenaere Training Records); Ex. 64 (Simons Training Records).

94.　　The only training that the Defendants received on Memo Books were the two courses that the City identified in its discovery responses on "Crime Scene Management" and "Report Writing;" and the curriculum for those courses as set forth in PSOAF ¶¶ 95-98 below did not include any training on disclosure obligations. Ex. 62 (Buschmann Training Records) at MPD SJH 1437 (Crime Scene Management), MPD SJH 1437 (1997 Report Writing), MDP SJH 1439 (1995 Report Writing), and MPD SJH 1441 (1991 Crime Scene Investigation); Ex. 63 (Devalkenaere Training Records) at MPD SJH 1446 (1999 Crime Scene Management), MPD SJH 1447 (1997 Report Writing), MPD SJH 1448 (1996 Crime Scene Processing); MPD SJH 1449-50 (1992 & 1993 Report Writing); Ex. 64 (Simons Training Records) at MPD SJH 1456 (1996 Crime Scene Processing); MPD SJH 1457 (1993 Report Writing).

95.　　Despite its written policy on Memo Books, prior to the Payne homicide, the City did not provide any training to its officers on the "[c]reation, use, retention, and disclosure of Memo Books." Ex. 69 (City's Responses to Plaintiff's First Set of Interrogatory requests) at No. 9. The only training the City identified on the topic of the "creation, use, retention and disclosure of Memo Books" between 1990 and 2000 was a single in-service training on Crime Scene Management in the fall of 1999. Ex. 69 (City's Responses to Plaintiff's First Set of Interrogatory requests) at No. 9; *see also* Ex. 65 (1999 Crime Scene Management Training) at MPD SJH 001469-88.

96.     While the Crime Scene Management training materials include training on what to put in reports (the who, what, why, when, where, and how) and mentions that reports will be read by prosecutors and criminal defense attorneys, the training materials do not discuss an officer's duty to disclose the information in their Memo Books to the prosecutor. Ex. 65 (1999 Crime Scene Management Training) at MPD SJH 1469-88.

97.     The same is true with respect to the City's training on the "[c]reation, use, retention, and disclosure of police notes and/or reports taken during the course of an investigation." Ex. 69 (City's Responses to Plaintiff's First Set of Interrogatory requests) at No. 9. Again, the only training the City provided was *after* the Payne homicide investigation—in the fall of 1997—and consisted of a single Report Writing in-service training. Ex. 69 (City's Responses to Plaintiff's First Set of Interrogatory requests) at No. 9; Ex. 66 (1997 Report Writing Training Materials) at MPD SJH 1489-1521.

98.     The Report Writing training materials make no mention of an officer's duty to disclose information to the prosecutor. *See generally*, Ex. 66 (1997 Report Writing Training Materials) at MPD SJH 1489-1521. The only mention of "disclosure" in the training materials is about an officer's report being subject to public disclosure through a public records request and therefore potentially viewed by lawyers, judges, citizens, insurance companies and the media. Ex. 66 (1997 Report Writing Training Materials) at MPD SJH 1489-99 ("Most reports are ultimately susceptible to disclosure under Wis. Stat. 19.35 – The Open Records Law.").

99.     The Defendants did not take notes in their Department issued Memo Books once they became detectives, but instead took notes during interviews, including their interviews of Cooper, Gwin and Hadaway, on steno pads and then destroyed their notes. Ex. 4 (Buschmann Dep. 4/7/21) at 37:3-38:9 (used steno pad and destroyed notes after wrote report); Ex. 68

28

(Devalkenaere Dep. 6/22/10) at 42:24-43:14 (kept notes in steno pad and then destroyed notes): Ex. 18 (Devalkenaere Dep. 4/12/12) at 89:5-15 (if took notes during interview of Cooper he did so on a steno pad and then destroyed his notes); Ex. 5 (Buschmann Dep. 6/30/10) at 50:9-51:5 (took notes on steno pad and then destroyed his notes), 51:9-14 (Buschmann believed it was consistent with Department policy to destroy his witness interview notes); Ex. 67 (Buschmann Dep. 4/12/12) at 30:24-31:14, 31:15-25; 33:9-11 (took notes on steno pad and then destroyed them); *see also* Ex. 23 (Rowe Dep.) at 41:3-16 (as part of preparation for Rule 30(b)(6) deposition, counsel informed its corporate witness that detectives did not use Memo Books per Rule 4, but steno pads, legal pads or "pieces of paper").

100.    Because those notes were destroyed, they could not be disclosed to prosecutors. Ex. 68 (Devalkenaere Dep. 6/22/10) at 42:24-43:14 (kept notes in steno pad and then destroyed notes): Ex. 18 (Devalkenaere Dep. 4/12/12) at 89:5-15 (if took notes during interview of Cooper he did so on a steno pad and then destroyed his notes); Ex. 5 (Buschmann Dep. 6/30/10) at 50:9-51:5 (took notes on steno pad and then destroyed his notes), 51:9-14 (Buschmann believed it was consistent with Department policy to destroy his witness interview notes); Ex. 67 (Buschmann Dep. 4/12/12) at 30:24-31:14 (took notes on steno pad and then destroyed them).

Respectfully Submitted,


/s/ Gayle Horn
*Attorney for Plaintiff*


Gayle Horn
Heather Lewis Donnell
Elliot Slosar
LOEVY & LOEVY
311 N. Aberdeen Street, Third Floor
Chicago, Illinois 60607
Phone: 312-243-5900