# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| SAM HADAWAY, | **)** | |
| | **)** | |
| Plaintiff, | **)** | Case No. 2:19-cv-01106-PP |
| | **)** | |
| v. | **)** | Judge Pamela Pepper |
| | **)** | |
| CITY OF MILWAUKEE, et al., | **)** | |
| | **)** | |
| Defendants | **)** | |
| | **)** | |

## RESPONSE TO DEFENDANTS' LOCAL RULE 56.1(b)(1)
## STATEMENT OF UNDISPUTED FACTS

Plaintiff, Sam Hadaway, by and through his attorneys, responds to the Defendants' LR 56.1 statement of facts as follows:

### Jurisdiction and Venue

1. Jurisdiction and venue is proper because Plaintiff brings federal claims pursuant to 42 U.S.C. § 1983 and the events giving rise to the alleged claims occurred within this judicial district. (Pl.'s Compl., Dkt. # 1, ¶¶ 10-11).

**RESPONSE: Plaintiff objects to the extent that this statement of fact ("SOF") relies on Plaintiff's unverified Complaint, which is not evidence.** ***See, e.g., Armstrong v. Brann****, No. 04-C-0884, 2006 WL 3422570, at \*1 (E.D. Wis. Sept. 25, 2006);* **see also** ***Vega v. Chicago Bd. of Educ.****,* **338 F. Supp. 3d 806, 808 (N.D. Ill. 2018) and cases cited therein. Subject to that objection, Plaintiff admits.**

### Parties and Claims

2. Plaintiff Sam Hadaway is an individual. (*Id.* at ¶ 9.)

**RESPONSE: Plaintiff objects to the extent that this statement of fact ("SOF") relies on Plaintiff's unverified Complaint, which is not evidence.** ***See, e.g., Armstrong v. Brann****,* **No.**

04-C-0884, 2006 WL 3422570, at *1 (E.D. Wis. Sept. 25, 2006); *see also Vega v. Chicago Bd.*
*of Educ.*, 338 F. Supp. 3d 806, 808 (N.D. Ill. 2018) and cases cited therein. **Subject to that**
**objection, Plaintiff admits.**

3. Defendants Carl Buschmann, James Devalkenaere and Robert Simons are current or
former Milwaukee police officers, and are sued in their individual capacities. (*Id.* at ¶ 10.)

**RESPONSE: Plaintiff objects to the extent that this statement of fact ("SOF") relies on**
**Plaintiff's unverified Complaint, which is not evidence.** ***See***, *e.g.*, ***Armstrong v. Brann***, **No.**
**04-C-0884, 2006 WL 3422570, at *1 (E.D. Wis. Sept. 25, 2006);** ***see also Vega v. Chicago Bd.***
***of Educ.***, **338 F. Supp. 3d 806, 808 (N.D. Ill. 2018) and cases cited therein. Subject to that**
**objection, Plaintiff admits.**

4. Defendant the City of Milwaukee is a municipal entity that employs or employed the
Individual Defendants. (*Id.* at ¶ 11.)

**RESPONSE: Plaintiff objects to the extent that this statement of fact ("SOF") relies on**
**Plaintiff's unverified Complaint, which is not evidence.** ***See***, *e.g.*, ***Armstrong v. Brann***, **No.**
**04-C-0884, 2006 WL 3422570, at *1 (E.D. Wis. Sept. 25, 2006);** ***see also Vega v. Chicago Bd.***
***of Educ.***, **338 F. Supp. 3d 806, 808 (N.D. Ill. 2018) and cases cited therein. Subject to that**
**objection, Plaintiff admits.**

## Undisputed Material Facts

**A. The Death of Jessica Payne**

5. On August 26, 1995, 16 year-old Jessica Payne and 13 year-old Rebecca Morrison ran
away from home. (*Id.* at ¶ 12.)

2

**RESPONSE: Plaintiff objects to the extent that this statement of fact ("SOF") relies on Plaintiff's unverified Complaint, which is not evidence.** *See*, *e.g.*, *Armstrong v. Brann*, No. 04-C-0884, 2006 WL 3422570, at *1 (E.D. Wis. Sept. 25, 2006); *see also Vega v. Chicago Bd. of Educ.*, 338 F. Supp. 3d 806, 808 (N.D. Ill. 2018) **and cases cited therein. Subject to that objection, Plaintiff admits.**

6.  The two girls went to North Milwaukee, and arrived at a house involved with drug use and prostitution. (*Id.* at ¶ 13.)

**RESPONSE: Plaintiff objects to the extent that this statement of fact ("SOF") relies on Plaintiff's unverified Complaint, which is not evidence.** *See*, *e.g.*, *Armstrong v. Brann*, No. 04-C-0884, 2006 WL 3422570, at *1 (E.D. Wis. Sept. 25, 2006); *see also Vega v. Chicago Bd. of Educ.*, 338 F. Supp. 3d 806, 808 (N.D. Ill. 2018) **and cases cited therein. Subject to that objection, Plaintiff admits.**

7.  At some point, Morrison and Payne got into a yellow Cadillac with four black men: Terrance Wallace, Johnnie Jones, Delon Russell, and Deshay Cox. When the six of them arrived at a friend's house, Morrison went inside. (*Id.* at ¶ 14.)

**RESPONSE: Plaintiff objects to the extent that this statement of fact ("SOF") relies on Plaintiff's unverified Complaint, which is not evidence.** *See*, *e.g.*, *Armstrong v. Brann*, No. 04-C-0884, 2006 WL 3422570, at *1 (E.D. Wis. Sept. 25, 2006); *see also Vega v. Chicago Bd. of Educ.*, 338 F. Supp. 3d 806, 808 (N.D. Ill. 2018) **and cases cited therein. Subject to that objection, Plaintiff admits.**

8.  Payne, however, wanted to go home. Wallace dropped Payne off at the corner of 17th Street and Center Street. (*Id.* at ¶ 15.)

3

**RESPONSE: Plaintiff objects to the extent that this statement of fact ("SOF") relies on Plaintiff's unverified Complaint, which is not evidence.** *See*, *e.g.*, *Armstrong v. Brann*, No. 04-C-0884, 2006 WL 3422570, at *1 (E.D. Wis. Sept. 25, 2006); *see also Vega v. Chicago Bd. of Educ.*, 338 F. Supp. 3d 806, 808 (N.D. Ill. 2018) **and cases cited therein. Subject to that objection, Plaintiff admits that Wallace told police that he dropped Payne off at the corner of 17th and Center Streets. Ex 70 (Wallace Supplement) at MPD SJH 432.**

9. Four days later, on August 30, 1995, Payne's body was discovered under a mattress behind an abandoned house with her throat slashed. (*Id.* at ¶ 16.)

**RESPONSE: Plaintiff objects to the extent that this statement of fact ("SOF") relies on Plaintiff's unverified Complaint, which is not evidence.** *See*, *e.g.*, *Armstrong v. Brann*, No. 04-C-0884, 2006 WL 3422570, at *1 (E.D. Wis. Sept. 25, 2006); *see also Vega v. Chicago Bd. of Educ.*, 338 F. Supp. 3d 806, 808 (N.D. Ill. 2018) **and cases cited therein. Subject to that objection, Plaintiff admits but clarifies that Payne was "partially nude; pants that she was wearing [*sic*] was pulled down below the knee area, T-shirt was pulled up just partially around the breast area." Ex. 1 (Morrow *Ott* Preliminary Hearing Test.) at 5-6.**

10. A rape kit was collected. (*Id.* at ¶ 17.)

**RESPONSE: Plaintiff objects to the extent that this statement of fact ("SOF") relies on Plaintiff's unverified Complaint, which is not evidence.** *See*, *e.g.*, *Armstrong v. Brann*, No. 04-C-0884, 2006 WL 3422570, at *1 (E.D. Wis. Sept. 25, 2006); *see also Vega v. Chicago Bd. of Educ.*, 338 F. Supp. 3d 806, 808 (N.D. Ill. 2018) **and cases cited therein. Subject to that objection, Plaintiff admits that Dr. Teggatz did a sexual assault examination and collected specimens. Ex. 3 (Teggatz *Ott* Trial Test.) at 201:16-20.**

4

## B. The Murder Investigation

11. From roughly August 30 to October 1995, several Milwaukee Police Department officers investigated Payne's murder. While numerous leads were pursued, a killer was not identified. (Ex. 1 – Jones Decl., p.3.)

**RESPONSE: Plaintiff objects to the extent that the cited evidence does not support the SOF. The Jones Declaration is a declaration by the Defendants' police practices expert. On page 3, it states only that "[d]uring the Payne homicide investigation numerous suspects were interviewed, and/or interrogated, and/or arrested, and their information verified." Doc. 104-1 (Jones Decl.) at 3. Subject to that objection, Plaintiff denies. Latonia Cooper was interviewed by Detectives Schuler and Young on August 31, 1995 and again by Defendant DeValkenaere and Detective Morrow on October 9, 1995. Ex 20 (Schuler Supp. 8/31/95) at MPD SJH 358; Ex. 19 (Morrow Supp. 10/10/95) at MD SJH 528. During those interviews, Cooper told police, including Defendant DeValkenaere, that Sandra Giles introduced Payne to Walter Ellis just before Payne's disappearance, and that Cooper thought Giles and Ellis had something to do with Payne's murder. Ex. 16 (Cooper Dep.) at 23-24; *see also id*. at 8 (identifying Exhibit 1 to the deposition as Walter Ellis); *id*. at 28 (police showed her a photograph of Ellis). That was not only because Cooper saw Payne with Ellis shortly before Payne disappeared, but also because (1) Ellis would attack women who could not defend themselves; (2) Giles would try to get girls to prostitute themselves to support her drug habit; and (3) Giles did not want Payne at the house and was trying to prostitute her out. Ex. 16 (Cooper Dep.) at 10-11, 14, 24, 26-27. No one from the Milwaukee Police Department ("MPD"), including Defendants, investigated Ellis notwithstanding Cooper's identification of him nor did they ever disclose to the prosecutor the information**

5

that Cooper provided about Ellis. Ex. 71 (Williams Decl.) at ¶ 4; Ex. 2 (Waller Decl.) at 50-51.

