# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN, MILWAUKEE DIVISION

| | | |
|---|---|---|
| SAM HADAWAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 2:19-cv-01106 |
| | ) | |
| CITY OF MILWAUKEE, ET AL., | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................... iii

Introduction .................................................................................................................... 1

Factual Background ........................................................................................................ 2

    The Murder of Jessica Payne ..................................................................................... 2

    Plaintiff Sam Hadaway is Absolutely Innocent of this Crime .................................... 2

    The Moore Report ...................................................................................................... 3

    Latonia Cooper Implicates Walter Ellis but the Defendants Bury that Information .......... 4

    Police Corroborate Latonia Cooper ........................................................................... 5

    The Coercion of Richard "Cortez" Gwin ................................................................... 6

    The Coercion and Fabrication of Plaintiff's Statement .............................................. 7

    Defendants Fabricate a Polygraph ............................................................................. 11

    Plaintiff Testifies Against Ott and Pleads Guilty to Armed Robbery.......................... 12

    The City's Policies and Practices .............................................................................. 13

Legal Standard .............................................................................................................. 14

Argument ...................................................................................................................... 15

A.    A Jury Must Decide Plaintiff's Fifth Amendment Confession Claim ................... 15

    1.    Qualified Immunity Jurisprudence is Clear that The Focus is On the Alleged Conduct by Defendants, Not the Availability of a Legal Remedy ....................... 15

    2.    By 1995, It Was Clearly Established That Police Could Not Coerce An Involuntary Statement ............................................................................. 17

B.    Plaintiff's Substantive Due Process Claim Also Must Be Decided by a Jury ................. 19

C.    Plaintiff's Due Process Claim Must Proceed To Trial...................................... 21

    1.    A Jury Must Decide Plaintiff's Fabrication of Evidence Claim ............................ 21

a.   The Record Supports a Jury Finding that Defendants Devalkenaere and Buschmann Knowingly Fabricated Gwin's False Statement..........................22

b.   The Record Supports a Jury Finding that Defendants Knowingly Fabricated Plaintiff's False Confession..............................................................25

c.   The Record Supports a Jury Finding that Defendant Simons Knowingly Fabricated a False Polygraph Report ..............................................27

D.   A Jury Must Decide Plaintiff's Brady Claim....................................................29

1.   The Defendants Withheld Exculpatory Information From Latonia Cooper..........31

2.   Defendants Withheld their Coercion and Fabrication of Gwin's Statement .........34

3.   Defendants May Not Avail Themselves of a Qualified Immunity Defense..........35

E.   A Jury Must Decide Plaintiff's Malicious Prosecution/Unlawful Detention Claims ........39

F.   Jury Must Decide Plaintiff's Monell Claim....................................................40

1.   Applicable Law................................................................................40

2.   The Record Supports a Jury Finding that the City Provided *No* Training on *Brady* obligations................................................................................41

3.   Plaintiff can prevail on this claim without demonstrating a widespread practice .42

4.   The Need for Training on Disclosure of Exculpatory and Impeachment Evidence is so Obvious that Plaintiff can show Deliberate Indifference ..............................45

5.   A Jury Must Decide if the City's Failure to Train was the "Moving Force" Causing the Constitutional Violations Plaintiff Suffered ......................................46

Conclusion ......................................................................................................47

Cases:

*Abdullahi v. City of Madison*, 423 F.3d 763 (7th Cir. 2005) ........................................................23

*Alexander v. United States*, 721 F.3d 418 (7th Cir. 2013)............................................................39

*Andersen v. City of Chicago*, No. 16 C 1963, 2019 WL 6327226, (N.D. Ill. Nov. 26, 2019)

.................................................................................................................................31, 32, 33

*Andersen v. Thieret*, 903 F.2d 526 (7th Cir. 1990) .......................................................20

*Anderson v. Creighton,* 483 U.S. 635 (1987) ..............................................16

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986)..............................................14

*Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015)..........................................15, 16, 35

*Ashcraft v. Tennessee*, 322 U.S. 143 (1994) ....................................................17

*Autullo v. United States*, 81 F.3d 163 (7th Cir. 1996) ....................................................36

*Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017)..........................................21, 34

*Baker v. City of Chicago*, 483 F. Supp. 3d 543 (N.D. Ill. 2020) ...........................................34, 38

*Beaman v. Freesmeyer*, 776 F.3d 500 (7th Cir. 2015)..............................................31

*Beck v. Ohio*, 379 U.S. 89 (1964) .......................................................39

*Behrens v. Pelletier,* 516 U.S. 299 (1996) ......................................................16

*Betterman v. Montana*, 578 U.S. 437 (2016)...............................................37

*Bielevicz v. Dubinon,* 915 F.2d 845 (3d Cir. 1990) ........................................47

*Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397 (1997)...............41, 42

*Brady v. Maryland*, 373 U.S. 83 (1963) ....................................................... *passim*

*Bram v. United States*, 168 U.S. 532 (1897)..............................................17

*Brown v. Mississippi*, 297 U.S. 278 (1936) ..............................................17

*Cairel v. Alderden*, 821 F.3d 823 (7th Cir. 2016) .................................................................32, 33

*Camm v. Faith*, 937 F.3d 1096 (7th Cir. 2019) ......................................................................21, 35

*Campbell v. Marshall*, 769 F.2d 314 (6th Cir.1985) ...................................................................36

*Carvajal v. Dominguez*, 542 F.3d 561 (7th Cir. 2008) ...............................................................29

*Cazares v. Frugoli*, No. 13 C 5626, 2017 WL 1196978 (N.D. Ill. Mar. 31, 2017) ....................47

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...........................................................................14

*Chambers v. Florida*, 309 U.S. 227 (1940) ................................................................................17

*City of Canton v. Harris*, 489 U.S. 378 (1989) .............................................................40, 41, 42, 45

*Clewis v. Texas*, 386 U.S. 707 (1967) ........................................................................................19

*Coleman v. City of Peoria, Illinois*, 925 F.3d 336 (7th Cir. 2019) ..............................................26

*Connick v. Thompson*, 563 U.S. 51 (2011) ...................................................................40, 42, 43, 45

*Cooper v. Dubnik*, 963 F.2d 1220 (9th Cir. 1992) ......................................................................20

*Crews v. County of Nassau*, 996 F. Supp. 2d 186 (E.D.N.Y. 2014) ............................................43

*Culombe v. Connecticut*, 367 U.S. 568 (1961) ...........................................................................18

*Davis v. North Carolina*, 384 U.S. 737 (1966) ...........................................................................19

*Delaney v. DeTella*, 123 F. Supp. 2d 429 (N.D. Ill. 2000) .........................................................36

*Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) ..................................................................24

*Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008) ................................................................29

*Echavarria v. Roach*, 565 F. Supp. 3d 51 (D. Mass. 2021) ........................................................46

*Edwards v. Cook County*, 215 F. Supp. 3d 681 (N.D. Ill. 2016) .................................................46

*Etherly v. Davis*, 619 F.3d 654 (7th Cir. 2010) ..........................................................................17

*Ezell v. City of Chicago*, No. 18 C 1049, 2024 WL 278829 (N.D. Ill. Jan. 24, 2024) ................32

*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) ...............................................15, 16, 24, 26, 35

*Fikes v. Alabama*, 352 U.S. 191 (1957) ......................................................................................19

iv

*Fox v. Hayes*, 600 F3d 819 (7th Cir. 2010) ...................................................................39

*Garcia v. Hudak*, 156 F. Supp. 3d 907 (N.D. Ill. 2016) ................................................30

*Goudy v. Cummings*, 922 F.3d 834 (7th Cir. 2019)..............................................21, 35

*Gray v. City of Chicago*, No. 18 C 2624, 2022 WL 910601 (N.D. Ill. Mar. 29, 2022).....22, 26, 29

*Greenwald v. Wisconsin*, 390 U.S. 519 (1968)..............................................................18

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006)........................41, 43, 44, 46

*Hall v. Idaho Dep't of Fish & Game*, No. 2:11-CV-0062, 2013 WL 2458537 (D. Idaho June 6, 2013) .................................................................................................................20

*Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014)............................................................17

*Harlow v. Fitzgerald,* 457 U.S. 800 (1982) ..................................................................16

*Harris v. Bornhorst*, No. 5:03-CV-1827, 2014 WL 7340519 (N.D. Ohio Aug. 13, 2014) ..........20

*Herrera v. Collins*, 506 U.S. 390 (1993) ......................................................................37

*Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994 (N.D. Ill. Jan. 26, 2009) ...................18

*Holland v. City of Chicago*, 643 F.3d 248 (7th Cir. 2011) ............................................29

*Hurt v. Wise*, 880 F.3d 831 (7th Cir. 2018) ..................................................................17

*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019) .................................41, 43, 44, 45, 46

*Jackson v. Curry*, 888 F.3d 259 (7th Cir. 2018) ...........................................................17

*Jenkins v. Bartlett*, 487 F.3d 482 (7th Cir. 2007) .................................................. 40-41

*Jimenez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2013) ...........................................28

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) ....................................28, 29, 33

*Koh v. Ustich*, 933 F.3d 836 (7th Cir. 2019)..................................................................17

*Kuri v. City of Chicago*, No. 13 C 1653, 2017 WL 4882338 (N.D. Ill. Oct. 30, 2017)..........39, 40

*Kyles v. Whitley*, 514 U.S. 419 (1995) ...............................................................29, 34

*LaPorta v. City of Chicago*, 277 F. Supp. 3d 969 (N.D. Ill. 2017)................................47

*Lawson v. Veruchi*, 637 F.3d 699 (7th Cir. 2011) .................................................................. 39-40

*Lynumn v. Illinois*, 372 U.S. 528 (1963)........................................................................18

*Malloy v. Hogan*, 378 U.S. 1 (1964) ..........................................................................17

*Martinez v. City of Oxnard*, 337 F.3d 1091 (9th Cir. 2003) ...................................20

*Maxwell v. Indianapolis*, 998 F.2d 431 (7th Cir. 1993).............................................39

*McCann v. Mangialardi*, 337 F.3d 782 (7th Cir. 2003)........................................30, 37

*Menna v. New York*, 423 U.S. 61 (1975) ...................................................................38

*Miller v. Angliker*, 848 F.2d 1312 (2d Cir. 1988).............................................30, 31, 36

*Miller v. Fenton*, 474 U.S. 104 (1985)........................................................................17

*Mitchell v. Forsyth,* 472 U.S. 511 (1985) .................................................................16

*Nationwide Ins. Co. v. Cent. Laborers' Pension Fund*, 704 F.3d 522 (7th Cir. 2013)............15, 19

*Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001)......................................................29

*Ollins v. O'Brien*, No. 03-cv-5795, 2005 WL 730987 (N.D. Ill. Mar. 28, 2005)...................30, 37

*Osborne v. Georgiades*, No. CV RDB-14-182, 2015 WL 6447503 (D. Md. Oct. 23, 2015).........24

*Ott v. City of Milwaukee*, 48 F. Supp. 3d 1197 (E.D. Wis. 2014) ..............................32, 33, 35, 38

*Patrick v. City of Chicago*, 213 F. Supp. 3d 1033 (N.D. Ill. 2016) ........................................23, 27

*Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020) ........................................22

*Patterson v. Dorrough*, No. 10 C 1491, 2012 WL 5381328 (N.D. Ill. Oct. 31, 2012) ................23

*Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003)..............................................................19

*Pearson v. Callahan,* 555 U.S. 223 (2009).................................................................16

*Petty v. City of Chicago*, 754 F.3d 416 (7th Cir. 2014) ...............................................21, 22, 26, 27

*Powell v. City of Chicago*, No. 17-CV-5156, 2018 WL 1211576 (N.D. Ill. Mar. 8, 2018) .... 29-30

*Reck v. Pate*, 367 U.S. 433 (1961)...............................................................................19

vi

*Rogers v. Richmond*, 365 U.S. 534 (1961) ...................................................................18

*Salazar v. City of Phoenix*, No. CV 1901188PHXSRBESW, 2022 WL 7706963 (D. Ariz. Sept. 14, 2022) ............................................................................................................45

*Sandra T.-E. v. Sperlik*, No. 05 C 473, 2009 WL 2422209 (N.D. Ill. July 29, 2009) ............ 45-46

*Saunders v. City of Chicago*, No. 12-CV-09158, 2013 WL 6009933 (N.D. Ill. Nov. 13, 2013) ..30

*Schneckloth v. Bustmamonte*, 412 U.S. 218 (1973)......................................................17

*Serrano v. Guevara*, No. 17 CV 2869, 2020 WL 3000284 (N.D. Ill. June 4, 2020) .................24

*Smith v. Campbell*, No. 08-11161, 295 Fed. Appx. 314 (11th Cir. 2008) ....................................20

*Spano v. New York*, 360 U.S. 315 (1959) .....................................................................18

