UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SAM HADAWAY,

        Plaintiff,

    v.

CITY OF MILWAUKEE, *et al.*,

        Defendants.

Case No. 19-cv-1106-pp

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (DKT. NO. 102)**

---

This case arises out of the plaintiff's arrest, prosecution and subsequent conviction for attempted robbery related to the 1995 murder of 16-year-old Jessica Payne. Dkt. No. 1. The plaintiff's conviction later was overturned in 2018. Id. at ¶5. The plaintiff filed this case on July 31, 2019, alleging that law enforcement "threatened and coerced him into giving a fabricated statement falsely inculpating himself and his once-co-defendant, Chaunte Ott, into the murder of Jessica Payne" and withheld exculpatory evidence showing that the real perpetrator was serial killer Walter Ellis. Id. at ¶4. On February 2, 2024, the defendant filed a motion for summary judgment on all claims. The court will grant in part and deny in part the defendants' motion.

## I.    Background

The following facts are undisputed unless otherwise noted. Individual defendants Carl Buschmann, James DeValkenaere and Robert Simons are

1

current or former Milwaukee police officers who were involved in the investigation. Dkt. No. 121 at ¶3. Defendant City of Milwaukee is a municipal entity that employs or employed the individual defendants. Id. at ¶4.

A.     The Death of Jessica Payne

On August 26, 1995, 16-year-old Jessica Payne and 13-year-old Rebecca Morrison ran away from home. Id. at ¶5. The two girls went to North Milwaukee and arrived at a house involved with drug use and prostitution. Id. at ¶6. At some point, Morrison and Payne got into a yellow Cadillac with four black men: Terrance Wallace, Johnnie Jones, Delon Russell and Deshay Cox. Id. at ¶7. When the six of them arrived at a friend's house, Morrison went inside. Id. But Payne wanted to go home, so Wallace dropped her off at the corner of 17th Street and Center Street. Id. at ¶8. Four days later, on August 30, 1995, Payne's body was discovered under a mattress behind an abandoned house; she was partially nude, and her throat was slashed. Id. at ¶9. Law enforcement collected a rape kit. Id. at ¶10.

B.     The Murder Investigation

From roughly August 30, 1995 to October 1995, several Milwaukee Police Department officers investigated Payne's murder. Id. at ¶11. The defendants state that although numerous leads were pursued, a killer was not identified. Id. The plaintiff contends that officers interviewed Latonia Cooper twice during this period and that Cooper stated she believed Walter Ellis and Sandra Giles had something to do with Payne's murder. Id. The plaintiff asserts that no one from the Milwaukee Police Department investigated these leads or

2

disclosed Cooper's statements to the prosecutor in the plaintiff's later criminal case. Id.

Around October 20, 1995, defendants Buschmann and Devlakenaere started working on the Payne homicide as a cold case. Id. at ¶12. One of their leads was a potential suspect known by the name "Cortez," whom the police eventually identified as Richard Gwin. Id. at ¶¶13, 15.

C.     Police Interrogation of Richard Gwin

After police identified Gwin, he appeared for an interview on October 24, 1995. Id. at ¶16. Gwin denied having any knowledge of Payne's murder. Id. at ¶17. The defendants state that officers took Gwin into custody because (1) he indicated that he knew police wanted to speak to him about the death of a white girl because his mother had told him so, when police had not actually told Gwin's mother why they wanted to speak to him and (2) he knew that Payne was found with her throat cut. Id. at ¶18. The plaintiff argues that the police report does not reflect that Gwin knew that police wanted to speak to him about the death of a white girl. Id. The plaintiff also asserts that it was public knowledge that Payne's throat was cut, because it was reported in a Milwaukee Journal Sentinel article published almost two months prior to Gwin's interrogation. Id.

Around 4:50 on October 24, 1995, officers interviewed Gwin again. Id. at ¶19. He again denied having any involvement in Payne's death. Id. at ¶20. The defendants state that Gwin added that he had heard about the death of a white girl on 7th and Burleigh from his neighbor "Sammy Joe." Id. at ¶21. He further

3

explained that sometime, possibly within the previous few months, he had been on his front porch and saw Sammy Joe and a person he thought to be Sammy Joe's cousin on Sammy Joe's porch with two white girls. Id. at ¶22. Gwin identified one of the white girls as Payne from Payne's photo. Id. at ¶23. Gwin saw the women leave Sammy Joe's porch and walk away. Id. at ¶24. Gwin said that about a month later, Sammy Joe told him that one of the girls Sammy Joe had been with had been found behind an abandoned house on 7th and Burleigh with her throat cut. Id. at ¶25.[1]

On October 25, 1995 at 12:30 a.m., detectives took Gwin to a hospital for blood, saliva, head hair and pubic hair samples. Id. at ¶26. Around 10:00 a.m. that day, defendant Robert Simons administered a polygraph test to Gwin, given his statements that he had nothing to do with Payne's death. Id. at ¶27. Simons determined that Gwin was not being completely truthful and might have knowledge of who killed Payne. Id. at ¶28. The plaintiff objects, arguing that the polygraph results were unreliable and could not definitively prove that Gwin was lying about his knowledge of Payne's death. Id.

---

[1] The plaintiff objects to all these proposed facts about Gwin's statements as inadmissible hearsay statements contained in a police report. Id. at ¶¶21–25. But the court has determined that these statements are not hearsay because they are not being offered for the truth of the matter asserted but rather for the impact on the listener. See Woods v. City of Chicago, 234 F.3d 979, 986–87 (7th Cir. 2000) (a statement in a police report is not hearsay if it is offered "to show the effect that the statements had on the officers" who heard it). Gwin's statements memorialized in the police reports are not hearsay to the extent that they are being offered to explain why law enforcement's subsequent investigation proceeded the way it did.

4

Later that day, law enforcement reinterviewed Gwin. Id. at ¶29. During this interview, Gwin stated that he previously had seen Payne with two men he referred to as Sammie Joe and Chaunte. Id. at ¶30. He stated that he gave the three of them a ride in his car to a dope house. Id. at ¶31. Gwin said that when they arrived, Sammie Joe, Chaunte and Payne got out and walked away while Gwin waited in the car. Id. at ¶32. According to Gwin, about fifteen minutes later, Sammie Joe and Chaunte returned without Payne. Id. at ¶33. Gwin stated that when he asked where Payne was, Sammie Joe said that she had no money, so Chaunte cut her throat. Id. at ¶34. Gwin recounted that Chaunte also stated that he "did that bitch." Id. at ¶35. The plaintiff disputes the truth of these statements, arguing that law enforcement told Gwin what to say and that Gwin repeated the statements because he felt threatened and wanted to leave. Id. at ¶¶30–35.

D.    Police Interrogation of the Plaintiff

Police determined that the plaintiff was "Sammy Joe," Gwin's neighbor. Id. at ¶37. The plaintiff was born with cerebral palsy, which has impacted the left side of his body. Dkt. No. 139 at ¶45. Particularly, his left leg is shorter than his right leg and the left side of his body is weaker than the right side. Id. As a result, the plaintiff always has walked with a limp and has difficulty manipulating and holding things with his left hand. Id. The plaintiff also has had a seizure disorder since he was a child, for which he takes—and took—regular medication to control his seizures. Id. at ¶46. The plaintiff asserts that he also has significant "cognitive challenges" and was in special education all

5

his life due to difficulty with reading, writing and math. Id. at ¶47. The defendants object to this fact, stating that they have not had an independent expert examine the plaintiff's capabilities. Id.