12. Around October 20, 1995, Buschmann and Devalkenaere were assigned the Payne homicide as a cold case. (Ex. 2 – Buschmann 2010 Dep., 34:18-35:3; Ex. 3 – 10/27/95 Report, p.1.)

**RESPONSE: Admit but clarify that Defendant Buschmann testified that he and DeValkenaere "chose the cases we wanted to look at." Ex. 4 (Buschmann Dep. 4/7/21) at 20:5-24; *see also id.* at 21:25-22:14. Further clarify that Defendant DeValkenaere had worked on the Payne homicide prior to taking it on as a cold case. Ex. 4 (Buschmann Dep. 4/7/21) at 29:3-8.**

13. One of the remaining leads was to locate a potential suspect known by the name "Cortez." (Ex. 3 – 10/27/95 Report, p.1.)

**RESPONSE: Plaintiff admits but clarify that was not the only remaining lead. As described in response to SOF 11, which is expressly incorporated herein, the Defendants also should have been locating and speaking with Ellis. *See* Response to SOF No. 11.**

14. Police obtained the name "Cortez" from a jailhouse informant, who said she heard him say that he had a "white bitch for sale." (Ex. 4 – 10/4/95 Report.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits that Defendant DeValkenaere spoke with Antoinette Rozell aka Inetha Waller on or about October 27, 1995. Deny that Rozell was a "jailhouse informant," as unsupported by the record evidence. Further deny that "Cortez" ever said that he had a "white bitch for sale." Ex. 30 (Rozell Dep.) at 44:14-**

**45:25 (testifying that she would say anything back then to get out of jail, she lied all the time, and that she does not recall actually having information about the murder of a white girl).**

15. Police eventually identified "Cortez" as Richard Gwin. (Ex. 3 – 10/27/95 Report, p.1.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits. Ex. 5 (Buschmann Dep. 6/30/10) at 44:16-24.**

**C. Police Interrogation of Richard Gwin**

16. After Gwin was identified, he appeared and was interviewed at the Criminal Investigation Bureau on October 24, 1995. (Ex. 3 –10/27/95 Report)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits that Gwin and his mother came to the police station voluntarily, and that the Defendants then interrogated him over the course of two days. Ex. 5 (Buschmann Dep. 6/30/10) at 46:3-47:4;** ████████████

████████████

17. Gwin initially denied any knowledge regarding Payne's murder. (*Id.* at p.3)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff states that Gwin denied any knowledge regarding Payne's murder during his two-day interrogation because he had no knowledge**

7

**regarding Payne's murder. Ex. 29 (Jones Dep.) at 21:10-22:8, 23:1-7, 24:7-24, 70:5-71:3, 72:3-6, 84:15-85:3, 95:4-96:7, 97:15-98:1; Ex. 31 (Russano Corrected Report) at 27 & n.171.**

18. He was nevertheless taken into custody when he indicated that (i) he knew police wanted to speak to him about the death of a white girl because his mother had told him so, when police had not actually told Gwin's mother why they wanted to speak to him, and (ii) he displayed knowledge of Payne having her throat cut. (*Id.*)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff denies. The report indicates only that "[d]ue to the information that had been received prior to Richard GWIN appearing at the Criminal Investigation Bureau and the fact that he was displaying some knowledge of this incident, GWIN was taken into custody at 4:50 p.m. on 10-24-95." Ex. 27 (DeValkenaere Supp. Report—Gwin Part 1 10/4/95) at MPD SJH 551. It does not say anything about the fact that Gwin knew that police wanted to speak with him about the death of a white girl. Moreover, it was public knowledge that Payne's throat was cut. Ex. 44 (Simons Dep. 7/6/22) at 325:2-326:10;** ███████████████████████████████████████
██████████████████████████████████████**]Ex. 31 (Russano Corrected Report) at 27 n.171; Ex. 74 (*Journal Sentinel* article) at 1. For example, that fact was reported in a *Milwaukee Journal Sentinel* article published on September 2, 1995 (well before Gwin's interrogation). Ex. 74 (*Journal Sentinel* article) at 1.**

19. Around 4:50 that day, Gwin was interviewed again. (Ex. 5 – 10/27/95 Report.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133**

8

**(7th Cir. 2013). Subject to that objection, Plaintiff admits. Ex. 4 (Buschmann Dep. 4/7/21) at 96:10-18.**

20. He again denied having any involvement in Payne's death. (*Id.* at p.1.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits that Gwin denied any knowledge regarding Payne's murder during his two-day interrogation because he had no knowledge regarding Payne's murder. Ex. 29 (Jones Dep.) at 21:10-22:8, 23:1-7, 24:7-24, 70:5-71:3, 72:3-6, 84:15-85:3, 95:4-96:7, 97:15-98:1; Ex. 31 (Russano Corrected Report) at 27 & n.171.**

21. However, he added that he heard about the death of a white girl on 7th and Burleigh from his neighbor "Sammy Joe." (*Id.*)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Because there is no admissible evidence to support this statement, Plaintiff denies it.**

**Plaintiff further denies this SOF because Gwin denied any knowledge regarding Payne's murder during his two-day interrogation because he had no knowledge regarding Payne's murder. Ex. 29 (Jones Dep.) at 21:10-22:8, 23:1-7, 24:7-24, 70:5-71:3, 72:3-6, 84:15-85:3, 95:4-96:7, 97:15-98:1; Ex. 31 (Russano Corrected Report) at 27 & n.171.**

22. He further explained that sometime possibly within the last few months, he had been on his front porch and saw Sammy Joe and who he thought to be Sammy Joe's cousin on Sammy Joe's porch with two white girls. (*Id.* at pp.1-2.)

9

**RESPONSE:** Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Because there is no admissible evidence to support this statement, Plaintiff denies it.

Plaintiff further denies this SOF because Gwin denied any knowledge regarding Payne's murder during his two-day interrogation because he had no knowledge regarding Payne's murder. Ex. 29 (Jones Dep.) at 21:10-22:8, 23:1-7, 24:7-24, 70:5-71:3, 72:3-6, 84:15-85:3, 95:4-96:7, 97:15-98:1; Ex. 31 (Russano Corrected Report) at 27 & n.171. After being threatened by Defendants Devalkenaere and Buschmann, Gwin told the police what they wanted to hear so that he could go home. Ex. 29 (Jones Dep.) at 70:5-71:3, 72:3-6, 84:15-85:3. Gwin told his sister, Teresa Jones, that "police said that Sam and his cousins [sic] was with the white girl that was missing that ended up dead, they found dead. He didn't say that that was true, he just said that's what the police said." Ex. 29 (Jones Dep.) at 21:10-22; *see also id.* at 17:8-11, 86:1-5 (describing Chaunte Ott as Hadaway's cousin). In fact, Gwin said he never saw a white girl with Hadaway and Ott. Ex. 29 (Jones Dep.) at 24:7-24; *see also id.* at 70:5-71:3, 72:3-6, 84:15-85:3.

Plaintiff further denies that Gwin had any knowledge or involvement in the Payne homicide; and likewise denies that Gwin had any knowledge that Sam Hadaway or Chaunte Ott were involved in Payne's homicide. Ex. 29 (Jones Dep.) at 97:15-98:1. Both Hadaway and Ott are absolutely innocent of this crime. Ex. 7 (Hadaway Dep. 8/31/22) at 241:13-14; Ex. 6 (Hadaway Claims Board Decision); Ex. 37 (Ott Claims Board Decision).