*Speagle v. Ferguson*, No. 10-2040, 2010 WL 3724784 (C.D. Ill. Aug. 20, 2010) ......................38

*Spierer v. Rossman*, 798 F.3d 502 (7th Cir. 2015) ........................................................14

*Spreen v. Brey*, 961 F.2d 109 (7th Cir. 1992). .............................................................. 36

*Steidl v. Fermon*, 494 F.3d 623 (7th Cir. 2007) ...........................................................33

*Stewart v. Coughlin*, No. 3:20-CV-00497-M, 2023 WL 121989 (N.D. Tex. Jan. 6, 2023) ....45, 46

*Stinson v. Gauger*, 868 F.3d 516 (7th Cir. 2017)..................................................24, 28

*Tanner v. Walters*, No. 1:19-CV-849, 2021 WL 320940 (W.D. Mich. Feb. 1, 2021) .................46

*Tate v. Wood*, 963 F.2d 20 (2d Cir. 1992) ....................................................................31

*Thomas v. Cook Cty. Sheriff's Dept.*, 604 F.3d 293 (7th Cir. 2010) .....................................46-47

*Tuduj v. Newbold*, 958 F.3d 576 (7th Cir. 2000) ....................................................... 27-28

*United States v. Boyd*, 55 F.3d 239 (7th Cir. 1995)........................................................23

*United States v. Conroy*, 567 F.3d 174 (5th Cir. 2009) ..................................................30

*United States v. Dahl*, No. 14-4087, 597 Fed.Appx. 489 (10th Cir. 2015) ................................30

*United States v. Hull*, 441 F.2d 308 (7th Cir. 1971) ......................................................18

*United States v. Ruiz*, 536 U.S. 622 (2002) ..................................................31, 36, 37

vii

*United States v. Verdugo-Urquidez*, 494 U.S. 295 (1990)..............................................17

*United States v. Wright*, 43 F.3d 491 (10th Cir. 1994) ...............................................36

*Washington v. Boudreau*, No. 16-CV-01893, 2022 WL 4599708 (N.D. Ill. Sept. 30, 2022) .25, 26

*White v. Smith*, 696 F.3d 740 (8th Cir. 2012) ............................................24

*White v. United States*, 858 F.2d 416 (8th Cir. 1988) ................................36

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012) .................................22, 26, 29

*Williams v. City of Chicago*, 773 F.3d 749 (7th Cir. 2013) ........................................39

*Wilson v. Lawrence County*, 260 F.3d 946 (8th Cir. 2001) ........................................17

Statutes:

42 U.S.C. § 1983....................................................................................... *passim*

Articles:

Rakoff, "Why Innocent People Plead Guilty," *The New York Review of Books*, at

https://www.nybooks.com/articles/2014/11/20/why-innocent-people-plead-guilty/. .................37

Case 2:19-cv-01106-PP   Filed 03/20/24   Page 9 of 57   Document 123

## Introduction

Plaintiff Sam Hadaway was wrongfully convicted of attempted armed robbery in connection with the 1995 homicide of Jessica Payne. The story of how Plaintiff—a young man with significant physical and cognitive challenges—came to falsely implicate himself and his good friend in Payne's murder starts and stops with the Defendants.

Taking a step back, Payne was murdered around the same time and in close geographic proximity to at least two other women. The Defendants knew that a serial killer might be responsible for these crimes and even got the name Walter Ellis from a witness—Ellis is the serial killer whose DNA was eventually linked to each of these victims, including Payne's, and who was convicted of seven murders. Rather than run down that lead, the Defendants short-circuited the investigation and preyed on Plaintiff, an incredibly vulnerable 20 year-old, and Richard Gwin, a susceptible teenager, in an effort to simply close the case. To get his false confession (and Gwin's false inculpatory statement) the Defendants used threats, promises, isolation and repeated interrogation that stretched for multiple days. And for Plaintiff, the Defendants not only withheld food during his days-long interrogation, but also his seizure medication causing Plaintiff to have a seizure in custody. After days of enduring this coercion, Plaintiff broke. The Defendants then fed him the facts that they wanted him to parrot back in his false statements.

The Defendants do not dispute that the tactics they used, if credited by a jury, were unduly coercive; or even that they fed Plaintiff and Gwin details about the crime. Instead, the Defendants' escape valve is largely that the law did not require them to do something different because it was not clearly established that Plaintiff had a legal remedy for their misconduct. But the problem with the Defendants' argument is that qualified immunity focuses on an officer's

conduct not on whether there was a civil action available to challenge that conduct. And there is really no dispute that the conduct described above falls far short of what the Constitution demands. Nor are the Defendants on stronger footing claiming that they did not know about Ellis or that the information was too vague or immaterial. Had the Defendants disclosed it, Plaintiff's wrongful conviction would have never happened and Ellis' later victims would be alive.

Finally, the City's attempt to get off the hook fares no better. Notwithstanding the obvious need to provide training about *Brady v. Maryland*, 373 U.S. 83 (1963) and attendant disclosure obligations, the City—by its own admission—provided none. As the Supreme Court has explained, police officers are not lawyers and they do not come to the job versed in the law (let alone a law as complicated as *Brady*). Therefore, the need for training on *Brady* was obvious and critical, and the failure to provide it led to the tragedy here: the withholding of evidence about Ellis. For these reasons, and those below, the Defendants' motion should be denied.

## Factual Background

### The Murder of Jessica Payne

On the morning of August 30, 1995, the body of Jessica Payne was found on a mattress behind a vacant home at 3116 North 7th Street, Milwaukee, Wisconsin. SOAF ¶1. Payne had a "deep type, gashing type injury in the throat area." *Id*. The manner in which her body was found indicated a possible sexual assault: her body was found partially nude; there was bruising below her breast and on her inner thighs; her bra was torn, exposing her breasts; her t-shirt was pulled up near breast level, and her pants were pull down to the knees. *Id*. ¶2.

### Plaintiff Sam Hadaway is Absolutely Innocent of this Crime

Plaintiff Sam Hadaway is innocent of this crime. SOAF ¶4. In 2021, Plaintiff was declared innocent by "clear and convincing" evidence by the Wisconsin State Claims Board. *Id*.

2

Instead, the crime was committed by serial killer Walter Ellis. *Id*. ¶5. DNA evidence from the vaginal swab/smear of Jessica Payne matched Ellis's DNA. *Id*. Ellis's DNA was also found on the following homicide victims, all but one of whom were women murdered on the north side of Milwaukee between 1986 and 2007: Debra Harris, Tanya Miller, Irene Smith, Carron Kilpatrick, Florence McCormick, Sheila Farrior. Carron Kilpatrick, Maryetta Griffin, Joyce Mims and Ouitherean Stokes. *Id*. ¶6.

### The Moore Report

That the Payne homicide was committed by a serial killer was not news to the Milwaukee Police Department ("MPD"). Before Payne was killed, the homicide detectives in the MPD were "cognizan[t]" of the possibility that a serial killer was involved in the homicides of women on Milwaukee's north side. SOAF ¶7. The victims were women "living on the fringe of society;" many were drug-addicted or prostituting themselves for drugs; a lot of the victims were sexually assaulted; many victims had injuries to their neck; and many victims were left in vacant lots or buildings, or even trash cans. *Id*.

The detectives would track unsolved homicides on a chart that included information such as the M number of the homicide, the victim's name, the murder location, and the cause of death. *Id*. ¶8. As new information and/or murders came in, they would be added to the chart. *Id*. Several of Ellis' victims were on the detectives' chart: Ouitherean Stokes, Joyce Mims, Deborah Harris and Florence McCormick. *Id*. ¶9. Payne may also have been on the chart. *Id*.

Detectives Barbian-Gayan and Eric Moore were specifically assigned to review 32 unsolved homicides to look for a possible connection among them and determine whether there was physical evidence that could be DNA-tested. *Id*. ¶10. This investigation was going on at least by the time of the Payne autopsy. *Id*.

3

Detective Moore identified five cases that should be prioritized for DNA testing, including Payne's and two other women—Sheila Farrior and Florence McCormick—whose murders were eventually linked to Ellis. *Id*. ¶11. Detective Moore thought there was a possibility that the assailant in all five cases could be connected. *Id*.

Detective Moore issued a report memorializing his investigation into the 32 homicides ("Moore Report"). *Id*. ¶13. The Moore Report was widely distributed among the homicide division" because Detective Moore "made tons of copies and made sure that everybody [] had one." *Id*. Detective Moore especially wanted to make sure that the detectives working on the cases identified in the Moore Report got a copy of the Report. *Id*.

**Latonia Cooper Implicates Walter Ellis but the Defendants Bury that Information**

Defendants were aware of Walter Ellis at the time of their investigation into the Payne homicide, because of witness Latonia Cooper. SOAF ¶14. Cooper was interviewed during the Payne homicide investigation, including by Defendant Devalkenaere. Cooper specifically recalled being interviewed close in time to the homicide and was also interviewed again on October 10, 1995. *Id*. ¶16.

At the time of Payne's homicide, Cooper was living in Willie Brooks's house where Sandra Giles also lived. *Id*. ¶15. Payne came to Brooks's house when she ran away from home, just before her murder. *Id*.

Cooper testified that during an interview by MPD detectives, she was shown photographs of women and men, including of Sandra Giles and Walter Ellis. *Id*. ¶17. Cooper identified both Giles and Ellis. *Id*. Cooper told the detectives that Giles was a madam who would try to get girls to prostitute themselves. *Id*. ¶18. Cooper also said that Giles would introduce women to Ellis either in exchange for drugs or simply to be mean because she knew that Ellis would hurt them.

4

*Id.* As for Ellis, Cooper testified that Ellis was "real mean." *Id.* ¶19. Cooper told detectives that

Ellis "was just always just trying to get with women that he knew that probably was like a little

too high to defend theirselves [*sic*] or whatever." *Id.*

Cooper told the detectives that Giles did not want Payne at their house. *Id.* ¶20. Cooper

said that Giles introduced Payne to Ellis; and that she thought that Giles and Ellis had something

to do with Payne disappearing. *Id.* In fact, Cooper saw Ellis with Payne on the night of Payne's

disappearance. *Id.* ¶21.

The information that Cooper provided detectives would have been shared with other

detectives working on the Payne investigation, including Defendants. *Id.* ¶22. Detectives shared

information with each other about their interviews largely through briefings at shift changes, but

also through a follow-up book and supplementary reports. *Id.* ¶23. During the briefings, "[a]ny

follow-up that had been conducted by the previous shift would be conveyed to the next shift

that's going to still be working on the case, and any new information that was obtained by the

previous shift would be passed on to the shift that was going to be working on the case." *Id.*

The information that Cooper provided detectives about Giles and Ellis should have been

memorialized in a Memo Book and/or a supplementary report; it was not. *Id.* ¶24. Nor was the

information that Cooper shared with detectives about Ellis and Giles disclosed to the prosecutor

during the pendency of Plaintiff's criminal proceedings. *Id.* ¶25.

### Police Corroborate Latonia Cooper

But it was not only Cooper pointing the finger at Giles and Ellis. Defendant

Devalkenaere corroborated the information that Cooper provided through multiple interviews.

First, Devalkenaere spoke with Antoinette Rozell aka Inetha Waller on September 27, 1995 and

September 28, 1995. SOAF ¶26. At the time, Rozell was incarcerated in the County Jail with

5

Giles. *Id*. At first, Rozell only told Devalkenaere about a boy named "Cortez" who allegedly said he had a "white bitch" for sale. *Id*. ¶27. When Devalkenaere went back to speak to Rozell on September 28, however, Rozell told Devalkenaere that Giles had been making statements about the death of the white girl, but Giles told Rozell not to say anything and instead give the detectives Cortez's name. *Id*. In particular, Rozell told Devalkenaere that Giles said that the white girl who was found dead had been at her home; that Giles held the girl for four days; and that when the girl tried to leave, Giles killed her. *Id*. ¶28. Giles then made a throat-slashing motion. *Id*. Rozell told Defendant Devalkenaere that Gwen Mayone was present when Giles said this. *Id*.

Defendant Devalkenaere then went to speak with Mayone. *Id*. ¶29. Mayone told Devalkenaere that Giles bragged about killing a 15 year-old white girl; that Giles said she held the girl as a slave for four days before she was killed; and that after the girl was killed, she was taken behind a greenhouse and covered with a mattress. *Id*. In other words, Mayone corroborated Rozell—and Cooper.

The next day Devalkenaere spoke with yet another inmate, Rhonda Smith, who also corroborated the information Devalkenaere had heard from Cooper, Rozell and Mayone. *Id*. ¶30.

After these interviews, on October 2, 1995, Devalkenaere went and spoke with Giles. *Id*. ¶31. Giles denied any knowledge of the death of the white girl and denied that she had made the statements attributed to her. *Id*. Giles was polygraphed and the polygrapher found that she was not being truthful. *Id*. ¶32. The case then went cold. *Id*. ¶33.