On October 24, 1995, law enforcement took the plaintiff into custody in relation to Payne's murder. Dkt. No. 121 at ¶38. Several different detectives interviewed the plaintiff from October 24, 1995 through November 1, 1995. Id. at ¶39. The plaintiff eventually stated he and Chaunte Ott were involved in the murder, and that he saw Ott kill Payne. Id. at ¶40. The plaintiff alleges that this was a false statement, and that law enforcement coerced him into giving it. Id. at ¶41. The plaintiff asserts that law enforcement withheld his medication and food, threatened him with lengthy incarceration, fed him information about the crime to incorporate into his false statement and promised that he would receive a reduced sentence if his statement implicated Ott as the killer. Id.

The plaintiff states that the defendants were aware of his disabilities. When he was taken in for questioning, the plaintiff informed detectives Dubis and Percy Moore, as well as defendant Simons, that he had cerebral palsy and that his left side was weak. Dkt. No. 139 at ¶48. According to defendant Simons, he and defendant Buschmann had the plaintiff act out how he allegedly held Payne down, and they would have known from that that plaintiff had significant left-side weakness and a limp. Id. at ¶50. The parties dispute whether the defendants would have known about the plaintiff's need for his seizure medication. Id. at ¶51.

After the plaintiff gave his statement, defendant Simons administered a polygraph test to the plaintiff. Dkt. No. 121 at ¶42. Simons testified that he was worried about the plaintiff being able to complete the polygraph because of his disabilities, but administered one nonetheless. Dkt. No. 139 at ¶52. The defendants say that Simons determined that deception was indicated, causing Simons and Buschmann to reinterview the plaintiff, at which point the plaintiff added details to his prior statement. Dkt. No. 121 at ¶43. The plaintiff disputes this, stating that the polygraph results were recorded incorrectly and in fact confirmed that he was not involved in Payne's death. Id. The plaintiff argues that it was Simons and Buschmann who added details to the plaintiff's fabricated statement after the polygraph test. Id.

E.      The Conviction of Chaunte Ott and the Plaintiff

Ott eventually was prosecuted for Payne's murder. Id. at ¶44. Gwin and the plaintiff testified at trial as to Ott's guilt. Id. at ¶45. Neither witness stated that Ott raped Payne, though the plaintiff testified that Ott groped Payne after he searched her and found no money. Id. at ¶46. The jury found Ott guilty and on March 20, 1996, he was sentenced to life in prison. Id. at ¶47. Gwin died afterward, around 1997. Id. at ¶50. The plaintiff pled guilty to attempted robbery. Id. at ¶48. Mark Williams was the prosecutor in his case. Id. at ¶51. The plaintiff was sentenced to five years in prison on October 29, 1996 and was released from prison around August 1999. Id. at ¶¶48–49.

### F.  Post-Conviction DNA Results

In 2003, DNA collected from Payne matched DNA collected from the homicide of Joyce Mims. Id. at ¶52. In 2007, DNA collected from Payne matched DNA collected from the homicide of Outherean Stokes. Id. at ¶53. Eventually that DNA was matched to a man named Walter Ellis, who later was revealed to be a serial killer. Id. at ¶54.

### G.  The Eric Moore Report

In January 1996, detective Eric Moore wrote a report in which he recommended DNA testing in nineteen homicides (referred to by the parties as the "Moore Report"). Id. at ¶55. The Payne case was among them. Id. at ¶56. Regarding Payne's murder, the Moore Report recommended testing the plaintiff's and Ott's DNA against vaginal swabs taken from Payne, even though Ott and the plaintiff denied sexual contact with Payne. Id. at ¶57. Assistant District Attorneys Gahn and Mark Williams recommended this testing "due to time constraints created by the legislative goal of bringing homicide cases to trial within 90 days." Id. at ¶58. The evaluation of that DNA testing was "presently being monitored by Assistant District Attorneys GAHN and WILLIAMS." Id. at ¶59.

Elsewhere, the Moore Report recommended priority DNA testing "to determine if four relatively recent asphyxiation and/or suffocation Homicides were connected." Id. at ¶60. Payne's murder was not included among those four homicides. Id. at ¶61. But the plaintiff asserts that Moore thought there was a possibility that these four cases could be connected to Payne's murder. Id. At

8

the time of the Moore Report, police could not definitively link any of the homicides in the report. Id. at ¶62. The overall investigative strategy outlined in the Moore Report was developed by conferring with "Assistant District Attorney Norm GAHN, who ha[d] considerable expertise in the application of DNA evidence in criminal prosecutions." Id. at ¶63.

The Moore Report was addressed only to Captain Victor Vernon. Id. at ¶64. The plaintiff states that Moore widely distributed the report among the members of the homicide division beyond Captain Vernon. Id. The defendants contend that defendants DeValkenaere and Buschmann did not see the Moore Report prior to their depositions in Chaunte Ott's civil lawsuit. Id. at ¶65. The plaintiff disputes this, arguing that Moore testified in his deposition that he distributed copies of the report widely throughout the homicide division. Id.

H.     Interviews of Latonia Cooper

On at least two occasions, police interviewed Latonia Cooper as part of the Payne investigation. Id. at ¶66. Cooper had stayed in the drug and prostitution house where Payne and Morrison were prior to Payne's death. Id. at ¶67. Cooper's first memorialized interview was on August 31, 1995 with detective Gregory Schuler, who later was joined by detective Michael Young. Id. at ¶68. Cooper's second memorialized interview was on October 8, 1995, with defendant DeValkenaere and detective Ken Morrow. Id. at ¶69.

When deposed in Chaunte Ott's civil suit against the city of Milwaukee, Cooper recalled that officers brought her to the police station and showed her several photos, one of which was of Walter Ellis. Id. at ¶72. She could not

9

identify the officer who showed her the photo. Id. at ¶73. Cooper did not know Ellis's name or address at the time but recognized him as someone whom she believed had attempted to "get with" women who were on drugs. Id. at ¶74. Cooper testified that she told the interviewing officers that she believed that Ellis and a woman named Sandra Giles—whom Cooper knew as a "madam"— had something to do with Payne's death. Id. at ¶75.

Cooper was not asked whether she saw Payne and Ellis together, but she told police that Giles introduced Payne to Ellis. Id. at ¶76. Cooper stated that she never saw Ellis hurt Payne but also stated that Ellis was mean and had once assaulted her. Id. Cooper recalled seeing Ellis and several other people outside the house at which Payne and Morrison were staying when she left Payne there. Id. at ¶77. Cooper recalled that she saw Payne get into a yellow Cadillac with a group of men. Id. at ¶78. The parties dispute whether Ellis was among those men. Id. at ¶¶78–79.

Cooper did not know whether the officer who showed her Ellis's photo took notes of their discussion. Id. at ¶80. When deposed in this case, defendant DeValkenaere did not recall showing Cooper a photo of Ellis, and in fact did not have any recollection of interviewing Cooper. Id. at ¶81.