23. Gwin identified one of the white girls as Payne from Payne's photo. (*Id.*)

10

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted.** *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). **Because there is no admissible evidence to support this statement, Plaintiff denies it.**

**Plaintiff further denies this statement because Gwin never saw Hadaway and Ott with the white girl. Ex. 29 (Jones Dep.) at 24:7-24;** *see also id.* **at 70:5-71:3, 72:3-6, 84:15-85:3. Gwin told his sister, Teresa Jones, that "police said that Sam and his cousins [sic] was with the white girl that was missing that ended up dead, they found dead. He didn't say that that was true, he just said that's what the police said." Ex. 29 (Jones Dep.) at 21:10-22;** *see also id.* **at 17:8-11, 86:1-5 (describing Chaunte Ott as Hadaway's cousin). After being threatened by Defendants Devalkenaere and Buschmann, Gwin told the police what they wanted to hear so that he could go home. Ex. 29 (Jones Dep.) at 70:5-71:3, 72:3-6, 84:15-85:3.**

**Plaintiff further denies that Gwin had any knowledge or involvement in the Payne homicide; and likewise denies that Gwin had any knowledge that Sam Hadaway or Chaunte Ott were involved in Payne's homicide. Ex. 29 (Jones Dep.) at 97:15-98:1. Both Hadaway and Ott are absolutely innocent of this crime. Ex. 7 (Hadaway Dep. 8/31/22) at 241:13-14; Ex. 6 (Hadaway Claims Board Decision); Ex. 37 (Ott Claims Board Decision).**

24. Gwin saw the women leave Sammy Joe's porch and walk away. (*Id.* at p.2.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted.** *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). **Because there is no admissible evidence to support this statement, Plaintiff denies it.**

Plaintiff further denies this SOF because Gwin denied any knowledge regarding Payne's murder during his two-day interrogation because he had no knowledge regarding Payne's murder. Ex. 29 (Jones Dep.) at 21:10-22:8, 23:1-7, 24:7-24, 70:5-71:3, 72:3-6, 84:15-85:3, 95:4-96:7, 97:15-98:1; Ex. 31 (Russano Report) at 27 & n.171. After being threatened by Defendants Devalkenaere and Buschmann, Gwin told the police what they wanted to hear so that he could go home. Ex. 29 (Jones Dep.) at 70:5-71:3, 72:3-6, 84:15-85:3. Gwin told his sister, Teresa Jones, that "police said that Sam and his cousins [sic] was with the white girl that was missing that ended up dead, they found dead. He didn't say that that was true, he just said that's what the police said." Ex. 29 (Jones Dep.) at 21:10-22; *see also id.* at 17:8-11, 86:1-5 (describing Chaunte Ott as Hadaway's cousin). In fact, Gwin said he never saw a white girl with Hadaway and Ott. Ex. 29 (Jones Dep.) at 24:7-24; *see also id*. at 70:5-71:3, 72:3-6, 84:15-85:3.

Plaintiff further denies that Gwin had any knowledge or involvement in the Payne homicide; and likewise denies that Gwin had any knowledge that Sam Hadaway or Chaunte Ott were involved in Payne's homicide. Ex. 29 (Jones Dep.) at 97:15-98:1. Both Hadaway and Ott are absolutely innocent of this crime. Ex. 7 (Hadaway Dep. 8/31/22) at 241:13-14; Ex. 6 (Hadaway Claims Board Decision); Ex. 37 (Ott Claims Board Decision).

25. Gwin said that about a month later, Sammy Joe told him that one of the girls Sammy Joe had been with had been found behind an abandoned house on 7th and Burleigh with her throat cut. (*Id.*)

RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133

(7th Cir. 2013). Because there is no admissible evidence to support this statement, Plaintiff denies it.

Plaintiff further denies this SOF because Gwin denied any knowledge regarding Payne's murder during his two-day interrogation because he had no knowledge regarding Payne's murder. Ex. 29 (Jones Dep.) at 21:10-22:8, 23:1-7, 24:7-24, 70:5-71:3, 72:3-6, 84:15-85:3, 95:4-96:7, 97:15-98:1; Ex. 31 (Russano Report) at 27 & n.171. After being threatened by Defendants Devalkenaere and Buschmann, Gwin told the police what they wanted to hear so that he could go home. Ex. 29 (Jones Dep.) at 70:5-71:3, 72:3-6, 84:15-85:3. Gwin told his sister, Teresa Jones, that "police said that Sam and his cousins [sic] was with the white girl that was missing that ended up dead, they found dead. He didn't say that that was true, he just said that's what the police said." Ex. 29 (Jones Dep.) at 21:10-22; *see also id.* at 17:8-11, 86:1-5 (describing Chaunte Ott as Hadaway's cousin). In fact, Gwin said he never saw a white girl with Hadaway and Ott. Ex. 29 (Jones Dep.) at 24:7-24; *see also id.* at 70:5-71:3, 72:3-6, 84:15-85:3.

Plaintiff further denies that Gwin had any knowledge or involvement in the Payne homicide; and likewise denies that Gwin had any knowledge that Sam Hadaway or Chaunte Ott were involved in Payne's homicide. Ex. 29 (Jones Dep.) at 97:15-98:1. Both Hadaway and Ott are absolutely innocent of this crime. Ex. 7 (Hadaway Dep. 8/31/22) at 241:13-14; Ex. 6 (Hadaway Claims Board Decision); Ex. 37 (Ott Claims Board Decision).

26. On October 25, 1995, at 12:30 a.m., detectives Valuch and Trudell took Gwin to a hospital for blood, saliva, head hair and pubic hair samples. (Ex. 6 – 10/25/95 Report.)

Case 2:19-cv-01106-PP   Filed 03/20/24   Page 13 of 45   Document 121

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted.** *See*, *e.g.*, *Jordan v. Binns*, **712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits.**

27. Around 10:00 a.m. that day, detective Simons administered a polygraph test to Gwin in light of his statements that he had nothing to do with Payne's death. (Ex. 7 – Polygraph Report.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay polygraph report for the truth of the matter asserted.** *See*, *e.g.*, *Jordan v. Binns*, **712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits. Ex. 44 (Simons Dep. 7/6/22) at 326:13-327:2.**

28. Simon determined that Gwin was not being completely truthful and may have knowledge of who killed Payne. (*Id.*)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay polygraph report for the truth of the matter asserted.** *See*, *e.g.*, *Jordan v. Binns*, **712 F.3d 1123, 1133 (7th Cir. 2013).** ████████████████████████████

████████████████████████████████████████████

████████████████████████ **According to Simons, "restricted lying" means that Simons could not "make a definite determination in [his] analysis of the polygraph charts that the person is . . . lying." Ex. 44 (Simons Dep. 7/6/22) at 50:21-24. Plaintiff nonetheless denies that Gwin was not being completely truthful** ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████ **The "Arther polygraph technique conducted was not valid at the time it was**

14

administered" to Gwin. Ex. 56 (Sosnowski Corrected Report) at 3; Ex. 57 (Sosnowski Rebuttal Report) at 1-3.

29. On October 25, 1995, around 5:15 p.m., Gwin was reinterviewed after being administratively released. (Ex. 8 – 10/25/95 Report.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits that Gwin was reinterviewed on October 25, 1995 around 5:15 p.m. but denies that he was ever "administratively released." Gwin was only allowed to go home once he told the police what Gwin alleged they wanted to hear. Ex. 29 (Jones Dep.) at 23:19-24:6, 84:15-85:3.**

30. During this interview, Gwin indicated that he had previously seen Payne with two men he referred to as Sammie Joe and Chaunte. (*Id.* at p.1.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits that Gwin told Defendants Devalkenaere and Buschmann that he saw Payne with Sammie Joe and Chaunte but deny that this is true. Ex. 29 (Jones Dep.) at 24:7-24, 84:15-85:3, 97:15-98:1. Instead, it was the "police [that] said that Sam and his cousins was with the white girl that was missing that ended up dead . . . ." Ex. 29 (Jones Dep.) at 21:18-22, 22:2-8 *see also id.* at 17:8-11, 86:1-5 (describing Chaunte Ott as Hadaway's cousin). Gwin only repeated that statement because he was being threatened and wanted to go home. Ex. 29 (Jones Dep.) at 23:1-7, 24:3-24.**

31. He stated that he gave the three of them a ride in his car to a dope house. (*Id.* at p.2.)

15

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted.** *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). **Subject to that objection, Plaintiff admits that Gwin told Defendants Devalkenaere and Buschmann that he gave Hadaway, Ott and Payne a ride to a dope house, but deny that this is true. Ex. 29 (Jones Dep.) at 24:7-24, 97:15-98:1. Instead, it was the "police [that] said that Sam and his cousins was with the white girl that was missing that ended up dead . . . ." Ex. 29 (Jones Dep.) at 21:18-22;** *see also id.* **at 17:8-11, 86:1-5 (describing Chaunte Ott as Hadaway's cousin). Gwin explained that the police "wanted him to say that he had dropped them off somewhere and that, if he didn't, he could be involved as a suspect as well." Ex. 29 (Jones Dep.) at 23:5-7;** *see also id.* **at 22:2-8. Gwin only repeated that statement because he was being threatened and wanted to go home. Ex. 29 (Jones Dep.) at 23:1-7, 24:3-24.**

32. Gwin said that when they arrived, Sammie Joe, Chaunte, and Payne got out and walked behind an abandoned house while Gwin waited in the car. (*Id.*)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted.** *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). **Subject to that objection, Plaintiff admits that Gwin told Defendants Devalkenaere and Buschmann that Hadaway, Ott and Payne got out of the car, but deny that he said they walked behind an abandoned house as unsupported by the evidence, and deny that any of this SOF is true. Ex. 29 (Jones Dep.) at 24:7-24, 84:15-85:3, 97:15-98:1. Instead, it was the "police [that] said that Sam and his cousins was with the white girl that was missing that ended up dead . . . ." Ex. 29 (Jones Dep.) at 21:18-22;** *see also id.* **at 17:8-11, 86:1-5 (describing Chaunte Ott as Hadaway's cousin). Gwin explained that the police**

"wanted him to say that he had dropped them off somewhere and that, if he didn't, he could be involved as a suspect as well." Ex. 29 (Jones Dep.) at 23:5-7; *see also id.* at 22:2-8. Gwin only repeated that statement because he was being threatened and wanted to go home. Ex. 29 (Jones Dep.) at 23:1-7, 24:3-24.