### The Coercion of Richard "Cortez" Gwin

Sometime after the Payne homicide, Buschmann and Devalkenaere were assigned to a newly-constituted Cold Case squad. SOAF ¶34. Around October 20, 1995, Devalkenaere and

6

Buschmann picked the Payne homicide investigation back up; they were the primary detectives responsible for investigating the homicide. *Id*. ¶35. Instead of going back to Giles, the Defendants turned their attention to Richard "Cortez" Gwin, a 17 year-old boy who had nothing to do with the murder of Payne and no knowledge of it whatsoever. *Id*. ¶¶35, 36.

Gwin went to the police station with his mother on October 24, 1995 at around 1:30 p.m. *Id*. ¶36. Gwin was interrogated twice by Defendants Devalkenaere and Buschmann on the 24th, and he told them he knew nothing about Payne's murder. *Id*. ¶37.

The Defendants, however, refused to accept Gwin's statements and spent the next two days breaking his will. Gwin was held in custody for approximately 29 hours before he gave a signed statement implicating himself, Plaintiff and Chaunte Ott in Payne's murder. *Id*.¶38. During his interrogation, Gwin was threatened and fed information by the police about what to say. *Id*. ¶39. Although Gwin did not identify who threatened and fed him information, the only detectives whose names appear on police reports as having interacted with Gwin are Simons, Devalkenaere and Buschmann. *Id*.

Gwin was threatened that he had to tell Defendants something or he was going to be charged with the murder. *Id*. ¶40. Gwin was also given information about the crime by the Defendants. In particular, Defendants told Gwin that Hadaway and Ott "was [*sic*] with the white girl that was missing that ended up dead . . . ." *Id*. ¶41. Defendants "wanted [Gwin] to say that he seen them together or that he dropped them off somewhere." *Id*. Defendants told Gwin that "if he didn't, he could be involved as a suspect as well." *Id*.

As a result, Gwin gave a statement to Devalkenaere and Buschmann falsely implicating Plaintiff and Ott in the crime. In that statement, Gwin alleged (among other things) that he gave Plaintiff, Ott and Payne a ride to a drug house; that once there, they smoked marijuana. Plaintiff,

Ott and Payne then got out of the car and only Plaintiff and Ott returned. When they returned, Plaintiff allegedly said that Payne "didn't have no money so Chaunte cut her throat." *Id*. ¶42. According to Gwin's statement, about a month later, Gwin saw Plaintiff, who told Gwin that the girl who was found dead behind the house was the same girl who was with them; and Plaintiff made a cutting motion across his throat. *Id*.

Gwin's October 25, 1995 handwritten statement was not true. *Id*. ¶43. Gwin only gave it because he was threatened, put under "severe pressure," and wanted to go home. *Id*.

### Coercion and Fabrication of Plaintiff's Statement

On October 24, 1995, detectives Michael Valuch and Ricky Burems located Plaintiff at his home and took him to the police station for questioning. SOAF ¶44.

### *Defendants Knew That Plaintiff Was Very Vulnerable*

Plaintiff was a particularly vulnerable individual; he has both physical and cognitive challenges. He was born with cerebral palsy, which has impacted the left-side of his body. *Id*. ¶45. In particular, Plaintiff's left leg is shorter than his right leg and the left-side of his body is weaker than the right side of his body. *Id*. As a result, Plaintiff has always walked with a limp and has difficulty manipulating and holding things with his left hand. *Id*. Plaintiff also has a seizure disorder. *Id*. ¶46. Plaintiff takes—and took—regular medication to control his seizures. *Id*.

Plaintiff also has significant cognitive challenges. Plaintiff was in special education all of his life due to his difficulty with reading, writing and math. *Id*. ¶47. ███████████████████ ████████████████████████████████████████ *Id*.

Defendants would have been aware of each of these vulnerabilities during their interrogations of Plaintiff. To start, Plaintiff told Detectives Dubis and Percy Moore, as well

Defendant Simons, that he had cerebral palsy and that his left side was weak. *Id*. ¶48. As noted above, detectives shared information with each other about interviews, and both Buschmann and Devalkenaere indicated that they would have reviewed information about prior interviews before speaking to a suspect. *Id*. ¶¶48, 49. Plaintiff's limp, left-side weakness and difficulty manipulating his left-hand also would have been obvious to anyone who observed Plaintiff. *Id*. ¶50. For example, Simons and Buschmann had Plaintiff act out how he allegedly held Payne down, which would have shown Plaintiff's significant left-side weakness and limp. *Id*.

As for Plaintiff's seizure disorder and attendant need for medication, Plaintiff alerted the Defendants to it. *Id*. ¶51. Finally, Plaintiff's cognitive limitations were so obvious that Simons admitted he was worried about Plaintiff being able to complete the polygraph. But he gave him one nonetheless. *Id*. ¶52.

### *Defendants Coerced Plaintiff*

Plaintiff was first interviewed on October 24, 1995 by Detectives Ricky Burems and Michael Valuch. *Id*. ¶53. During that interrogation, Plaintiff denied any knowledge of the Payne homicide. *Id*.

Plaintiff was then interrogated off and on for the next three days—on October 25, 1995 or October 26, 1995 by Detective Eric Moore; on October 26, 1995 by Detectives Michael Dubis and Percy Moore; and October 27, 1995 by Defendants Devalkenaere and Buschmann. *Id*. ¶54. Only on the third day of interrogation did Plaintiff give a false statement implicating himself and Ott in the Payne murder. *Id*. ¶56. That statement was the result of Defendants' coercion. *Id*. ¶57.

First, as noted above, Plaintiff was detained and interrogated for at least three days, during which Plaintiff was largely isolated. Second, Plaintiff was denied his seizure medication during this time. *Id*. ¶58. As a result, Plaintiff had a seizure. *Id*. Third, Plaintiff was denied food

9

during his interrogations. *Id*. ¶59. Fourth, Plaintiff was repeatedly threatened, including by Defendants Devalkenaere and Buschmann. *Id*. ¶60. Plaintiff was threatened that if he did not implicate Ott, he would not see his family again and would be in prison for the rest of his life. During these threats, police slammed on the table, called Plaintiff a n***** and shook their handcuffs, and even threw a chair at him. *Id*. ¶61. Unsurprisingly, Plaintiff cried throughout these interrogations. *Id*. ¶68. Fifth, Plaintiff was promised that if he implicated Ott, he would not be charged and could go free. *Id*. ¶62. These promises were made by several detectives, including Defendants Devalkenaere and Buschmann. *Id*.

### *Defendants Feed Plaintiff Information about the Crime*

Plaintiff did not know anything about the Payne homicide, which he repeatedly told the police including the Defendants. SOAF ¶63. Instead, Defendants provided Plaintiff with information about the crime that was incorporated into Plaintiff's "statement." *Id*. As Plaintiff explained, "[t]hey was telling me what to say at certain times, certain points . . . ." *Id*. ¶64. Indeed, sometimes the Defendants would just tell him what they were writing down as his statement and threatened him that he had to "sign or you're doing life." *Id*.

For example, among other things, Defendants told Plaintiff to say that Ott motioned for him and Payne to get out of the car; that Ott was feeling Payne's pockets; that Ott was hitting the girl in the face; that Ott said you're going to give up something; that Plaintiff told Ott to go; that Plaintiff was about to leave but heard silence; that Plaintiff saw blood and told Ott that he was sick; that when Plaintiff and Ott walked back to the car, Plaintiff made a slashing motion and said "I think he killed her;" and that they then drove to Gwin's aunt's house. *Id*. ¶66. Defendants also drew the map that was attached to Plaintiff's handwritten statement. *Id*. ¶67.

10

Plaintiff testified that he agreed to the statement because he was scared and threatened, and he wanted to go home. *Id.* ¶68. Plaintiff was afraid to go to prison for the rest of his life for something that he did not do. *Id.* ¶69.

### Defendants Fabricate a Polygraph

After Plaintiff signed his statement, he was brought to a charging conference where he met with prosecutor Mark Williams. Assistant District Attorney ("ADA") Williams had concerns about the investigation and in particular, about whether Plaintiff and Gwin were telling the truth. SOAF ¶71. As a result, on November 1, 1995, Hadaway was taken for a polygraph. *Id.* ¶72.

Defendant Simons conducted Plaintiff's polygraph. SOAF ¶73. Simons used the Arther Method to conduct Plaintiff's polygraph even though Arther Method was not valid at the time. *Id.* The Arther method was "built on criteria that had no scientific basis," but were instead based on "preconceived signals" (*e.g.*, answers given to a checklist prior to the actual administration of the polygraph exam), myths (*e.g.*, at least 85% of non-reactors are lying) and prejudice (*e.g.*, male homosexuals are hard to test) about polygraph subjects. *Id.* ¶74. In fact, the Arther Method instructs polygraphers to make a determination about whether the person is truthful or not prior to even administering the polygraph test. *Id.*

Plaintiff was asked four relevant questions during the polygraph examination:

> Question 3B: Did Chaunte Ott cut that white girl's throat?
> Question 5: Did you cut that white girl's throat?
> Question 8: While that white girl was fighting, did you help hold her down?
> Question 9: Did you have any sexual contact with that white girl?

*Id.* ¶75.

The only question on which Plaintiff had a reaction was Question 3B; both Simons and Plaintiff's polygraph expert Dan Sosnowski found a reaction at 3B. *Id.* ¶77. Plaintiff answered "yes," to Question 3B, meaning that Plaintiff was lying when he said that "Chaunte cut that

11

white girls throat." *Id*. There were "no significant reactions" to the remainder of the relevant questions that Defendant Simons's asked Plaintiff. *Id*. ¶78. In other words, the polygraph confirmed that Plaintiff was not involved in the Payne homicide and had no knowledge that Ott was either. *Id*. ¶79.

Defendant Simons, however, falsely reported that Plaintiff failed the polygraph as to each of the above-listed questions, and that Plaintiff had additional knowledge about the crime. *Id*. ¶79. Plaintiff was then interrogated again on November 1, 1995 by Defendants Simons and Buschmann, *Id*. ¶80. During that interrogation, Defendant Simons threatened Plaintiff and told Plaintiff that "[y]ou gotta say something. You killed her," or words to that effect. *Id*. As a result, after the polygraph, Plaintiff agreed that he did not tell the police the whole truth previously. *Id*. ¶81. That was not true, but Plaintiff said as much to give Defendants Simons and Buschmann what they wanted. *Id*.

Plaintiff gave another statement to Buschmann and Simons on November 1, 1995. *Id*. ¶82. The Defendants told Plaintiff to make up some involvement in the crime, which Plaintiff did. In that statement, Defendants told Plaintiff to say that he held Payne's hands down; that Plaintiff told Ott that she didn't have anything so they should leave; and that Ott said she was fixing to give up something. *Id*.

Plaintiff's October 27th statement to Defendants Buschmann and Devalkenaere and his November 1st statement to Defendants Simons and Buschmann are both false. *Id*. ¶83.

**Plaintiff Testifies Against Ott and Pleads Guilty to Armed Robbery**

On February 27, 1996, and February 28, 1996, Plaintiff testified against Ott. The Defendants rehearsed Plaintiff's testimony with him so that he could remember everything in his

statement. SOAF ¶84. After Plaintiff testified at Ott's trial, Plaintiff pled guilty to attempted armed robbery and was sentenced to five years in prison. *Id*. ¶85.

Plaintiff's time in prison was particularly difficult: He was isolated from his family, spent two periods of time in solitary confinement, was afraid for his life and was aware that inmates were killed. *Id*. ¶86. Even once Plaintiff got out of prison, he continued to be impacted by his wrongful conviction. For example, Plaintiff has had to endure the stigma of being falsely branded a convicted murderer and having to register as a sex offender. *Id*.

### The City's Policies and Practices

The City had an official written policy that officers must document all pertinent information from their investigations in Department-issued Memo Books. SOAF ¶87. However, the City had no formal policies requiring officers to (1) maintain their Memo Books; (2) not destroy their Memo Books; (3) ensure all information contained in the Memo Books corresponded with the information contained in their reports; or (4) disclose Memo Book contents to the district attorney. *Id*. ¶88. According to Denny Waller, Plaintiff's police practices expert, the City's failure to adopt policies on the use, retention and disclosure of Memo Books departed from the well-established standards at the time because "[t]he option of complying with the obligation to disclose exculpatory information . . . was left as a matter of policy and practice within the discretion of the individual officer. This stands in marked contrast to the well-established police practice that criminal defendants have a right to police notes because those notes could constitute *Brady* material." *Id*. ¶90.

Compounding the problem, the City provided no training to its officers on disclosure obligations at any time between 1990 and 2000. *Id*. ¶91. In fact, the City could not identify a single document that would reflect any training on this topic. *Id*.