I.      Testimony of Teresa Jones

Teresa Jones is the deceased Richard Gwin's sister. Id. at ¶82. Jones testified that shortly after Gwin was released from police custody, he said to her that he "told them what they wanted to hear so I could go home." Id. at ¶83. The defendants state that Jones never went into detail with Gwin about

10

what he told the police. Id. at ¶84. The plaintiff argues that Jones testified about several things Gwin told her, including that police had told him the plaintiff was Chaunte Ott's cousin, that they wanted Gwin to say that he had seen Ott and the plaintiff together, that they threatened Gwin and that they coerced him into lying in order to be released from custody. Id. Jones testified that officers told Gwin that he would be a suspect if he did not cooperate and give the statement officers wanted him to give. Id. at ¶86. Gwin did not identify which officer or officers told him that. Id. at ¶87. The plaintiff states that the police reports reflect that the only detectives who interacted with Gwin were defendants DeValkenaere, Buschmann and Simons. Id.

J.     The Milwaukee Police Department's Policy on Memo Pads

During the Payne investigation, the Milwaukee Police Department had a policy of requiring officers to record in Memo Books "the names of persons taken into custody by them and such particulars in each case as may be important in the trial thereof . . . and matters of importance relative to the discharge of their official duties." Id. at ¶89 (quoting Dkt. No. 104-27 at 2). Sometimes defendants DeValkaneare and Buschmann recorded investigatory notes, such as interview notes, in steno pads instead of their Memo Books (which also were notepads). Id. at ¶90. Those steno pads later would be destroyed. Id. at ¶91. The defendants assert that the notes in the steno pads would be copied to police reports before the steno pads were destroyed. Id. at ¶92. The plaintiff disputes this, arguing that DeValkaneare testified that he

11

took notes during the Payne investigation and during Cooper's interview which are not reflected in any written report. Id.

Buschmann testified that he did not receive training from the police department regarding his obligations to disclose exculpatory information. Id. at ¶93. The defendant states that Diane Rowe, who was a Milwaukee Police Department officer at the time of the Payne investigation, testified that she knew that such disclosure was part of the Department's policy. Id. at ¶94. The plaintiff argues that Rowe's testimony is irrelevant because she never was in the Detective Bureau and so cannot testify as to what the practice was in that department. Id. During the Payne investigation, the Milwaukee Chief of Police was Philip Arreola. Id. at ¶95. Arthur Jones was chief from 1996 to 2003, and Nannette Hegerty was chief from 2003 to 2007. Id. at ¶¶96–97.

K.    Vacated Convictions and Plaintiff's Claims

The plaintiff's and Ott's convictions later were vacated (Ott's in 2007 and the plaintiff's in 2019). Id. at ¶98. In this case, the plaintiff brings eight claims against the defendants. Count I alleges that the individual defendants conspired to force the plaintiff into giving a coerced and false confession in violation of 42 U.S.C. §1983. Dkt. No. 1 at ¶¶77–82. Count II alleges that the individual defendants deprived the plaintiff of his due process right to a fair trial by withholding exculpatory evidence in violation of §1983. Id. at ¶¶83–88. Count III alleges that the plaintiff was subject to a malicious prosecution in violation of §1983. Id. at ¶¶89–94. Count IV alleges that the defendants unlawfully detained the plaintiff prior to trial in violation of §1983. Id. at ¶¶95–

12

99. Count V alleges that the individual defendants conspired to deprive the plaintiff of his constitutional rights in violation of §1983. Id. at ¶¶100–105. Count VI alleges that the defendants failed to intervene to prevent the violation of the plaintiff's constitutional rights in violation of §1983. Id. at ¶¶106–110. Count VII alleges that the city of Milwaukee failed to adequately train, supervise and discipline officers who engaged in the alleged constitutional violations in violation of §1983 and Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978). Id. at ¶¶111–115. Count VIII asserts a state law claim for indemnification against the city for any judgment entered against the individual defendant officers. Id. at ¶¶116–119.

## II.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its

13

motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Id. (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. See Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003) (citing Liberty Lobby, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." Fitzgerald v. Santoro, 707 F.3d 725, 730 (7th Cir. 2013) (quoting Harper v. C.R. Eng., Inc., 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in her favor." Fitzgerald, 707 F.3d at 730 (quoting Makowski v. SmithAmundsen LLC, 662 F.3d 818, 822 (7th Cir. 2011)).

## III. Parties' Arguments

### A. Defendants' Brief (Dkt. No. 103)

The defendants moved for summary judgment on all claims, arguing that the plaintiff either lacks evidence to prove his claims or cannot overcome the defense of qualified immunity. Dkt. No. 103 at 6. The defendants assert that the plaintiff fails to establish his claim that the individual defendants withheld any exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). Id. at 14. They maintain that there is no evidence that the individual

14

defendants were aware of Latonia Cooper's statements identifying Walter Ellis as someone who may have been involved in Payne's murder. Id. at 15. They contend that Cooper made these statements to detectives other than the defendants and that there is no evidence those detectives ever made notes about this interview or passed this information to the individual defendants. Id. at 16. The defendants argue that the individual defendants had no obligation to disclose exculpatory information of which they were not aware. Id. They say that even if they were aware of Cooper's statements, those statements were too vague and speculative to support a Brady claim. Id. at 16–17.

The defendants argue that the Moore Report cannot be the basis for a Brady claim. Id. at 17. They contend that there is no evidence that the individual defendants were aware of the Moore Report prior to litigation. Id. at 18. They assert that the prosecutor was aware of the Moore Report because he had conferred with Moore about the DNA analysis recommended in the report. Id. The defendants argue that the officers' duty under Brady is to share exculpatory information with the prosecutor; they assert that because the prosecutor already was aware of the substance of the report, there was no Brady violation for the individual defendants' failure to independently share the report with the prosecutor. Id. at 18–19. They also contend that the Moore Report was not material enough to have reasonably changed the outcome of the plaintiff's plea because it does not suggest that the plaintiff was innocent or that Ellis murdered Payne. Id. at 19.

15

The defendants argue that there can be no <u>Brady</u> claim based on the individual defendants' alleged withholding of statements made by Gwin's sister, Teresa Jones. <u>Id.</u> They assert that Gwin did not tell Jones any details about who coerced him into giving a false statement or any details about how he was coerced. <u>Id.</u> at 20. The defendants contend that in Ott's civil case, the court determined that these purported statements did not contain any exculpatory evidence that the individual defendants failed to disclose. <u>Id.</u> (citing <u>Ott v. City of Milwaukee</u>, 48 F. Supp. 3d 1197, 1207 (E.D. Wis. 2014)).

Alternatively, the defendants argue that they are entitled to summary judgment on this claim because of qualified immunity. <u>Id.</u> They contend that in November 1996, when the plaintiff pled guilty, it was unclear whether <u>Brady</u> applied to plea bargains. <u>Id.</u> The defendants assert that in 2014, the Sixth Circuit determined that the law governing this issue still was unsettled. <u>Id.</u> at 20–21 (citing <u>Robertson v. Lucas</u>, 753 F.3d 606 (6th Cir. 2014)). They contend that in 2003 the Seventh Circuit stated that it had yet to address whether the Due Process Clause requires <u>Brady</u> disclosures outside the context of a trial. <u>Id.</u> at 21 (quoting <u>McCann v. Mangialardi</u>, 337 F.3d 782, 787 (7th Cir. 2003)). The defendants say that because the law in this area still was unsettled years after the plaintiff's 1996 plea, the defendants are entitled to qualified immunity. <u>Id.</u> at 22.