33. According to Gwin, about fifteen minutes later, Sammie Joe and Chaunte returned without Payne. (*Id.*)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits that Gwin told Defendants Devalkenaere and Buschmann that Hadaway and Ott returned to the car fifteen minutes later, but deny this is true. Ex. 29 (Jones Dep.) at 24:7-24, 84:15-85:3, 97:15-98:1. Instead, it was the "police [that] said that Sam and his cousins was with the white girl that was missing that ended up dead . . . ." Ex. 29 (Jones Dep.) at 21:18-22; *see also id.* at 17:8-11, 86:1-5 (describing Chaunte Ott as Hadaway's cousin). Gwin explained that the police "wanted him to say that he had dropped them off somewhere and that, if he didn't, he could be involved as a suspect as well." Ex. 29 (Jones Dep.) at 23:5-7; *see also id.* at 22:2-8. Gwin only repeated that statement because he was being threatened and wanted to go home. Ex. 29 (Jones Dep.) at 23:1-7, 24:3-24.**

34. Gwin stated that when he asked where Payne was, Sammie Joe said she had no money so Chaunte cut her throat. (*Id.*)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits that Gwin told Defendants**

17

Devalkenaere and Buschmann that Gwin asked where Payne was and Hadaway said that she had no money so cut her throat, but deny that this is true. Ex. 29 (Jones Dep.) at 24:7-24, 84:15-85:3, 97:15-98:1. Instead, it was the "police [that] said that Sam and his cousins was with the white girl that was missing that ended up dead . . . ." Ex. 29 (Jones Dep.) at 21:18-22; *see also id.* at 17:8-11, 86:1-5 (describing Chaunte Ott as Hadaway's cousin). Gwin explained that the police "wanted him to say that he had dropped them off somewhere and that, if he didn't, he could be involved as a suspect as well." Ex. 29 (Jones Dep.) at 23:5-7; *see also id.* at 22:2-8. Gwin only repeated that statement because he was being threatened and wanted to go home. Ex. 29 (Jones Dep.) at 23:1-7, 24:3-24. Moreover, both Ott and Hadaway are absolutely innocent of the murder of Payne. Ex. 7 (Hadaway Dep. 8/31/22) at 241:13-14; Ex. 6 (Hadaway Claims Board Decision); Ex. 37 (Ott Claims Board Decision).

35. Gwin recounted that Chaunte also stated that he "did that bitch." (*Id.*)

RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits that Gwin told Defendants Devalkenaere and Buschmann that Ott said he "did that bitch," but deny that this is true. Ex. 29 (Jones Dep.) at 24:7-24, 84:15-85:3, 97:15-98:1. Instead, it was the "police [that] said that Sam and his cousins was with the white girl that was missing that ended up dead . . . ." Ex. 29 (Jones Dep.) at 21:18-22; *see also id.* at 17:8-11, 86:1-5 (describing Chaunte Ott as Hadaway's cousin). Gwin explained that the police "wanted him to say that he had dropped them off somewhere and that, if he didn't, he could be involved as a suspect as well." Ex. 29 (Jones Dep.) at 23:5-7; *see also id.* at 22:2-8. Gwin only repeated that

18

statement because he was being threatened and wanted to go home. Ex. 29 (Jones Dep.) at 23:1-7, 24:3-24. Moreover, both Ott and Hadaway are absolutely innocent of the murder of Payne. Ex. 7 (Hadaway Dep. 8/31/22) at 241:13-14; Ex. 6 (Hadaway Claims Board Decision); Ex. 37 (Ott Claims Board Decision).

36. Gwin signed and initialed his statement. (*Id.* at p.3.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Because there is no admissible evidence to support this SOF, Plaintiff denies it.**

### D. Police Interrogation of Sam Hadaway

37. Police identified Gwin's neighbor, Sammy Joe, as Plaintiff. (Ex. 9 – 10/26/95 Report.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits that he was Gwin's neighbor and that the police arrested him. Ex. 7 (Hadaway Dep. 8/31/22) at 117:18-19.**

38. On October 25, 1995, Plaintiff was arrested in relation to Payne's murder. (*Id.*)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits that the clearance report indicates that Hadaway was arrested on October 25, 1995, but clarify that Hadaway was picked up at his home on October 24, 1995 by Detectives Burems and Valuch and interrogated at the Detective Bureau. Ex. 38 (Burems Dep.) at 13:1-6, 38:1-42:4; Ex. 39**

19

(Burems Supp. 10/25/95) at MPD SJH 536; Ex. 7 (Hadaway Dep. 8/31/22) at 129:11-130:10 (arrested at house on 10/24/95). He was subsequently conveyed to the Good Samaritan Hospital to give forensic samples, and then to the jail where he was taken into custody on an outstanding charge as well as the Payne homicide. Ex. 38 (Burems Dep.) at 41:17-42:4; Ex. 7 (Hadaway Dep. 8/31/22) at 138:23-139:12 (taken to hospital to give samples), 278:2-10 (in custody from time arrested to time testified at Ott's trial); Ex. 76 (Hadaway Clearance Report) at MPD SJH 276. A reasonable person would not have thought that he was free to leave when he was taken to the Detective Bureau for an interrogation (as opposed to, *e.g.*, being interrogated at his home). *See Warfield v. City of Chicago*, 565 F. Supp. 2d 948, 967 (N.D. Ill. 2008) (under Illinois law, arrest "occurs when a reasonable person would believe he was not free to leave").

39. Afterwards, Plaintiff was interviewed by several different detectives. (*E.g.*, Ex. 10 – 10/25/95 Report; Ex. 11 – 10/26/95 Report.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits that he was interviewed by several detectives, but clarifies that his first interview was on October 24, 1995 by Detectives Ricky Burems and Michael Valuch and continued up and through November 1, 1995. Ex. 38 (Burems Dep.) at 13:1-6, 38:1-42:4; Ex. 39 (Burems Supp. 10/25/95) at MPD SJH 536; Ex. 43 (Dubis Dep.) at 19:7-21:4; Ex. 42 (Dubis Notes) at MPD SJH 740-41; Ex. 47 (E. Moore Dep. 8/23/10) at 64:4-66:6 (interrogated Hadaway on either 10/25/95 or 10/26/95); Ex. 48 (Hadaway Statement to E. Moore) at MPD SJH 734-39; Ex. 4 (Buschmann Dep. 4/7/21) at 124:1-125:2; Ex. 21 (DeValkenaere Dep. 3/25/21) at 147:9-20;**

20

**Ex. 49 (Hadaway Statement 10/27/95) at MPD SJH 742-47; Ex. 50 (Buschmann Supp. 10/27/95) at MPD SJH 562-67; Ex. 44 (Simons Dep. 7/6/22) at 307:25-308:23, 311:6-312:2, 312:22-313:7; Ex. 59 (Hadaway Statement 11/1/95) at MPD SJH 1683-84.**

40. Plaintiff eventually stated he and Ott were involved in the murder, and that he saw Ott kill Payne. (Ex 12 – 10/27/95 Report.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits that he eventually gave a false and fabricated statement implicating himself and Ott in Payne's murder. Plaintiff clarifies, however, that he was unlawfully coerced into doing so. Plaintiff was a very vulnerable individual: He had (and has) significant cognitive challenges and medical issues, including a seizure disorder, that requires regular medication ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 7 (Hadaway Dep. 8/31/22) at 49:11-50:24 (special education all his life, difficulty with reading/writing/math); Ex. 40 (T. Hadaway Dep.) at 114:19-116:10 (Sam has had cerebral palsy since birth, left-side shorter and weaker than right), 118:18-120:1 (Sam has had seizure disorder since he was a child). Defendants exploited that vulnerability by detaining Plaintiff, using threats, promises, withholding of medication and food; and feeding Plaintiff information about the crime:**

- **Lengthy detention and isolation. *See* Response to SOF 39 and cites therein; Ex. 31 (Russano Corrected Report) at 35-36**

- **Withheld seizure medication Ex. 7 (Hadaway Dep. 8/31/22) at 142:4-145:24, 147:13-25, 198:10-23**

- **Withheld food. Ex. 7 (Hadaway Dep. 8/31/22) at 164:22-167:4**

21

- **Slammed on the table, called him a n***** and shook his handcuffs and pounding the table. Ex. 7 (Hadaway Dep. 8/31/22) at 146:24-147:12, 164:4-165:2, 166:24-167:6, 167:11-168:1, 302:2-13**

- **Threatened that if he did not implicate Ott, he would be charged and convicted of Payne's murder and never see his family again. Ex. 7 (Hadaway Dep 8/31/22) at 201:2-17, 203:4-19, 204:21-205:5, 234:19-235:1, 260:1-261:4, 329:12-330:15**

- **Promised that if he implicated Ott, he would only get 5 years in prison and/or go free. Ex. 7 (Hadaway Dep. 8/31/22) at 204:21-205:2, 241:15-22, 327:11-24, 329:20-330:8, 332:7-18**

- **Defendants refused to listen to his protestations of innocence. Ex. 7 (Hadaway Dep. 8/31/22) at 115:1-116:1, 118:17-119:5, 124:2-10, 201:19-202**

- **Fed information about the crime to incorporate into his statement. Ex. 7 (Hadaway Dep. 8/31/22) at 120:5-123:2, 210:20-24, 220:12-24, 228:3-16, 230:23-231:4, 232:1-233:244:4, 244:15-245:23, 252:4-253:2, 269:16-23, 270:7-12**