13

Nor did the City train its officers on the "[c]reation, use, retention, and disclosure of Memo Books." *Id*. ¶ 95. All the City provided was a single in-service training on crime scene management in the fall of 1999—*after* the Payne homicide investigation. *Id*. ¶95. While the Defendants' training materials include training on what to put in reports (the who, what, why, when, where, and how) and mentions that reports will be read by prosecutors and criminal defense attorneys, the training materials do not discuss an officer's duty to disclose the information in their Memo Books to the prosecutor. *Id*. ¶96.

The same is true for the City's training on the "[c]reation, use, retention, and disclosure of police notes and/or reports taken during the course of an investigation." *Id*. ¶97. Again, the only training the City provided was *after* the Payne investigation—in the fall of 1997—and consisted of a single report writing in-service training. *Id*. The training materials make no mention of an officer's duty to disclose information to the prosecutor. *Id*. ¶98. The only mention of disclosure was in the context of reports being subject to open records requests. *Id*.

## Legal Standard

On summary judgment, the moving party bears the initial burden of showing no genuine dispute of material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]ith the court drawing all inferences in the light most favorable to the non-moving party, the moving party must discharge its burden of showing that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law." *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015). Credibility determinations are for the jury, and all reasonable inferences must be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).

14

**A.      A Jury Must Decide Plaintiff's Fifth Amendment Confession Claim**

Defendants make no arguments regarding the voluntariness of Plaintiff's statement or the constitutionality of their particular tactics, or even whether the law was ambiguous regarding their actions as of 1995. Accordingly, Defendants have waived any such arguments and should not be permitted to raise them in their reply brief. *Nationwide Ins. Co. v. Cent. Laborers' Pension Fund*, 704 F.3d 522, 527 (7th Cir. 2013).

Instead, Defendants' sole challenge to Plaintiff's Fifth Amendment claim is that they have qualified immunity because it was not clearly established in 1995 that Plaintiff could sue the Defendants for unlawfully coercing his (false) confession. Dtk. 103 at 22-23. But this reflects a fundamental misunderstanding about the doctrine of qualified immunity.[1] That doctrine's familiar two-party inquiry is focused on whether the defendants' *conduct* at issue was clearly established at the time of the incident, not on the availability of a legal *remedy*. *See, e.g.*, *Armstrong v. Daily*, 786 F.3d 529, 556 (7th Cir. 2015) (focus is whether defendant's *conduct* violated a clearly established constitutional right); *Fields v. Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014). Applying the correct legal analysis makes clear that the Defendants' motion should be denied; in 1995, the law clearly established that the Defendants' conduct in extracting Plaintiff's involuntary statement violated the Constitution.

**1.      Qualified Immunity Jurisprudence is Clear that The Focus is On the Alleged Conduct by Defendants, Not the Availability of a Legal Remedy**

The Seventh Circuit has addressed—and rejected—the Defendants' argument that qualified immunity focuses on whether it was clearly established that a plaintiff could sue for

---

[1]      Plaintiff's citations are to the Court's ECF pagination as reflected on the electronic filing.

damages. In *Fields v. Wharrie*, in the context of whether a prosecutor had qualified immunity for

fabricating evidence, the Seventh Circuit explained:

> [W]hen the question is whether to grant immunity to a public employee, the focus
> is on his conduct, not on whether that conduct gave rise to a tort in a particular
> case. As the Court said in *Harlow v. Fitzgerald, supra,* 457 U.S. at 819, 102 S.Ct.
> 2727, the test for qualified immunity is "the objective legal reasonableness of an
> official's acts. Where an official could be expected to know that certain conduct
> would violate statutory or constitutional rights, he should be made to hesitate; and
> a person who suffers injury caused by such conduct may have a cause of action"
> (emphasis added)—or may not.

*Fields*, 740 F.3d at 1114.

A year later, *Armstrong* reaffirmed that "[t]he issue is not whether issues concerning the

availability of a *remedy* are settled. The qualified immunity defense focuses instead on whether

the official defendant's *conduct* violated a clearly established constitutional right." *Armstrong*,

786 F.3d at 555-56. "This point is consistent with the way the Supreme Court has repeatedly

described the defense of qualified immunity, in terms of whether the defendant official's

'actions' or 'conduct' violated clearly established law, not in terms of whether a defendant

should have realized he would be held civilly liable for his actions or conduct." *Id.* at 556 (citing

Supreme Court cases as follows "*Pearson v. Callahan,* 555 U.S. 223, 231 (2009) ("conduct");

*Behrens v. Pelletier,* 516 U.S. 299, 305 (1996) ("conduct"); *Anderson v. Creighton,* 483 U.S.

635, 638(1987) ("actions"); *Mitchell v. Forsyth,* 472 U.S. 511, 528 (1985) ("actions"); *Harlow v.

Fitzgerald,* 457 U.S. 800, 818 (1982) ("conduct").").

Defendants' qualified immunity argument is thus ill-founded. This Court's inquiry is

whether the prohibition on Defendants' conduct was clearly established by 1995, which as

discussed below it unquestionably was.

16

## 2. By 1995, It Was Clearly Established That Police Could Not Coerce An Involuntary Statement

The Defendants do not even try to argue that the conduct alleged was not clearly prohibited by 1995—and for good reason. Plaintiff's interrogation was highly coercive and included tactics such as depriving Plaintiff of needed seizure medicine (which resulted in Plaintiff having a seizure); a lengthy detention and repeated interrogation; threats of physical violence; promises of leniency coupled with threats of life imprisonment for failure to cooperate, and threats that Plaintiff would never see his family. SOAF ¶¶ 53-62. Defendants employed these extreme tactics knowing that Plaintiff was especially vulnerable: he had cerebral palsy, a seizure disorder, and was of limited intelligence. *Id*. ¶¶ 45-52;

Each of these tactics, particularly when viewed in their totality, were prohibited by 1995.[2] For example, it was long held illegal to engage in a lengthy detention. *Chambers v. Florida*, 309 U.S. 227, 240-41 (1940) (the length of questioning); *Ashcraft v. Tennessee*, 322 U.S. 143, 154-55 (1944) (36-hour incommunicado detention and questioning without rest was inherently coercive). By 1995, it was also clearly established that an officer could not make threats, or withhold food or medication from a suspect. *Schneckloth v. Bustmamonte*, 412 U.S. 218, 226

---

[2]    It is beyond dispute that the right not to have an involuntary statement used against a criminal defendant was clearly established long before 1995. *See Brown v. Mississippi*, 297 U.S. 278 (1936). *See also United States v. Verdugo-Urquidez*, 494 U.S. 295, 264 (1990); *Miller v. Fenton*, 474 U.S. 104 (1985); *Malloy v. Hogan*, 378 U.S. 1, 6 (1964); *Bram v. United States*, 168 U.S. 532, 542 (1897). The voluntariness of a confession depends on the totality of the circumstances, including both the characteristics of the accused and the nature of the interrogation. If those circumstances reveal that the interrogated person's will was overborne, admitting the resulting confession violates the Fifth Amendment. *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (quoting *Jackson v. Curry*, 888 F.3d 259, 265 (7th Cir. 2018) (quoting *Hurt v. Wise*, 880 F.3d 831, 839 (7th Cir. 2018))). *See also Etherly v. Davis*, 619 F.3d 654, 660-61 (7th Cir. 2010) ("whether a confession was involuntary requires an examination of the totality of the surrounding circumstances, including the characteristics of the person in custody and the details of the interrogation that resulted in the statement."); *Schneckloth* , 412 U.S. at 226 (decisions do not turn "on the presence or absence of a single controlling criterion; each reflect[s] a careful scrutiny of all the surrounding circumstances"); *Halsey v. Pfeiffer*, 750 F.3d 273, 307 (3d Cir. 2014) (summary judgment cannot be granted based on examination of particular interrogation techniques or factors involved in an interrogation); *Wilson v. Lawrence County*, 260 F.3d 946, 953 (8th Cir. 2001) ("[A] totality of the circumstances analysis does not permit state officials to cherry-pick cases that address individual potentially coercive tactics, isolated one from the other, in order to insulate themselves when they have combined all of those tactics in an effort to overbear an accused's will.").

17

(1973) (circumstances relevant to finding will overborne include "the length of detention . . . the repeated and prolonged nature of the questioning . . .; and the use of physical punishment such as the deprivation of food or sleep"); *United States v. Hull*, 441 F.2d 308, 312 (7th Cir. 1971) ("[yelling and pounding on the table" threatened "Hull's normally weak powers of resistance"); *Greenwald v. Wisconsin*, 390 U.S. 519, 521 (1968) (deprivation of blood pressure medicine considered as factor rendering statement involuntary); *Lynumn v. Illinois*, 372 U.S. 528, 533 (1963) (confession involuntary when suspect told she could lose benefits and custody of children); *Rogers v. Richmond*, 365 U.S. 534, 543 (1961) (confession involuntary when police threaten to take suspect's wife into custody).

So too for using lies and misleading statements designed to inject false information; those also were deemed impermissible well before 1995. *See Spano v. New York*, 360 U.S. 315, 323 (1959) (confession involuntary when officer told suspect (a friend of his) that officer would get in trouble if he did not confess). Similarly, the Defendants would have known by 1995 that they could not use racial slurs or feed the suspect the facts that make up the confession. *See Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994, at *8 (N.D. Ill. Jan. 26, 2009) (reasonable police officer would have known in 1992 "that coercing a confession by abusive language and physical contact, along with coaching the suspect as to the details of the confession, clearly violates the suspect's constitutional right against self-incrimination").

Indeed, the Defendants were on notice that all of this misconduct was impermissible in 1995, particularly given Plaintiff's limited intelligence. *Hull*, 441 F.2d at 312 ("[m]ental or emotional instability, low intelligence and immaturity have been recognized as important factors in determining the voluntariness of confessions.") (citing *Culombe v. Connecticut*, 367 U.S. 568 (1961), *Spano v. New York*, 360 U.S. 315 (1959), *Clewis v. Texas*, 386 U.S. 707 (1967), *Davis v.*

18

*North Carolina*, 384 U.S. 737 (1966), and *Reck v. Pate*, 367 U.S. 433 (1961)); *Fikes v. Alabama*, 352 U.S. 191, 196 (1957) (low intelligence a factor in voluntariness analysis). As such, Defendants' qualified immunity defense fails.

## B.     Plaintiff's Substantive Due Process Claim Also Must Be Decided by a Jury

In addition, Plaintiff has also alleged that his interrogation "shocks the conscience" under the Fourteenth Amendment. Dkt. 1 at ¶¶77-80 (alleging Plaintiff's involuntary statement is cognizable under both the Fifth and Fourteenth Amendments). Defendants did not address Plaintiff's substantive due process claim in their brief, and therefore have waived any argument that they are entitled to summary judgment on it. *Nationwide Ins. Co.*, 704 F.3d at 527.

While Plaintiff recognizes that the "shocks-the-conscience" test is a high bar to overcome, the circumstances of Plaintiff's interrogation warrant at trial on this claim. To start, Plaintiff had severe intellectual and physical limitations that made him particularly vulnerable to a coercive interrogation. SOAF ¶¶45-52. Defendants exploited those limitations, for example, by depriving Plaintiff of his seizure medication causing him to have a seizure. *Id*. ¶58. The Defendants also interrogated Plaintiff over days; withheld food; made threats against Plaintiff that he would face a life in prison; called him a n*****; slammed the table and threw a chair at Plaintiff; made promises of leniency if he falsely implicated himself and Ott in Payne's murder; and falsely told Plaintiff he failed a polygraph. *Id*. ¶¶57, 59-62, 79-80. Because Plaintiff did not know anything about the crime, and because both he and Ott had no involvement in it, the Defendants then fabricated his statements. *Id*. ¶¶63-70, 82-83.

When Plaintiff's evidence is properly credited, as it must be, there is sufficient proof for a jury to find conscience-shocking behavior. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). While there is no single test for when misconduct crosses the line to "conscience shocking,"

courts have found interrogators to meet that threshold where there were threats, physical violence, deception, feeding information, and a lengthy and relentless interrogation. *See Cooper v. Dubnik*, 963 F.2d 1220, 1223 (9th Cir. 1992) (police violated suspect's substantive due process rights when they "ignored Cooper's repeated requests to speak with an attorney, deliberately infringed on his constitutional right to remain silent, and relentlessly interrogated him in an attempt to extract a confession"); *Harris v. Bornhorst*, No. 5:03-CV-1827, 2014 WL 7340519, at *16 (N.D. Ohio Aug. 13, 2014) (finding substantive due process violation where interrogation involved deception, fabrication of evidence, false promises of leniency and suspect fed information about crime); *Hall v. Idaho Dep't of Fish & Game*, No. 2:11-CV-0062, 2013 WL 2458537, at *12 (D. Idaho June 6, 2013) ("An interrogation which shocks the conscience typically involves physical or psychological abuse."); *cf. Andersen v. Thieret*, 903 F.2d 526, 530 & n.1 (7th Cir. 1990) (sleep deprivation and intoxication can be coercive). Additionally, courts have held that where police withhold needed medication from a suspect, that too can shock the conscience—particularly where it results in physical harm as it did here. *Martinez v. City of Oxnard*, 337 F.3d 1091, 1092 (9th Cir. 2003) (police interrogation of suspect after shot in the face and interference with medical treatment is conscience shocking); *see also Smith v. Campbell*, No. 08-11161, 295 Fed. Appx. 314, 319 (11th Cir. 2008) (denial of anti-anxiety medication not conscience shocking but opining that it would be unreasonable "if the interrogators had refused a diabetic her insulin or an asthmatic experiencing an asthma attack her treatment").