The defendants next argue that qualified immunity protects them from liability on the plaintiff's coerced confession claim. <u>Id.</u> They maintain that at the time of the plaintiff's sentencing in 1996, the Supreme Court had stated

16

that the right against self-incrimination is only a trial right and that it did not hold that the right applied to sentencing hearings until 1999. Id. (citing U.S. v. Verdugo-Urquidez, 494 U.S. 259, 264 (1990); Mitchell v. U.S., 526 U.S. 314, 320–21 (1999)). The defendants concede that although now it is settled that the Fifth Amendment applies to plea bargains, the law was not so developed in 1996 when the plaintiff pled guilty and was sentenced. Id. at 23. The defendants argue that because the law was not clearly established at that time, they are entitled to qualified immunity on this claim. Id.

The defendants argue that to the extent that the plaintiff's due process claim is based on allegedly fabricated evidence rather than on a Brady violation, it still cannot succeed. Id. They contend that a coerced confession cannot be the basis for a due process violation because the coerced testimony may be true or false; they assert that the evidence must be completely fabricated to form the basis of a due process violation. Id. at 23–24 (citing Petty v. City of Chicago, 754 F.3d 416, 422 (7th Cir. 2014)). They maintain that because the plaintiff claims his confession was coerced—not fabricated—he cannot base a due process claim on that confession. Id. at 24.

The defendants argue that they are entitled to summary judgment on the plaintiff's malicious prosecution and pretrial detention claims because probable cause existed for his prosecution and detention. Id. They assert that the plaintiff has no proof that the individual defendants coerced Gwin into falsely implicating the plaintiff and that Gwin's statements alone provided probable cause to detain and prosecute the plaintiff. Id. at 25 (citing Smith v. City of

17

Chicago, 913 F.2d 469 (7th Cir. 1990); Phillips v. Allen, 668 F.3d 912, 915 (7th Cir. 2012)).

Finally, the defendants argue that the plaintiff has failed to establish a Monell claim against the City of Milwaukee. Id. at 26. They say that the plaintiff has presented no evidence that there was a widespread practice of officers destroying handwritten notes without first copying them to official memo books. Id. at 26–27. The defendants assert that even if the plaintiff could show that officers recorded Cooper's statements about Ellis on a separate steno pad and then destroyed those notes, that single incident does not prove there was a widespread unconstitutional practice under Monell. Id. at 27. They argue that even if there was a widespread practice, the plaintiff has failed to show that the police chief at the time knew about the practice. Id. at 28. According to the defendants, even if the plaintiff had established this practice and had established that the police chief knew about it, the plaintiff cannot show that notes memorializing Cooper's comments ever existed, so there is no evidence that the practice was the moving force behind any Brady violation. Id. at 28.

The defendants argue that there is no evidence that the city failed to adequately train its officers about their Brady obligations in general. Id. Although they concede that Buschmann did not recall receiving formal training on his Brady obligations, the defendants argue that he may have learned those obligations outside of formal training. Id. at 29. They assert that Diane Rowe, another officer during the relevant period, stated that the police department's policy was to make exculpatory evidence available. Id. They contend that

18

Buschmann's failure to receive training, if proven, cannot be extrapolated to apply to all other officers as required to establish a widespread failure to train claim. Id. The defendants argue that even if the plaintiff could establish a widespread failure to train of which the chief of police was aware, because the plaintiff has not established a Brady violation, the failure to train could not be the moving force behind any violation of the plaintiff's rights. Id.

B. Plaintiff's Response (Dkt. No. 123)

The plaintiff responds that the defendants misstate the standard for qualified immunity. Dkt. No. 123 at 24. He argues that the issue is whether the defendants' conduct violated clearly established law at the time of the violation, not whether there was an established legal remedy for the violation. Id. at 24–25. He says that it was clearly established in 1995 that law enforcement could not coerce a defendant into giving an involuntary statement. Id. at 26. He cites several cases that he argues establish that the tactics law enforcement used to coerce his confession—lengthy detention, withholding food or medication and feeding the defendant information for his statement—clearly were unlawful in 1995. Id. at 26–27.

The plaintiff also argues that the tactics used to coerce his confession "shock[] the conscience," in violation of the Fourteenth Amendment. Id. at 28. He asserts that he had severe intellectual and physical limitations that made him particularly vulnerable, and that law enforcement exploited those limitations to coerce a false confession. Id. He contends that other courts have found interrogations have shocked the conscience "where there were threats,

19

physical violence, deception, feeding information, and a lengthy and relentless interrogation." Id. at 29 (collecting cases).

The plaintiff argues next that his due process claim can proceed under either a theory that the defendants fabricated evidence or a theory that they withheld exculpatory evidence in violation of Brady. Id. at 30 (citing Goudy v. Cummings, 922 F.3d 834, 838 (7th Cir. 2019)). The plaintiff asserts that the court need not decide under which theory he must proceed at this stage, only whether there is any due process violation ripe for trial. Id. According to the plaintiff, a jury could find that the defendants knowingly fabricated three pieces of evidence: Gwin's false statement, the plaintiff's false statement and Simons's false polygraph test result. Id. He argues that both he and Chaunte Ott have been declared innocent of Payne's murder, so the inculpatory statements by Gwin and the plaintiff clearly are false. Id. at 31–32. He contends that the similarities between Gwin's and the plaintiff's statements suggest that they both were fed the same false information by law enforcement. Id. at 32. The plaintiff also asserts that coercion itself can be evidence of fabrication. Id. at 33. He maintains that the same is true for his own false confession. Id. at 34. He contends that the defendants coerced him into giving the false statement while feeding him specific facts to include in the statement, which he argues establishes a fabrication theory of liability. Id. at 34–35.

Turning to the polygraph report, the plaintiff argues that the circumstances surrounding the polygraph testing show that it was intentionally fabricated. Id. at 36–37. He contends that the method of

20

polygraphing defendant Simons used has "no scientific basis" and that the results could be "easily manipulated." Id. at 37. He asserts that Simons reported that the plaintiff was lying when the results showed he was being truthful. Id. The plaintiff says that after recording this incorrect result, Simons threatened the plaintiff into making additional false statements. Id. The plaintiff argues that Simons both knowingly fabricated the polygraph result and assisted in fabricating the plaintiff's false statement. Id. at 38.

Turning to the Brady claim, the plaintiff contends that it is well-established that Brady requires officers to turn over exculpatory evidence pre-plea bargaining. Id. at 38–39. He says that Cooper's statement clearly was exculpatory because it implicated Ellis as a suspect rather than the plaintiff. Id. at 40. The plaintiff argues that there is an ample basis to conclude that the defendants knew about Cooper's statements because the record suggests that defendant DeValkenaere was present when Cooper made them, or at least that he would have heard the information from the other detectives assigned to the case. Id. at 41. He also asserts that in Chaunte Ott's civil case, the court determined that DeValkenaere and/or defendant Buschmann were aware of Cooper's exculpatory statements. Id. (quoting Ott, 48 F. Supp. 3d at 1208). The plaintiff maintains that Cooper's statements were material because they provided an alternative explanation for Payne's death other than the plaintiff's fabricated statement. Id. at 42–43.