41. Plaintiff claims that he was coerced into falsely giving this statement. (Pl.'s Compl., Dkt. 1, ¶ 3.)

**RESPONSE: Plaintiff objects to the extent that this SOF relies on Plaintiff's unverified Complaint, which is not evidence. *See*, *e.g.*, *Armstrong v. Brann*, No. 04-C-0884, 2006 WL 3422570, at *1 (E.D. Wis. Sept. 25, 2006); *see also Vega v. Chicago Bd. of Educ.*, 338 F. Supp. 3d 806, 808 (N.D. Ill. 2018) and cases cited therein. Subject to that objection, Plaintiff admits that he was coerced into giving a false statement that was knowingly fabricated by the Defendants. Plaintiff was a very vulnerable individual: He had (and has) significant cognitive challenges and medical issues, including a seizure disorder, that requires regular**

medication. ████████████████████████████████████████████████████

████ Ex. 7 (Hadaway Dep. 8/31/22) at 49:11-50:24 (special education all his life, difficulty with reading/writing/math); Ex. 40 (T. Hadaway Dep.) at 114:19-116:10 (Sam has had cerebral palsy since birth, left-side shorter and weaker than right), 118:18-120:1 (Sam has had seizure disorder since he was a child). Defendants exploited that vulnerability by detaining Plaintiff, using threats, promises, withholding of medication and food; and feeding Plaintiff information about the crime:

- Lengthy detention and isolation. *See* Response to SOF 39 and cites therein; Ex. 31 (Russano Corrected Report) at 35-36

- Withheld seizure medication Ex. 7 (Hadaway Dep. 8/31/22) at 142:4-145:24, 147:13-25, 198:10-23

- Withheld food. Ex. 7 (Hadaway Dep. 8/31/22) at 164:22-167:4

- Slammed on the table, called him a n***** and shook his handcuffs and pounding the table. Ex. 7 (Hadaway Dep. 8/31/22) at 146:24-147:12, 164:4-165:2, 166:24-167:6, 167:11-168:1, 302:2-13

- Threatened that if he did not implicate Ott, he would be charged and convicted of Payne's murder and never see his family again; Ex. 7 (Hadaway Dep 8/31/22) at 201:2-17, 203:4-19, 204:21-205:5, 234:19-235:1, 260:1-261:4, 329:12-330:15

- Promised that if he implicated Ott, he would only get 5 years in prison and/or go free. Ex. 7 (Hadaway Dep. 8/31/22) at 204:21-205:2, 241:15-22, 327:11-24, 329:20-330:8, 332:7-18

- Defendants refused to listen to his protestations of innocence. Ex. 7 (Hadaway Dep. 8/31/22) at 115:1-116:1, 118:17-119:5, 124:2-10, 201:19-202

23

- **Fed information about the crime to incorporate into his statement. Ex. 7 (Hadaway Dep. 8/31/22) at 120:5-123:2, 210:20-24, 220:12-24, 228:3-16, 230:23-231:4, 232:1-233:244:4, 244:15-245:23, 252:4-253:2, 269:16-23, 270:7-12**

42. After making his statement, Plaintiff was administered a polygraph test by Simons to determine if he was withholding information. (Ex. 13 – Polygraph Report.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay polygraph report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits that Plaintiff was given a polygraph on November 1, 1995 by Defendant Simons. Ex. 4 (Buschmann Dep. 4/7/21) at 151:2-5, 156:16-157:18.**

43. After Simons determined deception was indicated, Simons and Buschmann interviewed Plaintiff, at which point he added details to his prior statement, such as holding Payne's hands while Ott searched Payne for money. (Ex. 14 – 11/1/95 Report.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay polygraph report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, admit that Simons and Buschmann interviewed Plaintiff following his polygraph examination but deny the remainder of this SOF.**

**Plaintiff denies that Defendant Simons found that deception was indicated. That was for three reasons. First, Simons admits that he wrote down the wrong answer on the polygraph for Question 3B. Ex. 44 (Simons Dep. 7/6/22) at 266:1-268:13, 291:13-292:20. Question 3B asked: "Did Chaunte cut that white girl's throat?" Ex. 44 (Simons Dep. 7/6/22) at 241:16-242:9. Simons wrote down the answer as "No" but he clarified at his**

24

deposition that the answer had to have been "Yes." Ex. 44 (Simons Dep. 7/6/22) at 266:1-268:13, 291:13-292:20. Indeed, Simons's polygraph report reflects the same. Ex. 55 (Hadaway Polygraph Report) at MPD SJH 1688. Simons's finding that there was deception, therefore, indicates that Hadaway was lying when he said that "Chaunte cut the white girl's throat." Ex. 56 (Sosnowski Corrected Report) at 6.

Second, Hadaway showed "no significant reactions" to the remainder of the relevant questions—which confirmed that Hadaway did not cut Payne's throat, did not hold Payne down and did not have sexual contact with Payne. Ex. 56 (Sosnowski Corrected Report) at 6. Any suggestion otherwise by Defendant Simons was erroneous. In other words, the polygraph confirmed that Hadaway was not involved in the Payne homicide and had no knowledge that Ott was either. Ex. 56 (Sosnowski Corrected Report) at 6.

Third, the Arther method, which Defendant Simons used to conduct Hadaway's polygraph examination, was not valid at the time it was administered to Hadaway. Ex. 56 (Sosnowski Corrected Report) at 3; Ex. 57 (Sosnowski Rebuttal Report) at 1-3. The Arther method was "built on criteria that had no scientific method," but was instead based on "preconceived signals," myths (e.g., at least 85% of non-reactors are lying) and prejudice (male homosexuals are hard to test) about polygraph subjects. Ex. 57 (Sosnowski Rebuttal Report) at 2-3

Plaintiff also denies that he "added details to his prior statement, such as holding Payne's hands while Ott searched Payne for money." Defendants Simon and Buschmann—and not Plaintiff—added the detail to Plaintiff's prior false and fabricated statement that Plaintiff allegedly held Payne's hands down while Ott searched for money. Ex. 7 (Hadaway Dep. 8/31/22) at 269:16-23. Indeed, Plaintiff was born with cerebral palsy and his left side is

25

smaller than his right side. As a result, Plaintiff not only walks with a limp, but also has had difficulty manipulating and holding things with his left hand since birth. **Ex. 7 (Hadaway Dep. 8/31/22) at 45:11013, 154:19-22; Ex. 40 (T. Hadaway Dep.) at 114:19-118:13.**

### E. The Conviction of Chaunte Ott and Sam Hadaway

44. Ott was eventually prosecuted for Payne's murder. (Pl.'s Compl., Dkt. 1, ¶ 42.)

**RESPONSE: Plaintiff objects to the extent that this SOF relies on Plaintiff's unverified Complaint, which is not evidence. *See*, *e.g.*, *Armstrong v. Brann*, No. 04-C-0884, 2006 WL 3422570, at \*1 (E.D. Wis. Sept. 25, 2006); *see also Vega v. Chicago Bd. of Educ.*, 338 F. Supp. 3d 806, 808 (N.D. Ill. 2018) and cases cited therein. Subject to that objection, Plaintiff admits.**

45. Gwin and Plaintiff testified at trial as to Ott's guilt. (Ex. 15 – Gwin trial testimony; Ex. 16 – Hadaway trial testimony.)

**RESPONSE: Plaintiff objects to Exhibit 16 as an incomplete record of Hadaway's trial testimony, which occurred over two days (February 27, 1996 and Feb. 28, 1996): It is missing many pages. *Compare* Doc. 105-16 with Ex. 60 (Hadaway Test. 2/27/96) and Ex. 61 (Hadaway Test. 2/28/96). Subject to that objection, Plaintiff admits, but clarifies that Gwin and Plaintiff only gave their statements implicating Ott (and attendant testimony) because the Defendants coerced them into doing so and fed them information about the crime. *See* response to SOF Nos. 30-35, 40-41, 43, which are expressly incorporated herein. *See also* Ex. 7 (Hadaway Dep. 8/31/22) at 287:7-23 (detectives rehearsed story with Plaintiff before he testified).**

46. Neither witness stated that Ott raped Payne. (Ex. 15 – *passim*; Ex. 16 – *passim*.)

**RESPONSE: Plaintiff objects to Exhibit 16 as an incomplete record of Hadaway's trial testimony, which occurred over two days (February 27, 1996 and Feb. 28, 1996): It is missing many pages. *Compare* Doc. 105-16 with Ex. 60 (Hadaway Test. 2/27/96) and Ex. 61 (Hadaway Test. 2/28/96). Subject to that objection, Plaintiff admits that Gwin did not testify that Ott raped Payne, but deny as to Plaintiff. Plaintiff testified that after Ott searched Payne and found no money, Ott allegedly told Payne "You're going to give me somethin'." Ex. 60 (Hadaway Test. 2/27/96) at 159:1-2. Ott purportedly was "trying to get in between her legs" while Payne's shirt was "half up on her stomach" and her pants were unfastened. Ex. 60 (Hadaway Test. 2/27/96) at 159:10-14. The implication from this testimony is that Ott was sexually assaulting Payne. None of this testimony was true: Both Ott and Hadaway are absolutely innocent of the murder of Payne. Ex. 7 (Hadaway Dep. 8/31/22) at 241:13-14; Ex. 6 (Hadaway Claims Board Decision); Ex. 37 (Ott Claims Board Decision).**

47. Ott was found guilty and sentenced to life in prison on March 20, 1996. (Ex. 30 sentencing transcript.)

**RESPONSE: Plaintiff admits.**

48. Plaintiff pled guilty to attempted robbery and was sentenced to five years in prison on October 29, 1996. (Ex. 17 – sentencing transcript, pp. 13, 16.)