All of those factors were present in Plaintiff's interrogations. Resolution of his claim requires a trial.

**C. Plaintiff's Due Process Claim Must Proceed To Trial**

As an initial matter, Plaintiff has alleged a single due process violation: he can prevail under either a theory that Defendants fabricated evidence or withheld exculpatory and/or impeachment evidence in violation of *Brady*. *See Goudy v. Cummings*, 922 F.3d 834, 838 (7th Cir. 2019) (various theories support single claim that plaintiff received unfair trial in violation of his due process rights). The Seventh Circuit has instructed that once it is established at summary judgment that a trial is required on due process theories, the court "need not and do[es] not address [the plaintiff's] allegation that the alleged [additional theory of liability] independently constituted a basis for liability"). *Id.* at 844; *see also Camm v. Faith*, 937 F.3d 1096, 1108–09 (7th Cir. 2019) (single *Brady* claim alleging suppression of three baskets of evidence). Accordingly, once Plaintiff has prevailed on one of his due process theories at this stage, the Court need not parse out the separate sub-theories to determine if his right to fair trial claim must proceed to trial.

**1. A Jury Must Decide Plaintiff's Fabrication of Evidence Claim**

In a single page with a single legal cite, Defendants argue that they are entitled to summary judgment on Plaintiff's fabrication claim because Plaintiff's claim is really just a coercion claim by another name. Dkt. 103 at 23-24 (relying on *Petty v. City of Chicago*, 754 F.3d 416, 423 (7th Cir. 2014)). Contrary to Defendants' assertion, a jury could find that the Defendants *knowingly* fabricated three pieces of evidence: (1) Gwinn's false and fabricated statement; (2) Hadaway's false and fabricated statement; and (3) Simons' false and fabricated polygraph test result. *Petty*, 754 F.3d at 423 (knowing creation of false evidence is the "hallmark of a fabrication case"); *see also Avery v. City of Milwaukee*, 847 F.3d 433, 439–40 (7th Cir. 2017) (what's relevant is not the label on the claim, but whether the officers "created evidence

21

that they knew to be false.") (quoting in part *Petty*, 754 F.3d at 423 (emphasis added in original)); *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012) (police officer who manufactures false evidence violates due process if that evidence is later used to deprive the defendant of her liberty in some way).

In order to prevail on such a claim, Plaintiff must show: (1) the defendant knowingly fabricated evidence against the plaintiff, (2) the evidence was used at his criminal trial, (3) the evidence was material, and (4) the plaintiff was damaged as a result. *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020). Plaintiff does not need "a smoking gun or an admission to prove knowledge." *Gray v. City of Chicago*, No. 18 C 2624, 2022 WL 910601, at *10 (N.D. Ill. Mar. 29, 2022). Rather, Plaintiff "only needs to offer sufficient evidence from which a reasonable jury could find that the Individual Defendants knew the evidence they were eliciting was false." *Id.* As set forth below, Plaintiff's fabrication claim based on all three pieces of evidence should proceed to trial.

### a. The Record Supports a Jury Finding that Defendants Devalkenaere and Buschmann Knowingly Fabricated Gwin's False Statement[3]

Plaintiff and Ott had nothing whatsoever to do with Payne's death, a fact which much be credited at summary judgment. Plaintiff and Ott were both excluded as contributors to DNA found on the victim, both have been declared innocent by the State of Wisconsin, and both never met Payne, let alone slashed her throat. SOAF ¶¶ 4, 70, 83. Instead, Payne's murder was committed by serial killer Walter Ellis. *Id.* ¶5.

As a result, the question at summary judgment is not whether Gwin's statement inculpating Plaintiff and Ott is false—which it is—but instead who manufactured it: Gwin or

---

[3] Defendants have assumed for purposes of summary judgment that Jones's testimony is admissible. Dkt. 103 at 14. As a result, Plaintiff has not addressed the multiple bases on which it is admissible for purposes of summary judgment and trial.

22

Defendants Devalkenaere and Buschmann? At summary judgment, where there are competing inferences, the tie goes to the Plaintiff. *See Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005). That is particularly appropriate here given the substantial evidence of fabrication. *See Patterson v. Dorrough*, No. 10 C 1491, 2012 WL 5381328, at *4 (N.D. Ill. Oct. 31, 2012) (finding jury had to decide fabrication claim where plaintiff indicated that "he will offer testimony at trial regarding the falsity of the statements made by the arresting officers in their reports, which if believed by the trier of fact would constitute circumstantial evidence" of fabrication).

Most notably, Gwin's statement in large measure parrots Plaintiff's—and Plaintiff's statement, as described below, was fabricated by Defendants. So, either Gwin—on his own—came up with the same set of false facts that Defendants manufactured for Plaintiff (not likely) or Gwin got the identical false information from the identical source (likely). *See Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1058 (N.D. Ill. 2016) (explaining that "the only way to get eight people to confess (separately) to witnessing an impossible event" would be through a conspiracy with the police); *Cf. United States v. Boyd*, 55 F.3d 239, 246 (7th Cir. 1995) (explaining that favorable benefits to witnesses would call into question whether the government had significant doubts about the reliability of those witnesses). Indeed, Gwin's sister has testified that among other things, he told her that the Defendants wanted him to say that he had seen Plaintiff, Ott and Payne together and that he dropped them off somewhere. SOAF ¶¶39, 41. Defendants threatened that if he did not, he would be charged with Payne's murder. *Id*. ¶40.

Moreover, it is undisputed that Gwin alleged the Defendants coerced him into giving a statement. While the Defendants have tried to suggest that coercion is irrelevant for fabrication— or that, anytime the word "coercion" arises it means that the claim is really one of coercion—the

23

case law does not so neatly disaggregate the two. Rather, coercion can be evidence of fabrication, as it is here. *See Fields*, 740 F.3d at 1112 ("The point is not that coercion is legally irrelevant; far from it—coercion (which in an extreme case could amount to torture) may be an essential tool in 'persuading; a witness to fabricate testimony."); *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc) (explaining that "[f]abrication can also be proven circumstantially" including by defendants' use of coercion); *Serrano v. Guevara*, No. 17 CV 2869, 2020 WL 3000284, at *15 (N.D. Ill. June 4, 2020) (in denying summary judgment on a fabricated evidence claim, the court reasoned, "[a]lthough Wilda was not forced to pick a particular car, plaintiffs have some evidence that the detectives used suggestive techniques to obtain Wilda's identification of Montanez's car."); *see also White v. Smith*, 696 F.3d 740, 757 (8th Cir. 2012) (allowing a § 1983 fabrication claim to proceed when evidence demonstrated "that Defendants coached and manipulated" witnesses "into adopting Defendants' theory of the case"); *Osborne v. Georgiades*, No. CV RDB-14-182, 2015 WL 6447503, at *4 (D. Md. Oct. 23, 2015), aff'd, 679 Fed. App'x. 234 (4th Cir. 2017) (finding that allegations that the defendant exerted pressure on victim that resulted in the fabrication of evidence against plaintiff set forth a fabrication claim particularly where the "contents of the conversations . . . are not disclosed" contrary to what one would expect). Indeed, the Seventh Circuit has made clear that in the context of fabrication claims, "[k]nowledge and intent must often be proven by circumstantial evidence." *Stinson v. Gauger*, 868 F.3d 516, 527 (7th Cir. 2017). Coercion is just such evidence.

As noted above, the only argument that the Defendants make in their effort to jettison liability for fabricating Gwin's statement is that Plaintiff is really alleging coercion—not fabrication. But when the evidence is properly credited in Plaintiff's favor, the record supports a reasonable inference that Defendants Buschmann and Devalkenaere knowing fabricated Gwin's

false statement. Gwin, only seventeen years-old, repeatedly denied any knowledge of Payne's murder over the course of his nearly thirty-hour detention. Defendants responded not by merely suggesting facts to Gwin, but telling him explicitly what to say. Defendants also knew that there was no actual evidence pointing to Gwin's involvement (or Plaintiff and Ott's). Instead, the evidence pointed to Giles and Ellis, but the Defendants ignored that and preyed on a young and vulnerable teenager. *Washington v. Boudreau*, No. 16-CV-01893, 2022 WL 4599708, at *20 (N.D. Ill. Sept. 30, 2022) ("[W]hether Defendants merely coerced, and did not fabricate, evidence against Plaintiffs is ultimately a question of fact not properly resolved on the present motion."). Given the foregoing, Defendants' motion should be denied.

### b. The Record supports a Jury Finding that Defendants Knowingly Fabricated Plaintiff's False Confession

The same is true for Defendants' knowing fabrication of Plaintiff's false confession implicating himself and Ott in Payne's murder. Defendants were well aware that Plaintiff was vulnerable and easily manipulated, based on his significant physical and mental impairments. SOAF ¶¶45-52. They also knew that Plaintiff had repeatedly and consistently denied any knowledge of Payne's homicide during his days of interrogation until their threats, promises and deprivation of Plaintiff seizure medicine broke his will. *Id*. ¶¶53, 56, 58. Like Gwin, Defendants had to supply Plaintiff the pertinent facts of Payne's murder—Plaintiff, who is innocent, had no personal knowledge of the crime. *Id*. ¶¶63-70. Plaintiff explained that sometimes the Defendants would just tell him what they were writing down as his statement and threatened him that he had to "sign or you're doing life." *Id*. ¶64. They also expressly told Plaintiff what was in Gwin's statement. And then fabricated that Plaintiff created a map showing where Payne's body was found when the Defendants created it. *Id*. ¶¶65, 67. Finally, and perhaps most critically, Defendants knew that the "confession" was factually implausible. Plaintiff had cerebral palsy, so

25

the left side of his body was extremely weak and he could not hold down Payne. *Id*. ¶¶45 ,48. At summary judgment, the Court must credit the inference that when Defendants Simons and Buschmann had Plaintiff re-enact how he allegedly held Payne's arms down while Ott attacked her, they would have seen that this was a physical impossibility and objectively false. *Id*. ¶50. *See, e.g.*, *Gray*, 2022 WL 910601, at *11 (sufficient evidence of knowing fabrication of plaintiff's confession where plaintiff testified he did not commit the crime, milk jug filled with gasoline allegedly used to start an arson included in his confession was provided to him by the defendants, and by time of trial defendants knew the milk jug showed no evidence of gasoline).

The facts described above go well beyond coercion; they make out a fabrication theory of liability. *See, e.g.*, *Gray*, 2022 WL 910601, at *11; *Washington*, 2022 WL 4599708, at *20 (rejecting the same argument defendants raise here where plaintiffs alleged their statements and witness statements were fabricated based in part on plaintiff/witnesses lacked any knowledge of the murder and they were threatened by defendants).

Defendants' only argument with respect to Plaintiff's fabrication theory is the same one they made about Gwin; that is, that their actions amount to mere coercion and not fabrication. Dkt. 103 at 23-24. Defendants are wrong, and their argument obscures the careful distinction between the knowing creation of a false statement (fabrication) and coercion. *See, e.g.*, *Whitlock*, 683 F.3d at 384; *Fields*, 740 F.3d at 1110; *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 346 (7th Cir. 2019) ("A reluctant witness ... whose testimony an officer must pry out through aggressive interrogation techniques may be telling the truth ... Fabricated testimony, meanwhile, is invariably false because it is made up by the officer, who knows he is making it up."); *Petty*, 754 F.3d at 421-23.

26

On that score, they cite *Petty*, but that case is readily distinguishable. In *Petty*, the plaintiff alleged that defendants had coerced the witness "into giving false evidence by threatening him with jail time if he did not cooperate, holding him against his will in a locked room without food or water for over 13 hours, badgering him, and pressuring him to identify Petty as one of the assailants." *Petty*, 754 F.3d at 423. Despite plaintiff "label[ing]" his claim as one for "manufactured false evidence," plaintiff's fabrication claim "fail[ed] because he did not allege in his complaint, his statement of material facts in opposition to the Defendant's motion for summary judgment, or his appellate brief that CPD officers manufactured evidence that they knew to be false." *Id.*

The only way these interrogations could be mischaracterized as *Petty*-style coercion is by ignoring the mountain of fabrication evidence Plaintiff has presented——from Plaintiff's and Gwin's testimony that the Defendants literally made up statements for them to parrot back, to the evidence Defendants hid showing that these "confessions" were false (including the trail of evidence pointing to real killer Walter Ellis; Defendants' creation of the map they attributed to Plaintiff; and seeing a disabled Plaintiff unable to pin down the victim during the re-enactment). Moreover, the statements themselves corroborate Plaintiff's claim of fabrication: That is not only because they contain non-public facts about the murder that innocent persons would not have known, but also because they are virtually identical in content but factually wrong (and impossible). *See Patrick*, 213 F. Supp. 3d at 1058. Ignoring evidence is, of course, a forbidden strategy at summary judgment.