The plaintiff clarifies that he is not pursuing a Brady claim based on the Moore Report but asserts that the defendants improperly withheld information

that they coerced Gwin into giving a false statement. Id. at 43. He argues that the defendants' failure to disclose that they fabricated this statement is a Brady violation. Id. He asserts that unlike in the Ott case, in this case Jones testified that Gwin told her that the statement was false. Id. at 44. He contends that together, Cooper's statement about Ellis and the fabrication of Gwin's statement establish materiality for the purposes of a Brady claim. Id. The plaintiff states that he may not have pled guilty had he been aware of these facts. Id.

The plaintiff argues that the defendants are not entitled to qualified immunity because it was clearly established prior to 1995 that officers could not withhold exculpatory evidence. Id. at 44–45 (collecting cases). He asserts that it was clearly established that this obligation to disclose exculpatory evidence applied prior to trial, though it was only later that the Supreme Court clarified that *impeachment* evidence was not subject to the same disclosure obligations pre-plea. Id. at 45–46. He maintains that in Ott, the court determined that withholding Cooper's statement about Ellis could form the basis of a Brady violation, so granting immunity to the defendants in this case just because the plaintiff did not go to trial (when Ott did) would not serve the purposes underlying qualified immunity. Id. at 47.

The plaintiff argues that there was no probable cause for his detention and prosecution because Gwin's and the plaintiff's statements were fabricated by the defendants. Id. at 48. He asserts that fabricated evidence cannot be used to "manufacture" probable cause. Id. at 48–49. He also contends that the

22

defendants waived any other argument against this claim because they did not raise it in their opening brief. Id. at 48.

The plaintiff argues that there are material facts in dispute as to whether the City of Milwaukee provided training to its officers on their Brady obligations, precluding summary judgment. Id. at 49. He asserts that the city provided no standard training to its officers on their Brady obligations prior to 1996. Id. at 50. According to the plaintiff, the city identified only two training sessions on the topic of creating and retaining police reports and notes during an investigation, both after 1996 and neither focusing specifically on officers' constitutional obligations. Id. The plaintiff contends that a Monell claim can survive summary judgment based on a single instance of failure-to-train resulting in a constitutional violation. Id. at 51–52. He says that Rowe's testimony on the city's policies creates a factual dispute at most because other officers testified differently. Id. at 53–54. He also argues that even if there were a policy in place to comply with Brady, the lack of training on the policy still can form the basis of a Monell claim. Id. at 54. The plaintiff maintains that the need for training on Brady obligations was obvious, and that the city's failure to do so shows deliberate indifference. Id. at 54–55. The plaintiff argues that because he has established a viable Brady claim, he is entitled to have a jury decide whether the city's deficient policy was the moving force behind the violation. Id. at 55–56.

## C.    Defendants' Reply (Dkt. No. 138)

The defendants reply that the court may grant summary judgment on part of a claim, meaning that the plaintiff is not allowed to proceed on all theories of liability just because he has established a due process issue for trial. Dkt. No. 138 at 2. In any event, the defendants argue that the plaintiff has not established a Brady claim because the plaintiff bases his argument that the defendants knew about Cooper's statements on pure speculation. Id. at 3. They contend that §1983 liability attaches only if a defendant was personally involved in the violation. Id. They maintain that the plaintiff's assertion that detectives shared information generally is too vague to establish personal involvement. Id. at 3–4. The defendants argue that Cooper did not present facts actually implicating Ellis and only speculated that he might be involved in Payne's death because he was a bad man. Id. at 4–5. They say that this is too vague to establish Brady materiality. Id. at 5.

The defendants also argue that there is no evidence that the individual defendants were the ones who allegedly coerced Gwin into giving a false statement, and because Gwin has passed away, there can be no further discovery on the issue. Id. at 6. The defendants contend that the plaintiff cannot establish with certainty that Gwin's statement was fabricated. Id. at 7. The defendants assert that the plaintiff's polygraph results never were used as evidence against him, so they cannot be the basis for a fabrication of evidence claim. Id. at 9. They argue that the factual foundation for the plaintiff's plea

24

was the plaintiff's confession, not Gwin's confession or the polygraph test. <u>Id.</u> at 10.

The defendants also assert that the plaintiff has abandoned his claim regarding the city's note-taking policy and thus can pursue only his claim based on the lack of <u>Brady</u> training. <u>Id.</u> The defendants reiterate their argument that the plaintiff has not established an underlying <u>Brady</u> violation based on Cooper's statements, meaning that there necessarily cannot be a <u>Monell</u> claim based on the city's alleged failure to provide <u>Brady</u> training. <u>Id.</u> at 11.

The defendants reiterate that they are entitled to qualified immunity on the plaintiff's coerced confession claim because the scope of the right at issue was not clearly established in 1995. <u>Id.</u> at 13. They argue that plaintiff's cases do not establish that the issue of whether the Fifth Amendment applies prior to trial was clearly established prior to 1995 and that the cases the plaintiff cites all involve confessions used at trial. <u>Id.</u> at 14. The defendants assert that because the plaintiff's confession was not used at trial, they are entitled to qualified immunity because the scope of the Fifth Amendment prior to trial was not yet clearly established. <u>Id.</u>

The defendants also contend they are entitled to qualified immunity on the plaintiff's <u>Brady</u> claims. <u>Id.</u> They argue that the plaintiff's own cases establish that the Seventh Circuit had not yet decided <u>Brady</u>'s applicability to plea deals in 1996. <u>Id.</u> They maintain that there was uncertainty in the law in

25

this area until at least the 2000s, justifying their claim of qualified immunity. Id. at 14–15.

## IV. Analysis

### A. Coerced and False Confession

Section 1983 allows a person to sue anyone who, "under color of" state law, deprives that person of his constitutional rights. "To prevail on a § 1983 claim, the plaintiff must prove 'that: (1) he was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was visited upon him by a person or persons acting under color of state law.'" Bohanon v. City of Indianapolis, 46 F.4th 669, 675 (7th Cir. 2022) (quoting Buchanan-Moore v. C'nty of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The Fifth Amendment establishes a constitutional right against self-incrimination, stating that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. A plaintiff can bring a §1983 claim under the Fifth Amendment "when a suspect's unlawfully obtained inculpatory statement is used against him in a criminal case." Johnson v. Winstead, 900 F.3d 428, 434 (7th Cir. 2018) (citing Chavez v. Martinez, 538 U.S. 760, 767 (2003)).

The defendants do not challenge the merits of the plaintiff's false confession claim; they argue only that they are entitled to qualified immunity. "Qualified immunity shields a government official from suit when the official is performing a discretionary function and his conduct does not violate clearly established rights of which a reasonable person would have known." Sutterfield

26

v. City of Milwaukee, 751 F.3d 542, 572 (7th Cir. 2014). "To be 'clearly established,' a constitutional right 'must have a sufficiently clear foundation in then-existing precedent.'" Campbell v. Kallas, 936 F.3d 536, 545 (7th Cir. 2019) (quoting District of Columbia v. Wesby, 583 U.S. 48, 63 (2018)). "Qualified immunity applies unless the specific contours of the right 'were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" Id. (quoting Plumhoff v. Rickard, 572 U.S. 765, 778–79 (2014)). Clearly established law "cannot be framed at a 'high level of generality.'" Id. (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)).