**RESPONSE: Plaintiff admits.**

49. He was released from IDOC around August 1999. (Ex. 18.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are relying on a hearsay "Inmate Record Summary" for the truth of the matter asserted. Subject to that objection, Plaintiff admits.**

50. Gwin died afterwards around 1997. (Ex. 19 – Jones Dep., 11:17-19.)

**RESPONSE: Plaintiff admits.**

51. Mark Williams was the prosecutor in Hadaway's case. (Ex. 17, p.1.)

**RESPONSE: Plaintiff admits.**


**F.  Post-Conviction DNA Results**

52. In 2003 DNA collected from Payne matched DNA collected from the homicide of Joyce Mims. (Pl.'s Compl., Dkt. 1, ¶ 44.)

**RESPONSE: Plaintiff objects to the extent that this statement of fact ("SOF") relies on Plaintiff's unverified Complaint, which is not evidence. *See*, *e.g.*, *Armstrong v. Brann*, No. 04-C-0884, 2006 WL 3422570, at \*1 (E.D. Wis. Sept. 25, 2006); *see also Vega v. Chicago Bd. of Educ.*, 338 F. Supp. 3d 806, 808 (N.D. Ill. 2018) and cases cited therein. Subject to that objection, Plaintiff admits. Ex. 10 (Lankford Aff. 3/28/13) at ¶ 19.**

53. In 2007 DNA collected from Payne matched DNA collected from the homicide of Outherean Stokes. (*Id.* at ¶ 45.)

**RESPONSE: Plaintiff objects to the extent that this statement of fact ("SOF") relies on Plaintiff's unverified Complaint, which is not evidence. *See*, *e.g.*, *Armstrong v. Brann*, No. 04-C-0884, 2006 WL 3422570, at \*1 (E.D. Wis. Sept. 25, 2006); *see also Vega v. Chicago Bd. of Educ.*, 338 F. Supp. 3d 806, 808 (N.D. Ill. 2018) and cases cited therein. Subject to that objection, Plaintiff admits. Ex. 10 (Lankford Aff. 3/28/13) at ¶ 22.**

28

54. Eventually that DNA was matched to a man named Walter Ellis, who was later revealed to be a serial killer. (*Id.* at ¶ 47-48.)

**RESPONSE: Plaintiff objects to the extent that this statement of fact ("SOF") relies on Plaintiff's unverified Complaint, which is not evidence. *See*, *e.g.*, *Armstrong v. Brann*, No. 04-C-0884, 2006 WL 3422570, at \*1 (E.D. Wis. Sept. 25, 2006); *see also Vega v. Chicago Bd. of Educ.*, 338 F. Supp. 3d 806, 808 (N.D. Ill. 2018) and cases cited therein. Subject to that objection, Plaintiff admits. Ex. 10 (Lankford Aff. 3/28/13) at ¶¶ 23, 27-32, 37; Ex. 9 (Lankford Aff. 2/10/23) at ¶ 8.**

### G. The Eric Moore Report

55. In January 1996, detective Eric Moore wrote a report in which he recommended DNA testing in 19 homicides (the "Moore Report".) (Ex. 20.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits. Ex. 14 (E. Moore Dep. 8/29/22) at 79:3-15.**

56. Payne's case was among them. (*Id.* at p.2.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits. Ex. 14 (E. Moore Dep. 8/29/22) at 84:1-85:3.**

57. As to Payne's murder, the Moore Report recommended testing, *inter alia*, Plaintiff's and Ott's DNA against vaginal swabs taken from Payne, even though Ott and Hadaway denied sexual contact with Payne. (*Id.* at pp.7-8.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits. Ex. 14 (E. Moore Dep. 8/29/22) at 92:1-93:18.**

58. This testing was recommended by Assistant District Attorneys Gahn and Mark Williams "due to time constraints created by the legislative goal of bringing homicide cases to trial within 90 days." (*Id.*)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff denies the statement as written. The "purpose" of the testing of the swabs taken from Payne was to see if it "could shed some light on [Ott and Hadaway's] culpability . . . ." Ex. 14 (E. Moore Dep. 8/29/22) at 92:1-93:2. The testing of evidence in Payne's homicide was recommended to occur prior to any other testing because of a legislative goal of bringing homicide cases to trial within 90 days. Ex. 14 (E. Moore Dep. 8/29/22) at 93:19-94:17.**

59. The evaluation of that DNA testing was "presently being monitored by Assistant District Attorneys GAHN and WILLIAMS." (*Id.* at p.8.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits that the report states that the**

30

evaluation of the DNA testing in the Payne case was being monitored by ADAs Gahn and Williams.

60. Elsewhere, the Moore Report recommended priority DNA testing "to determine if four relatively recent asphyxiation and/or suffocation Homicides were connected." (*Id.* at p.5.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted.** ***See***, ***e.g.***, ***Jordan v. Binns***, **712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits. Ex. 14 (E. Moore Dep. 8/29/22) at 87:23-88:16.**

61. Payne's murder was not included among those four homicides. (*Id.*)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted.** ***See***, ***e.g.***, ***Jordan v. Binns***, **712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits that the Moore Report expressly identifies four homicides that may be connected on pages 5-7 of the Moore Report, which did not include Payne's, but denies that the MPD thought Payne's was not connected. Detective Moore thought there was a possibility that the assailant in all five cases could be connected. Ex. 14 (E. Moore Dep. 8/29/22) at 95:14-21;** ***see also id.*** **at 95:24-98:13.**

62. At the time of the Moore Report, police could not link any of the homicides listed therein. (Ex. 21 – Moore 2012 Dep., 17:19-24.)

**RESPONSE: Plaintiff admits that the police "couldn't definitively link at that time any of the cases," but that the homicide unit was generally cognizant of the possibility of a link among the homicides of women in North Milwaukee. Ex. 77 (E. Moore Dep. 5/7/12) at 17:19-24; Ex. 11 (Barbian-Gayan Dep.) at 51:16-23, 75:18-76:4.**

63. The overall investigative strategy outlined in the Moore Report was developed by conferring with "Assistant District Attorney Norm GAHN, who ha[d] considerable expertise in the application of DNA evidence in criminal prosecutions." (Ex. 20, p.5.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Further object to the extent that this SOF is vague as written as to what "overall investigative strategy" it is referring to. Subject to those objections, Plaintiff admits that Detective Moore conferred with ADA Gahn as well as with the Wisconsin Crime Lab and his homicide supervisors and co-workers during his investigation of unsolved female homicides. Ex. 14 (E. Moore Dep. 8/29/22) at 75:10-78:19, 87:10-88:13, 105:5-23.**

64. The Moore Report was only addressed to Captain Victor Vernon. (*Id.* at p.1.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits that the report was only addressed to Captain Victor Vernon but clarify that it was "widely distributed among the homicide division" because Detective Moore "made tons of copies and made sure that everybody had – had one," including line homicide detectives. Ex. 14 (E. Moore Dep. 8/29/22) at 105:24-106:19.**

65. Devalkenaere and Buschmann did not see the Moore Report prior to their depositions in Chaunte Ott's civil lawsuit. (Ex. 22 – Devalkenaere 2012 Dep., 44:7-19; Ex. 23 – Buschmann 2012 Dep., 19:10-22.)

32

**RESPONSE: Plaintiff admits that Defendants DeValkenaere and Buschmann testified that they did not see the Moore Report prior to their depositions but deny that this is true. Ex. 14 (E. Moore Dep. 8/29/22) at 105:24-106:19 (explaining that he "made tons of copies" and made sure that every homicide detective had a copy of his report).**

### H. Interviews of Latonia Cooper

66. On at least two occasions, police interviewed Latonia Cooper as part of the Payne investigation. (Ex. 24 – 8/31/95 Report.; Ex. 25 – 10/10/95 Report.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits that the police reports indicate that Ms. Cooper was interviewed at least twice by police.**

67. Cooper had stayed in the drug and prostitution house that Payne and Morrison were at prior to Payne's death. (Ex. 24. at p.2.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits. Ex. 16 (Cooper Dep.) at 17:18-18:21; *see also id.* at 11:1-17 (Giles was like a madam); *id.* at 44:9-45:6 (Giles would prostitute girls to Ellis for drugs or to be mean)**

68. The first memorialized interview was on August 31, 1995, at the Police Administration Building, and was initially with detective Gregory Schuler, and was later joined by detective Michael Young. (*Id.* at p.1.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted.** *See***,** *e.g.***,** *Jordan v. Binns***, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits that the first police report documenting an interview of Latonia Cooper in the Payne homicide file is Detective Schuler's 8/31/95 supplementary report. Ex. 20 (Schuler Supp. 8/31/95) at MPD SJH 358-364.**

69. The second memorialized interview was on October 8, 1995, at the Criminal Justice Facility (CJF, or jail) and was with detectives Devalkenaere and Ken Morrow. (Ex. 25, p.1.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted.** *See***,** *e.g.***,** *Jordan v. Binns***, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits that the second police report documenting an interview of Latonia Cooper in the Payne homicide file is Detective Morrow's 10/10/95 supplementary report. Ex. 19 (Morrow Supp. 10/10/95) at MPD SJH 528-30.**

70. The report of the first interview indicates that Cooper was shown a photo of Payne. (Ex. 24, p.6.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted.** *See***,** *e.g.***,** *Jordan v. Binns***, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits that Detective Schuler's police report states that he showed Cooper a photograph of Payne, but deny that that can be admitted for the truth of the matter. Ex. 19 (Schuler Supp. 8/31/95) at MPD SJH 363. Cooper testified that the police showed her a photograph of Payne when they came to her home. Ex. 16 (Cooper Dep.) at 6:5-14; 21:7-22:4.**