### c. The Record Supports a Jury Finding that Defendant Simons Knowingly Fabricated a False Polygraph Report

Finally, Defendants' brief fails to address Plaintiff's third piece of fabricated evidence altogether, and therefore, they have waived any such arguments. *See Tuduj v. Newbold*, 958 F.3d

27

576, 579 (7th Cir. 2000). Even if not waived, a jury could find from the circumstances surrounding the polygraph and how it was administered that Defendant Simons knowingly fabricated his polygraph report. *See, e.g.*, *Stinson*, 868 F.3d at 527 (forensic odontologists fabricated bitemark opinions); *Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988) (fabrication of false laboratory reports). For starters, Simons used the invalid Arthur method of polygraphing, which was "built on criteria that had no scientific basis" and could be easily manipulated. SOAF ¶¶73-74. It also required the examiner to *predetermine* the truthfulness of the examinee before it is administered. *Id*. ¶74. *See Jimenez v. City of Chicago*, 732 F.3d 710, 721-22 (7th Cir. 2013) (defendant's deviations from professional standards can support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights).

Second, Plaintiff was only subjected to the polygraph after Assistant District Attorney ("ADA") Mark Williams told Defendants Buschmann and Devalkenaere that he had concerns about whether Plaintiff and Gwin were telling the truth. SOAF ¶¶71-72. In other words, Defendants needed more evidence to get the case charged *before* the polygraph examination.

Third, Defendant Simons falsely reported that Plaintiff was "lying" when in reality the results showed the opposite: the only question Plaintiff reacted to was Question 3B, where Plaintiff responded "yes" to the question: "Did Chaunte Ott cut that white girl's throat." *Id*. ¶¶76-77. Reacting to Question 3B means Plaintiff was *lying* when he said Ott cut that white girl's throat. Simons then used the "failed" polygraph to confront Plaintiff with "evidence" that he was not telling the truth. *Id*. ¶¶76, 79. Simons threatened Plaintiff and told him that "[y]ou gotta say something. You killed her," *Id*. ¶80. That "something" was supplied by Buschmann and Simons: they told Plaintiff to say that he held Payne's hands down; that he told Ott that she didn't have anything so they should leave; and that Ott said she was fixing to give up something. *Id*. ¶82.

28

The Defendants knew that was not true: There was no legitimate evidence implicating Ott or Plaintiff in Payne's murder, and it would have been physically impossible for Plaintiff to have held Payne down.

The record developed here provides more than sufficient basis for a jury to conclude that Defendants Simons knowingly fabricated both the polygraph result and Plaintiff's November 1, 1995 statement. *See*, *e.g.*, *Gray*, 2022 WL 910601, at *11.

### D.     A Jury Must Decide Plaintiff's *Brady* Claim

*Brady* requires that exculpatory and impeachment evidence material to the criminal case be disclosed to the prosecution and defense. *Holland v. City of Chicago*, 643 F.3d 248, 255 (7th Cir. 2011); *see also Kyles v. Whitley*, 514 U.S. 419, 438 (1995). The Seventh Circuit has long recognized that §1983 due process claims may be brought against police who withhold evidence, causing wrongful convictions. *Whitlock*, 682 F.3d at 572; *Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001); *Jones*, 856 F.2d at 992-93.

To prove a *Brady* claim, Plaintiff must show: (1) the evidence at issue was favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence must have been suppressed, either willfully or inadvertently; and (3) the evidence must have been material, meaning there is a reasonable probability that the result of the proceeding would have been different. *Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008).

As a threshold matter, the right to exculpatory evidence exists even in the context of guilty pleas, as police are required to disclose *Brady* material pre-plea. "*Brady* and its progeny require the prosecution team to disclose known (and material) exculpatory evidence before a criminal defendant pleads guilty." *Powell v. City of Chicago*, No. 17-CV-5156, 2018 WL

1211576, at *6 (N.D. Ill. Mar. 8, 2018), *on reconsideration in part*, 12-CV-09158, 2014 WL 3535723 (N.D. Ill. July 11, 2014) (citing cases); *id. at* *8 "(*Garcia v. Hudak*, 156 F. Supp. 3d 907, 916 (N.D. Ill. 2016) (holding that "the State has a constitutional duty to disclose material exculpatory evidence to a criminal defendant before the defendant pleads guilty"); *Ollins v. O'Brien*, No. 03-cv-5795, 2005 WL 730987, at *11 (N.D. Ill. Mar. 28, 2005) (holding that "due process requires the disclosure of information of factual innocence during the plea bargaining process"); *United States v. Dahl*, No. 14-4087, 597 Fed.Appx. 489, 490 (10th Cir. 2015) (holding that the government's duty to disclose "in the context of a guilty plea extends only to material exculpatory evidence"); *Miller v. Angliker*, 848 F.2d 1312, 1320 (2d Cir. 1988) (concluding that *Brady* governs due-process claims brought by individuals who pled guilty "without knowledge of material evidence withheld by the prosecution"); *but see United States v. Conroy*, 567 F.3d 174, 178 (5th Cir. 2009) (holding that "a guilty plea precludes the defendant from asserting a Brady violation")."

In *Saunders v. City of Chicago*, No. 12-CV-09158, 2013 WL 6009933 (N.D. Ill. Nov. 13, 2013), the court rejected the argument that the defendants were "exempt from the clear mandate of *Brady* because [one of the plaintiffs] pleaded guilty." *Id.* at *9.  It relied on the Seventh Circuit's guidance that "it is highly likely that the Supreme Court would find a violation of the Due Process Clause if prosecutors or other relevant government actors have knowledge of a criminal defendant's factual innocence but fail to disclose such information to a defendant before he enters a guilty plea." *Id.* (citing *McCann v. Mangialardi*, 337 F.3d 782, 788 (7th Cir. 2003)). Likewise in *Powell*, the court held that police officers were constitutionally obligated to disclose material exculpatory evidence prior to a plea, relying on the Supreme Court's distinction

30

between exculpatory and impeachment evidence. *Powell*, 2018 WL 1211576, at *6 (observing

that *United States v. Ruiz*, 536 U.S. 622, 628-629 (2002) was limited to impeachment evidence).

Materiality in the context of a plea is measured by "whether there is a reasonable

probability that but for the failure to produce such information the defendant would not have

entered the plea but instead would have insisted on going to trial. The inquiry is an objective one

that is resolved largely on the basis of the persuasiveness of the withheld evidence." *Tate v.

Wood*, 963 F.2d 20, 24–25 (2d Cir. 1992) (citing *Angliker*, 848 F.2d at 1322).

1.    **The Defendants Withheld Exculpatory Information From Latonia Cooper**

The information Cooper provided was clearly exculpatory, in that she provided

information about an alternative suspect, Walter Ellis, now known to be the real killer, during the

original investigation. *Beaman v. Freesmeyer*, 776 F.3d 500, 509–10 (7th Cir. 2015) ("evidence

inculpating another suspect [i]s *Brady* material."); *Andersen v. City of Chicago*, No. 16 C 1963,

2019 WL 6327226, at *8 (N.D. Ill. Nov. 26, 2019) (suppressed information about alternative

suspect was exculpatory and material). Here, Cooper told police that she had observed Ellis with

Payne in shortly before her murder. SOAF ¶21. Cooper also disclosed that Giles, who Payne and

Cooper were both living with at the time of the murder, was a madam who tried to get girls to

prostitute themselves to Ellis. *Id*. ¶18. Cooper told them that Giles did not want Payne staying in

the house; that Giles had connected Ellis with Payne; and that Ellis was cruel. *Id*. ¶¶19-20.

Detectives showed Cooper a photograph of Ellis and she identified him as the man she saw with

Payne. *Id*. ¶¶16-17, 20-21.

There is no dispute that this patently exculpatory information was withheld and never

turned over to the prosecutor. *Id*. ¶¶24-25. Instead, the Defendants argue that they are off the

hook because they either did not know about Cooper's interview, or because the information she

gave police was not material to Plaintiff's plea. Dkt. 103 at 15-16. Both arguments fail, and the *Ott* court has already rejected them. *Ott v. City of Milwaukee*, 48 F. Supp. 3d 1197, 1208 (E.D. Wis. 2014) ("The evidence establishes that Devalkenaere interviewed Cooper and that he and Buschmann were the primary detectives in the Payne investigation. As the primary detectives Devalkenaere and Buschmann should have been aware of all the information gathered during the investigation, including exculpatory information. . . [A] reasonable jury could conclude that Devalkenaere and/or Buschmann were aware of the exculpatory information obtained from Cooper and that they failed to disclose the information.").

As in *Ott,* here there is ample basis to conclude that all of the Defendants knew about Cooper's statements. The record strongly suggests that Devalkenaere interviewed Cooper on October 10, which means he would have heard Cooper's revelations first-hand. Indeed, Defendants' conjecture that someone other than Devalkenaere interviewed Cooper would require the Court to invert the summary judgment standard and draw inferences in Defendants' favor. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) (at summary judgment, plaintiff is entitled to the benefit of all inferences). *See Andersen*, No. 16 C 1963, 2019 WL 6327226, at *8 (reasonable inference that detectives had obtained exculpatory information from a witness regarding an alternative suspect but failed to disclose it). Alternatively, Devalkenaere and Buschmann were briefed on Cooper's statements within the "information-sharing" environment that the homicide unit operated. *See, e.g.*, *Ezell v. City of Chicago*, No. 18 C 1049, 2024 WL 278829, at *17 (N.D. Ill. Jan. 24, 2024) (knowledge can imputed to officers in an "information sharing environment")*.* As noted above, detectives on the Payne case attended homicide shift-change briefings, during which detectives were apprised of developments in on-going homicide investigations. SOAF ¶¶22-23. This would include information from witnesses. *Id*. ¶23.

32

The jury must resolve which of these two scenarios occurred, but either way, Devalkenaere and Buschmann are liable for failing to disclose Cooper's statements to the prosecution and criminal defendant. *See Ott*, 48 F. Supp. 3d at 1208 (denying summary judgment to Buschmann and Devalkenaere on this claim); *Cairel*, 821 F.3d at 830. Devalkenaere and Buschmann were the primary detectives responsible for investigating Payne's homicide. SOAF ¶34. If Devalkenaere interviewed Cooper directly, he was required to have included it in his Memo Book and a subsequent supplementary report. *Id*. ¶¶24, 87. If Devalkenaere and Buschmann learned of Cooper's statement through a briefing, they had to disclose it as well. Due process requires that each and every officer who has knowledge of a particular exculpatory fact disclose that fact to prosecutors. *See, e.g.*, *Steidl v. Fermon*, 494 F.3d 623, 630-32 (7th Cir. 2007) (holding that each of five police officers who discovered exculpatory information had a duty to disclose it to prosecutors); *Jones*, 856 F.2d at 992-93 (each of three police supervisors who learned exculpatory information from subordinates held liable for failing to disclose that information).

As to materiality, Defendants contend that the information withheld regarding Cooper was not material because, in their view, Cooper's statements regarding Ellis were "extremely vague and speculative." Dkt. 11-12. The record proves otherwise. Cooper's statement revealed that there was an alternate suspect, whom an eyewitness identified as being with the victim before her death. Cooper's details were specific—she identified Ellis in a photograph; told police that Ellis obtained "girls" for sex from Giles, with whom Payne was living when she was killed; that Ellis was introduced specifically to Payne; that Ellis was cruel; and that he was seen with Payne shortly before her murder. *See, e.g. Andersen*, 2019 WL 6327226, at *8 (withheld information about alternative suspect that was more than generalized and satisfied materiality

33

standard at summary judgment state). Without this evidence, Plaintiff faced the prospect of criminal trial with nothing but his own protestations of innocence—which his false and fabricated confession rebuked. A reasonably jury could certainly conclude that the alternate suspect evidence, as well as the fact that Defendants failed to investigate Ellis and instead forced a confession from Plaintiff, was undoubtedly material.