> Whether qualified immunity applies turns on two questions: First, whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right; and second, whether the federal right at issue was clearly stablished at the time of the violation. *Tolan v. Cotton*, 572 U.S. 650, 655-56 . . . (2014) (per curiam). These questions may be addressed in either order. *Jones [v. Clark]*, 630 F.3d [677,] at 682 [7th Cir. 2011] (citing *Pearson v. Callahan*, 555 U.S. 223, 236-43 . . . (2009)). "If *either* inquiry is answered in the negative, the defendant official is protected by qualified immunity." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (citation and internal quotation marks omitted).

Smith v. Finkley, 10 F.4th 725, 737 (7th Cir. 2021).

"The question of a defendant's qualified immunity is a question of law for the court, not a jury question." Id. at 734 (quoting Warlick v. Cross, 969 F.2d 303, 305 (7th Cir. 1992)). The court need not determine whether facts make out a constitutional violation if the conduct at issue did not violate clearly established law at the time of the alleged violation. See Pearson v. Callahan, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding

27

which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."). Because the defendants focus their argument on whether the law was clearly established at the time of the plaintiff's confession, the court will address that issue first.

The defendants argue that it was not clearly established in 1996 that the Fifth Amendment right against self-incrimination applied prior to trial. The plaintiff focuses on the tactics used to obtain the false confession, arguing that the defendants' behavior during the plaintiff's interrogation was clearly established as unlawful in 1996. Though neither party cited it, the Seventh Circuit's decision in Gill v. City of Milwaukee, 850 F.3d 335 (7th Cir. 2017), reveals that the defendants are entitled to qualified immunity.

In Gill, officers arrested and interrogated the plaintiff for several days in 2013 until he confessed to being the perpetrator of a deadly shooting. Id. at 338. The officers' interrogation tactics included "social isolation, confrontation, theme development, and minimization" as well as making false statements to the plaintiff that he had been identified as the shooter by an eyewitness and that the plaintiff had failed his polygraph test. Id. at 339. The plaintiff filed a motion to suppress his confession, arguing that it was involuntary based on the officers' coercive tactics and his "intellectual disability." Id. The court granted the motion to suppress, and the criminal charges were dismissed shortly afterward. Id. The plaintiff then brought a §1983 claim against the officers, asserting that the detectives had coerced his confession in violation of

28

the Fifth and Fourteenth Amendments. <u>Id.</u> at 340. He argued that the defendants were not entitled to qualified immunity because the right to be free from coercive interrogation tactics was well-established in 2013. <u>Id.</u> The Seventh Circuit rejected this argument:

> Whether interrogation tactics are unconstitutionally coercive is an inquiry that depends on the specific facts and circumstances present in a particular case. Indeed, our cases have highlighted that "[t]here is no clear-cut analysis to determine what constitutes 'conscience–shocking' conduct . . . ." *Fox [v. Hayes]*, 600 F.3d [819,] at 841 [(7th Cir. 2010)]; *see also Cairel v. Alderden*, 821 F.3d 823, 833 (7th Cir. 2016) ("Determining what constitutes such behavior can be difficult. . . ."). This is true even where the officers have knowledge of a witness's cognitive impairment. *Cairel*, 821 F.3d at 833–34. The right "to be free from coercive interrogation" is highly generalized. Therefore, it cannot be the basis for defeating a qualified immunity defense, unless there is closely analogous precedent that is "particularized" to the facts of the instant case. *See White [v. Pauly]*, 137 S.Ct. [548,] at 552 [(2017)].
>
> "When looking at closely analogous cases to determine if a right was clearly established at the time of violation, we look first to controlling precedent on the issue from the Supreme Court and to precedent from this Circuit." *Estate of Escobedo v. Bender*, 600 F.3d 770, 781 (7th Cir. 2010). Gill has not cited, and we have not identified, any precedent from the Supreme Court or this Circuit that puts the unconstitutionality of the officers' conduct here "beyond debate." *See Mullenix [v. Luna]*, 136 S.Ct. [305,] at 308 [(2015)].

<u>Id.</u> at 341. The Seventh Circuit considered two Eighth Circuit cases Gill cited and determined that they did not show a "clear trend" indicating that the Seventh Circuit inevitably would have recognized the right as clearly established. <u>Id.</u> (citing <u>Livers v. Schenck</u>, 700 F.3d 340 (8th Cir. 2012); <u>Wilson v. Lawrence County</u>, 260 F.3d 946 (8th Cir. 2001)). Notably, those two Eighth Circuit cases were from 2012 and 2001—both years after the 1996 interrogation in this case. The Seventh Circuit held that because the plaintiff's

29

right to be free from the interrogation tactics used to elicit his false confession was not clearly established in 2013, the officers were entitled to qualified immunity. Id.

The facts in Gill are similar to those here, and this court is bound to follow Gill. The officers in Gill used the same tactics—isolation, lengthy detention, false statements—to which the plaintiff here objects. Both the plaintiff in Gill and the plaintiff here suffered from cognitive impairments that they argue made them uniquely vulnerable to coercive tactics. If it was not clearly established in 2013 that the coercive tactics used in Gill violated the Constitution, it could not have been clearly established in 1996 that those same tactics violated the Constitution. The court must grant summary judgment for the defendants on the plaintiff's false confession claim because of qualified immunity.

    B.    Due Process

The plaintiff's due process claim has two components: (1) a Brady claim based on the defendants' alleged withholding of Cooper's statements and facts about the alleged coercion of Gwin's statement and (2) a fabrication-of-evidence claim based on Gwin's false statement, the plaintiff's false statement and the false polygraph test result. The defendants assert that they are entitled to qualified immunity for the Brady claim, but have not raised this defense for the fabrication of evidence claim. The court will analyze the Brady claim first.

    1.    *Brady Claim*

In Brady, the Supreme Court held that "the suppression by the

prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963). This places a duty on "the prosecutor [to] turn over to the defense all potentially exculpatory evidence." Harris v. Kuba, 486 F.3d 1010, 1014 (7th Cir. 2007). "That obligation extends to police officers, insofar as they must turn over potentially exculpatory evidence when they turn over investigative files to the prosecution." Id. "To prevail on a civil Brady-based due process claim against a police officer, a plaintiff must demonstrate that the evidence in question was favorable to him, that the police 'suppressed' the favorable evidence, and prejudice ensued because the suppressed evidence was material." Anderson v. City of Rockford, 932 F.3d 494, 504 (7th Cir. 2019).