34

71. The report of the second interview does not indicate any photos were shown to Cooper. (Ex. 25, *passim*.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are using a hearsay police report for the truth of the matter asserted. *See*, *e.g.*, *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Subject to that objection, Plaintiff admits that Detective Morrow's police report does not state that he or Defendant DeValkenaere showed Cooper any photographs, but deny that that can be admitted for the truth of the matter. Ex. 19 (Morrow Supp. 10/10/95) at MPD SJH 528-30. Cooper testified that the police showed her a photograph of Payne when they came to her home. Ex. 16 (Cooper Dep.) at 6:5-14. Cooper further testified that she was shown photographs of men and women, including of Walter Ellis and Sandra Giles. Ex. 16 (Cooper Dep.) at 7:18-8:22, 10:12-14, 11:1-8, 28:11-15. Neither Schuler's nor Morrow's supplementary reports state that they showed Cooper these photographs. Ex. 20 (Schuler Supp. 8/31/95) at MPD SJH 358-64; Ex. 19 (Morrow Supp. 10/10/95) at MPD SJH 528-30; Ex. 2 (Waller Decl.) at 50.**

72. When deposed in Chaunte Ott's civil suit against the City, Cooper recalled an interview when she was brought to the police stations and shown several photos, one of which was of Walter Ellis. (Ex. 26 – Cooper Dep., 6:15-16.)

**RESPONSE: Plaintiff admits.**

73. She was shown this by one officer, and did not identify who the officer was. (*Id.* at 10:8-11, 32:17-22.)

**RESPONSE: Plaintiff denies that she was shown Ellis's photograph by one officer as the cited evidence indicates only that there was one policeman in the room when Cooper told the police that Ellis "was just always just trying to get with women that he knew that**

35

**probably was like a little too high to defend theirselves (*sic*) or whatever." Ex. 16 (Cooper Dep.) at 10:3-11. It does not state that there was only one officer present when Cooper was shown Ellis's photograph. Plaintiff admits that Cooper could not identify any of the officers who showed her photographs except to say that none were black. Ex. 16 (Cooper Dep.) at 32:17-33:3.**

74. Cooper did not know Ellis's name or address at the time, but recognized him as someone who she believed attempted to "get with" women who were on drugs. (*Id.* at 8:13-14, 9:3-5.)

**RESPONSE: Plaintiff admits that Cooper did not know Ellis's name or address at the time, but that she knew who he was and that he was always hanging around her area. Ex. 16 (Cooper Dep.) at 8:5-9:5. Plaintiff further admits that Cooper told police that Ellis "was just always just trying to get with women that he knew that probably was like a little too high to defend theirselves (*sic*) or whatever." Ex. 16 (Cooper Dep.) at 10:3-11.**

75. Cooper testified that she told the interviewing officer she believed Ellis and a woman named Sandra Giles – who Cooper knew as a "madam" – had something to do with Payne's death. (*Id.* at 11:1-10, 24:11-17.)

**RESPONSE: Plaintiff admits that Cooper testified that she told police that Giles and Ellis had something to do with Payne's death, but deny that she said that to only one "interviewing officer" as unsupported by the record citation. Ex. 16 (Cooper Dep.) at 23:24-24:17. Instead, Cooper was asked what information she told "the officers" who interviewed her—not a single officer. Ex. 16 (Cooper Dep.) at 23:24-25, 24:11.**

76. Cooper was not asked if she saw Payne and Ellis together, and did not say that she ever saw Ellis hurt Payne. (*Id.* at 14:24-15:2, *passim*.)

36

**RESPONSE: Plaintiff objects to this SOF as misleading as written. While Cooper testified that the police did not ask her if she saw Payne with Ellis, she expressly told police that "Sandra introduced Jessica to him (witness demonstrates) and after that I hadn't seen her again." Ex. 16 (Cooper Dep.) at 23:11-17. When Cooper was referring to "him," she was talking about Ellis who was in the picture marked as Exhibit 1 at her deposition. Ex. 16 (Cooper Dep.) at 23:20-23 (when she said "him," she was referring to Exhibit 1); *id*. at 8:5-19 (Exhibit 1 is a photograph of Walter Ellis). Plaintiff admits that Cooper did not testify that she told police she saw Ellis hurt Payne, but clarify that Cooper testified that Ellis was "real mean" and had once assaulted her; that Giles told her she introduced Payne to someone; and that Giles would introduce people to Ellis either in exchange for drugs or to be mean/so Ellis would hurt them. Ex. 16 (Cooper Dep.) at 26:9-27:1, 31:6-32:20, 44:9-45:6, 48:19-23.**

77. Instead, Cooper recalled seeing Ellis outside of the house Payne and Morrison were staying at, and was one of several people around the house when she left Payne there. (*Id.* at 14:18-23, 15:5-12.)

**RESPONSE: Plaintiff admits but clarifies that she saw Payne and Ellis outside Mr. Brooks's home a little before she left. Cooper recalled Brooks, Eric and Rhonda also being present outside. Ex. 16 (Cooper Dep.) at 14:9-15:12.**

78. Cooper recalled that she last saw Payne get into a yellow Cadillac with a group of men. (*Id.* at 40:15-41:13.)

**RESPONSE: Plaintiff admits that Cooper testified that she saw Payne get into a yellow Cadillac with a group of men, including Ellis. Ex. 16 (Cooper Dep.) at 40:15-41:16. Plaintiff denies that this was the last time Cooper saw Payne as unsupported by the citation.**

37

79. It is now known that Ellis was not among those men. (Pl.'s Compl., Dkt. 1, ¶ 14.)

**RESPONSE: Plaintiff objects to the extent that this statement of fact ("SOF") relies on Plaintiff's unverified Complaint, which is not evidence. *See*, *e.g.*, *Armstrong v. Brann*, No. 04-C-0884, 2006 WL 3422570, at *1 (E.D. Wis. Sept. 25, 2006); *see also Vega v. Chicago Bd. of Educ.*, 338 F. Supp. 3d 806, 808 (N.D. Ill. 2018) and cases cited therein. Subject to that objection, Plaintiff denies this SOF as unsupported by any record evidence.**

80. Cooper did not know if the officer who showed her Ellis's photo took notes of their discussion. (Ex. 26 – Cooper Dep., 10:22-25.)

**RESPONSE: Plaintiff admits, but clarify that it would have been Defendant Devalkenaere's practice for either him or Detective Morrow to take notes in either a steno pad or Memo Book, and to destroy the notes "[a]t some point." Ex. 18 (Devalkenaere Dep. 4/12/12) at 89:5-90:2. Further clarify that officers were required to document in their Memo Books anything of importance to an investigation, including information like a witness identifying a potential suspect. Ex.78 (Milwaukee Police Department, Rule 4, General Order 4/080.00(16)); Exhibit 23 (Rowe Dep.) at 39:1-40:21.**

81. Devalkenaere did not recall showing her a photo of Ellis. (Ex. 11 – Devalkenaere 2012 Dep., 90:12-15.)

**RESPONSE: Plaintiff admits but clarifies that DeValkenaere did not have any recollection of interviewing Cooper and reviewing Morrow's supplementary report about their interview of Cooper did not refresh his recollection. Ex. 18 (DeValkenaere Dep. 4/12/12) at 87:18-24, 90:5-11.**

Case 2:19-cv-01106-PP   Filed 03/20/24   Page 38 of 45   Document 121

## I. Testimony of Teresa Jones

82. Teresa Jones is the deceased Richard Gwin's sister. (Ex. 19 – Jones Dep., 40:13-19.)

**RESPONSE: Plaintiff admits.**

83. Jones testified that shortly after Gwin was released from police custody, he said to her that he "told them what they wanted to hear so I could go home." (*Id.* at 18:8-19:9, 53:12-16.)

**RESPONSE: Plaintiff admits.**

84. She never went into detail with Gwin about what he told the police. (*Id.* at 28:8-21:3, 22:9-22, 54:6-14, 69:4-70:3.)

**RESPONSE: Plaintiff objects to the extent that this SOF is vague. Plaintiff admits that Jones testified that she did not go into detail with her brother about what he told the police, but Gwin did tell her a number of things about his interaction with the police including:**

- **Police told him that Hadaway and "his cousins was with the white girl that was missing that ended up dead . . . ." Ex. 29 (Jones Dep.) at 21:18-22; *see also id.* at 17:8-11, 86:1-5 (describing Chaunte Ott as Hadaway's cousin).**

- **Police "wanted [Gwin] to say that he seen them together or that he dropped them off somewhere." Ex. 29 (Jones Dep.) at 22:2-6; *see also id.* at 22:14-20. Police told him that "if he didn't, he could be involved as a suspect as well." Ex. 29 (Jones Dep.) at 23:4-7; *see also id.* at 95:22-96:7.**

- **Police threatened him while he was in custody and felt pressure to talk to the police. Ex. 29 (Jones Dep.) at 23:1-3, 52:10-19, 83:16-84:21.**

- **In order to go home, Gwin had to lie. Ex. 29 (Jones Dep.) at 84:15-21. That is, the first and second days Gwin was in custody, he told police he did not know anything**

**about the homicide; he finally "told then what [they] wanted to hear because he really wanted to go home." Ex. 29 (Jones Dep.) at 95:4-11; *see also id*. at 95:12-21.**

85. She also never discussed with him if he lied to the police, but instead made that assumption. (*Id.* at 53:12-16, 84:15-21.)