### 2. Defendants Withheld their Coercion and Fabrication of Gwin's Statement[4]

Defendants also failed to disclose the tactics they used to coerce Gwin into falsely implicating Plaintiff in Payne's murder. These tactics include threats that they would charge Gwin with Payne's murder if he did not cooperate with them; and feeding Gwin the details they wanted him to include—that he was with Ott, Hadaway and Payne and that he saw them together or dropped them off somewhere. SOAF ¶¶38-42. Failure to disclose such information in the context of a coerced and fabricated witness statement is well-established as a *Brady* violation. *See, e.g.*, *Kyles*, 514 U.S. at 437–38; *Avery*, 847 F.3d at 443–44 ("Avery knew that the informants' statements were false, but he did not know about the pressure tactics and inducements the detectives used to obtain them. . . In other words, he did not have the evidence that could help him prove that the informants' statements were false."); *Baker v. City of Chicago*, 483 F. Supp. 3d 543, 554 (N.D. Ill. 2020) ("That the plaintiff knew evidence was fabricated at the time does not preclude a *Brady*-based due process claim if the officers failed to disclose circumstances pertaining to the fabrication that would have enabled the plaintiff to challenge the validity of the evidence at trial.").

Defendants rely on the *Ott* summary judgment decision to defend against this claim. *Ott* found insufficient evidence that Defendants coerced, coached, or manipulated Gwin. Dkt. 103 at

---

[4] Plaintiff is not pursuing a *Brady* claim with respect to the Moore report as it was disclosed to the prosecutors.

15 (discussing *Ott*, 48 F. Supp. 3d at 1207). But *Ott* did not have the benefit of Teresa Jones's deposition testimony. Jones testified in this case about the information her brother conveyed to her regarding how Defendants Devalkenaere and Buschmann threated to charge him with Payne's murder and that they fed him specific facts to include in his statement. SOAF ¶39. In other words, the evidence of what was withheld vis-à-vis Gwin is more robust in this record than in *Ott*. Moreover, the Court must make its own determination on materiality here based on this factual record.

Most importantly, the information Cooper provided Defendants and the information Defendants withheld about Gwin's statement must be taken together in the aggregate for *Brady* materiality. *Camm*, 937 F.3d at 1109. It is reasonable to infer that Plaintiff may not have pleaded to participating in Payne's murder had he and his counsel known about Ellis and been armed with evidence that Gwin's statement had been procured through threats and was the product of Defendants feeding him facts. Indeed, with that evidence, (a) Plaintiff could have conducted his own investigation into Ellis; and (b) he could have undermined the evidence against him.

### 3.    Defendants May Not Avail Themselves of a Qualified Immunity Defense

As set forth above in Section A, qualified immunity considers whether state actors were on notice that their conduct was unlawful, not whether there was a civil remedy. *Armstrong*, 786 F.3d at 556; *Fields*, 740 F.3d at 1114. And, it has long been settled that defendants cannot withhold material exculpatory evidence—whether in concert with others, or on their own. *See Goudy*, 922 F.3d at 844 ("clearly established as early as 1981 that police could not withhold exculpatory information from prosecutors").

Prior to the Plaintiff's guilty plea in November 1996, several appellate courts had held that *Brady* violations could render a plea agreement involuntary.[5] *Autullo v. United States*, 81 F.3d 163 (7th Cir. 1996) (in decision from March 1996, the court explained that "several circuits have held that *Brady* may be invoked to challenge the voluntariness of a guilty plea"); *Tate*, 963 F.2d at 24–25 (1992 decision by the Second Circuit holding that withholding of exculpatory evidence (that victim was aggressor that corroborated defendant's claim of self-defense) was material and should have been disclosed prior to plea agreement); *United States v. Wright*, 43 F.3d 491, 496 (10th Cir. 1994) ("[W]e hold that, under certain limited circumstances, the prosecution's violation of *Brady* can render a defendant's plea involuntary."); *Angliker*, 848 F.2d at 1320 ("[W]e conclude that even a guilty plea that was "knowing" and "intelligent" may be vulnerable to challenge if it was entered without knowledge of material evidence withheld by the prosecution."); *White v. United States*, 858 F.2d 416, 422 (8th Cir. 1988) (adopting Sixth Circuit's approach as set forth in *Campbell v. Marshall*, 769 F.2d 314, 321-24 (6th Cir.1985), *cert. denied*, 475 U.S. 1048 (1986)).

Viewed in the context of the conduct Defendants knew was unconstitutional, it becomes clear that qualified immunity is unavailable. It was clearly established by November 1996 that the Defendants were obligated to disclose exculpatory evidence prior to Plaintiff's plea. Tellingly, Defendants have not cited any cases holding that *Brady* violations **did not** apply in the context of guilty pleas prior to November 1996. Indeed, it was not until six years after Plaintiff's guilty plea in 2002 that the Supreme Court's decision in *Ruiz* clarified that impeachment

---

[5]     "In ascertaining whether a right is clearly established, the court is not limited to considering only precedent from the Supreme Court or this circuit. Decisions from other circuits are authoritative insofar as they reflect the state of the law at the time of the alleged misconduct." *Delaney v. DeTella*, 123 F. Supp. 2d 429, 439 (N.D. Ill. 2000), *order aff'd and remanded*, 256 F.3d 679 (7th Cir. 2001) (cleaned up cite); *see also Spreen v. Brey*, 961 F.2d 109, 113 (7th Cir. 1992).

36

evidence was not subject to the same disclosure obligations pre-plea. *Ruiz*, 526 U.S. at 633[6]; *see also McCann*, 337 F.3d at 788. During the Payne investigation, therefore, the conduct at issue was clearly prohibited.

That is particularly so because allowing police and prosecutors to withhold evidence that a criminal defendant is factually innocent cuts against the "central purpose of any system of criminal justice," which is "to convict the guilty and free the innocent." *Herrera v. Collins*, 506 U.S. 390, 398 (1993). Imagine, for example, a case in which a criminal defendant has been charged with rape. Prior to the criminal defendant's plea, the police learn that DNA from the victim matches an entirely different person. Under the Defendants' read of the law, the police would not be required to disclose that fact if the criminal defendant decided to plea. That egregious withholding of evidence, however, cannot be sanctioned simply because the criminal defendant chose to plead guilty (particularly where guilty pleas are often taken for a number of reasons that do not correspond to a criminal defendant's factual guilt or innocence). *See, e.g.*, Rakoff, "Why Innocent People Plead Guilty," *The New York Review of Books*, at https://www.nybooks.com/articles/2014/11/20/why-innocent-people-plead-guilty/. Indeed, that rule would mean that criminal defendants would plead guilty to crimes that they did not commit because the police were not required to provide them with evidence that they had in their possession that someone else did it.[7]

---

[6]      Moreover, the concerns animating *Ruiz* are unique to impeachment evidence. For example, *Ruiz* noted that "impeachment information is special in relation to the *fairness of a trial*" and "not in respect to whether a plea is *voluntary . . . .*" *Ruiz*, 536 U.S. at 629 (emphasis in original). That is at least in part because the "random way in which [impeachment] information may, or may not, help a particular defendant." *Id. at 630*. For example, impeachment evidence about a witness who ultimately does not end up testifying at trial--e.g., his prior convictions or prior statements--may become completely irrelevant. Information about whether someone is factually innocent is qualitatively different. A plea cannot be knowing and voluntary if the criminal defendant is not aware that the police have evidence that someone else committed the crime. *See Ollins*, 2005 WL 730987, at *11 (due process requires disclosure of factual innocence).

[7]      This is especially troubling when our criminal justice system is heavily tilted toward resolving criminal proceedings through pleas rather than trials. *See, e.g.*, *Betterman v. Montana*, 578 U.S. 437, 438 (2016) ("The

Moreover, none of the purposes of qualified immunity are served by allowing the Defendants to invoke it here. As noted above, Plaintiff's co-defendant, Chaunte Ott went to trial (rather than plead). SOAF ¶84. The *Ott* court found that the defendants' failure to disclose Cooper's information about Ellis gave rise to a *Brady* violation for Ott. *Ott*, 48 F. Supp. 3d 1197 at 1208. Defendants' argument here would result in the same conduct on the part of the same Defendants being afforded the cloak of immunity—not on account of the defendants' conduct at issue, which is the appropriate focus of qualified immunity, but simply based on whether the individual went to trial or not.[8] *See Baker*, 483 F. Supp. 3d at 554-55 (rejecting defendants' claim that they have qualified immunity because *Brady* does not apply to guilty pleas at motion to dismiss); *Speagle v. Ferguson*, No. 10-2040, 2010 WL 3724784, at *4 (C.D. Ill. Aug. 20, 2010) (rejecting dismissal of *Brady* claim because plaintiff entered a guilty plea), *report and recommendation adopted*, No. 10-CV-2040, 2010 WL 3724785 (C.D. Ill. Sept. 16, 2010).  The Supreme Court has made clear that entering a guilty plea does not render all protections of the Constitution waived. *See Menna v. New York*, 423 U.S. 61, 62 (1975) (rejecting argument that double jeopardy clause protection waived on account of a guilty plea because "[w]here the State is precluded by the United States Constitution from haling a defendant into court on a charge, federal law requires that a conviction on that charge be set aside even if the conviction was entered pursuant to a counseled plea of guilty.").

For the reasons set forth above, the Defendants' motion for summary judgment on Plaintiff's *Brady* claim should be denied.

---

prevalence of guilty pleas and the resulting scarcity of trials in today's justice system do not bear on the presumption-of-innocence protection at the heart of the Speedy Trial Clause.").

[8]        Defendants never turned over the exculpatory information pertaining to Cooper or Gwin prior to or during Ott's criminal trial. *Ott*, 48 F. Supp. 3d 1197 at 1208.

**E.     A Jury Must Decide Plaintiff's Malicious Prosecution/Unlawful Detention Claims**

Plaintiff has alleged that Defendants subjected him to unlawful pretrial detention under the Fourth Amendment. To prove his claim, he must show that: "the defendant[s] (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Kuri v. City of Chicago*, No. 13 C 1653, 2017 WL 4882338, at *7 (N.D. Ill. Oct. 30, 2017). The probable cause standard is objective and based on the facts known to the officers. *Fox v. Hayes*, 600 F3d 819, 833 (7th Cir. 2010). Officers have probable cause when "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). When the facts underlying probable cause are disputed, a jury must decide the issue. *Maxwell v. Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993); *Williams v. City of Chicago*, 773 F.3d 749, 757 (7th Cir. 2013).

The only aspect of this claim that Defendants challenge is Plaintiff's ability to show that his detention and prosecution was "unsupported by probable cause." *Kuri*, 2017 WL 4882338, at *7. Any other argument has been waived. *See Tuduj*, 958 F.3d at 579. On this front, Defendants' argue that Plaintiff lacks sufficient evidence that Defendants coerced Gwin into falsely implicating him in Payne's murder. Dkt. 103 at 25. Defendants miss the mark. Their entire basis for probable cause was two manufactured, false statements (from Gwin and Plaintiff). Defendants cannot knowingly manufacture probable cause. *See Alexander v. United States*, 721 F.3d 418, 423 (7th Cir. 2013) ("Knowingly false statements by the affiant cannot support a finding of probable cause"); *Lawson v. Veruchi*, 637 F.3d 699, 704 (7th Cir. 2011) (analyzing whether probable cause existed by setting aside purportedly fabricated or manipulated evidence);

39

*Kuri*, 2017 WL 4882338, at *7 ("Defendants cannot manufacture their own probable cause by fabricating evidence.") (collecting cases). The evidence that Gwin's statement and Plaintiff's confession were fabricated, *see* Section C *supra,* defeats summary judgment on Plaintiff's Fourth Amendment unlawful detention/malicious prosecution claim.

**F.    A Jury Must Decide Plaintiff's *Monell* Claim**

Finally, Plaintiff's *Monell* claim must be decided by a jury because material facts are in dispute regarding whether the City provided training to its officers on their duty to turn over exculpatory and impeachment evidence to prosecutors. Defendants raise three arguments in support of their motion. First, that Plaintiff lacks evidence of a widespread practice to prevail on this claim; second, that the Chief of Police lacked notice; and third, that Plaintiff lacks evidence that the failure to train was the moving force causing the constitutional violations here. None of those arguments have merit.

**1.    Applicable Law**

In order to prevail on his *Monell* claim, Plaintiff must demonstrate that an action taken pursuant to "official municipal policy" caused his injury. *Connick v. Thompson*, 563 U.S. 51, 60 (2011). "[A] local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Id*. at 61. To set forth a claim for the failure to train, a plaintiff must show that that (1) the City failed to train its officers; (2) that failure amounted to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact;" and (3) the failure was the moving force behind the plaintiff's injuries. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

Failure to provide training where the "need for more or different training" was "obvious" is an actionable *Monell* theory. *Canton*, 489 U.S. at 390; *Jenkins v. Bartlett*, 487 F.3d 482, 492

40

(7th Cir. 2007) (municipality liable "when the inadequacy in training amounts to deliberate indifference to the rights of the individuals with whom the officers come into contact"). Under that theory, there is no requirement of a widespread practice or prior instances that give notice to the policymaker; instead, a plaintiff can prevail even where the only incident is the one in the Complaint. *See Canton*, 489 U.S. at 390 n.10; *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 409 (1997).