Again, Gill is instructive. In Gill, the plaintiff brought a Brady claim based on the officers' failure to disclose witness statements that allegedly corroborated the initial account of the shooting the plaintiff had made prior to his false confession. Gill, 850 F.3d at 343. The Seventh Circuit stated that it had "consistently held that Brady does not require the disclosure of favorable evidence prior to trial." Id. (citing Armstrong v. Daily, 786 F.3d 529, 552 (7th Cir. 2015); United States v. Grintjes, 237 F.3d 876, 880 (7th Cir. 2001)). "In failure to disclose cases. . . '[t]he critical question under *Brady* is whether the exculpatory evidence is disclosed in time for the defendant to make use of it.'" Id. (quoting Armstrong, 786 F.3d at 552). Because the plaintiff in Gill pled

31

guilty rather than proceeding to trial, the Seventh Circuit found that his <u>Brady</u> claim based on the officers' failure to disclose evidence must fail. <u>Id.</u>

Here, the plaintiff similarly raises a <u>Brady</u> claim based on the defendants' alleged failure to disclose Cooper's statement and the facts surrounding Gwin's statement. But the plaintiff accepted a plea bargain and did not go to trial. The court need not wade into the issue of whether the evidence was material or exculpatory because the duty to disclose it had not yet been triggered when the plaintiff pled guilty. <u>See</u> <u>Armstrong</u>, 786 F.3d at 552 ("The prosecution may fulfill its <u>Brady</u> obligation through disclosure in the time leading up to or sometimes even during trial.")).

The plaintiff's arguments do not compel a different result. The plaintiff cites several district court cases and two out-of-circuit cases in support of his argument that <u>Brady</u> applies pre-trial. All but one of those cases were decided prior to <u>Gill</u>, which reaffirmed the Seventh Circuit's position that <u>Brady</u> does not apply prior to trial. The one (unpublished) case the plaintiff cites that was decided after <u>Gill</u> states that the Seventh Circuit had not addressed this issue directly and relied primarily on other district court cases and out-of-circuit cases to determine that <u>Brady</u> applies prior to trial. <u>See</u> <u>Powell v. City of Chicago</u>, Case No. 17-CV-5156, 2018 WL 1211576, at *6–7 (N.D. Ill. Mar. 8, 2018). This court is bound to follow the Seventh Circuit's holding in <u>Gill</u>, not the reasoning of other circuits or district courts.

Additionally, although the district court in Ott's civil case denied summary judgment on Ott's <u>Brady</u> claim based on the same evidence (see <u>Ott</u>,

48 F. Supp. 3d at 1208–09), that same result is not compelled here because Ott went to trial and the plaintiff didn't. Gill stands for the proposition that withholding exculpatory evidence does not trigger a Brady violation until the accused proceeds to trial. Because the plaintiff here never went to trial, his Brady claim cannot succeed. The court will grant summary judgment for the defendants on the plaintiff's Brady claim.

### 2. Fabrication-of-Evidence Claim

The defendants appear to concede that the plaintiff has stated a fabrication-of-evidence claim based on his own false confession. See Dkt. No. 138 at 7 ("Plaintiff's fabrication of evidence argument about his own confession is well taken.") But the defendants contend that Gwin's false statement and the false polygraph test result cannot form the basis for a fabrication-of-evidence claim.

"[A] police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way." Whitlock v. Brueggemann, 682 F.3d 567, 580 (7th Cir. 2012). The Seventh Circuit draws a distinction between fabricated evidence and coercion, reasoning that "coercively interrogating witnesses, paying witnesses for testimony, and witness-shopping may be deplorable, and these tactics may contribute to wrongful convictions, but . . . unlike falsified evidence and perjured testimony, [coerced testimony] may turn out to be true." Petty v. Chicago, 754 F.3d 416, 422 (7th Cir. 2014) (internal brackets and quotation marks omitted). "[A] claim that an officer coerced a

33

witness to give incriminating evidence does not, at least standing alone, violate the wrongly convicted person's due-process rights" because the coerced testimony may in fact be true. <u>Avery v. City of Milwaukee</u>, 847 F.3d 433, 439 (7th Cir. 2017). But "convictions premised on deliberately falsified evidence will always violate the defendant's right to due process. What's relevant is not the label on the claim, but whether the officers 'created evidence that they knew to be false.'" <u>Id.</u> (quoting <u>Petty</u>, 754 F.3d at 423).

On this claim, there are disputed issues of material fact precluding summary judgment, at least as to the plaintiff's false confession. The plaintiff presents evidence suggesting that the defendants knew his confession was false. Not only does the plaintiff assert that officers fed him information to include in his statement (including facts about Payne's murder and details from Gwin's statement), but he presents evidence that his cerebral palsy made the left side of his body "extremely weak," so that physically he could not hold down Payne the way he stated he did in the confession. Viewing these facts in the light most favorable to the plaintiff, a reasonable jury could find that the defendants knew that the plaintiff's confession was false and manufactured that confession to use against him. Both parties agree that the factual foundation for the plaintiff's guilty plea was his false confession, so the false evidence was used to deprive the plaintiff of his liberty via the plea deal.

Gwin's statement and the polygraph evidence, on the other hand, cannot form the basis of an evidence fabrication claim because they never were used against the plaintiff. Although officers may have used Gwin's statement to

assist in fabricating the plaintiff's false confession, the factual foundation for the plaintiff's plea was not based on Gwin's statement. Similarly, the polygraph evidence did not contribute to the factual foundation of the plaintiff's plea, and as the defendants state, Illinois already prohibited the use of polygraph results as evidence against criminal defendants. See, *e.g.*, People v. Baynes, 88 Ill.2d 225 (1981); People v. Triplett, 37 Ill.2d 234 (1967). The plaintiff cannot proceed with a fabrication-of-evidence claim based on Gwin's statement or the polygraph results, but the court will deny the defendants' motion for summary judgment on the plaintiff's due process claim as it relates to the fabrication of his confession.

### 3. *Qualified Immunity*

The defendants have asserted qualified immunity as a defense only to the plaintiff's Brady claim. Because the court is granting summary judgment for the defendants on the merits of the plaintiff's Brady claim, the court need not address the qualified immunity defense. Even if the plaintiff had stated a Brady claim, the defendants would be protected by qualified immunity because it was not clearly established at the time of the plaintiff's guilty plea whether Brady disclosures were required prior to trial. In McCann v. Mangialardi, 337 F.3d 782 (7th Cir. 2003), the Seventh Circuit stated that it "ha[d] yet to address, however, whether the Due Process Clause requires [Brady] disclosures outside the context of a trial." Id. at 787. The Seventh Circuit then stated in dicta that

> [t]he Supreme Court's decision in *[United States v.] Ruiz,* [536 U.S. 622 (2002)] strongly suggests that a *Brady*-type disclosure might be required under the circumstances of this particular case. In holding that the Due Process Clause does not require the government to

35

> disclose impeachment information prior to the entry of a criminal defendant's guilty plea, the Court in *Ruiz* reasoned that it was "particularly difficult to characterize impeachment information *as critical information of which the defendant must always be aware prior to pleading guilty ....*" 536 U.S. at 630 . . . (emphasis added) . . . Thus, *Ruiz* indicates a significant distinction between impeachment information and exculpatory evidence of actual innocence. Given this distinction, it is highly likely that the Supreme Court would find a violation of the Due Process Clause if prosecutors or other relevant government actors have knowledge of a criminal defendant's factual innocence but fail to disclose such information to a defendant before he enters into a guilty plea.

Id. at 787–88. The court went on to say that it need not resolve this question and decided the Brady issue on different grounds. Id. at 788. The Seventh Circuit's later decision in Gill implies that the court now would resolve the issue differently, because it held that Brady disclosures are not required prior to trial. Gill, 850 F.3d at 343.