**RESPONSE: Plaintiff denies. Jones testified that Gwin told her that he "dropped Sam and the young lady off at some house." Ex. 29 (Jones Dep.) at 24:3-4. When Jones asked Gwin if he actually saw them together, Gwin said no. Ex. 29 (Jones Dep.) at 24:7-19; *see also id*. at 97:15-98:1. Jones then asked him why he lied to the police and he said because he wanted go home; that is, that he said what police wanted to hear so he could go home because he had been there three days. Ex. 29 (Jones Dep.) at 24:20-24; *see also id*. at 23:19-24, 45:9-13.**

86. Jones testified that Gwin was told by officers that he could be a suspect if he did not cooperate. (*Id.* at 23:1-7.)

**RESPONSE: Plaintiff admits that Gwin was threatened by the Defendants that he would become a suspect but deny that the threat was that Gwin would become a suspect if he did not "cooperate." Gwin was told that he would become a suspect if he did not say that "he had dropped [Hadaway, Ott and Payne] off somewhere." Ex. 29 (Jones Dep.) at 23:1-14; *see also id*. at 95:22-96:7.**

87. Gwin did not identify which officer or officers told him that, or when they did so. (*Id.* at 23:8-10.)

**RESPONSE: Plaintiff admits that he did not identify the names of the officers who threatened him, but deny that he did not tell his sister when that threat was made as unsupported by the citation. Regardless, those threats occurred while Gwin was in custody. Ex. 29 (Jones Dep.) at 23:1-10. Further, while Gwin did not identify which officers**

40

**threatened him, the only detectives whose names appear on any police reports as having interacted with Gwin are Defendants DeValkenaere, Buschmann and Simons. Ex. 29 (Jones Dep.) at 23:8-10; Ex. 27 (DeValkenaere Supp. 10/27/95 – Gwin pt.1) at MPD SJH 549-51; Ex. 28 (DeValkenaere Supp. 10/27/95 – Gwin pt.2) at MPD SJH 552-53; Ex. 32 (DeValkenaere Supp. 10/27/95 – Gwin pt.3) at MPD SJH 554-57; Ex. 33 (Gwin Handwritten Statement 10/24/95) at MPD SJH 716-717; Ex. 34 (Gwin Handwritten Statement 10/25/95) at MPD SJH 720-22; Ex. 35 (Gwin Polygraph Report) at MPD SJH 1762-63.**

88. Beyond these statements, Gwin did not tell Jones how he was treated at the police station, and never indicated that the police hurt him. (*Id.* at 22:23-25, 96:8-15.)

**RESPONSE: Plaintiff objects to this SOF because it is vague as written, particularly because it does not identify which "statements" it is referring to. Subject to that objection, Plaintiff admits that Gwin did not tell Jones that the police physically hurt him, but did tell her:**

- **Police told him that Hadaway and "his cousins was with the white girl that was missing that ended up dead . . . ." Ex. 29 (Jones Dep.) at 21:18-22; *see also id.* at 17:8-11, 86:1-5 (describing Chaunte Ott as Hadaway's cousin).**

- **Police "wanted [Gwin] to say that he seen them together or that he dropped them off somewhere." Ex. 29 (Jones Dep.) at 22:2-6; *see also id.* at 22:14-20. Police told him that "if he didn't, he could be involved as a suspect as well." Ex. 29 (Jones Dep.) at 23:4-7; *see also id.* at 95:22-96:7.**

- **Police threatened him while he was in custody and felt pressure to talk to the police. Ex. 29 (Jones Dep.) at 23:1-3, 52:10-19, 83:16-84:21.**

41

- **In order to go home, Gwin had to lie. Ex. 29 (Jones Dep.) at 84:15-21. That is, the first and second days Gwin was in custody, he told police he did not know anything about the homicide; he finally "told then what [they] wanted to hear because he really wanted to go home." Ex. 29 (Jones Dep.) at 95:4-11; *see also id*. at 95:12-21.**

## J. The Milwaukee Police Department's Policy on Memo Pads

89. During the Payne investigation, the Milwaukee Police Department had a policy of requiring officers to record in Memo Books "the names of persons taken into custody by them and such particulars in each case as may be important in the trial thereof…and matters of importance relative to the discharge of their official duties…." (Ex. 27 – Milwaukee Police Department, Rule 4, General Order 4/0800.00(16).)

**RESPONSE: Plaintiff admits, but clarifies that that rule required officers to include witness statements where the witness identifies a potential suspect in their Memo Book. Ex. 23 (Rowe Dep.) at 68:5-24.**

90. Sometimes Devalkenaere and Buschmann recorded investigatory notes, such as interview notes, in steno pads instead of their Memo Books (which were also notepads). (Ex. 2 – Buschmann 2010 Dep., 50:24-51:5; Ex. 22 – Devalkenaere 2012 Dep., 79:5-80:12.)

**RESPONSE: Plaintiff admits.**

91. Those steno pads would later be destroyed. (Ex. 2 – Buschmann 2010 Dep., 50:9-20; Ex. 22 – Devalkenaere 2012 Dep., 82:3-23.)

**RESPONSE: Plaintiff admits.**

92. However, notes within them would be copied to police reports before the steno pads were destroyed. (Ex. 2 – Buschmann 2010 Dep., 50:9-20; Ex. 22 – Devalkenaere 2012 Dep., 80:24-22.)

**RESPONSE: Plaintiff denies. Defendant DeValkenaere testified that he took notes as a detective, including during the Payne investigation, and that either he or Detective Morrow would have taken notes during their interview of Latonia Cooper. Ex. 18 (DeValkenaere Dep. 4/12/12) at 79:5-80:12, 89:5-90:2. Nonetheless, none of the information that Cooper provided DeValkenaere about Giles and Ellis appears anywhere in a written report. Ex. 2 (Waller Decl.) at 28-29, 49-50.**

93. Buschmann did not recall receive training from the police department regarding his obligations to disclose exculpatory information to prosecutors in criminal cases. (Ex. 28 – Buschmann 2021 Dep., 209:25-210:4.)

**RESPONSE: Plaintiff admits but clarifies that Buschmann testified that he was not trained on his obligation to disclose exculpatory evidence—not that he could not recall any training. Ex. 4 (Buschmann Dep. 4/7/21) at 209:25-210:4 ("Q. . . . Were you trained as an officer at the Milwaukee Police Department on any duties to disclose exculpatory information? A. No.").**

94. However, Diane Rowe, who was a Milwaukee Police Department officer at the time of the Payne investigation, testified that she knew that such disclosure was part of the Department's policy. (Ex. 29 – Rowe Dep., 13:11-14:9, 57:1-58:4.)

**RESPONSE: Plaintiff denies. Rowe testified that "[t]here's not a specific policy that refers to that, but your reports – the practice is that your reports need to have such detail as to not exclude anything of importance." Ex. 23 (Rowe Dep.) at 57:1-11. Moreover, Rowe was**

never in the Detective Bureau so she does not have a foundation for stating what the practice was there: She spent her career in the Patrol Bureau (1991-1994), working at the jail (1994-95) or in the Administrative Bureau as an identification officer (1995-2011). Ex. 23 (Rowe Dep.) at 13:11-16:4.

95. The Milwaukee Chief of Police during the Payne investigation was Philip Arreola. (Ex. 30 – Arreola Non-Disclosure Request.)

**RESPONSE: Plaintiff objects to the extent that the Defendants are relying on a To-From memo for the truth of the matter asserted. Plaintiff further objects to the extent that the duration of the "Payne investigation" is undefined. Subject to those objections, Plaintiff admits.**

96. Arthur Jones was Chief from 1996 to 2003. (Ex. 31 – A. Jones Dep., 28:10-12, 45:7-9.)

**RESPONSE: Plaintiff admits.**

97. Nenette Hegerty was Chief from 2003 to 2007. (Ex. 32 – Hegerty Dep., 4:18-22).

**RESPONSE: Plaintiff admits.**


**K. Vacated Convictions and Plaintiff's Claims**

98. Ott and Hadaway later had their convictions vacated (Ott in 2007 and Hadaway in 2019). (Compl., ¶¶ 49-50 & 58-59.)

**RESPONSE: Plaintiff objects to the extent that this statement of fact ("SOF") relies on Plaintiff's unverified Complaint, which is not evidence. *See*, *e.g.*, *Armstrong v. Brann*, No. 04-C-0884, 2006 WL 3422570, at \*1 (E.D. Wis. Sept. 25, 2006); *see also Vega v. Chicago Bd. of Educ.*, 338 F. Supp. 3d 806, 808 (N.D. Ill. 2018) and cases cited therein. Subject to that objection, Plaintiff admits.**

44

99. Plaintiff brings the following claims: **Count I** – Coerced and False Confessions; **Count II** – Due Process; **Count III** – Federal Malicious Prosecution; **Count IV** – Unlawful Pretrial Detention; **Count V** – Conspiracy; **Count VI** – Failure to Intervene; **Count VII** – *Monell* (against the City) and **Count VIII** – State law indemnification. (*Id.* at ¶¶ 77-119.)

**RESPONSE: Plaintiff admits.**

Respectfully Submitted,

/s/ Gayle Horn
*Attorney for Plaintiff*

Gayle Horn
Heather Lewis Donnell
Elliot Slosar
LOEVY & LOEVY
311 N. Aberdeen Street, Third Floor
Chicago, Illinois 60607
Phone: 312-243-5900

45