2. **The Record Supports a Jury Finding that the City Provided *No* Training on *Brady* Obligations**

To start, there is no dispute that the City provided *no* training to its officers on their duty to disclose exculpatory and impeachment evidence to the prosecutors. In response to Plaintiff's interrogatory requests, the City failed to identify *any* training it provided to its officers on this obligation prior to the Payne homicide investigation and Plaintiff's criminal prosecution in 1995-96. SOAF ¶91. In fact, the City was able to identify only two trainings from 1990 to 2000 on the topics of the "[c]reation, use, retention, and disclosure of police notes and/or reports taken during the course of an investigation" and the "creation, use, retention and disclosure of Memo Books"—one in 1997 on report writing and a second in 1999 on crime scene management. *Id*. ¶95. Both were given after the Payne investigation and neither addressed an officer's constitutional obligation to disclose exculpatory evidence, regardless. *Id*. ¶¶95-98. *See, e.g.*, *Jackson v. City of Cleveland*, 925 F.3d 793, 834-36 (6th Cir. 2019) (finding testimony by three former officers that they did not receive training on their *Brady* disclosure obligations sufficient to create genuine issue of material fact as to whether training was sufficient); *Gregory v. City of Louisville*, 444 F.3d 725, 754 (6th Cir. 2006) (finding triable *Monell* claim where "testimony from the former Chief of Police . . . that officers are trained to document and turn over to the prosecutor all evidence in their possession" was contested by "expert testimony that LPD

41

training . . . was nonexistent" and "inferential evidence" that training would be documented but there has been no such evidence produced).

Perhaps unsurprisingly, then, Defendant Buschmann testified that he did not receive any training on his duty to disclose information. *Id*. ¶ 92 ("Q. . . . Were you trained as an officer at the Milwaukee Police Department on any duties to disclose exculpatory information? A. No."). Similarly, Defendant Devalkenaere testified he did not have an understanding of his obligations under *Brady*. *Id*. The Defendants' testimony is corroborated by their training records, which reflect no record of any training on disclosure obligations. *Id*. ¶93.[9]

Third, while the City had an official policy requiring detectives to record pertinent facts of investigations in their Department-issued Memo Books, the City lacked any policies requiring officers to maintain their Memo Book, disclose their memo books to the prosecutor, or ensure that the information contained in the Memo Books was also contained in an official report. *Id*. ¶¶ 94-95. As a result, officers, including these Defendants, destroyed their memo books; and there is no indication whatsoever that the exculpatory information that Cooper provided was put into a Memo Book or a supplementary report. *Id*. ¶¶99-100.

### 3. Plaintiff can prevail on this claim without demonstrating a widespread practice

Given the foregoing, there is ample evidence that the City failed wholesale to train officers on their discovery obligations. Defendants' attempt to dismiss Plaintiff's claim by mandating a widespread practice misses the import of Plaintiff's failure to train claim.

---

[9] The Defendants have records of attending the "Crime Scene Management" course in 1999 and the "Report Writing" in 1997, and earlier versions, but there is no evidence in the training materials the officer's disclosure obligations were covered in those trainings. SOAF ¶¶95-98. Accordingly, at best, this is factual dispute for the jury to decide.

42

The Supreme Court has made clear that prior instances of misconduct are not always required. *See Brown*, 520 U.S. at 409; *Canton*, 489 at 390 n.10. In *Connick v. Thompson*, 563 U.S. 51 (2011), the Supreme Court contemplated one of the very situations presented here: failure to train officers regarding their *Brady* obligations. In *Connick*, the Court found no single-incident liability for failure to train *prosecutors* about *Brady* because prosecutors are legally trained and familiar with *Brady*. *Connick*, 563 U.S. at 63-71. The Court expressly distinguished attorneys from police officers: "The reason why the *Canton* hypothetical is inapplicable is that attorneys, *unlike police officers*, are equipped with the tools to find, interpret, and apply legal principles." *Id.* at 69-70 (emphasis added); *id*. at 63 (explaining that legal training is what differentiates attorneys from other public employees). For that reason, courts have repeatedly held that plaintiffs can survive summary judgment on a single-incident failure to train *Monell* claim regarding *Brady* because the failure to train officers about their *Brady* obligations has the "highly predictable consequence" that a plaintiff's due process rights will be violated. *Gregory*, 444 F.3d at 753 ("At a minimum, Plaintiff has presented sufficient evidence to survive summary judgment on his failure to train allegations regarding exculpatory materials . . . This Court has held that evidence pointing to a City's failure to provide *any* training on key duties with direct impact on the constitutional rights of citizens is sufficient to survive summary judgment with a *Monell* failure to train claim."); *Crews v. County of Nassau*, 996 F. Supp. 2d 186, 209-11 (E.D.N.Y. 2014) ("Finally, if plaintiff's evidence is credited and construed most favorably to plaintiff, a reasonable jury could conclude that, because police officers do not come to their jobs trained in the law, a municipality's failure to train them on how to handle exculpatory evidence has the obvious consequence of leading to constitutional violations, such that a single incident can give rise to *Monell* liability.").

43

The Sixth Circuit's decision in *Jackson* is particularly instructive here. In that case, Cleveland presented evidence that it trained its officers on the police manual; that officers were trained "to turn over the entire product of their investigation to the prosecutor;" and that officers were likewise "instructed to write down the [witness] statement as close to what the witness said as possible, whether it is good or bad." *Jackson*, 925 F.3d at 835. Nonetheless, the Sixth Circuit found that plaintiffs' failure-to-train claim should proceed to trial. *Id.* at 836. That was because the plaintiffs had adduced evidence to the contrary: three officers who testified that they had not received any training on *Brady*. *Id*. at 835-36. One officer testified that he was "not taught anything at police academy about police officers' obligation to disclose Brady evidence" and that he did not remember having "ever attend[ed] any training concerning police officers' obligation to disclose exculpatory evidence to the defense.'" *Id.* at 835 (cites to the record omitted). A second testified that he did not recall any training "that officers have an obligation to disclose exculpatory evidence to criminal defendants or prosecutors." *Id.* And, a third testified that there was no training with respect to turning over witness statements or any specific training on turning over exculpatory evidence either. *Id.* Based on this evidence the Sixth Circuit concluded that "[a] reasonable jury could interpret this testimony as indicating that officers received no training, on-the-job or otherwise, in their *Brady* obligations generally or in their obligation to provide witness statements to prosecutors." *Id.* at 836.

The same result should apply here. That is because Plaintiff has similarly developed a record on which the jury could find that Milwaukee police officers received *no* training on their *Brady* obligations. SOAF ¶93.

Defendants' reliance on Rowe's testimony does not compel a different result. Dkt. 103 at 29. Her testimony that MPD's policy was to make exculpatory evidence available, at most,

44

creates a factual dispute. *See*, *e.g.*, *Gregory*, 444 F.3d at 754; *Jackson*, 925 F.3d at 834-36.

Indeed, it is no different than *Jackson*, where Cleveland had evidence that its official policy was

to turn over evidence as well. *Jackson*, 925 F.3d at 834-36; *Stewart v. Coughlin*, No. 3:20-CV-

00497-M, 2023 WL 121989, at *8-9 (N.D. Tex. Jan. 6, 2023) (finding failure-to-train claim was

triable where defendant testified that he did not know of any policies relating to *Brady* and did

not think it applied "back in the day," and only evidence of *Brady* training was declarations by

Dallas police officers that they were trained about the police Department's open-file policy; the

court found that that policy "is not coterminous with an officers' legal duty under *Brady*");

*Salazar v. City of Phoenix*, No. CV 1901188PHXSRBESW, 2022 WL 7706963 at 19-21 (D.

Ariz. Sept. 14, 2022) (finding sufficient evidence to warrant trial on failure-to-train claim where

the only evidence regarding *Brady* requirements was in a one-half page operations order, which

was "confusing"). At summary judgment, a factual dispute on a material issue like this one

requires a trial on the claim. *Jackson*, 925 F.3d at 835-36. Moreover, beyond the he-said-she-said

factual dispute, it is worth noting that if there is no training on how to comply with a policy, then

the existence of the policy alone does not satisfy a municipality's constitutional obligations. *Id*.

### 4. The Need for Training on Disclosure of Exculpatory and Impeachment Evidence is so Obvious that Plaintiff can show Deliberate Indifference

Defendants further argue that Plaintiff cannot demonstrate notice to the Chief of Police

during the Payne homicide of a widespread practice. Dkt. 103 at 29. As set forth in the section

above, under *Canton* and its progeny, Plaintiff does not have to demonstrate notice of a

widespread practice; he need only show "deliberate indifference." *Connick*, 563 U.S. at 61.

Deliberate indifference can be proven in two ways: either a plaintiff can demonstrate a pattern of

similar violations, or where there is only a single incident, a plaintiff must show that that incident

was "the 'obvious' consequence of a failure to provide specific training." *Connick*, 563 U.S. at

62; *Sandra T.-E. v. Sperlik*, No. 05 C 473, 2009 WL 2422209, at *2 (N.D. Ill. July 29, 2009) ("a municipality acts with deliberate indifference where the need for training is so obvious and the inadequacy so likely to result in a violation of constitutional rights."); *Jenkins*, 487 F.3d at 492.

As noted above, courts have repeatedly found that a plaintiff can demonstrate deliberate indifference given the obvious need to train police officers on their *Brady* obligations. *See, e.g.*, *Gregory*, 444 F.3d at 753; *Jackson*, 925 F.3d at 837 ("Plaintiffs have provided testimony sufficient for a jury to find that Cleveland did not in fact train its officers in their disclosure obligations. . . there is sufficient evidence for a reasonable jury to find that Cleveland was deliberately indifferent to the risk of *Brady* violations."); *see also Stewart*, 2023 WL 121989, at *8-9 (N.D. Tex. Jan. 6, 2023) (finding that the single-incident exception applied to the failure to train officers on their Brady obligations); *Echavarria v. Roach*, 565 F. Supp. 3d 51, 91-92 (D. Mass. 2021) (finding single-incident liability applies to failure to train on disclosure of evidence); *Tanner v. Walters*, No. 1:19-CV-849, 2021 WL 320940, at *3 (W.D. Mich. Feb. 1, 2021) (finding that the case fell squarely within Jackson, in part because "[t]he Jackson court held that the plaintiff had shown deliberate indifference based on failure to train, even though he pointed to a single violation of rights – his own"); *Edwards v. Cook County*, 215 F. Supp. 3d 681, 584 (N.D. Ill. 2016) (single-incident liability could apply to failure to train on Brady).

### 5. A Jury Must Decide if the City's Failure to Train was the "Moving Force" Causing the Constitutional Violations Plaintiff Suffered

Finally, the City argues that Plaintiff cannot show the City is the moving force because he has not proven his underlying *Brady* violations. Dkt. 103 at 29. Plaintiff has put forth evidence of viable *Brady* violations. *See infra* Section C. Plaintiff also has built a record that the City failed to train its officer on *Brady* obligations. SOAF ¶¶92-93. Accordingly, a jury must decide the question regarding whether the City's policy was the moving force. *See, e.g.*, *Thomas v. Cook*

46

*Cty. Sherriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010) ("Beyond these threshold requirements [of showing a widespread practice and deliberate indifference], the jury must make a factual determination as to whether the evidence demonstrates that the County had a widespread practice that the alleged constitutional harm.). Indeed, "[a]s long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 991 (N.D. Ill. 2017) (quoting *Bielevicz v. Dubinon,* 915 F.2d 845, 851 (3d Cir. 1990)); *Cazares v. Frugoli*, No. 13 C 5626, 2017 WL 1196978, at *19 (N.D. Ill. Mar. 31, 2017) (denying summary judgment on *Monell* code of silence claim where plaintiffs had circumstantial evidence that the City's "code of silence" was the moving force). That is the case here: Plaintiff has alleged that the Defendants failed to disclose the information that Cooper told police notwithstanding it's obvious exculpatory value. A jury could reasonably decide that the Defendants' failure to do so was because they had never received training on their disclosure obligations.

Plaintiff's *Monell* claim based on the City's failure to train must be decided by a jury.

## Conclusion

For the reasons set forth above, Defendants' motion for summary judgment should be denied.

Respectfully Submitted,

/s/ Heather Lewis Donnell
*Attorney for Plaintiff*

Gayle Horn
Heather Lewis Donnell
Elliot Slosar
LOEVY & LOEVY
311 N. Aberdeen Street, Third Floor
Chicago, Illinois 60607
Phone: 312-243-5900

47

## CERTIFICATE OF SERVICE

I, Heather Lewis Donnell, an attorney, certify that on March 20, 2024, I filed a copy of the foregoing document and thereby served a copy of the same on all counsel of record via the Court's electronic filing system.

<u>/s/ Heather Lewis Donnell</u>