If the applicability of Brady to plea bargaining was not yet clearly established in 2003 when the court decided McCann, it necessarily was not clearly established in 1996 when the plaintiff pled guilty. Accordingly, the defendants are protected by qualified immunity even if the plaintiff had stated a Brady claim.

C.      Malicious Prosecution and Unlawful Pre-Trial Detention

The defendants contend that the plaintiff's claims for malicious prosecution and unlawful pre-trial detention must fail because there was probable cause to detain and prosecute the plaintiff for Payne's murder. The plaintiff responds that the defendants "manufactured" probable cause via the plaintiff's and Gwin's false statements.

36

A claim for "pretrial detention based on fabricated evidence sounds in the Fourth Amendment right to be free from seizure without probable cause." Patrick v. City of Chicago, 974 F.3d 824, 834 (7th Cir. 2020) (citing Lewis v. City of Chicago, 914 F.3d 472, 476–78 (7th Cir. 2019)). "Although the Seventh Circuit 'has not provided elements for a Fourth Amendment unlawful pretrial detention claim,' '[t]he consensus among district courts' is that a plaintiff must show that the defendants (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in the plaintiff's favor." Ree v. City of Chicago, Case No. 22 CV 4284, 2023 WL 3123761, at *3 (N.D. Ill. Apr. 27, 2023) (quoting Bahena v. Kennedy, Case No. 17 CV 8532, 2021 WL 8153974, at *6 (N.D. Ill. Oct. 25, 2021)). The existence of probable cause is an "absolute defense" to this claim. See Norris v. Serrato, 761 F. App'x. 612, 615 (7th Cir. 2019) ("probable cause is an absolute defense to claims under section 1983 against police officers for an allegedly unreasonable seizure, whether a false arrest or a wrongful pretrial detention").

Similarly, the Supreme Court recognizes "a Fourth Amendment claim under § 1983 for malicious prosecution." Thompson v. Clark, 596 U.S. 36, 42, 44 (2022). "The claim arises if a criminal prosecution (1) was instituted without probable cause; (2) for a 'malicious' motive—a purpose other than bringing the defendant to justice; and (3) 'ended without a conviction.'" Evans v. Matson, Case No. 23-2954, 2024 WL 2206638, at *2 (7th Cir. May 16, 2024) (quoting Thompson, 596 U.S. at 44, 49).

37

"Probable cause to arrest exists if the totality of the circumstances known to the officer at the time of the arrest would warrant a reasonable person in believing that the arrestee had committed, was committing, or was about to commit a crime." Gutierrez v. Kermon, 722 F.3d 1003, 1008 (7th Cir. 2013). "The officers' subjective intentions are irrelevant so long as there was probable cause to detain him for any crime." United States v. Brown, 973 F.3d 667, 706 (7th Cir. 2020). "What matters, and all that matters, is whether the facts known to the arresting officers at the time they acted supported probable cause to arrest." White v. Hefel, 875 F.3d 350, 357 (7th Cir. 2017). The defendants did not challenge these claims on any grounds other than probable cause, so the court will address only that element.

The plaintiff asserts that it was a combination of Gwin's false statement and the plaintiff's false confession that led to the plaintiff's unlawful detention and prosecution. The court already has determined that there is a genuine dispute of material fact as to whether the defendants knowingly fabricated the plaintiff's confession. If the defendants knew that the plaintiff's confession was false, the confession cannot establish probable cause to detain or prosecute the plaintiff. See Alexander v. United States, 721 F.3d 418, 423 (7th Cir. 2013) ("Knowingly false statements by the affiant cannot support a finding of probable cause"). Accordingly, the court cannot grant summary judgment on these claims because a reasonable jury could find that there was no probable cause to detain or prosecute the plaintiff. The court will deny the defendants' motion as to Counts III and IV of the complaint.

38

D.    *Monell* Claim

A municipality cannot be held vicariously liable under §1983 based on an individual officer's liability. Monell, 436 U.S. at 691. Instead, a plaintiff may sue a municipality directly under §1983 only if "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by that body's officers." Id. at 690. The plaintiff must show that he "(1) suffered a deprivation of a federal right; (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority for the City; which (3) was the proximate cause of his injury." King v. Kramer, 763 F.3d 635, 649 (7th Cir. 2014) (quoting Ienco v. City of Chicago, 286 F.3d 994, 998 (7th Cir. 2002)).

The plaintiff pursues a Monell claim based only on a purported Brady violation. The court determined above that the plaintiff has not established a Brady violation. That means the plaintiff's Monell claim fails at the first prong of the analysis; he has not established that he suffered a deprivation of a federal right. The court will grant summary judgment for the defendants on the plaintiff's Monell claim.

E.    Conspiracy, Failure to Intervene and Indemnification Claims

The defendants provide no argument as to why the court should grant summary judgment on the plaintiff's conspiracy-to-deprive-constitutional-rights claim, his failure to intervene claim or his indemnification claim. The plaintiff does not mention either of these claims in his brief. Because the court

39

is granting summary judgment for the defendants on the plaintiff's coerced confession and <u>Brady</u> claims, the corresponding claims for conspiracy and failure to intervene based on that conduct necessarily must fail. <u>See</u> <u>Gill</u>, 850 F.3d at 342 (affirming grant of summary judgment on conspiracy and failure to intervene claims where the court granted qualified immunity to officers on the underlying constitutional violations). But because the defendant has provided no grounds to dismiss these claims as to the plaintiff's due process claim based on the fabrication of evidence, his malicious prosecution claim or his unlawful pre-trial detention claim, the court will allow these claims to proceed because they relate to the plaintiff's surviving underlying claims.

In summary, the court grants the defendants' motion for summary judgment as to Counts I (coerced and false confession) and VII (<u>Monell</u>) in their entirety, and Count II to the extent it is predicated on a <u>Brady</u> violation. The court denies the defendants' motion as to Counts II (due process based on the fabrication of the plaintiff's confession), III (malicious prosecution), IV (unlawful pre-trial detention), V (conspiracy), VI (failure to intervene) and VIII (indemnification).

## V.    Conclusion

The court **GRANTS IN PART** and **DENIES IN PART** the defendants' motion for summary judgment. Dkt. No. 102.

The court **ORDERS** that Counts I and VII of the complaint are **DISMISSED WITH PREJUDICE**.

40

The court realizes that the summary judgment motion has been fully briefed since May 2024. The plaintiff since has filed a motion asking the court to set a trial date, dkt. no. 142 (which the court denied because it had not yet decided the summary judgment motion, dkt. no. 143), and a motion for a status hearing, dkt. no. 144. The delay in ruling on the summary judgment motion lies squarely with the court, and it apologizes to the parties for that delay.

Now that the court has decided the summary judgment motion, the court **GRANTS** the plaintiff's motion for a status hearing, dkt. no. 144, and **ORDERS** that the parties must appear for a telephonic status conference on **August 24, 2026 at 10:30 AM**. The parties are to appear by calling the court's conference line at 551-285-1373 and entering Meeting ID 161 4901 8989 and Passcode 190021 when prompted. The parties should be prepared to address scheduling at the hearing.

Dated in Milwaukee, Wisconsin this 22nd day of July, 2026.

BY THE COURT:

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**

41